**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---------------------------------------------------------- x

In re:                                                                        :   Chapter 11
                                                                              :
MLCJR LLC, *et al.*,[1]                                          :   Case No. 23-90324 (CML)
                                                                              :
                            Debtors.                             :   (Joint Administration Requested)
                                                                              :   (Emergency Hearing Requested)

---------------------------------------------------------- x

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY
OF AN ORDER (A) AUTHORIZING THE PAYMENT OF CERTAIN
(I) ESSENTIAL VENDOR OBLIGATIONS, (II) MARKETING EXPENSES,
AND (III) OUTSTANDING ORDERS, AND (B) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than 4:00 p.m. (prevailing Central Time) on May 16, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on May 16, 2023 at 4:00 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***")

respectfully state the following in support of this emergency motion (this "***Motion***"):

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: MLCJR LLC (0875); Cox Oil Offshore, L.L.C. (7047); Cox Operating, L.L.C. (0939); Energy XXI GOM, LLC (0027); Energy XXI Gulf Coast, LLC (8595); EPL Oil & Gas, LLC (9562); and M21K, LLC (3978). The Debtors' address is 4514 Cole Ave, Suite 1175, Dallas, Texas 75205.

**RELIEF REQUESTED**

1.      By this Motion, the Debtors request entry of an order (the "***Proposed Order***") substantially in the form attached hereto:

a)      authorizing the Debtors to pay in the ordinary course of business certain undisputed, liquidated, prepetition amounts owing on account of (i) Essential Vendor Claims, (ii) Marketing Expenses, and (iii) Outstanding Orders; and

b)      granting related relief.

2.      The Debtors, by and through their undersigned counsel, respectfully represent:

**JURISDICTION AND VENUE**

3.      The United States Bankruptcy Court for the Southern District of Texas (this "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  The Debtors confirm their consent to entry of a final order by this Court.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 363, and 503(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Local Rules***"), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "***Complex Case Procedures***").

**BACKGROUND**

5.      On the date hereof (the "***Petition Date***"), the Debtors (together with their non-debtor affiliates, collectively, the "***Company***") filed voluntary petitions in this Court commencing cases for relief under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***").  The factual background regarding the Debtors, including their business operations, their capital and debt

US-DOCS\138448713

structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Ryan Omohundro, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* (the "***First Day Declaration***"),[2] which is filed with this Court concurrently herewith and is fully incorporated herein by reference.

6.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have been appointed.

7.      Simultaneously with the filing of this Motion, the Debtors have filed a motion with this Court pursuant to Bankruptcy Rule 1015(b) seeking joint administration of the Chapter 11 Cases.

## BASIS FOR RELIEF

8.      The following table summarizes the types of claims that the Debtors request authority to pay pursuant to this Motion, as well as estimated prepetition amounts outstanding in each category and the amounts which the Debtors seek authorization to pay:

*($ in millions)*

| Category | Est. Amount Outstanding as of the Petition Date | Authority Sought to Pay |
|---|---|---|
| Est. Liens (Federal/State) | $87.8 | $36.0 |
| Est. 503(b)(9) | 4.7 | 3.0 |
| Other Operating Expenses | 86.2 | 1.0 |
| **Total Operating Expenses** | **$178.8** | **$40.0** |
| *% of Operating Expenses* | | *22%* |
| | | |
| Marketing Expenses | $6.7 | $6.7 |
| **Total Oil & Gas Obligations** | **$185.5** | **$46.7** |

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

US-DOCS\138448713

The Debtors seek authority to pay a portion of the accrued and outstanding amounts due pursuant to the prepetition Oil and Gas Obligations (as defined herein) and to continue to honor the Oil and Gas Obligations in the ordinary course of business on a postpetition basis.

**A.      Operating Expenses**

9.      As operators of the majority of their Oil and Gas Leases (as defined below), in the ordinary course of business, the Debtors incur certain obligations to suppliers of goods and services (the "*Vendors*") relating to lease operating and capital expenses (the "*Operating Expenses*").  The Operating Expenses include amounts incurred with respect to the purchase of certain supplies used at the Debtors' facilities as well as services essential to the Debtors' operations.

