# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

------------------------------------------------------------ x

In re: : Chapter 11

:

MLCJR LLC, *et al.*,[1] : Case No. 23-90324 (CML)

:

Debtors. : (Joint Administration Requested)

:

------------------------------------------------------------ x

## DECLARATION OF RYAN OMOHUNDRO, CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Ryan Omohundro, declare under penalty of perjury that, if called to testify, I would testify competently to the facts set forth in this Declaration.

1. I am the Chief Restructuring Officer for the debtors (collectively, the "***Debtors***") in the above-captioned cases (collectively, the "***Chapter 11 Cases***"). I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.[2]

2. The Debtors and their non-Debtor affiliates (the "***Non-Debtor Affiliates***" and, collectively with the Debtors, the "***Company***") are an independently owned exploration and production company operating in the Gulf of Mexico. The Debtors are headquartered in Dallas, Texas, with operational and administrative staff in New Orleans and Houston and offshore operations in locations ranging from Texas to Alabama.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: MLCJR LLC (0875); Cox Oil Offshore, L.L.C. (7047); Cox Operating, L.L.C. (0939); Energy XXI GOM, LLC (0027); Energy XXI Gulf Coast, LLC (8595); EPL Oil & Gas, LLC (9562); and M21K, LLC (3978). The Debtors' address is 4514 Cole Ave, Suite 1175, Dallas, Texas 75205.

[2] As described more fully in paragraphs 64 through 65 below, on May 12, 2023, certain trade creditors filed an involuntary petition under chapter 7 of the Bankruptcy Code against Debtor Cox Operating, L.L.C. in the Eastern District of Louisiana. The Debtors intend to promptly file a motion to transfer venue to this Court, all as described more fully below.

US-DOCS\139827024

3. I am a Managing Director for Alvarez & Marsal North America, LLC ("*A&M*"), a restructuring advisory services firm with numerous offices throughout the United States. Through my employment with A&M, I began working with the Debtors in October 2022. I have held the position of Chief Restructuring Officer since April 4, 2023. My engagement with the Company, both personally and through working with employees of the Company and my oversight of representatives of A&M, includes: (a) evaluating the Debtors' cash-flow projections and identifying and implementing liquidity enhancing opportunities; (b) working with the Debtors and their advisors in evaluating and negotiating financing; (c) contingency planning; (d) assisting with electronic data collection; and (e) assisting the Debtors in their communications strategy with outside parties, including the Debtors' vendors.

4. In addition to the Debtors, I have advised numerous distressed energy companies in recent comparable chapter 11 reorganizations, such as Talen Energy Supply, Weatherford International, Superior Energy Services, FTS International, Arena Energy, Jones Energy, Hi-Crush Inc., Castex Energy 2005, and Parker Drilling Company, among others. I have been employed at A&M for over 16 years and have been a Managing Director since 2017. I received a bachelor's degree in business administration and a master's degree in professional accounting from the University of Texas at Austin, graduating with Highest Honors, and I am a Certified Public Accountant, Chartered Financial Analyst, Certified Insolvency & Restructuring Advisor, and Certified Fraud Examiner.

5. As a result of my role advising the Debtors, I am generally knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these Chapter 11 Cases. I have overseen (and continue to oversee) the services provided by A&M, as described above. Except as otherwise

2

US-DOCS\139827024

indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management, employees, and advisors, analysis prepared by the A&M team, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.

6. Any references to chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), the chapter 11 process, and related legal matters reflect my understanding of such matters based on the explanations and advice provided to me by counsel to the Debtors, as well as my long-standing experience in restructuring advisory services.

7. On the date hereof (the "***Petition Date***"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Court***").

8. I submit this Declaration to assist the Court and parties in interest in understanding the Debtors' businesses and background, the circumstances that led to the Debtors' chapter 11 filings, and the Debtors' goals in these Chapter 11 Cases. I also submit this Declaration in support of relief that the Debtors have requested in certain of the "first day" applications and motions filed with this Court (collectively, the "***First Day Pleadings***").

9. This Declaration is divided into four parts. **Part I** describes the Debtors' businesses and organizational structure, and their prepetition indebtedness. **Part II** describes the circumstances leading to the commencement of these Chapter 11 Cases. **Part III** describes the path forward that the Debtors have charted for these Chapter 11 Cases. Finally, **Part IV** summarizes the First Day Pleadings and explains why the relief requested therein is appropriate and necessary.

3

**PRELIMINARY STATEMENT**

10.     The Debtors are one of the most significant oil and gas exploration and production companies in the Gulf of Mexico (the "***GOM***").  Their portfolio of properties spans approximately 750,000 net acres, with a focus on shallow-water properties.  The Debtors engaged in multiple synergistic acquisitions of proven assets over the last seven years, with the most significant being the 2018 acquisition of Energy XXI's GOM shelf assets (the "***Energy XXI Assets***").  The Debtors acquired their other GOM assets through multiple other transactions.  Today, the Debtors have interests in approximately 750 producing wells, of which approximately 350 are shut-in or suspended, and a majority of which are operated by Debtor Cox Operating, L.L.C. ("***Cox Operating***") across more than 60 fields.

11.     Despite the Debtors' strategic growth plan and low risk inventory, they recently have suffered certain operational and financial challenges that have adversely affected their liquidity profile.  After experiencing recurring operational downtime throughout 2020 and 2021 as a result of adverse events outside of the Debtors' control, the business continued to face ongoing headwinds beginning in 2022.  Further details of these events are provided in Part II below.

12.     In response to these challenges, the Debtors launched a process to explore strategic alternatives in Fall 2022.  The Debtors' first step was to retain A&M as their financial advisor on October 31, 2022.  A&M was tasked with assisting the Debtors in examining possible solutions to their liquidity issues.

13.     However, around December 22, 2022, freezing temperatures descended on the shallow Gulf of Mexico region and caused temporary shut-ins at several properties, effectively taking approximately 45% of the Company's daily net production temporarily offline.  Since that

US-DOCS\139827024

time, production has never fully recovered to prior comparable levels, as shown in the table below. This weather event exacerbated the Debtor's worsening liquidity position.



14. In response, the Company and A&M expended tremendous efforts on managing payments to vendors in attempts to maintain daily production, repair infrastructure on a timely basis, and restore suspended producing wells. These efforts included identifying and engaging those vendors most critical to operations, negotiating payment plans with both active and inactive vendors, and addressing the increasing number of liens filed against Debtors' assets. Despite these efforts, however, the Debtors' flexibility to address unforeseen operational difficulties continued to diminish as liquidity declined, and outstanding accounts payable have grown to over $212 million as of the Petition Date.

15. In furtherance of their strategic planning, the Debtors retained Moelis & Company LLC ("*Moelis*") as their investment banker on December 20, 2022 in order to explore possible refinancing or other transactions to raise capital. Following several weeks of evaluation of possible out-of-court transactions, on January 14, 2023, the Debtors retained Latham & Watkins LLP ("*Latham*", and collectively with A&M and Moelis, the "*Advisors*") to advise on possible corporate and finance transactions. Moreover, on January 19, 2023, Mr. Patrick J. Bartels (the

"*Independent Manager*") was appointed as the independent manager of Debtor MLCJR LLC ("*MLCJR*"). On April 5, 2023, concurrently with my appointment as Chief Restructuring Officer, Mr. Bartels was further appointed as independent manager of Debtors Cox Operating, Energy XXI GOM, LLC, and EPL Oil & Gas, LLC.

16. The Advisors have met with the Independent Manager and the Debtors' management teams on a regular basis in the months leading up the Petition Date in furtherance of efforts to address the Debtors' liquidity and restructure their funded debt and other third party obligations.