10.      In the twelve months preceding the Petition Date, the Debtors incurred approximately $414 million in Operating Expenses.  As of the Petition Date, the Debtors estimate that they have approximately $179 million of Operating Expenses outstanding, including past-due amounts (of which approximately $17 million is reimbursable by owners of non-operating working interests).

11.      In light of the Milestones described and defined in the First Day Declaration and the DIP Order (as defined below), the Debtors have, with the assistance of their advisors, identified a select subset of vendor activities essential to the continued, safe, and responsible daily operation of the Debtors' Oil and Gas Leases (the "*Essential Vendor Activities*").  In the Debtors' business judgment, any interruption of the Essential Vendor Activities would significantly diminish the Debtors' ability to achieve their goals in the Chapter 11 Cases.  In particular, interruption of the Essential Vendor Activities would significantly reduce the Debtors' probability of successful achievement of their proposed asset sales and/or chapter 11 plan of reorganization, thus impairing value obtained through the Chapter 11 Cases and diminishing recoveries for all stakeholders.

US-DOCS\138448713

12.     Because of the amount of accrued and unpaid Vendor obligations due as of the Petition Date, the Debtors believe that a failure to pay at least a portion of the prepetition amount due with respect to the Essential Vendor Activities (the "***Essential Vendor Obligations***") would likely result in the cessation of Essential Vendor Activities.  Any interruption in Essential Vendor Activities could result in an inability of the Debtors to continue with safe and responsible operation of their Oil and Gas Leases.  Due to the specialized nature of the goods and services related to the Essential Vendor Activities, the lack of availability or existence of practical alternate suppliers (*e.g.*, limited dock and heliport access), and the remote location of the Debtors' Oil and Gas Leases, Vendors related to Essential Vendor Activities are difficult, if not impossible, to replace. Moreover, the goods and services provided with respect to the Essential Vendor Activities are essential to maintaining the safety of the Debtors' facilities and workforce as well as to protecting the environment.  To the extent that Essential Vendor Activities are interrupted (even temporarily), the Debtors' ability to continue operations, much less achieve their goals in the Chapter 11 Cases could be severely diminished.  A summary of the Essential Vendor Activities follows:

a. **Transportation and Dock Services ("*Transportation Vendors*")**.  The Transportation Vendors provide, among other things, (i) boats, helicopters, and trucking used in the transportation of offshore crews, materials, and equipment between the shore and the Debtors' remote offshore assets as well as prompt emergency response, (ii) dock and heliport access used in the staging of personnel and storage of tools and equipment utilized in offshore operations, and (iii) fuel and lubricants consumed both in the operation of boats and helicopters as well as offshore compressors and generators.  Because of the specialized nature of, and geographic constraints with respect to, the Transportation Vendors, they would be difficult, if not impossible, to replace.  Moreover, the specialized services they provide are essential to the safe and responsible operation of the Debtors' infrastructure.  By way of example, timely crew changes and effective emergency response given the Debtors' remote offshore locations are impractical or impossible by boat.

b. **Third-Party Labor Providers ("*Labor Vendors*")**.  In the ordinary course of business, the Debtors rely on the services of select third-party laborers for the day-to-day operation of the Debtors' assets as well as the routine repair and maintenance of the Debtors' infrastructure.  The Debtors' relationship with the Labor Vendors

5

is longstanding and, as such, the Labor Vendors have significant familiarity with the Debtors' assets, infrastructure, current and planned projects, and daily routines. Continued uninterrupted use of the Labor Vendors will allow the Debtors to transition into Chapter 11 without meaningful interruption to continued operations.