17. Before concluding that a chapter 11 filing was the best path forward, the Debtors, led by Moelis, explored the possibility of a capital raise. As described in more detail in the Moelis Declaration,[3] filed concurrently with this Declaration, Moelis contacted 102 prospective financing sources. Of these prospective financing sources, 77 were focused on potentially providing debt financing ("*Prospective Debt Funds*") and 25 were focused on potentially providing financing backed by certain unencumbered litigation assets held by the Debtors ("*Prospective Litigation Finance Funds*"), which litigation assets are described more fully in Part II below.

18. Of those prospective financing sources contacted by Moelis, 28 Prospective Debt Funds and 22 Prospective Litigation Finance Funds conducted diligence pursuant to non-disclosure agreements. At the conclusion of the process, the Debtors received preliminary term sheets from six Prospective Litigation Finance Funds. The Debtors did not receive a proposal from any of the Prospective Debt Funds. After a detailed review, the Debtors, with the assistance

---

[3] The "*Moelis Declaration*" is the *Declaration of Bassam J. Latif in Support of Debtors' Emergency Motion for Entry of Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief.*

US-DOCS\139827024

of their Advisors, determined that the proposals received from the Prospective Litigation Finance Funds would not provide the Debtors with funding in an amount sufficient to resolve the liquidity issues then facing the Debtors.

19.     Concurrently with these financing efforts, the Debtors and the Advisors approached BP Energy Company ("**bpec**"), the Debtors' largest secured creditor.  As described more fully in paragraphs 35 through 37 below, the Debtors and bpec were party to a swap agreement that was materially out-of-the-money to the Debtors and secured by substantially all assets of the Debtors.[4] Over the course of several months, the Debtors and the Advisors presented bpec with various strategic alternatives contemplating, among other things, (a) the restructuring and deferral of future payment obligations arising under the swap agreement, (b) restoration of suspended production, and (c) development of undrilled inventory.  These alternatives were developed and presented with the goal of simultaneously maximizing the value of the Debtors' business and allowing bpec to recoup the full value they are owed on account of their Swap Obligations (as defined below).  Each scenario, however, required significant new incremental capital to address the Debtors' large negative working capital position and to increase oil and gas production from both producing wells and undeveloped reserves.  Given the amount of vendor payables outstanding, the attendant risk in providing new money in connection therewith, and bpec's *pari passu* collateral position with Amarillo (as described herein), bpec indicated it was willing to provide additional financing in a chapter 11 context.

20.     Left with no viable alternatives for out-of-court financing, the Debtors, with the assistance of the Advisors, focused on obtaining debtor-in-possession financing on the best terms

---

[4]     As described more fully in paragraphs 52-53 below, the secured swap agreement (*i.e.*, the ISDA Agreement) was terminated by bpec as of April 28, 2023, which resulted in a claim owed to bpec of approximately $190 million.

available to facilitate a smooth landing in chapter 11. As described below, these efforts were successful, and the proposed debtor-in-possession financing contemplates an asset sale process or other transaction, with the Debtors retaining the flexibility to pivot to a chapter 11 reorganization if the proposed transactions do not adequately maximize the value of the Debtors' assets.

## I.  The Company's Businesses and Organizational Structure

### A.  History of the Debtors

21.     The Company was established in 2003 and commenced operations in the GOM in 2004. Since then, the Company has remained privately owned and has grown to become one of the largest privately owned independent operators in the GOM, consistently maintaining its focus on the acquisition, exploration, development, and operation of oil and natural gas properties in Louisiana state waters and the GOM Outer Continental Shelf.

22.     From 2005 through 2013, the Company acquired additional GOM interests, including in Quarantine Bay, Eloi Bay, and Half Moon Lake Field. Beginning in 2016, the Company executed a series of major asset acquisitions, including (a) Chevron's GOM assets with proved reserves comprising 55.5 million barrels of oil equivalent ("*MMboe*") net in 2016 (the "*Chevron Acquisition*"), (b) Freeport-McMoran's GOM assets with proved reserves comprising 4.3 MMboe net in 2017, (c) Energy XXI's GOM assets across 55 fields with approximately 577 producing wells in 2018 (the "*Energy XXI Acquisition*"), and (d) QuarterNorth's interest in certain GOM fields with proved reserves comprising approximately 3.0 MMboe net in 2022 (the "*QuarterNorth Acquisition*").

23.     Of these transactions, the Energy XXI Acquisition was the most significant, with the Company nearly doubling its production from approximately 35 thousand barrels of oil equivalent per day ("*Mboe/d*") pre-transaction to approximately 61 Mboe/d, with assets amounting

8

US-DOCS\139827024

to more than 700 wells across 750,000 net acres.  As further discussed below, however, subsequent adverse events have reduced year to date output to approximately 22 Mboe/d.

### B. **Corporate Structure**

24.     A corporate structure chart for the Company is attached hereto as **Exhibit A**.  As shown therein, Debtor MLCJR is a Texas entity owned by Cox Investment Partners, LP (69.25%), WIN Management LLC (24.79%), and CLS Development LLC (5.96%).  Debtor Cox Operating is a Louisiana entity owned that is indirectly wholly-owned by Cox Investment Partners, LP.  The remaining five Debtor entities (Cox Oil Offshore, L.L.C., Energy XXI GOM, LLC, Energy XXI Gulf Coast, LLC, EPL Oil & Gas, LLC, and M21K, LLC) are all Delaware entities and are wholly owned, direct or indirect subsidiaries of Debtor MLCJR.

US-DOCS\139827024

25.     The below is a simplified version depicting the legal structure as relevant to the Debtors:



## C.     The Debtors' Business

26.     The Debtors' business operations are primarily focused on oil and natural gas, with approximately two-thirds of its production (the "***Marketed Production***") being oil.  The Debtors' approximately 75 MMboe of proven reserves,[5] approximately 78 MMboe of probable reserves, and approximately 40 MMboe of possible reserves currently yield approximately 22 thousand

---

[5]   As reflected in a December 31, 2022 NYMEX reserve report issued by Netherland Sewell & Associates, Inc. dated March 31, 2023 (the "***Reserve Report***").

US-DOCS\139827024

barrels of oil equivalent daily ("***MMboe/d***"), with another approximately 10 MMboe/d suspended or shut-in.

27.    The Debtors own interests in approximately 400 oil, gas, and mineral leases (the "***Oil and Gas Leases***"), a substantial number of which are granted by the Bureau of Ocean Energy Management ("***BOEM***"), and operate approximately 92% of their production.  The remaining 8% of the Debtors' production is operated by third parties (the "***Non-Operating Interests***").  Because the Debtors control production for the majority of their interests, they are able to optimize the processes used and determine the timing and amount of capital expenditures and other projects.

### 1.    Business Operations

28.    The Debtors' business operations occur across three stages:  (a) exploration and production, (b) midstream processing, and (c) sales and marketing of refined oil and gas.

### a.    *Exploration and Production*

29.    The Debtors presently operate the majority of their over 750 wells across 470 structures in 60 fields in the waters spanning from Texas to Alabama.  As operators, the Debtors bear primary responsibility for paying all lease operating expenses with respect to their oil, gas, and mineral leases (the "***Lease Operating Expenses***") both on account of their working interests in the leases and on behalf of the non-operating working interest owners (the "***Third-Party Working Interest Owners***").  The Debtors then seek reimbursement from the Third-Party Working Interest Owners for each such owner's *pro rata* share of the Lease Operating Expenses, which comprise costs required to operate and sustain flow of production.  These primarily consist of production surveillance costs, which include labor, transportation and fuel, as well as maintenance and construction costs to maintain the integrity of the assets.