c. **Specialized Materials, Equipment, and Supplies ("*Specialty Vendors*")**. In the ordinary course of business, the Debtors use the services of select providers of specialized materials and equipment in the maintenance, repair and operations of the Debtors' assets. These Specialty Vendors often fabricate and repair (onside or onshore) the Debtors' equipment and infrastructure such as pumps, gauges, valves and cranes and other essential equipment. Moreover, the Specialty Vendors often furnish the Debtors with specialized tools for purchase or rent in the daily operation or repair of infrastructure. These Specialty Vendors have deep familiarity with the Debtors and their operations and maintain supplies and personnel specific to the Debtors' particular needs and demands. Finally, given the age of the Debtors' assets, the Specialty Vendors are not only deeply familiar with the assets but are often sole source suppliers to the Debtors of original equipment manufacturer (OEM) replacement parts. Due to the specificity of the Debtors' needs, replacement of the Specialty Vendors would be costly, difficult, and, in some instances, impossible during the pendency of the Chapter 11 Cases.

d. **Offshore Compression and Generation Providers ("*C&G Vendors*")**. The Debtors' operation of their offshore oil and gas assets requires the use of gas compressors for activities such as gas lift, injection, transportation, and separation. In addition, safe and consistent daily offshore operations require electricity obtained from offshore generators. Some of the Debtor's compressors and generators are owned, while others are rented. Because of age and sustained use, the owned equipment is the subject of continuous repair and maintenance, which is essential to uninterrupted and safe operations. Continuous operation of rented equipment is equally integral to the continuation of the Debtors' business. Moreover, the C&G Vendors have deep familiarity with the Debtors' owned and rented equipment and maintain a supply of replacement parts and mechanics ready to service such equipment as needed. Accordingly, loss or any sustained interruption of services from the C&G Vendors would be significantly detrimental to the Debtors' ability to continue business in the ordinary course.

e. **Regulatory and Compliance Related Vendors ("*Compliance Vendors*")**. In the ordinary course of business, the Debtors employ the services of a select group of Compliance Vendors to maintain compliance with certain regulatory requirements. The Compliance Vendors are responsible for, among other things: (i) conducting inspections and certifications of the Debtors' facilities and equipment; (ii) creating and maintaining emergency, spill response, and similar protocols; (iii) writing reports for regulatory agencies; (iv) conducting sampling, metering, and measurement; (v) developing personnel screening and training programs for both onshore and offshore personnel; and (vi) providing supplies such as personal protective equipment, workwear, monitors, and other tools which allow the Debtors' personnel to execute their duties safely. The work of the Compliance

6

Vendors is bespoke to the assets, operations, and history of the Debtors and therefore they cannot be replaced without significant cost, delay, and potential interruption to the Debtors' operations.  Particularly in light of the strict guidelines governing the Debtors' industry, failure to maintain the uninterrupted service of the Compliance Vendors may result in the Debtors' inability to operate their assets.

13.     As illustrated in the table in paragraph 8 above, the Debtors estimate that nearly all Vendors owed the Essential Vendor Obligations may be entitled to assert (or may have already asserted) liens pursuant to applicable state and federal law (such claims, the "***Statutory Lien Claims***").  In particular, to the extent the Vendors of Essential Vendor Activities provide offshore goods or services, they may be able to assert materialman and workman liens on or against the Debtors' assets, including, but not limited to, the Debtors' interests in the Oil and Gas Leases and production proceeds.[3]  Moreover, pursuant to section 363(e) of the Bankruptcy Code, such parties, as bailees, may potentially be entitled to adequate protection in the form of a possessory lien.  As a result, these Vendors may refuse to deliver or release the Debtors' inventory or other goods and materials currently in their possession before their claims have been satisfied, resulting in disruption to the Debtors' operations and significant diminishment of the Debtors' ability to achieve their goals in the Chapter 11 Cases.

14.     Furthermore, due to the specialized and remote nature of the Debtors' operations, some Vendors of Essential Vendor Activities are the sole source of their goods and services or are among a small number of such suppliers in the geographic regions in which the Debtors operate.