US-DOCS\139827024

### b. *Midstream Processing*

30. To convert extracted raw material from oil and gas properties operated by the Debtors into a refined product that can be marketed to end users, the Debtors enter into contractual arrangements (the "***Midstream Arrangements***") pursuant to which third parties (the "***Midstream Counterparties***") charge for services necessary or desirable either for refining or marketing the oil and natural gas (such charges, collectively, the "***Midstream Expenses***"). Such services include gathering, transportation, treating, dehydration, compression, processing, fractionation, and other similar services necessary or desirable for refining and marketing the oil and natural gas downstream. All of these steps are essential to the success of the Debtors' operation, as a delay or stoppage at any point would reverberate through the Debtors' entire production chain and force a complete halt in their business. The Midstream Arrangements are also crucial in instances where the Debtors receive their production from their respective Non-Operating Working Interests "in-kind", rather than requesting that the third-party operator market the production associated with the Debtors' Non-Operating Working Interests on their behalf.

31. The Midstream Arrangements are categorized as either (a) managed by third-party CIMA Energy, LP ("***CIMA***") or (b) managed by the Debtors, depending on whether CIMA or the Debtors contract with Midstream Counterparties to move raw product up the value chain and ultimately to market. CIMA, which provides an integrated host of services to the Debtors, pays the Midstream Counterparties it contracts with on behalf of the Debtors by netting such costs out of the Debtors' revenue. A majority of the Debtors' midstream partners are paid through CIMA. For those managed by the Debtors, the Debtors directly contract with (and pay) such Midstream Counterparties for specific midstream services.

12

US-DOCS\139827024

### c. Sales and Marketing

32.     The Debtors rely on their marketing counterparty, CIMA, to handle the distribution of Marketed Production to end consumers, thus monetizing the Marketed Production.  CIMA builds relationships with customers and enters into contracts that generate revenue for the Debtors' business.

33.     The Debtors rely on CIMA to market almost all of the Marketed Production. Certain Debtors are individually party to physical commodity sale agreements with bpec and BP Products North America Inc. ("*bppna*" and together with bpec, "*BP*"), pursuant to which predetermined amounts of Marketed Production are sold directly to BP.  However, CIMA has the right and obligation to market all of the Marketed Production (except for the amount nominated to BP).  CIMA nets its fees from receipts associated with the Marketed Production.

### 2.     Employees

34.     As of the Petition Date, the Debtors employed approximately 430 people (excluding independent contractors and temporary staff) at offshore locations and in their offices in Houston, Dallas, and New Orleans (the "*Employees*").  As described in the Wages Motion (as defined below), all Employees are employed by Debtor Cox Operating.  The Employees provide a range of critical functions in connection with each stage of the above-described production process, as well as fulfilling a variety of management and administrative roles.  In addition, the Debtors work with approximately six independent contractors who provide specialized engineering, landmen, and similar services.  The Debtors pay approximately 260 of their Employees on an hourly basis, and approximately 170 Employees by salary.  None of the Debtors' Employees are covered by a collective bargaining agreement.

13

### 3. Hedging Activities

35.     The Debtors historically have engaged in hedging activities to reduce their exposure to market fluctuations in oil and natural gas prices.  The Debtors' primary hedging relationship until immediately prior to the Petition Date was with BP.  In particular, Debtor MLCJR and bpec were parties to that certain 2002 ISDA Master Agreement, dated as of October 18, 2018 (the "***Master Agreement***"), which includes (a) the Amended and Restated Schedule thereto, dated as of December 10, 2021 (the "***Schedule***") and (b) certain transactions for the sale and purchase of natural gas and crude oil between individual Debtors, on the one hand, and BP or certain related parties, on the other hand, in connection with the Debtors' offshore oil and gas exploration and production operations and the Debtors' hedging of commodity prices in connection therewith (together with all transaction confirmations, special provisions, and annexes thereto, the "***Physical Commodity Transactions***", and together with the Master Agreement and Schedule, as each may have been amended, modified, or supplemented from time to time, the "***ISDA Agreement***").

36.     The Debtors' hedging transactions under the ISDA Agreement were primarily financially-settled, fixed-for-floating rate swaps for both natural gas and crude oil.  However, as more fully described in paragraph 53 below, bpec designated April 28, 2023 as an Early Termination Date in respect of the Transactions under the ISDA Agreement (and determining an Early Termination Amount owed to bpec of approximately $190 million), suspending further payments and deliveries as well as performance of all of its other obligations thereunder. Accordingly, the Debtors are no longer actively engaged in the hedging of their production.

37.     Moreover, pursuant to the Intercreditor Agreement (as defined below), the other six Debtors guaranteed the obligations of MLCJR arising under the ISDA Agreement, and each Debtor granted security interests and liens in substantially all their respective assets to secure such

14

US-DOCS\139827024

obligations.  As described more fully in paragraph 54 below, the liens that secure the ISDA Agreement are *pari passu* with the liens that secure the Prepetition First Lien Credit Agreement.

### 4.  Intercompany Transactions

38.  Prior to the Petition Date, and in the ordinary course of their business, the Debtors conduct intercompany transactions as described more fully in their Cash Management Motion (as defined below) pursuant to arrangements (both formal and informal) relating to the ownership, operations, and divestitures of their oil and gas assets.

39.  The most significant intercompany transactions relate to the ownership by certain Debtors (other than Cox Operating) of the Debtors' interests in their respective offshore oil and gas leases and respective offshore oil and gas wells (the "*Leases and Wells*").  Pursuant to certain operating agreements between each such Debtor and Debtor Cox Operating, Cox Operating performs extensive services related to the Leases and Wells where the Debtor would otherwise be the operator (the "*Operating Services*"), such as:

> (a) performing all duties related to operating and maintaining the Wells, including without limitation, maintaining Owner's compliance with all terms of (i) all agreements between Owner and all other Persons contracted to operate and maintain such Wells and (ii) all agreements that allow for or related to the exploration and development of the Wells, including, without limitation, all oil and gas leases, surface use agreements, and easements;
>
> (b) undertaking any reworking, recompleting, deepening, plugging back, and sidetracking with respect to the Wells;
>
> (c) negotiating the sales of all hydrocarbons produced from the Wells and distributing the revenue of such hydrocarbons;
>
> (d) preparing and reviewing joint interest billing statements and delivering such statements for all operations and maintenance from the Wells;
>
> (e) taking bids and negotiating contracts with Persons providing services for the operating and maintenance of the Wells and the related platforms;
>
> (f) preparation of and review of any authority for expenditures required for any operations on or related to the Wells;

15

(g) supervising all work performed on the Wells, from all Persons performing Services with respect to the Wells;

(h) regulatory compliance and required governmental filings for all operations for the Wells;

(i) asset management plans, annual budgets, annual work programs, acquisition and divesture analysis, plugging and abandoning capital analysis, and meetings and conferences with third party non-operators and governmental authorities; and

(j) supervising all work related to the plugging and abandoning of any Well.

40. In exchange for performing the Operating Services, Debtor Cox Operating charges a fee to the other applicable Debtors (the "*Payor Debtors*") as specified in the relevant operating agreements (the "*Operating Fee*"). During 2022, the monthly average of the Operating Fee charged to the Payor Debtors was approximately $4.7 million.

41. Additionally, Cox Operating incurs all direct operating expenses for Employees and third-party vendors ("*Direct Operating Expenses*") on behalf of the Payor Debtors. As a result, Cox Operating bills the Payor Debtors for Direct Operating Expenses as they are incurred. During 2022, the monthly average of Direct Operating Expenses billed to the Payor Debtors has been approximately $46.3 million.[6]

42. Intercompany Claims between Cox Operating, on the one hand, and the Payor Debtors and their subsidiaries, on the other hand, arise as a result of the monthly Operating Fee and Direct Operating Expenses, which are settled via netting against the collection of revenue produced from the Payor Debtors' assets, the incurrence of amounts owed to third-party vendors not included in the Operating Services by Cox Operating, and cash transfers between Cox Operating and the Payor Debtors for draw and paydown of debt facilities. A summary of the

---

[6] As described in paragraph 56 below, Debtor Cox Operating (as operator of the Leases and Wells) enters into transactions with third-party vendors on behalf of the Payor Debtors that own the Leases and Wells for such third-party vendors to provide goods and services related to the operation of such Leases and Wells. Debtor Cox Operating is, in general, the only party liable for unpaid amounts owed to such third-party vendors.