---

[3]     See by reference the Louisiana Oil Well Lien Act ("***LOWLA***"), which allows contractors, laborers, logistics and transportation providers, sellers of movables and consumables, and lessors of movables, among others, to assert and enforce liens (*i.e.*, Privileges) against the Debtors' operating interests, assets, and proceeds.  La. Stat. Ann. § 9:4862 (2018).  Other states in which the Debtors operate, including Texas and Mississippi, provide similar protection to parties that render services and provide materials to oil and natural gas companies.  *See, e.g.*, Tex. Prop. Code Ann. § 56.002 (granting "mineral contractor" and "mineral subcontractor" status for select "mineral activities[.]"); *see also* Miss. Code Ann. § 85-7-131 (granting liens to secure "labor, material and services rendered . . . in the drilling, completion, recompletion, reworking or other operations of the oil and gas well.").

US-DOCS\138448713

If not paid, these Vendors may refrain from supplying goods and services, halting the Debtors' day-to-day operations.  Moreover, certain Vendors of Essential Vendor Activities rely upon the Debtors for the continued operation of their own businesses.  Without the Debtors' payments, such Vendors could be forced to curtail or cease operations, further jeopardizing the Debtors' ability to achieve an optimal outcome in the Chapter 11 Cases.  Accordingly, it is imperative that the Debtors maintain positive relationships with the Vendors providing Essential Vendor Activities and that the Debtors be allowed to pay certain Essential Vendor Obligations in the ordinary course so as to avoid the potential disruption to operations.

15.     Finally, as further illustrated in the table in paragraph 8 above, the Debtors estimate that a subset of the Essential Vendor Obligations may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code for goods delivered to the Debtors within the 20 days prior to the Petition Date (the "*503(b)(9) Claims*").[4]  To the extent that the Debtors obtain supplies from such Vendors on an order-by-order basis, rather than through enforceable long-term contracts, these providers of Essential Vendor Activities may (a) refuse to supply new orders without payment of their prepetition claims, (b) reduce the Debtors' existing trade credit, or (c) demand payment in cash on delivery—which would further strain the Debtors' limited liquidity.  Moreover, the Debtors do not seek to accelerate or modify existing payment terms with respect to the 503(b)(9) Claims and, in light of their priority status, the relief sought with respect to 503(b)(9) Claims is a matter of timing rather than payment priority.

16.     As such, the Debtors request authorization, but not direction, to pay up to $40 million of Essential Vendor Obligations, including 503(b)(9) Claims (the "*Essential Vendor*

---

[4]     The Debtors do not concede that any claims described in this Motion are conclusively entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code, and the Debtors expressly reserve the right to contest the extent or validity of all such claims.

US-DOCS\138448713

*Obligation Cap*") either immediately or, to the extent such claims are not yet due and payable, in the ordinary course of business on a postpetition basis.

**B.     Customary Trade Terms**

17.     Subject to the Court's approval, the Debtors intend to pay Essential Vendor Obligations using the amounts requested in this Motion only to the extent necessary to preserve their businesses and only to the extent that Vendors receiving such payments agree to continue providing goods and services on trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date or, if more favorable, that existed within the one hundred eighty (180) day period prior to the Petition Date ("*Customary Trade Terms*").  The Debtors reserve the right to require, at their discretion, that the Customary Trade Terms condition to payment be made in writing.  The Debtors further seek authority to require more favorable trade terms from any Vendor receiving such payment as a condition to payment of any prepetition claim. Prior to finalizing any proposed agreement to pay an Essential Vendor Obligation, the Debtors and their Advisors, in consultation with the DIP Lenders (as defined in the DIP Order), will evaluate all available information and make a final determination regarding (a) whether payment of such Essential Vendor Obligation is in fact essential to the achievement of the specific goals contemplated in the Chapter 11 Cases, (b) whether such Vendor is otherwise subject to an existing agreement by which the Debtors could compel continued performance on prepetition terms; and (c) whether replacement costs (including, among others, pricing, delay, transition expenses, and professional fees) exceed the amount of the prepetition claim of such Vendor.

18.     The Debtors request that if any party accepts payment of a prepetition claim pursuant to the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then:  (a) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim and therefore immediately recoverable by

9

the Debtors in cash upon written request; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoff, claims, provision for payment of reclamation or trust fund claims, or otherwise.