16

Intercompany Transactions involving Cox Operating, and the resulting Intercompany Claims, is included in the below schematic:



43. While the Debtors seek the authority to continue all Intercompany Transactions between and among Debtors in the ordinary course, the Debtors seek only limited relief to continue Intercompany Transactions with respect to Non-Debtor Affiliates in order to continue paying for only (a) helicopter services for crew changes provided by Flow Line Transportation, LLC, (b) expenses for rental equipment used by Lochridge Energy Services P&A, LLC in connection with plugging and abandonment activities, and (c) taxes and surety bonds for certain non-Debtor subsidiaries. Each of these proposed transactions is described in detail in the Cash Management Motion.

US-DOCS\139827024

**5.** **Surety Bonds and P&A Obligations**

44.     In the ordinary course of business, the Debtors are required by certain applicable statutes, rules, and regulations to participate in the Bonding Program (as defined below), pursuant to which the Debtors provide surety bonds to certain third parties (which are often governmental units or other public agencies) to secure the Debtors' payment or performance of certain obligations.  In particular, to cover the various obligations of lessees, such as the cost to plug and abandon wells and decommission and remove platforms and pipelines at the end of production on a lease (the "*P&A Obligations*"), BOEM generally requires that lessees post surety bonds or other acceptable financial assurances that such obligations will be met (unless BOEM exempts the lessee from such requirements).

45.     As of the Petition Date, the Debtors have obtained approximately $673.1 million in surety bonds for the benefit of BOEM and other governmental entities to secure the Debtors' P&A Obligations and other payment and performance obligations, at a cost to the Debtors of approximately $11 million annually.  As of the Petition Date, the Debtors believe approximately $7.8 million is currently overdue and outstanding on account of bond premiums owed to bonding companies (the "*Bonding Companies*"), much of which is months overdue.

| Debtor Principal | Bond Amount |
|---|---|
| MLCJR, LLC | $300,000,000 |
| EPL Oil & Gas, LLC | $182,093,489 |
| Energy XXI GOM, LLC | $71,774,407 |
| Cox Oil Offshore, L.L.C. | $55,019,896 |
| M21K, LLC | $43,527,872 |
| Energy XXI Gulf Coast, LLC | $11,118,636 |
| Cox Operating, L.L.C. | $9,614,250 |
| Total Debtors | $673,148,550 |

US-DOCS\139827024

46. In addition to the Debtors being liable for past-due bond premiums, upon information and belief, the chairman of the Debtors and certain non-Debtor affiliates have provided indemnity agreements to certain of the sureties for certain surety bonds. Under these agreements, such non-Debtors indemnify, on a joint and several basis, the sureties for missed bond premium payments to and/or payments made by the sureties under the relevant surety bonds. Certain of these indemnity agreements contain a cap on the indemnity amount, depending on the identity of the indemnitor. Upon information and belief, these non-Debtor indemnity agreements have been provided by (i) Brad E. Cox (ii) CEXXI, LLC (iii) Cox Oil, LLC (iv) Cox Investment Partners, LP (v) EPL Pipeline, LLC (vi) Energy XXI Pipeline, LLC, and (vii) Energy XXI Pipeline II, LLC.

47. The Reserve Report forecasts the PV10 of the Company's P&A liabilities at $329 million, none of which is scheduled to begin prior to 2027. The Debtors have certain near-term plugging and abandonment obligations required by the legacy asset purchase agreements from the Chevron Acquisition and the QuarterNorth Acquisition detailed in paragraph 22 above, as well as obligations in connection with the Energy XXI Acquisition detailed in paragraphs 22 through 23 above (including obligations from ExxonMobil). The asset purchase agreement underpinning the Chevron Acquisition requires that the Debtors fund an escrow account monthly for future P&A activities of such Chevron legacy assets (currently funded at approximately $51.2 million with a contractual cap of $143.7 million). Finally, in connection with the Energy XXI Acquisition, the Debtors are required to either execute P&A activities totaling $10 million per year or fund an escrow account for the Energy XXI Assets. Both escrow accounts for the Chevron Acquisition and the Energy XXI Assets can be used to satisfy future P&A obligations outlined in the Reserve Report. In connection with the QuarterNorth Acquisition, the Debtors currently forecast $4.7

19

million and $500,000 of P&A obligations associated with the GI43 platform in 2023 and 2024, respectively, which is a rescheduling of GI43 P&A obligations in the Reserve Report. However, these amounts are pending post-closing contractual negotiations with QuarterNorth, and a revised schedule has not yet been determined.

### D. Prepetition Capital Structure & Trade Vendors

48. As of the Petition Date, and as described more fully below, the Debtors have material claims owed to their secured creditors and past-due amounts owed to their trade vendors, many of whom have filed mechanics' liens against certain of the Debtors' assets.[7]

### 1. Prepetition First Lien Credit Agreement

49. Debtor MLCJR, as borrower, and Amarillo National Bank, as lender ("*Amarillo*" or the "*First Lien Lender*"), are parties to that certain Loan Agreement, dated as of April 15, 2016 (as amended, modified, or supplemented from time to time, the "*Prepetition First Lien Credit Agreement*").[8]

50. The Prepetition First Lien Credit Agreement provides for a revolving credit facility in the principal amount of up to $80 million (the "*Prepetition Revolver Facility*"), with a maturity date of August 31, 2024. As of the Petition Date, not less than $80 million in obligations was

---

[7] Nothing in this Declaration constitutes a waiver of any objections or defenses of the Debtors to such claims or asserted liens, all of which rights are reserved.

[8] The Prepetition First Lien Credit Agreement has been amended or modified on twelve prior occasions: First Amendment of Loan Agreement and Promissory Note Modification Agreement dated as of June 2016, Second Amendment of Loan Agreement dated as of June 30, 2016, Third Amendment of Loan Agreement dated as of July 31, 2017, Fourth Amendment of Loan Agreement dated as of December 21, 2017, Fifth Amendment of Loan Agreement dated as of October 17, 2018, Sixth Amendment of Loan Agreement dated as of September 5, 2019, Seventh Amendment of Loan Agreement dated as of December 23, 2019, Eighth Amendment of Loan Agreement dated as of September 8, 2020, Ninth Amendment of Loan Agreement dated as of October 21, 2020, Tenth Amendment of Loan Agreement dated as of September 14, 2021, Eleventh Amendment of Loan Agreement dated as of December 10, 2021, and Twelfth Amendment of Loan Agreement dated as of July 31, 2022.

US-DOCS\139827024

outstanding under the Prepetition Revolver Facility for principal amounts, plus accrued but unpaid interest, fees, costs, and expenses (the "***Prepetition First Lien Obligations***").

51.     Pursuant to the Loan Documents (as defined in the DIP Motion), (a) the other six Debtors (in such capacity, the "***Guarantors***") jointly and severally guaranteed the Prepetition First Lien Obligations owed by Debtor MLCJR, and (b) each Debtor granted first priority security interests and liens on substantially all of their respective assets, whether real or personal, tangible or intangible (the "***Prepetition Collateral***"), to secure repayment of the Prepetition First Lien Obligations to Amarillo.[9]

### 2.     ISDA Agreement

52.     As described in paragraph 35 above, Debtor MLCJR and bpec historically were parties to the ISDA Agreement, and the other six Debtors jointly and severally guaranteed the obligations owed thereunder by MLCJR (the "***Swap Obligations***").  In connection with outstanding payment defaults under the ISDA Agreement, the Debtors and BP entered into a forbearance agreement, dated as of March 27, 2023 (the "***Forbearance Agreement***").  Under the Forbearance Agreement, BP agreed to forbear from the exercise of certain rights and remedies and granted a payment extension with respect to Swap Obligations due and payable by the Debtors from January 2023 through the term of such agreement (with an outside date of December 31, 2023).  Pursuant to the Forbearance Agreement, the Debtors granted liens and security interests in additional assets to the Collateral Agent under the Intercreditor Agreement (defined below).  These transfers occurred in April 2023 and, accordingly, were within 90 days of the Petition Date.