**C.      Production and Marketing Expenses**

19.      As described more fully in the First Day Declaration, the Debtors' operations are focused on the acquisition, development, exploitation, and production of hydrocarbons from oil and natural gas properties.  As of the date hereof, the Debtors own interests in approximately 400 oil, gas, and mineral leases ("***Oil and Gas Leases***"), a substantial number of which are granted by the Bureau of Ocean Energy Management.

20.      To effectively market and sell production from oil and gas properties operated by the Debtors, the Debtors enter into contractual arrangements pursuant to which third parties charge for services necessary or desirable either for gathering, processing, and transporting produced hydrocarbons or for marketing the oil and natural gas downstream (respectively, the "***Midstream Program***" and the "***Marketing Program***", and collectively, the "***Marketing Arrangements***").  The Midstream Program and the Marketing Program are each described more fully below.

21.      Pursuant to the Marketing Arrangements, the Debtors incur certain obligations (the "***Marketing Expenses***", and together with the Essential Vendor Obligations, the "***Oil and Gas Obligations***") to their various contractual counterparties.  In addition, in instances where the Debtors own Non-Operating Working Interests, the Debtors may receive their production "in-kind" and incur Marketing Expenses on account thereof, rather than requesting that the third-party

US-DOCS\138448713

operator market the production associated with the Debtors' Non-Operating Working Interests on the Debtors' behalf.

22.     The Debtors' compliance with the Marketing Arrangements and timely payment of the Marketing Expenses is critical to the Debtors' ability to receive revenue from production that they market both on behalf of themselves and third parties (the "***Marketed Production***").  Failure to receive such revenue would not only devastate the Debtors' own business, it would also directly threaten the Debtors' ability to make timely payments to third parties holding an interest in production, such as working interest owners and royalty interest owners.[5]

### 1.   The Midstream Program

23.     As part of the Midstream Program, the Debtors rely on a number of midstream partners (the "***Midstream Counterparties***") to transport produced hydrocarbons and process them into products that can be marketed, including through gathering, transportation, treating, dehydration, compression, processing, fractionation, and other similar services necessary or desirable for marketing the oil and natural gas downstream.  All of these steps are essential to the success of the Debtors' operations, as a delay or stoppage at any point in this chain can bring the Debtors' entire business to a halt.

24.     The Debtors' Midstream Program is subcategorized as (a) managed by CIMA Energy, LP ("***CIMA***") and (b) managed by the Debtors.  Under the Midstream Program, the Debtors contract with Midstream Counterparties to move the raw product up the value chain and ultimately to the market.  CIMA provides an integrated host of services to the Debtors, manages the transportation of the Debtors' production through the Midstream Program, and pays the

---

[5]   For additional detail regarding payments to royalty interest owners and working interest owners, see the *Debtors' Emergency Motion for Entry of an Order (A) Authorizing Payment of Mineral Obligations and (B) Granting Related Relief* (the "***Mineral Obligations Motion***"), filed contemporaneously herewith.

US-DOCS\138448713

majority of the Midstream Counterparties on behalf of the Debtors by netting such costs out of the Debtors' revenue. Given that a majority of the Debtors' midstream partners are paid directly by CIMA on the Debtors' behalf, it is essential for CIMA to have the authority to continue netting the accrued and unpaid pre-petition midstream costs against revenue from Marketed Production.

25. The Debtors also have agreements with Midstream Counterparties whereby the Debtors pay such partners directly for midstream services. It is critical for the Debtors to pay these Midstream Counterparties in full promptly as any delay in the direct payments could lead to the stoppage of service and further loss of goodwill. This is particularly so in light of the fact that, in many cases, there are no alternative midstream providers to move the Debtors' production to market. Accordingly, if these Midstream Counterparties cease providing services to the Debtors, then it will be prohibitively difficult to resume operations given the Debtors' already precarious financial condition.

### 2. The Marketing Program

26. The Debtors rely on their marketing partner (the "***Marketing Counterparty***") to handle the wholesale distribution of Marketed Production to purchasers. The Marketing Counterparty builds relationships with customers and enters into contracts that generate revenue for the Debtors' business. The Debtors market their production through CIMA.