---

[9]     In addition to the Prepetition First Lien Obligations, Debtor MLCJR is a guarantor on a line of credit issued pursuant to certain Loan Agreement, dated of as December 30, 2019, as between Non-Debtor Affiliate Energy XXI GIGS Services, LLC and Amarillo (as amended, supplemented, or otherwise modified, the "***GIGS Line of Credit***").  Funds borrowed under the GIGS Line of Credit have historically been deposited directly into the Debtors' Main Operating Account (as further described in the Cash Management Motion).  As of the Petition Date, the GIGS Line of Credit is drawn in the principal amount of approximately $2.3 million.

53.     On April 27, 2023, bpec conveyed a Notice of Event of Default and Designation of Early Termination Date (the "***Termination Notice***") to the Debtors, thereby terminating the Forbearance Agreement.  In addition, the Termination Notice designated April 28, 2023 as the Early Termination Date in respect of the Transactions under the ISDA Agreement and determined an Early Termination Amount owed to bpec of approximately $190 million.

### 3.     Intercreditor Agreement

54.     In connection with the Prepetition First Lien Credit Agreement and the ISDA Agreement, Debtor MLCJR, each other Debtor as Guarantor, Amarillo, and bpec entered into that certain Second Amended and Restated Intercreditor Agreement, dated December 10, 2021 (the "***Intercreditor Agreement***").[10]  Pursuant to the Intercreditor Agreement, the parties agreed, among other things, that the Prepetition First Lien Obligations and the Swap Obligations shall each be secured on a first priority, *pari passu* basis with each other on all Prepetition Collateral.  As a result of bpec's termination and liquidation of their claim, they are now the majority creditor pursuant to the Intercreditor Agreement and, as such, control the direction of the Collateral Agent thereunder.

### 4.     Operating Expenses and Mechanics' Liens

55.     In the ordinary course of business, the Debtors incur certain obligations to suppliers of goods and services relating to lease operating and capital expenses (the "***Operating Expenses***"). These parties supply the Debtors with a variety of services and supplies, such as (a) maintenance and repair of equipment and infrastructure, (b) transportation of crews, fuel, and equipment to offshore locations, (c) customized tools, heavy equipment, and parts, (d) offshore compressor and

---

[10]     The Intercreditor Agreement amended and restated the Amended and Restated Intercreditor Agreement dated as of September 12, 2019, which in turn amended and restated the Intercreditor Agreement dated as of October 18, 2018.

22

electricity generator rentals, repair, and maintenance, and (e) various regulatory and compliance-related services.

56.     Prior to the Petition Date, Debtor Cox Operating incurred approximately $179 million in Operating Expenses that remain unpaid and outstanding, of which 72% is over 90 days aged.  The Debtors estimate that approximately $23 million in such Operating Expenses have become subject to asserted mechanics' and similar liens in and upon certain assets of the Debtors in favor of the holders of such claims related to such Operating Expenses, and that additional liens will be filed after the Petition Date to the extent permitted by the Bankruptcy Code.  The Debtors do not concede that any such liens (whether filed before or after the Petition Date) are valid or otherwise perfected, and reserve all rights, objections, and defenses in connection therewith.

### 5.     Volumetric Production Payment Agreement

57.     Debtors Cox Oil Offshore, L.L.C., Energy XXI GOM, LLC, EPL Oil & Gas, Inc., and M21K, LLC, as the grantors (in such capacity, the "***VPP Grantors***"), Debtor Cox Operating, L.L.C., as the operator (in such capacity, the "***VPP Operator***"), and Flint River VPP II, LLC and EP Northern Investments, LLC, as grantees (together, the "***VPP Grantees***"), are parties to that certain Production Sales Agreement, dated October 18, 2018 (the "***Production Sales Agreement***"). In connection therewith, the VPP Grantors (as sellers) and the VPP Grantees (as buyers) are parties to that certain Purchase and Sale Agreement, dated October 18, 2018 (the "***Purchase and Sale Agreement***", and together with the Production Sales Agreement and certain related Conveyances of Term Overriding Royalty Interest described below, the "***Volumetric Production Payment Agreement***" or the "***VPP Agreement***").

58.     I understand that, pursuant to the VPP Agreement, the VPP Grantees purchased from the VPP Grantors an undivided interest in overriding royalty interests ("***ORRIs***") in certain mineral properties for a term extending to December 31, 2023 (the "***VPP Agreement Termination***

23

***Date***") for a cash purchase price of $375 million.[11] In exchange, the VPP Grantees are entitled to receive production of all Overriding Royalty Hydrocarbons (as defined in the VPP Agreement) in the volumes set forth in the VPP Agreement, and the VPP Grantors are obligated to purchase (or cause to be purchased) all such production at the applicable index price and pricing group applicable during a given month, payable on a monthly basis, through the VPP Termination Date. In recent months, due to the strength of the oil and gas market and correspondingly high index prices relative to the prior year, the Debtors have incurred significant obligations to the VPP Grantees in connection with their obligations in connection with the VPP Agreement, further reducing their liquidity as described more fully below.

## II.    **Key Events Leading to Commencement of These Chapter 11 Cases**

59.    The Debtors have faced significant operational challenges in their recent history, largely due to idiosyncratic factors outside of their control and an inadequate financing structure to withstand these challenges. This, in turn, has resulted in the liquidity crisis that prompted the filing of these Chapter 11 Cases.



---

[11]    The Debtors expressly reserve the right to dispute the nature of the ORRIs and any related obligations.

US-DOCS\139827024

60.     *First*, in 2019, the Debtors assumed control of the Energy XXI Assets. Soon thereafter, in early 2020, the OPEC price war and COVID-19 led to significant production curtailment. Late 2020 proved no less challenging due to Hurricanes Laura, Sally, Delta, and Zeta, with storm damage from the 2020 hurricane season alone resulting in over $30 million of repair expenses to date. In 2021, the Debtors made significant progress on production restoration, but were dealt additional damage by Hurricane Ida. The resulting shut-ins led to significant production decline in late 2021 and an additional $61.5 million (and counting) of storm repair costs.

61.     *Second*, significant damage was inflicted upon certain of the Debtors' assets by third parties, and the Debtors have yet to be compensated for such destruction. Specifically, in October 2020, the *M/V Atina*—a crude oil tanker flagged under the laws of Malta—struck one of the Debtors' platforms off the coast of Louisiana, SP-57B. The collision caused major damage and required the platform to be shut down. Pending repairs, the platform has remained offline at the cost of approximately 1,500 barrels of oil per day in lost production. To date, neither the *M/V Atina* nor her owners, operators, or agents have compensated the Debtors for such damages. Accordingly, the Debtors are pursuing approximately $225 million in damage claims against such parties in the suit captioned *Cox Operating, LLC v.* Atina M/V *et al.*, Case No. 2:20-cv-02845 (E.D. La.), with trial scheduled to begin in September 2023. Pending a judgment and recovery thereon, the Debtors continue to suffer mounting damages.

62.     These challenges have limited the Debtors' base production and stretched their payables profile. The Debtors currently have an aggregate of approximately 10 Mboe/d of suspended or shut-in net production.