27. CIMA has the right and duty to market all of the Marketed Production, other than those portions of the Debtors' production nominated to BP Energy Company and BP Products North America Inc. (collectively, "***BP***") pursuant to separate agreements with BP. CIMA is paid a fee in exchange for its services. Particularly in light of its handling all of the Debtors' marketing needs and, in turn, ensuring that the Debtors' production is monetized, CIMA is crucial to the Debtors' ability to continue their business. Without CIMA as a Marketing Counterparty, the Debtors would have to search on their own for wholesale distribution opportunities on a large scale

12

and at a competitive price.  Any delay in paying CIMA its marketing fee could lead to a pause in marketing, which would effectively suspend the Debtors' ability to generate revenue.  As of the Petition Date, the Debtors have accrued approximately $200,000 in marketing fees owed to CIMA.

28.     As described above, the Marketing Counterparty commonly has possession and, at times, title to the Marketed Production.  Accordingly, as with the Essential Vendor Obligations, failure to pay Marketing Expenses when due could result in such counterparty refusing to release production or revenue associated with the Marketed Production in its possession or refusing to accept delivery of additional Marketed Production.  In instances where delivery of Marketed Production is refused, the Debtors may be forced to "shut-in" a well.  Shutting in a well may have economic consequences to the Debtors beyond temporary cessation of production and revenue therefrom.  For instance, once a well is shut in, it may not be possible to reestablish production from the well.  Further, the act of shutting in a well can trigger obligations to other interest owners in that well, including payment obligations or potential forfeiture of the Debtors' interest under the terms of an Oil and Gas Lease.  Accordingly, without seamless compliance with their Marketing Arrangements, the Debtors' revenue stream and ability to operate their business could be severely impaired.

29.     In the twelve months preceding the Petition Date, the Debtors incurred approximately $39,200,000 in Marketing Expenses in the aggregate.  As of the Petition Date, the Debtors estimate that they have approximately $6,700,000 of prepetition Marketing Expenses outstanding, approximately $4,300,000 of which will come due and payable within the first 21 days of the Chapter 11 Cases.  To preserve and protect their relationships with the Marketing Counterparty, the Debtors request authorization to continue to have Marketing Expenses paid in the ordinary course, including by netting such expenses against the proceeds of Marketed

13

Production, and to pay any accrued and unpaid prepetition Marketing Expenses in the ordinary course of business on a postpetition basis.

**D.      Payment of Outstanding Orders**

30.      Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "*Outstanding Orders*").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders, and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

**APPLICABLE AUTHORITY**

**A.      The Debtors Should Be Authorized to Pay the Oil and Gas Obligations**

**1.      Payment of the Oil and Gas Obligations Is a Sound Exercise of the Debtors' Business Judgment Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code**

31.      Section 363 of the Bankruptcy Code provides authority for the Debtors to pay the Oil and Gas Obligations as and when they come due.  Specifically, section 363(b) provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  "In such circumstances, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling,

14

or leasing the property outside the ordinary course of business." *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) (internal quotations omitted); *see also In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."). "The business judgment standard in section 363 is flexible and encourages discretion." *ASARCO*, 650 F.3d at 601; *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

32.     Courts authorize payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to pay certain prepetition claims).

33.     Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations when necessary to protect and preserve the debtor's estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (stating that in certain situations, a debtor's fiduciary duty to maximize estate value for all parties can only be satisfied through the payment of a prepetition claim).

34.     Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity." The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can

US-DOCS\138448713

exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity").

35.     The doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment.").

36.     Due to the nature of the Debtors' business, health, safety, and environmental concerns are of the utmost importance. Further, any interruption to delivery of the goods and services underpinning the Oil and Gas Obligations risks long-term damage to the Debtors' business, rather than a mere pause. The goods and services provided by the claimholders holding Oil and Gas Obligations are critical to the safety and economic operation of the Debtors' assets. To ensure that the Debtors are able to continue to maintain the safety and operational standards crucial to the Debtors' operations, it is imperative that the Debtors have the authority to pay all such claimants. The Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.