63.     *Third*, the Debtors' entry into the VPP Agreement and the ISDA Agreement have effectively frozen the Debtors out of the current oil and gas market boom. The Debtors entered

25

US-DOCS\139827024

into these agreements in lieu of utilizing existing cash or other forms of capital, such as the issuance of debt. However, the economic characteristics of both the VPP Agreement and the ISDA Agreement effectively peg the calculation of cash obligations at future points to variable commodity prices. In the intervening years after entry into the agreements, market conditions shifted dramatically, positioning the Debtors on the wrong side of what otherwise would have been positive economic developments for the Debtors as a result of the improved commodity price environment. Thus, instead of reaping the benefits of strong demand and correspondingly high prices for hydrocarbons, the Debtors are obligated under the terms of these agreements to pay their counterparties increased market prices. In the end, the Debtors' existing capital structure did not provide sufficient flexibility or liquidity to respond to the market and operational challenges facing the Debtors.

### III. The Chapter 11 Cases

64. **Involuntary Chapter 7 Proceeding Against Cox Operating.** On May 12, 2023, certain trade creditors filed an involuntary petition under chapter 7 of the Bankruptcy Code against Debtor Cox Operating in the Eastern District of Louisiana. The Debtors intend to promptly file a motion to transfer venue to this Court. Pendency of this involuntary petition does not automatically stay these Chapter 11 Cases, which may appropriately proceed in this Court.[12]

65. These Chapter 11 Cases involve six Debtors in addition to Debtor Cox Operating, and the Debtors have been preparing to commence these cases for weeks (as shown by the extensive pleadings and consensual DIP Facility filed less than one business day after the

---

[12] Bankruptcy Rule 1014(b) provides that if two or more petitions are filed regarding the same debtor, "the court in the district in which the first-filed petition is pending <u>may</u> determine, in the interests of justice and for the convenience of the parties, the district or districts in which any of the cases should proceed. The court <u>may</u> so determine on motion and after a hearing […]. The court <u>may</u> order the parties to the later-filed cases not to proceed further until it makes the determination." (emphasis added).

US-DOCS\139827024

commncement of the involuntary case).  Now that the Debtors have voluntarily filed their own chapter 11 petitions, the predicate for an involuntary petition—supervision of a bankruptcy court—has been achieved.  Accordingly, Debtor Cox Operating will promptly seek to transfer the involuntary case or otherwise plead in response to that involuntary petition.

66.  **The DIP Facility**.  As further detailed in the Moelis Declaration, the Debtors launched a solicitation process to obtain debtor-in-possession financing and the consensual use of cash collateral to fund these Chapter 11 Cases.  The Debtors, through their investment banker, Moelis, solicited offers for debtor-in-possession financing from sixteen third-party prospective lenders, plus the Debtors' prepetition lender, Amarillo, under the Prepetition First Lien Credit Agreement, and bpec, as holder of the Swap Obligations.  Amarillo and bpec were the only parties to make a financing proposal.

67.  To fund the Chapter 11 Cases, the Debtors are seeking this Court's approval for a first lien senior secured super-priority term loan facility in the aggregate new money principal amount not to exceed $75 million (the "*DIP Facility*").  The proposed lenders under the DIP Facility are bpec and Amarillo (in such capacity, the "*DIP Lenders*").  The Debtors seek authority to draw under the DIP Facility up to $20 million on an initial interim basis (the "*Initial Funding*") and up to $50 million on a second interim basis (the "*Interim Funding*").  The remainder of the DIP Facility would be available upon entry of a final order.  The DIP Facility would mature by no later than six months after the Petition Date and includes the milestones below.  Finally, in connection with the final order, the DIP Facility includes a cashless refinancing of the aggregate outstanding Prepetition First Lien Obligations and Swap Obligations of approximately $220 million.

68.    **Proposed Timeline for Asset Sale or Plan of Reorganization**.    The Debtors believe that, to be successful, these Chapter 11 Cases must proceed in the most expeditious manner permitted by the Bankruptcy Code.  The terms of the DIP Facility reflect that belief.  The Debtors have agreed to certain milestones contained in the DIP Facility regarding, among other things, entry of an order by the Court approving either an Approved Sale (with the Sale Order to be entered within 95 days after the Petition Date) or Approved Plan of Reorganization (with the Confirmation Order to be entered within 140 days after the Petition Date), as set forth in the following timeline for these Chapter 11 Cases (subject to the Court's calendar):[13]

| Milestone | Event |
|---|---|
| Seven (7) days after the Petition Date | The Debtors shall have filed a motion, in form and substance reasonably acceptable to the DIP Lenders, seeking final approval of procedures governing the sale (the "***Sale***") and marketing process (the "***Sale Process***") for substantially all of the Debtors' assets (the "***Bidding Procedures Motion***"). |
| Thirty (30) days after the Petition Date | An order granting the Bidding Procedures Motion, in form and substance reasonably acceptable to the DIP Lenders (the "***Bidding Procedures Order***"), shall have been entered by the Court. |
| Seventy-five (75) days after the Petition Date | The bid deadline (the "***Bid Deadline***") set forth in the Bidding Procedures Order shall have passed. |
| Eighty (80) days after the Petition Date | The Debtors shall have made a determination, in consultation with and subject to the written consent of the DIP Lenders, as to whether to proceed with the Auction (as defined below) or pursue an Approved Plan of Reorganization.[14] |

---

[13]    The summaries contained below are qualified in their entirety by the provisions of the documents referenced including, without limitation, the DIP Documents and the Interim Order.  To the extent anything herein is inconsistent with such documents, the terms of the applicable documents shall control.

[14]    "***Approved Plan of Reorganization***" means the plan of reorganization which shall either (i) provide for the satisfaction in full of the then outstanding Prepetition Secured Obligations and DIP Obligations through payment in indefeasible funds as of the effective date of such plan, which shall not be later than thirty (30) days after entry of the order of confirmation, or (ii) be in form and substance satisfactory to the DIP Lenders in their sole discretion.

US-DOCS\139827024

| Milestone | Event |
|---|---|
| Eighty-five (85) days after the Petition Date | If the Debtors have determined **not** to pursue an Approved Plan of Reorganization, the auction (the "*Auction*"), if any, on the terms set forth in Bidding Procedures Order shall have occurred. |
| Ninety (90) days after the Petition Date | Either (a) if the Debtors have determined that the highest and best bid received through the Sale Process is **not** an Approved Sale, or (b) if the Auction did **not** occur, then the Debtors shall have filed with the Court an Approved Plan of Reorganization and a disclosure statement with respect to the Approved Plan of Reorganization. |
| Ninety-five (95) days after the Petition Date | If the Debtors have determined that the highest and best bid received through the Sale Process is an Approved Sale,[15] an order approving the Sale (the "*Sale Order*"), in form and substance reasonably acceptable to the Required DIP Lenders, shall have been entered by the Court. |
| Fifteen (15) days after the entry of the Sale Order | If the Debtors have determined that the highest and best bid received through the Sale Process is an Approved Sale, no later than the date that is fifteen (15) days after the entry of the Sale Order, the Sale shall have been consummated; provided, that, if such failure is due solely to additional time required to obtain pending regulatory approvals, such date shall be extended solely for the additional time as necessary to complete such regulatory approvals. |
| One hundred five (105) days after the Petition Date | If the Debtors did **not** hold an Auction, an order conditionally approving the disclosure statement in respect of an Approved Plan of Reorganization, in form and substance reasonably satisfactory to the DIP Lenders, shall have been entered by the Court. |
| One hundred forty (140) days after the Petition Date | If the Debtors did **not** hold an Auction, an order confirming the Approved Plan of Reorganization, in form and substance reasonably satisfactory to the DIP Lenders, shall have been entered by the Court. |
| One hundred fifty-five (155) days after the Petition Date | If the Debtors did **not** hold an Auction, the effective date of an Approved Plan of Reorganization shall have occurred in accordance with its terms. |

---

[15] "*Approved Sale*" means a disposition of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code consummated in accordance with the Bidding Procedures Order or Approved Plan of Reorganization (as defined above), which disposition (i) satisfies in full through payment in indefeasible funds as of closing of such sale(s) the then outstanding Prepetition Secured Obligations and DIP Obligations or (ii) is otherwise approved by the Required DIP Lenders in their sole discretion.