US-DOCS\138448713

### 2. Failure to Pay the Oil and Gas Obligations Would Threaten the Debtors' Ability to Operate and Subject the Debtors' Assets to the Perfection of Liens

37.     Certain holders of Oil and Gas Obligations may be entitled under applicable non-bankruptcy law to assert certain possessory or statutory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[6]  As a result, the holders of Oil and Gas Obligations may be able to perfect liens on, among other things, the Debtors' wells, the production and proceeds therefrom, the Debtors' working interests (which are real property rights), and fixtures and equipment associated on the oil and gas properties.  *See, e.g.*, La. Stat. Ann. §§ 9:4861–9:4873 (2018).  The Debtors anticipate that such claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.  Even absent a valid lien, to the extent creditors have possession of the Debtors' inventory, equipment, or products, mere possession or retention could disrupt the Debtors' operations.  Any of these outcomes could jeopardize the Debtors' revenues and their relationships with non-operating working interest owners.

38.     Conversely, paying such claims should not impair unsecured creditor recoveries in the Chapter 11 Cases.  Where the amount owed on an Oil and Gas Obligation is less than the value of the goods that could be held to secure such claim, the holder may be a fully secured creditor of the Debtors' estates.  In such instances, payment now only provides the holder with what they

---

[6]     *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").

might be entitled to receive under a chapter 11 plan, without any interest costs that might otherwise accrue during the Chapter 11 Cases. Conversely, all creditors will benefit from the seamless transition into and continuation of the Debtors' operations in bankruptcy. Accordingly, payment of the Oil and Gas Obligations is necessary to protect the Debtors' business and ensure that the Debtors are able to maximize the value of their estates during the Chapter 11 Cases.[7]

**B.      This Court Should Authorize the Payment of Claims Entitled to Priority Pursuant to Section 503(b)(9) of the Bankruptcy Code**

39.      Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within twenty days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." These claims must be paid in full for the Debtors to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A). Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan. Additionally, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy.

40.      The Bankruptcy Code does not prohibit a debtor from paying such claims prior to confirmation. As administrative claims incurred in the ordinary course of business, the Debtors believe they may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code. *See, e.g.*, *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21-23 ("I think arguably the debtor could pay its 503(b)(9) claimants without court approval.") (Hon. Kevin J. Carey). The timing of such payments also lies squarely within this Court's discretion. *See In re Glob. Home Prods., LLC*, No. 06-10340

---

7      Moreover, to the extent any holder of Oil and Gas Obligations has a valid secured claim, the Debtors may be required to pay such claimant in full to confirm a plan of reorganization. *See* 11 U.S.C. § 1129.

18

(KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").

41.     The Debtors' ongoing ability to obtain goods as provided herein is key to their survival and necessary to preserve the value of their estates. Absent payment of the 503(b)(9) Claims at the outset of the Chapter 11 Cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to the equipment and goods necessary to maintain the Debtors' business operations. Failure to honor these claims in the ordinary course of business may also cause the Debtors' vendor base to withhold support for the Debtors during this chapter 11 process. Such vendors could accelerate or eliminate favorable trade terms. Needless to say, such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.

**C.      This Court Should Confirm That Outstanding Orders Are Administrative Expense Priority Claims and That Payment of Such Claims Is Authorized**

42.     Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are in fact administrative expense priority claims because they benefit the estate postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses). Thus, the granting of the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not prejudice any other party in interest.

43.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of

19

such administrative priority.  The attendant disruption to the continuous and timely flow of critical raw materials and other goods to the Debtors would force the Debtors to potentially halt operations and production, disrupt the Debtors' business, and lead to a loss of revenue, all to the detriment of the Debtors and their creditors.  This Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize the Debtors to pay the Outstanding Orders in the ordinary course of business.