29

69. The terms of the DIP Facility are the result of arm's-length, good-faith negotiations conducted by the Debtors and their Advisors with the DIP Lenders. These discussions spanned several weeks and lasted until shortly before the Petition Date. Ultimately, the Debtors, in consultation with their Advisors, determined that the DIP Facility is necessary because the Debtors' cash (which is Prepetition Collateral) is insufficient to fund their immediate needs,[16] and that the DIP Facility represents the best post-petition DIP financing option available to the Debtors. The DIP Facility and use of cash collateral are essential to the Debtors' maintenance of the support of key constituencies, including their workforce and vendors, and avoidance of severe interruption of their business or other involuntary and adverse modification of operations.

70. As noted above, the Debtors rely on a dedicated workforce whose skills are in high demand. Indeed, in the current competitive labor market, the Debtors have faced challenges retaining their Employees and only anticipate further challenges with the filing of these Chapter 11 Cases. If the Debtors are not able to access the DIP Facility on an interim basis and signal to their Employees that they have the liquidity necessary to meet ongoing obligations and bridge to a change-of-control transaction, I expect those challenges to be exacerbated, which would disrupt the Debtors' business and ultimately harm their estates.

71. Likewise, the Debtors' business relies on a complex network of vendors to provide them with highly specialized goods and services needed to satisfy the stringent technical, safety, environmental, and other operational requirements that guide the Debtors' exploration and production operations. Due to the specific nature of the Debtors' needs, the sole-source nature of certain suppliers, and the lien rights many such suppliers have over the Debtors' production and

---

[16] As of the Petition Date, the amount of such cash collateral was approximately $825,000.

US-DOCS\139827024

other assets, the Debtors have limited flexibility in regards to which vendors they work with. Accordingly, the Debtors would incur significant damage if their vendors refused to continue to do business with them as a result of uncertainty regarding the Debtors' financial wherewithal or the Debtors' ongoing failure to pay such vendors, with such refusal potentially forcing a complete halt of the Debtors' operations. This is particularly true in light of the fact that, as liquidity deteriorated in the past few months, the Debtors were forced to delay payments to certain of their vendors to preserve what little cash remained. Many vendors have already stopped providing goods and/or services to the Debtors because of overdue invoices. Further, without immediate access to the DIP Facility, vendors may demand onerous trade terms, such as cash on delivery, as a condition to continuing to do business with the Debtors, which would further strain the Debtors' liquidity. Recognizing that they are at risk of both permanent damage to vendor relationships and loss of access to goods and services that are critical to the maintenance of their operations, the Debtors intend to immediately use approximately $40 million of the Interim Funding to pay past-due vendor payables owed by the Debtors.

72. If Employees resign or vendors cease to provide essential goods and services, the Debtors likely would need to shut in wells for safety, environmental, and/or regulatory reasons. These actions would risk permanent production declines to such wells, which would be value-destructive regardless of whether the Debtors reorganize or consummate a sale of their assets.

73. Therefore, it is imperative that the Debtors have access to the DIP Facility from the outset of these cases in order to signal to the Debtors' stakeholders, including their Employees, vendors, and customers, that their situation is only temporary and they have the liquidity necessary to meet their obligations in the ordinary course until the business is able to emerge from the chapter 11 process with a more stable capital structure.

31

## IV. Facts Supporting Relief Sought in First Day Pleadings[17]

74. In furtherance of the objective of preserving value for all stakeholders, the Debtors have sought approval of the First Day Pleadings and related orders (the "***Proposed Orders***"), and respectfully request that this Court consider entering the Proposed Orders granting the First Day Pleadings. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in those of the First Day Pleadings for which such authority is sought. A description of the relief requested in as well as an overview of the facts supporting each of the following First Day Pleadings is set forth below:

### A. Administrative and Procedural Pleadings

1. The *Motion of Debtors for Entry of an Order (A) Directing Joint Administration of Chapter 11 Cases and (B) Granting Related Relief* (the "***Joint Administration Motion***")

The Joint Administration Motion seeks joint administration of the Debtors' cases, given the integrated nature of the Debtors' operations. Joint administration for procedural purposes only will provide significant administrative convenience without harming the substantive rights of any party in interest. Parties in interest will also benefit from the cost reductions associated with the joint administration of the Chapter 11 Cases.

2. The *Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Debtors to Redact Certain Personal Identification Information and (B) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information* (the "***Creditor Matrix Motion***")

The Creditor Matrix Motion (a) seeks authority for the Debtors to redact certain personal identification information for individuals from the Creditor Matrix, Schedules and Statements, and any other paper filed or to be filed with the Court and (b) approves the form and manner of the notice of commencement in substantially the form attached to the Proposed Order as Exhibit 1.

Redaction of personal identification information is necessary to protect the privacy interests of natural persons who may be listed on the Creditor Matrix, the Schedules and Statements, and any other filings. Additionally, approval of the form and manner of the notice of commencement is necessary not only to properly serve notice to interested parties, but also to

---

[17] Unless otherwise defined, all capitalized terms in this Part IV have the meanings given to them in the applicable First Day Pleadings.

32

avoid confusion among creditors and prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple parties listed on the Debtors' voluminous Creditor Matrix.

3.      The *Debtors' Emergency Motion for Entry of an Order (A) Extending Time to File (I) Schedules and Statements and (II) Rule 2015.3 Financial Reports and (B) Granting Related Relief* (the "**Schedules/SOFA Motion**")

The Schedules/SOFA Motion seeks an extension of the deadline by which the Debtors must file their Schedules and Statements and 2015.3 Reports. Ample cause exists to grant the requested extensions. To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, leases, and contracts from each of the seven Debtors, requiring significant expenditure of time and effort on the part of the Debtors. Prepetition preparation of these documents was not practicable given the Debtors' focus on preparing a smooth transition into chapter 11. Further, the relief requested will not prejudice any party in interest.

4.      The *Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC As Claims, Noticing, and Solicitation Agent* (the "**Section 156(c) Claims Agent Application**")

The Section 156(c) Claims Agent Application seeks authority for the Debtors to employ Kroll Restructuring Administration LLC ("**Kroll**") as claims, noticing, and solicitation agent for the Debtors. Kroll's employment is in the best interest of the Debtors' estates as Kroll has the expertise required for complex chapter 11 cases.

## B.      Business and Operational Motions

1.      The *Debtors' Emergency Motion for Entry of Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Scheduling Final Hearing* (the "**DIP Motion**")

The DIP Motion seeks authority for the Debtors to enter into postpetition financing and use cash collateral, all of which is critical to the Debtors' business operations as explained in Part III above.

2.      The *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Use Their Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Continue Their Existing Deposit Practices, and (III) Continue Intercompany Transactions, (B) Granting Administrative Expense Status to Postpetition Intercompany Claims, and (C) Granting Related Relief* (the "**Cash Management Motion**")

The Cash Management Motion seeks, among other things: (a) authority for the Debtors to (i) maintain and use their existing cash management system (the "**Cash Management System**"), including maintenance of their existing Bank Accounts, checks, and business forms, (ii) maintain

33

and use their existing deposit and investment practices notwithstanding the provisions of section 345(b) of the Bankruptcy Code, (iii) comply with their P&A Obligations and certain surety obligations by continuing to fund the applicable Bank Accounts in the ordinary course and consistent with prepetition practice, (iv) continue Intercompany Transactions between Debtors and other Debtors, as well as between Debtors and certain Non-Debtor Affiliates with respect to certain specified intercompany transactions, and (v) open and close Bank Accounts; (b) an extension of time for the period within which to comply with certain bank account and related requirements of the U.S. Trustee or make such other arrangements as agreed with the U.S. Trustee to the extent that such requirements are inconsistent with the Debtors' practices under their existing cash management system or other actions described in the Cash Management Motion, and (c) administrative expense status for postpetition Intercompany Claims arising from certain Intercompany Transactions between Debtors and other Debtors.

The Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Cases and the Debtors' goal of maximizing value for the benefit of all parties in interest. To require the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the collection and disbursement of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value and repay their creditors. The Intercompany Transactions are both administratively beneficial and essential to the continued smooth functioning and operation of the Debtors' businesses. Discontinuance of the Intercompany Transactions would disrupt the Debtors operations to the detriment of all stakeholders.

3. The *Debtors' Emergency Motion for Entry of an Order (A) Authorizing (I) Payment of Prepetition Workforce Obligations and (II) Continuation of Workforce Programs on a Postpetition Basis, (B) Authorizing Payment of Payroll Taxes, (C) Confirming the Debtors' Authority to Transmit Payroll Deductions, (D) Authorizing Payment of Prepetition Claims Owing to Administrators, (E) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments, and (F) Granting Related Relief* (the "***Wages Motion***")

The Wages Motion seeks authority for the Debtors to honor and continue their employee compensation and benefits programs, and pay any and all related workforce obligations. As of the Petition Date, the Debtors employ approximately 430 Employees, who perform a variety of critical functions for the Debtors. The Employees' skills, knowledge, and understanding of the Debtors' infrastructure and operations are essential to the continuation of the Debtors' business during these Chapter 11 Cases and to maintaining the value of the Debtors' assets. The tightening labor market has only underscored how essential these Employees are and increased the Debtors' ever-present concern about losing valuable Employees to competitors. Without their Employees, the Debtors would lack a key component of their go-forward business and, indeed, could suffer irreversible damage to currently operating assets.

34

US-DOCS\139827024

4.    The *Debtors' Emergency Motion for Entry of an Order (A) Authorizing Payment of Mineral Obligations and (B) Granting Related Relief* (the "***Mineral Obligations Motion***")

The Mineral Obligations Motion seeks authority for the Debtors to pay, in the ordinary course of business, undisputed, liquidated amounts owing to (i) holders of royalty, working, and other interests, including suspense obligations, as required by the Debtors' various leases and related agreements, and (ii) operators for unpaid joint interest billings and related obligations billings (collectively, the "***Mineral Obligations***"). Failure to timely pay the Mineral Obligations may provide grounds for contractual or statutory lien rights against the Debtors' working interests, or otherwise have a material adverse effect upon the Debtors and their operations including, without limitation, potential cancellation, forfeiture, or termination of oil and gas leases, penalties and interest turnover actions, conversion and constructive trust claims, assertion of significant secured claims against property of the Debtors' estates, litigation, and attempted removal of the Debtors as operator of the oil and gas leases. Continuation of these payments is essential to preserving the value of the Debtors' business, properties, and assets.

5.    The *Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Payment of Certain (I) Essential Vendor Obligations, (II) Outstanding Orders, and (III) Marketing Expenses, and (B) Granting Related Relief* (the "***Trade Motion***")

The Trade Motion seeks authority for the Debtors to pay, in the ordinary course of business, certain undisputed, liquidated, prepetition amounts owing on account of (i) Essential Vendor Claims, (ii) Marketing Claims, and (iii) Outstanding Orders. Payment of the identified trade claims is essential to ensure the ongoing operation of the Debtors' business. *First*, failure to pay at least a portion of the prepetition amounts due with respect to the Essential Vendor Obligations would likely result in the cessation of Essential Vendor Activities. This cessation would impede the Debtors' ability to continue with the safe and responsible operation of their Oil and Gas Leases, especially given the specialized nature of the goods and services underpinning the Essential Vendor Activities, the remote location of the Debtors' Oil and Gas Leases, and the lack of practical alternate suppliers. *Second*, the Marketing Expenses are critical to the Debtors' ability to receive revenue from production; failure to receive this revenue would devastate the Debtors' business and threaten their ability to make timely payments to third parties holding an interest in production, such as working interest owners and royalty interest owners. *Finally*, the Debtors may have ordered goods that will not be delivered until after the Petition Date, but which are necessary to continued operations. Granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations arising from the Debtors' acceptance of goods subject to Outstanding Orders and authorizing the Debtors to satisfy such obligations in the ordinary course of business are therefore essential to prevent disruption to the Debtors' business operations.

6.    The *Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Debtors to Pay Prepetition Taxes and Fees and (B) Granting Related Relief* (the "***Tax Motion***")

35

US-DOCS\139827024

The Tax Motion seeks authority for the Debtors to pay the Taxes and Fees, including on behalf of certain specified Non-Debtor Affiliates, in the ordinary course and consistent with prepetition practice. Granting the Debtors the authority to pay the Taxes and Fees will serve to maximize the value of the Debtors' estates for the benefit of all stakeholders. If the Debtors do not continue to pay the Taxes and Fees, the Taxing Authorities likely will take actions against the Debtors, including potential lien filings and audits, which will require the Debtors to expend valuable resources on, among other things, administrative costs, legal fees, and accounting fees. It is in the best interest of the Debtors to pay the Taxes and Fees and avoid unnecessary governmental action that would diminish the value of the Debtors' estates to the detriment of all stakeholders.

7.  The *Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Debtors to (I) Pay Their Prepetition Insurance Obligations, (II) Pay Their Prepetition Bonding Obligations, (III) Maintain Their Postpetition Insurance Coverage, and (IV) Maintain Their Bonding Program, and (B) Granting Related Relief* (the "**Insurance Motion**")

The Insurance Motion seeks authority for the Debtors to (a) continue to (i) administer insurance coverage currently in effect and pay all amounts on account of prepetition premiums, taxes, charges, fees, and other obligations owed under or with respect thereto, including the Insurance Broker's Fees (as defined in the Insurance Motion), and (ii) pay amounts on account of any obligations owed to issuers of surety bonds on the Debtors' behalf that accrued but remain unpaid as of the Petition Date, and any fees and other obligations associated therewith; (b) pay all postpetition premiums, administrative fees, deductibles, and other obligations relating to the Insurance Obligations and the Bonding Obligations (each as defined in the Insurance Motion); and (c) revise, extend, supplement, change, terminate and/or replace the Debtors' insurance coverage, or purchase new, supplemental, or replacement surety bonds as needed in the ordinary course of business. Continuation and renewal of the Insurance Policies and the Bonding Program are essential to the Debtors' ability to continue operations safely and in accordance with applicable regulations (including the U.S. Trustee's Operating Guidelines for Chapter 11 Cases), and therefore to maximizing the value of the Debtors' assets.

8.  The *Debtors' Emergency Motion for Entry of an Order (A) Prohibiting Utility Providers from Altering or Discontinuing Service on Account of Prepetition Invoices, (B) Approving Deposit As Adequate Assurance of Payment, (C) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment, and (D) Granting Related Relief* (the "**Utility Motion**")

The Utility Motion seeks an order (a) prohibiting the Debtors' utility service providers from altering or discontinuing electricity, natural gas, waste management, network and telecommunications, cable, and similar services on account of prepetition invoices and (b) approving procedures that would provide adequate assurance of payment to the utility service providers under section 366 of the Bankruptcy Code through provision of a deposit. Uninterrupted utility services are essential to the Debtors' ongoing safe operation of on- and offshore facilities, including by enabling the Debtors to run their production equipment and ensure field locations

36

US-DOCS\139827024

remain livable and connected to the mainland, and hence are crucial to the overall success of the Chapter 11 Cases.

75.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth in each are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal interruptions and disruptions to our businesses or loss of productivity or value; (b) is necessary to ensure compliance with applicable laws and regulations and to preserve valuable relationships with customers, trade vendors and other creditors; and (c) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonably inquiry, the foregoing statements are true and correct.

Dated: May 15, 2023

/s/ Ryan Omohundro
Ryan Omohundro
Chief Restructuring Officer of the Debtors

37

US-DOCS\139827024

# **Exhibit A**

## **Organizational Structure**

US-DOCS\139827024