**D.      Cause Exists to Authorize Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

44.      The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, anticipated access to cash collateral, and proceeds from the DIP Facility (as defined below).  Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to an authorized payment in respect of the relief requested herein.  Checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently.  The Debtors request that this Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**DIP ORDER AND DIP DOCUMENTS CONTROL**

45.      Contemporaneously, the Debtors are seeking approval of interim and final orders, which provide for, among other things, the Debtors' entry into a postpetition financing facility (the "***DIP Facility***") and the use of cash collateral (any order entered by the Court approving the Debtors' entry into such postpetition financing facility and/or the use of cash collateral, the "***DIP Order***", and the definitive documentation for such facility, the "***DIP Documents***").  The DIP Order and the DIP Documents contain terms that limit and otherwise apply to the Debtors' ability to

20

utilize certain of the relief requested herein.  For the avoidance of doubt, the relief described and requested herein and/or granted by any order issued pursuant hereto is subject in all respects to the terms of the DIP Order and the DIP Documents.

## EMERGENCY CONSIDERATION

46.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one (21) days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and the success of the Chapter 11 Cases. As discussed in detail above and in the First Day Declaration, immediate and irreparable harm would result if the relief requested herein were not granted.  The Debtors believe that without such relief, certain of the afore-described vendors and service providers may be permitted to assert liens against the Debtors' property, which could block the Debtors' access to such property and severely damage the Debtors' ability to operate their businesses for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied both (a) the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and (b) the requirements of Local Rule 9013-1(i) and, therefore, respectfully request that this Court approve the relief requested in this Motion on an emergency basis.

## BANKRUPTCY RULE 6004 SHOULD BE WAIVED

47.     To the extent that any aspect of the relief sought herein constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h). As described above, the relief that the Debtors request in this Motion is immediately necessary in order for the Debtors to be able to continue to operate their businesses and preserve

21

the value of their estates. The Debtors respectfully request that this Court waive the notice requirements imposed by Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**RESERVATION OF RIGHTS**

48. Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against any Debtor or the existence of any lien against the Debtors' properties; (b) a waiver of the Debtors' rights to dispute any claim or lien on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim would constitute an allowed claim; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; or (f) a limitation on the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to the Proposed Orders once entered. Nothing contained in such order shall be deemed to increase, decrease, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

**NOTICE**

49. Notice of this Motion will be given to: (a) the Office of the United States Trustee for the Southern District of Texas (the "*U.S. Trustee*"); (b) the parties included on the Debtors' consolidated list of the holders of the thirty (30) largest unsecured claims against the Debtors; (c) Haynes and Boone, LLP as counsel to BP; (d) Kelly Hart & Pitre and Underwood Law Firm, P.C., as counsel to Amarillo National Bank; (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Environmental Protection Agency and similar state regulatory and environmental agencies for states in which the Debtors conduct business; (i) the state attorneys

22

general for states in which the Debtors conduct business; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is required or needed under the circumstances.

50.     A copy of this Motion is available on (a) this Court's website, www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed Claims and Noticing Agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/MLCJR.

US-DOCS\138448713

The Debtors respectfully request that this Court enter the Proposed Order substantially in the form attached hereto, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Signed:  May 15, 2023
           Houston, Texas

/s/  Emily Meraia
Matthew D. Cavenaugh (TX Bar No. 24062656)
J. Scott Rose (TX Bar No. 172528000)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Emily F. Meraia (TX Bar No. 24129307)

**JACKSON WALKER LLP**
1401 McKinney St., Suite 1900
Houston, Texas 77010
Tel:    713-752-4200
Fax:   713-752-4221
Email:  srose@jw.com
            rchaikin@jw.com
            emeraia@jw.com

-and-

Keith A. Simon (*pro hac vice* admission pending)
Misha E. Ross (*pro hac vice* admission pending)
Christopher Beaucage (*pro hac vice* admission pending)
Alexandra M. Zablocki (*pro hac vice* admission pending)

**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Tel:    212-906-1200
Fax:   212-751-4864
Email:  keith.simon@lw.com
            misha.ross@lw.com
            christopher.beaucage@lw.com
            alexandra.zablocki@lw.com

*Proposed Counsel for the Debtors and Debtors in Possession*

## CERTIFICATE OF ACCURACY

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/  Emily Meraia*
Emily Meraia

## CERTIFICATE OF SERVICE

I certify that on May 15, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/  Emily Meraia*
Emily Meraia

US-DOCS\138448713