No Plat

State of Louisiana,
Parish of East Baton Rouge.

LEASE NO. 195

WHEREAS, under the provisions of Act No. 30 of the Extra Legislative Session of 1915, as amended by Act No. 315 of 1926, application was made to the Governor for a lease of the hereinafter described lands, and a report thereon having been made by the Register of the State Land Office, and,

WHEREAS, the Governor caused advertisements of the proposed lease of said lands to be published in the official journal of the Parishes of Plaquemines & St. Bernard wherein said lands lie, and in the State-Times, the official journal of the State of Louisiana, as required by law, and,

WHEREAS, in response to said advertisements, bids were received at the State Capitol on the 3rd day of January 1928 in the presence of Fred J. Grace and Carl Campbell and,

WHEREAS, it appeared that the bid of M. Hession, was the most advantageous;

NOW BE IT KNOWN AND REMEMBERED, that the said O. H. SIMPSON, acting under the authority of the said Act No. 30 of the Extra Session of 1915, as amended by Act No. 315 of 1926, and in accordance with the terms thereof, and in behalf of the State of Louisiana, does hereby let and lease unto the said M. Hession, his heirs and assigns, the hereinafter described property, for the purpose of exploiting the same for, and producing therefrom, oil, gas or other minerals, in and under said lands, as also the exclusive right to investigate with and to operate thereon with seismographs and other geophysical instruments, and also the exclusive right of drilling and operating thereon, for oil or gas, together with a right of way for, and a right to lay pipe-lines to convey water, oil, steam and gas, and a right to have sufficient water, oil and gas from the premises, to drill and operate any wells that the said lessee may bore thereon, and also such other privileges as are reasonably requisite for the conduct of said operations, and the right to remove at any time from said premises, any and all property which may be placed thereon by said lessee, provided that the said lessee is not at the time indebted to the State of Louisiana under the provisions of this lease.

The said premises as to which this instrument does apply, are described as follows:

"All the lands, beds and bottoms owned by the State of Louisiana, comprised within the area extending from the land or shore line of that part of Plaquemines Parish, Louisiana, lying on the east side of the Mississippi River, into the marginal or maritime belt of the Gulf of Mexico to the extreme limit or boundary of the domain, territory and sovereignty of the State of Louisiana from Pass A Loutre on the south to the lower line of St. Bernard Parish on the north, including the lands, beds and bottoms in and underlying the waters of Grand Bay, Grand Coquille Bay, Little Coquille Bay, Raccoon Pass, Quarantine Bay, California Bay, August Bay, Cox Bay, Black Bay, and that portion of Breton Sound adjacent to or lying in the Parish of Plaquemines; also all the lands, beds and bottoms owned by the State of Louisiana in Lake Lery, Petit Lake, Grand Lake, Bayou Long, River Aux Chenes, Bayou Gentilly, not heretofore disposed of by the State.

TO HAVE AND TO HOLD unto the said lessee, his heirs and assigns, for the term and under the provisions as hereinafter specified as follows, to-wit:

I.

There is expressly granted to the said M. Hession the right at any time before the expiration of twelve months to begin operations of drilling a well or wells for oil or gas on the premises hereby leased, and if the said lessee shall within said term begin such operations, he shall continue same with reasonable diligence until the completion of such well, and the said well, when begun, shall be completed to a depth of twenty-six hundred feet, unless oil or gas be found in paying quantities at a lesser depth, or unless salt or gypsum be found at a lesser depth.

Upon the beginning of operations of drilling a well within the period specified by the lease, the lessee shall have the right to make as many attempts to find oil, gas or other minerals as he pleases,

State of Louisiana,
Parish of East Baton Rouge.

LEASE NO. 195

WHEREAS, under the provisions of Act No. 30 of the Extra Legislative Session of 1915, as amended by Act No. 315 of 1926, application was made to the Governor for a lease of the hereinafter described lands, and a report thereon having been made by the Register of the State Land Office, and,

WHEREAS, the Governor caused advertisements of the proposed lease of said lands to be published in the official journal of the Parish/es of [illegible] & St. [illegible] wherein said lands lie, and in the State-Times, the official journal of the State of Louisiana, as required by law, and,

WHEREAS, in response to said advertisements, bids were received at the State Capitol on the [illegible] day of [illegible] 19[illegible]8 in the presence of [illegible] J. [illegible]

and [illegible] and,

WHEREAS, it appeared that the bid of [illegible], was the most advantageous;

NOW BE IT KNOWN AND REMEMBERED, that the said [illegible], acting under the authority of the said Act No. 30 of the Extra Session of 1915, as amended by Act No. 315 of 1926, and in accordance with the terms thereof, and in behalf of the State of Louisiana, does hereby let and lease unto the said [illegible], his heirs and assigns, the hereinafter described property, for the purpose of exploiting the same for, and producing therefrom, oil, gas or other minerals, in and under said lands, as also the exclusive right of [illegible] drilling and operating thereon, for oil or gas, together with a right of way for, and a right to lay pipe-lines to convey water, oil, steam and gas, and a right to have sufficient water, oil and gas from the premises, to drill and operate any wells that the said lessee may bore thereon, and also such other privileges as are reasonably requisite for the conduct of said operations, and the right to remove at any time from said premises, any and all property which may be placed thereon by said lessee, provided that the said lessee is not at the time indebted to the State of Louisiana under the provisions of this lease.

The said premises as to which this instrument does apply, are described as follows:

[illegible]

TO HAVE AND TO HOLD unto the said lessee, [illegible] heirs and assigns, for the term and under the provisions as hereinafter specified as follows, to-wit:

I.

There is expressly granted to the said [illegible] the right at any time before the expiration of twelve months to begin operations of drilling a well or wells for oil or gas on the premises hereby leased, and if the said lessee shall within said term begin such operations, he shall continue same with reasonable diligence until the completion of such well, and the said well, when begun, shall be completed to a depth of twenty-six hundred feet, unless oil or gas be found in paying quantities at a lesser depth, or unless salt or gypsum be found at a lesser depth.

..., ... that the said lessee is not at the time indebted to the State of Louisiana under the provisions of this lease.

The said premises as to which this instrument does apply, are described as follows:
All the lands, beds and bottoms owned by the State of Louisiana, comprised within the area extending from the land or shore line of that part of Plaquemines Parish, Louisiana, lying on the east side of the Mississippi River, into the marginal or maritime belt of the Gulf of Mexico to the extreme limit or boundary of the domain, territory and sovereignty of the State of Louisiana from Pass A Loutre on the south to the lower line of St. Bernard Parish on the north, including the lands, beds and bottoms in and underlying the waters of Grand Bay, Grand Coquille Bay, Little Coquille Bay, Raccoon Pass, Quarantine Bay, California Bay, August Bay, Cox Bay, Black Bay, and that portion of Breton Sound adjacent to or lying in the Parish of Plaquemines; also all the lands, beds and bottoms owned by the State of Louisiana in Lake Lery, Petit Lake, Grand Lake, Bayou Long, River Aux Chenes, Bayou Gentilly, ... not heretofore disposed of by the State.

TO HAVE AND TO HOLD unto the said lessee, his heirs and assigns, for the term and under the provisions as hereinafter specified as follows, to-wit:

I.

There is expressly granted to the said ... E. Nession the right at any time before the expiration of twelve months to begin operations of drilling a well or wells for oil or gas on the premises hereby leased, and if the said lessee shall within said term begin such operations, he shall continue same with reasonable diligence until the completion of such well, and the said well, when begun, shall be completed to a depth of twenty-six hundred feet, unless oil or gas be found in paying quantities at a lesser depth, or unless salt or gypsum be found at a lesser depth.

Upon the beginning of operations of drilling a well within the period specified by the lease, the lessee shall have the right to make as many attempts to find oil, gas or other minerals as he pleases, and to continue the exercises of such right as long as he pleases, provided, however, that such attempts shall be successive in the sense, that until oil, gas or other minerals shall be found, not more than sixty days shall elapse between the cessation or abandonment of work on one well and the beginning of work on another.

II.

If in the exercise of the right granted by this lease, the first well proves to be a paying oil or gas well, the said lessee binds himself that thereafter he will proceed to further develop the said property with reasonable diligence and will so continue until such number of wells have been drilled upon the said property as to constitute a reasonable development thereof.

III.

If in the exercise of the right herein granted, oil be produced on said premises in paying quantities, then the said lessee shall deliver to the lessor as royalty, free of expense:

One-eighth of the oil produced and saved from all wells. In estimating the royalty payments, the average daily production for the calendar month shall be taken as a basis; delivery to be made in tanks with connections by the lessor provided, or into any pipe line that may be connected to the well or wells.

One-eighth of the net proceeds derived from the sale of gas, provided however, that the minimum royalty on each gas well shall be not less than $200.00 per year.

Seventy-five cents per long ton of sulphur produced and saved.

Ten cents per ton for all potash produced and saved, and one-eighth of all other minerals produced and saved.

As a further consideration of this contract, the lessee herewith pays to the lessor a cash bonus of Ten Thousand Six Hundred Forty ($10,640.00) Dollars, receipt of which is hereby acknowledged.

It is further understood and agreed that the provisions of this [illegible]

The said premises as to which this instrument does apply, are described as follows:

[illegible] line of [illegible] Louisiana, [illegible] on the east side of [illegible] the Gulf [illegible] domain, territory [illegible] of the State of Louisiana [illegible] on the north, including [illegible] the waters of [illegible] Bay, [illegible] Bay, [illegible] Bay, [illegible] tion of [illegible]; also [illegible] State of Louisiana in [illegible] tilly, [illegible].

TO HAVE AND TO HOLD unto the said lessee, [illegible] his heirs and assigns, for the term and under the provisions as hereinafter specified as follows, to-wit:

I.

**There is expressly granted to the said** [illegible]ession **the right at any time before the expiration of** twelve months **to begin operations of drilling a well or wells for oil** or gas on the premises hereby leased, and if the said lessee shall within said term begin such operations, he shall continue same with reasonable diligence until the completion of such well, and the said well, when begun, shall be completed to a depth of twenty-six hundred feet, unless oil or gas be found in paying quantities at a lesser depth, or unless salt or gypsum be found at a lesser depth.

Upon the beginning of operations of drilling a well within the period specified by the lease, the lessee shall have the right to make as many attempts to find oil, gas or other minerals as he pleases, and to continue the exercises of such right as long as he pleases, provided, however, that such attempts shall be successive in the sense, that until oil, gas or other minerals shall be found, not more than sixty days shall elapse between the cessation or abandonment of work on one well and the beginning of work on another.

II.

If in the exercise of the right granted by this lease, the first well proves to be a paying oil or gas well, the said lessee bind himself that thereafter he will proceed to further develop the **said property with reasonable diligence and will so continue until such number of wells have been drilled upon the said property as to constitute a reasonable development thereof.**

III.

If in the exercise of the right herein granted, oil be produced on said premises in paying quantities, then the said lessee shall deliver to the lessor as royalty, free of expense:

One-eighth of the oil produced and saved from all wells. In estimating the royalty payments, the average daily production for the calendar month shall be taken as a basis; delivery to be made in tanks with connections by the lessor provided, or into any pipe line that may be connected to the well or wells

One-eighth of the net proceeds derived from the sale of gas, provided however, that the minimum royalty on each gas well shall be not less than $200.00 per year.

Seventy-five cents per long ton of sulphur produced and saved.

Ten cents per ton for all potash produced and saved, and one-eighth of all other minerals produced and saved.

In further consideration of this contract, the lessee herewith pays to the lessor a cash bonus of Ten Thousand Six Hundred Forty ($10,640.00) Dollars, receipt of which is hereby acknowledged.

It is further understood and agreed that the provisions of this contract may be extended from year to year by the payment in advance of the sum of Five Thousand Three Hundred Twenty ($5,320.00) Dollars such extension period not to exceed in the aggregate four (4) years.

[illegible]

IV.

If any of the oil produced from said premises, be found to contain water or sediment in such quantities as not to be suitable for pipe-line run, then the lessee obligates itself to treat the said oil free of expense to the lessor, so that the royalty to the State, shall be marketable oil.

V.

It is expressly understood and agreed that if oil, gas or other minerals be produced from said property, this lease shall be thereby continued in full force and effect as long as the oil, gas or other minerals may be produced from said property, subject only to the express stipulations contained in this contract.

And if for any cause beyond the control of the lessee, any well or wells on the said property should cease to produce, such cessation shall not affect the lease; provided the lessee proceed with reasonable diligence to work on the said wells so as to cause them to produce further.

But if the lessee fails to comply with such stipulations after having drilled wells on said property, which produce oil, gas or other minerals, then and in that event, surrender of this lease as to the undeveloped portion may be demanded and becomes effective having formally put lessee in default by sixty (60) days' notice to comply with such stipulation.

It is understood that at the end of ~~three (3)~~ five (5) years, the lessee shall declare in writing, what portion or portions of the leased premises, are not at such time in its judgment developed, and whether the same be by it judged capable of development as herein contemplated; and if there shall be such portions undeveloped and capable of development, the lessee shall proceed to further develop the property, locating a sufficient number of wells at such reasonably close intervals as consistent with the interest of both parties as to accomplish a reasonably profitable development [illegible] contemplated.

VI.

If there should be drilled on the adjacent property, within one hundred and fifty (150) feet of the line, a well or wells producing as much as two hundred (200) barrels of oil per day for thirty consecutive days, the lessee herein agrees that he will with all reasonable diligence begin and prosecute the drilling of an equal number of wells within approximately the same distance of the line, on the said premises, in a faithful effort to find and produce thereon, oil in paying quantities, under penalty, upon failure of said lessee so to do, after thirty (30) days' notice by lessor, such notice to be given any time after the thirty consecutive days above referred to, that this lease shall be cancelled as to ten acres immediately adjacent and opposite to such producing well or wells on the adjacent property; the said ten acres to be contained within parallel lines four acres distant from each other, and running as nearly as may be, perpendicular to the adjacent line, and which said parallel lines if projected into the adjacent property shall be equi-distant from said producing well or wells; except that such ten acre block shall not include or be any nearer to any existing well or wells on said premises than one hundred (100) feet.

VII.

IV.

If any of the oil produced from said premises, be found to contain water or sediment in such quantities as not to be suitable for pipe-line run, then the lessee obligates itself to treat the said oil free of expense to the lessor, so that the royalty to the State, shall be marketable oil.

V.

It is expressly understood and agreed that if oil, gas or other minerals be produced from said property, this lease shall be thereby continued in full force and effect as long as the oil, gas or other minerals may be produced from said property, subject only to the express stipulations contained in this contract.

And if for any cause beyond the control of the lessee, any well or wells on the said property should cease to produce, such cessation shall not affect the lease, provided the lessee proceed with reasonable diligence to work on the said wells so as to cause them to produce further.

But if the lessee fails to comply with such stipulations after having drilled wells on said property, which produce oil, gas or other minerals, then and in that event, surrender of this lease as to the undeveloped portion may be demanded and becomes effective having formally put lessee in default by sixty (60) days' notice to comply with such stipulation.

It is understood that at the end of three (3) years, the lessee shall declare in writing, what portion or portions of the leased premises, are not at such time in its judgment developed, and whether the same be by it judged capable of development as herein contemplated; and if there shall be such portions undeveloped and capable of development, the lessee shall proceed to further develop the property, locating a sufficient number of wells at such reasonably close intervals as consistent with the interest of both parties as to accomplish a reasonably profitable development of the entire tract as herein contemplated.

VI.

If there should be drilled on the adjacent property, within one hundred and fifty (150) feet of the line, a well or wells producing as much as two hundred (200) barrels of oil per day for thirty consecutive days, the lessee herein agree that it will with all reasonable diligence begin and prosecute the drilling of an equal number of wells within approximately the same distance of the line, on the said premises, in a faithful effort to find and produce thereon, oil in paying quantities, under penalty, upon failure of said lessee so to do, after thirty (30) days' notice by lessor, such notice to be given any time after the thirty consecutive days above referred to, that this lease shall be cancelled as to ten acres immediately adjacent and opposite to such producing well or wells on the adjacent property; the said ten acres to be contained within parallel lines four acres distant from each other, and running as nearly as may be, perpendicular to the adjacent line, and which said parallel lines if projected into the adjacent property shall be equi-distant from said producing well or wells; except that such ten acre block shall not include or be any nearer to any existing well

... undeveloped portion may be demanded and becomes effective having formally put lessee in default by sixty (60) days' notice to comply with such stipulation.

It is understood that at the end of ~~three (3)~~ five (5) years, the lessee shall declare in writing, what portion or portions of the leased premises, are not at such time in its judgment developed, and whether the same be by it judged capable of development as herein contemplated; and if there shall be such portions undeveloped and capable of development, the lessee shall proceed to further develop the property, locating a sufficient number of wells at such reasonably close intervals as consistent with the interest of both parties as to accomplish a reasonably profitable development ... herein contemplated.

VI.

If there should be drilled on the adjacent property, within one hundred and fifty (150) feet of the line, a well or wells producing as much as two hundred (200) barrels of oil per day for thirty consecutive days, the lessee herein agrees that he will with all reasonable diligence begin and prosecute the drilling of an equal number of wells within approximately the same distance of the line, on the said premises, in a faithful effort to find and produce thereon, oil in paying quantities, under penalty, upon failure of said lessee so to do, after thirty (30) days' notice by lessor, such notice to be given any time after the thirty consecutive days above referred to, that this lease shall be cancelled as to ten acres immediately adjacent and opposite to such producing well or wells on the adjacent property; the said ten acres to be contained within parallel lines four acres distant from each other, and running as nearly as may be, perpendicular to the adjacent line, and which said parallel lines if projected into the adjacent property shall be equi-distant from said producing well or wells; except that such ten acre block shall not include or be any nearer to any existing well or wells on said premises than one hundred (100) feet.

VII.

It is agreed and understood that neither all nor any part of the land herein leased shall be subleased unless agreed to by the Governor.

VIII.

It is further agreed and understood that operating the leased property herein, shall not impede navigation.

THUS DONE, ACCEPTED, READ AND SIGNED by the parties hereto, the lessor, the State of Louisiana, herein represented by O. H. SIMPSON, , Governor, and the lessee, M. Hession in the presence of Fred J. Grace and Carl Campbell , and before me, R. H. Flower , Assistant Secretary of State, on this 20th day of February , A. D. 1928

O.H. Simpson, Governor
*For the State of Louisiana, Lessor.*

M. Hession
*Lessee.*

R.H. Flower
Assistant Secretary of State.

WITNESSES:

Fred J. Grace

Carl Campbell

It is understood that at the end of three (3) years the lessee shall declare in writing what portion or portions of the leased premises, are not at such time in its judgment developed, and whether the same be by it judged capable of development as herein contemplated, and if there shall be such portions undeveloped and capable of development, the lessee shall proceed to further develop the property, locating a sufficient number of wells at such reasonably close intervals as consistent with the interest of both parties as to accomplish a reasonably profitable development of the entire tract as herein contemplated.

VI.

If there should be drilled on the adjacent property, within one hundred and fifty (150) feet of the line, a well or wells producing as much as two hundred (200) barrels of oil per day for thirty consecutive days, the lessee herein agrees that he will with all reasonable diligence begin and prosecute the drilling of an equal number of wells within approximately the same distance of the line, on the said premises, in a faithful effort to find and produce thereon, oil in paying quantities, under penalty, upon failure of said lessee so to do, after thirty (30) days' notice by lessor, such notice to be given any time after the thirty consecutive days above referred to, that this lease shall be cancelled as to ten acres immediately adjacent and opposite to such producing well or wells on the adjacent property; the said ten acres to be contained within parallel lines four acres distant from each other, and running as nearly as may be, perpendicular to the adjacent line, and which said parallel lines if projected into the adjacent property shall be equi-distant from said producing well or wells; except that such ten acre block shall not include or be any nearer to any existing well or wells on said premises than one hundred (100) feet.

VII.

It is agreed and understood that neither all nor any part of the land herein leased shall be sub-leased unless agreed to by the Governor.

VIII.

It is further agreed and understood that operating the leased property herein, shall not impede navigation.

THUS DONE, ACCEPTED, READ AND SIGNED by the parties hereto, the lessor, the State of Louisiana, herein represented by [illegible], Governor, and the lessee, [illegible] in the presence of [illegible] and [illegible], and before me, [illegible], Assistant Secretary of State, on this 20th day of February, A. D. 192[illegible]




, Governor
*For the State of Louisiana, Lessor.*

**Lessee.**

[illegible] Secretary of State.

WITNESSES:

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD
October 26, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attention: Susan F. Irby

Dear Ms. Irby:

Enclosed herewith are two (2) certified copies of Resolution #22-09-009 Docket No. 6 adopted at a meeting of the State Mineral and Energy Board held on October 12, 2022, approving an Assignment from BHST LLC, et al to Cox Oil LLC, affecting State Lease Nos. 195, 1349 and 15941, Plaquemines Parish, Louisiana.

**Your attention is directed to Item No. 5 in the resolution which requires that the resolution be attached to the instrument when it is recorded in Plaquemines Parish**. Please furnish us with the recording information when it is available. Please mail recording information to me or email recording information to Cristina.Vince@la.gov.

We wish to advise that we have retained one (1) copy of the instrument for reference use in this office.

Yours very truly,

Cristina Vince
Land Specialist 4

Enclosures

DOCKET INFORMATION SHEET
OCTOBER 12, 2022

6. ASSIGNMENT

SSTATE LEASE NOS. 195, 1349 and 15941,
Plaquemines Parish, Louisiana

An Assignment from BHST LLC, Quarantine Bay, L.L.C. and Cox Interests, L.L.C. to Cox Oil LLC, of all of Assignor's right, title and interest in and to State Lease Nos. 195, 1349 and 15941, Plaquemines Parish, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil LLC is designated as the joint account Lessee (contact company) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

______ MINERAL INCOME

✓ OWNERSHIP

______ G&E

______ GIS

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

September 27, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attn: Susan F. Irby

Dear Ms. Irby:

Receipt is acknowledged of the items listed below:

> Three (3) fully executed copies of an Assignment from BHST LLC, et al. to Cox Oil, LLC, affecting State Lease Nos. 195, 1349 and 15941, Plaquemines Parish, Louisiana.

This matter will be placed on the Docket Review Agenda for the consideration by the State Mineral & Energy Board at a meeting to be held Wednesday, October 12, 2022 at 9:30 a.m., in the Mineral Board Hearing Room, First Floor, LaSalle Building, 617 North Third St., Baton Rouge, Louisiana.

You may wish to attend the Committee meeting to answer any questions that may arise from its members.

Yours very truly,

Cristina Vince
Land Specialist 4
Office of Mineral Resources

6

RECEIVED
OFFICE OF
MINERAL RESOURCES
STATE MINERAL BOARD
2022 SEP 15 AM 10: 35

COX OIL LLC
4514 Cole Avenue, Suite 1175
Dallas, TX 75205
(214) 420-7710

September 13, 2022

Ms. Cristina Vince
Louisiana Dept. of Natural Resources
Office of Mineral Resources
617 N. Third St., 8th Floor
Baton Rouge, LA 70802

By Fed Ex

Re: Assignments
SL 2220, 2221, 4039, 4147, 16158
Half Moon Lake/Eloi Bay Fields
St. Bernard Ph., Louisiana
SL 195, 1349, 15941
Quarantine Bay Field
Plaquemines Parish, Louisiana

SL. Nos. 195
1349
15941
Plag

Dear Cristina:

Enclosed please find for your further handling triplicate originals of the following Assignments, together with the appropriate Form B's and Form C's. We are also enclosing Cox Oil's check #2756 in the amount of $1400 covering the filing fees.

(1) Assignment of State Lease Nos. 2220, 2221 and 4147 from Half Moon Lake, L.L.C. to Cox Oil LLC
(2) Assignment of State Lease Nos. 2220, 2221, 4039, 4147, and 16158 from BHST LLC to Cox Oil LLC
(3) Assignment of State Lease No. 4039 from Valley View Energy, L.L.C. to Cox Oil LLC
(4) Assignment of State Lease No. 16158 from Louisiana Bay Drilling, L.L.C. to Cox Oil LLC
(5) Assignment of State Lease Nos. 195, 1349, and 15941 from BHST LLC, et al, to Cox Oil LLC
(6) Assignment of State Lease No. 195 (Pelican Acreage) from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC

Rec'd
3fe

Thanks for all your help on this matter. Should you have any questions, please feel free to call me at the above phone number or 214-343-2721.

Very truly yours,

Susan

Susan F. Irby
Land Manager

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD
October 26, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attention: Susan F. Irby

Dear Ms. Irby:

Enclosed herewith are two (2) certified copies of Resolution #22-09-010 Docket No. 7 adopted at a meeting of the State Mineral and Energy Board held on October 12, 2022, approving an Assignment from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC, affecting State Lease No. 195, Plaquemines Parish, Louisiana.

**Your attention is directed to Item No. 5 in the resolution which requires that the resolution be attached to the instrument when it is recorded in <u>Plaquemines Parish</u>.** Please furnish us with the recording information when it is available. Please mail recording information to me or email recording information to Cristina.Vince@la.gov.

We wish to advise that we have retained one (1) copy of the instrument for reference use in this office.

Yours very truly,

Cristina Vince
Land Specialist 4

Enclosures

DOCKET INFORMATION SHEET
OCTOBER 12, 2022

7. ASSIGNMENT

STATE LEASE NO. 195,
Plaquemines Parish, Louisiana

An Assignment from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC, of all of Assignor's right, title and interest in and to State Lease No. 195, Plaquemines Parish, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil LLC is designated as the joint account Lessee (contact company) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

______ MINERAL INCOME

______ OWNERSHIP

______ G&E

______ GIS

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana
DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

September 27, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attn: Susan F. Irby

Dear Ms. Irby:

Receipt is acknowledged of the items listed below:

Three (3) fully executed copies of an Assignment from William L. Graham, Trustee of the BEC Trust. to Cox Oil, LLC, affecting State Lease No. 195, Plaquemines Parish, Louisiana.

This matter will be placed on the Docket Review Agenda for the consideration by the State Mineral & Energy Board at a meeting to be held Wednesday, October 12, 2022 at 9:30 a.m., in the Mineral Board Hearing Room, First Floor, LaSalle Building, 617 North Third St., Baton Rouge, Louisiana.

You may wish to attend the Committee meeting to answer any questions that may arise from its members.

Yours very truly,

Cristina Vince
Land Specialist 4
Office of Mineral Resources

7

RECEIVED
OFFICE OF
MINERAL RESOURCES
STATE MINERAL BOARD
2022 SEP 15 AM 10: 35

COX OIL LLC
4514 Cole Avenue, Suite 1175
Dallas, TX 75205
(214) 420-7710

September 13, 2022

Ms. Cristina Vince
Louisiana Dept. of Natural Resources
Office of Mineral Resources
617 N. Third St., 8th Floor
Baton Rouge, LA 70802

By Fed Ex

SL. No 195
Plag

Re: Assignments
SL 2220, 2221, 4039, 4147, 16158
Half Moon Lake/Eloi Bay Fields
St. Bernard Ph., Louisiana
SL 195, 1349, 15941
Quarantine Bay Field
Plaquemines Parish, Louisiana

Dear Cristina:

Enclosed please find for your further handling triplicate originals of the following Assignments, together with the appropriate Form B's and Form C's. We are also enclosing Cox Oil's check #2756 in the amount of $1400 covering the filing fees.

(1) Assignment of State Lease Nos. 2220, 2221 and 4147 from Half Moon Lake, L.L.C. to Cox Oil LLC
(2) Assignment of State Lease Nos. 2220, 2221, 4039, 4147, and 16158 from BHST LLC to Cox Oil LLC
(3) Assignment of State Lease No. 4039 from Valley View Energy, L.L.C. to Cox Oil LLC
(4) Assignment of State Lease No. 16158 from Louisiana Bay Drilling, L.L.C. to Cox Oil LLC
(5) Assignment of State Lease Nos. 195, 1349, and 15941 from BHST LLC, et al, to Cox Oil LLC
(6) Assignment of State Lease No. 195 (Pelican Acreage) from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC

Rec'd
3-fe

Thanks for all your help on this matter. Should you have any questions, please feel free to call me at the above phone number or 214-343-2721.

Very truly yours,

Susan

Susan F. Irby
Land Manager

Louisiana State Form Feb. 1942

No Plat

## STATE OF LOUISIANA,
## PARISH OF EAST BATON ROUGE.

STATE LEASE No. 1849

WHEREAS, under the provisions of Act No. 93 of the Regular Legislative Session of 1936, as amended, application was made to the STATE MINERAL BOARD for a lease of the hereinafter described lands, and a report thereon having been made by the Register of the State Land Office, and,

WHEREAS, in response to said advertisements, bids were received at the State Capitol on the 8th day of December 19 47, at a meeting of the STATE MINERAL BOARD, and,

WHEREAS, it appears that the bid of Gulf Refining Company

of P. O. Drawer 2100, Houston, Texas

hereinafter styled "lessee", is the most advantageous to the State of Louisiana;

NOW, THEREFORE, BE IT KNOWN AND REMEMBERED, that the said STATE MINERAL BOARD, acting under the authority of the said Act No. 93 of the Regular Session of 1936, as amended, and in accordance with the terms thereof, and acting in behalf of the State of Louisiana as "lessor", does hereby let and lease unto the said lessee, ~~(its)~~ its heirs and assigns the hereinafter described property, for the purpose of exploiting the same by geophysical means in locating mineral bearing structure thereon, and for producing therefrom sulphur, potash, oil, gas and/or other liquid or gaseous hydro-carbon minerals, in and under said lands, and also the exclusive right of drilling and operating thereon for sulphur, potash, oil, gas and/or other liquid or gaseous hydro-carbon minerals, together with a right of way for, and the right to lay pipelines to convey water, oil, gas, steam and sulphur, and the right to have sufficient water from the premises to drill and operate any wells which the said lessee may bore thereon, and also such other privileges as are reasonably requisite for conducting such operations, and the right to remove from said premises at any time any and all property that may have been placed thereon by lessee, provided that the said lessee shall have fulfilled its obligations to lessor hereunder.

The said property to which this instrument applies is located in Plaquemines & St. Bernard parish and is described as follows:

MAIN PASS AREA

Tract 2981, West 1,760 acres of Original Block 34

TRACT 2981, BEING ORIGINAL BLOCK 34, MAIN PASS AREA, STATE OF LOUISIANA: Beginning at a point off the coast of the State of Louisiana 74,735.09 feet South of and 19,549.81 feet East of U.S. Coast and Geodetic Survey Triangulation Station "MOZAM 1934"; thence North 14,750 feet; thence West in a straight line to a point where said line intersects the East boundary line of State Lease No. 195; thence in a Southwesterly and then Southerly direction along the East boundary line of State Lease No. 195 to a point due West of the point of beginning; thence East to the point of beginning; containing 3,520.00 acres, more or less. All bearings based on Louisiana Lambert Plane Coordinate System (South Zone).

TO HAVE AND TO HOLD unto the said lessee, ~~(its)~~ its heirs and assigns, for the term and under the conditions hereinafter set forth, to-wit:

I.

Lessee has this day paid to lessor the sum of forty-five thousand, seven hundred sixty ($45,760.00) Dollars for the right to begin the drilling of a well on the herein leased premises at any time within one (1) year from the date hereof, said sum also being part consideration for lessee's right to delay such drilling operations under the conditions hereinafter provided.

Should lessee fail to begin the actual drilling (spudding in) of a well on these premises within the one (1) year above provided, then this lease shall terminate as to both parties, lessor and lessee, unless on or before such anniversary date lessee pays to lessor the sum of twenty-two thousand, eight hundred eighty ($22,880.00) Dollars (herein called rental), which payment shall cover the privilege of deferring commencement of drilling operations (as above defined) for a period of twelve (12) months. In like manner, and upon like payments annually, the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each, during the primary term of this lease, which primary term is hereby declared to be ~~three (3)~~ five (5) years from the date hereof.

If during the primary term of this lease as above set forth, lessee shall begin actual drilling on the premises and shall thereafter cease such drilling operations for more than sixty (60) days, prior to developing and producing sulphur, potash, oil, gas and/or other liquid or gaseous hydro-carbon mineral in paying quantities, then the said lessee may continue its rights in effect for the remainder of the primary term of this lease by resuming payments as above provided, and by paying to lessor, within sixty (60) days from the cessation of drilling operations, the payment for the current period which lessee must have paid to maintain its rights had lessee begun no such operations

II.

Upon beginning the drilling of a well within the time specified by this lease, then lessee shall have the right to make as many attempts to develop, sulphur, potash, oil, gas and/or other liquid or gaseous hydro-carbon minerals as lessee pleases, even beyond said primary term as above set forth, and to continue the exercise of such rights as long as it pleases, provided, however, that except as otherwise provided herein, such attempts shall be successive in the sense that until sulphur, potash, oil, gas and/or other liquid or gaseous hydro-carbon mineral is being produced in paying quantities, not more than sixty (60) days shall lapse from the date of cessation of work on one well and the beginning of drilling operations (as above defined) on another, or of reworking operations on the same well, and provided further, that such operations shall be carried out diligently and in good faith in an effort to develop the premises as herein contemplated.

If in the exercise of the rights herein granted, minerals be developed or produced in paying quantities in or on the premises, the said lessee binds itself to thereafter proceed to further develop the said premises with reasonable diligence and to so continue until a reasonable development of the property has been accomplished.

Lessee further agrees that should a well capable of producing oil or gas or other liquid hydro-carbon mineral in paying quantities be brought in within six hundred sixty (660) feet (or within any spacing or pooling unit distance as established by the Department of Conservation) of the leased premises, it will begin the drilling of a well on said leased premises within sixty (60) days of the date on which said well so qualifies as a well capable of producing oil or gas or other liquid or gaseous hydro-carbon mineral in paying quantities, and in addition to the specific offset drilling obligation above provided, will drill any and all wells necessary on the premises to prevent drainage of oil, gas and/or other liquid or gaseous hydro-carbon mineral by a well or wells on adjacent property.

III.

Should sulphur, potash, oil, gas and/or other liquid hydro-carbon mineral be produced in paying quantities on the premises hereunder, then the said lessee shall deliver to lessor as royalty, free of expense:

One-eighth (1/8) of all oil produced and saved, including distillate or other liquid hydro-carbons, delivery of said oil to be understood as made when same has been received by the first purchaser thereof. Or lessee may, in lieu of said oil delivery, and at its option, pay to lessor sums equal to the value thereof on the premises; provided no deductions or charges shall be made for gathering or transporting said oil to the purchaser thereof, or loading terminal, nor shall any deductions whatsoever be made chargeable to lessor; provided further, that the price paid lessor for said oil shall not be less than the average posted pipe-line or loading terminal price then current for oil of like grade or quality.

One-eighth (1/8) of all gas produced and saved or utilized, delivery of said gas to be understood as made when same has been received by the first purchaser thereof. Or lessee may, in lieu of said gas delivery, and at its option, pay to lessor sums equal to the value thereof at the well, provided no gathering or other charges are made chargeable to lessor; provided further that the price paid lessor for said gas shall not be less than the average price then current for gas of like character or quality delivered to the pipe line purchaser in that field. Lessee shall however when a market cannot be secured for gas and gas produced is not being utilized or sold on or off the premises, pay lessor, "lieu royalty" at the rate of Two Hundred ($200.00) Dollars per year, payable quarterly, for each well capable of producing gas only.

Seventy-five cents (75¢) per long ton for all sulphur produced and saved.

Ten cents (10¢) per ton for all potash produced and saved.

One-eighth (1/8) of any and all other liquid or gaseous hydro-carbon minerals not specifically mentioned, said royalties to be delivered or paid as is the accepted custom in such matters.

IV.

It is expressly understood and agreed that about, (on or before) the expiration of the primary term hereof, lessee shall declare in writing that portion or portions of the property herein leased, if any, are not at such time, in lessee's judgment developed, the lessee, in so declaring, to make known to lessor the existence of any Domes, and/or other Structure favorable for accumulation of minerals

on or under the premises of which lessee may have knowledge, and to declare whether the same be by lessee deemed capable of development as herein understood (should lessee fail to make such required declaration, then this lease shall ipso facto terminate except as to acreage lessee is specifically allowed to retain as set forth in paragraphs numbered V and VI hereof), and if there shall be any portion or portions of the premises remaining undeveloped and capable of development and this lease has been kept in force and effect by production or drilling operations, then lessee shall proceed immediately to develop the remainder of said property as contemplated herein, and lessee shall then release, by proper instrument, from the effect of this lease, any portion or portions of the premises not already under active development or included within the above described declaration as being capable of further development.

V.

Should lessee, at any time after beginning to exploit the premises as understood herein, decide that it no longer desires to carry on drilling operations, then the said lessee is granted the right to cease such operations, and lessee shall, if (it) so selects, retain (its) rights in and to ten (10) acres or the size acreage unit for the field as established by a spacing or pooling order of the Department of Conservation, (in the form of a square, the well being the center, as near as practicable) of the property for each and every well (other than a gas well) which lessee shall have drilled thereon and is producing sulphur, potash, oil, or other liquid hydro-carbon mineral therefrom; provided that said well or wells shall be located on that portion or portions of the property so retained by lessee; and provided further, that lessee's rights in and to that portion of the premises so retained shall endure only so long as lessee shall continue to produce sulphur, potash, oil, or other hydrocarbon mineral from said well or wells on said tract or tracts so retained in paying quantities.

Should lessee at any time elect to abandon operations as above provided, then lessee shall notify lessor in writing of its intention to so do, and shall specify what portion or portions of the said premises the said lessee is entitled by virtue hereof to retain and operate; and lessee shall, as soon as practicable thereafter, execute an instrument or all instruments necessary to effect a proper release of the undeveloped portion of the premises.

VI.

It is agreed and understood that lessee shall not be required to drill more than one (1) well for each forty (40) acres held hereunder where the premises shall prove to be productive of gas only, save and except where such well, or wells, are necessary to prevent drainage of gas from the said premises by wells on adjacent property; and it is further agreed that should lessee at any time elect to abandon drilling operations as provided in paragraph V hereof, then the said lessee shall be entitled to retain its rights in and to the gas production from forty (40) acres (in the form of a square as near as practicable) for each and every gas well from which it shall at such time be producing gas in paying quantities; provided also, that any well or wells so producing shall be located on and reasonably near the center of that portion or portions of the property retained by lessee; and provided further, that lessee's rights to so hold such portion or portions of the said premises shall endure only so long as lessee shall continue to produce therefrom, gas in paying quantities.

VII.

If at any time during the life of this lease, lessee elects to no longer maintain the rights herein granted in effect, then the said lessee shall have the right to release and surrender unto lessor any and all rights hereby held unto lessee, whereupon this contract shall wholly terminate, but without prejudice to rights of lessor to enforce any liability or cause of action which may have theretofore accrued hereunder in favor of lessor.

VIII.

It is agreed and understood that operations hereunder shall offer no impediment to navigation.

IX.

It is further agreed and understood that the rights of lessee may be assigned or transferred in whole or in part but no transfer, whether in whole or in part, of the herein leased property shall be valid unless such transfer or assignment be approved by the STATE MINERAL BOARD and that said STATE MINERAL BOARD shall have supervision of this lease for the full period of its duration.

X.

Lessee may, with the consent and approval of the STATE MINERAL BOARD, pool or combine the acreage covered by this lease, or any portion thereof, with the land, lease, or leases contiguous thereto or contained in one unit. Such pooling or combining to be in strict conformity with spacing and other rules, regulations, or orders of the Department of Conservation and the STATE MINERAL BOARD; nor shall such pooling or combining agreement in any way decrease the obligations of lessee as herein stipulated.

THUS DONE, READ, ACCEPTED AND SIGNED by the parties hereto, the lessor, The State of Louisiana, herein represented by the State Mineral Board, acting through B. A. Hardey, Chairman, duly authorized, and the lessee, Gulf Refining Company in the presence of the respective undersigned witnesses, on this the 9th day of January, A.D. 1948.

1349

WITNESSES to the signature of Lessor:

A D Harmon

M M Files

STATE MINERAL BOARD

By: [signature] Chairman

For the State of Louisiana, Lessor

WITNESSES to the signature of Lessee:

[signature]

[signature]

[signature] Vice-Pres.

For Lessee

Gulf Refining Company

STATE OF LOUISIANA,

PARISH OF Caddo.

BE IT KNOWN that on this 9th day of January, 1948, before me Charles O. Hardey, Notary Public, duly commissioned and qualified, personally appeared the above named B. A. Hardey, Chairman, State Mineral Board

who signed the foregoing mineral lease before me and in the presence of the two competent witnesses whose names are thereto subscribed as such, and the said appearer thereupon declared and acknowledged unto me, in the presence of said witnesses, that he signed and executed said mineral lease for the purposes and considerations therein expressed.

IN WITNESS WHEREOF the said appearer has signed these presents before me and in the presence of said witnesses, and I have hereunto set my official hand and seal with said witnesses on the day and date above written.

WITNESSES:

A D Harmon

M M Files

[signature]

Charles O. Hardey
Notary Public

STATE OF TEXAS,

COUNTY OF HARRIS.

BE IT KNOWN that on this ____ day of January, 1948, before me Margie D. Johnson, Notary Public, duly commissioned and qualified, personally appeared the above named J. H. Russell, Vice-President of Gulf Refining Company, Lessee, duly authorized,

who signed the foregoing mineral lease before me and in the presence of the two competent witnesses whose names are thereto subscribed as such, and the said appearer thereupon declared and acknowledged unto me, in the presence of said witnesses, that he signed and executed said mineral lease for the purposes and considerations therein expressed.

IN WITNESS WHEREOF the said appearer has signed these presents before me and in the presence of said witnesses, and I have hereunto set my official hand and seal with said witnesses on the day and date above written.

WITNESSES:

[signature]

[signature]

J. H. Russell
Vice-President, of Gulf Refining Company

Margie D. Johnson
Notary Public
in and for Harris County, Texas.

MARGIE D. JOHNSON

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD
October 26, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attention: Susan F. Irby

Dear Ms. Irby:

Enclosed herewith are two (2) certified copies of Resolution #22-09-009 Docket No. 6 adopted at a meeting of the State Mineral and Energy Board held on October 12, 2022, approving an Assignment from BHST LLC, et al to Cox Oil LLC, affecting State Lease Nos. 195, 1349 and 15941, Plaquemines Parish, Louisiana.

**Your attention is directed to Item No. 5 in the resolution which requires that the resolution be attached to the instrument when it is recorded in <u>Plaquemines Parish</u>**. Please furnish us with the recording information when it is available. Please mail recording information to me or email recording information to Cristina.Vince@la.gov.

We wish to advise that we have retained one (1) copy of the instrument for reference use in this office.

Yours very truly,

Cristina Vince
Land Specialist 4

Enclosures

DOCKET INFORMATION SHEET
OCTOBER 12, 2022

6. ASSIGNMENT

SSTATE LEASE NOS. 195, 1349 and 15941,
Plaquemines Parish, Louisiana

An Assignment from BHST LLC, Quarantine Bay, L.L.C. and Cox Interests, L.L.C. to Cox Oil LLC, of all of Assignor's right, title and interest in and to State Lease Nos. 195, 1349 and 15941, Plaquemines Parish, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil LLC is designated as the joint account Lessee (contact company) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

______ MINERAL INCOME

__✓__ OWNERSHIP

______ G&E

______ GIS

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

September 27, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attn: Susan F. Irby

Dear Ms. Irby:

Receipt is acknowledged of the items listed below:

> Three (3) fully executed copies of an Assignment from BHST LLC, et al. to Cox Oil, LLC, affecting State Lease Nos. 195, 1349 and 15941, Plaquemines Parish, Louisiana.

This matter will be placed on the Docket Review Agenda for the consideration by the State Mineral & Energy Board at a meeting to be held Wednesday, October 12, 2022 at 9:30 a.m., in the Mineral Board Hearing Room, First Floor, LaSalle Building, 617 North Third St., Baton Rouge, Louisiana.

You may wish to attend the Committee meeting to answer any questions that may arise from its members.

Yours very truly,

Cristina Vince
Land Specialist 4
Office of Mineral Resources

6

RECEIVED
OFFICE OF
MINERAL RESOURCES
STATE MINERAL BOARD
2022 SEP 15 AM 10:35

COX OIL LLC
4514 Cole Avenue, Suite 1175
Dallas, TX 75205
(214) 420-7710

September 13, 2022

Ms. Cristina Vince
Louisiana Dept. of Natural Resources
Office of Mineral Resources
617 N. Third St., 8th Floor
Baton Rouge, LA 70802

By Fed Ex

Re: Assignments
SL 2220, 2221, 4039, 4147, 16158
Half Moon Lake/Eloi Bay Fields
St. Bernard Ph., Louisiana
SL 195, 1349, 15941
Quarantine Bay Field
Plaquemines Parish, Louisiana

SL. Nos. 195
1349
15941
Plaq

Dear Cristina:

Enclosed please find for your further handling triplicate originals of the following Assignments, together with the appropriate Form B's and Form C's. We are also enclosing Cox Oil's check #2756 in the amount of $1400 covering the filing fees.

(1) Assignment of State Lease Nos. 2220, 2221 and 4147 from Half Moon Lake, L.L.C. to Cox Oil LLC
(2) Assignment of State Lease Nos. 2220, 2221, 4039, 4147, and 16158 from BHST LLC to Cox Oil LLC
(3) Assignment of State Lease No. 4039 from Valley View Energy, L.L.C. to Cox Oil LLC
(4) Assignment of State Lease No. 16158 from Louisiana Bay Drilling, L.L.C. to Cox Oil LLC
(5) Assignment of State Lease Nos. 195, 1349, and 15941 from BHST LLC, et al, to Cox Oil LLC
(6) Assignment of State Lease No. 195 (Pelican Acreage) from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC

Rec'd
3fe

Thanks for all your help on this matter. Should you have any questions, please feel free to call me at the above phone number or 214-343-2721.

Very truly yours,

Susan

Susan F. Irby
Land Manager

Lo R d O t be 1948

# STATE OF LOUISIANA
# PARISH OF EAST BATON ROUGE

STATE LEASE No 2220

WHEREAS under the provisions of Chapter 2 Title 30 of the Louisiana Revised Statutes of 1950 as amended and other applicable laws the State Mineral Board of the State of Louisiana advertised for bids for an oil gas and mining lease on the hereinafter described property and

WHEREAS in response to the necessary regular advertisements bids were received at the Capitol of the State of Louisiana on the 20th day of November 19 52 at a meeting of the State Mineral Board of the State of Louisiana and

WHEREAS it appears that the bid of Phillips Petroleum Company

of the Post Office address of Bartlesville, Oklahoma

hereinafter referred to as Lessee is the most advantageous to the State of Louisiana

NOW THEREFORE be it known and remembered that the State Mineral Board of the State of Louisiana acting under authority of said Chapter 2 Title 30 of the Louisiana Revised Statutes of 1950 as amended and other applicable laws and acting for and in behalf of the State of Louisiana as Lessor does hereby lease let and grant exclusively unto the said Lessee and Lessee s successors and assigns for the purpose of exploring by any method for formations or structures and prospecting and drilling for mining and producing sulphur potash oil gas and any other liquid or gaseous hydrocarbon minerals storing minerals and fluids laying pipe lines dredging canals building roads bridges docks tanks power stations telephone and electric transmission lines and other structures and facilities including houses for employees necessary or convenient for the purpose of conducting the aforesaid operations the following described property situated in the Parish of St. Bernard State of Louisiana to wit

TRACT 5193 described as follows.

TRACT 5193 - St Bernard Parish, Louisiana - Block 48 Chandeleur Sound Area, All of the lands now or formerly constituting the beds and bottoms of all lakes, bays, coves, bayous, rivers and any other water bodies of every nature and description and all islands and other lands, except tax lands, owned by the State of Louisiana and not under lease as of September 29, 1952, situated within the following described boundaries, to-wit Beginning at a point whose Lambert Plane Coordinate Position is X = 2,605,850 0 and Y = 410,830 0 thence East 14,750 feet thence South 14,750 feet thence West 14,750 feet, thence North 14,750 feet to the point of beginning, includin in particular the beds and bottoms of Eloi Bay and Mosquito Bight, this particulariza tion, however, not being nor intended to be all inclusive, the State owned lands and water bottoms lying within said area being estimated to contain 4,163 acres, more or less All Bearings are based on Louisiana Lambert Plane Coordinate System (South Zone)

1 Lessee has this day paid to Lessor the sum of One Million, One Hundred Forty-Eight Thousand, Nine Hundred and Eighty-Eight ($ 1,148,988 00) Dollars as the full and adequate consideration for every right granted hereunder and the same is not to be considered as mere rental for a period

2 Subject to the other provisions hereof this lease shall be for a term of Three (3) years from the date hereof (hereinafter called primary term ) and as long thereafter as sulphur potash oil gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quan tities or any operation conducted or payment made or condition exists which continues this lease in force according to its terms

3 If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof this lease shall then terminate unless Lessee on or before the expiration of said period shall pay or tender to the Lessor the sum of Five Hundred Seventy-Four Thousand, Four Hundred and Ninety-Four ($ 574,494 00) Dollars (hereinafter called rental ) which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced Thereafter annually in like manner and upon like payments or tenders all of Lessee s rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term Payment or tender of rental may be made by check or draft of Lessee delivered or mailed on or before the rental paying date

D5 19

4 If on any rental paying date there be neither actual drilling mining nor reworking operations in progress on the leased premises nor production therefrom this lease shall not terminate if Lessee on or before said date shall make or resume the payment of rental as herein set forth provided if drilling reworking or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date or if production ceases within such ninety (90) days Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to commence reworking or mining operations or actual drilling of another well on the leased premises or within which to make said rental payment and the commencement of such operations or the payment of such rental within said ninety (90) days period shall have the same effect as though commenced or paid on or before said rental paying date Wherever used in this lease reworking operations shall be defined as reconditioning deepening plugging back cleaning out or otherwise attempting in good faith to increase or restore production

If at the expiration of the primary term sulphur potash oil gas or any other liquid or gaseous hydrocarbon mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well if a well be abandoned or production should cease within ninety (90) days prior to the expiration of the primary term) Lessee commences actual drilling mining or reworking operations on the leased premises in search of such products then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more than ninety (90) days between cessation of operations and their recommencement whether on the same well or mine or on different wells or mines successively If after the expiration of the primary term production hereunder should for any reason cease or terminate Lessee shall have the right at any time within ninety (90) days from cessation of such production to resume actual drilling mining or reworking operations in an effort to make the leased premises again produce any of such products in which event this lease shall remain in force so long as such operations are continued as above provided If as a result of any such operations sulphur potash oil gas or any other liquid or gaseous hydrocarbon mineral be found and produced or the production of any of the same be restored this lease shall continue in force so long as any of them is produced hereunder in paying quantities

This lease may be maintained in force by directional drilling operations (deviation from vertical) in which event actual drilling shall be considered to have commenced on the leased premises when the drill stem penetrates beneath the surface of the leased premises Lessee shall have the right and privilege to set up any necessary surface equipment and installations on the property covered by thi lease for the purpose of drilling a directional well or wells in search of sulphur potash oil gas or any other liquid or gaseous hydrocarbon mineral under a mineral lease or leases covering adjoining or adjacent property granted by the State and owned in whole or in part by Lessee and to erect construct and use such additional installations as are necessary or convenient in connection with the development production transporting and marketing of any and all said minerals from such adjoining or adjacent property Such rights and privileges shall remain in full force and effect so long as this lease or any such adjacent or adjoining lease is in force

5 Lessee further agrees that should a well capable of producing oil or gas or other liquid hydrocarbon mineral in paying quantities be brought in within six hundred sixty (660) feet (or within any spacing or pooling unit distance as established by the Department of Conservation) of and draining the leased premises on property not owned by Lessor Lessee will begin the drilling of a well on said leased premises within ninety (90) days of the date on which said well so qualifies as a well capable of producing oil or gas or other liquid or gaseous hydrocarbon mineral in paying quantities and in addition to the specific offset drilling obligation above provided will drill any and all wells necessary on the premises to prevent drainage of oil gas or other liquid or gaseous hydrocarbon mineral by a well or wells on adjacent property not owned by Lessor

6 Lessee shall deliver to Lessor as royalty free of cost of production

One-Eighth (1/8) of all oil including distillate and other liquid hydrocarbons produced and saved at the well by ordinary production methods delivery to be understood as made when same has been received by the first purchaser thereof Or Lessee may in lieu of said delivery and at Lessee s option pay to Lessor sums equal to the value thereof on the premises The price paid Lessor shall not be less than the average posted pipe line price in the same field or loading terminal price in the same field then current for oil including distillate or other liquid hydrocarbons of like grade or quality

One-Eighth (1/8) of all gas produced and saved or utilized delivery of said gas to be understood as made when same has been received by the first purchaser thereof Or Lessee may in lieu of said gas delivery and at Lessee s option pay to Lessor sums equal to the value thereof at the well provided that the price paid Lessor for said gas shall not be less than the average price then current for gas of like character or quality delivered to the pipe line purchaser in that field If there is on the leased premises a well or wells capable of producing gas and gas is not being used or marketed therefrom and this lease is not then being maintained by other production or operations this lease shall nevertheless remain in full force and effect for a period of ninety (90) days after cessation of production or operations or the shutting in of said well and on or before the expiration of said ninety (90) day period Lessee may pay or tender a sum equal to One Dollar ($1 00) per acre for the number of acres then covered by this lease but such sum shall not be less than Two Hundred Dollars ($200 00) which payment shall maintain this lease in full force and effect for a period of six (6) months from the expiration of said ninety (90) day period and it will be considered that gas is being produced hereunder and such payments or tenders shall have the same effect as the production of gas for all purposes hereof especially under the provisions of Articles 2 4 and 7 hereof Thereafter semi annually in like manner upon like payments or tenders this lease may be maintained in force and effect for successive periods of six (6) months each so long as such payments are made but not however exceeding six (6) successive periods It is understood that the above provision or shut in clause shall apply to any well where the gas/oil ratio is such that the Commissioner of Conservation will not permit the operation of such well without the use or sale of the gas

Two Dollars ($2 00) per long ton for all sulphur produced and saved

Ten Cents ($ 10) per ton for all potash produced and saved

One-Eighth (1/8) for any and all other liquid or gaseous hydrocarbon minerals not specifically mentioned herein said royalties to be delivered or paid as is the accepted custom in such matters

Additional Consideration:

7. Lessee may surrender all or any portion or portions of the leased premises at any time this lease is in effect and thereby be relieved of all obligations thereafter accruing under this lease as to the portions surrendered; provided that no partial release or surrender shall reduce, or otherwise affect, the amount of rentals provided for in Article 3 of this lease.

In the event of cancellation or forfeiture of this lease for any cause, Lessee may, nevertheless, retain hereunder 40 acres around each well producing oil and 160 acres around each well producing gas (including wells drilled under this lease by directional drilling), and in the case of any well being worked on or being drilled Lessee shall have the right to complete such operations or reworking or drilling, and in the event any such well results in a producer of oil, Lessee may retain 40 acres around such well and if any such well results in a producer of gas, Lessee may retain 160 acres around such well, such acreage to be reserved in as near a square tract as practicable with the well or wells to be as near the center of said acreage so selected as practicable; provided that if a drilling or proration unit has been assigned to any such well by the Commissioner of Conservation, Lessee may retain the acreage fixed for such drilling or proration unit.

8. It is further agreed and understood that the rights of Lessee may be assigned or transferred in whole or in part but no transfer, whether in whole or in part, of the herein leased property shall be valid unless such transfer or assignment be approved by the State Mineral Board.

9. Lessee may, with the consent and approval of the State Mineral Board, pool or combine the acreage covered by this lease, or any portion thereof, with any other property, lease or leases, or portions thereof.

10. Lessee shall have the right during or within one year after the life of this lease to remove all Lessee's property and equipment, including the right to draw and remove all casing.

THUS DONE, READ, ACCEPTED AND SIGNED by the parties hereto in the presence of the respective undersigned witnesses, as of the 22nd day of November, A. D., 19 52, which shall be the date of this lease for all purposes.

WITNESSES to the signature of Lessor:

Richard G. Irwin

Donald B. Bonnecarrere

STATE MINERAL BOARD

By John W. Olvey, Chairman

For the State of ~~Louisiana~~, Lessor

WITNESSES to the signature of Lessee:

R. C. Curtiss

W. Gamble

PHILLIPS PETROLEUM COMPANY

By ______ Vice President

For Lessee

ATTEST: ______

Asst. Secretary

**ACKNOWLEDGMENT FOR STATE MINERAL BOARD**

STATE OF LOUISIANA

PARISH OF East Baton Rouge

Before me, the undersigned authority, personally came and appeared Richard G. Irwin, who by me being first duly sworn, deposed and said:

That he is one of the witnesses to the execution of the foregoing instrument and that he saw John W. Olvey sign said instrument as Chairman of the State Mineral Board for and on behalf of the State of Louisiana in the presence of appearer and Donald B. Bonnecarrere, the other subscribing witness.

Richard G. Irwin

Sworn to and subscribed before me on this the 27th day of November, 19 52.

Angela B. Casbio

Notary Public

## ACKNOWLEDGMENT FOR CORPORATE LESSEE

STATE OF Oklahoma
County OF Washington

Before me, the undersigned authority, personally came and appeared H. L. Gamble, who by me being first duly sworn, deposed and said:

That he is one of the witnesses to the execution of the foregoing instrument and that he saw H. E. Koopman execute said instrument as Vice President of Phillips Petroleum Company as the free act and deed of said corporation in the presence of appearer and R. C. Curtiss, the other subscribing witness.

H L Gamble

Sworn to and subscribed before me on this the 28th day of November, 1952.

D B Legg
Notary Public

My Commission Expires December 29, 1953

## ACKNOWLEDGMENT FOR INDIVIDUAL LESSEE

STATE OF __________
__________ OF __________

Before me, the undersigned authority, personally came and appeared __________, who by me being first duly sworn, deposed and said:

That he is one of the witnesses to the execution of the foregoing instrument and that he saw __________ execute said instrument as his own free act and deed in the presence of appearer and of __________, the other subscribing witness.

__________

Sworn to and subscribed before me on this the _____ day of __________, 19____.

__________
Notary Public

D5 20


TRACT NO. 5175
± 3050 Acres
TRACT NO. 5176
± 4133 Acres
TRACT NO. 5177
± 3790 Acres
TRACT NO. 5178
± 3055 Acres
TRACT NO. 5179
± 4157 Acres
TRACT NO. 5182
± 3,720 Acres
TRACT NO. 5180
± 346 Acres
TRACT NO. 5181
± 980 Acres
TRACT NO. 5183
± 2,717 Acres
(PT. BLOCK 3)
TRACT NO. 5184
± 2,564 Acres
(BLOCK 22)
TRACT NO. 5185
± 3,644 Acres
(BLOCK 21)
TRACT NO. 5186
± 3,856 Acres
(BLOCK 20)
TRACT NO. 5187
± 3526 Acres
(BLOCK 23)
TRACT NO. 5188
± 3559 Acres
(BLOCK 24)
TRACT NO. 5189
± 4194 Acres
TRACT NO. 5190
± 2,426 Acres
(BLOCK 44)
TRACT NO. 5191
± 3,583 Acres
(BLOCK 43)
TRACT NO. 5192
± 2,809 Acres
(BLOCK 47)
TRACT NO. 5193
± 4,163 Acres
(BLOCK 48)
TRACT NO. 5194
± 4,542 Acres
(BLOCK 49)
TRACT NO. 5195
± 3,215 Acres
(BLOCK 50)

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD
October 26, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attention: Susan F. Irby

Dear Ms. Irby:

Enclosed herewith are two (2) certified copies of Resolution #22-09-005 Docket No. 2 adopted at a meeting of the State Mineral and Energy Board held on October 12, 2022, approving an Assignment from Half Moon Lake, L.L.C. to Cox Oil LLC, affecting State Lease Nos. 2220, 2221 and 4147, St. Bernard Parish, Louisiana.

**Your attention is directed to Item No. 5 in the resolution which requires that the resolution be attached to the instrument when it is recorded in St. Bernard Parish**. Please furnish us with the recording information when it is available. Please mail recording information to me or email recording information to Cristina.Vince@la.gov.

We wish to advise that we have retained one (1) copy of the instrument for reference use in this office.

Yours very truly,

Cristina Vince
Land Specialist 4

Enclosures

DOCKET INFORMATION SHEET
OCTOBER 12, 2022

2. ASSIGNMENT

STATE LEASE NOS. 2220, 2221 and 4147, St. Bernard Parish, Louisiana

An Assignment from Half Moon Lake, L.L.C. to Cox Oil LLC, of all of Assignor's right, title and interest in and to State Lease Nos. 2220, 2221 and 4147, St. Bernard Parish, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil LLC is designated as the joint account Lessee (contact company) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

______ MINERAL INCOME

MX OWNERSHIP

______ G&E

______ GIS

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

September 27, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attn: Susan F. Irby

Dear Ms. Irby:

Receipt is acknowledged of the items listed below:

> Three (3) fully executed copies of an Assignment from Half Moon Lake, L.L.C. to Cox Oil, LLC, affecting State Lease Nos. 2220, 2221 and 4147, St. Bernard Parish, Louisiana.

This matter will be placed on the Docket Review Agenda for the consideration by the State Mineral & Energy Board at a meeting to be held Wednesday, October 12, 2022 at 9:30 a.m., in the Mineral Board Hearing Room, First Floor, LaSalle Building, 617 North Third St., Baton Rouge, Louisiana.

You may wish to attend the Committee meeting to answer any questions that may arise from its members.

Yours very truly,

Cristina Vince
Land Specialist 4
Office of Mineral Resources

Invoice # 1255841

SECURITY FEATURES INCLUDE TRUE WATERMARK PAPER, HEAT SENSITIVE ICON AND FOIL HOLOGRAM.

CHECKSAFE

002756

Amarillo National Bank
410 South Taylor
Amarillo, TX 79101
88-95/1113

*Cox Oil, LLC*
*4514 Cole Ave Ste 1175*
*Dallas, TX 75205-4183*

9/6/2022

PAY TO THE ORDER OF Office of Mineral Resources $ **1,400.00

One Thousand Four Hundred and 00/100************************************************************************************ DOLLARS

Details on Back. Security Features Included

Office of Mineral Resources
P.O. Box 2827
Baton Rouge, LA 70821-2827

MEMO

AUTHORIZED SIGNATURE MP

325444

2

RECEIVED

ST

2022 SEP 15 AM 10:35

COX OIL LLC
4514 Cole Avenue, Suite 1175
Dallas, TX 75205
(214) 420-7710

September 13, 2022

Ms. Cristina Vince
Louisiana Dept. of Natural Resources
Office of Mineral Resources
617 N. Third St., 8th Floor
Baton Rouge, LA 70802

By Fed Ex

SL. Nos 2220
2221
4147
St. Bernard

Re: Assignments
SL 2220, 2221, 4039, 4147, 16158
Half Moon Lake/Eloi Bay Fields
St. Bernard Ph., Louisiana
SL 195, 1349, 15941
Quarantine Bay Field
Plaquemines Parish, Louisiana

Dear Cristina:

Enclosed please find for your further handling triplicate originals of the following Assignments, together with the appropriate Form B's and Form C's. We are also enclosing Cox Oil's check #2756 in the amount of $1400 covering the filing fees.

(1) Assignment of State Lease Nos. 2220, 2221 and 4147 from Half Moon Lake, L.L.C. to Cox Oil LLC
(2) Assignment of State Lease Nos. 2220, 2221, 4039, 4147, and 16158 from BHST LLC to Cox Oil LLC
(3) Assignment of State Lease No. 4039 from Valley View Energy, L.L.C. to Cox Oil LLC
(4) Assignment of State Lease No. 16158 from Louisiana Bay Drilling, L.L.C. to Cox Oil LLC
(5) Assignment of State Lease Nos. 195, 1349, and 15941 from BHST LLC, et al, to Cox Oil LLC
(6) Assignment of State Lease No. 195 (Pelican Acreage) from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC

Rec'd
3fe

Thanks for all your help on this matter. Should you have any questions, please feel free to call me at the above phone number or 214-343-2721.

Very truly yours,

Susan

Susan F. Irby
Land Manager

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD
October 26, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attention: Susan F. Irby

Dear Ms. Irby:

Enclosed herewith are two (2) certified copies of Resolution #22-09-006 Docket No. 3 adopted at a meeting of the State Mineral and Energy Board held on October 12, 2022, approving an Assignment from HST LLC to Cox Oil LLC, affecting State Lease Nos. 2220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana.

**Your attention is directed to Item No. 5 in the resolution which requires that the resolution be attached to the instrument when it is recorded in St. Bernard Parish.** Please furnish us with the recording information when it is available. Please mail recording information to me or email recording information to Cristina.Vince@la.gov.

We wish to advise that we have retained one (1) copy of the instrument for reference use in this office.

Yours very truly,

Cristina Vince
Land Specialist 4

Enclosures

DOCKET INFORMATION SHEET
OCTOBER 12, 2022

3. ASSIGNMENT

STATE LEASE NOS. 2220,
2221, 4039, 4147 and 16158,
St. Bernard Parish, Louisiana

An Assignment from HST LLC to Cox Oil LLC, of all of Assignor's right, title and interest in and to State Lease Nos. 220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil LLC is designated as the joint account Lessee (contact company) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

______ MINERAL INCOME

HW ______ OWNERSHIP

______ G&E

______ GIS

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

September 27, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attn: Susan F. Irby

Dear Ms. Irby:

Receipt is acknowledged of the items listed below:

> Three (3) fully executed copies of an Assignment from BHST LLC to Cox Oil, LLC, affecting State Lease Nos. 2220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana.

This matter will be placed on the Docket Review Agenda for the consideration by the State Mineral & Energy Board at a meeting to be held Wednesday, October 12, 2022 at 9:30 a.m., in the Mineral Board Hearing Room, First Floor, LaSalle Building, 617 North Third St., Baton Rouge, Louisiana.

You may wish to attend the Committee meeting to answer any questions that may arise from its members.

Yours very truly,

Cristina Vince
Land Specialist 4
Office of Mineral Resources

3

RECEIVED
OFFICE OF
MINERAL RESOURCES
STATE MINERAL BOARD
2022 SEP 15 AM 10: 35

COX OIL LLC
4514 Cole Avenue, Suite 1175
Dallas, TX 75205
(214) 420-7710

September 13, 2022

Ms. Cristina Vince
Louisiana Dept. of Natural Resources
Office of Mineral Resources
617 N. Third St., 8th Floor
Baton Rouge, LA 70802

By Fed Ex

SL Nos 2220
2221
4039
4147
16158
St. Bernard

Re: Assignments
SL 2220, 2221, 4039, 4147, 16158
Half Moon Lake/Eloi Bay Fields
St. Bernard Ph., Louisiana
SL 195, 1349, 15941
Quarantine Bay Field
Plaquemines Parish, Louisiana

Dear Cristina:

Enclosed please find for your further handling triplicate originals of the following Assignments, together with the appropriate Form B's and Form C's. We are also enclosing Cox Oil's check #2756 in the amount of $1400 covering the filing fees.

(1) Assignment of State Lease Nos. 2220, 2221 and 4147 from Half Moon Lake, L.L.C. to Cox Oil LLC
(2) Assignment of State Lease Nos. 2220, 2221, 4039, 4147, and 16158 from BHST LLC to Cox Oil LLC
(3) Assignment of State Lease No. 4039 from Valley View Energy, L.L.C. to Cox Oil LLC
(4) Assignment of State Lease No. 16158 from Louisiana Bay Drilling, L.L.C. to Cox Oil LLC
(5) Assignment of State Lease Nos. 195, 1349, and 15941 from BHST LLC, et al, to Cox Oil LLC
(6) Assignment of State Lease No. 195 (Pelican Acreage) from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC

Rec'd
3 fee

Thanks for all your help on this matter. Should you have any questions, please feel free to call me at the above phone number or 214-343-2721.

Very truly yours,

Susan

Susan F. Irby
Land Manager

Q-201,926

STATE OF LOUISIANA, STATE LEASE No. 2221

PARISH OF EAST BATON ROUGE.

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received at the Capitol of the State of Louisiana on the 20th. day of November, 1952, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, it appears that the bid of Phillips Petroleum Company

of the Post Office address of Bartlesville, Oklahoma, hereinafter referred to as Lessee, is the most advantageous to the State of Louisiana,

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana, acting under authority of said Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, and acting for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let and grant exclusively unto the said Lessee, and Lessee's successors and assigns, for the purpose of exploring by any method for formations or structures and prospecting and drilling for, mining and producing sulphur, potash, oil, gas and any other liquid or gaseous hydrocarbon minerals, storing minerals and fluids, laying pipe lines, dredging canals, building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines and other structures and facilities, including houses for employees necessary or convenient for the purpose of conducting the aforesaid operations, the following described property situated in the Parish of St. Bernard, State of Louisiana, to-wit:

**TRACT 5194, described as follows:**

TRACT 5194 - St. Bernard Parish, Louisiana - Block 49; Chandeleur Sound Area; All of the lands now or formerly constituting the beds and bottoms of all lakes, bays, coves, bayous, rivers and any other water bodies of every nature and description and all islands and other lands, except tax lands, owned by the State of Louisiana and not under lease as of September 29, 1952, situated within the following described boundaries, to-wit: Beginning at a point whose Lambert Plane Coordinate Position is X = 2,620,600.0 and Y = 410,830.0; thence East 14,750 feet; thence South 14,750 feet; thence West 14,750 feet; thence North 14,750 feet to the point of beginning; includir in particular the bed and bottom of Eloi Bay, this particularization, however, not being nor intended to be all inclusive; the State owned lands and water bottoms lying within said area being estimated to contain 4,542 acres, more or less. All Bearings are based on Louisiana Lambert Plane Coordinate System (South Zone).

1. Lessee has this day paid to Lessor the sum of One Million, Two Hundred Fifty-Three Thousand, Five Hundred and Ninety-Two ($ 1,253,592.00) Dollars as the full and adequate consideration for every right granted hereunder and the same is not to be considered as mere rental for a period.

2. Subject to the other provisions hereof, this lease shall be for a term of Three (3) years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation conducted or payment made or condition exists which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of said period shall pay or tender to the Lessor the sum of Six Hundred Twenty-Six Thousand, Seven Hundred, Ninety-Six and no/100 ($ 626,796.00) Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee delivered or mailed on or before the rental paying date.

D5 19

4. If on any rental paying date there be neither actual drilling, mining nor reworking operations in progress on the leased premises, nor production therefrom, this lease shall not terminate if Lessee, on or before said date, shall make or resume the payment of rental as herein set forth; provided, if drilling, reworking or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date, or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to commence reworking or mining operations or actual drilling of another well on the leased premises, or within which to make said rental payment, and the commencement of such operations or the payment of such rental within said ninety (90) days' period shall have the same effect as though commenced or paid on or before said rental paying date. Wherever used in this lease, "reworking operations" shall be defined as reconditioning, deepening, plugging back, cleaning out or otherwise attempting in good faith to increase or restore production.

If at the expiration of the primary term sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well, if a well be abandoned or production should cease within ninety (90) days prior to the expiration of the primary term), Lessee commences actual drilling, mining or reworking operations on the leased premises in search of such products, then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more than ninety (90) days between cessation of operations and their recommencement, whether on the same well or mine or on different wells or mines successively. If, after the expiration of the primary term, production hereunder should for any reason cease or terminate, Lessee shall have the right at any time within ninety (90) days from cessation of such production to resume actual drilling, mining or reworking operations in an effort to make the leased premises again produce any of such products, in which event this lease shall remain in force so long as such operations are continued as above provided. If as a result of any such operations, sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral be found and produced, or the production of any of the same be restored, this lease shall continue in force so long as any of them is produced hereunder in paying quantities.

This lease may be maintained in force by directional drilling operations (deviation from vertical) in which event actual drilling shall be considered to have commenced on the leased premises when the drill stem penetrates beneath the surface of the leased premises. Lessee shall have the right and privilege to set up any necessary surface equipment and installations on the property covered by this lease for the purpose of drilling a directional well or wells in search of sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral under a mineral lease or leases covering adjoining or adjacent property granted by the State and owned in whole or in part by Lessee, and to erect, construct and use such additional installations as are necessary or convenient in connection with the development, production, transporting and marketing of any and all said minerals from such adjoining or adjacent property. Such rights and privileges shall remain in full force and effect so long as this lease, or any such adjacent or adjoining lease is in force.

5. Lessee further agrees that should a well capable of producing oil or gas or other liquid hydrocarbon mineral in paying quantities be brought in within six hundred sixty (660) feet (or within any spacing or pooling unit distance as established by the Department of Conservation) of, and draining, the leased premises, on property not owned by Lessor, Lessee will begin the drilling of a well on said leased premises within ninety (90) days of the date on which said well so qualifies as a well capable of producing oil or gas or other liquid or gaseous hydrocarbon mineral in paying quantities, and in addition to the specific offset drilling obligation above provided, will drill any and all wells necessary on the premises to prevent drainage of oil, gas or other liquid or gaseous hydrocarbon mineral by a well or wells on adjacent property not owned by Lessor.

6. Lessee shall deliver to Lessor as royalty, free of cost of production:

**One-Eighth (1/8)** __________ of all oil, including distillate and other liquid hydrocarbons, produced and saved at the well by ordinary production methods, delivery to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said delivery and at Lessee's option, pay to Lessor sums equal to the value thereof on the premises. The price paid Lessor shall not be less than the average posted pipe line price in the same field or loading terminal price in the same field then current for oil, including distillate or other liquid hydrocarbons, of like grade or quality.

**One-Eighth (1/8)** __________ of all gas produced and saved or utilized, delivery of said gas to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said gas delivery, and at Lessee's option, pay to Lessor sums equal to the value thereof at the well; provided that the price paid Lessor for said gas shall not be less than the average price then current for gas of like character or quality delivered to the pipe line purchaser in that field. If there is on the leased premises a well or wells capable of producing gas and gas is not being used or marketed therefrom and this lease is not then being maintained by other production or operations, this lease shall, nevertheless, remain in full force and effect for a period of ninety (90) days after cessation of production or operations or the shutting in of said well and on or before the expiration of said ninety (90) day period, Lessee may pay or tender a sum equal to One Dollar ($1.00) per acre for the number of acres then covered by this lease, but such sum shall not be less than Two Hundred Dollars ($200.00), which payment shall maintain this lease in full force and effect for a period of six (6) months from the expiration of said ninety (90) day period, and it will be considered that gas is being produced hereunder, and such payments or tenders shall have the same effect as the production of gas, for all purposes hereof, especially under the provisions of Articles 2, 4 and 7 hereof. Thereafter, semi-annually in like manner, upon like payments or tenders, this lease may be maintained in force and effect for successive periods of six (6) months each so long as such payments are made, but not, however, exceeding six (6) successive periods. It is understood that the above provision or shut-in clause shall apply to any well where the gas/oil ratio is such that the Commissioner of Conservation will not permit the operation of such well without the use or sale of the gas.

**Two Dollars ($ 2. 00)** __________ per long ton for all sulphur produced and saved.

**Ten Cents ($ . 10)** __________ per ton for all potash produced and saved.

**One-Eighth (1/8)** __________ for any and all other liquid or gaseous hydrocarbon minerals not specifically mentioned herein, said royalties to be delivered or paid as is the accepted custom in such matters.

Additional Consideration:

7. Lessee may surrender all or any portion or portions of the leased premises at any time this lease is in effect and thereby be relieved of all obligations thereafter accruing under this lease as to the portions surrendered; provided that no partial release or surrender shall reduce, or otherwise affect, the amount of rentals provided for in Article 3 of this lease.

In the event of cancellation or forfeiture of this lease for any cause, Lessee may, nevertheless, retain hereunder 40 acres around each well producing oil and 160 acres around each well producing gas (including wells drilled under this lease by directional drilling), and in the case of any well being worked on or being drilled Lessee shall have the right to complete such operations or reworking or drilling, and in the event any such well results in a producer of oil, Lessee may retain 40 acres around such well and if any such well results in a producer of gas, Lessee may retain 160 acres around such well, such acreage to be reserved in as near a square tract as practicable with the well or wells to be as near the center of said acreage so selected as practicable; provided that if a drilling or proration unit has been assigned to any such well by the Commissioner of Conservation, Lessee may retain the acreage fixed for such drilling or proration unit.

8. It is further agreed and understood that the rights of Lessee may be assigned or transferred in whole or in part but no transfer, whether in whole or in part, of the herein leased property shall be valid unless such transfer or assignment be approved by the State Mineral Board.

9. Lessee may, with the consent and approval of the State Mineral Board, pool or combine the acreage covered by this lease, or any portion thereof, with any other property, lease or leases, or portions thereof.

10. Lessee shall have the right during or within one year after the life of this lease to remove all Lessee's property and equipment, including the right to draw and remove all casing.

THUS DONE, READ, ACCEPTED AND SIGNED by the parties hereto in the presence of the respective undersigned witnesses, as of the 22nd day of November, A. D., 1952, which shall be the date of this lease for all purposes.

WITNESSES to the signature of Lessor:

Richard G. Irwin

Donald B. Bonnecarrere

STATE MINERAL BOARD

By: John W. Olvey Chairman

For the State of Louisiana, Lessor

WITNESSES to the signature of Lessee:

R. C. Curtis

W. Gamble

PHILLIPS PETROLEUM COMPANY

By [signature] Vice President

For Lessee

ATTEST: [signature] Asst. Secretary

**ACKNOWLEDGMENT FOR STATE MINERAL BOARD**

STATE OF LOUISIANA

PARISH OF East Baton Rouge

Before me, the undersigned authority, personally came and appeared Richard G. Irwin, who by me being first duly sworn, deposed and said:

That he is one of the witnesses to the execution of the foregoing instrument and that he saw John W. Olvey sign said instrument as Chairman of the State Mineral Board for and on behalf of the State of Louisiana in the presence of appearer and Donald B. Bonnecarrere, the other subscribing witness.

Richard G. Irwin

Sworn to and subscribed before me on this the 24th day of November, 1952.

Angela B. Cashio

Notary Public

DS 22

## ACKNOWLEDGMENT FOR CORPORATE LESSEE

STATE OF Oklahoma
County OF Washington

Before me, the undersigned authority, personally came and appeared H. L. Gamble ________, who by me being first duly sworn, deposed and said:

That he is one of the witnesses to the execution of the foregoing instrument and that he saw H. E. Koopman execute said instrument as Vice President of Phillips Petroleum Company as the free act and deed of said corporation in the presence of appearer and R. C. Curtiss, the other subscribing witness.

H L Gamble

Sworn to and subscribed before me on this the 28th day of November, 1952

E B Legg
Notary Public

My Commission Expires December 29, 1953

## ACKNOWLEDGMENT FOR INDIVIDUAL LESSEE

STATE OF ________
________ OF ________

Before me, the undersigned authority, personally came and appeared ________ ________, who by me being first duly sworn, deposed and said:

That he is one of the witnesses to the execution of the foregoing instrument and that he saw ________ execute said instrument as his own free act and deed in the presence of appearer and of ________, the other subscribing witness.

________

Sworn to and subscribed before me on this the ________ day of ________, 19____.

________
Notary Public

DS 20


MISSISSIPPI
SOUND
BAY BOUDREAU
SHELL ISLAND LAKE
TRACT NO. 5175
±3050 Acres
TRACT NO. 5176
±4133 Acres
TRACT NO. 5177
±3790 Acres
TRACT NO. 5178
TRACT NO. 5179
TRACT NO. 5182
±3,720 Acres
TRACT NO. 5181
±980 Acres
TRACT NO. 5180
TRACT NO. 5183
±2,717 Acres
TRACT NO. 5184
TRACT NO. 5185
±3,644 Acres
TRACT NO. 5186
±3,856 Acres
TRACT NO. 5187
±3526 Acres
TRACT NO. 5188
±3859 Acres
TRACT NO. 5189
±4194 Acres
TRACT NO. 5190
±2,486 Acres
TRACT NO. 5191
±3,583 Acres
TRACT NO. 5192
±2,809 Acres
TRACT NO. 5193
±4,163 Acres
TRACT NO. 5194
±4,542 Acres
TRACT NO. 5195
(BLOCK 47)
(BLOCK 48)
(BLOCK 49)
(BLOCK 50)

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD
October 26, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attention: Susan F. Irby

Dear Ms. Irby:

Enclosed herewith are two (2) certified copies of Resolution #22-09-005 Docket No. 2 adopted at a meeting of the State Mineral and Energy Board held on October 12, 2022, approving an Assignment from Half Moon Lake, L.L.C. to Cox Oil LLC, affecting State Lease Nos. 2220, 2221 and 4147, St. Bernard Parish, Louisiana.

**Your attention is directed to Item No. 5 in the resolution which requires that the resolution be attached to the instrument when it is recorded in St. Bernard Parish.** Please furnish us with the recording information when it is available. Please mail recording information to me or email recording information to Cristina.Vince@la.gov.

We wish to advise that we have retained one (1) copy of the instrument for reference use in this office.

Yours very truly,

Cristina Vince
Land Specialist 4

Enclosures

DOCKET INFORMATION SHEET
OCTOBER 12, 2022

2. ASSIGNMENT

STATE LEASE NOS. 2220, 2221 and 4147, St. Bernard Parish, Louisiana

An Assignment from Half Moon Lake, L.L.C. to Cox Oil LLC, of all of Assignor's right, title and interest in and to State Lease Nos. 2220, 2221 and 4147, St. Bernard Parish, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil LLC is designated as the joint account Lessee (contact company) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

______ MINERAL INCOME

MX OWNERSHIP

______ G&E

______ GIS

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

September 27, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attn: Susan F. Irby

Dear Ms. Irby:

Receipt is acknowledged of the items listed below:

> Three (3) fully executed copies of an Assignment from Half Moon Lake, L.L.C. to Cox Oil, LLC, affecting State Lease Nos. 2220, 2221 and 4147, St. Bernard Parish, Louisiana.

This matter will be placed on the Docket Review Agenda for the consideration by the State Mineral & Energy Board at a meeting to be held Wednesday, October 12, 2022 at 9:30 a.m., in the Mineral Board Hearing Room, First Floor, LaSalle Building, 617 North Third St., Baton Rouge, Louisiana.

You may wish to attend the Committee meeting to answer any questions that may arise from its members.

Yours very truly,

Cristina Vince
Land Specialist 4
Office of Mineral Resources

Invoice # 1255841

SECURITY FEATURES INCLUDE TRUE WATERMARK PAPER, HEAT SENSITIVE ICON AND FOIL HOLOGRAM.

CHECKSAFE

002756

*Cox Oil, LLC*
*4514 Cole Ave Ste 1175*
*Dallas, TX 75205-4183*

**Amarillo National Bank**
410 South Taylor
Amarillo, TX 79101
88-95/1113

9/6/2022

PAY TO THE ORDER OF Office of Mineral Resources $ **1,400.00

One Thousand Four Hundred and 00/100************************************************************************************ DOLLARS

Office of Mineral Resources
P.O. Box 2827
Baton Rouge, LA 70821-2827

MEMO

AUTHORIZED SIGNATURE MP

325444

Details on Back. Security Features Included

2

RECEIVED

2022 SEP 15 AM 10: 35

COX OIL LLC
4514 Cole Avenue, Suite 1175
Dallas, TX 75205
(214) 420-7710

September 13, 2022

Ms. Cristina Vince
Louisiana Dept. of Natural Resources
Office of Mineral Resources
617 N. Third St., 8th Floor
Baton Rouge, LA 70802

By Fed Ex

SL. Nos 2220
2221
4147
St. Bernard

Re: Assignments
SL 2220, 2221, 4039, 4147, 16158
Half Moon Lake/Eloi Bay Fields
St. Bernard Ph., Louisiana
SL 195, 1349, 15941
Quarantine Bay Field
Plaquemines Parish, Louisiana

Dear Cristina:

Enclosed please find for your further handling triplicate originals of the following Assignments, together with the appropriate Form B's and Form C's. We are also enclosing Cox Oil's check #2756 in the amount of $1400 covering the filing fees.

(1) Assignment of State Lease Nos. 2220, 2221 and 4147 from Half Moon Lake, L.L.C. to Cox Oil LLC
(2) Assignment of State Lease Nos. 2220, 2221, 4039, 4147, and 16158 from BHST LLC to Cox Oil LLC
(3) Assignment of State Lease No. 4039 from Valley View Energy, L.L.C. to Cox Oil LLC
(4) Assignment of State Lease No. 16158 from Louisiana Bay Drilling, L.L.C. to Cox Oil LLC
(5) Assignment of State Lease Nos. 195, 1349, and 15941 from BHST LLC, et al, to Cox Oil LLC
(6) Assignment of State Lease No. 195 (Pelican Acreage) from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC

Rec'd
3 fee

Thanks for all your help on this matter. Should you have any questions, please feel free to call me at the above phone number or 214-343-2721.

Very truly yours,

Susan

Susan F. Irby
Land Manager

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD
October 26, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attention: Susan F. Irby

Dear Ms. Irby:

Enclosed herewith are two (2) certified copies of Resolution #22-09-006 Docket No. 3 adopted at a meeting of the State Mineral and Energy Board held on October 12, 2022, approving an Assignment from HST LLC to Cox Oil LLC, affecting State Lease Nos. 2220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana.

**Your attention is directed to Item No. 5 in the resolution which requires that the resolution be attached to the instrument when it is recorded in St. Bernard Parish**. Please furnish us with the recording information when it is available. Please mail recording information to me or email recording information to Cristina.Vince@la.gov.

We wish to advise that we have retained one (1) copy of the instrument for reference use in this office.

Yours very truly,

Cristina Vince
Land Specialist 4

Enclosures

DOCKET INFORMATION SHEET
OCTOBER 12, 2022

3. ASSIGNMENT

STATE LEASE NOS. 2220,
2221, 4039, 4147 and 16158,
St. Bernard Parish, Louisiana

An Assignment from HST LLC to Cox Oil LLC, of all of Assignor's right, title and interest in and to State Lease Nos. 220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil LLC is designated as the joint account Lessee (contact company) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

______ MINERAL INCOME

HA ______ OWNERSHIP

______ G&E

______ GIS

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

September 27, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attn: Susan F. Irby

Dear Ms. Irby:

Receipt is acknowledged of the items listed below:

> Three (3) fully executed copies of an Assignment from BHST LLC to Cox Oil, LLC, affecting State Lease Nos. 2220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana.

This matter will be placed on the Docket Review Agenda for the consideration by the State Mineral & Energy Board at a meeting to be held Wednesday, October 12, 2022 at 9:30 a.m., in the Mineral Board Hearing Room, First Floor, LaSalle Building, 617 North Third St., Baton Rouge, Louisiana.

You may wish to attend the Committee meeting to answer any questions that may arise from its members.

Yours very truly,

Cristina Vince
Land Specialist 4
Office of Mineral Resources

3

RECEIVED
OFFICE OF
MINERAL RESOURCES
STATE MINERAL BOARD
2022 SEP 15 AM 10: 35

COX OIL LLC
4514 Cole Avenue, Suite 1175
Dallas, TX 75205
(214) 420-7710

September 13, 2022

Ms. Cristina Vince
Louisiana Dept. of Natural Resources
Office of Mineral Resources
617 N. Third St., 8th Floor
Baton Rouge, LA 70802

By Fed Ex

SL Nos 2220
2221
4039
4147
16158
St. Bernard

Re: Assignments
SL 2220, 2221, 4039, 4147, 16158
Half Moon Lake/Eloi Bay Fields
St. Bernard Ph., Louisiana
SL 195, 1349, 15941
Quarantine Bay Field
Plaquemines Parish, Louisiana

Dear Cristina:

Enclosed please find for your further handling triplicate originals of the following Assignments, together with the appropriate Form B's and Form C's. We are also enclosing Cox Oil's check #2756 in the amount of $1400 covering the filing fees.

(1) Assignment of State Lease Nos. 2220, 2221 and 4147 from Half Moon Lake, L.L.C. to Cox Oil LLC
(2) Assignment of State Lease Nos. 2220, 2221, 4039, 4147, and 16158 from BHST LLC to Cox Oil LLC
(3) Assignment of State Lease No. 4039 from Valley View Energy, L.L.C. to Cox Oil LLC
(4) Assignment of State Lease No. 16158 from Louisiana Bay Drilling, L.L.C. to Cox Oil LLC
(5) Assignment of State Lease Nos. 195, 1349, and 15941 from BHST LLC, et al, to Cox Oil LLC
(6) Assignment of State Lease No. 195 (Pelican Acreage) from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC

Rec'd
3 fee

Thanks for all your help on this matter. Should you have any questions, please feel free to call me at the above phone number or 214-343-2721.

Very truly yours,

Susan

Susan F. Irby
Land Manager

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**

*No Plat*

STATE LEASE No. 3839

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received at the Capitol of the State of Louisiana on the 11th day of April, 1962, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of California Oil Company, acting through its Division, The California Company

of the Post Office address of 1111 Tulane Avenue, New Orleans 12, Louisiana

hereinafter referred to as Lessee, as being the most advantageous to the State of Louisiana.

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana, acting under authority of said Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, and acting for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let and grant exclusively unto the said Lessee, and Lessee's successors and assigns, for the purpose of exploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining and producing sulphur, potash, oil, gas and any other liquid or gaseous hydrocarbon minerals, storing minerals and fluids, laying pipe lines, dredging canals, building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines and other structures and facilities, including houses for employees necessary or convenient for the purpose of conducting the aforesaid operations, the following described property situated in the Parish of Cameron, State of Louisiana, to-wit:

**PORTION OF TRACT NO. 8106, Said Portion being more fully described as follows:**
eginning at the Northeast corner of Block 17 having Lambert Coordinates of X=1,243,871.232 and =393,790.240; thence Southwest to the Southwest corner of Block 17; thence East to the South ine of Zone I; thence Northeasterly along the South line of Zone I to the East line of Block 7; thence North to the point of beginning, estimated to contain approximately 2,455 acres. All oordinates and bearings are based on Louisiana Lambert Plane Coordinate System, South Zone.

**ENTIRE TRACT NO. 8106 being described as follows:**

TRACT 8106 - PORTION OF BLOCK 17, WEST CAMERON AREA, REVISED, CAMERON PARISH, LOUISIANA
That portion of Block 17, West Cameron Area, Revised, Cameron Parish, Louisiana, belonging to the State of Louisiana and not under mineral lease on March 2, 1962, lying in Zone I as defined in the October 12, 1956 Agreement between the State of Louisiana and the United States of America and delineated on a copy of Exhibit "A" thereof, on file in the State Land Office. Said portion of Block 17 is further described as follows: Beginning at the Northeast corner of Block 17 having Lambert Coordinates of X=1,243,871.232 and Y=393,790.240; thence West 14,758.048 feet; thence South 14,758.048 feet; thence East to the South line of Zone I; thence Northeasterly along said South line of Zone I to the East line of Block 17; thence North to the point of beginning, estimated to contain approximately 4,955 acres. All bearings are based on Louisiana Lambert Plane Coordinate System, South Zone.

3839

1. Lessee has this day paid to Lessor the sum of One Hundred Eighty-Six Thousand, Three Hundred and No/100ths ($186,300.00) Dollars as the full and adequate consideration for every right granted hereunder and the same is not to be considered as mere rental for a period.

2. Subject to the other provisions hereof, this lease shall be for a term of Five (5) years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation conducted or payment made or condition exists which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of said period shall pay or tender to the Lessor, the sum of Ninety-Three Thousand, One Hundred Fifty and No/100ths ($93,150.00) Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to order of Register, State Land Office and delivered or mailed to the Register on or before the rental paying date.

4. If on any rental paying date there be neither actual drilling, mining nor reworking operations in progress on the leased premises, nor production therefrom, this lease shall not terminate if Lessee, on or before said date shall make or resume the payment of rental as herein set forth; provided, if drilling, reworking or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date, or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to resume production or to com-

No Plat

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**

STATE LEASE No. 3839

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received at the Capitol of the State of Louisiana on the 11th day of April, 1962, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of California Oil Company, acting through its Division, The California Company

of the Post Office address of 1111 Tulane Avenue, New Orleans 12, Louisiana

hereinafter referred to as Lessee, as being the most advantageous to the State of Louisiana.

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana, acting under authority of said Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, and acting for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let and grant exclusively unto the said Lessee, and Lessee's successors and assigns, for the purpose of exploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining and producing sulphur, potash, oil, gas and any other liquid or gaseous hydrocarbon minerals, storing minerals and fluids, laying pipe lines, dredging canals, building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines and other structures and facilities, including houses for employees necessary or convenient for the purpose of conducting the aforesaid operations, the following described property situated in the Parish of Cameron, State of Louisiana, to-wit:

PORTION OF TRACT NO. 8106, Said Portion being more fully described as follows:

Beginning at the Northeast corner of Block 17 ...

To the extent such permit is required, there is included in the rights herein granted, a special permit to conduct geophysical and geological work on the leased premises and, where shot points are used in navigable waters, such work shall be done under applicable rules, regulations and statutes in force at the time such work is conducted.

1. Lessee has this day paid to Lessor the sum of One Hundred Eighty-Six Thousand, Three Hundred and No/100ths ($186,300.00) Dollars as the full and adequate consideration for every right granted hereunder and the same is not to be considered as mere rental for a period.

2. Subject to the other provisions hereof, this lease shall be for a term of Five (5) years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation conducted or payment made or condition exists which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of said period shall pay or tender to the Lessor, the sum of Ninety-Three Thousand, One Hundred Fifty and No/100ths ($93,150.00) Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to order of Register, State Land Office and delivered or mailed to the Register on or before the rental paying date.

4. If on any rental paying date there be neither actual drilling, mining nor reworking operations in progress on the leased premises, nor production therefrom, this lease shall not terminate if Lessee, on or before said date shall make or resume the payment of rental as herein set forth; provided, if drilling, reworking or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date, or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to resume production or to com-

mence reworking or mining operations or actual drilling of another well on the leased premises, or within which to make said rental payment, and the resumption of production or the commencement of such operations or the payment of such rental within said ninety (90) days' period shall have the same effect as though resumed, commenced or paid on or before said rental paying date. Wherever used in this lease, "reworking operations" shall be defined as reconditioning, deepening, plugging back, cleaning out or otherwise attempting in good faith to increase or restore production.

If at the expiration of the primary term sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well, if a well be abandoned or production should cease within ninety (90) days prior to the expiration of the primary term), Lessee commences actual drilling, mining or reworking operations on the leased premises in search of such products, (or production is resumed during such ninety day period), then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more than ninety (90) days between cessation of operations and their recommencement, whether on the same well or mine or on different wells or mines successively. If, at any time or times after the expiration of the primary term, production hereunder should for any reason cease or terminate, Lessee shall have the right at any time within ninety (90) days from cessation of such production to resume production or actual drilling, mining or reworking operations in an effort to make the leased premises again produce any of such products, in which event this lease shall remain in force so long as such operations are continued as above provided. If as a result of any such operations, sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral be found and produced, or the production of any of the same be restored, this lease shall continue in force so long as any of them is produced hereunder in paying quantities, or this lease is otherwise being maintained as herein provided.

This lease may be maintained in force by directional drilling operations (deviation from vertical) in which event actual drilling shall be considered to have commenced on the leased premises when the drill stem penetrates beneath the surface of the leased premises. Lessee shall have the right and privilege to set up any necessary surface equipment and installations on the property covered by this lease for the purpose of drilling a directional well or wells in search of sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral under the mineral lease or leases covering adjoining or adjacent property granted by the State and owned in whole or in part by Lessee, and to erect, construct and use such additional installations as are necessary or convenient in connection with the development, production, transporting and marketing of any and all said minerals from such adjoining or adjacent property. Such rights and privileges shall remain in full force and effect so long as this lease, or any such adjacent or adjoining lease is in force.

5. Lessee further agrees that should a well producing oil or gas or other liquid hydrocarbon mineral in paying quantities for thirty (30) consecutive days be brought in within six hundred sixty (660) feet (or within any spacing or pooling unit distance as established by the Department of Conservation) of, and draining, the leased premises, and located on property not owned by Lessor, Lessee will begin operations for the drilling of a well on said leased premises within sixty (60) days after said well has so produced for thirty (30) consecutive days, and in addition to the specific offset drilling obligation above provided, will drill any and all wells necessary on the premises to prevent drainage of oil, gas or other liquid or gaseous hydrocarbon mineral by a well or wells on adjacent property not owned by Lessor; however, such offset wells shall not be necessary when the leased premises are being reasonably protected by a well or wells located thereon or on land pooled therewith (or with any part thereof).

6. Lessee shall deliver to Lessor as royalty, free of cost of production:

One-Sixth (1/6th) of all oil, including condensate and other liquid hydrocarbons, produced and saved at the well by ordinary production methods, delivery to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said delivery and at Lessee's option, pay to Lessor sums equal to the value thereof at the well when produced. The price paid Lessor shall not be less than the average posted pipe line price in the same field or loading terminal price in the same field then current for oil, including condensate or other liquid hydrocarbons, of like grade and quality.

One-Sixth (1/6th) of all gas produced and saved or utilized, delivery of said gas to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said gas delivery, and at Lessee's option, pay to Lessor sums equal to the value thereof at the well; provided that the price paid Lessor for said gas shall not be less than the average price then current for gas of like character and quality delivered to the pipe line purchaser in that field.

It is recognized that in addition to condensate and other liquid hydrocarbons separated from gas in the field by ordinary production methods, as to which lessor shall receive royalty as above provided, lessee may extract liquid hydrocarbons or otherwise process gas either at the wells or in the fields, or beyond the field, either itself or by contract with third parties. No charge shall be made by Lessee for separation of any condensate or other liquid hydrocarbons by ordinary production methods in the field. It is provided, however, that should Lessee enter into a bona fide arms-length contract for the extraction of liquid hydrocarbons from gas or for the manufacture of gasoline or other products from gas in a plant located in the field or having a direct pipeline connection with the field, the royalty on gas above provided for shall be based on the amount realized by Lessee under such contract. In the event Lessee shall itself, or in conjunction with others, construct or otherwise provide a plant either in the field, or having a direct pipeline connection with the field, for the extraction of liquid hydrocarbons from gas or for the manufacture of gasoline or other products from gas, the royalty on gas above provided for shall be based on the current market value at the plant of the products so extracted or processed, after deducting the proportionate part of the reasonable cost of extracting or manufacturing such products; and it is provided that if Lessee shall have contracted with others for the extraction or processing of gas in said plant under a bona fide arms-length contract, the proportionate charge to be borne by Lessor shall be the same as that provided in said contract, and in the event of the existence of several contracts with varying charges, the proportionate share shall be the average thereof. In all of the cases provided for above, Lessor shall also be entitled to the royalties stipulated herein on lessee's share of the residue gas sold or otherwise disposed of after plant extraction or processing.

If at any time or times there is on the leased premises a well or wells capable of producing gas and gas is not being used or marketed therefrom and this lease is not then being otherwise maintained, this lease shall, nevertheless, remain in full force and effect for a period of ninety (90) days after cessation of production or operations or the shutting in of said well and on or before the expiration of said 90-day period lessee may com-

mence semi-annual payments to the Lessor at the rate and in the manner provided hereinbelow and thereby maintain the lease in full force and effect during the periods covered by such payments, but not more than six consecutive periods. If the lessee elects to maintain the lease by such payments, the first payment except as hereinafter provided shall be made on or before the expiration of said 90-day period and subsequent payments shall be made at six month intervals thereafter. The payments shall be in the following amounts:

(a) The payment for each of first and second semi-annual periods shall be a sum equal to $1.00 per acre for the number of acres then covered by this lease.

(b) The payment for each of third and fourth semi-annual periods shall be a sum equal to $2.00 per acre for the number of acres then covered by this lease.

(c) The payment for each of fifth and sixth semi-annual periods shall be a sum equal to $3.00 per acre for the number of acres then covered by this lease.

Provided that no payment hereunder shall be less than $200.00, and provided also that if the 90-day period should expire during the first year of the primary term or during any year for which a rental has previously been paid the initial payment hereunder shall not be required until the next anniversary date of the lease. Each payment shall maintain this lease in full force and effect for a period of six months and during each period for which a payment has been made it shall be considered that gas is being produced hereunder for all purposes hereof, especially under the provisions of Articles 2, 4 and 7 hereof. It is understood that the above shut-in clause shall apply to any well where the gas/oil ratio is such that the Commissioner of Conservation will not permit the operation of such well without the use or sale of the gas.

If it should appear to the Board that despite diligent effort by lessee to obtain a satisfactory market, lessee may not be able to market gas by the end of the last six month period herein provided for, the Board shall grant such extension of said six months periods as shall under the circumstances seem to the Board to be warranted, the payment for each such extended period to be the same as that provided above for the fifth and sixth period.

Two Dollars ($2.00) per long ton for all sulphur produced and saved.

Ten Cents (10¢) per ton for all potash produced and saved.

One-Sixth (1/6th) for any and all other liquid or gaseous hydrocarbon minerals not specifically mentioned herein, said royalties to be delivered or paid as is the accepted custom in such matters.

The first payment of royalty shall be made within 120 days following commencement of production from, or allocation of production to the lease premises. Thereafter, royalty on oil, including condensate and other liquid hydrocarbons produced and saved at the well by ordinary production methods shall be paid by the 25th of each month for production of the previous month; and royalty on gas, including liquids or other products extracted or processed from gas other than by ordinary production methods, and on sulphur, potash and other liquids or gaseous hydrocarbon minerals not specifically mentioned shall be paid on or before the 25th day of the second month following that in which produced or extracted or processed. Whenever lessee is unable to make payments within the period so provided because of adverse claims, disputes, litigation or other circumstance involving the title of lessor or the extent of interest of lessor, or whenever circumstances are such as to prevent lessee from making payments within said periods, despite reasonable and diligent effort, lessee shall not be required to make payments within said periods. Otherwise, any royalty payment not made within the period so provided shall bear interest at the rate of six percent per annum, beginning as of the date by which such payment should have been made and running until paid. The foregoing provisions for the payment of interest shall be in lieu of any right of lessor to cancel the lease for non-payment of royalties, except in case of any deliberate and wrongful failure or refusal to pay such royalties after they become due as provided for above, in which event lessee shall still not be in default until lessee shall have been notified in writing by lessor of such failure or refusal and lessee shall then have failed to make the requisite payment or payments within sixty days from the date of receipt of such written notice.

Additional Consideration:

7. Lessee may surrender all or any portion or portions of the leased premises at any time this lease is in effect and thereby be relieved of all obligations thereafter accruing under this lease as to the portions surrendered; provided that no partial release or surrender shall reduce, or otherwise affect, the amount of rentals provided for in Article 3 of this lease.

In the event of cancellation or forfeiture of this lease for any cause, Lessee may, nevertheless, retain hereunder 40 acres around each well producing oil and 160 acres around each well producing gas and around each shut-in gas well (including wells drilled under this lease by directional drilling); and if any well is then being worked on or being drilled, Lessee shall have the right to complete such operations or reworking or drilling, and in the event any such well results in a producer of oil, Lessee may retain 40 acres around such well and if any such well results in a producer of gas or a shut-in gas well, Lessee may retain 160 acres around such well, such acreage to be reserved in as near a square tract as practicable with the well or wells to be as near the center of said acreage so selected as practicable; provided, however, that if any acreage covered by this lease shall have been included in a producing unit, drilling unit, or shut-in gas well unit created under the terms hereof or in such a unit established by the Commissioner of Conservation, or if any such acreage shall have been assigned to a producing or shut-in well under statewide allowable orders of the Commissioner, Lessee may retain all the acreage included in such unit or units or so assigned for allowable purposes.

8. It is further agreed and understood that the rights of Lessee may be assigned or transferred in whole or in part but no transfer, whether in whole or in part, of the herein leased property shall be valid unless such transfer or assignment be approved by the State Mineral Board.

9. Lessee may, with the consent and approval of the State Mineral Board, pool or combine the acreage covered by this lease, or any portion thereof, with any other property, lease or leases, or portions thereof.

10. Should Lessee apply to the Commissioner of Conservation of the State of Louisiana for the creation of any unit or units which would include all or any portion of the leased permises, at the time such application is filed with the Commissioner of Conservation, Lessee shall furnish the Secretary of the State Mineral Board with a copy of said application and with a copy of each unit plat filed therewith. If a unit or units including all or any portion of the leased premises are created by order of the Commissioner of Conservation, Lessee shall submit to the State Mineral Board a survey plat of each of the unit or units so created.

11. Lessee shall have the right during or within one year after the life of this lease to remove all Lessee's property and equipment, including the right to draw and remove all casing.

THUS DONE, READ, ACCEPTED AND SIGNED by the parties hereto in the presence of the respective undersigned witnesses, as of the 23rd day of April, A. D., 19 62, which shall be the date of this lease for all purposes.

WITNESSES to the signature of Lessor:

Elaine B Davis
ELAINE B DAVIS

Jeanette Martin Crow
JEANETTE MARTIN CROW

STATE MINERAL BOARD

By: Mayo M. Iles
Alternate Vice-Chairman
For the State of Louisiana, Lessor
Mayo M. Iles

Witnesses to the signature of Lessee:

WITNESSES TO THE SIGNATURE OF LESSEE:

Mary Janet Tate
Mary Janet Tate

Laura Mae Carey
*LAURA MAE CAREY*

CALIFORNIA OIL COMPANY

By ____
Attorney-in-Fact

By ____
Attorney-in-Fact

5839

PARISH OF ORLEANS

On this 4th day of May, 1962 before me appeared K. A. McINTYRE and C. J. MALLERICH, to me personally known, who, being by me duly sworn did say that they are the Attorneys-in-Fact of California Oil Company, a California corporation, and that the seal affixed to said instrument is the corporate seal of California Oil Company, and that said instrument was signed and sealed in behalf of said corporation by authority of its Board of Directors, and said appearers acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF I have hereunto set my official hand and seal on the date hereinabove written.

Emily Ashmore
Notary Public in and for Orleans Parish, Louisiana

My Commission expires at death.

Notary Public

For Lessee

## ACKNOWLEDGMENT FOR STATE MINERAL BOARD

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

Before me, the undersigned authority, personally came and appeared ELAINE B. DAVIS, who by me being first duly sworn, deposed and said; That she is one of the witnesses to the execution of the foregoing instrument and that she saw Mayo M. Iles sign said instrument as Alternate Vice-Chairman of the State Mineral Board for and on behalf of the State of Louisiana, in the presence of appearer and JEANETTE MARTIN CROW, the other subscribing witness.

Elaine B. Davis
ELAINE B. DAVIS

Sworn to and subscribed before me on this the 26 day of April, 1962.

Ernest R Eldred
Notary Public

STATE OF LOUISIANA

PARISH OF ORLEANS

On this 4th day of May, 1962 before me appeared K. A. McINTYRE and C. J. MALLERICH, to me personally known, who, being by me duly sworn did say that they are the Attorneys-in-Fact of California Oil Company, a California corporation, and that the seal affixed to said instrument is the corporate seal of California Oil Company, and that said instrument was signed and sealed in behalf of said corporation by authority of its Board of Directors, and said appearers acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF I have hereunto set my official hand and seal on the date hereinabove written.

Emily Ackmoorl
Notary Public in and for Orleans Parish, Louisiana

My Commission expires at death.

Notary Public

RESOLVED: That the President, or any Vice President of The California Company Division of this corporation, or K. A. McIntyre, or E. F. Raftery, as Contract Agents of said Division, together with the Secretary or an Assistant Secretary of said Division of this corporation be and they are hereby empowered in their respective capacities or as attorneys in fact for this corporation to execute (without the necessity of affixing the corporate seal thereto) all papers concerning the properties and business of said Division requiring execution in the name of this corporation or in the name of The California Company Division of this corporation, excepting no authority is conferred hereby for the execution of oil leases covering fee lands of this corporation or deeds or conveyances to others covering fee lands of this corporation (other than rights-of-way and similar easements) where either the book value or the sale price exceeds $50,000, and each of said persons is hereby empowered to acknowledge and deliver any such instruments as fully as if special authority were granted in each particular instance.

and be it further

RESOLVED: That resolutions of this Board of Directors adopted prior to this date of similar import are hereby rescinded.

I, J. K. ELLISON, Assistant Secretary of CALIFORNIA OIL COMPANY, a California corporation, do hereby certify that the above resolution is a true, complete, and correct copy of a resolution adopted by the Board of Directors of such corporation at a meeting held on January 3, 1961, at the office of the corporation in San Francisco, California; that such resolution is now in full force and effect; and that K. A. McINTYRE and C. J. MALLERICH were on the first day of July, 1961, and at present are the Contract Agent and Assistant Secretary, respectively, of The California Company, a division of CALIFORNIA OIL COMPANY.

IN WITNESS WHEREOF I have hereunto set my hand and affixed the seal of said corporation this 4th day of May, 1962

J K Ellison
Assistant Secretary

3839

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana
DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

November 4, 2016

Mr. Rodney Dykes
Cox Operating, LLC
1615 Poydras Street, Suite 830
New Orleans, Louisiana 70112

Re: Change of Operator
State Lease No. 3839, 3840, 3841, 4418
West Cameron Blk. 17 Field
West Cameron Blk. 17 Unit
Unit Agreement No. 14-08-0001-8927

Dear Mr. Rodney Dykes:

The staff of the State Mineral and Energy Board (SMEB) recently received a mailed copy of the Bureau of Safety and Environmental Enforcement's approval letter to Cox Operating, LLC regarding the intention of Cox to take over as Successor Unit Operator of the West Cameron Blk. 17 Unit from Chevron U.S.A Inc. on Oct 11, 2016.

Based on the foregoing, our staff has concluded that in accordance with Article 4.1 of the Unit Agreement of 1968, Cox Operating, LLC is approved as the designated Successor Unit Operator for the West Cameron Blk. 17 Unit. As the approved unit operator, Cox Operating, LLC must assume the obligations to reasonably develop or otherwise protect the State Lease(s) in this unit as required under the Agreement, whether expressed or implied. A plan of operations pursuant to the Unit Agreement will be required on an annual basis.

Very truly yours,

David Pipkin

David Pipkin
District Geologist

DP/lkj

cc: Mr. Mark Hanan
U.S. Department of the Interior
Bureau of Safety and Environmental Enforcement
1201 Elmwood Park Boulevard
New Orleans, Louisiana 70123-2394

Mr. J. K. Phipps
Chevron U.S.A Inc.
1200 Smith Street
Houston, Texas 77002

Brant Cole, BSEE

Jason Talbot, Geologist Supervisor
David Pipkin, District Geologist

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

STATE LEASE No. 3840

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received at the Capitol of the State of Louisiana on the 11th day of April, 1962, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of **California Oil Company, acting through its Division, The California Company**

of the Post Office address of **1111 Tulane Avenue, New Orleans 12, Louisiana**,

hereinafter referred to as Lessee, as being the most advantageous to the State of Louisiana.

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana, acting under authority of said Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, and acting for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let and grant exclusively unto the said Lessee, and Lessee's successors and assigns, for the purpose of exploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining and producing sulphur, potash, oil, gas and any other liquid or gaseous hydrocarbon minerals, storing minerals and fluids, laying pipe lines, dredging canals, building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines and other structures and facilities, including houses for employees necessary or convenient for the purpose of conducting the aforesaid operations, the following described property situated in the Parish of **Cameron**, State of Louisiana, to-wit:

**ENTIRE TRACT NO. 8107, Said Tract No. 8107 being described as follows:**

TRACT 8107 - PORTION OF BLOCK 48, WEST CAMERON AREA, REVISED, CAMERON PARISH, LOUISIANA
That portion of Block 48, West Cameron Area, Revised, Cameron Parish, Louisiana, belonging to the State of Louisiana and not under mineral lease on March 2, 1962, lying in Zone I as defined in the October 12, 1956 Agreement between the State of Louisiana and the United States of America and delineated on a copy of Exhibit "A" thereof, on file in the State Land Office. Said portion of Block 48 is further described as follows: Beginning at the Northwest corner of Block 48 having Lambert Coordinates of X=1,229,113.184 and Y=379,032.192; thence South to the South line of Zone I; thence Northeasterly along said South line of Zone I to its intersection with the North line of Block 48; thence West to the point of beginning, estimated to contain approximately 470 acres. All bearings are based on Louisiana Lambert Plane Coordinate System, South Zone.

To the extent such permit is required, there is included in the rights herein granted, a special permit to conduct geophysical and geological work on the leased premises and, where shot points are used in navigable waters, such work shall be done under applicable rules, regulations and statutes in force at the time such work is conducted.

1. Lessee has this day paid to Lessor the sum of **Thirty-Five Thousand, Seven Hundred and 00/100th ($35,700.00)** Dollars as the full and adequate consideration for every right granted hereunder and the same is not to be considered as mere rental for a period.

2. Subject to the other provisions hereof, this lease shall be for a term of **Five (5)** years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation conducted or payment made or condition exists which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of said period shall pay or tender to the Lessor, the sum of **Seventeen Thousand, Eight Hundred Fifty and 00/100th ($17,850.00)** Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to order of Register, State Land Office and delivered or mailed to the Register on or before the rental paying date.

4. If on any rental paying date there be neither actual drilling, mining nor reworking operations in progress on the leased premises, nor production therefrom, this lease shall not terminate if Lessee, on or before said date shall make or resume the payment of rental as herein set forth; provided, if drilling, reworking or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date, or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to resume production or to com-

mence reworking or mining operations or actual drilling of another well on the leased premises, or within which to make said rental payment, and the resumption of production or the commencement of such operations or the payment of such rental within said ninety (90) days' period shall have the same effect as though resumed, commenced or paid on or before said rental paying date. Wherever used in this lease, "reworking operations" shall be defined as reconditioning, deepening, plugging back, cleaning out or otherwise attempting in good faith to increase or restore production.

If at the expiration of the primary term sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well, if a well be abandoned or production should cease within ninety (90) days prior to the expiration of the primary term), Lessee commences actual drilling, mining or reworking operations on the leased premises in search of such products, (or production is resumed during such ninety day period), then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more than ninety (90) days between cessation of operations and their recommencement, whether on the same well or mine or on different wells or mines successively. If, at any time or times after the expiration of the primary term, production hereunder should for any reason cease or terminate, Lessee shall have the right at any time within ninety (90) days from cessation of such production to resume production or actual drilling, mining or reworking operations in an effort to make the leased premises again produce any of such products, in which event this lease shall remain in force so long as such operations are continued as above provided. If as a result of any such operations, sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral be found and produced, or the production of any of the same be restored, this lease shall continue in force so long as any of them is produced hereunder in paying quantities, or this lease is otherwise being maintained as herein provided.

This lease may be maintained in force by directional drilling operations (deviation from vertical) in which event actual drilling shall be considered to have commenced on the leased premises when the drill stem penetrates beneath the surface of the leased premises. Lessee shall have the right and privilege to set up any necessary surface equipment and installations on the property covered by this lease for the purpose of drilling a directional well or wells in search of sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral under the mineral lease or leases covering adjoining or adjacent property granted by the State and owned in whole or in part by Lessee, and to erect, construct and use such additional installations as are necessary or convenient in connection with the development, production, transporting and marketing of any and all said minerals from such adjoining or adjacent property. Such rights and privileges shall remain in full force and effect so long as this lease, or any such adjacent or adjoining lease is in force.

5. Lessee further agrees that should a well producing oil or gas or other liquid hydrocarbon mineral in paying quantities for thirty (30) consecutive days be brought in within six hundred sixty (660) feet (or within any spacing or pooling unit distance as established by the Department of Conservation) of, and draining, the leased premises, and located on property not owned by Lessor, Lessee will begin operations for the drilling of a well on said leased premises within sixty (60) days after said well has so produced for thirty (30) consecutive days, and in addition to the specific offset drilling obligation above provided, will drill any and all wells necessary on the premises to prevent drainage of oil, gas or other liquid or gaseous hydrocarbon mineral by a well or wells on adjacent property not owned by Lessor; however, such offset wells shall not be necessary when the leased premises are being reasonably protected by a well or wells located thereon or on land pooled therewith (or with any part thereof).

6. Lessee shall deliver to Lessor as royalty, free of cost of production:

__One-sixth (1/6th)__ of all oil, including condensate and other liquid hydrocarbons, produced and saved at the well by ordinary production methods, delivery to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said delivery and at Lessee's option, pay to Lessor sums equal to the value thereof at the well when produced. The price paid Lessor shall not be less than the average posted pipe line price in the same field or loading terminal price in the same field then current for oil, including condensate or other liquid hydrocarbons, of like grade and quality.

__One-sixth (1/6th)__ of all gas produced and saved or utilized, delivery of said gas to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said gas delivery, and at Lessee's option, pay to Lessor sums equal to the value thereof at the well; provided that the price paid Lessor for said gas shall not be less than the average price then current for gas of like character and quality delivered to the pipe line purchaser in that field.

It is recognized that in addition to condensate and other liquid hydrocarbons separated from gas in the field by ordinary production methods, as to which lessor shall receive royalty as above provided, lessee may extract liquid hydrocarbons or otherwise process gas either at the wells or in the fields, or beyond the field, either itself or by contract with third parties. No charge shall be made by Lessee for separation of any condensate or other liquid hydrocarbons by ordinary production methods in the field. It is provided, however, that should Lessee enter into a bona fide arms-length contract for the extraction of liquid hydrocarbons from gas or for the manufacture of gasoline or other products from gas in a plant located in the field or having a direct pipeline connection with the field, the royalty on gas above provided for shall be based on the amount realized by Lessee under such contract. In the event Lessee shall itself, or in conjunction with others, construct or otherwise provide a plant either in the field, or having a direct pipeline connection with the field, for the extraction of liquid hydrocarbons from gas or for the manufacture of gasoline or other products from gas, the royalty on gas above provided for shall be based on the current market value at the plant of the products so extracted or processed, after deducting the proportionate part of the reasonable cost of extracting or manufacturing such products; and it is provided that if Lessee shall have contracted with others for the extraction or processing of gas in said plant under a bona fide arms-length contract, the proportionate charge to be borne by Lessor shall be the same as that provided in said contract, and in the event of the existence of several contracts with varying charges, the proportionate share shall be the average thereof. In all of the cases provided for above, Lessor shall also be entitled to the royalties stipulated herein on lessee's share of the residue gas sold or otherwise disposed of after plant extraction or processing.

If at any time or times there is on the leased premises a well or wells capable of producing gas and gas is not being used or marketed therefrom and this lease is not then being otherwise maintained, this lease shall, nevertheless, remain in full force and effect for a period of ninety (90) days after cessation of production or operations or the shutting in of said well and on or before the expiration of said 90-day period lessee may com-

mence semi-annual payments to the Lessor at the rate and in the manner provided hereinbelow and thereby maintain the lease in full force and effect during the periods covered by such payments, but not more than six consecutive periods. If the lessee elects to maintain the lease by such payments, the first payment except as hereinafter provided shall be made on or before the expiration of said 90-day period and subsequent payments shall be made at six month intervals thereafter. The payments shall be in the following amounts:

(a) The payment for each of first and second semi-annual periods shall be a sum equal to $1.00 per acre for the number of acres then covered by this lease.

(b) The payment for each of third and fourth semi-annual periods shall be a sum equal to $2.00 per acre for the number of acres then covered by this lease.

(c) The payment for each of fifth and sixth semi-annual periods shall be a sum equal to $3.00 per acre for the number of acres then covered by this lease.

Provided that no payment hereunder shall be less than $200.00, and provided also that if the 90-day period should expire during the first year of the primary term or during any year for which a rental has previously been paid the initial payment hereunder shall not be required until the next anniversary date of the lease. Each payment shall maintain this lease in full force and effect for a period of six months and during each period for which a payment has been made it shall be considered that gas is being produced hereunder for all purposes hereof, especially under the provisions of Articles 2, 4 and 7 hereof. It is understood that the above shut-in clause shall apply to any well where the gas/oil ratio is such that the Commissioner of Conservation will not permit the operation of such well without the use or sale of the gas.

If it should appear to the Board that despite diligent effort by lessee to obtain a satisfactory market, lessee may not be able to market gas by the end of the last six month period herein provided for, the Board shall grant such extension of said six months periods as shall under the circumstances seem to the Board to be warranted, the payment for each such extended period to be the same as that provided above for the fifth and sixth period.

Two Dollars ($2.00) per long ton for all sulphur produced and saved.

Ten cents (10¢) per ton for all potash produced and saved.

One-sixth (1/6th) for any and all other liquid or gaseous hydrocarbon minerals not specifically mentioned herein, said royalties to be delivered or paid as is the accepted custom in such matters.

The first payment of royalty shall be made within 120 days following commencement of production from, or allocation of production to the lease premises. Thereafter, royalty on oil, including condensate and other liquid hydrocarbons produced and saved at the well by ordinary production methods shall be paid by the 25th of each month for production of the previous month; and royalty on gas, including liquids or other products extracted or processed from gas other than by ordinary production methods, and on sulphur, potash and other liquids or gaseous hydrocarbon minerals not specifically mentioned shall be paid on or before the 25th day of the second month following that in which produced or extracted or processed. Whenever lessee is unable to make payments within the period so provided because of adverse claims, disputes, litigation or other circumstance involving the title of lessor or the extent of interest of lessor, or whenever circumstances are such as to prevent lessee from making payments within said periods, despite reasonable and diligent effort, lessee shall not be required to make payments within said periods. Otherwise, any royalty payment not made within the period so provided shall bear interest at the rate of six percent per annum, beginning as of the date by which such payment should have been made and running until paid. The foregoing provisions for the payment of interest shall be in lieu of any right of lessor to cancel the lease for non-payment of royalties, except in case of any deliberate and wrongful failure or refusal to pay such royalties after they become due as provided for above, in which event lessee shall still not be in default until lessee shall have been notified in writing by lessor of such failure or refusal and lessee shall then have failed to make the requisite payment or payments within sixty days from the date of receipt of such written notice.

Additional Consideration:

7. Lessee may surrender all or any portion or portions of the leased premises at any time this lease is in effect and thereby be relieved of all obligations thereafter accruing under this lease as to the portions surrendered; provided that no partial release or surrender shall reduce, or otherwise affect, the amount of rentals provided for in Article 3 of this lease.

In the event of cancellation or forfeiture of this lease for any cause, Lessee may, nevertheless, retain hereunder 40 acres around each well producing oil and 160 acres around each well producing gas and around each shut-in gas well (including wells drilled under this lease by directional drilling); and if any well is then being worked on or being drilled, Lessee shall have the right to complete such operations or reworking or drilling, and in the event any such well results in a producer of oil, Lessee may retain 40 acres around such well and if any such well results in a producer of gas or a shut-in gas well, Lessee may retain 160 acres around such well, such acreage to be reserved in as near a square tract as practicable with the well or wells to be as near the center of said acreage so selected as practicable; provided, however, that if any acreage covered by this lease shall have been included in a producing unit, drilling unit, or shut-in gas well unit created under the terms hereof or in such a unit established by the Commissioner of Conservation, or if any such acreage shall have been assigned to a producing or shut-in well under statewide allowable orders of the Commissioner, Lessee may retain all the acreage included in such unit or units or so assigned for allowable purposes.

8. It is further agreed and understood that the rights of Lessee may be assigned or transferred in whole or in part but no transfer, whether in whole or in part, of the herein leased property shall be valid unless such transfer or assignment be approved by the State Mineral Board.

9. Lessee may, with the consent and approval of the State Mineral Board, pool or combine the acreage covered by this lease, or any portion thereof, with any other property, lease or leases, or portions thereof.

10. Should Lessee apply to the Commissioner of Conservation of the State of Louisiana for the creation of any unit or units which would include all or any portion of the leased permises, at the time such application is filed with the Commissioner of Conservation, Lessee shall furnish the Secretary of the State Mineral Board with a copy of said application and with a copy of each unit plat filed therewith. If a unit or units including all or any portion of the leased premises are created by order of the Commissioner of Conservation, Lessee shall submit to the State Mineral Board a survey plat of each of the unit or units so created.

11. Lessee shall have the right during or within one year after the life of this lease to remove all Lessee's property and equipment, including the right to draw and remove all casing.

THUS DONE, READ, ACCEPTED AND SIGNED by the parties hereto in the presence of the respective undersigned witnesses, as of the 23rd day of April, A. D., 1962, which shall be the date of this lease for all purposes.

WITNESSES to the signature of Lessor:

Betty Starns Baronne
Betty Starns Baronne

Jeanette Martin Crow
JEANETTE MARTIN CROW

STATE MINERAL BOARD

By: Mayo M. Iles
Alternate Vice - Chairman
For the State of Louisiana, Lessor
Mayo M. Iles

Witnesses to the signature of Lessee:

For Lessee

WITNESSES TO THE
SIGNATURE OF LESSEE:

Mary Janet Tate
Mary Janet Tate

Laura Mae Carey
LAURA MAE CAREY

CALIFORNIA OIL COMPANY

By K. A. McIntyre
Attorney-in-Fact

By C. J. Mallerich
Attorney-in-Fact

3840

PARISH OF ORLEANS

On this 4th day of May, 1962 before me appeared K. A. McINTYRE and C. J. MALLERICH, to me personally known, who, being by me duly sworn did say that they are the Attorneys-in-Fact of California Oil Company, a California corporation, and that the seal affixed to said instrument is the corporate seal of California Oil Company, and that said instrument was signed and sealed in behalf of said corporation by authority of its Board of Directors, and said appearers acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF I have hereunto set my official hand and seal on the date hereinabove written.

Emily Robinson
Notary Public in and for Orleans
Parish, Louisiana

My Commission expires at death.

3840

## ACKNOWLEDGMENT FOR STATE MINERAL BOARD

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

Before me, the undersigned authority, personally came and appeared Betty Stearns Baronne, who by me being first duly sworn, deposed and said; That he is one of the witnesses to the execution of the foregoing instrument and that he saw Mayo M. Iles sign said instrument as Alternate Vice-Chairman of the State Mineral Board for and on behalf of the State of Louisiana, in the presence of appearer and JEANETTE MARTIN CROW, the other subscribing witness.

Betty Stearns Baronne
Betty Stearns Baronne

Sworn to and subscribed before me on this the 28 day of April, 1962.

Ernest R Eldred
Notary Public

## ACKNOWLEDGMENT FOR CORPORATE LESSEE

STATE OF LOUISIANA

PARISH OF ORLEANS

On this 4th day of May, 1962, before me appeared K. A. McINTYRE and C. J. MALLERICH, to me personally known, who, being by me duly sworn did say that they are the Attorneys-in-Fact of California Oil Company, a California corporation, and that the seal affixed to said instrument is the corporate seal of California Oil Company, and that said instrument was signed and sealed in behalf of said corporation by authority of its Board of Directors, and said appearers acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF I have hereunto set my official hand and seal on the date hereinabove written.

Emily Ashmore
Notary Public in and for Orleans Parish, Louisiana

My Commission expires at death.

384

RESOLVED: That the President, or any Vice President of The California Company Division of this corporation, or K. A. McIntyre, or E. F. Raftery, as Contract Agents of said Division, together with the Secretary or an Assistant Secretary of said Division of this corporation be and they are hereby empowered in their respective capacities or as attorneys in fact for this corporation to execute (without the necessity of affixing the corporate seal thereto) all papers concerning the properties and business of said Division requiring execution in the name of this corporation or in the name of The California Company Division of this corporation, excepting no authority is conferred hereby for the execution of oil leases covering fee lands of this corporation or deeds or conveyances to others covering fee lands of this corporation (other than rights-of-way and similar easements) where either the book value or the sale price exceeds $50,000, and each of said persons is hereby empowered to acknowledge and deliver any such instruments as fully as if special authority were granted in each particular instance.

and be it further

RESOLVED: That resolutions of this Board of Directors adopted prior to this date of similar import are hereby rescinded.

I, J. K. ELLISON, Assistant Secretary of CALIFORNIA OIL COMPANY, a California corporation, do hereby certify that the above resolution is a true, complete, and correct copy of a resolution adopted by the Board of Directors of such corporation at a meeting held on January 3, 1961, at the office of the corporation in San Francisco, California; that such resolution is now in full force and effect; and that K. A. McINTYRE and C. J. MALLERICH were on the first day of July, 1961, and at present are the Contract Agent and Assistant Secretary, respectively, of The California Company, a division of CALIFORNIA OIL COMPANY.

IN WITNESS WHEREOF I have hereunto set my hand and affixed the seal of said corporation this 4th day of May, 1962

J K Ellison
Assistant Secretary

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana
DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

November 4, 2016

Mr. Rodney Dykes
Cox Operating, LLC
1615 Poydras Street, Suite 830
New Orleans, Louisiana 70112

Re: Change of Operator
State Lease No. 3839, 3840, 3841, 4418
West Cameron Blk. 17 Field
West Cameron Blk. 17 Unit
Unit Agreement No. 14-08-0001-8927

Dear Mr. Rodney Dykes:

The staff of the State Mineral and Energy Board (SMEB) recently received a mailed copy of the Bureau of Safety and Environmental Enforcement's approval letter to Cox Operating, LLC regarding the intention of Cox to take over as Successor Unit Operator of the West Cameron Blk. 17 Unit from Chevron U.S.A Inc. on Oct 11, 2016.

Based on the foregoing, our staff has concluded that in accordance with Article 4.1 of the Unit Agreement of 1968, Cox Operating, LLC is approved as the designated Successor Unit Operator for the West Cameron Blk. 17 Unit. As the approved unit operator, Cox Operating, LLC must assume the obligations to reasonably develop or otherwise protect the State Lease(s) in this unit as required under the Agreement, whether expressed or implied. A plan of operations pursuant to the Unit Agreement will be required on an annual basis.

Very truly yours,

David Pipkin

David Pipkin
District Geologist

DP/lkj

cc: Mr. Mark Hanan
U.S. Department of the Interior
Bureau of Safety and Environmental Enforcement
1201 Elmwood Park Boulevard
New Orleans, Louisiana 70123-2394

Mr. J. K. Phipps
Chevron U.S.A Inc.
1200 Smith Street
Houston, Texas 77002

Brant Cole, BSEE

Jason Talbot, Geologist Supervisor
David Pipkin, District Geologist

No Plat

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**

STATE LEASE No. 3841

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received at the Capitol of the State of Louisiana on the 11th day of April, 1962, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of Ocean Drilling & Exploration Company - 1/6, Oil and Gas Futures, Inc. - 1/6, North Central Oil Corporation - 1/6, South Shore Oil & Development Company - 1/6,
of the Post Office address of 2475 Canal Street, Caribe Building, New Orleans, Louisiana; 1200 Oil and Gas Building, New Orleans, Louisiana; 1507 Sterling Building, Houston, Texas; 1200 Oil and Gas Building, New Orleans, Louisiana;

Lujon Oil Company - 1/6 and Murphy Corporation - 1/6, a joint bid,

1200 Oil and Gas Building, New Orleans, Louisiana and Murphy Building, El Dorado, Arkansas, respectively,

3841

ploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining and producing sulphur, potash, oil, gas and any other liquid or gaseous hydrocarbon minerals, storing minerals and fluids, laying pipe lines, dredging canals, building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines and other structures and facilities, including houses for employees necessary or convenient for the purpose of conducting the aforesaid operations, the following described property situated in the Parish of Cameron, State of Louisiana, to-wit:

PORTION OF TRACT NO. 8109, Said Portion being more fully described as follows:

Beginning at the Northwest corner of Block 18, having Lambert Coordinates of X = 1,243,871.232 and Y = 393,790.240; thence East 3,500 feet, more or less; thence South to the South line of Zone I; thence Southwesterly along said South line of Zone I to its intersection with the West line of Block 18; thence North to the point of beginning, estimated to contain approximately 1,000 acres.

3841

To the extent such permit is required, there is included in the rights herein granted, a special permit to conduct geophysical and geological work on the leased premises and, where shot points are used in navigable waters, such work shall be done under applicable rules, regulations and statutes in force at the time such work is conducted.

1. Lessee has this day paid to Lessor the sum of Forty-One Thousand, Five Hundred Twenty and No/100ths ($41,520.00) Dollars as the full and adequate consideration for every right granted hereunder and the same is not to be considered as mere rental for a period.

2. Subject to the other provisions hereof, this lease shall be for a term of Five (5) years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation conducted or payment made or condition exists which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of said period shall pay or tender to the Lessor, the sum of Twenty Thousand, Seven Hundred Sixty and No/100ths ($20,760.00) Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to order of Register, State Land Office and delivered or mailed to the Register on or before the rental paying date.

4. If on any rental paying date there be neither actual drilling, mining nor reworking operations in progress on the leased premises, nor production therefrom, this lease shall not terminate if Lessee, on or before said date shall make or resume the payment of rental as herein set forth; provided, if drilling, reworking or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date, or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to resume production or to com-

 Case 23-90324 Document 712-1 Filed in TXSB on 07/25/23 Page 76 of 279

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**

STATE LEASE No. 3841

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received at the Capitol of the State of Louisiana on the 11th day of April, 1962, at a meeting of the State Mineral Board of the State of Louisiana; and,

hereinafter referred to as Lessee, as being the most advantageous to the State of Louisiana.

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana, acting under authority of said Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, and acting for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let and grant exclusively unto the said Lessee, and Lessee's successors and assigns, for the purpose of exploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining and producing sulphur, potash, oil, gas and any other liquid or gaseous hydrocarbon minerals, storing minerals and fluids, laying pipe lines, dredging canals, building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines and other structures and facilities, including houses for employees necessary or convenient for the purpose of conducting the aforesaid operations, the following described property situated in the Parish of Cameron, State of Louisiana, to-wit:

PORTION OF TRACT NO. 8109, Said Portion being more fully described as follows:

Beginning at the Northwest corner of Block 18, having Lambert Coordinates of X = 1,243,871.232 and Y = 393,790.240; thence East 3,200 feet, more or less; thence South to the South line of Zone I; thence Southwesterly along said South line of Zone I to its intersection with the West line of Block 18; thence North to the point of beginning, estimated to contain approximately 1,000 acres. 3841

ENTIRE TRACT NO. 8109 being described as follows:

TRACT 8109 - PORTION OF BLOCK 18, WEST CAMERON AREA, REVISED, CAMERON PARISH, LOUISIANA
That portion of Block 18, West Cameron Area, Revised, Cameron Parish, Louisiana, belonging to the State of Louisiana and not under mineral lease on March 2, 1962, lying in Zone I as defined in the October 12, 1956 Agreement between the State of Louisiana and the United States of America and delineated on a copy of Exhibit "A" thereof, on file in the State Land Office. Said portion of Block 18 is further described as follows: Beginning at the Northwest corner of Block 18, having Lambert Coordinates of X=1,243,871.232 and Y=393,790.240; thence East 14,758.048 feet; thence South to the South line of Zone I; thence Southwesterly along said South line of Zone I; to its intersection with the West line of Block 18; thence North to the point of beginning, estimated to contain approximately 4,220 acres. All bearings are based on Louisiana Lambert Plane Coordinate System, South Zone.

is conducted.

1. Lessee has this day paid to Lessor the sum of Forty-One Thousand, Five Hundred Twenty and No/100ths ($41,520.00) Dollars as the full and adequate consideration for every right granted hereunder and the same is not to be considered as mere rental for a period.

2. Subject to the other provisions hereof, this lease shall be for a term of Five (5) years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation conducted or payment made or condition exists which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of said period shall pay or tender to the Lessor, the sum of Twenty Thousand, Seven Hundred Sixty and No/100ths ($20,760.00) Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to order of Register, State Land Office and delivered or mailed to the Register on or before the rental paying date.

4. If on any rental paying date there be neither actual drilling, mining nor reworking operations in progress on the leased premises, nor production therefrom, this lease shall not terminate if Lessee, on or before said date shall make or resume the payment of rental as herein set forth; provided, if drilling, reworking or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date, or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to resume production or to com-

mence reworking or mining operations or actual drilling of another well on the leased premises, or within which to make said rental payment, and the resumption of production or the commencement of such operations or the payment of such rental within said ninety (90) days' period shall have the same effect as though resumed, commenced or paid on or before said rental paying date. Wherever used in this lease, "reworking operations" shall be defined as reconditioning, deepening, plugging back, cleaning out or otherwise attempting in good faith to increase or restore production.

If at the expiration of the primary term sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well, if a well be abandoned or production should cease within ninety (90) days prior to the expiration of the primary term), Lessee commences actual drilling, mining or reworking operations on the leased premises in search of such products, (or production is resumed during such ninety day period), then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more than ninety (90) days between cessation of operations and their recommencement, whether on the same well or mine or on different wells or mines successively. If, at any time or times after the expiration of the primary term, production hereunder should for any reason cease or terminate, Lessee shall have the right at any time within ninety (90) days from cessation of such production to resume production or actual drilling, mining or reworking operations in an effort to make the leased premises again produce any of such products, in which event this lease shall remain in force so long as such operations are continued as above provided. If as a result of any such operations, sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral be found and produced, or the production of any of the same be restored, this lease shall continue in force so long as any of them is produced hereunder in paying quantities, or this lease is otherwise being maintained as herein provided.

This lease may be maintained in force by directional drilling operations (deviation from vertical) in which event actual drilling shall be considered to have commenced on the leased premises when the drill stem penetrates beneath the surface of the leased premises. Lessee shall have the right and privilege to set up any necessary surface equipment and installations on the property covered by this lease for the purpose of drilling a directional well or wells in search of sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral under the mineral lease or leases covering adjoining or adjacent property granted by the State and owned in whole or in part by Lessee, and to erect, construct and use such additional installations as are necessary or convenient in connection with the development, production, transporting and marketing of any and all said minerals from such adjoining or adjacent property. Such rights and privileges shall remain in full force and effect so long as this lease, or any such adjacent or adjoining lease is in force.

5. Lessee further agrees that should a well producing oil or gas or other liquid hydrocarbon mineral in paying quantities for thirty (30) consecutive days be brought in within six hundred sixty (660) feet (or within any spacing or pooling unit distance as established by the Department of Conservation) of, and draining, the leased premises, and located on property not owned by Lessor, Lessee will begin operations for the drilling of a well on said leased premises within sixty (60) days after said well has so produced for thirty (30) consecutive days, and in addition to the specific offset drilling obligation above provided, will drill any and all wells necessary on the premises to prevent drainage of oil, gas or other liquid or gaseous hydrocarbon mineral by a well or wells on adjacent property not owned by Lessor; however, such offset wells shall not be necessary when the leased premises are being reasonably protected by a well or wells located thereon or on land pooled therewith (or with any part thereof).

6. Lessee shall deliver to Lessor as royalty, free of cost of production:
One-Sixth (1/6th) of all oil, including condensate and other liquid hydrocarbons, produced and saved at the well by ordinary production methods, delivery to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said delivery and at Lessee's option, pay to Lessor sums equal to the value thereof at the well when produced. The price paid Lessor shall not be less than the average posted pipe line price in the same field or loading terminal price in the same field then current for oil, including condensate or other liquid hydrocarbons, of like grade and quality.

One-Sixth (1/6th) of all gas produced and saved or utilized, delivery of said gas to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said gas delivery, and at Lessee's option, pay to Lessor sums equal to the value thereof at the well; provided that the price paid Lessor for said gas shall not be less than the average price then current for gas of like character and quality delivered to the pipe line purchaser in that field.

It is recognized that in addition to condensate and other liquid hydrocarbons separated from gas in the field by ordinary production methods, as to which lessor shall receive royalty as above provided, lessee may extract liquid hydrocarbons or otherwise process gas either at the wells or in the fields, or beyond the field, either itself or by contract with third parties. No charge shall be made by Lessee for separation of any condensate or other liquid hydrocarbons by ordinary production methods in the field. It is provided, however, that should Lessee enter into a bona fide arms-length contract for the extraction of liquid hydrocarbons from gas or for the manufacture of gasoline or other products from gas in a plant located in the field or having a direct pipeline connection with the field, the royalty on gas above provided for shall be based on the amount realized by Lessee under such contract. In the event Lessee shall itself, or in conjunction with others, construct or otherwise provide a plant either in the field, or having a direct pipeline connection with the field, for the extraction of liquid hydrocarbons from gas or for the manufacture of gasoline or other products from gas, the royalty on gas above provided for shall be based on the current market value at the plant of the products so extracted or processed, after deducting the proportionate part of the reasonable cost of extracting or manufacturing such products; and it is provided that if Lessee shall have contracted with others for the extraction or processing of gas in said plant under a bona fide arms-length contract, the proportionate charge to be borne by Lessor shall be the same as that provided in said contract, and in the event of the existence of several contracts with varying charges, the proportionate share shall be the average thereof. In all of the cases provided for above, Lessor shall also be entitled to the royalties stipulated herein on lessee's share of the residue gas sold or otherwise disposed of after plant extraction or processing.

If at any time or times there is on the leased premises a well or wells capable of producing gas and gas is not being used or marketed therefrom and this lease is not then being otherwise maintained, this lease shall, nevertheless, remain in full force and effect for a period of ninety (90) days after cessation of production or operations or the shutting in of said well and on or before the expiration of said 90-day period lessee may com-

mence semi-annual payments to the Lessor at the rate and in the manner provided hereinbelow and thereby maintain the lease in full force and effect during the periods covered by such payments, but not more than six consecutive periods. If the lessee elects to maintain the lease by such payments, the first payment except as hereinafter provided shall be made on or before the expiration of said 90-day period and subsequent payments shall be made at six month intervals thereafter. The payments shall be in the following amounts:

(a) The payment for each of first and second semi-annual periods shall be a sum equal to $1.00 per acre for the number of acres then covered by this lease.

(b) The payment for each of third and fourth semi-annual periods shall be a sum equal to $2.00 per acre for the number of acres then covered by this lease.

(c) The payment for each of fifth and sixth semi-annual periods shall be a sum equal to $3.00 per acre for the number of acres then covered by this lease.

Provided that no payment hereunder shall be less than $200.00, and provided also that if the 90-day period should expire during the first year of the primary term or during any year for which a rental has previously been paid the initial payment hereunder shall not be required until the next anniversary date of the lease. Each payment shall maintain this lease in full force and effect for a period of six months and during each period for which a payment has been made it shall be considered that gas is being produced hereunder for all purposes hereof, especially under the provisions of Articles 2, 4 and 7 hereof. It is understood that the above shut-in clause shall apply to any well where the gas/oil ratio is such that the Commissioner of Conservation will not permit the operation of such well without the use or sale of the gas.

If it should appear to the Board that despite diligent effort by lessee to obtain a satisfactory market, lessee may not be able to market gas by the end of the last six month period herein provided for, the Board shall grant such extension of said six months periods as shall under the circumstances seem to the Board to be warranted, the payment for each such extended period to be the same as that provided above for the fifth and sixth period.

Two Dollars ($2.00) per long ton for all sulphur produced and saved.

Ten Cents (10¢) per ton for all potash produced and saved.

One-Sixth (1/6th) for any and all other liquid or gaseous hydrocarbon minerals not specifically mentioned herein, said royalties to be delivered or paid as is the accepted custom in such matters.

The first payment of royalty shall be made within 120 days following commencement of production from, or allocation of production to the lease premises. Thereafter, royalty on oil, including condensate and other liquid hydrocarbons produced and saved at the well by ordinary production methods shall be paid by the 25th of each month for production of the previous month; and royalty on gas, including liquids or other products extracted or processed from gas other than by ordinary production methods, and on sulphur, potash and other liquids or gaseous hydrocarbon minerals not specifically mentioned shall be paid on or before the 25th day of the second month following that in which produced or extracted or processed. Whenever lessee is unable to make payments within the period so provided because of adverse claims, disputes, litigation or other circumstance involving the title of lessor or the extent of interest of lessor, or whenever circumstances are such as to prevent lessee from making payments within said periods, despite reasonable and diligent effort, lessee shall not be required to make payments within said periods. Otherwise, any royalty payment not made within the period so provided shall bear interest at the rate of six percent per annum, beginning as of the date by which such payment should have been made and running until paid. The foregoing provisions for the payment of interest shall be in lieu of any right of lessor to cancel the lease for non-payment of royalties, except in case of any deliberate and wrongful failure or refusal to pay such royalties after they become due as provided for above, in which event lessee shall still not be in default until lessee shall have been notified in writing by lessor of such failure or refusal and lessee shall then have failed to make the requisite payment or payments within sixty days from the date of receipt of such written notice.

Additional Consideration:

7. Lessee may surrender all or any portion or portions of the leased premises at any time this lease is in effect and thereby be relieved of all obligations thereafter accruing under this lease as to the portions surrendered; provided that no partial release or surrender shall reduce, or otherwise affect, the amount of rentals provided for in Article 3 of this lease.

In the event of cancellation or forfeiture of this lease for any cause, Lessee may, nevertheless, retain hereunder 40 acres around each well producing oil and 160 acres around each well producing gas and around each shut-in gas well (including wells drilled under this lease by directional drilling); and if any well is then being worked on or being drilled, Lessee shall have the right to complete such operations or reworking or drilling, and in the event any such well results in a producer of oil, Lessee may retain 40 acres around such well and if any such well results in a producer of gas or a shut-in gas well, Lessee may retain 160 acres around such well, such acreage to be reserved in as near a square tract as practicable with the well or wells to be as near the center of said acreage so selected as practicable; provided, however, that if any acreage covered by this lease shall have been included in a producing unit, drilling unit, or shut-in gas well unit created under the terms hereof or in such a unit established by the Commissioner of Conservation, or if any such acreage shall have been assigned to a producing or shut-in well under statewide allowable orders of the Commissioner, Lessee may retain all the acreage included in such unit or units or so assigned for allowable purposes.

8. *It is further agreed* and understood that the rights of Lessee may be assigned or transferred in whole or in part but no transfer, whether in whole or in part, of the herein leased property shall be valid unless such transfer or assignment be approved by the State Mineral Board.

9. Lessee may, with the consent and approval of the State Mineral Board, pool or combine the acreage covered by this lease, or any portion thereof, with any other property, lease or leases, or portions thereof.

10. Should Lessee apply to the Commissioner of Conservation of the State of Louisiana for the creation of any unit or units which would include all or any portion of the leased permises, at the time such application is filed with the Commissioner of Conservation, Lessee shall furnish the Secretary of the State Mineral Board with a copy of said application and with a copy of each unit plat filed therewith. If a unit or units including all or any portion of the leased premises are created by order of the Commissioner of Conservation, Lessee shall submit to the State Mineral Board a survey plat of each of the unit or units so created.

11. Lessee shall have the right during or within one year after the life of this lease to remove all Lessee's property and equipment, including the right to draw and remove all casing.

THUS DONE, READ, ACCEPTED AND SIGNED by the parties hereto in the presence of the respective undersigned witnesses, as of the 23rd day of April, A. D., 1962, which shall be the date of this lease for all purposes.

WITNESSES to the signature of Lessor:

Betty Stearns Baronne

Jeanette Martin Crow

JANETTE MARTIN CROW

[redacted]

STATE MINERAL BOARD

By: Mayo M. Miles

Alternate Vice-Chairman
For the State of Louisiana, Lessor
Mayo M. Miles

WITNESSES TO THE SIGNATURES OF LESSEES:

3841

Beverly George

William S. Halcomb

OCEAN DRILLING & EXPLORATION COMPANY

BY: President

William A. Wells

Laurel V. Holden

OIL AND GAS FUTURES, INC.

BY: William B. Meyer
Vice President

Susan M. Jennings

Patricia I. McCullough

NORTH CENTRAL OIL CORPORATION

BY: John F. Wemple
Vice President, John F. Wemple

Joan M. O'Brien

Robert L. Goodwin

SOUTH SHORE OIL AND DEVELOPMENT COMPANY

NY: John F. Bricker
President

Joan M. O'Brien

Robert L. Goodwin

LUJON OIL COMPANY

BY: John F. Bricker
General Partner

Barbara A. Thiele

Carol N. Mitchell

MURPHY CORPORATION

BY:
Vice President

day of ..., 19..

NOTARY PUBLIC
PARISH OF ORLEANS

Notary Public

STATE OF Texas

County OF Harris

3841

BEFORE ME, the undersigned authority, personally came and appeared William A. Wells, who by me being first duly sworn, deposed and said;

That he is one of the witnesses to the execution of the foregoing instrument and that he saw William B. Meyer, execute said instrument as Vice President of OIL AND GAS FUTURES, INC. as the free act and deed of said corporation in the presence of appearer and Laurel V. Holden, the other subscribing witness.

William A. Wells

Sworn to and subscribed before me on this the 7th day of May, 1962.

JACQUELYN R. BRUIN

**ACKNOWLEDGMENT FOR STATE MINERAL BOARD**

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

Before me, the undersigned authority, personally came and appeared Betty Starns Barrone, who by me being first duly sworn, deposed and said; That he is one of the witnesses to the execution of the foregoing instrument and that he saw Mayo M. Iles sign said instrument as Alternate Vice-Chairman of the State Mineral Board for and on behalf of the State of Louisiana, in the presence of appearer and JEANETTE MARTIN CROW, the other subscribing witness.

Betty Starns Barrone

Sworn to and subscribed before me on this the 16 day of May, 1962.

Ernest R Eldred
Notary Public

**ACKNOWLEDGMENT FOR CORPORATE LESSEE**

STATE OF Louisiana
PARISH OF Orleans

Before me, the undersigned authority, personally came and appeared William S.Halcomb, who by me being first duly sworn, deposed and said; That he is one of the witnesses to the execution of the foregoing instrument and that he saw Alden J. Laborde execute said instrument as President of Ocean Drilling & Exploration Company as the free act and deed of said corporation in the presence of appearer and Beverly George the other subscribing witness.

William S. Halcomb

Sworn to and subscribed before me on this the 12 day of May, 1962.

H. H. WHITE, JR.
NOTARY PUBLIC
PARISH OF ORLEANS

H. H. White Jr.
Notary Public

STATE OF Texas
County OF Harris

3841

BEFORE ME, the undersigned authority, personally came and appeared William A. Hills, who by me being first duly sworn, deposed and said;

That he is one of the witnesses to the execution of the foregoing instrument and that he saw William B. Meyer, execute said instrument as Vice President of OIL AND GAS FUTURES, INC. as the free act and deed of said corporation in the presence of appearer and Laurel V. Holden, the other subscribing witness.

William A. Hills

Sworn to and subscribed before me on this the 7th day of May, 1962.

Jacquelyn R. Bruhn
NOTARY PUBLIC

JACQUELYN R. BRUHN
Notary Public in and for Harris County, Texas
My Commission Expires June 1, 1963

**ACKNOWLEDGEMENT FOR CORPORATE LESSEE**

STATE OF TEXAS
COUNTY OF HARRIS

BEFORE ME, the undersigned authority, personally came and appeared Susan M. Jennings, who by me being first duly sworn, deposed and said;

That she is one of the witnesses to the execution of the foregoing instrument and that she saw John P. Wemple execute said instrument as Vice President of NORTH CENTRAL OIL CORPORATION as the free act and deed of said corporation in the presence of appearer and Patricia I. McCullough, the other subscribing witness.

Susan M. Jennings

Sworn to and subscribed before me on this the 7th day of May, 1962

Susan M. Jennings

Sworn to and subscribed before me on this the 7th day of May, 1962

Agnes L. Lacy
NOTARY PUBLIC

ACKNOWLEDGEMENT FOR CORPORATE LESSEE

STATE OF Louisiana
Parish OF ORLEANS

BEFORE ME, the undersigned authority, personally came and appeared Robert L. Goodwin, who by me being first duly sworn, deposed and said;

That he is one of the witnesses to the execution of the foregoing instrument and that he saw JOHN F. BRICKER, execute said instrument as PRESIDENT of SOUTH SHORE OIL AND DEVELOPMENT COMPANY as the free act and deed of said corporation in the presence of appearer and Joan M. O'Brien, the other subscribing witness.

Robert L. Goodwin

Sworn to and subscribed before me on this the 1 day of May, 1962

H. H. White, Jr.
Notary Public

H. H. WHITE, JR.
NOTARY PUBLIC
PARISH OF ORLEANS
STATE OF LOUISIANA
MY COMMISSION IS ISSUED FOR LIFE

ACKNOWLEDGEMENT FOR PARTNERSHIP LESSEE

STATE OF Louisiana
Parish OF ORLEANS

BEFORE ME, the undersigned authority, personally came and appeared Robert L. Goodwin, who by me being first duly sworn, deposed and said;

That he is one of the witnesses to the execution of the foregoing instrument and that he saw JOHN F. BRICKER execute as General Partner of LUJON OIL COMPANY as the free act and deed of ~~General~~ Limited Partnership in the presence of appearer and Joan M. O'Brien, the other subscribing witness.

Robert L. Goodwin

Sworn to and subscribed before me on this the 1st day of May, 1962

H. H. White, Jr.
NOTARY PUBLIC

H. H. WHITE, JR.
NOTARY PUBLIC
PARISH OF ORLEANS
STATE OF LOUISIANA
MY COMMISSION IS ISSUED FOR LIFE

ACKNOWLEDGEMENT FOR CORPORATE LESSEE

STATE OF Louisiana
Parish OF Orleans

BEFORE ME, the undersigned authority, personally came and appeared Carol N. Marshall, who by me being first duly sworn, deposed and said;

That she is one of the witnesses to the execution of the foregoing instrument and that she saw C. J. Hoke execute said instrument as Vice President of MURPHY CORPORATION as the free act and deed of said corporation in the presence of appearer and Barbara A. Ibielle the other subscribing witness.

Carol N. Marshall

Sworn to and subscribed before me on this the 1st day of May, 1962

H. H. White, Jr.
NOTARY PUBLIC

H. H. WHITE, JR.
NOTARY PUBLIC
PARISH OF ORLEANS
STATE OF LOUISIANA
MY COMMISSION IS ISSUED FOR LIFE

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana
DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

November 4, 2016

Mr. Rodney Dykes
Cox Operating, LLC
1615 Poydras Street, Suite 830
New Orleans, Louisiana 70112

Re: Change of Operator
State Lease No. 3839, 3840, 3841, 4418
West Cameron Blk. 17 Field
West Cameron Blk. 17 Unit
Unit Agreement No. 14-08-0001-8927

Dear Mr. Rodney Dykes:

The staff of the State Mineral and Energy Board (SMEB) recently received a mailed copy of the Bureau of Safety and Environmental Enforcement's approval letter to Cox Operating, LLC regarding the intention of Cox to take over as Successor Unit Operator of the West Cameron Blk. 17 Unit from Chevron U.S.A Inc. on Oct 11, 2016.

Based on the foregoing, our staff has concluded that in accordance with Article 4.1 of the Unit Agreement of 1968, Cox Operating, LLC is approved as the designated Successor Unit Operator for the West Cameron Blk. 17 Unit. As the approved unit operator, Cox Operating, LLC must assume the obligations to reasonably develop or otherwise protect the State Lease(s) in this unit as required under the Agreement, whether expressed or implied. A plan of operations pursuant to the Unit Agreement will be required on an annual basis.

Very truly yours,

David Pipkin

David Pipkin
District Geologist

DP/lkj

cc: Mr. Mark Hanan
U.S. Department of the Interior
Bureau of Safety and Environmental Enforcement
1201 Elmwood Park Boulevard
New Orleans, Louisiana 70123-2394

Mr. J. K. Phipps
Chevron U.S.A Inc.
1200 Smith Street
Houston, Texas 77002

Brant Cole, BSEE

Jason Talbot, Geologist Supervisor
David Pipkin, District Geologist

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**

STATE LEASE No. 4039

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received at the Capitol of the State of Louisiana on the 25th day of October, 1962, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of James E. Wright, Jr.,

of the Post Office address of 1806 National Bank of Commerce Building, New Orleans 12, Louisiana,

hereinafter referred to as Lessee, as being the most advantageous to the State of Louisiana.

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana, acting under authority of said Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, and acting for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let and grant exclusively unto the said Lessee, and Lessee's successors and assigns, for the purpose of exploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining and producing sulphur, potash, oil, gas and any other liquid or gaseous hydrocarbon minerals, storing minerals and fluids, laying pipe lines, dredging canals, building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines and other structures and facilities, including houses for employees necessary or convenient for the purpose of conducting the aforesaid operations, the following described property situated in the Parish of St. Bernard, State of Louisiana, to-wit:

**PORTION OF TRACT NO. 8510, Said Portion being more fully described as follows:**

Beginning at a point having Lambert Coordinates of X=2,605,850.00 and Y=410,830.00, said point being the Northeast corner of Block 47, Chandeleur Sound Area, St. Bernard Parish, Louisiana, thence South 14,750 feet; thence West 7,375 feet; thence North 14,750 feet; thence East 7,375 feet to the point of beginning, estimated to contain approximately 1,794 acres.

**ENTIRE TRACT NO. 8510 being described as follows:**

TRACT 8510 - BLOCK 47, CHANDELEUR SOUND AREA, ST. BERNARD PARISH, LOUISIANA
All of the lands now or formerly constituting the beds and bottoms of all water bodies of every nature and description and all islands and other lands formed by accretion or reliction, except tax lands, owned by and not under mineral lease from the State of Louisiana on September 10, 1962, situated in St. Bernard Parish, Louisiana, within the following described boundaries: Beginning at a point having Lambert Coordinates of X=2,591,100.00 and Y=410,830.00, said point being the Northwest corner of Block 47, Chandeleur Sound Area; thence East 14,750 feet to the Northeast corner of said tract; thence South 14,750 feet to the Southeast corner of said tract; thence West 14,750 feet to the Southwest corner of said tract; thence North 14,750 feet to the point of beginning, estimated to contain approximately 2,809 acres, all more fully shown outlined in red on a plat on file in the State Land Office. All bearings are based on Louisiana Lambert Plane Coordinate System (South Zone). 4039

1. Lessee has this day paid to Lessor the sum of Two Hundred Twenty-Six Thousand, Forty-Four and 76/100ths ($226,044.76) Dollars as the full and adequate consideration for every right granted hereunder and the same is not to be considered as mere rental for a period.

2. Subject to the other provisions hereof, this lease shall be for a term of Three (3) years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation conducted or payment made or condition exists which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of said period shall pay or tender to the Lessor, the sum of One Hundred Thirteen Thousand, Twenty-Two and 38/100ths ($113,022.38) Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to order of Register, State Land Office and delivered or mailed to the Register on or before the rental paying date.

4. If on any rental paying date there be neither actual drilling, mining nor reworking operations in progress on the leased premises, nor production therefrom, this lease shall not terminate if Lessee, on or before said date shall make or resume the payment of rental as herein set forth; provided, if drilling, reworking or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date, or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to resume production or to com-

 Case 23-90324 Document 712-1 Filed in TXSB on 07/25/23 Page 84 of 279

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**

STATE LEASE No. 4039

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received at the Capitol of the State of Louisiana on the 25th day of October, 1962, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of James E. Wright, Jr.,

of the Post Office address of 1806 National Bank of Commerce Building, New Orleans 12, Louisiana,

hereinafter referred to as Lessee, as being the most advantageous to the State of Louisiana.

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana, acting under authority of said Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, and acting for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let and grant exclusively unto the said Lessee, and Lessee's successors and assigns, for the purpose of exploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining and producing sulphur, potash, oil, gas and any other liquid or gaseous hydrocarbon minerals, storing minerals and fluids, laying pipe lines, dredging canals, building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines and other structures and facilities, including houses for employees necessary or convenient for the purpose of conducting the aforesaid operations, the following [illegible]

To the extent such permit is required, there is included in the rights herein granted, a special permit to conduct geophysical and geological work on the leased premises and, where shot points are used in navigable waters, such work shall be done under applicable rules, regulations and statutes in force at the time such work is conducted.

1. Lessee has this day paid to Lessor the sum of Two Hundred Twenty-Six Thousand, Forty-Four and 76/100ths ($226,044.76) Dollars as the full and adequate consideration for every right granted hereunder and the same is not to be considered as mere rental for a period.

2. Subject to the other provisions hereof, this lease shall be for a term of Three (3) years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation conducted or payment made or condition exists which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of said period shall pay or tender to the Lessor, the sum of One Hundred Thirteen Thousand, Twenty-Two and 38/100ths ($113,022.38) Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to order of Register, State Land Office and delivered or mailed to the Register on or before the rental paying date.

4. If on any rental paying date there be neither actual drilling, mining nor reworking operations in progress on the leased premises, nor production therefrom, this lease shall not terminate if Lessee, on or before said date shall make or resume the payment of rental as herein set forth; provided, if drilling, reworking or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date, or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to resume production or to com-

mence reworking or mining operations or actual drilling of another well on the leased premises, or within which to make said rental payment, and the resumption of production or the commencement of such operations or the payment of such rental within said ninety (90) days' period shall have the same effect as though resumed, commenced or paid on or before said rental paying date. Wherever used in this lease, "reworking operations" shall be defined as reconditioning, deepening, plugging back, cleaning out or otherwise attempting in good faith to increase or restore production.

If at the expiration of the primary term sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well, if a well be abandoned or production should cease within ninety (90) days prior to the expiration of the primary term), Lessee commences actual drilling, mining or reworking operations on the leased premises in search of such products, (or production is resumed during such ninety day period), then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more than ninety (90) days between cessation of operations and their recommencement, whether on the same well or mine or on different wells or mines successively. If, at any time or times after the expiration of the primary term, production hereunder should for any reason cease or terminate, Lessee shall have the right at any time within ninety (90) days from cessation of such production to resume production or actual drilling, mining or reworking operations in an effort to make the leased premises again produce any of such products, in which event this lease shall remain in force so long as such operations are continued as above provided. If as a result of any such operations, sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral be found and produced, or the production of any of the same be restored, this lease shall continue in force so long as any of them is produced hereunder in paying quantities, or this lease is otherwise being maintained as herein provided.

This lease may be maintained in force by directional drilling operations (deviation from vertical) in which event actual drilling shall be considered to have commenced on the leased premises when the drill stem penetrates beneath the surface of the leased premises. Lessee shall have the right and privilege to set up any necessary surface equipment and installations on the property covered by this lease for the purpose of drilling a directional well or wells in search of sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral under the mineral lease or leases covering adjoining or adjacent property granted by the State and owned in whole or in part by Lessee, and to erect, construct and use such additional installations as are necessary or convenient in connection with the development, production, transporting and marketing of any and all said minerals from such adjoining or adjacent property. Such rights and privileges shall remain in full force and effect so long as this lease, or any such adjacent or adjoining lease is in force.

5. Lessee further agrees that should a well producing oil or gas or other liquid hydrocarbon mineral in paying quantities for thirty (30) consecutive days be brought in within six hundred sixty (660) feet (or within any spacing or pooling unit distance as established by the Department of Conservation) of, and draining, the leased premises, and located on property not owned by Lessor, Lessee will begin operations for the drilling of a well on said leased premises within sixty (60) days after said well has so produced for thirty (30) consecutive days, and in addition to the specific offset drilling obligation above provided, will drill any and all wells necessary on the premises to prevent drainage of oil, gas or other liquid or gaseous hydrocarbon mineral by a well or wells on adjacent property not owned by Lessor; however, such offset wells shall not be necessary when the leased premises are being reasonably protected by a well or wells located thereon or on land pooled therewith (or with any part thereof).

6. Lessee shall deliver to Lessor as royalty, free of cost of production:
One-Sixth (1/6th)________of all oil, including condensate and other liquid hydrocarbons, produced and saved at the well by ordinary production methods, delivery to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said delivery and at Lessee's option, pay to Lessor sums equal to the value thereof at the well when produced. The price paid Lessor shall not be less than the average posted pipe line price in the same field or loading terminal price in the same field then current for oil, including condensate or other liquid hydrocarbons, of like grade and quality.

One-Sixth (1/6th)________of all gas produced and saved or utilized, delivery of said gas to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said gas delivery, and at Lessee's option, pay to Lessor sums equal to the value thereof at the well; provided that the price paid Lessor for said gas shall not be less than the average price then current for gas of like character and quality delivered to the pipe line purchaser in that field.

It is recognized that in addition to condensate and other liquid hydrocarbons separated from gas in the field by ordinary production methods, as to which lessor shall receive royalty as above provided, lessee may extract liquid hydrocarbons or otherwise process gas either at the wells or in the fields, or beyond the field, either itself or by contract with third parties. No charge shall be made by Lessee for separation of any condensate or other liquid hydrocarbons by ordinary production methods in the field. It is provided, however, that should Lessee enter into a bona fide arms-length contract for the extraction of liquid hydrocarbons from gas or for the manufacture of gasoline or other products from gas in a plant located in the field or having a direct pipeline connection with the field, the royalty on gas above provided for shall be based on the amount realized by Lessee under such contract. In the event Lessee shall itself, or in conjunction with others, construct or otherwise provide a plant either in the field, or having a direct pipeline connection with the field, for the extraction of liquid hydrocarbons from gas or for the manufacture of gasoline or other products from gas, the royalty on gas above provided for shall be based on the current market value at the plant of the products so extracted or processed, after deducting the proportionate part of the reasonable cost of extracting or manufacturing such products; and it is provided that if Lessee shall have contracted with others for the extraction or processing of gas in said plant under a bona fide arms-length contract, the proportionate charge to be borne by Lessor shall be the same as that provided in said contract, and in the event of the existence of several contracts with varying charges, the proportionate share shall be the average thereof. In all of the cases provided for above, Lessor shall also be entitled to the royalties stipulated herein on lessee's share of the residue gas sold or otherwise disposed of after plant extraction or processing.

If at any time or times there is on the leased premises a well or wells capable of producing gas and gas is not being used or marketed therefrom and this lease is not then being otherwise maintained, this lease shall, nevertheless, remain in full force and effect for a period of ninety (90) days after cessation of production or operations or the shutting in of said well and on or before the expiration of said 90-day period lessee may com-

mence semi-annual payments to the Lessor at the rate and in the manner provided hereinbelow and thereby maintain the lease in full force and effect during the periods covered by such payments, but not more than six consecutive periods. If the lessee elects to maintain the lease by such payments, the first payment except as hereinafter provided shall be made on or before the expiration of said 90-day period and subsequent payments shall be made at six month intervals thereafter. The payments shall be in the following amounts:

(a) The payment for each of first and second semi-annual periods shall be a sum equal to $1.00 per acre for the number of acres then covered by this lease.

(b) The payment for each of third and fourth semi-annual periods shall be a sum equal to $2.00 per acre for the number of acres then covered by this lease.

(c) The payment for each of fifth and sixth semi-annual periods shall be a sum equal to $3.00 per acre for the number of acres then covered by this lease.

Provided that no payment hereunder shall be less than $200.00, and provided also that if the 90-day period should expire during the first year of the primary term or during any year for which a rental has previously been paid the initial payment hereunder shall not be required until the next anniversary date of the lease. Each payment shall maintain this lease in full force and effect for a period of six months and during each period for which a payment has been made it shall be considered that gas is being produced hereunder for all purposes hereof, especially under the provisions of Articles 2, 4 and 7 hereof. It is understood that the above shut-in clause shall apply to any well where the gas/oil ratio is such that the Commissioner of Conservation will not permit the operation of such well without the use or sale of the gas.

If it should appear to the Board that despite diligent effort by lessee to obtain a satisfactory market, lessee may not be able to market gas by the end of the last six month period herein provided for, the Board shall grant such extension of said six months periods as shall under the circumstances seem to the Board to be warranted, the payment for each such extended period to be the same as that provided above for the fifth and sixth period.

**Two Dollars ($2.00)** per long ton for all sulphur produced and saved.

**Twenty Cents (20¢)** per ton for all potash produced and saved.

**One-Sixth (1/6th)** for any and all other liquid or gaseous hydrocarbon minerals not specifically mentioned herein, said royalties to be delivered or paid as is the accepted custom in such matters.

The first payment of royalty shall be made within 120 days following commencement of production from, or allocation of production to the lease premises. Thereafter, royalty on oil, including condensate and other liquid hydrocarbons produced and saved at the well by ordinary production methods shall be paid by the 25th of each month for production of the previous month; and royalty on gas, including liquids or other products extracted or processed from gas other than by ordinary production methods, and on sulphur, potash and other liquids or gaseous hydrocarbon minerals not specifically mentioned shall be paid on or before the 25th day of the second month following that in which produced or extracted or processed. Whenever lessee is unable to make payments within the period so provided because of adverse claims, disputes, litigation or other circumstance involving the title of lessor or the extent of interest of lessor, or whenever circumstances are such as to prevent lessee from making payments within said periods, despite reasonable and diligent effort, lessee shall not be required to make payments within said periods. Otherwise, any royalty payment not made within the period so provided shall bear interest at the rate of six percent per annum, beginning as of the date by which such payment should have been made and running until paid. The foregoing provisions for the payment of interest shall be in lieu of any right of lessor to cancel the lease for non-payment of royalties, except in case of any deliberate and wrongful failure or refusal to pay such royalties after they become due as provided for above, in which event lessee shall still not be in default until lessee shall have been notified in writing by lessor of such failure or refusal and lessee shall then have failed to make the requisite payment or payments within sixty days from the date of receipt of such written notice.

Additional Consideration:

7. Lessee may surrender all or any portion or portions of the leased premises at any time this lease is in effect and thereby be relieved of all obligations thereafter accruing under this lease as to the portions surrendered; provided that no partial release or surrender shall reduce, or otherwise affect, the amount of rentals provided for in Article 3 of this lease.

In the event of cancellation or forfeiture of this lease for any cause, Lessee may, nevertheless, retain hereunder 40 acres around each well producing oil and 160 acres around each well producing gas and around each shut-in gas well (including wells drilled under this lease by directional drilling); and if any well is then being worked on or being drilled, Lessee shall have the right to complete such operations or reworking or drilling, and in the event any such well results in a producer of oil, Lessee may retain 40 acres around such well and if any such well results in a producer of gas or a shut-in gas well, Lessee may retain 160 acres around such well, such acreage to be reserved in as near a square tract as practicable with the well or wells to be as near the center of said acreage so selected as practicable; provided, however, that if any acreage covered by this lease shall have been included in a producing unit, drilling unit, or shut-in gas well unit created under the terms hereof or in such a unit established by the Commissioner of Conservation, or if any such acreage shall have been assigned to a producing or shut-in well under statewide allowable orders of the Commissioner, Lessee may retain all the acreage included in such unit or units or so assigned for allowable purposes.

8. It is further agreed and understood that the rights of Lessee may be assigned or transferred in whole or in part but no transfer, whether in whole or in part, of the herein leased property shall be valid unless such transfer or assignment be approved by the State Mineral Board.

9. Lessee may, with the consent and approval of the State Mineral Board, pool or combine the acreage covered by this lease or any portion thereof with any other property, lease or leases, or portions thereof.

Case 23-90324 Document 712-1 Filed in TXSB on 07/25/23 Page 86 of 279

10. Should Lessee apply to the Commissioner of Conservation of the State of Louisiana for the creation of any unit or units which would include all or any portion of the leased permises, at the time such application is filed with the Commissioner of Conservation, Lessee shall furnish the Secretary of the State Mineral Board with a copy of said application and with a copy of each unit plat filed therewith. If a unit or units including all or any portion of the leased premises are created by order of the Commissioner of Conservation, Lessee shall submit to the State Mineral Board a survey plat of each of the unit or units so created.

11. Lessee shall have the right during or within one year after the life of this lease to remove all Lessee's property and equipment, including the right to draw and remove all casing.

THUS DONE, READ, ACCEPTED AND SIGNED by the parties hereto in the presence of the respective undersigned witnesses, as of the 29th day of October, A. D., 1962, which shall be the date of this lease for all purposes.

WITNESSES to the signature of Lessor:

Betty Starns Baronne

Mildred B. Parker

STATE MINERAL BOARD

By: Val S Phillips Chairman

For the State of Louisiana, Lessor

Witnesses to the signature of Lessee:

Roline B. Nation

Lois Dieck

For [signature] Lessee

## ACKNOWLEDGMENT FOR STATE MINERAL BOARD

STATE OF LOUISIANA
PARISH OF East Baton Rouge

Before me, the undersigned authority, personally came and appeared ________, who by me being first duly sworn, deposed and said; That she is one of the witnesses to the execution of the foregoing instrument and that she saw ________ sign said instrument as ________ of the State Mineral Board for and on behalf of the State of Louisiana, in the presence of appearer and ________, the other subscribing witness.

Betty Starns Baronne

Sworn to and subscribed before me on this the 1 day of Nov., 1962.

Ernest R Eldred

Notary Public

## ACKNOWLEDGMENT FOR CORPORATE LESSEE

STATE OF ________

________ OF ________

Before me, the undersigned authority, personally came and appeared ________, who by me being first duly sworn, deposed and said; That he is one of the witnesses to the execution of the foregoing instrument and that he saw ________ execute said instrument as ________ of ________ as the free act and deed of said corporation in the presence of appearer and ________, the other subscribing witness.

________

Sworn to and subscribed before me on this the ____ day of ________, 19____.

________

Notary Public

## ACKNOWLEDGMENT FOR INDIVIDUAL LESSEE

STATE OF Louisiana
Parish OF Orleans

Before me, the undersigned authority, personally came and appeared Roline B. Nation, who by me being first duly sworn, deposed and said; That he is one of the witnesses to the execution of the foregoing instrument and that he saw James E. Wright Jr. execute said instrument as his own free act and deed in the presence of appearer and of Lois Dieck, the other subscribing witness.

Roline B. Nation

Sworn to and subscribed before me on this the 20th day of November, 1962.

Taylor Caffery

Notary Public

TAYLOR CAFFERY,
NOTARY PUBLIC
STATE OF LOUISIANA, PARISH OF ORLEANS
MY COMMISSION IS ISSUED FOR LIFE

4


LONG LAGOON
DO NOT REMOVE
HALF MOON LAKE
46
45
47
48
72
73
71
OFFICIAL COPY
STATE LAND OFFICE
DO NOT REMOVE
Bayou Eloi
LAKE ELOI
8510
LAKE ATHANASIO
LAKE ANATHASIO
POINTE 1934
TEXAS STATE 2-19
TEXAS STATE 1940
SPAN 1934
Eloi Pt
LAKE ANATHASIO FIELD
Tr 8510
T-15-S

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD
October 26, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attention: Susan F. Irby

Dear Ms. Irby:

Enclosed herewith are two (2) certified copies of Resolution #22-09-006 Docket No. 3 adopted at a meeting of the State Mineral and Energy Board held on October 12, 2022, approving an Assignment from HST LLC to Cox Oil LLC, affecting State Lease Nos. 2220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana.

**Your attention is directed to Item No. 5 in the resolution which requires that the resolution be attached to the instrument when it is recorded in St. Bernard Parish.** Please furnish us with the recording information when it is available. Please mail recording information to me or email recording information to Cristina.Vince@la.gov.

We wish to advise that we have retained one (1) copy of the instrument for reference use in this office.

Yours very truly,

Cristina Vince
Land Specialist 4

Enclosures

DOCKET INFORMATION SHEET
OCTOBER 12, 2022

3. ASSIGNMENT

STATE LEASE NOS. 2220,
2221, 4039, 4147 and 16158,
St. Bernard Parish, Louisiana

An Assignment from HST LLC to Cox Oil LLC, of all of Assignor's right, title and interest in and to State Lease Nos. 220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil LLC is designated as the joint account Lessee (contact company) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

______ MINERAL INCOME

______ OWNERSHIP

______ G&E

______ GIS

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

September 27, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attn: Susan F. Irby

Dear Ms. Irby:

Receipt is acknowledged of the items listed below:

> Three (3) fully executed copies of an Assignment from BHST LLC to Cox Oil, LLC, affecting State Lease Nos. 2220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana.

This matter will be placed on the Docket Review Agenda for the consideration by the State Mineral & Energy Board at a meeting to be held Wednesday, October 12, 2022 at 9:30 a.m., in the Mineral Board Hearing Room, First Floor, LaSalle Building, 617 North Third St., Baton Rouge, Louisiana.

You may wish to attend the Committee meeting to answer any questions that may arise from its members.

Yours very truly,

Cristina Vince
Land Specialist 4
Office of Mineral Resources

3

RECEIVED
OFFICE OF
MINERAL RESOURCES
STATE MINERAL BOARD
2022 SEP 15 AM 10: 35

COX OIL LLC
4514 Cole Avenue, Suite 1175
Dallas, TX 75205
(214) 420-7710

September 13, 2022

Ms. Cristina Vince
Louisiana Dept. of Natural Resources
Office of Mineral Resources
617 N. Third St., 8th Floor
Baton Rouge, LA 70802

By Fed Ex

SL Nos 2220
2221
4039
4147
16158
St. Bernard

Re: Assignments
SL 2220, 2221, 4039, 4147, 16158
Half Moon Lake/Eloi Bay Fields
St. Bernard Ph., Louisiana
SL 195, 1349, 15941
Quarantine Bay Field
Plaquemines Parish, Louisiana

Dear Cristina:

Enclosed please find for your further handling triplicate originals of the following Assignments, together with the appropriate Form B's and Form C's. We are also enclosing Cox Oil's check #2756 in the amount of $1400 covering the filing fees.

(1) Assignment of State Lease Nos. 2220, 2221 and 4147 from Half Moon Lake, L.L.C. to Cox Oil LLC
(2) Assignment of State Lease Nos. 2220, 2221, 4039, 4147, and 16158 from BHST LLC to Cox Oil LLC
(3) Assignment of State Lease No. 4039 from Valley View Energy, L.L.C. to Cox Oil LLC
(4) Assignment of State Lease No. 16158 from Louisiana Bay Drilling, L.L.C. to Cox Oil LLC
(5) Assignment of State Lease Nos. 195, 1349, and 15941 from BHST LLC, et al, to Cox Oil LLC
(6) Assignment of State Lease No. 195 (Pelican Acreage) from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC

Rec'd
3 fee

Thanks for all your help on this matter. Should you have any questions, please feel free to call me at the above phone number or 214-343-2721.

Very truly yours,

Susan

Susan F. Irby
Land Manager

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD
October 26, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attention: Susan F. Irby

Dear Ms. Irby:

Enclosed herewith are two (2) certified copies of Resolution #22-09-007 Docket No. 4 adopted at a meeting of the State Mineral and Energy Board held on October 12, 2022, approving an Assignment from Valley View Energy, L.L.C. to Cox Oil LLC, affecting State Lease No. 4039, St. Bernard Parish, Louisiana.

**Your attention is directed to Item No. 5 in the resolution which requires that the resolution be attached to the instrument when it is recorded in St. Bernard Parish**. Please furnish us with the recording information when it is available. Please mail recording information to me or email recording information to Cristina.Vince@la.gov.

We wish to advise that we have retained one (1) copy of the instrument for reference use in this office.

Yours very truly,

Cristina Vince
Land Specialist 4

Enclosures

DOCKET INFORMATION SHEET
OCTOBER 12, 2022

4. ASSIGNMENT

STATE LEASE NO. 4039,
St. Bernard Parish, Louisiana

An Assignment from Valley View Energy, L.L.C. to Cox Oil LLC, of all of Assignor's right, title and interest in and to State Lease No. 4039, St. Bernard Parish, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil LLC is designated as the joint account Lessee (contact company) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

______ MINERAL INCOME

__WM__ OWNERSHIP

______ G&E

______ GIS

**JOHN BEL EDWARDS**
GOVERNOR

**THOMAS F. HARRIS**
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

September 27, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attn: Susan F. Irby

Dear Ms. Irby:

Receipt is acknowledged of the items listed below:

> Three (3) fully executed copies of an Assignment from Valley View Energy, L.L.C. to Cox Oil, LLC, affecting State Lease No. 4039, St. Bernard Parish, Louisiana.

This matter will be placed on the Docket Review Agenda for the consideration by the State Mineral & Energy Board at a meeting to be held Wednesday, October 12, 2022 at 9:30 a.m., in the Mineral Board Hearing Room, First Floor, LaSalle Building, 617 North Third St., Baton Rouge, Louisiana.

You may wish to attend the Committee meeting to answer any questions that may arise from its members.

Yours very truly,

Cristina Vince
Land Specialist 4
Office of Mineral Resources

4

RECEIVED
OFFICE OF
MINERAL RESOURCES
STATE MINERAL BOARD
2022 SEP 15 AM 10: 35

COX OIL LLC
4514 Cole Avenue, Suite 1175
Dallas, TX 75205
(214) 420-7710

September 13, 2022

Ms. Cristina Vince
Louisiana Dept. of Natural Resources
Office of Mineral Resources
617 N. Third St., 8th Floor
Baton Rouge, LA 70802

By Fed Ex

SL. 4039
St. Bernard

Re: Assignments
SL 2220, 2221, 4039, 4147, 16158
Half Moon Lake/Eloi Bay Fields
St. Bernard Ph., Louisiana
SL 195, 1349, 15941
Quarantine Bay Field
Plaquemines Parish, Louisiana

Dear Cristina:

Enclosed please find for your further handling triplicate originals of the following Assignments, together with the appropriate Form B's and Form C's. We are also enclosing Cox Oil's check #2756 in the amount of $1400 covering the filing fees.

(1) Assignment of State Lease Nos. 2220, 2221 and 4147 from Half Moon Lake, L.L.C. to Cox Oil LLC
(2) Assignment of State Lease Nos. 2220, 2221, 4039, 4147, and 16158 from BHST LLC to Cox Oil LLC
(3) Assignment of State Lease No. 4039 from Valley View Energy, L.L.C. to Cox Oil LLC
(4) Assignment of State Lease No. 16158 from Louisiana Bay Drilling, L.L.C. to Cox Oil LLC
(5) Assignment of State Lease Nos. 195, 1349, and 15941 from BHST LLC, et al, to Cox Oil LLC
(6) Assignment of State Lease No. 195 (Pelican Acreage) from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC

Rec'd
3-fe

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**

STATE LEASE No. 4147

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received at the Capitol of the State of Louisiana on the 18th day of July, 1963, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of California Oil Company, A California corporation, acting through its Division, The California Company
of the Post Office address of 1111 Tulane Avenue, New Orleans, Louisiana,
hereinafter referred to as Lessee, as being the most advantageous to the State of Louisiana.

**ENTIRE TRACT NO. 8726, Said Tract No. 8726 being described as follows:**

TRACT 8726 - BLOCK 71, CHANDELEUR SOUND AREA, St. Bernard Parish, Louisiana-
All of the lands now or formerly constituting the beds and bottoms of all lakes, bays, coves, bayous, rivers and all other water bodies of every nature and description, including all islands and other lands formed by accretion or reliction, except tax lands, owned by and not under mineral lease from the State of Louisiana on May 27, 1963, situated in St. Bernard Parish, Louisiana, within the following described boundaries: Beginning at the Northwest corner of Block 71, Chandeleur Sound Area, being also the Southwest corner of State Lease 2220, having Lambert Plane Coordinates of X = 2,605,850.00 and Y = 396,080.00; thence East 14,750 feet to the Southeast corner of State Lease 2220; thence South 14,750 feet; thence West 14,750 feet; thence North 14,750 feet to the point of beginning, estimated to contain approximately 4,938 acres, all more fully shown outlined in red on a plat on file in the State Land Office. All bearings are b[illegible]ed on the Louisiana Lambert Plane Coordinate System (South Zone).

waters, such work shall be done under applicable rules, regulations and statutes in force at the time such work is conducted.

1. Lessee has this day paid to Lessor the sum of Five Hundred Twenty-Seven Thousand, One Hundred Four and No/100ths ($527,104.00) Dollars as the full and adequate consideration for every right granted hereunder and the same is not to be considered as mere rental for a period.

2. Subject to the other provisions hereof, this lease shall be for a term of Three (3) years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation conducted or payment made or condition exists which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of said period shall pay or tender to the Lessor, the sum of Two Hundred Sixty-Three Thousand, Five Hundred Fifty-Two and No/100ths ($263,552.00) Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to order of Register, State Land Office and delivered or mailed to the Register on or before the rental paying date.

4. If on any rental paying date there be neither actual drilling, mining nor reworking operations in progress on the leased premises, nor production therefrom, this lease shall not terminate if Lessee, on or before said date shall make or resume the payment of rental as herein set forth; provided, if drilling, reworking or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date, or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to resume production or to com-

 76543

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**

STATE LEASE No. 4147

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received at the Capitol of the State of Louisiana on the 18th day of July, 1963, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of California Oil Company, A California corporation, acting through its Division, The California Company

of the Post Office address of 1111 Tulane Avenue, New Orleans, Louisiana

hereinafter referred to as Lessee, as being the most advantageous to the State of Louisiana.

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana, acting under authority of said Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, and acting for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let and grant exclusively unto the said Lessee, and Lessee's successors and assigns, for the purpose of exploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining and producing sulphur, potash, oil, gas and any other liquid or gaseous hydrocarbon minerals, storing minerals and fluids, laying pipe lines, dredging canals, building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines and other structures and facilities, including houses for employees necessary or convenient for the purpose of conducting the aforesaid operations, the following described property situated in the Parish of St. Bernard, State of Louisiana, to-wit:

PORTION OF TRACT NO. 8726, Said Portion being more fully described as follows:

Portion of Tract No. 8726, said portion being all of Tract No. 8726 lying North of a straight line drawn diagonally across Tract No. 8726 from the Southeast corner to the Northwest corner of said Tract No. 8726, and being more particularly described as follows: Beginning at the Northwest corner of Block 71, Chandeleur Sound Area, being also the Southwest corner of State Lease 2220, and having Lambert Plane Coordinates of X = 2,605,850.00 and Y = 396,080; thence East 14,750 feet along the North boundary line of said Block 71 to the Southeast corner of State Lease 2220; thence South 14,750 feet along the East boundary line of said Block 71 to the Southeast corner of said Block 71; thence North 45 degrees 00 minutes 00 seconds West 20,859.65 feet to the point of beginning, containing 2,497.27 acres.

To the extent such permit is required, there is included in the rights herein granted, a special permit to conduct geophysical and geological work on the leased premises and, where shot points are used in navigable waters, such work shall be done under applicable rules, regulations and statutes in force at the time such work is conducted.

1. Lessee has this day paid to Lessor the sum of Five Hundred Twenty-Seven Thousand, One Hundred Four and No/100ths ($527,104.00) Dollars as the full and adequate consideration for every right granted hereunder and the same is not to be considered as mere rental for a period.

2. Subject to the other provisions hereof, this lease shall be for a term of Three (3) years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation conducted or payment made or condition exists which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of said period shall pay or tender to the Lessor, the sum of Two Hundred Sixty-Three Thousand, Five Hundred Fifty-Two and No/100ths ($263,552.00) Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to order of Register, State Land Office and delivered or mailed to the Register on or before the rental paying date.

4. If on any rental paying date there be neither actual drilling, mining nor reworking operations in progress on the leased premises, nor production therefrom, this lease shall not terminate if Lessee, on or before said date shall make or resume the payment of rental as herein set forth; provided, if drilling, reworking or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date, or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to resume production or to com-

mence reworking or mining operations or actual drilling of another well on the leased premises, or within which to make said rental payment, and the resumption of production or the commencement of such operations or the payment of such rental within said ninety (90) days' period shall have the same effect as though resumed, commenced or paid on or before said rental paying date. Wherever used in this lease, "reworking operations" shall be defined as reconditioning, deepening, plugging back, cleaning out or otherwise attempting in good faith to increase or restore production.

If at the expiration of the primary term sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well, if a well be abandoned or production should cease within ninety (90) days prior to the expiration of the primary term), Lessee commences actual drilling, mining or reworking operations on the leased premises in search of such products, (or production is resumed during such ninety day period), then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more than ninety (90) days between cessation of operations and their recommencement, whether on the same well or mine or on different wells or mines successively. If, at any time or times after the expiration of the primary term, production hereunder should for any reason cease or terminate, Lessee shall have the right at any time within ninety (90) days from cessation of such production to resume production or actual drilling, mining or reworking operations in an effort to make the leased premises again produce any of such products, in which event this lease shall remain in force so long as such operations are continued as above provided. If as a result of any such operations, sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral be found and produced, or the production of any of the same be restored, this lease shall continue in force so long as any of them is produced hereunder in paying quantities, or this lease is otherwise being maintained as herein provided.

This lease may be maintained in force by directional drilling operations (deviation from vertical) in which event actual drilling shall be considered to have commenced on the leased premises when the drill stem penetrates beneath the surface of the leased premises. Lessee shall have the right and privilege to set up any necessary surface equipment and installations on the property covered by this lease for the purpose of drilling a directional well or wells in search of sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral under the mineral lease or leases covering adjoining or adjacent property granted by the State and owned in whole or in part by Lessee, and to erect, construct and use such additional installations as are necessary or convenient in connection with the development, production, transporting and marketing of any and all said minerals from such adjoining or adjacent property. Such rights and privileges shall remain in full force and effect so long as this lease, or any such adjacent or adjoining lease is in force.

5. Lessee further agrees that should a well producing oil or gas or other liquid hydrocarbon mineral in paying quantities for thirty (30) consecutive days be brought in within six hundred sixty (660) feet (or within any spacing or pooling unit distance as established by the Department of Conservation) of, and draining, the leased premises, and located on property not owned by Lessor, Lessee will begin operations for the drilling of a well on said leased premises within sixty (60) days after said well has so produced for thirty (30) consecutive days, and in addition to the specific offset drilling obligation above provided, will drill any and all wells necessary on the premises to prevent drainage of oil, gas or other liquid or gaseous hydrocarbon mineral by a well or wells on adjacent property not owned by Lessor; however, such offset wells shall not be necessary when the leased premises are being reasonably protected by a well or wells located thereon or on land pooled therewith (or with any part thereof).

6. Lessee shall deliver to Lessor as royalty, free of cost of production:

One-Sixth (1/6th) of all oil, including condensate and other liquid hydrocarbons, produced and saved at the well by ordinary production methods, delivery to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said delivery and at Lessee's option, pay to Lessor sums equal to the value thereof at the well when produced. The price paid Lessor shall not be less than the average posted pipe line price in the same field or loading terminal price in the same field then current for oil, including condensate or other liquid hydrocarbons, of like grade and quality.

One-Sixth (1/6th) of all gas produced and saved or utilized, delivery of said gas to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said gas delivery, and at Lessee's option, pay to Lessor sums equal to the value thereof at the well; provided that the price paid Lessor for said gas shall not be less than the average price then current for gas of like character and quality delivered to the pipe line purchaser in that field.

It is recognized that in addition to condensate and other liquid hydrocarbons separated from gas in the field by ordinary production methods, as to which lessor shall receive royalty as above provided, lessee may extract liquid hydrocarbons or otherwise process gas either at the wells or in the fields, or beyond the field, either itself or by contract with third parties. No charge shall be made by Lessee for separation of any condensate or other liquid hydrocarbons by ordinary production methods in the field. It is provided, however, that should Lessee enter into a bona fide arms-length contract for the extraction of liquid hydrocarbons from gas or for the manufacture of gasoline or other products from gas in a plant located in the field or having a direct pipeline connection with the field, the royalty on gas above provided for shall be based on the amount realized by Lessee under such contract. In the event Lessee shall itself, or in conjunction with others, construct or otherwise provide a plant either in the field, or having a direct pipeline connection with the field, for the extraction of liquid hydrocarbons from gas or for the manufacture of gasoline or other products from gas, the royalty on gas above provided for shall be based on the current market value at the plant of the products so extracted or processed, after deducting the proportionate part of the reasonable cost of extracting or manufacturing such products; and it is provided that if Lessee shall have contracted with others for the extraction or processing of gas in said plant under a bona fide arms-length contract, the proportionate charge to be borne by Lessor shall be the same as that provided in said contract, and in the event of the existence of several contracts with varying charges, the proportionate share shall be the average thereof. In all of the cases provided for above, Lessor shall also be entitled to the royalties stipulated herein on lessee's share of the residue gas sold or otherwise disposed of after plant extraction or processing.

If at any time or times there is on the leased premises a well or wells capable of producing gas and gas is not being used or marketed therefrom and this lease is not then being otherwise maintained, this lease shall, nevertheless, remain in full force and effect for a period of ninety (90) days after cessation of production or operations or the shutting in of said well and on or before the expiration of said 90-day period lessee may com-

mence semi-annual payments to the Lessor at the rate and in the manner provided hereinbelow and thereby maintain the lease in full force and effect during the periods covered by such payments, but not more than six consecutive periods. If the lessee elects to maintain the lease by such payments, the first payment except as hereinafter provided shall be made on or before the expiration of said 90-day period and subsequent payments shall be made at six month intervals thereafter. The payments shall be in the following amounts:

(a) The payment for each of first and second semi-annual periods shall be a sum equal to $1.00 per acre for the number of acres then covered by this lease.

(b) The payment for each of third and fourth semi-annual periods shall be a sum equal to $2.00 per acre for the number of acres then covered by this lease.

(c) The payment for each of fifth and sixth semi-annual periods shall be a sum equal to $3.00 per acre for the number of acres then covered by this lease.

Provided that no payment hereunder shall be less than $200.00, and provided also that if the 90-day period should expire during the first year of the primary term or during any year for which a rental has previously been paid the initial payment hereunder shall not be required until the next anniversary date of the lease. Each payment shall maintain this lease in full force and effect for a period of six months and during each period for which a payment has been made it shall be considered that gas is being produced hereunder for all purposes hereof, especially under the provisions of Articles 2, 4 and 7 hereof. It is understood that the above shut-in clause shall apply to any well where the gas/oil ratio is such that the Commissioner of Conservation will not permit the operation of such well without the use or sale of the gas.

If it should appear to the Board that despite diligent effort by lessee to obtain a satisfactory market, lessee may not be able to market gas by the end of the last six month period herein provided for, the Board shall grant such extension of said six months periods as shall under the circumstances seem to the Board to be warranted, the payment for each such extended period to be the same as that provided above for the fifth and sixth period.

Two Dollars ($2.00) per long ton for all sulphur produced and saved.

Ten Cents (10¢) per ton for all potash produced and saved.

One-Sixth (1/6th) for any and all other liquid or gaseous hydrocarbon minerals not specifically mentioned herein, said royalties to be delivered or paid as is the accepted custom in such matters.

The first payment of royalty shall be made within 120 days following commencement of production from, or allocation of production to the lease premises. Thereafter, royalty on oil, including condensate and other liquid hydrocarbons produced and saved at the well by ordinary production methods shall be paid by the 25th of each month for production of the previous month; and royalty on gas, including liquids or other products extracted or processed from gas other than by ordinary production methods, and on sulphur, potash and other liquids or gaseous hydrocarbon minerals not specifically mentioned shall be paid on or before the 25th day of the second month following that in which produced or extracted or processed. Whenever lessee is unable to make payments within the period so provided because of adverse claims, disputes, litigation or other circumstance involving the title of lessor or the extent of interest of lessor, or whenever circumstances are such as to prevent lessee from making payments within said periods, despite reasonable and diligent effort, lessee shall not be required to make payments within said periods. Otherwise, any royalty payment not made within the period so provided shall bear interest at the rate of six percent per annum, beginning as of the date by which such payment should have been made and running until paid. The foregoing provisions for the payment of interest shall be in lieu of any right of lessor to cancel the lease for non-payment of royalties, except in case of any deliberate and wrongful failure or refusal to pay such royalties after they become due as provided for above, in which event lessee shall still not be in default until lessee shall have been notified in writing by lessor of such failure or refusal and lessee shall then have failed to make the requisite payment or payments within sixty days from the date of receipt of such written notice.

Additional Consideration:

7. Lessee may surrender all or any portion or portions of the leased premises at any time this lease is in effect and thereby be relieved of all obligations thereafter accruing under this lease as to the portions surrendered; provided that no partial release or surrender shall reduce, or otherwise affect, the amount of rentals provided for in Article 3 of this lease.

In the event of cancellation or forfeiture of this lease for any cause, Lessee may, nevertheless, retain hereunder 40 acres around each well producing oil and 160 acres around each well producing gas and around each shut-in gas well (including wells drilled under this lease by directional drilling); and if any well is then being worked on or being drilled, Lessee shall have the right to complete such operations or reworking or drilling, and in the event any such well results in a producer of oil, Lessee may retain 40 acres around such well and if any such well results in a producer of gas or a shut-in gas well, Lessee may retain 160 acres around such well, such acreage to be reserved in as near a square tract as practicable with the well or wells to be as near the center of said acreage so selected as practicable; provided, however, that if any acreage covered by this lease shall have been included in a producing unit, drilling unit, or shut-in gas well unit created under the terms hereof or in such a unit established by the Commissioner of Conservation, or if any such acreage shall have been assigned to a producing or shut-in well under statewide allowable orders of the Commissioner, Lessee may retain all the acreage included in such unit or units or so assigned for allowable purposes.

8. It is further agreed and understood that the rights of Lessee may be assigned or transferred in whole or in part but no transfer, whether in whole or in part, of the herein leased property shall be valid unless such transfer or assignment be approved by the State Mineral Board.

9. Lessee may, with the consent and approval of the State Mineral Board, pool or combine the acreage covered by this lease or any portion thereof, with any other property, lease or leases, or portions thereof.

10. Should Lessee apply to the Commissioner of Conservation of the State of Louisiana for the creation of any unit or units which would include all or any portion of the leased permises, at the time such application is filed with the Commissioner of Conservation, Lessee shall furnish the Secretary of the State Mineral Board with a copy of said application and with a copy of each unit plat filed therewith. If a unit or units including all or any portion of the leased premises are created by order of the Commissioner of Conservation, Lessee **shall submit to the State Mineral Board a survey plat of each of the unit or units so created.**

11. Lessee shall have the right during or within one year after the life of this lease to remove all Lessee's property and equipment, including the right to draw and remove all casing.

THUS DONE, READ, ACCEPTED AND SIGNED by the parties hereto in the presence of the respective undersigned witnesses, as of the 23 day of July, A. D., 19 63, which shall be the date of this lease for all purposes.

WITNESSES to the signature of Lessor:

JEANETTE MARTIN CROW

MILDRED B. PARKER

STATE MINERAL BOARD

By: Hal S. Phillips
For the State of Louisiana, Lessor
CHAIRMAN

Witnesses to the signature of Lessee:

Mary Janet Tate

Johnnie L. Boozer

CALIFORNIA OIL COMPANY
By K. A. McIntyre
For Attorney-in-Fact Lessee
By J. K. Ellison
Attorney-in-Fact

**ACKNOWLEDGMENT FOR STATE MINERAL BOARD**

STATE OF LOUISIANA
PARISH OF East Baton Rouge

Before me, the undersigned authority, personally came and appeared JEANETTE MARTIN CROW, who by me being first duly sworn, deposed and said; That She is one of the witnesses to the execution of the foregoing instrument and that She saw Hal S. Phillips sign said instrument as CHAIRMAN of the State Mineral Board for and on behalf of the State of Louisiana, in the presence of appearer and MILDRED B. PARKER, the other subscribing witness.

JEANETTE MARTIN CROW

Sworn to and subscribed before me on this the 25 day of July, 19 63.

Ernest R. Eldred
Notary Public

**ACKNOWLEDGMENT FOR CORPORATE LESSEE**

STATE OF LOUISIANA

PARISH OF ORLEANS

On this 5th day of August, 1963, before me appeared K. A. McINTYRE and J. K. ELLISON, to me personally known, who, being by me duly sworn did say that they are the Attorneys-in-Fact of California Oil Company, a California corporation, and that the seal affixed to said instrument is the corporate seal of California Oil Company, and that said instrument was signed and sealed in behalf of said corporation by authority of its Board of Directors, and said appearers acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF I have hereunto set my official hand and seal on the date hereinabove written.

Emily Ashmead
Notary Public in and for Orleans Parish, Louisiana

My Commission expires at death.

Sworn to and subscribed before me on this the ____ day of ____________, 19____.

Notary Public

34-14


ST. BERNARD PARISH, LA.
OFFICIAL COPY
STATE LAND OFFICE
DO NOT REMOVE
BLOCK 48
State Lse 2220
BLOCK 49
State Lse 2221
BLOCK 50
BLOCK 51
ELOI BAY
BRETON SOUND
1966.36 Acres
1222± Acres
State Lse 4040
DEADMAN ISLAND
LOUISIANA PLANE COORDINATE SYSTEM
ATHANASIO
BLOCK 71
4938 Acres
BLOCK 70
4918 Acres
CHANDELEUR SOUND AREA
2497.28 Acres
BLOCK 69
2369± Acres
BLOCK 68
State Lse 2461
OFFICIAL COPY
STATE LAND OFFICE
DO NOT REMOVE
3121.60 Acres
MAIN PASS AREA
BRETON SOUND AREA
BLOCK 3
BLOCK 4
4994.53 Acres
BLOCK 1
BLOCK 2
State Lse 2464
State Lse 2425
BASE MAP - Lake Eloi Morgan Harbor Lake Athanasio and Point Chicot Quadrangles Scale 1:24000 USC&GS
GRAPHIC SCALE

# R E S O L U T I O N

Upon motion of Mr. Durham, seconded by Mr. Stall, the Board voted to award a lease on a portion (2,497 acres) of Tract 8726 to California Oil Company, a California corporation, acting though its Division, The California Company.

Upon motion of Mr. Petit, seconded by Mr. Harrell, the Board voted to award a lease on a portion (1,000 acres) of Tract 8727 to California Oil Company, a California corporation, acting through its Division, The California Company.

CERTIFICATE

I hereby certify that the above is a true and correct copy of a resolution adopted at a meeting of the State Mineral Board held in the State Capitol, in the City of Baton Rouge, State of Louisiana, on the 18th day of July, 19 63, pursuant to due notice, at which meeting a quorum was present, and that said resolution is duly entered in the Minute Book of said Board and is now in full force and effect.

Given under my signature in the City of Baton Rouge, Louisiana on the 25th day of July, 19 63.

[signature]

Secretary, State Mineral Board

**RESOLVED:** That the President, or any Vice President of The California Company Division of this corporation, or K. A. McIntyre, or F. C. Allen, Jr. as Contract Agents of said Division, together with the Secretary or an Assistant Secretary of said Division of this corporation be and they are hereby empowered in their respective capacities or as attorneys in fact for this corporation to execute (without the necessity of affixing the corporate seal thereto) all papers concerning the properties and business of said Division requiring execution in the name of this corporation or in the name of The California Company Division of this corporation, excepting no authority is conferred hereby for the execution of oil leases covering fee lands of this corporation or deeds or conveyances to others covering fee lands of this corporation (other than rights-of-way and similar easements) where either the book value or the sale price exceeds $50,000, and each of said persons is hereby empowered to acknowledge and deliver any such instruments as fully as if special authority were granted in each particular instance.

and be it further

RESOLVED: That the resolution granting similar authority adopted by the Board of Directors of this corporation on January 3, 1961, be and the same is hereby rescinded.

I, C. W. COFFEY, Assistant Secretary of CALIFORNIA OIL COMPANY, a California corporation, do hereby certify that the above resolution is a true, complete, and correct copy of a resolution adopted by The Executive Committee of the Board of Directors of such corporation at a meeting held on April 18, 1963, at the office of the corporation in San Francisco, California; that such resolution is now in full force and effect; and that K. A. McINTYRE and J. K. ELLISON were on the 5th day of August, 1963, and at present are the CONTRACT AGENT and ASS'T SECRETARY, respectively, of The California Company, a division of CALIFORNIA OIL COMPANY.

IN WITNESS WHEREOF I have hereunto set my hand and affixed the seal of said corporation this 5th day of August, 1963.

C W Coffey
Assistant Secretary

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD
October 26, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attention: Susan F. Irby

Dear Ms. Irby:

Enclosed herewith are two (2) certified copies of Resolution #22-09-005 Docket No. 2 adopted at a meeting of the State Mineral and Energy Board held on October 12, 2022, approving an Assignment from Half Moon Lake, L.L.C. to Cox Oil LLC, affecting State Lease Nos. 2220, 2221 and 4147, St. Bernard Parish, Louisiana.

**Your attention is directed to Item No. 5 in the resolution which requires that the resolution be attached to the instrument when it is recorded in St. Bernard Parish**. Please furnish us with the recording information when it is available. Please mail recording information to me or email recording information to Cristina.Vince@la.gov.

We wish to advise that we have retained one (1) copy of the instrument for reference use in this office.

Yours very truly,

Cristina Vince
Land Specialist 4

Enclosures

DOCKET INFORMATION SHEET
OCTOBER 12, 2022

2. ASSIGNMENT

STATE LEASE NOS. 2220, 2221 and 4147, St. Bernard Parish, Louisiana

An Assignment from Half Moon Lake, L.L.C. to Cox Oil LLC, of all of Assignor's right, title and interest in and to State Lease Nos. 2220, 2221 and 4147, St. Bernard Parish, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil LLC is designated as the joint account Lessee (contact company) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

______ MINERAL INCOME

__✓__ OWNERSHIP

______ G&E

______ GIS

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

September 27, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attn: Susan F. Irby

Dear Ms. Irby:

Receipt is acknowledged of the items listed below:

> Three (3) fully executed copies of an Assignment from Half Moon Lake, L.L.C. to Cox Oil, LLC, affecting State Lease Nos. 2220, 2221 and 4147, St. Bernard Parish, Louisiana.

This matter will be placed on the Docket Review Agenda for the consideration by the State Mineral & Energy Board at a meeting to be held Wednesday, October 12, 2022 at 9:30 a.m., in the Mineral Board Hearing Room, First Floor, LaSalle Building, 617 North Third St., Baton Rouge, Louisiana.

You may wish to attend the Committee meeting to answer any questions that may arise from its members.

Yours very truly,

Cristina Vince
Land Specialist 4
Office of Mineral Resources

Invoice # 1255841

SECURITY FEATURES INCLUDE TRUE WATERMARK PAPER, HEAT SENSITIVE ICON AND FOIL HOLOGRAM.

CHECKSAFE

002756

*Cox Oil, LLC*
*4514 Cole Ave Ste 1175*
*Dallas, TX 75205-4183*

**Amarillo National Bank**
410 South Taylor
Amarillo, TX 79101
88-95/1113

9/6/2022

PAY TO THE ORDER OF Office of Mineral Resources $ **1,400.00

One Thousand Four Hundred and 00/100*************************************************************************************** DOLLARS

Office of Mineral Resources
P.O. Box 2827
Baton Rouge, LA 70821-2827

MEMO

AUTHORIZED SIGNATURE MP

325444

Details on Back. Security Features Included

2

RECEIVED

2022 SEP 15 AM 10:35

COX OIL LLC
4514 Cole Avenue, Suite 1175
Dallas, TX 75205
(214) 420-7710

September 13, 2022

Ms. Cristina Vince
Louisiana Dept. of Natural Resources
Office of Mineral Resources
617 N. Third St., 8th Floor
Baton Rouge, LA 70802

By Fed Ex

SL. Nos 2220
2221
4147
St. Bernard

Re: Assignments
SL 2220, 2221, 4039, 4147, 16158
Half Moon Lake/Eloi Bay Fields
St. Bernard Ph., Louisiana
SL 195, 1349, 15941
Quarantine Bay Field
Plaquemines Parish, Louisiana

Dear Cristina:

Enclosed please find for your further handling triplicate originals of the following Assignments, together with the appropriate Form B's and Form C's. We are also enclosing Cox Oil's check #2756 in the amount of $1400 covering the filing fees.

(1) Assignment of State Lease Nos. 2220, 2221 and 4147 from Half Moon Lake, L.L.C. to Cox Oil LLC
(2) Assignment of State Lease Nos. 2220, 2221, 4039, 4147, and 16158 from BHST LLC to Cox Oil LLC
(3) Assignment of State Lease No. 4039 from Valley View Energy, L.L.C. to Cox Oil LLC
(4) Assignment of State Lease No. 16158 from Louisiana Bay Drilling, L.L.C. to Cox Oil LLC
(5) Assignment of State Lease Nos. 195, 1349, and 15941 from BHST LLC, et al, to Cox Oil LLC
(6) Assignment of State Lease No. 195 (Pelican Acreage) from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC

Rec'd
3 for

Thanks for all your help on this matter. Should you have any questions, please feel free to call me at the above phone number or 214-343-2721.

Very truly yours,

Susan

Susan F. Irby
Land Manager

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD
October 26, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attention: Susan F. Irby

Dear Ms. Irby:

Enclosed herewith are two (2) certified copies of Resolution #22-09-006 Docket No. 3 adopted at a meeting of the State Mineral and Energy Board held on October 12, 2022, approving an Assignment from HST LLC to Cox Oil LLC, affecting State Lease Nos. 2220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana.

**Your attention is directed to Item No. 5 in the resolution which requires that the resolution be attached to the instrument when it is recorded in St. Bernard Parish**. Please furnish us with the recording information when it is available. Please mail recording information to me or email recording information to Cristina.Vince@la.gov.

We wish to advise that we have retained one (1) copy of the instrument for reference use in this office.

Yours very truly,

Cristina Vince
Land Specialist 4

Enclosures

DOCKET INFORMATION SHEET
OCTOBER 12, 2022

3. ASSIGNMENT

STATE LEASE NOS. 2220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana

An Assignment from HST LLC to Cox Oil LLC, of all of Assignor's right, title and interest in and to State Lease Nos. 220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil LLC is designated as the joint account Lessee (contact company) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

_____ MINERAL INCOME

HA_____ OWNERSHIP

_____ G&E

_____ GIS

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana

DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

September 27, 2022

Cox Oil LLC
4514 Cole Avenue, Suite 1175
Dallas, Texas 75205

Attn: Susan F. Irby

Dear Ms. Irby:

Receipt is acknowledged of the items listed below:

> Three (3) fully executed copies of an Assignment from BHST LLC to Cox Oil, LLC, affecting State Lease Nos. 2220, 2221, 4039, 4147 and 16158, St. Bernard Parish, Louisiana.

This matter will be placed on the Docket Review Agenda for the consideration by the State Mineral & Energy Board at a meeting to be held Wednesday, October 12, 2022 at 9:30 a.m., in the Mineral Board Hearing Room, First Floor, LaSalle Building, 617 North Third St., Baton Rouge, Louisiana.

You may wish to attend the Committee meeting to answer any questions that may arise from its members.

Yours very truly,

Cristina Vince
Land Specialist 4
Office of Mineral Resources

3

RECEIVED
OFFICE OF
MINERAL RESOURCES
STATE MINERAL BOARD
2022 SEP 15 AM 10: 35

COX OIL LLC
4514 Cole Avenue, Suite 1175
Dallas, TX 75205
(214) 420-7710

September 13, 2022

Ms. Cristina Vince
Louisiana Dept. of Natural Resources
Office of Mineral Resources
617 N. Third St., 8th Floor
Baton Rouge, LA 70802

By Fed Ex

SL Nos 2220
2221
4039
4147
16158
St. Bernard

Re: Assignments
SL 2220, 2221, 4039, 4147, 16158
Half Moon Lake/Eloi Bay Fields
St. Bernard Ph., Louisiana
SL 195, 1349, 15941
Quarantine Bay Field
Plaquemines Parish, Louisiana

Dear Cristina:

Enclosed please find for your further handling triplicate originals of the following Assignments, together with the appropriate Form B's and Form C's. We are also enclosing Cox Oil's check #2756 in the amount of $1400 covering the filing fees.

(1) Assignment of State Lease Nos. 2220, 2221 and 4147 from Half Moon Lake, L.L.C. to Cox Oil LLC
(2) Assignment of State Lease Nos. 2220, 2221, 4039, 4147, and 16158 from BHST LLC to Cox Oil LLC
(3) Assignment of State Lease No. 4039 from Valley View Energy, L.L.C. to Cox Oil LLC
(4) Assignment of State Lease No. 16158 from Louisiana Bay Drilling, L.L.C. to Cox Oil LLC
(5) Assignment of State Lease Nos. 195, 1349, and 15941 from BHST LLC, et al, to Cox Oil LLC
(6) Assignment of State Lease No. 195 (Pelican Acreage) from William L. Graham, Trustee of the BEC Trust to Cox Oil LLC

Rec'd
3 fee

Thanks for all your help on this matter. Should you have any questions, please feel free to call me at the above phone number or 214-343-2721.

Very truly yours,

Susan

Susan F. Irby
Land Manager

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**

STATE LEASE No. 4418

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received at the Capitol of the State of Louisiana on the 12 day of November, 1964, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of California Oil Company, a California Corporation, acting through its Division, The California Company

of the Post Office address of 1111 Tulane Avenue, New Orleans 12, Louisiana

hereinafter referred to as Lessee, as being the most advantageous to the State of Louisiana.

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana, acting under authority of said Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, and acting for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let and grant exclusively unto the said Lessee, and Lessee's successors and assigns, for the purpose of exploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining and producing sulphur, potash, oil, gas and any other liquid or gaseous hydrocarbon minerals, storing minerals and fluids, laying pipe lines, dredging canals, building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines and other structures and facilities, including houses for employees necessary or convenient for the purpose of conducting the aforesaid operations, the following described property situated in the Parish of Cameron, State of Louisiana, to-wit:

**ENTIRE TRACT NO. 9271, Said Tract No. 9271 being described as follows:**

TRACT 9271 - PORTION OF BLOCK 18, WEST CAMERON AREA, REVISED, CAMERON PARISH, LOUISIANA
That portion of Block 18, West Cameron Area, Revised, Cameron Parish, Louisiana, belonging to the State of Louisiana and not under mineral lease on September 23, 1964, lying in Zone I as defined in the October 12, 1956 Agreement between the State of Louisiana and the United States of America and delineated on a copy of Exhibit "A" thereof, on file in the State Land Office. Said portion of Block 18 is further described as follows: Beginning at the Northeast corner of Block 18, West Cameron Area having Lambert Coordinates X = 1,258,629.280 and Y = 393,790.240; thence West 11,558.048 feet along the North line of Block 18, West Cameron Area, to the Northeast corner of State Lease No. 3841; thence South along the East line of said State Lease No. 3841 to the South line of Zone I; thence Easterly along the South line of Zone I to a point South of the point of beginning; thence North to the point of beginning, estimated to contain approximately 3,220 acres. All bearings are based on Louisiana Lambert Plane Coordinate System, South Zone.

To the extent such permit is required, there is included in the rights herein granted, a special permit to conduct geophysical and geological work on the leased premises and, where shot points are used in navigable waters, such work shall be done under applicable rules, regulations and statutes in force at the time such work is conducted.

1. Lessee has this day paid to Lessor, the sum of Eight Hundred Thirty-One Thousand, One Hundred Fourteen and 20/100ths ($831,114.20) Dollars as the full and adequate consideration for every right granted hereunder and the same is not to be considered as mere rental for a period.

2. Subject to the other provisions hereof, this lease shall be for a term of Five (5) years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation conducted or payment made or condition exists which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of said period shall pay or tender to the Lessor, the sum of Four Hundred Fifteen Thousand, Five Hundred Fifty-Seven and 10/100ths ($415,557.10) Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to order of Register, State Land Office and delivered or mailed to the Register on or before the rental paying date.

4. If on any rental paying date there be neither actual drilling, mining nor reworking operations in progress on the leased premises, nor production therefrom, this lease shall not terminate if Lessee, on or before said date shall make or resume the payment of rental as herein set forth; provided, if drilling, reworking or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date, or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to resume production or to com-

mence reworking or mining operations or actual drilling of another well on the leased premises, or within which to make said rental payment, and the resumption of production or the commencement of such operations or the payment of such rental within said ninety (90) days' period shall have the same effect as though resumed, commenced or paid on or before said rental paying date. Wherever used in this lease, "reworking operations" shall be defined as reconditioning, deepening, plugging back, cleaning out or otherwise attempting in good faith to increase or restore production.

If at the expiration of the primary term sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well, if a well be abandoned or production should cease within ninety (90) days prior to the expiration of the primary term), Lessee commences actual drilling, mining or reworking operations on the leased premises in search of such products, (or production is resumed during such ninety day period), then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more than ninety (90) days between cessation of operations and their recommencement, whether on the same well or mine or on different wells or mines successively. If, at any time or times after the expiration of the primary term, production hereunder should for any reason cease or terminate, Lessee shall have the right at any time within ninety (90) days from cessation of such production to resume production or actual drilling, mining or reworking operations in an effort to make the leased premises again produce any of such products, in which event this lease shall remain in force so long as such operations are continued as above provided. If as a result of any such operations, sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral be found and produced, or the production of any of the same be restored, this lease shall continue in force so long as any of them is produced hereunder in paying quantities, or this lease is otherwise being maintained as herein provided.

This lease may be maintained in force by directional drilling operations (deviation from vertical) in which event actual drilling shall be considered to have commenced on the leased premises when the drill stem penetrates beneath the surface of the leased premises. Lessee shall have the right and privilege to set up any necessary surface equipment and installations on the property covered by this lease for the purpose of drilling a directional well or wells in search of sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral under the mineral lease or leases covering adjoining or adjacent property granted by the State and owned in whole or in part by Lessee, and to erect, construct and use such additional installations as are necessary or convenient in connection with the development, production, transporting and marketing of any and all said minerals from such adjoining or adjacent property. Such rights and privileges shall remain in full force and effect so long as this lease, or any such adjacent or adjoining lease is in force.

5. Lessee further agrees that should a well producing oil or gas or other liquid hydrocarbon mineral in paying quantities for thirty (30) consecutive days be brought in within six hundred sixty (660) feet (or within any spacing or pooling unit distance as established by the Department of Conservation) of, and draining, the leased premises, and located on property not owned by Lessor, Lessee will begin operations for the drilling of a well on said leased premises within sixty (60) days after said well has so produced for thirty (30) consecutive days, and in addition to the specific offset drilling obligation above provided, will drill any and all wells necessary on the premises to prevent drainage of oil, gas or other liquid or gaseous hydrocarbon mineral by a well or wells on adjacent property not owned by Lessor; however, such offset wells shall not be necessary when the leased premises are being reasonably protected by a well or wells located thereon or on land pooled therewith (or with any part thereof).

6. Lessee shall deliver to Lessor as royalty, free of cost of production:

**One-Sixth (1/6th)** of all oil, including condensate and other liquid hydrocarbons, produced and saved at the well by ordinary production methods, delivery to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said delivery and at Lessee's option, pay to Lessor sums equal to the value thereof at the well when produced. The price paid Lessor shall not be less than the average posted pipe line price in the same field or loading terminal price in the same field then current for oil, including condensate or other liquid hydrocarbons, of like grade and quality.

**One-Sixth (1/6th)** of all gas produced and saved or utilized, delivery of said gas to be understood as made when same has been received by the first purchaser thereof. Or Lessee may, in lieu of said gas delivery, and at Lessee's option, pay to Lessor sums equal to the value thereof at the well; provided that the price paid Lessor for said gas shall not be less than the average price then current for gas of like character and quality delivered to the pipe line purchaser in that field.

It is recognized that in addition to condensate and other liquid hydrocarbons separated from gas in the field by ordinary production methods, as to which lessor shall receive royalty as above provided, lessee may extract liquid hydrocarbons or otherwise process gas either at the wells or in the fields, or beyond the field, either itself or by contract with third parties. No charge shall be made by Lessee for separation of any condensate or other liquid hydrocarbons by ordinary production methods in the field. It is provided, however, that should Lessee enter into a bona fide arms-length contract for the extraction of liquid hydrocarbons from gas or for the manufacture of gasoline or other products from gas in a plant located in the field or having a direct pipeline connection with the field, the royalty on gas above provided for shall be based on the amount realized by Lessee under such contract. In the event Lessee shall itself, or in conjunction with others, construct or otherwise provide a plant either in the field, or having a direct pipeline connection with the field, for the extraction of liquid hydrocarbons from gas or for the manufacture of gasoline or other products from gas, the royalty on gas above provided for shall be based on the current market value at the plant of the products so extracted or processed, after deducting the proportionate part of the reasonable cost of extracting or manufacturing such products; and it is provided that if Lessee shall have contracted with others for the extraction or processing of gas in said plant under a bona fide arms-length contract, the proportionate charge to be borne by Lessor shall be the same as that provided in said contract, and in the event of the existence of several contracts with varying charges, the proportionate share shall be the average thereof. In all of the cases provided for above, Lessor shall also be entitled to the royalties stipulated herein on lessee's share of the residue gas sold or otherwise disposed of after plant extraction or processing.

If at any time or times there is on the leased premises a well or wells capable of producing gas and gas is not being used or marketed therefrom and this lease is not then being otherwise maintained, this lease shall, nevertheless, remain in full force and effect for a period of ninety (90) days after cessation of production or operations or the shutting in of said well and on or before the expiration of said 90-day period lessee may com-

mence semi-annual payments to the Lessor at the rate and in the manner provided hereinbelow and thereby maintain the lease in full force and effect during the periods covered by such payments, but not more than six consecutive periods. If the lessee elects to maintain the lease by such payments, the first payment except as hereinafter provided shall be made on or before the expiration of said 90-day period and subsequent payments shall be made at six month intervals thereafter. The payments shall be in the following amounts:

(a) The payment for each of first and second semi-annual periods shall be a sum equal to $1.00 per acre for the number of acres then covered by this lease.

(b) The payment for each of third and fourth semi-annual periods shall be a sum equal to $2.00 per acre for the number of acres then covered by this lease.

(c) The payment for each of fifth and sixth semi-annual periods shall be a sum equal to $3.00 per acre for the number of acres then covered by this lease.

Provided that no payment hereunder shall be less than $200.00, and provided also that if the 90-day period should expire during the first year of the primary term or during any year for which a rental has previously been paid the initial payment hereunder shall not be required until the next anniversary date of the lease. Each payment shall maintain this lease in full force and effect for a period of six months and during each period for which a payment has been made it shall be considered that gas is being produced hereunder for all purposes hereof, especially under the provisions of Articles 2, 4 and 7 hereof. It is understood that the above shut-in clause shall apply to any well where the gas/oil ratio is such that the Commissioner of Conservation will not permit the operation of such well without the use or sale of the gas.

If it should appear to the Board that despite diligent effort by lessee to obtain a satisfactory market, lessee may not be able to market gas by the end of the last six month period herein provided for, the Board shall grant such extension of said six months periods as shall under the circumstances seem to the Board to be warranted, the payment for each such extended period to be the same as that provided above for the fifth and sixth period.

Two Dollars ($2.00) per long ton for all sulphur produced and saved.

Ten Cents (10¢) per ton for all potash produced and saved.

One-Sixth (1/6th) for any and all other liquid or gaseous hydrocarbon minerals not specifically mentioned herein, said royalties to be delivered or paid as is the accepted custom in such matters.

The first payment of royalty shall be made within 120 days following commencement of production from, or allocation of production to the lease premises. Thereafter, royalty on oil, including condensate and other liquid hydrocarbons produced and saved at the well by ordinary production methods shall be paid by the 25th of each month for production of the previous month; and royalty on gas, including liquids or other products extracted or processed from gas other than by ordinary production methods, and on sulphur, potash and other liquids or gaseous hydrocarbon minerals not specifically mentioned shall be paid on or before the 25th day of the second month following that in which produced or extracted or processed. Whenever lessee is unable to make payments within the period so provided because of adverse claims, disputes, litigation or other circumstance involving the title of lessor or the extent of interest of lessor, or whenever circumstances are such as to prevent lessee from making payments within said periods, despite reasonable and diligent effort, lessee shall not be required to make payments within said periods. Otherwise, any royalty payment not made within the period so provided shall bear interest at the rate of six percent per annum, beginning as of the date by which such payment should have been made and running until paid. The foregoing provisions for the payment of interest shall be in lieu of any right of lessor to cancel the lease for non-payment of royalties, except in case of any deliberate and wrongful failure or refusal to pay such royalties after they become due as provided for above, in which event lessee shall still not be in default until lessee shall have been notified in writing by lessor of such failure or refusal and lessee shall then have failed to make the requisite payment or payments within sixty days from the date of receipt of such written notice.

Additional Consideration:

7. Lessee may surrender all or any portion or portions of the leased premises at any time this lease is in effect and thereby be relieved of all obligations thereafter accruing under this lease as to the portions surrendered; provided that no partial release or surrender shall reduce, or otherwise affect, the amount of rentals provided for in Article 3 of this lease.

In the event of cancellation or forfeiture of this lease for any cause, Lessee may, nevertheless, retain hereunder 40 acres around each well producing oil and 160 acres around each well producing gas and around each shut-in gas well (including wells drilled under this lease by directional drilling); and if any well is then being worked on or being drilled, Lessee shall have the right to complete such operations or reworking or drilling, and in the event any such well results in a producer of oil, Lessee may retain 40 acres around such well and if any such well results in a producer of gas or a shut-in gas well, Lessee may retain 160 acres around such well, such acreage to be reserved in as near a square tract as practicable with the well or wells to be as near the center of said acreage so selected as practicable; provided, however, that if any acreage covered by this lease shall have been included in a producing unit, drilling unit, or shut-in gas well unit created under the terms hereof or in such a unit established by the Commissioner of Conservation, or if any such acreage shall have been assigned to a producing or shut-in well under statewide allowable orders of the Commissioner, Lessee may retain all the acreage included in such unit or units or so assigned for allowable purposes.

8. It is further agreed and understood that the rights of Lessee may be assigned or transferred in whole or in part but no transfer, whether in whole or in part, of the herein leased property shall be valid unless such transfer or assignment be approved by the State Mineral Board.

9. Lessee may, with the consent and approval of the State Mineral Board, pool or combine the acreage covered by this lease, or any portion thereof, with any other property, lease or leases, or portions thereof.

10. Should Lessee apply to the Commissioner of Conservation of the State of Louisiana for the creation of any unit or units which would include all or any portion of the leased permises, at the time such application is filed with the Commissioner of Conservation, Lessee shall furnish the Secretary of the State Mineral Board with a copy of said application and with a copy of each unit plat filed therewith. If a unit or units including all or any portion of the leased premises are created by order of the Commissioner of Conservation, Lessee shall submit to the State Mineral Board a survey plat of each of the unit or units so created.

11. Lessee shall have the right during or within one year after the life of this lease to remove all Lessee's property and equipment, including the right to draw and remove all casing.

THUS DONE, READ, ACCEPTED AND SIGNED by the parties hereto in the presence of the respective undersigned witnesses, as of the 16 day of November, A. D., 19 64, which shall be the date of this lease for all purposes.

WITNESSES to the signature of Lessor:

JEANETTE MARTIN CROW

MILDRED B. PARKER

STATE MINERAL BOARD

By: Henry V. Howe, Chairman

For the State of Louisiana, Lessor

WITNESSES:

ANNA HELEN CRUSH

EVA JACOB

CALIFORNIA OIL COMPANY

By ________ Attorney-in-Fact

By ________ Attorney-in-Fact

4418

Henry V. Howe sign said instrument as Chairman of the State Mineral Board for and on behalf of the State of Louisiana, in the presence of appearer and MILDRED B. PARKER, the other subscribing witness.

JEANETTE MARTIN CROW

Sworn to and subscribed before me on this the 19 day of November, 1964.

Notary Public

## ACKNOWLEDGMENT FOR CORPORATE LESSEE

STATE OF LOUISIANA

PARISH OF ORLEANS

On this 25th day of November, 19 64, before me appeared K. A. McINTYRE and C. J. MALLERICH, to me personally known, who, being by me duly sworn did say that they are the Attorneys-in-Fact of California Oil Company, a California corporation, and that the seal affixed to said instrument is the corporate seal of California Oil Company, and that said instrument was signed and sealed in behalf of said corporation by authority of its Board of Directors, and said appearers acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF I have hereunto set my official hand and seal on the date hereinabove written.

Notary Public in and for
Orleans Parish, Louisiana

My Commission expires at death.

Sworn to and subscribed before me on this the ____ day of ____________, 19____.

Notary Public

#914.10 documentary stamps affixed and cancelled on original.

34-14

10. Should Lessee apply to the Commissioner of Conservation of the State of Louisiana for the creation of any unit or units which would include all or any portion of the leased permises, at the time such application is filed with the Commissioner of Conservation, Lessee shall furnish the Secretary of the State Mineral Board *with a copy of* said application and with a copy of each unit plat filed therewith. If a unit or units including all or any portion of the leased premises are created by order of the Commissioner of Conservation, Lessee

Witnesses to the signature of Lessee:

_______________________ 

_______________________ 

_______________________
For Lessee

**ACKNOWLEDGMENT FOR STATE MINERAL BOARD**

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

Before me, the undersigned authority, personally came and appeared JEANETTE MARTIN CROW, who by me being first duly sworn, deposed and said; That She is one of the witnesses to the execution of the foregoing instrument and that She saw Henry V. Howe sign said instrument as Chairman of the State Mineral Board for and on behalf of the State of Louisiana, in the presence of appearer and MILDRED B. PARKER, the other subscribing witness.

Jeanette Martin Crow
JEANETTE MARTIN CROW

Sworn to and subscribed before me on this the 19 day of November, 1964.

Ernest R Eldred
Notary Public

**ACKNOWLEDGMENT FOR CORPORATE LESSEE**

STATE OF LOUISIANA

PARISH OF ORLEANS

On this 25th day of November, 1964, before me appeared K. A. McINTYRE and C. J. MALLERICH, to me personally known, who, being by me duly sworn did say that they are the Attorneys-in-Fact of California Oil Company, a California corporation, and that the seal affixed to said instrument is the corporate seal of California Oil Company, and that said instrument was signed and sealed in behalf of said corporation by authority of its Board of Directors, and said appearers acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF I have hereunto set my official hand and seal on the date hereinabove written.

Edward A. Wallace
Notary Public in and for
Orleans Parish, Louisiana

My Commission expires at death.

Sworn to and subscribed before me on this the ____ day of ____________, 19____.

_______________________
Notary Public

#914.10 xx documentary stamps affixed and cancelled on original.

34-14

RESOLVED: That the President, or any Vice President of The California Company Division of this corporation, or K. A. McIntyre, or James Sanders as Contract Agents of said Division, together with the Secretary or an Assistant Secretary of said Division of this corporation be and they are hereby empowered in their respective capacities or as attorneys in fact for this corporation to execute (without the necessity of affixing the corporate seal thereto) all papers concerning the properties and business of said Division requiring execution in the name of this corporation or in the name of The California Company Division of this corporation, excepting no authority is conferred hereby for the execution of oil leases covering fee lands of this corporation or deeds or conveyances to others covering fee lands of this corporation (other than rights-of-way and similar easements) where either the book value or the sale price exceeds $50,000, and each of said persons is hereby empowered to acknowledge and deliver any such instruments as fully as if special authority were granted in each particular instance.

and be it further

RESOLVED: That the resolution granting similar authority adopted by the Executive Committee of this corporation on April 18, 1963, be and the same is hereby rescinded.

I, C. W. COFFEY, Assistant Secretary of CALIFORNIA OIL COMPANY, a California corporation, do hereby certify that the above resolution is a true, complete, and correct copy of a resolution adopted by The Executive Committee of the Board of Directors of such corporation at a meeting held on May 26, 1964, at the office of the corporation in San Francisco, California; that such resolution is now in full force and effect; and that K. A. McINTYRE and C. J. MALLERICH were on 26TH day of MAY, 1964, and at present are the CONTRACT AGENT and Assistant Secretary, respectively, of The California Company, a division of CALIFORNIA OIL COMPANY.

IN WITNESS WHEREOF I have hereunto set my hand and affixed the seal of said corporation this 25TH day of NOVEMBER, 1964.

C W Coffey
Assistant Secretary

4418


SL 4418 "A"
4418
EAST CAMERON AREA
WEST CAMERON AREA
TR 9267 Nov 64
TR 9266 Nov 64
TR 9270 Nov 64
TR 9271 Nov 64
TR 9269 Nov 64
TR 9268 Nov 64
GRAND LAKE
CALCASIEU LAKE
SABINE LAKE
PORT ARTHUR

JOHN BEL EDWARDS
GOVERNOR

THOMAS F. HARRIS
SECRETARY

# State of Louisiana
DEPARTMENT OF NATURAL RESOURCES
OFFICE OF MINERAL RESOURCES
STATE MINERAL AND ENERGY BOARD

November 4, 2016

Mr. Rodney Dykes
Cox Operating, LLC
1615 Poydras Street, Suite 830
New Orleans, Louisiana 70112

Re: Change of Operator
State Lease No. 3839, 3840, 3841, 4418
West Cameron Blk. 17 Field
West Cameron Blk. 17 Unit
Unit Agreement No. 14-08-0001-8927

Dear Mr. Rodney Dykes:

The staff of the State Mineral and Energy Board (SMEB) recently received a mailed copy of the Bureau of Safety and Environmental Enforcement's approval letter to Cox Operating, LLC regarding the intention of Cox to take over as Successor Unit Operator of the West Cameron Blk. 17 Unit from Chevron U.S.A Inc. on Oct 11, 2016.

Based on the foregoing, our staff has concluded that in accordance with Article 4.1 of the Unit Agreement of 1968, Cox Operating, LLC is approved as the designated Successor Unit Operator for the West Cameron Blk. 17 Unit. As the approved unit operator, Cox Operating, LLC must assume the obligations to reasonably develop or otherwise protect the State Lease(s) in this unit as required under the Agreement, whether expressed or implied. A plan of operations pursuant to the Unit Agreement will be required on an annual basis.

Very truly yours,

David Pipkin

David Pipkin
District Geologist

DP/lkj

cc: Mr. Mark Hanan
U.S. Department of the Interior
Bureau of Safety and Environmental Enforcement
1201 Elmwood Park Boulevard
New Orleans, Louisiana 70123-2394

Mr. J. K. Phipps
Chevron U.S.A Inc.
1200 Smith Street
Houston, Texas 77002

Brant Cole, BSEE

Jason Talbot, Geologist Supervisor
David Pipkin, District Geologist

# LEASE FOR OIL, GAS AND OTHER LIQUID OR GASEOUS MINERALS

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**

State Lease No. 15941
Louisiana State Lease Form Revised 1981 with Approved Rider Attached.

WHEREAS, under the provisions of Sub-Part A of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for a lease covering oil, gas and other liquid or gaseous minerals in solution and produced with oil or gas on the property described below; and

WHEREAS, in response to required advertisements, bids were received and duly opened in the City of Baton Rouge, Parish of East Baton Rouge, State of Louisiana on the 10th day of December, 19 97, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of CENTURY OFFSHORE MANAGEMENT CORPORATION whose mailing address is LAKEWAY 1, SUITE 1400, 3900 NORTH CAUSEWAY BLVD., METAIRIE, LA 70002

(hereinafter referred to as "Lessee") as being the most advantageous to the State of Louisiana:

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana, acting under said authority for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let, and grant exclusively unto the said Lessee, and Lessee's successors and assigns, the property described below for the purpose of exploring by any method, including but not limited to geophysical and geological exploration for formations or structures and prospecting and drilling for and producing oil, gas, and any other liquid or gaseous minerals in solution and produced with oil or gas, hereinafter sometimes referred to for convenience as oil, gas or other liquid or gaseous mineral. "SEE ADDENDUM" In connection therewith Lessee shall have the right to use so much of the property as may be reasonably necessary for such operations, including but not limited to storing minerals and fluids in facilities or by means other than subsurface storage; laying pipelines; dredging canals; and building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines, and other structures and facilities. The leased property, situated in the Parish of Plaquemines, State of Louisiana, is more fully described as follows:

See attached Exhibit "A"

923 182
JAN 21 1998
Cordelia P. Cappiello
DY. CLERK OF COURT AND RECORDER

This lease excludes free sulphur, potash, lignite, salt and other solid minerals. Lessee shall not have any rights to explore, drill for, mine, produce or take any action whatsoever in regard to any such solid mineral deposits. Rights to geothermal resources are specifically excluded from this lease.

1. Lessee has this day paid to Lessor a cash payment of Seventy Thousand, Three Hundred Thirty-One and 16/100ths ($70,331.16) Dollars one-half (1/2) of which is bonus as full and adequate consideration for every right granted hereunder and not allocated as mere rental for a period, and one-half (1/2) of which is rental for the first year of this lease.

2. Subject to the other provisions hereof this lease shall be for a term of Three (3) years from the date hereof (hereinafter called "primary term") and as long thereafter as oil, gas or other liquid or gaseous mineral is produced hereunder in paying quantities or any operation is conducted, payment is made, or condition exists, which continues this lease in force, according to its terms.

3. If actual drilling operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of that period shall pay or tender to the Lessor the sum of Thirty-Six Thousand, One Hundred Sixty-Five and 58/100ths ($36,165.58) Dollars (hereinafter called "rental") which shall not be less than one-half of the above cash payment and which shall extend for twelve (12) months the time within which drilling operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to the order of Office of Mineral Resources and delivered or mailed by registered mail to said office on or before the rental paying date.

4. (a) If on any rental paying date actual drilling operations are being conducted on or production in paying quantities is being obtained from the leased premises, no rental shall be due for the annual rental period then commencing; if actual drilling operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to commence or resume production, commence actual drilling operations on the leased premises, or make the rental payment, and the commencement or resumption of production, commencement of such operations, or payment of rental within the ninety (90) day period shall have the same effect as though resumed, commenced, or paid on or before the rental paying date.

(b) If at the expiration of the primary term oil, gas or other liquid or gaseous mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandoment of a well, if a well be abandoned or production should cease within ninety (90) days prior to the expiration of the primary term) Lessee commences actual drilling or reworking operations on the leased premises in an effort to make the premises produce any such minerals (or production is commenced or resumed during such ninety (90) day period), then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more than ninety (90) days between cessation of operations and their recommencement whether on the same well or wells or on a different well or wells successively or so long as the production so commenced or resumed is obtained in paying quantities. If at any time or times after the expiration of the primary term production hereunder should for any reason cease or terminate, Lessee shall have the right at any time within ninety (90) days from cessation of production to resume production or actual drilling or reworking operations in an effort to make the leased premises again produce any of such minerals, in which event this lease shall remain in force so long as such operations are continued as above provided. If as a result of any such operations, oil, gas, or other liquid or gaseous mineral be found and produced or the production of any of them be restored, this lease shall continue in force so long as any of them is produced hereunder in paying quantities or this lease is otherwise being maintained as herein provided.

(c) This lease may be maintained in force by directional drilling operations (deviation from vertical), in which event actual drilling operations shall be considered to have commenced on the leased premises when the drill stem penetrates beneath the surface of the leased premises.

(d) Wherever used in this lease, "actual drilling operations" means actual drilling (commenced by spudding in) of a new well, or the good faith deepening, sidetracking, or the plugging back or attempted recompletion in a separate interval of an existing well (all such operations being commenced by actual downhole operations); and "reworking operations" means reconditioning, cleaning out, or otherwise attempting in good faith to establish, increase, or restore production in an existing well by downhole operations. Once commenced, any such operations shall be deemed to continue so long as they are ***SEE ADDENDUM*** lapse of more than ninety (90) days. Actual drilling operations shall be deemed to terminate on the last day actual operations of any kind, such as drilling, testing, or installation of equipment are conducted in good faith for the purpose of attempting to discover minerals or to complete a well as a producer. Reworking operations shall be deemed to terminate on the last day such operations are conducted in good faith for the purpose of establishing, increasing, or restoring production. "Paying Quantities" as used in this lease means paying quantities as defined by Article 124 of the Louisiana Mineral Code, provided that in addition thereto, and notwithstanding the provisions of Article 125 of said Code, the royalties payable on such production must also be sufficient to constitute a serious or adequate consideration to Lessor to maintain this lease in effect.

5. The obligations set forth in this Article are applicable only to wells drilled on property which is not part of a pooled unit containing all or any portion of the leased property. Such property is hereinafter described in this Article as "adjoining property."

(a) If at any time during or after the primary term there is completed on adjoining property a well located within six hundred and sixty (660) feet of the leased premises (or within any spacing or pooling unit distance greater than 660 feet established by the Commissioner of Conservation) and such well produces oil, gas, or other liquid or gaseous mineral in paying quantities for twenty (20) days (which need not be consecutive) during any period of thirty (30) days, or produces its monthly allowable during such thirty (30) day period, rebuttable presumptions will arise: (1) that the leased premises are thereby being drained; (2) that the leased premises are not being reasonably protected from drainage by any well or wells on the leased premises or land pooled therewith; and (3) that an offsetting well on the leased premises would be economically feasible. If Lessee is the operator of or has a working interest in the adjoining property, Lessee will begin actual drilling operations for a well on the leased premises within ninety (90) days after the end of the above thirty (30) day period. In all other cases Lessee shall be required to begin such operations only within ninety (90) days after receipt of written notice from the Board of the expiration of the above thirty (30) day period. No offset well shall be necessary if, on or before the maturity date of the offset obligation or any deferred maturity date as hereinafter provided, any of the stated presumptions is rebutted or a unit for the well in question embracing all or part of the leased premises is formed by agreement with the Board or by order of the Commissioner of Conservation.

In lieu of commencing operations for an offset well as above provided, Lessee may, at Lessee's option, commence compensatory payments equal to the royalties herein provided, computed on one-half (1/2) of the oil, gas, or other liquid or gaseous mineral produced by the well in question on and after the date operations would have otherwise been commenced, value to be determined in accordance with the provisions of Article 6 of this lease. Such payments may be commenced on or before sixty (60) days after the date operations would otherwise have been commenced, but shall include any accrued compensatory payments. Thereafter, payments shall be due monthly in accordance with Article 6(g). Lessee shall not be in default in either commencing compensatory payments or in making further payments as above provided if despite due diligence Lessee is unable timely to obtain the production information on which such payments are to be based. In any such case, however, Lessee must on or before the due date of the payments, notify the Board in writing of Lessee's inability to make such payment, the reasons therefor, and Lessee's intent to make such payment at the earliest reasonable time. Compensatory payments may be continued, at Lessee's discretion, for not more than one year from the date on which offset operations would otherwise have been commenced. At the end of that time, or within thirty (30) days from the end of any lesser period for which payments are made, Lessee shall comply with this offset obligation if the producing well continues to produce in paying quantities or to produce its allowable and the other conditions making this obligation operative are existent. The right to make compensatory payments is intended to permit Lessee to evaluate further the producing well, and the making of such payments shall not of itself be sufficient to maintain this lease if the lease is not otherwise being maintained in force and effect; however, the making of any such payments shall not prejudice Lessee's right to rebut any of the above enumerated presumptions.

(b) In addition to the specific offset drilling obligation above provided, Lessee agrees to drill any and all wells necessary to protect the leased premises from drainage of oil, gas, or other liquid or gaseous mineral by a well or wells on adjoining property or to take any other steps reasonably necessary to protect the leased premises against such drainage, including, but not limited to, obtaining the formation of appropriate drilling or production units. If Lessee is the operator of or has a working interest in any well on adjoining property, Lessee shall be obligated to begin actual drilling operations for a well on the leased premises or to take such other steps as may be reasonably necessary to protect the leased premises within ninety (90) days from the time Lessee knows or reasonably should know that drainage is occurring. In all other cases Lessee shall be obligated to begin such operations or take such other steps only within ninety (90) days after receipt of written notice from the Board.

(c) In those instances in which notice is expressly required under paragraph (a) or (b), above, damages, if due, shall be computed only from the date on which notice is received or, if Lessee commences compensatory payments, the date on which such payments are discontinued. In those instances in which there is no requirement of notice under (a) or (b), above, damages, if due, shall be computed from the time Lessee knew or reasonably should have known drainage was occurring. Written notice containing a demand for performance shall be necessary as a prerequisite to any action for cancellation of the lease by Lessor for nonperformance of any obligations of Lessee to protect the leased premises against drainage.

6. Unless Lessor elects to take in kind all or any part of the portion due Lessor as royalty on minerals produced and saved hereunder, which option is hereby expressly reserved by Lessor pursuant to L.R.S. 30:127 C and which is to be exercised by written notice by Lessor to Lessee at any time and from time to time while this lease is in effect and either prior or subsequent to acceptance by Lessor of royalties other than in kind, it being understood that nothing contained in this lease or in the rider attached hereto shall ever be interpreted as limiting or waiving said option, Lessee shall pay to Lessor as royalty:

(a) Twenty-Two and Five-Tenths Percent (22.5%) of the value, as hereinafter provided, of all oil, including condensate or other liquid mineral, produced and saved or utilized by methods considered ordinary production methods at the time of production. The value of such oil shall not be less than the average price for oil of like grade and quality posted for the field in which this lease is situated. If there is no price posted for the field in which this lease is situated, the value of such oil shall be not less than the average of prices posted for oil of like grade and quality for the three fields nearest to the field in which this lease is situated for which such prices are posted. If Lessee enters into an oil sales contract which, at the time of execution, provides for a price equal to or in excess of the appropriate average price referred to in the two preceding sentences, the price payable under the terms of the contract at the time such oil is run shall be the value of such oil, even though the appropriate average changes during the life of the contract; however, any such contract must have been prudently negotiated under the circumstances existing at the time of execution. If Lessee is unable, after diligent effort, to sell such oil for a price equal to or in excess of the appropriate average price and Lessee consequently negotiates a contract to sell such oil to an independent party at a lesser price, the value of such oil for the duration of any such contract (but not in excess of one year) shall be the price received by Lessee under such contract.

Lessee shall not make any deduction whatsoever for the cost of any operation, process, facility, or other item considered to be a production function or facility at the time such oil is run. Without limiting the foregoing sentence and without regard to classification as production costs, or otherwise, the following costs are not to be deducted from the value of production: (1) costs incurred for gathering or transporting production in the field; (2) costs incurred for handling, treating, separating, or in any way processing production to make it marketable by methods considered ordinary at the time such oil is run; and (3) the cost of storage on the lease or in the field. The performance of any producing function or any function mentioned in clauses (2) and (3) of the foregoing sentence at a commingled facility in or outside the field in which this lease is situated shall not make the cost of any such function deductible.

If Lessee delivers such oil at a point outside the field in which this lease is situated, Lessee may deduct from the value of such oil the actual costs of transportation from the field to the point of delivery by means of facilities belonging to an independent party. If such transportation is by means of facilities owned by one other than an independent party, Lessee may deduct the actual cost of such transportation, but only if such cost is no greater than the fair value of the services performed; if actual cost is greater than fair value, the fair value shall determine the amount deductible; however, if the facilities used are regulated as a common carrier by a state or federal regulatory agency, the authorized tariff chargeable for the services rendered and paid by Lessee shall be deemed the fair value of such services. If such transportation is by means of any facilities owned by Lessee, Lessee may deduct from the value of production a reasonable sum for such services, computed as follows: the amount deductible shall include only (1) the direct cost of operation and maintenance, including cost of labor, direct supervision, fuel, supplies, ordinary repairs, and ad valorem taxes; and (2) depreciation of the facility computed over the estimated life of the field.

If Lessee receives any compensation for any function or process for which Lessee is responsible to Lessor without right to deduct costs, including, but not limited to, (1) handling, gathering, or transporting such oil, or (2) treating or processing such oil by ordinary methods to make it marketable, the amount of such compensation shall be added to the value of such oil when computing royalties. If Lessee is deducting costs for any functions for which he is also receiving compensation, deductions may be made only to the extent they are in excess of any such compensation.

(b) Twenty-Two and Five-Tenths Percent (22.5%) of the value as hereinafter provided, of all gas, including casinghead gas, produced and saved or utilized by methods considered as ordinary production methods at the time of production. When such gas is sold by Lessee to an independent party under an arms' length contract prudently negotiated under the facts and circumstances existing at the time of its execution, the value of such gas and of gas utilized by Lessee shall be the price received by Lessee for such gas under the contract. If the purchaser is not an independent party but the contract would have been considered prudently negotiated under the facts and circumstances existing at the time of its execution if made with an independent party, then the value of the gas shall be the price received by Lessee under the contract; if the contract would not have been considered prudently negotiated if made with an independent party, the value of such gas shall be its fair value at the time of production but not less than the average of the prices paid for gas of like kind and quality from the field from which such gas is being produced, or if no gas is being sold from that field, the average of prices paid for gas of like kind and quality in the three nearest fields in which gas of like kind and quality is being sold, all comparisons to be with contracts made in the same market (either interstate or intrastate) and for the sale of similar quantities of gas. In all other cases the value of such gas shall be the average stated in the last clause of the preceding sentence.

Except as expressly permitted herein, Lessee shall not make any deduction whatsoever for the cost of any operation, process, facility, or other item considered to be a producing function at the time such gas is produced. Without limiting the foregoing sentence and without regard to classification as production costs or otherwise, the following costs are not to be deducted from the value of production: (1) costs incurred for gathering or transporting production in the field; or (2) costs incurred for dehydrating, decontaminating, or in any way processing production to make it marketable by methods considered ordinary at the time such gas is produced. The performance of any producing function or any function mentioned in clause (2) of the foregoing sentence at a commingled facility in or outside the field in which this lease is situated shall not make the cost of any such function deductible. Without regard to classification as production costs or otherwise, Lessee may deduct costs incurred for compression of gas at a point in or adjacent to the field for insertion into a purchaser's line or into a line owned by Lessee or a carrier for transportation to a point of delivery outside the field.

If Lessee delivers such gas at a point outside the field in which this lease is situated, Lessee may deduct from the value of such gas a reasonable sum for transportation from the field to the point of delivery by means of facilities belonging to an independent party, not in excess of actual cost. If such transportation is by means of facilities owned by one other than an independent party, Lessee may deduct the actual cost of such transportation, but

only if such cost is no greater than the fair value of the services performed; if actual cost is greater than fair value, the fair value shall determine the amount to be deducted. If such transportation is by means of any facilities owned by Lessee, Lessee may deduct from the value of production a reasonable sum for such services, computed as follows: the amount deductible shall include only (1) the direct cost of operation and maintenance, including cost of labor, direct supervision, fuel, supplies, ordinary repairs, and ad valorem taxes; and (2) depreciation of the facility computed over the estimated life of the field.

If Lessee receives any compensation for any function or process for which Lessee is responsible to Lessor without right to deduct costs, including but not limited to, (1) gathering or transporting such gas or (2) dehydrating, decontaminating, or in any way processing production to make it marketable, the amount of such compensation shall be added to the value of such gas when computing royalties. If Lessee is deducting costs for any functions for which he is also receiving compensation, deductions may be made only to the extent they are in excess of any such compensation.

(c) In addition to the separation of condensate or other liquid mineral from gas by ordinary production methods (as to which Lessor shall receive royalties above provided and for which separation no charge may be made by Lessee), gas produced hereunder, including casinghead gas, may be processed in a gasoline or other extraction plant in or serving the field, and products may be recovered therefrom either directly by Lessee or under contracts executed by Lessee. If Lessee enters into a contract for the processing of gas with an independent party or parties under which such party or parties retain in kind a portion of the products recovered from or attributed to such gas as consideration for processing, Lessee shall pay the royalty provided for gas in paragraph 6(b) based on the value, as hereinafter determined, of Lessee's share of such products under such contract. In all other cases Lessee shall pay the royalty provided for gas in paragraph 6(b) based on the value, as hereinafter determined, of the total products recovered, after deducting therefrom the costs of processing as specified below.

The value of such products (or Lessee's share thereof) in the cases above provided shall be the price or prices received by Lessee if sold under a contract or contracts prudently negotiated under the facts and circumstances existing at the time of execution with an independent party or parties. If such products are not sold to an independent party but are sold under a contract which would have been considered prudently negotiated if executed with an independent party, the value of such products (or Lessee's share thereof) shall be the price or prices received by Lessee. If such products are not sold to an independent party under a prudently negotiated contract or are sold to one other than an independent party under a contract which would not have been considered prudently negotiated if executed with an independent party, the value of the products shall be their fair market value at the plant at the time sold. The value of any such products (or Lessee's share thereof) not sold under any contracts shall be the fair market value at the plant for such products, or if no products are being sold at the plant, the average of the market values for like products of the same grade and quality at the three nearest plants at which such products are being sold.

When the cost of processing is not met by retention by the processor of a share of the products or in any other case in which Lessee is to deduct from the value of such products the cost of processing, the charges shall be determined as follows. If the gas is processed by an independent party or parties under a contract prudently negotiated under the facts and circumstances existing at the time of execution, the charges deducted shall be those provided in such contract. In all other cases, including processing by those other than an independent party or parties and those in which Lessee itself or in conjunction with others owns the plant, the charges should be determined by contract between Lessee and Lessor. In the absence of such a contract the charges to be deducted shall include only the proportionate part of (1) the direct cost of operating and maintaining the plant, computed annually, including cost of labor and on-site supervision, materials, supplies, and ordinary repairs; (2) plant fuel and shrinkage; (3) depreciation of the plant computed over the life or lives of the field or fields served by the plant, or by such other method as is agreed upon by Lessor and Lessee; and (4) ad valorem taxes.

In all of the cases provided for in this paragraph, Lessor shall be entitled to the royalty for gas provided in paragraph (b) of this Article based on the value of Lessee's share of the residue gas sold or otherwise disposed of after processing.

(d) If at any time or times (during or after the primary term) there is on the leased premises a well or wells capable of producing gas in paying quantities, which fact has been duly verified and confirmed in accordance with Lessor's requirements for proof thereof, but gas is not being used or marketed therefrom because of the lack of a reasonable market or marketing facilities or governmental restrictions and if this lease is not then being otherwise maintained by separate operations or production, this lease shall, nevertheless, remain in full force and effect for a period of ninety (90) days after cessation of such production or such operations or the shutting in of such well. If, on or before the expiration of the ninety (90) day period, production or operations shall not have been commenced or resumed, Lessee, in order to maintain the lease in force thereafter, shall commence semi-annual payments to the Lessor at the rate and in the manner provided hereinbelow and thereby maintain the lease in full force and effect during the periods covered by such payments; however, if the ninety (90) day period should expire during the first year of the primary term or during any year for which a rental has previously been paid, the initial payment hereunder shall not be required until the next anniversary date of the lease. The first payment, if made, shall be tendered on or before the expiration of the ninety (90) day period or the appropriate anniversary date, as the case may be, and shall maintain this lease for six (6) months, commencing from the expiration of the ninety (90) day period or the anniversary date. Subsequent payments shall be made at six (6) month intervals thereafter (herein referred to as "shut-in payment dates"). Unless additional payment periods are earned as hereinafter provided, Lessee's right to make such payments shall continue for six (6) semi-annual periods (the total of which is herein called "initial payment period"). Each semi-annual payment shall be at the rate of twenty-five dollars ($25.00) per acre for the number of acres then covered by this lease, but no payment shall be less than five hundred dollars ($500.00). Each payment shall maintain this lease in full force and effect for a period of six (6) months, and during each period for which a payment has been made, it shall be considered that gas is being produced hereunder for all purposes hereof, but especially under the provisions of Articles 2, 4, 7, and 9; however, if the provisions of this paragraph 6(d) are in conflict with those of any other articles hereof, the provisions of this paragraph shall be controlling.

If on any shut-in payment date, actual drilling operations are being conducted on or actual production of oil, gas, or other liquid or gaseous mineral in paying quantities is being obtained from the leased premises, no shut-in payment shall be due until the next shut-in payment date; however, the running of the initial payment period shall not be suspended or interrupted, and the same shall be true of any extension of that period by additional shut-in periods earned as hereinafter provided.

The initial payment period may be extended in the following manner. Lessee may earn two (2) additional six (6) month shut-in payment periods beyond the initial payment period for each additional well drilled or completed after completion of the shut-in well on which the initial shut-in payment was made (whether such additional wells are dry holes, producers, or shut-in wells). To qualify as a well "completed" after the first shut-in well, the completion must be in another hole, and no more than one completion will be counted for each additional hole regardless of the number of sands in any such hole. The aggregate additional periods (hereinafter referred to as "additional periods") so earned shall not exceed a total of six (6). The first of any additional periods shall commence from the date on which the initial payment period would have expired and the initial payment period, thus extended,

shall continue to run from that date, regardless whether Lessee is actually required to make any additional payments. The Board and Lessee may by mutual agreement provide for further six (6) month periods (hereinafter called "further periods") beyond the initial payment period and any extension thereof.

If the end of the initial payment period falls within the primary term of this lease and at a time when there is a remaining rental date which would permit Lessee to maintain this lease by payment of rentals, Lessee may commence or resume the payment of rentals on the next anniversary date of this lease or may maintain this lease by any other means permitted under paragraphs 4(a) and 4(c). If the end of the initial payment period or any extension thereof falls within the last year of the primary term, it shall be considered that production has ceased under the terms of paragraph 4(a), and no rental shall be due for the remainder of the primary term. If the end of the initial payment period, any extension thereof, or any further period falls on or after the expiration date of the primary term and there are no operations or actual production sufficient to maintain this lease under the provisions of paragraphs 4(b) and 4(c), this lease shall terminate.

The provisions of this paragraph shall be applicable to any well with a gas/oil ratio such that the Commissioner of Conservation will not permit its operation without use or sale of the gas.

Tender or acceptance of a shut-in payment or payments shall not free Lessee of any obligation to develop this lease as a prudent operator or to exercise diligent efforts to obtain a market for the gas so discovered.

(e) Twenty-Two and Five-Tenths Percent (22.5%) of any and all other liquid or gaseous minerals in solution and produced with oil or gas and saved or utilized, which are not specifically mentioned herein, said royalties to be delivered or paid when marketed or utilized as is the accepted practice in such matters.

(f) In all cases, Lessor's royalty shall be calculated and paid after deduction of all severance or production taxes.

(g) The first payment of royalty shall be made within one hundred twenty (120) days following commencement of production from, or allocation of production to the leased premises, except that in the case of any production from or allocable to the leased premises, which has occurred prior to the date of but which is deemed to be covered by this lease, Lessee hereby agrees to pay Lessor's royalty on all such prior production within one hundred twenty (120) days from the date of this lease. Thereafter, royalty on oil, including condensate or other liquid mineral, produced and saved at the well by ordinary production methods shall be paid by the 25th of each month for production of the previous month; and royalty on gas, including liquids or other products extracted or processed from gas other than by ordinary production methods, or other liquid or gaseous mineral not specifically mentioned shall be paid on or before the 25th day of the second month following that in which produced or extracted or processed. In the event any royalty payment is not correctly or timely made, the remedies provided by L.S.A.-R.S. 31:137 through 142 relative to notice, damages, interest, attorney fees, and dissolution shall be applicable, except that interest shall be payable thereon until paid without any requirement for prior written notice by Lessor to Lessee.

(h) For all purposes of this Article 6 "independent party" means a company, firm, or other business unit which is not: (1) a direct part of Lessee's corporate or other business structure; (2) a wholly owned or actually controlled subsidiary corporation or other business unit of Lessee; (3) a parent corporation of Lessee; or (4) a wholly owned or actually controlled subsidiary of Lessee's parent corporation.

7. (a) Lessee may surrender all or any portion or portions of the leased premises at any time this lease is in effect and thereby be relieved of all obligations thereafter accruing under this lease as to the portions surrendered; however, no partial release or surrender shall reduce or otherwise affect the amount of rentals provided for in Article 3 of this lease.

"SEE ADDENDUM"

(b) In the event of initial cancellation or forfeiture of this lease Lessee may retain forty (40) acres around each well capable of or producing oil and one hundred sixty (160) acres around each well producing gas and around each shut-in well capable of producing gas in paying quantities (including wells drilled under this lease by directional drilling). If any well is then being worked on or being drilled, Lessee shall have the right to complete such operations, and in the event any such operations result in completion of a well capable of producing oil or gas in paying quantities, Lessee may retain acreage around each such well as above provided. Retained acreage around any well shall form as near a square tract as is practical. If any acreage covered by this lease shall have been included in a unit established by the Commissioner of Conservation, or by conventional agreement, or if any such acreage shall have been assigned to a producing or shut-in well under statewide allowable orders of the Commissioner and such acreage is actually being drained by the well or would be drained by it if the well were produced, Lessee may retain all the acreage included in such unit or units or so assigned for allowable purposes. Thereafter, each area so retained by Lessee shall be subject to the terms of this lease as regards future maintenance thereof.

(c) Within ninety (90)days after expiration or termination by its own terms of this lease or any portion thereof, either during or after the primary term hereof, Lessee shall execute and record an appropriate release evidencing such expiration or termination, and shall also supply Lessor with a copy or copies thereof properly certified by the recorder or recorders of the parish or parishes in which the leased premises are located. In the event Lessee fails to timely comply therewith, Lessee shall be liable for reasonable attorney fees and court costs incurred in bringing suit for such cancellation, and for all damages resulting therefrom. It is agreed, however, that damages to be paid by Lessee to Lessor shall be One Hundred Dollars ($100.00) per day for each day of non-compliance after expiration of said ninety (90)day period, regardless of whether suit is filed for cancellation, and for such additional compensatory damages as Lessor may prove.

"SEE ADDENDUM"

8. It is further agreed and understood that the rights of Lessee may be assigned or transferred in whole or in part, but no transfer or assignment whether in whole or in part, in relation to this lease shall be valid unless such transfer or assignment be approved by the Lessor.

9. Lessee may, with the consent and approval of Lessor pool or combine the acreage covered by this lease (or any portion thereof) with any other property, lease, or leases (or portions thereof). Operations on or production of minerals from, or the existence of a shut-in gas well on, any portion of a unit, including units created by the Commissioner of Conservation or by conventional agreement, in which all or any part of the leased premises is embraced shall have the same effect under the terms of this lease as if it had occurred on the leased premises.

10. Should Lessee apply or give notice of intent to apply to the Commissioner of Conservation for the creation of any unit or units which would include all or any portion of the leased premises, Lessee shall furnish Lessor with a copy of the notice or application, each accompanying unit plat, and all other attached information either at the time the application is filed with the Commissioner or at the time required by applicable orders or regulations of the Commissioner for furnishing such information to any parties entitled to receive it, whichever is earlier. If a unit or units including all or any part of the leased premises are created by order of the Commissioner, Lessee shall submit to Lessor a survey plat of each unit or units so created.

11. Upon request by Lessor, Lessee shall furnish Lessor any or all of the following types of data relating to wells drilled on the leased premises or lands pooled therewith: (1) all wire line surveys in open or cased holes, including, but not limited to, all electrical and radio activity logs, porosity logs of all types and directional surveys; (2) core descriptions of both sidewall samples and conventional cores; (3) drill stem and production test data; (4) daily drilling reports to be supplied weekly; and (5) production data, current and cumulative, including oil, gas and water production, surface and subsurface pressures. Lessee shall also furnish Lessor with any other information and data requested by Lessor to keep Lessor fully informed that Lessee is complying with the provisions of this Lease in good faith, and developing and operating the leased premises as a reasonably prudent operator for the mutual benefit of Lessor and Lessee. Any information furnished by Lessee to Lessor or otherwise examined and studied by Lessor shall be retained in confidence. Nothing in this Article shall require that Lessee furnish or permit inspection of any interpretation of any of the types of data referred to above, and nothing herein shall be construed as requiring Lessee to secure any such data solely for the purposes of this Article. Lessor's representatives shall have access at all reasonable times to examine and inspect Lessee's records and operations pertaining to the leased premises or lands pooled therewith.

12. Lessee shall be obligated to plug and abandon all wells on the premises no longer necessary for operations or production on this lease, and to remove from the premises all structures and facilities serving said wells, all at Lessee's sole risk, cost and expense and subject to compliance with laws, rules and regulations. Lessee shall furnish bond as may be required at any time or times by Lessor, or such other security in lieu thereof as may be acceptable to Lessor, conditioned upon faithful performance of such obligations. *SEE ADDENDUM* In connection therewith, the right of Lessee to draw and remove casing from wells is recognized, provided such right is exercised by Lessee not later than one year after termination of this lease or portion thereof on which the well is located. ~~If such right of salvage is not timely exercised, then the same shall be forfeited and said casing shall become the property of Lessor.~~ By Resolution dated 6/8/94 In addition to restoration of the leased premises as contemplated and required by this lease, Lessee shall be responsible for all damages to the leased premises, and in addition thereto and without limitation for all damages to any timber, crops, roads, buildings, fences and other improvements thereon.

13. If at any time Lessee is maintaining this lease by actual drilling or reworking operations or by actual production and Lessee is prevented from continuing or resuming such operations or production by major storm, major flood, or other similar natural disaster or by a major accident beyond Lessee's control such as a blowout, fire, or explosion and if Lessee cannot by reason of any such occurrence maintain this lease on any rental date by continuing any such operations or production or cannot maintain this lease beyond the primary term by continuing such operations or production, this lease shall not terminate and no rental shall be due so long as Lessee is so prevented from continuing or resuming such operations or production and is making diligent efforts to eliminate the effect of such occurrence. Lessee shall notify Lessor in writing within a reasonable time after such occurrence for the provisions hereof to become effective and applicable. The primary term shall in no event be extended for more than one (1) year; and provided further that nothing herein shall suspend payment of delay rental to maintain this lease during the primary term in the absence of drilling or production.

14. If on the date of this lease all or any portion of the leased premises is included in a unit established by order of the Commissioner of Conservation, Lessee agrees to pay royalty on all oil, gas or other liquid or gaseous mineral produced and saved or utilized and attributable to the leased premises from the date of such unit regardless whether all development and operating costs chargeable to the leased premises have been paid.

15. Lessee hereby agrees to indemnify, hold harmless and defend Lessor against any and all claims, demands or suits for bodily injury, death, property damage or loss of any kind by Lessee or Lessee's employees, agents, subcontractors and their employees or agents and by any third parties which arise out of or result from or which are in any way connected with Lessee's operations, whether resulting from the sole or concurrent negligence of Lessor, Lessee or other parties operating hereunder.

16. In all suits arising out of this contract, the parties hereto agree that Louisiana law shall govern, and that the state courts of Louisiana shall be the proper forum, unless such suit is required to be filed in or is removed to any federal court in this state.

17. Notwithstanding any provisions to the contrary in this Lease or in the rider attached hereto, this Lease is granted and accepted without any warranty of title and without any recourse against Lessor whatsoever, either expressed or implied. It is expressly agreed that the Lessor shall not be required to return any payments received hereunder or be otherwise responsible to Lessee therefor.

18. In the event of any bona fide dispute or litigation involving Lessor's ownership or title to any portion of the leased premises, Lessee agrees to promptly notify Lessor in writing of the nature of said adverse claim in reasonable detail, identifying the adverse claimant, and the basis and extent of Lessee's accountability to said adverse claimant for any oil, gas or other liquid or gaseous mineral produced from or attributable to such portion of the leased premises. Pending final and definitive adjudication or other settlement of said title dispute or litigation the royalties payable hereunder on oil, gas or other liquid or gaseous mineral produced from or attributable to only such portion of the leased premises may be reduced by Lessee, with prior written consent of Lessor, to one-half (1/2) of the royalties on production of said minerals herein elsewhere stipulated, but not below the minimum royalties of one-eighth (1/8th) on said minerals as required by R.S. 30:127, said reduced royalties on said minerals to be computed and paid or delivered to Lessor in the same manner as the royalties on said minerals herein elsewhere stipulated. Pending final and definitive adjudication or other settlement of said dispute or litigation, Lessee shall pay or deliver and Lessor shall accept said reduced royalties on production of said minerals as full payment of all royalties due hereunder on production of said minerals from said portion of the leased premises; and, Lessee shall have no right to suspend, fail to pay or recover said reduced royalties on production of said minerals. When said title dispute or litigation shall be finally resolved, whether by final and definitive judgment of court or other settlement, then the payment or delivery of said reduced royalties on production of said minerals shall cease, effective as of the effective date of said final and definitive adjudication or other settlement; and, from and after the effective date thereof, but not retroactively, royalties on said production of said minerals shall be paid or delivered in accordance with said final and definitive adjudication or other settlement and pursuant to the other provisions of this lease. All of the foregoing provisions of this paragraph are subject to Lessee's right to release as otherwise provided in this lease.

Amendment to Paragraph 12.

12. Lessee shall be obligated to plug and abandon all wells on the premises no longer necessary for operations or production on this lease, and to remove from the premises all structures and facilities serving said wells, all at Lessee's sole risk, cost and expense and subject to compliance with laws, rules and regulations. Failure of Lessee to do so within a reasonable time shall subject Lessee to and make Lessee liable for any and all costs or expenses of any kind incurred by the State for removing said facilities, but in no instance shall title to or ownership of said facilities automatically vest in or transfer to the State nor shall said facilities be deemed "improvements" to the leased premises for purposes of vesting title in same to the State. Prior to the date of first production from any site on this lease, Lessee shall create or cause to be created, under the direction of the Commissioner of Conservation pursuant to the Memorandum of Understanding among the Department of Natural Resources, the Commissioner of Conservation and the State Mineral Board dated August 8,1995, a Site Specific Trust Account to be funded in a manner satisfactory to the Commissioner of Conservation in accordance with the rules and regulations promulgated under La. R.S. 30:80, et seq. The Site Specific Trust Account shall be reassessed and, if necessary, modified by the Secretary of the Department of Natural Resources and the Commissioner of Conservation prior to the date of first production of each additional well. In connection therewith, the right of Lessee to draw and remove casing from wells and to further remove any facilities no longer utilized in the operations or production on this lease is recognized, provided such right is exercised by Lessee not later than one year after termination of this lease or portion thereof on which the well is located. If such right of salvage is not timely exercised, Lessee shall be subject to and liable for any costs or expenses of any kind incurred by the State in removing or disposing of casing or other facilities, but under no circumstances shall title to said salvage transfer to or vest in the State nor shall it be forfeited by Lessee to the State. In addition to restoration of the leased premises as contemplated and required by this lease, Lessee shall be responsible for all damages to the leased premises, and in addition and without limitation for all damages to any timber, crops, roads, buildings, fences and other improvements thereon.

**ADDENDUM**

The following supplements are incorporated into and become a part of the current 1981 printed form of the State oil and gas mineral lease as if initially written and included therein, to-wit:

LANGUAGE TO ADD TO MINERAL LEASES

Notwithstanding any language herein to the contrary, the rights granted herein exclusively to the mineral Lessee shall be subject to the surface usage for seismic and geophysical exploration by any seismic permittee of the state whose valid permit predates the effective date of this mineral lease and includes all or a portion of the surface area encompassed within the geographical boundary of the leased premises herein. The said seismic permittee shall owe the mineral Lessee no duty to share seismic or geophysical information acquired under the predating permit nor to reimburse the mineral Lessee for surface usage, but said seismic permittee shall not unreasonably interfere with the mineral Lessee's exercise of its rights acquired hereunder and shall owe the mineral Lessee reasonable reimbursement for any actual damages caused by the seismic or geophysical operations carried out under the predating permit.

Further notwithstanding any language herein to the contrary, the rights granted herein exclusively to the mineral Lessee shall be subject to the surface usage for coastal restoration, reclamation and conservation projects promulgated, funded and effected through the Department of Natural Resources and its divisions, whether solely or in conjunction with other state, local or federal governmental agencies or with private individuals or entities. The mineral Lessee, in the exercise of its exclusive rights granted hereunder, shall utilize the best technology available, including directional drilling, so as to minimize interference with the ongoing surface usage entailed in the development, construction and maintenance of the said coastal restoration, reclamation and conservation projects which will now or may utilize all or a portion of the premises leased for mineral exploration and development herein.

# ADDENDUM

The following supplements are incorporated into and become a part of the current 1981 printed form of the State oil and gas mineral lease as if initially written and included therein, to-wit:

On Page 2. Section 4(d):

Installation of equipment to complete a well as a producer, as that phrase is used herein, shall not include the installation of flow lines or other surface facilities of any kind whatsoever needed to produce the well, but refers to that equipment necessary to maintain downhole completion activity.

On Page 5. Section 7(a):

Nor shall any release of the lease, in whole or part, relieve original Lessee or any of its successors or assigns of any obligations to plug and abandon wells, clean up the well or production site, or any other obligations arising under Commissioner of Conservation rulings or regulations pertaining to the status of well sites.

On Page 5. Section 7(c):

Lessee, its successors or assigns, hereby waives any further notice of default or otherwise and confesses judgment as regards the liquidated damages accruing as herein set forth.

On rider. Paragraph 3, at end:

The provisions of this paragraph shall also apply to any unit, ordered or created, which wholly underlies the property covered by this lease.

State Lease No. 15941

**EXHIBIT "A"**

**PORTION OF TRACT NO. 30446, Said Portion being more fully described as follows:**
That portion of Tract No. 30446 being more fully described as follows: Beginning at a point within Block 34 of Main Pass Area, Revised, said point being the Northeast corner of State Lease No. 1349, as amended, having Coordinates of X = 2,600,201.86 and Y = 281,906.00; thence along the boundary of said State Lease No. 1349 the following courses: West 1,814.86 feet, South 72 degrees 32 minutes 45 seconds West 886.83 feet, South 46 degrees 04 minutes 00 seconds West 1,063.67 feet, South 17 degrees 00 minutes 34 seconds West 406.80 feet, South 85 degrees 47 minutes 35 seconds West 1,008.72 feet, North 46 degrees 36 minutes 49 seconds West 1,104.94 feet, North 00 degrees 01 minutes 50 seconds West 1,876.00 feet, South 78 degrees 30 minutes 22 seconds East 1,099.04 feet, South 75 degrees 57 minutes 09 seconds East 1,235.96 feet, North 89 degrees 08 minutes 03 seconds East 1,191.14 feet, North 01 degrees 18 minutes 40 seconds West 568.15 feet, North 13 degrees 19 minutes 28 seconds West 624.82 feet, North 36 degrees 09 minutes 29 seconds West 740.66 feet to a point on the boundary of said State Lease No. 1349 having Coordinates of X = 2,597,719.00 and Y = 284,347.00; thence East 2,482.86 feet to a point having Coordinates of X = 2,600,201.86 and Y = 284,347.00; thence South 2,441.00 feet to the point of beginning, containing approximately **248.52 acres**, as shown outlined in red on a plat on file in the Office of Mineral Resources, Department of Natural Resources. All bearings, distances and coordinates are based on Louisiana Coordinate System of 1927 (South Zone).

**ENTIRE TRACT NO. 30446 being described as follows:**
**TRACT 30446 - PORTION OF BLOCK 34, MAIN PASS AREA, REVISED, Plaquemines Parish, Louisiana**
All of the lands now or formerly constituting the beds and bottoms of all water bodies of every nature and description and all islands and other lands formed by accretion or reliction, except tax lands, belonging to the State of Louisiana and not under mineral lease on December 10, 1997, situated in Plaquemines Parish, Louisiana, and more particularly described as follows: Beginning at the Southeast corner of Block 34, Main Pass Area, Revised, Plaquemines Parish, Louisiana, having Coordinates of X = 2,605,850.00 and Y = 278,080.00; thence West 3,257.78 feet along the South line of said Block 34 to the Southeast corner of State Lease No. 6421, as amended, having Coordinates of X = 2,602,592.22 and Y = 278,080.00; thence along the Eastern and Northern boundaries of said State Lease No. 6421 the following courses: North 29 degrees 35 minutes 32 seconds East 258.76 feet, North 53 degrees 07 minutes 48 seconds East 525.00 feet, North 62 degrees 52 minutes 10 seconds East 1,359.60 feet; North 52 degrees 13 minutes 28 seconds East 506.06 feet, North 31 degrees 53 minutes 27 seconds East 530.00 feet, North 01 degree 25 minutes 55 seconds East 400.13 feet, North 20 degrees 33 minutes 22 seconds West 427.20 feet, North 48 degrees 34 minutes 35 seconds West 453.43 feet, North 70 degrees 16 minutes 40 seconds West 563.03 feet, North 89 degrees 24 minutes 34 seconds West 970.05 feet, South 83 degrees 13 minutes 28 seconds West 1,017.10 feet, South 76 degrees 23 minutes 58 seconds West 1,275.77 feet, South 80 degrees 08 minutes 03 seconds West 466.90 feet, North 88 degrees 29 minutes 37 seconds West 138.19 feet to the Northwest corner of said State Lease No. 6421 having Coordinates of X = 2,600,201.86 and Y = 280,803.65, also being a point on the East boundary of State Lease No. 1349, as amended; thence along the boundaries of said State Lease No. 1349 the following courses: North 1,102.35 feet, West 1,814.86 feet, South 72 degrees 32 minutes 45 seconds West 886.83 feet, South 46 degrees 04 minutes 00 seconds West 1,063.67 feet, South 17 degrees 00 minutes 34 seconds West 406.80 feet, South 85 degrees 47 minutes 35 seconds West 1,008.72 feet, North 46 degrees 36 minutes 49 seconds West 1,104.94 feet, North 00 degrees 01 minute 50 seconds West 1,876.00 feet, South 78 degrees 30 minutes 22 seconds East 1,099.04 feet, South 75 degrees 57 minutes 09 seconds East 1,235.96 feet, North 89 degrees 08 minutes 03 seconds East 1,191.14 feet, North 01 degree 18 minutes 40 seconds West 568.15 feet, North 13 degrees 19 minutes 28 seconds West 624.82 feet, North 36 degrees 09 minutes 29 seconds West 740.66 feet, North 57 degrees 56 minutes 48 seconds West 1,903.12 feet, South 89 degrees 55 minutes 17 seconds West approximately 1,433 feet to its Northwest

corner being a point on the West line of said Block 34; thence Northeasterly along the West line of said Block 34 to a point having a Coordinate of Y = 291,510.00; thence East approximately 9,490 feet to a point on the East line of said Block 34 having Coordinates of X = 2,605,850.00 and Y = 291,510.00; thence South 13,430.00 feet along the East line of said Block 34 to the point of beginning, **LESS AND EXCEPT** any portion of State Lease No. 195, as amended, that may lie within the above described tract, containing approximately **2,443 acres**, as shown outlined in red on a plat on file in the Office of Mineral Resources, Department of Natural Resources. All bearings, distances and coordinates are based on Louisiana Coordinate System of 1927 (South Zone).

NOTE: The State of Louisiana does hereby reserve, and this lease shall be subject to, the imprescriptible right of surface use in the nature of a servitude in favor of the Department of Natural Resources, including its Offices and Commissions, for the sole purpose of implementing, constructing, servicing and maintaining approved coastal zone management and/or restoration projects. Utilization of any and all rights derived under this lease by the mineral lessee, its agents, successors or assigns, shall not interfere with nor hinder the reasonable surface use by the Department of Natural Resources, its Offices or Commissions, as hereinabove reserved.


24
25
X=2,605,850.00
X=2,620,600.00
14,750.00'
TRUE
N. 6768'
Y= 307,
N. 44° 43' W.
7,536'
TRUE
STATE LEASE NO. 195
33
32
14,750.00'
TRUE
N. 16° 16' E. 18,940'
S.L. 15941
PORTION OF
TR 30446
248.52 +Acs
Y = 292
X = 2,620,600.00
14,750.00'
OFFICIAL COPY
STATE LAND OFFICE
DO NOT REMOVE
P.O.B.
X = 2,600,201.86
Y = 281,906.00
35
TRUE
NORTH 11,372'
S.L. 1349
S.L. 6421
14,750.00'
SABLE IS.
51
50
14,750.00'
EAST 1088'
TRUE
RACCOON
X=2,593,299.62'
Y=272,248.81'
MAIN PASS AREA, REVISED
PLAQUEMINES PARISH
NOT TO SCALE



STATE LEASE NO. 195
TRUE N. 23° 37' E.
TRUE N. 6768'
24
25
X=2,605,850.00
X=2,620,600.00
14,750.00'
Y= 307,58
N. 44° 43' W. 7,536' TRUE
33
32
TRUE N. 16° 16' E. 18,940'
Y = 292,8
TR 30446
2,443 +Acs.
DEC., 1997
34
35
OFFICIAL COPY
STATE LAND OFFICE
DO NOT REMOVE
S.L. 1349
S.L. 6421
P.O.B.
X =2,605,850.00
Y = 278,080.00
TRUE NORTH 11,372'
14,750.00'
SABLE IS.
51
50
EAST 1088' TRUE
RACCOON
X=2,593,299.62'
Y=272,248.81'
MAIN PASS AREA, REVISED
PLAQUEMINES PARISH

State Lease No. 15941

THUS DONE, READ, ACCEPTED, AND SIGNED by the parties hereto in the presence of the respective undersigned witnesses, as of the 15th day of December, A.D. 19 97, which shall be the date of this lease for all purposes.

WITNESSES to the signature of Lessor:

Lynester Henderson

Mary Beth Kling

STATE MINERAL BOARD

By: Chairman
For the State of Louisiana, Lessor
Monica T. Surprenant

WITNESSES to the signature of Lessee:

David A. Seay

Karen Benoit

Century Offshore Management Corporation

By:
For Michael J. Willis, Chief Operating Officer
Lessee

**WITNESS FORM OF**
**ACKNOWLEDGMENT FOR STATE MINERAL BOARD**

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

Before me, the undersigned authority, personally came and appeared Mary Beth Kling, who by me being first duly sworn, deposed and said:

That she is one of the witnesses to the execution of the foregoing instrument and that she saw Monica T. Surprenant sign said instrument as Chairman of the State Mineral Board for and on behalf of the State of Louisiana, in the presence of appearer and Lynester Henderson, the other subscribing witness.

Sworn to and subscribed before me on this the 24th day of December, 19 97.

Notary Public

Mary Beth Kling
Appearer

**WITNESS FORM OF**
**ACKNOWLEDGMENT FOR CORPORATE LESSEE**

STATE OF LOUISIANA
PARISH OF JEFFERSON

Before me, the undersigned authority, personally came and appeared David A. Seay, who by me being first duly sworn, deposed and said:

That he is one of the witnesses to the execution of the foregoing instrument and that he saw Michael J. Willis execute said instrument as Chief Operating Officer of Century Offshore Management Corporation as the free act and deed of said corporation in the presence of appearer and Karen Benoit, the other subscribing witness.

Sworn to and subscribed before me on this the 20th day of January, 19 98.

Notary Public

Appearer

**WITNESS FORM OF**
**ACKNOWLEDGMENT FOR INDIVIDUAL LESSEE**

STATE OF ______

______ OF ______

Before me, the undersigned authority, personally came and appeared ______, who by me being first duly sworn, deposed and said:

That he is one of the witnesses to the execution of the foregoing instrument and that he saw ______ execute said instrument as his own free act and deed in the presence of appearer and of ______ the other subscribing witness.

Sworn to and subscribed before me on this the ______ day of ______, 19 ______.

Appearer

Notary Public

(Rev.1981)

APPROVED RIDER FOR ATTACHMENT TO
1981 LOUISIANA STATE AND STATE AGENCY LEASE FORMS

1. Marketing of Natural Gas

For the purposes of this rider, the term "gas" shall include (i) gas well gas, (ii) gas cap gas produced after depletion of the oil column, and (iii) gas produced during the blow down period in a cycling or other secondary recovery project. These terms are to be construed as same are commonly understood in the oil and gas industry.

The parties hereto recognize and acknowledge that one of the essential considerations for Lessor entering into the oil, gas and mineral lease to which this rider is attached as a part thereof (herein referred to as the "Lease") is that if a well capable of producing gas in paying quantities is completed on the leased premises, or on lands pooled or unitized therewith, and is completed in a reservoir, or reservoirs, not previously committed to a gas sales contract, as permitted hereinafter, such gas, insofar as attributable to the leased premises, shall be sold to an intrastate market, if such a market is available within a reasonable period of time as hereinafter provided. Therefore, in order to carry out the intentions of Lessor and Lessee in this regard, the parties hereto do hereby and by these presents agree that once a well capable of producing gas in paying quantities has been completed on the leased premises or on lands pooled or unitized therewith, the following agreements shall be thereafter effective:

(a) In the event such well is completed and qualified as a well capable of producing gas well gas, the Lease shall remain in force notwithstanding Paragraph 6(d) of the Lease without any shut-in payments being due from Lessee to Lessor for an intial period of eighteen (18) months after (a) such completion date, or (b) the effective date of pooling or unitization, as the case may be (herein called the "Initial Period"). During the Initial Period, Lessee agrees to make a diligent and good faith effort to obtain an intrastate market for the gas and, if such a market can be obtained, to enter into a gas sales contract for the intrastate marketing of said gas upon the best terms that can be obtained, but on terms customary in the industry for such contracts; or in lieu of obtaining a new intrastate market, Lessee shall have the option to deliver such gas under existing intrastate contracts (including amendments thereto) or take the gas for its own intrastate use. If the gas is delilvered under such an existing contract royalty shall be paid thereon as set forth in Paragraph 6(b) of the Lease except that for purposes of determining prudency of negotiations and value of such gas where applicable under Paragraph 6(b) it shall be considered that the contract was negotiated and executed on the date such delivery commenced. If the gas is taken by Lessee for its own intrastate use and royalty is due thereon, such royalty shall be based on the current market value of the gas when so used. It is further provided that if the initial intrastate contract is for a term of five (5) years or less, then if upon its termination, the well is still capable of producing gas in paying quantities, all of the provisions of this rider shall be applicable to the obtaining of a new market for the gas and the Initial Period shall be deemed to commence as of the expiration date of the first intrastate contract. In no event, however, shall Lessee be required to sell gas to an intrastate market on terms and conditions less favorable than those which could be negotiated for a sale to an interstate market. Among the conditions to be considered in making this determination are the price to be paid for the gas; the availability and the cost, direct or indirect, to Lessee of a pipeline outlet; length of contract; inclusion of any price escalation; adjustment for BTU content; renegotiation provisions; on-line processing rights and availability of facilities; and rate of take. If, however, at the end of the Initial Period Lessee shall not have commenced the delivery of the gas to an intrastate market or shall not have entered into a firm intrastate gas sales contract on the terms and conditions hereinabove set forth, but during such period has drilled, or has commenced operations for the drilling of, an additional well on the leased premises, or on lands pooled or unitized therewith, in an attempt to establish additonal gas reserves, or additional producibility, then Lessee, at its option, shall be entitled to an additional six (6) months period (herein called the "Second Period"), commencing at the end of the Initial Period, within which to seek an intrastate market for such gas on the basis above set forth. In the event Lessee elects to obtain the Second Period, he shall prior to the end of the Initial Period so inform Lessor to that effect in writing and shall identify the additional well drilled or commenced during the Initial Period. During the Second Period the Lease shall remain in effect without any shut-in payment being due by Lessee to Lessor.

(b) As to gas cap gas (i.e. gas which cannot be produced until such time as the oil phase of the reservoir is depleted) and as to gas produced during the blow down period in a cycling or secondary recovery project, the provisions of subparagraph (a) above shall be applicable, except (i) the Initial Period defined in subparagraph (a) above shall not commence until the date on which such gas cap gas or blow down gas is available for production and marketing, and (ii) the Second Period defined in subparagraph (a) above shall not be effective as to any gas covered by this subparagraph (b).

(c) Lessor and Lessee further agree that if within ninety (90) days after the commencement of the Initial Period, as defined in subparagraph (a) above, Lessee has not obtained an intrastate market for said gas after a diligent effort to obtain same and Lessee has the opportunity to sell gas to an interstate market under emergency or other short term sale contracts with pregranted abandonment or similar withdrawal required by federal regulatory authority, it shall, upon being granted said authorization and pregranted abandonment or other withdrawal by federal regulatory authority, have the right to sell said gas to said interstate market provided that the term of any such emergency or other short term sale contract shall not exceed the term of the Initial Period and the Second Period, if applicable.

(d) If at the end of the Initial Period or the Second Period, as the case may be, Lessee has provided for the intrastate marketing of said gas, but Lessee has not been able physically to commence delivery of gas to the market, then Lessee shall have an additional free period of six (6) months to permit installation of the necessary marketing equipment and facilities and to commence deliveries under that contract without any shut-in payment being due by Lessee to Lessor. If, at the end of the free period of six months provided for in the preceding sentence, deliveries have not commenced despite Lessee's good faith efforts to connect to the available market and if the Lease is not otherwise being maintained, Lessee may maintain the Lease by making shut-in gas payments as provided for in Paragraph 6(d) thereof, and it shall be considered that the well with respect to which such payments are to be made was shut in as of the end of the said additional free period.

(e) If at the end of the Initial Period or the Second Period identified above, as the case may be, Lessee has not provided for the intrastate marketing of said gas as set forth herein, and Lessor and Lessee have not mutually agreed to extend the period during which an intrastate market for said gas may be sought, Lessee shall be free to market said gas in interstate commerce. In addition, if at that time the Lease is not being otherwise maintained by separate operations or production as set forth in Paragraph 6(d) thereof, and Lessee desires to maintain the Lease by making shut-in gas well payments as provided for in said Paragraph 6(d), it shall be considered that the well with respect to which such payments are to be made was shut-in as of the end of the Initial Period or Second Period, as the case may be.

(f) Lessor shall have the right, but not the obligation, to assist Lessee in its attempts to secure an intrastate market for any gas discovered on or allocated to the leased premises, which shall include the submission through Lessor's efforts of offers from prospective purchasers; provided, however, that if Lessee shall have complied with its obligations as provided for herein to attempt to obtain an intrastate market, the decision of Lessee on the acceptance or rejection of such intrastate offers shall be final insofar as gas attributable to the interest of Lessee is concerned.

(g) Lessee shall make a full and complete disclosure to Lessor of its efforts to obtain an intrastate market, including information concerning the contracts made with prospective intrastate purchasers and the details of all interstate and intrastate offers made to Lessee as well as all contracts entered into under subparagraph 1(c) hereof. This information shall be furnished quarterly, beginning with the commencement of the Initial Period. All such information shall be kept strictly confidential by Lessor.

(h) Lessee shall not sell or commit to a contract any gas to be produced from or allocated to the leased premises unless said gas is to be produced from or allocated to a zone or zones, or their stratigraphic equivalent, which have been determined to be capable of producing gas in paying quantities on the effective date of such sale or commitment. Upon being presented reasonable justification for same, Lessor may elect to waive this restriction. It is further provided that the provisions of this rider and the time periods provided for herein shall relate separately to each such contract and to each different gas reserve as hereinafter defined. For the purposes of this rider each separate zone, or as the case may be, each separate pool or reservoir not committed under any prior gas contract shall be considered a "different gas reserve"; or if a prior contract committed all reserves to a spsecific depth or depths, "different gas reserves" shall be considered to be any discoveries below that specified depth or depths. In the event of the completion of a well in a different gas reserve, the Initial Period, as hereinabove defined, shall commence on the date a well is first completed in said different reserve or, as the case may be, when the gas is first ready for production and marketing.

(i) Lessor may waive any of the time periods provided for herein if it becomes satisfied that an intrastate gas market is not and will not be available, or if such waiver appears to be in the best interest of the State of Louisiana, and in connection therewith may enter into balancing agreements or similar agreements for placing other gas into an intrastate market under the terms of which Lessee may agree that the identical volume of gas produced from or

allocated to the leased premises and sold by Lessee to an interstate market may subsequently be dedicated to or sold by Lessee to an intrastate market whether said gas is realized by Lessee out of susequent production from or allocated to the leased premises or from other properties of Lessee.

(j) Lessee shall have the right to process the gas and sell the liquid components thereof as permitted by the Lease; provided, however, that if the gas has not previously been committed to an interstate market, no processing or other handling shall be utilized that will destroy the intrastate status of the gas.

2. Marketing of Oil and Other Liquid Minerals

(a) If either oil or other liquid mineral is produced in paying quantities, from the leased premises or on lands pooled or unitized therewith, such minerals, insofar as they are attributable to the leased premises, shall be sold by Lessee to an intrastate market for refining or processing in the State of Louisiana if such market is available within a reasonable period of time, as more fully set out herein below; or in lieu of obtaining a new intrastate market, Lessee may deliver such minerals under its existing intrastate contracts to be refined or processed in the State or to take the minerals for its own intrastate refining or processing. If Lessee does not elect to deliver such minerals under existing intrastate contracts or to take such minerals for its own intrastate uses, then for a period of ninety (90) days from the date of such production Lessee agrees to make a diligent and good faith effort to obtain an intrastate market for such minerals that will cause them to be refined or processed in the State of Louisiana, and if such a market can be obtained, to enter into a contract for the sale of such minerals to an intrastate market upon the best terms that can be negotiated, but on terms customary in the industry for such contracts. In no event, however, shall Lessee be required to sell such minerals to an intrastate market at a price less favorable than that which could be negotiated for a sale of the minerals to an interstate market and in no event shall Lessor's royalty be based on less than the current market value of the minerals. If at the end of the ninety (90) day period Lessee has not been able to sell such minerals to an intrastate market in accordance with the provisions hereof, Lessee shall be free to market such minerals to any purchaser whether intrastate or interstate in character. If the minerals are taken by Lessee for its own use or are delivered under an existing intrastate contract and royalty is due thereon, such royalty shall be based on the current market value of the minerals when so used or delivered.

(b) If the ninety (90) day period becomes operative, then it will be considered as a period during which Lessee is producing minerals from the premises in paying quantities, which production will have the same effect as actual production would have on the lease.

(c) For the purpose of assessing the performance of Lessee of the obligations imposed by this Paragraph 2, the disclosures provisions of Paragraph 1(g) of this rider shall be applicable.

(d) The waiver provisions of Paragraph 1(i) of this rider shall be applicable to the terms and conditions contained in this Paragraph 2.

3. Deferred Development

Notwithstanding anything to the contrary herein contained, it is understood and agreed that in the event during the primary term of this Lease, or within one (1) year thereafter (if the Lease is then in force and effect), a portion of the property covered hereby is integrated and included or placed with other lands in a pooled or combined unit, whether by order of a governmental agency or by conventional contract, then unit drilling operations or unit reworking operations or unit production from a well situated on lands or property embraced in such unit or units (hereinafter collectively called "unitized operations"), shall serve to maintain this Lease in force and effect as to the entirety of the leased premises, subject however to the following express requirements in lieu of reasonable development of the "outside acreage", as hereinafter defined, which is not otherwise maintained under the terms of this Lease all as set out more completely hereinbelow in this Paragraph 3. If on the anniversary date of the Lease next ensuing after the commencement of unitized operations (or if the first date of unitized operations is less than 90 days prior to the anniversary date, then on the expiration of 90 days after such first date of unitized operations) the Lease is not being maintained under its terms by means other than unitized operations, the Lease shall terminate on said anniversary date (or at the end of said 90 day period, as the case may be) as to all outside acreage unless on or before said anniversary date (or the end of said 90 day period, as the case may be) Lessee pays or tenders to Lessor, as a deferred development payment, a sum of money equal to one-half of the rate per acre of the cash payment paid for the Lease multiplied by the number of acres then comprising the outside acreage, which tender or payment shall maintain this Lease in effect as to such outside acreage not otherwise maintained under the terms of the Lease until the next ensuing anniversary date. By similar

tender or payment of a deferred development payment on or before each succeeding anniversary date this Lease may so be maintained in force during the remainder of the primary term (if any) and for two years thereafter as to such outside acreage. After the expiration of the periods during which the Lease may be maintained by deferred development payments as above provided, if this Lease at any time is not being maintained in effect by other than unitized operations, it shall terminate as to all outside acreage not otherwise so maintained under the provisions of this Lease, provided that if a unit or units are created after the expiration of said periods the effect of which is to convert non-unitized operations as hereinafter defined, into unitized operations, it shall be regarded for all purposes of this Lease as though there had been on the effective date of such unit or units a cessation of production on the outside acreage. If at any time during the primary term of the Lease or within one year thereafter there is a cessation of all non-unitized operations as hereinafter defined, whether same occurs as the result of the actual cessation of such operations or as the result of non-unitized operations being converted into unitized operations, then Lessee, in lieu of resuming non-unitized operations as provided in this Lease, may elect to maintain the Lease in effect as to the outside acreage by tendering or paying a deferred development payment, computed as hereinabove provided, on the next ensuing aniversary date of this Lease (or within 90 days from the cessation of non-unitized operations if such cessation should occur less than 90 days prior to such anniversary date). If at any time during the second year after the primary term of the Lease, there is a cessation of non-unitized operations as hereinafter defined, whether same occurs as the result of the actual cessation of such operations or as the result of non-unitized operations being converted into unitized operations, then the entire Lease shall nevertheless remain in effect until the next ensuing anniversary date.

Nothing contained in this Paragraph 3 is intended to create nor shall have the effect of creating several or separate leases, or in any manner to extend, increase or limit the obligation of Lessee to protect the leased premises from drainage as stated in the Lease, or otherwise. If at any time, either during the primary term of the Lease or the limited extension of the Lease beyond its primary term as provided above in this Paragraph 3, as to the outside acreage not otherwise held under the terms hereof, Lessee conducts non-unit drilling operations or non-unit reworking operations or obtains non-unit production from the leased premises (collectively defined as "non-unitized operations"), then the provisions of this paragraph shall not thereafter apply so long as said non-unitized operations shall continue.

The provisions of this Paragraph 3 shall also be applicable to a unitized shut-in gas well, but in this event, the annual deferred development payment shall be reduced by deducting therefrom the amount of shut-in gas well payments paid, if any, during the same period under Paragraph 6 of the Lease which is applicable to the acreage on which the deferred development payment is applicable.

*SEE ADDENDUM*

For purposes of this paragraph the following definitions shall apply:

(a) The term "anniversary date" shall mean the date of this Lease and the same date of each next ensuing year or years.

(b) The term "outside acreage" shall mean all of the leased premises, except any portion (s) thereof included in a unit or units on which unitized operations are being conducted.

4. Environmental and Other Considerations

Lessee hereby agrees, as one of the obligations of this rider, that in exercising the rights granted it under the Lease, it will comply with and be subject to all applicable environmental and other laws and regulations validly adopted or issued by the State of Louisiana, or its agencies, or by the United States, or its agencies. Lessee further agrees that it will comply with all minumum water quality standards validly adopted by said governmental authorities with respect to oil pollution and noxious chemicals and waste being introduced into affected water areas. Further, in conducting all operations under this Lease requiring dredging, filling, or local navigation in order to explore, develop or exploit shallow-water areas, Lessee shall comply with the applicable requirements of the appropriate Louisiana state agency charged with the environmental management of said area. Finally, it is understood and agreed that on depletion of production or completion of operations under this Lease, the Lessee shall remove all structures which would impede commercial fishing and trawling, including, without limitation, all submerged materials, equipment or debris placed on the leased premises by or for the account of Lessee; and the affected water bottoms shall, to the extent reasonably possible of accomplishment, be returned or restored to a condition as nearly equivalent to that which existed before said operations were conducted and/or structures were constructed. Lessee further agrees that in exercising the rights granted it hereunder and in discharging the obligations undertaken in Paragraph 2 of this rider, involving issuance of advance certifications, permits or approvals, it will allow sufficient

lead time in the planning of its activities to permit the affected regulatory agencies to make appropriate review of the proposed operations.

5. Notice

Except in the situations where specific time periods are established for performance, Lessee shall not be in default under the Lease with respect to the violation of any provision of this rider until 30 days after written notice of such violation is received from Lessor, and Lessee has not corrected or commenced to correct such violation.

6. Conflict of Terms

Unless specifically provided otherwise, in the event of a conflict between any provision of this rider and any of the provisions of the Lease, the provisions of this rider shall control.

7. Severability

In the event that this rider or any provision hereof is declared to be illegal or unconstitutional, its nullity shall in no way impair the validity of the Lease to which this rider is attached or of other portions of the rider not declared illegal or unconstitutional; provided that Lessee shall not directly or indirectly institute or cause to be instituted any action seeking to declare the nullity or the unenforceability of this rider or any part hereof.

# RESOLUTION

## LOUISIANA STATE MINERAL BOARD

On motion of Mr. Arnold seconded by Mr. Segura, the following Resolution was offered and adopted:

BE IT RESOLVED by the State Mineral Board that Docket Item No. 6 from the December 10, 2008 Meeting be approved, said instrument being An Assignment from Cox Interests, L.L.C. to Cox Oil LLC, of all of Assignor's right, title and interest in and to State Lease Nos. 195, 1349, 1350 and 15941, Plaquemines Parish, Louisiana, **INSOFAR AND ONLY INSOFAR AS** said leases cover all depths below 500' below the base of the 10 Sand in the Quarantine Bay Field, with further particulars being stipulated in the instrument.

Cox Operating LLC is designated as the joint account lessee (contact person) pursuant to State Mineral Board Resolution dated September 10, 1975.

This approval is expressly granted and accepted subject to certain conditions in the absence of which conditions approval of said instrument would not have been given as follows:

1) That all terms and conditions of the basic lease will be fulfilled, including but not limited to the full payment of rentals and royalties, regardless of the division of leasehold interests resulting from the instrument;

2) That failure to comply with the terms and conditions of the basic lease by the original lessee, or by any assignee, sublessor or sublessee, prior or subsequent hereto, shall not be deemed waived by the approval of said instrument by the State Mineral Board for the State of Louisiana, it being distinctly understood that the State Mineral Board for the State of Louisiana does not recognize said instrument as creating a novation, as regards any right or interest of the State or Board;

3) That in the event ownership of the basic mineral lease is or becomes vested in two or more lessees responsible to the lessor for compliance with indivisible obligations to maintain the lease, then said lessees shall designate in writing to the State Mineral Board the lessee representing the joint account of all lessees, who shall be accountable to the Board for discharge of indivisible obligations under the lease for all lessees or for release in lieu of compliance therewith, provided that in the event of failure of said lessees to comply with such condition, then the Board may withhold approval of and thereby deny validity to any pending or future assignment or transfer of an interest in the lease, and, provided further, that if any lessee should agree to release the lease or any segregated portion thereof in lieu of complying with an indivisible lease obligation to maintain the lease and no other lessee desires to assume and undertake the indivisible obligation, then all lessees agree to join in a release or to otherwise execute a similar release of their rights to lessor, relegating any nonsignatory lessee to such remedy, if any, as such party may have against the lessee or lessees, who may execute a release purporting to cover the entirety of the lease or of a segregated portion thereof;

4) That this approval is given merely for the purpose of validating the assignment or transfer under the provisions of R.S. 30:128, but by giving its approval, the Board does not recognize the validity of any other instrument referred to therein that has not also been considered and approved by the Board in its entirety nor of any descriptions nor adopt any of the terms and conditions in the assignment or transfer, including but not limited to any election to convert an overriding royalty interest to a working interest, and any such election shall not be effective until written notice thereof is given to the Board and assignment or transfer of such working interest in recordable form is docketed for approval and approved by the Board, and, furthermore, that this approval may not operate as the Board's approval of any sales contract, which may have been entered into by the parties to the assignment or transfer, inasmuch as the Board specifically reserves the right to take its royalty oil, gas and other minerals in kind;

5) That for purposes of recordation and notice, certified copies of this Resolution be attached to all docketed copies of the instrument approved hereby; and

6) That nothing herein shall be construed as approval for any assignment, sublease or transfer to or from any individual, partnership, corporation or other legal entity who has filed bankruptcy proceedings unless such status is specifically recognized in this resolution.

BE IT FURTHER RESOLVED that either the Chairman, Vice-Chairman, Secretary, Deputy Assistant Secretary, Chief Landman or any other authorized person be and he is hereby authorized to reflect the approval of the State Mineral Board by affixing his signature to the aforesaid instrument.

CERTIFICATE

I hereby certify that the above is a true and correct copy of a Resolution adopted at a meeting of the State Mineral Board held in the City of Baton Rouge, Louisiana, on the 10th day of December, 2008, pursuant to due notice, at which meeting a quorum was present, and that said Resolution is duly entered in the Minute Book of said Board and is now in full force and effect.

[signature]

State Mineral Board

**PARTIAL ASSIGNMENT OF**
**OIL AND GAS LEASES**

**STATE OF LOUISIANA** §
§
**PARISH OF PLAQUEMINES** §

**KNOW ALL MEN BY THESE PRESENTS:**

That COX INTERESTS, L.L.C., whose address is 4514 Cole Avenue, Suite 1175, Dallas, Texas 75205, hereinafter referred to as "**Assignor**," is the record owner of interests in the oil and gas leases described on Exhibit "A" attached hereto, hereinafter referred to as the "**Leases**";

That Assignor desires to grant, bargain, sell, transfer, assign and deliver all of its right, title and interest in and to the Leases INSOFAR AND ONLY INSOFAR AS SAID LEASES COVER ALL DEPTHS BELOW FIVE HUNDRED FEET (500') BELOW THE BASE OF THE TEN SAND IN THE QUARANTINE BAY FIELD, AS SUCH FORMATION IS FOUND IN THE STATE LEASE 7332 #1 WELL, LOCATED IN SECTION 13, TOWNSHIP 19 SOUTH, RANGE 16 EAST, PLAQUEMINES PARISH, LOUISIANA, such depths hereinafter referred to as the "**Deep Rights**," to COX OIL LLC, whose address is 4514 Cole Avenue, Suite 1175, Dallas, Texas 75205, hereinafter referred to as "**Assignee**";

**NOW, THEREFORE**, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Assignor does hereby grant, bargain, sell, transfer, assign and deliver unto Assignee all of its right, title and interest in and to the Leases **INSOFAR AND ONLY INSOFAR AS SAID LEASES COVER THE DEEP RIGHTS**.

This Partial Assignment of Oil and Gas Leases is specifically made subject to the terms of the Leases, to that certain Joint Operating Agreement covering the Quarantine Bay Field, Plaquemines Parish, Louisiana, dated effective December 1, 2002, by and between Source Petroleum, Inc., as Operator, and Quarantine Bay, L.L.C., et al, as Non-Operators, a memorandum of which was recorded in COB 1059, Folio 134, Entry #8261, Records of Plaquemines Parish, Louisiana, as the same has been or may be hereafter amended, modified, and/or ratified from time to time, and to all other contracts, assignments, rights-of-way, encumbrances, agreements and other lease burdens of record which affect the interests conveyed hereunder.

Assignee does hereby agree to assume, be bound by and subject to the express and implied covenants, rights, obligations and liabilities with respect to the interests assigned hereunder and all obligations under applicable state or federal law relating to the

interests conveyed hereunder, and Assignee's interests shall bear their proportionate shares of royalty interests, overriding royalty interests, and other payments from and after the Effective Date.

Assignee further agrees to protect, defend, indemnify, and hold Assignor free and harmless from and against all damages, claims, costs, expenses and liabilities of every kind and character whatsoever arising out of or in connection with the interests conveyed hereunder, but only insofar as such damages, claims, costs, expenses and liabilities relate to times on and after the Effective Date.

Assignee joins in the execution hereof for the purpose of being bound by all of the terms, provisions, obligations and covenants herein specified.

Assignor agrees to protect, defend, indemnify and hold Assignee free and harmless from and against all damages, claims, costs, expenses and liabilities of every kind and character whatsoever arising out of or in connection with the interests conveyed hereunder, but only insofar as such damages, claims, costs, expenses, and liabilities relate to times before the Effective Date hereof.

Assignor hereby warrants and agrees to defend title to the interest conveyed hereby against the claims of all persons claiming by, through, or under Assignor, but not otherwise.

The terms hereof shall inure to and be binding upon the respective heirs, successors, and assigns of Assignor and Assignee.

[the next page is the execution page]

IN WITNESS WHEREOF, this instrument is executed on the date indicated below, but is effective as of the 2nd day of January, 2008 (the "**Effective Date**").

| **WITNESSES** | **EXECUTION DATE** | **ASSIGNOR SIGNATURE** |
|---|---|---|
| Name: Michelle B. Saucier | 9/3, 2008 | **COX INTERESTS, L.L.C.** |
| Name: William L. Graham | | By: **Brad E. Cox, Manager** |

| **WITNESSES** | **EXECUTION DATE** | **ASSIGNEE SIGNATURE** |
|---|---|---|
| Name: Michelle B. Saucier | 9/3, 2008 | **COX OIL LLC** |
| Name: William L. Graham | | By: **Brad E. Cox, Manager** |

**Approved subject to attached Resolution December 10, 20 08**

**By:** __________
**STATE MINERAL BOARD**

**STATE OF TEXAS** §
§
**COUNTY OF DALLAS** §

On this 3rd day of Sept, 2008, before me appeared Brad E. Cox, to me personally known, who being by me duly sworn, did say that he is the Manager of Cox Interests, L.L.C., a Louisiana limited liability company, and the foregoing instrument was signed and delivered on behalf of said limited liability company and said Appearer acknowledged said instrument to be the free act and deed of said limited liability company.

BRONLYN B. BURKE
Notary Public, State of Texas
My Commission Expires
May 28, 2012

My Commission Expires:
5/28/2012

__________
Notary Public, State of Texas

**STATE OF TEXAS** §
§
**COUNTY OF DALLAS** §

On this 3rd day of September, 2008, before me appeared Brad E. Cox, to me personally known, who being by me duly sworn, did say that he is the Manager of Cox Oil LLC, a Delaware limited liability company, and the foregoing instrument was signed and delivered on behalf of said limited liability company and said Appearer acknowledged said instrument to be the free act and deed of said limited liability company.

My Commission Expires:

Notary Public, State of Texas

BRONLYN B. BURKE
Notary Public, State of Texas
My Commission Expires
May 28, 2012

**EXHIBIT "A"**
**Attached to Partial Assignment of Oil and Gas Leases from Cox Interests, L.L.C. to Cox Oil LLC, dated effective January 2, 2008**

**Oil and Gas Lease from the State of Louisiana (S.L. 195) to M. Hession, d. February 20, 1928, recorded in COB 65, Folio 396, Records of Plaquemines Parish, Louisiana**

**Oil and Gas Lease from the State of Louisiana (S.L. 1349) to Gulf Refining Company, d. January 9, 1948, recorded in COB 131, Folio 213, Records of Plaquemines Parish, Louisiana**

**Oil and Gas Lease from the State of Louisiana (S.L. 1350) to Gulf Refining Company, d. January 9, 1948, recorded in COB 131, Folio 217, Records of Plaquemines Parish, Louisiana**

**Oil and Gas Lease d. February 19, 1937 from Plaquemines Land Company to Gulf Refining Company, recorded in COB 83, Folio 328, Records of Plaquemines Parish, Louisiana**

**Oil and Gas Lease d. January 2, 1948 from John Vaccaro to Gulf Refining Company, recorded in COB 131, Folio 18, Records of Plaquemines Parish, Louisiana**

**Oil and Gas Lease d. April 15, 1948 from Phillip Fowler, et al, to Gulf Refining Company, recorded in COB 133, Folio 126, Records of Plaquemines Parish, Louisiana**

**Oil and Gas Lease d. August 12, 1948 from William G. Helis, Jr. to Gulf Refining Company, recorded in COB 135, Folio 476, Records of Plaquemines Parish, Louisiana**

**Oil and Gas Lease d. September 21, 1948 from Interstate Trust & Banking Company to Gulf Refining Company, recorded in COB 137, Folio 54, Records of Plaquemines Parish, Louisiana**

**Oil and Gas Lease d. November 18, 1949 from Walter F. Marcus to Gulf Refining Company, recorded in COB 142, Folio 724, Records of Plaquemines Parish, Louisiana**

**Oil and Gas Lease d. December 14, 1949 from Elmer D. Flanders, Testamentary Executor of the Succession of Burt Flanders, Jr. to Gulf Refining Company, recorded in COB 143, Folio 150, Records of Plaquemines Parish, Louisiana**

**Oil and Gas Lease from the State of Louisiana (S.L. 15941) to Century Offshore Management Corporation, d. December 15, 1997, recorded in COB 923, Folio 182, Records of Plaquemines Parish, Louisiana**

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

EFFECTIVE DATE OF TRANSFER (DATE OF SALE): January 2, 2008

STATEMENT OF CONVEYANCE
*FORM B*

STATE LEASE: 15941

LEASE ROYALTY DECIMAL: 0.2250000

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Cox Interests, L.L.C. | **GROSS** |
| STREET | 4514 Cole Avenue, Suite 1175 | **WORKING** |
| CITY/STATE | Dallas, Texas 75205 | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.4200000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0000000 |
| | INTEREST CONVEYED BY OWNER | 0.4200000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | Cox Oil LLC | 0.4200000 |
| STREET | 4514 Cole Avenue, Suite 1175 | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.4200000 |

?

PORTION DESCRIPTION: Limited in depth to all zones, formations and horizons occurring from and below five hundred feet (500') below the base of the 10 Sand in the Quarantine Bay Field as found in the S.L. 7332 Well No. 1, located in Section 13, Township 19 South, Range 16 East, Plaquemines Parish, Louisiana.

COMMENTS:

PREPARED BY: Susan Irby
DATE: October 20, 2008

formb 10/1/1999

P:\Landnew\Energen\formb15941deep

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

EFFECTIVE DATE OF TRANSFER (DATE OF SALE): January 2, 2008

STATEMENT OF CONVEYANCE
*FORM B*

STATE LEASE: 00195

LEASE ROYALTY DECIMAL: 0.1250000

CONVEYOR'S NAME & ADDRESS

| | | GROSS WORKING INTEREST |
|---|---|---|
| NAME | Cox Interests, L.L.C. | |
| STREET | 4514 Cole Avenue, Suite 1175 | |
| CITY/STATE | Dallas, Texas 75230 | |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.2100000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0000000 |
| | INTEREST CONVEYED BY OWNER | 0.2100000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | Cox Oil LLC | 0.2100000 |
| STREET | 4514 Cole Avenue, Suite 1175 | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | TOTAL | 0.2100000 |

L

PORTION DESCRIPTION: Portion ID "L": Description: Only as to the lease portion delineated in red on the plat attached to the assignment and only insofar as said lease portion covers all depths below five-hundred feet (500') below the base of the 10 Sand in the Quarantine Bay Field as found in the SL 7332 #1 Well located in Section 13, Township 19 South, Range 16 East in Plaquemines Parish, Louisiana. Plat in lease records file.

COMMENTS:

PREPARED BY: Susan Irby
DATE: October 20, 2008

formb 10/1/1999

P:\Landnew\Energen\formb195L

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
January 2, 2008

STATEMENT OF CONVEYANCE
*FORM B*

**STATE LEASE**
00195

**LEASE ROYALTY DECIMAL**
0.1250000

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Cox Interests, L.L.C. | **GROSS** |
| STREET | 4514 Cole Avenue, Suite 1175 | **WORKING** |
| CITY/STATE | Dallas, Texas 75205 | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.2100000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0000000 |
| | INTEREST CONVEYED BY OWNER | 0.2100000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | Cox Oil LLC | 0.2100000 |
| STREET | 4514 Cole Avenue, Suite 1175 | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.2100000 |

"N"

PORTION DESCRIPTION: Portion ID "N": Limited in depth to all zones, formations and horizons occurring from and below five-hundred feet (500') below the base of the 10 Sand in the Quarantine Bay Field, as found in the SL 7332 Well No. 1, located in Section 13, Township 19 South, Range 16 East, Plaquemines Parish, Louisiana, less and except that certain tract of land covering 5,928 acres, more or less, and being more particularly described in that certain assignment dated 3-21-97, but effective 9-11-96, by and between Pennzoil Exploration & Prod. Co., as Grantor, and Enterprise Oil LA, Inc., as Grantee, recorded 7-22-97 in COB 911, Folio 848 records of Plaquemines Parish, LA, and being the same land approved under State Min. Board Res. Docket Item No. 11 dated 6-11-97.

COMMENTS:

PREPARED BY: Susan Irby
DATE: October 20, 2008

formb 10/1/1999

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
January 2, 2008

STATEMENT OF CONVEYANCE
*FORM B*

**STATE LEASE**
01349

**CONVEYOR'S NAME & ADDRESS**

| | | **GROSS WORKING INTEREST** |
|---|---|---|
| NAME | Cox Interests, L.L.C. | |
| STREET | 4514 Cole Avenue, Suite 1175 | |
| CITY/STATE | Dallas, Texas 75205 | |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.2100000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0000000 |
| | INTEREST CONVEYED BY OWNER | 0.2100000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | Cox Oil LLC | 0.2100000 |
| STREET | 4514 Cole Avenue, Suite 1175 | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.2100000 |

**LEASE ROYALTY DECIMAL**
0.1250000

'D'

PORTION DESCRIPTION: Portion ID "D": Limited in depth to all zones, formations and horizons occurring from and below five-hundred feet (500') below the base of the 10 Sand in the Quarantine Bay Field, as found in the SL 7332 Well No. 1, located in Section 13, Township 19 South, Range 16 East, Plaquemines Parish, Louisiana.

COMMENTS:

PREPARED BY: Susan Irby
DATE: October 20, 2008

formb 10/1/1999

P:\Landnew\Energen\formb1349d

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

EFFECTIVE DATE
OF TRANSFER
(DATE OF SALE)
January 2, 2008

STATEMENT OF CONVEYANCE
*FORM B*

STATE LEASE
01350

LEASE ROYALTY DECIMAL
0.1250000

CONVEYOR'S NAME & ADDRESS

| | | |
|---|---|---|
| NAME | Cox Interests, L.L.C. | **GROSS** |
| STREET | 4514 Cole Avenue, Suite 1175 | **WORKING** |
| CITY/STATE | Dallas, Texas 75205 | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.2100000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0000000 |
| | INTEREST CONVEYED BY OWNER | 0.2100000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | Cox Oil LLC | 0.2100000 |
| STREET | 4514 Cole Avenue, Suite 1175 | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.2100000 |

"C"

PORTION DESCRIPTION: Portion ID "C": Limited in depth to all zones, formations and horizons occurring from and below five-hundred feet (500') below the base of the 10 Sand in the Quarantine Bay Field, as found in the SL 7332 Well No. 1, located in Section 13, Township 19 South, Range 16 East, Plaquemines Parish, Louisiana.

COMMENTS:

PREPARED BY: Susan Irby
DATE: October 20, 2008

formb 10/1/1999

P:\Landnew\Energen\formb1350c

# RESOLUTION

## LOUISIANA STATE MINERAL AND ENERGY BOARD

**RESOLUTION #15-09-028**
**(DOCKET REVIEW COMMITTEE)**

On motion of ***Mr. Sanders***, seconded by ***Mr. Cordaro***, the following Resolution was offered and adopted:

BE IT RESOLVED by the State Mineral and Energy Board that Docket Item No. 9 from the September 9, 2015 Meeting be approved subject to the approval of the Governor of Louisiana, said instrument being an Assignment from Cox Oil LLC to RCL Capital Management LLC (4% interest) and BHST, LLC (3% interest) in and to State Lease Nos. 195, 1349 and 15941, Plaquemines Parish, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil LLC is designated as the joint account Lessee (contact person) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

This approval is expressly granted and accepted subject to certain conditions in the absence of which conditions approval of said instrument would not have been given as follows.

1) That all terms and conditions of the basic lease will be fulfilled, including but not limited to the full payment of rentals and royalties, regardless of the division of leasehold interests resulting from the instrument;

2) That failure to comply with the terms and conditions of the basic lease by the original lessee, or by any assignee, sublessor or sublessee, prior or subsequent hereto, shall not be deemed waived by the approval of said instrument by the State Mineral and Energy Board for the State of Louisiana, it being distinctly understood that the State Mineral and Energy Board for the State of Louisiana does not recognize said instrument as creating a novation, as regards any right or interest of the State or Board;

3) That in the event ownership of the basic mineral lease is or becomes vested in two or more lessees responsible to the lessor for compliance with indivisible obligations to maintain the lease, then said lessees shall designate in writing to the State Mineral and Energy Board the lessee representing the joint account of all lessees, who shall be accountable to the Board for discharge of indivisible obligations under the lease for all lessees or for release in lieu of compliance therewith, provided that in the event of failure of said lessees to comply with such condition, then the Board may withhold approval of and thereby deny validity to any pending or future assignment or transfer of an interest in the lease, and, provided further, that if any lessee should agree to release the lease or any segregated portion thereof in lieu of complying with an indivisible lease obligation to maintain the lease and no other lessee desires to assume and undertake the indivisible obligation, then all lessees agree to join in a release or to otherwise execute a similar release of their rights to lessor, relegating any nonsignatory lessee to such remedy, if any, as such party may have against the lessee or lessees, who may execute a release purporting to cover the entirety of the lease or of a segregated portion thereof;

4) That this approval is given merely for the purpose of validating the assignment or transfer under the provisions of R.S. 30:128, but by giving its approval, the Board does not recognize the validity of any other instrument referred to therein that has not also been considered and approved by the Board in its entirety nor of any descriptions nor adopt any of the terms and conditions in the assignment or transfer, including but not limited to any election to convert an overriding royalty interest to a working interest, and any such election shall not be effective until written notice thereof is given to the Board and assignment or transfer of such working interest in recordable form is docketed for approval and approved by the Board, and, furthermore, that this approval may not operate as the Board's approval of any sales contract, which may have been entered into by the parties to the assignment or transfer, inasmuch as the Board specifically reserves the right to take its royalty oil, gas and other minerals in kind;

5) That for purposes of recordation and notice, certified copies of this Resolution be attached to all docketed copies of the instrument approved hereby, and

6) That nothing herein shall be construed as approval for any assignment, sublease or transfer to or from any individual, partnership, corporation or other legal entity who has filed bankruptcy proceedings unless such status is specifically recognized in this resolution.

BE IT FURTHER RESOLVED that either the Chairman, Vice-Chairman, Secretary, Deputy Assistant Secretary, Chief Landman or any other authorized person be and he is hereby authorized to reflect the approval of the State Mineral and Energy Board by affixing his signature to the aforesaid instrument.

CERTIFICATE

I hereby certify that the above is a true and correct copy of a Resolution adopted at a meeting of the State Mineral and Energy Board held in the City of Baton Rouge, Louisiana, on the 9th day of September, 2015, pursuant to due notice, at which meeting a quorum was present, and that said Resolution is duly entered in the Minute Book of said Board and is now in full force and effect.

State Mineral and Energy Board

Approved as per Executive Order BJ 2008-10
Bobby Jindal, Governor

By: ______________________
Thomas L. Arnold, Jr
Chairman, State Mineral Board

ASSIGNMENT, BILL OF SALE AND CONVEYANCE

STATE OF LOUISIANA §
§
PARISH OF PLAQUEMINES §

THAT, pursuant to Assignment, Bill of Sale, and Conveyance from Southern Bay Louisiana, LLC to Cox Oil LLC, dated effective August 1, 2012, recorded under File Number 2013-00001790 in Book 1293, Page 33 in the Clerk of Court's Office for Plaquemines Parish, Louisiana **("Southern Bay Assignment")**, Cox Oil LLC acquired all of the right, title and interest of Southern Bay Louisiana, LLC in and to the Properties (as defined below);

THAT, Cox Oil LLC desires to grant, bargain, sell, assign, transfer and deliver four percent (4%) of the interests it acquired pursuant to the Southern Bay Assignment to RCL Capital Management, LLC, held for the benefit of Series 10 (Southern Bay), a series of RCL Capital Management LLC, whose address is 4435 University, Dallas, Texas 75205;

THAT, Cox Oil LLC desires to grant, bargain, sell, assign, transfer and deliver three percent (3%) of the interests it acquired pursuant to the Southern Bay Assignment unto BHST LLC, whose address is 4514 Cole Avenue, Suite 1175, Dallas, Texas 75205;

NOW, THEREFORE, **COX OIL LLC**, whose address 4514 Cole Avenue, Suite 1175, Dallas, Texas 75205 ("**Assignor**"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration to it in hand paid, the receipt and sufficiency of which are hereby acknowledged, does hereby GRANT, BARGAIN, CONVEY, SELL, ASSIGN, TRANSFER and DELIVER four percent (4%) of the interests it acquired pursuant to the Southern Bay Assignment unto **RCL Capital Management LLC, held for the benefit of Series 10 (Southern Bay), a series of RCL Capital Management LLC** and three percent (3%) of the interests it acquired pursuant to the Southern Bay Assignment unto **BHST LLC** (RCL Capital Management LLC and BHST LLC hereinafter collectively referred to as "**Assignee**"), in and to the properties described in Section I below, except to the extent constituting Excluded Assets (as defined below), which, after said exclusion, shall collectively be called the "**Properties.**"

Cox Oil LLC retains unto itself and excludes from this conveyance ninety-three percent (93%) of the interests it acquired in and to the Properties pursuant to the Southern Bay Assignment.

## I. PROPERTIES CONVEYED

The Properties shall be comprised of the following, except to the extent constituting Excluded Assets:

(a) The oil and gas leases more particularly described in Exhibit "A" attached hereto and made a part hereof for all purposes (the "**Leases**");

(b) All the property and rights incident to the Leases, including fee mineral, overriding royalty, net profits, reversionary, production payments and royalty interests attributable thereto;

(c) All real and personal property interests relating to the Leases, including, but not limited to, all wells (including disposal wells) (the **"Wells"**), well equipment, platforms, production facilities, pipelines and surface equipment;

(d) Oil, gas, casinghead gas, condensate, natural gas liquids, and other liquid or gaseous hydrocarbons or any combination thereof and sulphur and other minerals of every kind and character extracted from or produced from the foregoing (collectively, "Hydrocarbons") (including all Hydrocarbons in the flowlines and gathering lines as of the Effective Date but specifically excluding all Hydrocarbons in any tanks or production facilities above the outlet connection from said tanks or production facilities as of the Effective Date);

(e) All claims and causes of action of Assignor arising under or with respect to any Existing Contracts that are attributable to periods of time on or after the Effective Date (including claims for adjustments or refunds); all claims and causes of action of Assignor arising from acts, omissions or events, or damage to or destruction of the Properties occurring on or after the Effective Date; provided, however, Assignor shall transfer to Assignee its proportionate shares of all claims of Assignor against prior owners of the Properties or third parties associated with or relating to obligations and liabilities attributable to any violation of, or the failure to perform any obligation imposed by, any Environmental Laws, or as necessary to address any environmental conditions, whether occurring before, on, or after the Effective Date; and all rights, claims, causes of action and interests of Assignor (Y) under any policy or agreement of insurance or indemnity agreement, or (Z) to any insurance proceeds or awards arising, in each case, from acts, omissions or events, or damage to or destruction of the Properties on or after the Effective Date, and

(f) All contracts, permits, agreements, instruments, including, but not limited to the Existing Contracts, including those agreements more particularly described in Exhibit "B" attached hereto and made a part hereof for all purposes, files, records, flow lines and gathering systems, production facilities, tanks, accounts, deposits, all warehouse stock and other material or equipment related to the operation of the Wells or ownership of the Leases.

## II. EXCLUDED ASSETS

There is specifically SAVED, EXCEPTED and RESERVED from this Assignment, the following described assets and properties, herein referred to as the **"Excluded Assets."** As used in this Assignment, the term "Excluded Assets" shall mean the following:

(a) all corporate, financial, income and franchise tax and legal records of Assignor that relate to Assignor's business generally (whether or not relating to the Properties), and all books, records and files that relate to the Excluded Assets, provided, however, Assignee shall be entitled to receive copies of any tax records which directly relate to any assumed obligations, or which are necessary for Assignee's ownership, administration, or operation of the Properties;

(b) all rights to any refund related to the expenses borne by Assignor or Assignor's predecessors in interest and title attributable to periods prior to the Effective Date;

(c) all trade credits, accounts receivable, notes receivable, take-or-pay amounts receivable, pre-paid expenses and deposits, and other receivables attributable to the Properties with respect to any period of time prior to the Effective Date; and

(d) any patent, patent application, logo, service mark, copyright, trade name or trademark of or associated with Assignor or any affiliate of Assignor or any business of Assignor or of any affiliate of Assignor.

Notwithstanding the foregoing Excluded Assets, Assignor and Assignee agree and acknowledge that any amounts paid with respect to Civil Action No. 4:07-cv-02724; *St. Paul Surplus Lines Insurance co. v. Cox Operating LLC*; In the United States District Court, Southern District of Texas, Houston Division following the Effective Date that would have otherwise been payable to the Assignor as to the interests acquired under the Southern Bay Assignment will instead be payable to Assignor and Assignee as the owners of the Properties in their proportionate shares.

TO HAVE AND TO HOLD the Properties unto Assignee and its successors and assigns forever together with all and singular the rights and appurtenances thereto and anywise belonging unto Assignee, its successors, assigns and legal representatives, forever.

## III. ADDITIONAL PROVISIONS

This Assignment is made expressly subject to the following terms and conditions:

**(A) ASSIGNOR WARRANTS TITLE TO THE PROPERTIES AGAINST ALL CLAIMS, LIENS, BURDENS AND ENCUMBRANCES ARISING BY, THROUGH, AND UNDER ASSIGNOR, BUT NOT OTHERWISE, AND, EXCEPT FOR THAT WARRANTY, THIS ASSIGNMENT IS MADE SUBJECT TO THE FOLLOWING:**

**(i) THE EXPRESS WARRANTY OF ASSIGNOR CONTAINED IN SECTION III(A) ABOVE IS EXCLUSIVE AND IS IN LIEU OF ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, AND, WITHOUT LIMITATION ON THE EXPRESS WARRANTY CONTAINED IN SECTION III(A) ABOVE, ASSIGNOR EXPRESSLY DISCLAIMS, AND ASSIGNEE HEREBY EXPRESSLY WAIVES ANY RIGHT OR CAUSE OF ACTION ARISING FROM OR RELATING TO, ANY AND ALL OTHER REPRESENTATIONS AND WARRANTIES (WITHOUT LIMITATION, EXCEPT FOR THE EXPRESS WARRANTY CONTAINED IN SECTION III(A) ABOVE, THE PROPERTIES SHALL BE CONVEYED PURSUANT HERETO WITHOUT ANY WARRANTY OR REPRESENTATION WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, RELATING TO THE CONDITION, QUANTITY, QUALITY, FITNESS FOR A PARTICULAR PURPOSE, CONFORMITY TO THE MODELS OR SAMPLES OF MATERIALS OR MERCHANTABILITY OF ANY EQUIPMENT FOR ITS FITNESS FOR ANY PURPOSE).**

**(ii) ASSIGNEE HAS INSPECTED, OR WAIVED ITS RIGHT TO INSPECT, THE PROPERTIES FOR ALL PURPOSES AND SATISFIED ITSELF AS TO**

**THEIR PHYSICAL AND ENVIRONMENTAL CONDITION, BOTH SURFACE AND SUBSURFACE, INCLUDING BUT NOT LIMITED TO CONDITIONS SPECIFICALLY RELATED TO THE PRESENCE, RELEASE OR DISPOSAL OF HAZARDOUS SUBSTANCES, SOLID WASTES, ASBESTOS AND OTHER MAN MADE MATERIAL FIBERS (COLLECTIVELY, "MMMF"), OR NATURALLY OCCURRING RADIOACTIVE MATERIALS ("NORM"). ASSIGNEE IS RELYING UPON ITS OWN INSPECTION OF THE PROPERTIES, AND ASSIGNEE HEREBY ACCEPTS ALL OF THE SAME IN THEIR "AS IS, WHERE IS" CONDITION. ASSIGNOR DISCLAIMS ALL LIABILITY ARISING IN CONNECTION WITH THE PRESENCE OF NORM OR MMMF ON THE PROPERTIES AND, IF TESTS HAVE BEEN CONDUCTED BY ASSIGNOR FOR THE PRESENCE OF NORM OR MMMF, ASSIGNOR DISCLAIMS ANY WARRANTY RESPECTING THE ACCURACY OF SUCH TESTS OR RESULTS. IN ADDITION, ASSIGNOR AND ITS REPRESENTATIVES MAKE NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, AS TO THE ACCURACY OR COMPLETENESS OF ANY DATA, INFORMATION OR MATERIALS HERETOFORE OR HEREAFTER FURNISHED ASSIGNEE IN CONNECTION WITH THE PROPERTIES OR AS TO THE QUALITY OR QUANTITY OF OIL, GAS AND OTHER HYDROCARBON RESERVES (IF ANY) ATTRIBUTABLE TO THE PROPERTIES OR THE ABILITY OF THE PROPERTIES TO PRODUCE OIL, GAS AND OTHER HYDROCARBONS. ANY AND ALL SUCH DATA, INFORMATION AND OTHER MATERIALS FURNISHED BY ASSIGNOR AND ITS REPRESENTATIVES WAS PROVIDED TO ASSIGNEE AS A CONVENIENCE AND ANY RELIANCE ON OR USE OF THE SAME HAS BEEN AND SHALL BE AT ASSIGNEE'S SOLE RISK. ASSIGNEE ACKNOWLEDGES THAT THIS EXPRESS DISCLAIMER AND WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS TRANSACTION AND THE CONSIDERATION THEREOF; AND ACKNOWLEDGES THAT THIS DISCLAIMER AND WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF ASSIGNEE AND EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWLINGLY CONSENTED TO THIS DISCLAIMER AND WAIVER.**

(B) Assignee hereby agrees as to the interests conveyed by this instrument:

(i) effective as of the Effective Date, to assume and agree to fully perform all of Assignor's express or implied covenants and conditions under the Leases;

(ii) effective as of the Effective Date, to assume and agree to perform all duties and obligations of Assignor applicable to the Leases and the operation of the Wells from and after the Effective Date, including (y) all duties and obligations contained in all presently existing contracts, agreements and instruments, whether recorded or unrecorded, including, but not limited to, operating agreements, unitization agreements, communitization and pooling agreements, agreements for the sale or purchase of oil, gas, casinghead gas or $CO_2$ and gas processing agreements (collectively the **"Existing Contracts"**), to the extent they relate to the interests acquired hereby, including those agreements more particularly described in Exhibit "B" attached hereto and made a part hereof for all purposes and (z) all duties and obligations relating

to applicable state, federal and local statutory and regulatory obligations, writs, court orders and laws (other than Environmental Laws) (**"Applicable Laws"**),

(iii) Assignee shall assume and agree to fully perform all of Assignor's duties, obligations and liabilities attributable to any violation of, or the failure to perform any obligation imposed by, any Environmental Laws, or as necessary to address any environmental conditions, whether occurring before, on, or after the Effective Date,

(iv) effective as of the Effective Date, to assume all obligations, responsibilities, liabilities, losses, costs, and expenses of any kind or character relating to the litigation previously identified to Assignee , and

(v) to indemnify and hold Assignor (and the affiliates of Assignor, and the respective directors, officers, employees, attorneys, contractors and agents of such affiliates and Assignor) harmless from and against any and all claims, actions, causes of action, liabilities, damages, losses, costs or expenses (including, without limitation, court costs and attorneys' fees) of any kind or character arising out of or otherwise relating to the matters set forth in this Section III.

In connection with (but not in limitation of) the foregoing, it is specifically understood and agreed that such duties, obligations and liabilities arising out of or otherwise relating to the ownership and/or operation of the Properties after the Effective Date shall (notwithstanding anything herein appearing to be to the contrary) be deemed to include all matters arising out of the condition of the Properties on the Effective Date (including, without limitation, within such matters all obligations to properly plug and abandon, or replug and re-abandon, wells located on the Properties, to restore the surface of the Properties and to comply with, or to bring the Properties into compliance with, applicable environmental laws, rules, regulations and orders, including conducting any remediation activities which may be required on or otherwise in connection with activities on the Properties), regardless of whether such condition or the events giving rise to such condition arose or occurred before or after the Effective Date, and the assumptions and indemnifications by Assignee provided for in this Section III(B) shall expressly cover and include such matters. **THE FOREGOING ASSUMPTIONS AND INDEMNIFICATIONS SHALL APPLY WHETHER OR NOT SUCH DUTIES, OBLIGATIONS OR LIABILITIES, OR SUCH CLAIMS, ACTIONS, CAUSES OF ACTION, LIABILITIES, DAMAGES, LOSSES, COSTS OR EXPENSES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE NEGLIGENCE, SINGLE NEGLIGENCE, CONCURRENT NEGLIGENCE, ACTIVE OR PASSIVE NEGLIGENCE, BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE) OF ANY INDEMNIFIED PARTY, OR (ii) STRICT LIABILITY.**

(C) To the extent permitted by law, Assignee, to the extent of the interests conveyed by this instrument, shall be subrogated to Assignor's rights in and to representations, warranties and covenants given with respect to the Properties. Assignor hereby grants and transfers to Assignee, its successors and assigns, to the extent so transferable and permitted by law, the benefit of and the right to enforce the covenants, representations and warranties, if any, which

Assignor is entitled to enforce with respect to the Properties, but only to the extent not enforced by Assignor.

(D) The references herein to contracts, claims and other matters shall not be deemed to ratify or create any rights in third parties or merge with, modify or limit the rights of Assignor or Assignee, as between themselves, as set forth in documents executed in connection therewith.

(E) Assignor and Assignee agree, when requested, to take all such further actions and execute, acknowledge and deliver all such further documents that are necessary or useful in carrying out the purposes of this Assignment. So long as authorized by applicable law so to do, (i) Assignor agrees to execute, acknowledge and deliver to Assignee all such other additional instruments, notices, division orders, transfer orders and other documents and to do all such other and further acts and things as may be necessary to more fully and effectively convey and assign to Assignee the Properties conveyed hereby or intended so to be conveyed; and (ii) Assignee agrees to execute, acknowledge and deliver to Assignor all such other additional instruments, notices, division orders, transfer orders and other documents and to do all such other and further acts and things as may be necessary to more fully and effectively evidence Assignor's rights in and to the Excluded Assets. Without limiting the foregoing, in the event any exhibit incorrectly or insufficiently describes or references or omits the description of a property or interest intended to be conveyed hereby, Assignor agrees to, within twenty (20) days of Assignor's receipt of Assignee's written request, together with supporting documentation satisfactory to Assignor, correct such Exhibit and/or execute an amended assignment or other appropriate instruments necessary to transfer the property or interest intended to be conveyed hereby to Assignee.

(F) All exhibits attached to this Assignment, and the terms of those exhibits which are referred to in this Assignment, are made a part hereof and incorporated herein by reference. References in such exhibits to instruments on file in the public records are made for all purposes. Unless provided otherwise, all recording references in such exhibits are to the appropriate records of the Parishes in which the Properties are located.

(H) Assignor or Assignee may execute separate governmental form assignments of the Properties on officially approved forms, in sufficient counterparts to satisfy applicable statutory and regulatory requirements. Those assignments shall be deemed to contain all of the exceptions, reservations, warranties, rights, titles, power and privileges set forth herein as fully as though they were set forth in each such assignment. The interests conveyed by such separate assignments are the same, and not in addition to, the Properties conveyed herein.

(I) This Assignment binds and inures to the benefit of Assignor and Assignee and their respective successors and assigns.

[SIGNATURE PAGE FOLLOWS.]

EXECUTED on the dates contained in the acknowledgments of this Assignment, to be effective for all purposes as of March 1, 2013 (the "**Effective Date**").

**ASSIGNOR:**

Witnesses:

Roxana Alvarado

Printed Name: Roxana Alvarado

Dave Garber

Printed Name: DAVE GARBER

Cox Oil LLC

By: ______________________

Name: Craig Sanders

Title: Chief Executive Officer

**ASSIGNEE:**

Witnesses:

Roxana Alvarado

Printed Name: Roxana Alvarado

Dave Garber

Printed Name: DAVE GARBER

RCL Capital Management LLC, held for the benefit of Series 10 (Southern Bay), a series of RCL Capital Management LLC

By: ______________________

Name: William L. Graham

Title: Manager

Roxana Alvarado

Printed Name: Roxana Alvarado

Dave Garber

Printed Name: DAVE GARBER

BHST LLC

By: ______________________

Name: CRAIG Sanders

Title: Chief Executive Officer

Approved subject to attached

Resolution dated Sept 9, 2015

By: ______________________

STATE MINERAL AND ENERGY BOARD

## ACKNOWLEDGEMENTS

State of Texas )
)
County of Dallas )

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this 23rd day of July, 2015, appeared Craig Sanders, the Chief Executive Officer of Cox Oil LLC, and acknowledged to me that he executed the same for the purposes and consideration therein expressed and in the capacities therein stated.

Susan F. Irby
Notary Public, State of Texas

SUSAN F. IRBY
Notary Public
State of Texas
My Comm. Exp. 08-22-2015

State of Texas )
)
County of Dallas )

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this 23rd day of July, 2015, appeared William L. Graham, Manager of RCL Capital Management LLC, held for the benefit of Series 10 (Southern Bay), a series of RCL Capital Management LLC, and acknowledged to me that he executed the same for the purposes and consideration therein expressed and in the capacities therein stated.

Susan F. Irby
Notary Public, State of Texas

SUSAN F. IRBY
Notary Public
State of Texas
My Comm. Exp. 08-22-2015

State of Texas )
)
County of Dallas )

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this 23rd day of July, 2015, appeared CRAIG SANDERS, the Chief Executive Officer of BHST LLC and acknowledged to me that he executed the same for the purposes and consideration therein expressed and in the capacities therein stated.

Susan F. Irby
Notary Public, State of Texas

SUSAN F. IRBY
Notary Public
State of Texas
My Comm. Exp. 08-22-2015

**EXHIBIT A**
**(To Assignment, Bill of Sale and Conveyance from Cox Oil LLC to BHST LLC, et al)**

**LEASES**

**Quarantine Bay Field**

Oil and Gas Lease dated February 20, 1928 from the State of Louisiana (S.L. 195) to M. Hession, recorded in COB 65, Folio 396, Records of Plaquemines Parish, Louisiana.

Oil and Gas Lease dated January 9, 1948 from the State of Louisiana (S.L. 1349) to Gulf Refining Company, recorded in COB 131, Folio 213, Records of Plaquemines Parish, Louisiana.

Oil and Gas Lease dated February 19, 1937 from Plaquemines Land Company to Gulf Refining Company, recorded in COB 83, Folio 328, Records of Plaquemines Parish, Louisiana.

Oil and Gas Lease dated January 2, 1948 from John Vaccaro to Gulf Refining Company, recorded in COB 131, Folio 18, Records of Plaquemines Parish, Louisiana.

Oil and Gas Lease dated April 15, 1948 from Phillip Fowler, et al, to Gulf Refining Company, recorded in COB 133, Folio 126, Records of Plaquemines Parish, Louisiana.

Oil and Gas Lease dated August 12, 1948 from William G. Helis, Jr. to Gulf Refining Company, recorded in COB 135, Folio 476, Records of Plaquemines Parish, Louisiana.

Oil and Gas Lease dated September 21, 1948 from Interstate Trust & Banking Company to Gulf Refining Company, recorded in COB 137, Folio 54, Records of Plaquemines Parish, Louisiana.

Oil and Gas Lease dated November 18, 1949 from Walter F. Marcus to Gulf Refining Company, recorded in COB 142, Folio 724, Records of Plaquemines Parish, Louisiana.

Oil and Gas Lease dated December 14, 1949 from Elmer D. Flanders, Testamentary Executor of the Succession of Burt Flanders, Jr. to Gulf Refining Company, recorded in COB 143, Folio 150, Records of Plaquemines Parish, Louisiana.

Oil and Gas Lease dated December 15, 1997 from the State of Louisiana (S.L. 15941) to Century Offshore Management Corporation, recorded in COB 923, Folio 182, Records of Plaquemines Parish, Louisiana.

**EXHIBIT B**
**(To Assignment, Bill of Sale and Conveyance from Cox Oil LLC to BHST LLC, et al)**

## RIGHTS OF WAY

### Quarantine Bay Field

State of Louisiana Right-of-Way No. 4170 dated November 15, 2001 from the State of Louisiana, as Grantor, to Devon Energy Production Co., L. P., as Grantee, unrecorded.

State of Louisiana Right-of-Way No. 3892 dated May 11, 2000 from the State of Louisiana, as Grantor, to Century Exploration Company, as Grantee, recorded in COB 973, Folio 378, Records of Plaquemines Parish, Louisiana.

## SURFACE LEASES

### Quarantine Bay Field

Surface Lease Agreement dated effective October 15, 1989 by and between Plaquemines Parish Government, as Lessor, and Chevron USA, Inc., as Lessee, recorded in COB 722, Folio 456, Records of Plaquemines Parish, Louisiana.

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
March 1, 2013

STATEMENT OF CONVEYANCE
*FORM B*

**STATE LEASE**
00195

**LEASE ROYALTY DECIMAL**
0.1250000

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Cox Oil LLC | **GROSS** |
| STREET | 4514 Cole Avenue, Suite 1175 | **WORKING** |
| CITY/STATE | Dallas, Texas 75205 | INTEREST |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.0700000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0651000 |
| | INTEREST CONVEYED BY OWNER | 0.0049000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | BHST LLC | |
| STREET | 4514 Cole Avenue, Suite 1175 | 0.0021000 |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | RCL Capital Management | 0.0028000 |
| STREET | 4435 University | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.0049000 |

PORTION DESCRIPTION: Portion ID J: Insofar as lease covers all of Quarantine Bay Area except 1,000 acres, more or less, as shown in yellow on plat attached to Form B approved 11-10-1992, as item # 69 and further except the Pelican Acreage- - - Shallow Rights

COMMENTS:

| | |
|---|---|
| PREPARED BY: | Susan Irby |
| DATE: | July 31, 2015 |
| Phone Number | (214) 343-2721 |
| E-mail Address | sirbydallas@aol.com |

formb 10/1/1999

P:\Landnew\Energen\coxoilFormB2_-_SL_00195-J.xls

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

EFFECTIVE DATE OF TRANSFER (DATE OF SALE): March 1, 2013

STATEMENT OF CONVEYANCE
*FORM B*

STATE LEASE: 00195

LEASE ROYALTY DECIMAL: 0.1250000

**CONVEYOR'S NAME & ADDRESS**

| | | **GROSS WORKING INTEREST** |
|---|---|---|
| NAME | Cox Oil LLC | |
| STREET | 4514 Cole Avenue, Suite 1175 | |
| CITY/STATE | Dallas, Texas 75205 | |
| | | |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.4300000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.4146000 |
| | INTEREST CONVEYED BY OWNER | 0.0154000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | BHST LLC | 0.0066000 |
| STREET | 4514 Cole Avenue, Suite 1175 | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | RCL Capital Management LLC | 0.0088000 |
| STREET | 4435 University | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.0154000 |

PORTION DESCRIPTION: Portion ID J-2: Pelican Acreage (195.45 acres) limited in depth to all zones, formation and horizons occurring from and below the base of the 10 Sand in the Quarantine Bay Field as found in SL 7332 #1 well located in Sec. 13-19S-16E

COMMENTS:

| | |
|---|---|
| PREPARED BY: | Susan Irby |
| DATE: | August 5, 2015 |
| Phone Number | (214) 343-2721 |
| E-mail Address | sirbydallas@aol com |

formb 10/1/1999

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

EFFECTIVE DATE OF TRANSFER (DATE OF SALE): March 1, 2013

STATEMENT OF CONVEYANCE

*FORM B*

STATE LEASE: 00195

LEASE ROYALTY DECIMAL: 0.1250000

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Cox Oil LLC | **GROSS** |
| STREET | 4514 Cole Avenue, Suite 1175 | **WORKING** |
| CITY/STATE | Dallas, Texas 75205 | **INTEREST** |
| | | |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.4300000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.4146000 |
| | INTEREST CONVEYED BY OWNER | 0.0154000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | BHST LLC | |
| STREET | 4514 Cole Avenue, Suite 1175 | 0.0066000 |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | RCL Capital Management LLC | |
| STREET | 4435 University | 0.0088000 |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.0154000 |

PORTION DESCRIPTION: Portion ID J-3: Pelican Acreage limited in depth to all zones, formations and horizons occurring from the surface to the base of the 10 Sand in the Quarantine Bay Field as found in SL 7332 #1 Well located in Sec. 13-19S-16E
Shallow Rights

COMMENTS:

| | |
|---|---|
| PREPARED BY: | Susan Irby |
| DATE: | August 5, 2015 |
| Phone Number | (214) 343-2721 |
| E-mail Address | sirbydallas@aol.com |

formb 10/1/1999

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
March 1, 2013

STATEMENT OF CONVEYANCE
*FORM B*

**STATE LEASE**
00195

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Cox Oil LLC | **GROSS** |
| STREET | 4514 Cole Avenue, Suite 1175 | **WORKING** |
| CITY/STATE | Dallas, Texas 75205 | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.5700000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.5490000 |
| | INTEREST CONVEYED BY OWNER | 0.0210000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | BHST LLC | |
| STREET | 4514 Cole Avenue, Suite 1175 | 0.0090000 |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | RCL Capital Management LLC | |
| STREET | 4435 University | 0.0120000 |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.0210000 |

**LEASE ROYALTY DECIMAL**
0.1250000

PORTION DESCRIPTION: Portion ID L: Only as to the lease portion delineated in red on the plat attached to the assignment and only insofar as said lease portion covers all depths below 500' below the base of the 10 sand in the Quarantine Bay Field as found in the SL 7332 #1 well located in Section 13-T19S, R16E, Plaquemines Parish. Plat in Lease records file.

COMMENTS:

| | |
|---|---|
| PREPARED BY: | Susan Irby |
| DATE: | July 31, 2015 |
| Phone Number | (214) 343-2721 |
| E-mail Address | sirbydallas@aol.com |

formb 10/1/1999

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
March 1, 2013

STATEMENT OF CONVEYANCE
*FORM B*

**STATE LEASE**
00195

**LEASE ROYALTY DECIMAL**
0.1250000

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Cox Oil LLC | **GROSS** |
| STREET | 4514 Cole Avenue, Suite 1175 | **WORKING** |
| CITY/STATE | Dallas, Texas 75205 | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.5700000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.5490000 |
| | INTEREST CONVEYED BY OWNER | 0.0210000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | BHST LLC | 0.0090000 |
| STREET | 4514 Cole Avenue, Suite 1175 | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | RCL Capital Management LLC | 0.0120000 |
| STREET | 4435 University | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.0210000 |

PORTION DESCRIPTION: Portion ID N: Limited in depth to all zones, formations and horizons occurring from and below 500' below the base of the 10 sand in the Quarantine Bay Field as found in the SL 7332 #1 well located in Section 13-19S-26E, Plaquemines Parish, Louisiana, less and except that certain tract of land covering 5,928 acres, more or less, and being more particularly described in that certain assignment dated March 21, 1997, but effective September 11, 1996, by and between Pennzoil Exploration and Production Company, as Grantor, and Enterprise Oil Louisiana, Inc., as Grantee, recorded July 22, 1997, in COB 911 Folio 848, records of Plaquemines Parish, Louisiana and being the same land approved under State Mineral Board Resolution Docket Item No. 11, dated June 11, 1997 and further less and except the Pelican Acreage

COMMENTS:

| | |
|---|---|
| PREPARED BY: | Susan Irby |
| DATE: | July 31, 2015 |
| Phone Number | (214) 343-2721 |
| E-mail Address | sirbydallas@aol.com |

formb 10/1/1999

P:\Landnew\Energen\coxoilFormB2_-_SL_00195-N.xls

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
March 1, 2013

STATEMENT OF CONVEYANCE
*FORM B*

**STATE LEASE**
01349

**LEASE ROYALTY DECIMAL**
0.1250000

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Cox Oil LLC | **GROSS** |
| STREET | 4514 Cole Avenue, Suite 1175 | **WORKING** |
| CITY/STATE | Dallas, Texas 75205 | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.0700000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0651000 |
| | INTEREST CONVEYED BY OWNER | 0.0049000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | BHST LLC | |
| STREET | 4514 Cole Avenue, Suite 1175 | 0.0021000 |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | RCL Capital Management LLC | 0.0028000 |
| STREET | 4435 University | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.0049000 |

PORTION DESCRIPTION: Portion ID A: Rest of lease

COMMENTS:

| | |
|---|---|
| PREPARED BY: | Susan Irby |
| DATE: | July 31, 2015 |
| Phone Number | (214) 343-2721 |
| E-mail Address | sirbydallas@aol.com |

formb 10/1/1999

P:\Landnew\Energen\coxoilFormB2_-_SL_01349-A.xls

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
March 1, 2013

STATEMENT OF CONVEYANCE
*FORM B*

**STATE LEASE**
01349

**LEASE ROYALTY DECIMAL**
0.1250000

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Cox Oil LLC | **GROSS** |
| STREET | 4514 Cole Avenue, Suite 1175 | **WORKING** |
| CITY/STATE | Dallas, Texas 75205 | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.0700000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0651000 |
| | INTEREST CONVEYED BY OWNER | 0.0049000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | BHST LLC | |
| STREET | 4514 Cole Avenue, Suite 1175 | 0.0021000 |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | RCL Capital Management LLC | 0.0028000 |
| STREET | 4435 University | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.0049000 |

PORTION DESCRIPTION: Portion ID C: Insofar and only insofar as such lease covers and affects lands lying within the geographical confines of that certain voluntary unit named the QB S-4 VUA as described on Exhibit "B" attached hereto and insofar and only insofar as such lease covers and affects the subsurface depths from 5000' TVD below the surface down to and including but not below the stratigraphic equivalent of the base of the 4 Sand as seen at a depth of 8,992' MD in the electric log for the Centry-SL 1349#1 well. - - - - - Shallow Rights

COMMENTS:

| | |
|---|---|
| PREPARED BY: | Susan Irby |
| DATE: | July 31, 2015 |
| Phone Number | (214) 343-2721 |
| E-mail Address | sirbydallas@aol.com |

formb 10/1/1999

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
March 1, 2013

STATEMENT OF CONVEYANCE
*FORM B*

**STATE LEASE**
01349

**LEASE ROYALTY DECIMAL**
0.1250000

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Cox Oil LLC | **GROSS** |
| STREET | 4514 Cole Avenue, Suite 1175 | **WORKING** |
| CITY/STATE | Dallas, Texas 75205 | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.5700000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.5490000 |
| | INTEREST CONVEYED BY OWNER | 0.0210000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | BHST LLC | |
| STREET | 4514 Cole Avenue, Suite 1175 | 0.0090000 |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | RCL Capital Management LLC | |
| STREET | 4435 University | 0.0120000 |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.0210000 |

PORTION DESCRIPTION: Portion ID D: Limited in depth to all zones, formations, and horizons occurring from and below 500' below the base of the 10 Sand in the Quarantine Bay Field, as found in the SL 7332 Well No 1, located in Section 13-T19S-R16E, Plaquemines Parish, Louisiana

COMMENTS:

| | |
|---|---|
| PREPARED BY: | Susan Irby |
| DATE: | July 31, 2015 |
| Phone Number | (214) 343-2721 |
| E-mail Address | sirbydallas@aol.com |

formb 10/1/1999

P:\Landnew\Energen\coxoilFormB2_-_SL_01349-D.xls

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
March 1, 2013

STATEMENT OF CONVEYANCE
*FORM B*

**STATE LEASE**
15941

**LEASE ROYALTY DECIMAL**
0.2250000

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Cox Oil LLC | **GROSS** |
| STREET | 4514 Cole Avenue, Suite 1175 | **WORKING** |
| CITY/STATE | Dallas, Texas 75205 | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0 0700000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0651000 |
| | INTEREST CONVEYED BY OWNER | 0.0049000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | BHST LLC | 0.0021000 |
| STREET | 4514 Cole Avenue, Suite 1175 | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | RCL Capital Management LLC | 0.0028000 |
| STREET | 4435 University | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.0049000 |

PORTION DESCRIPTION: Portion ID A: Remainder of Lease

COMMENTS:

| | |
|---|---|
| PREPARED BY: | Susan Irby |
| DATE: | July 31, 2015 |
| Phone Number | (214) 343-2721 |
| E-mail Address | sirbydallas@aol.com |

formb 10/1/1999

P:\Landnew\Energen\coxoilFormB2_-_SL_015941-A.xls

OFFICE OF MINERAL RESOURCES
STATE OF LOUISIANA
BATON ROUGE, LA

EFFECTIVE DATE OF TRANSFER (DATE OF SALE): March 1, 2013

STATEMENT OF CONVEYANCE
*FORM B*

STATE LEASE: 15941

LEASE ROYALTY DECIMAL: 0.2250000

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Cox Oil LLC | **GROSS** |
| STREET | 4514 Cole Avenue, Suite 1175 | **WORKING** |
| CITY/STATE | Dallas, Texas 75205 | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 0.4900000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.4851000 |
| | INTEREST CONVEYED BY OWNER | 0.0049000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | BHST LLC | 0.0021000 |
| STREET | 4514 Cole Avenue, Suite 1175 | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | RCL Capital Management LLC | 0.0028000 |
| STREET | 4435 University | |
| CITY/STATE | Dallas, Texas 75205 | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| NAME | | |
| STREET | | |
| CITY/STATE | | |
| | **TOTAL** | 0.0049000 |

PORTION DESCRIPTION: Portion ID B: Limited in depth to all zones, formations, and horizons occurring from and below 500' below the base of the 10 Sand in the Quarantine Bay Field, as found in the SL 7332, Well #1, located in Section 13-T19S-R16E, Plaquemines Parish, Louisiana

COMMENTS:

| | |
|---|---|
| PREPARED BY: | Susan Irby |
| DATE: | July 31, 2015 |
| Phone Number | (214) 343-2721 |
| E-mail Address | sirbydallas@aol.com |

formb 10/1/1999

280
Sh# F0002

Lease Validation
Agreement

State of Louisiana

Parish of Cameron

This Agreement entered into by and between the State Mineral Board for the State of Louisiana, herein represented by William B. Moran, its duly authorized Chairman, as Lessor, and the undersigned party or parties Lessee herein acting through their duly authorized representatives or acting individually, as the case may be, as follows:

1.

Pursuant to a report of the Special Master dated June 8, 1981, a Stipulation by the parties of June 5, 1981 attached thereto, and Final Decree of the United States Supreme Court entered on June 22, 1981, in the case of United States of America v. State of Louisiana, Docket No. 9, Original, the three (3) mile boundary line between state and federal submerged lands in the Gulf of Mexico as previously fixed by the Court's Decree of June 16, 1975, or by prior decree of the Court, was described and recognized, a fixed schedule for final accountings and payments was provided, a division of split leases was decreed, and each party was directed to validate and administer that portion of an existing lease on its side of said boundary or to issue a new lease thereon on like terms.

2.

Lessee herein holds and owns OCS Lease No. G-1435 covering Block No. 18 in the West Cameron Area, a portion of which is located landward of the aforesaid boundary and is owned by the State, and Lessee has requested the State, as Lessor, to validate or recognize such portion of Lessee's OCS lease or to issue a new lease to Lessee thereon upon like terms.

3.

Lessee has also represented that there has been full compliance with all applicable statutes, the Interim Agreement of October 12, 1956, and the separate agreement entered into with the State as to said OCS lease, which constitutes full compliance with the terms of said OCS lease; and that Lessee undertakes and agrees that State, as Lessor, has received or will receive all bonus, rental, royalty and other considerations or money, including all taxes, licenses and fees which have been or may be due and payable to the State on that portion of said OCS lease lying landward of the aforesaid boundary that now divides said OCS lease. State specifically reserves all of its rights thereto under the Interim Agreement of October 12, 1956, and applicable statutes.

For the purposes of administration by the State, as Lessor, under applicable state laws, the parties hereto recognize that validation or recognition by the State, as Lessor, of said portion of said OCS lease, can best be accomplished either by amendment to include same in an existing state lease owned by Lessee and adjacent thereto, if any, or by granting a new lease to Lessee covering said acreage upon like terms contained in said OCS lease.

5.

Consistently with the foregoing, and in accordance with the provisions of the Interim Agreement of October 12, 1956, and all applicable statutes, and acting pursuant to a resolution of the State Mineral Board for the State of Louisiana adopted at a Special Meeting of the Board for such purpose on December 21, 1981, the parties hereto have agreed and do hereby agree that Lessee's request for validation of that portion of said OCS lease lying landward of the aforesaid three (3) mile boundary has been and is hereby approved and recognized by State, as Lessor, as described and in the manner and to the extent set forth in Exhibit A attached and made part hereof, and as so described and in such manner and to such extent, the State, as Lessor, does hereby validate, recognize and ratify, the lease on such submerged lands now owned by the State, less and except any area previously validated, released, lapsed or expired or as to which Lessee is in default.

6.

This agreement is subject to the concurrence and approval of the Governor of the State of Louisiana and the concurrence of the Attorney General of the State of Louisiana.

In Witness whereof, this agreement is executed as of the 21st day of December, 1981, in the presence of the undersigned, competent witnesses.

Witnesses:

Glenda G. Blunschi

Mary H. Campbell

State Mineral Board
for the State of Louisiana

By: William B. Mor—

Its Chairman

"Lessor"

Concurring and Approving:

David C Treen

Governor of the State of Louisiana

Concurring:

[signature]

Attorney General of the State of Louisiana

Witnesses:

Judith D. Leb

Susan B. Mayo

TEXACO INC.

By: S. J. Waguespack

Its Attorney-in-Fact

"Lessee"

APPROVED
Form____
Terms____
Desc. NGP

Witness Acknowledgment
for Lessor

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

BEFORE ME, the undersigned authority, personally came and appeared

Glenda G. Blunschi, who by me being first duly sworn,

deposed and said:

That she is one of the witnesses to the execution of the foregoing instrument and that she saw William B. Moran sign said instrument as Chairman of the State Mineral Board, in the presence of appearer and the other subscribing witness.

Glenda G. Blunschi
Glenda G. Blunschi

SWORN TO AND SUBSCRIBED before me on
this the 25th day of February, 1982.

C Randall Brewer
Notary Public

Witness Acknowledgment
for Lessee

STATE OF LOUISIANA

PARISH OF ORLENANS

BEFORE ME, the undersigned authority, personally came and appeared

Judith S. Leto, who by me being first duly sworn,

deposed and said:

That she is one of the witnesses to the execution of the foregoing instrument and that she saw S. J. Waguespack sign said instrument as Attorney-in-Fact of the Texaco Inc., in the presence of appearer and the other subscribing witness.

Judith S. Leto

SWORN TO AND SUBSCRIBED before me on
this the 12th day of FEBRUARY, 1982.

David M Latham
Notary Public
DAVID M. LATHAM
Notary Public, Parish of Jefferson, State of La.
My Commission is issued for life.

Exhibit A
Identified with Lease
Validation Agreement
OCS Lease No. G 1435

Section I

Description of Portion of above OCS lease located landward of three (3) mile boundary line in the Gulf of Mexico, Offshore Louisiana

PORTION OF BLOCK 18, WEST CAMERON AREA, REVISED, Cameron Parish, Louisiana
That portion of Block 18, West Cameron Area, Revised, Cameron Parish, Louisiana, belonging to the State of Louisiana, described as follows: Beginning at a point in the East line of the Southwest Quarter (SW/4) of Block 18, West Cameron Area, Revised, having Lambert Plane Coordinates of X = 1,251,250.256 and Y = 381,382.19; thence Southwesterly in a straight line to a point having Lambert Plane Coordinates of X = 1,244,360.6 and Y = 380,028.3; thence Northeasterly in a straight line to a point having Lambert Plane Coordinates of X = 1,246,626 and Y = 380,401; thence Northeasterly along an arc having a radius of 18,240.60 feet and a vertex at X = 1,243,670 and Y = 398,400 to a point having Lambert Plane Coordinates of X = 1,247,120 and Y = 380,489; thence Northeasterly in a straight line to a point having Lambert Plane Coordinates of X = 1,251,250.256 and Y = 381,283.91; thence North to the point of beginning, estimated to contain approximately 11.30 acres, as shown outlined in red on a plat on file in the Office of the Secretary, Department of Natural Resources. All bearings are based on Louisiana Lambert Plane Coordinate System (South Zone).

which submerged land is also shown on a plat attached to the resolution of the State Mineral Board authorizing the execution of this Validation Agreement dated December 21, 1981, both of which being attached and made part hereof.

Section II

Granting New State Lease No. F0002 on the Acreage Described Above

1. The State Mineral Board acting for and on behalf of the State of Louisiana, as Lessor, does hereby lease, let and grant exclusively unto Lessee, Lessee's successors and assigns, the property described in Section I above and shown on the plat referred to therein, for the purpose of exploring by any method, including but not limited to geophysical and geological exploration for formations or structures, and prospecting and drilling for oil, gas and other liquid or gaseous minerals except helium gas. In connection therewith Lessee shall have the right to use so much of the property as may be reasonably necessary for such operations, including but not limited to storing minerals and fluids in facilities or by means other than subsurface storage, laying pipelines, dredging canals, and building docks, tanks, power stations, telephone and electric transmission lines and other structures and facilities.

2. Since this lease covers only oil, gas and other liquid or gaseous minerals except helium gas, all references in this lease to any other minerals have been deleted or considered as having no force and effect. Furthermore, the royalty payable to Lessor under the terms of this lease on production from the acreage covered hereby shall be the same royalty fraction provided in said OCS lease and is hereinafter stipulated in Article 6 of this lease.

3. The primary term of said OCS lease has long since expired and, therefore, all references in this lease to the primary term and for maintenance of this lease in relation thereto by delay rental or deferred development payments have been deleted or considered as having no force and effect.

4.(a) This lease shall be for a term of one (1) year from and after the date of the aforesaid Stipulation dated June 5, 1981 or until June 5, 1982, and as long thereafter as oil, gas or any other liquid or gaseous mineral is produced hereunder in paying quantities or any operation is conducted, payment is made, or condition exists, which continues this lease in effect according to its terms.

~~STATE OF LOUISIANA~~

PARISH OF EAST BATON ROUGE

~~State Lease No.~~ ______

~~Louisiana State Lease Form Revised, 1975~~ with Approved Rider Attached.

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas, and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received and duly opened in the City of Baton Rouge, Parish of East Baton Rouge, State of Louisiana on the ________ day of ________________________, 19________, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of ______________________________

whose mailing address is ______________________________

(hereinafter referred to as "Lessee") as being the most advantageous to the State of Louisiana:

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana (hereinafter referred to as "the Board"), acting under authority of said Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, and acting for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let, and grant exclusively unto the said Lessee, and Lessee's successors and assigns, the below described property for the purpose of exploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining, and producing sulphur, potash, oil, gas, and any other liquid or gaseous hydrocarbon minerals. In connection therewith Lessee shall have the right to use so much of the property as may be reasonably necessary for such operations, including but not limited to: storing minerals and fluids in facilities or by means other than subsurface storage; laying pipelines; dredging canals; and building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines, houses for employees and other structures and facilities. The leased property, situated in the Parish of ______________________________, State of Louisiana, is more fully described as follows:

To the extent such permit is required there is included in the rights herein granted a permit to conduct geophysical and geological work on the leased premises, and when shot points are used, such work shall be done under all applicable rules, regulations, and statutes in force at the time such work is conducted.

1. Lessee has this day paid to Lessor the sum of ______________________________ Dollars as the full and adequate consideration for every right granted hereunder and not as mere rental for a period.

2. Subject to the other provisions hereof this lease shall be for a term of ______________ years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation is conducted, payment is made, or condition exists, which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of that period shall pay or tender to the Lessor the sum of ______________________________ Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to the order of Register, State Land Office and delivered or mailed by registered mail to the Register on or before the rental paying date.

4. (a) If on any rental paying date actual drilling or mining operations are being conducted on or production in paying quantities is being obtained from the leased premises, no rental shall be due for the annual rental period then commencing; if actual drilling or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to commence or resume production, commence actual mining operations or actual drilling operations on the leased premises, or make the rental payment, and the commencement or resumption of production, commencement of such operations, or payment of rental within the ninety (90) day period shall have ~~the same effect as though resumed, commenced, or paid on or before the rental paying date~~.

(b) If at the expiration of said one (1) year term oil, gas or any other liquid or gaseous mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well, if a well be abandoned or production should cease within ninety (90) days prior to the expiration of the term) Lessee commences actual drilling, or reworking operations on the leased premises in an effort to make the premises produce any such minerals (or production is commenced or resumed during such ninety (90) day period), then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more

than ninety (90) days between cessation of operations and their recommencement whether on the same well or on different wells successively or so long as the production so commenced or resumed is obtained in paying quantities. If at any time or times after the expiration of the term production hereunder should for any reason cease or terminate, Lessee shall have the right at any time within ninety (90) days from cessation of production to resume production or actual drilling, or reworking operations in an effort to make the leased premises again produce any of such minerals, in which event this lease shall remain in force so long as such operations are continued as above provided. If as a result of any such operations, oil, gas, or any other liquid or gaseous mineral be found and produced or the production of any of them be restored, this lease shall continue in force so long as any of them is produced hereunder in paying quantities or this lease is otherwise being maintained as herein provided.

(c) This lease may be maintained in force by directional drilling operations (deviation from vertical), in which event actual drilling operations shall be considered to have commenced on the leased premises when the drill stem penetrates beneath the surface of the leased premises.

(d) Wherever used in this lease, "actual drilling operations" means actual drilling (commenced by spudding in) of a new well, or the good faith deepening, sidetracking, or the plugging back or attempted recompletion in a separate interval of an existing well (all such operations being commenced by actual downhole operations); and "reworking operations" means reconditioning, cleaning out, or otherwise attempting in good faith to establish, increase, or restore production in an existing well by downhole operations. Once commenced, any such operations shall be deemed to continue so long as they are conducted in good faith without lapse of more than ninety (90) days. Actual drilling operations or mining operations shall be deemed to terminate on the last day actual operations of any kind, such as drilling, testing, or installation of equipment are conducted in good faith for the purpose of attempting to discover minerals or to complete a well as a producer. Reworking operations shall be deemed to terminate on the last day such operations are conducted in good faith for the purpose of establishing, increasing, or restoring production.

5. The obligations set forth in this Article are applicable only to wells drilled on property which is not part of a pooled unit containing all or any portion of the leased property. Such property is hereinafter described in this Article as "adjoining property."

(a) If at any time during or after the primary term there is completed on adjoining property a well located within six hundred and sixty (660) feet of the leased premises (or within any spacing or pooling unit distance greater than 660 feet established by the Commissioner of Conservation) and such well produces oil, gas, or other liquid or gaseous minerals in paying quantities for twenty (20) days (which need not be consecutive) during any period of thirty (30) days, or produces its monthly allowable during such thirty (30) day period, rebuttable presumptions will arise: (1) that the leased premises are thereby being drained; (2) that the leased premises are not being reasonably protected from drainage by any well or wells on the leased premises or land pooled therewith; and (3) that an offsetting well on the leased premises would be economically feasible. If Lessee is the operator of or has a working interest in the adjoining property, Lessee will begin actual drilling operations for a well on the leased premises within ninety (90) days after the end of the above thirty (30) day period. In all other cases Lessee shall be required to begin such operations only within ninety (90) days after receipt of written notice from the Board of the expiration of the above thirty (30) day period. No offset well shall be necessary if, on or before the maturity date of the offset obligation or any deferred maturity date as hereinafter provided, any of the stated presumptions is rebutted or a unit for the well in question embracing all or part of the leased premises is formed by agreement with the Board or by order of the Commissioner of Conservation.

In lieu of commencing operations for an offset well as above provided, Lessee may, at Lessee's option, commence compensatory payments equal to the royalties herein provided, computed on one-half (½) of the oil, gas, or other liquid or gaseous minerals produced by the well in question on and after the date operations would have otherwise been commenced, value to be determined in accordance with the provisions of Article 6 of this lease. Such payments may be commenced on or before sixty (60) days after the date operations would otherwise have been commenced, but shall include any accrued compensatory payments. Thereafter, payments shall be due monthly in accordance with Article 6(i). Lessee shall not be in default in either commencing compensatory payments or in making further payments as above provided if despite due diligence Lessee is unable timely to obtain the production information on which such payments are to be based. In any such case, however, Lessee must on or before the due date of the payments, notify the Board in writing of Lessee's inability to make such payment, the reasons therefor, and Lessee's intent to make such payment at the earliest reasonable time. Compensatory payments may be continued, at Lessee's discretion, for not more than one year from the date on which offset operations would otherwise have been commenced. At the end of that time, or within 30 days from the end of any lesser period for which payments are made, Lessee shall comply with this offset obligation if the producing well continues to produce in paying quantities or to produce its allowable and the other conditions making this obligation operative are existent. The right to make compensatory payments is intended to permit Lessee to evaluate further the producing well, and the making of such payments shall not of itself be sufficient to maintain this lease in force and effect; however, the making of any such payments shall not prejudice Lessee's right to rebut any of the above enumerated presumptions.

(b) In addition to the specific offset drilling obligation above provided, Lessee agrees to drill any and all wells necessary to protect the leased premises from drainage of oil, gas, or other liquid or gaseous minerals by a well or wells on adjoining property or to take any other steps reasonably necessary to protect the leased premises against such drainage, including, but not limited to, obtaining the formation of appropriate drilling or production units. If Lessee is the operator of or has a working interest in any well on adjoining property Lessee shall be obligated to begin actual drilling operations for a well on the leased premises or to take such other steps as may be reasonably necessary to protect the leased premises within ninety (90) days from the time Lessee knows or reasonably should know that drainage is occurring. In all other cases Lessee shall be obligated to begin such operations or take such other steps only within ninety (90) days after receipt of written notice from the Board.

(c) In those instances in which notice is expressly required under paragraph (a) or (b), above, damages, if due, shall be computed only from the date on which notice is received or, if Lessee commences compensatory payments, the date on which such payments are discontinued. In those instances in which there is no requirement of notice under (a) or (b), above, damages, if due, shall be computed from the time Lessee knew or reasonably should have known drainage was occurring. Written notice containing a demand for performance shall be necessary as a prerequisite to any action for cancellation of the lease by Lessor for nonperformance of any obligations of Lessee to protect the leased premises against drainage.

6. Unless Lessor elects to take in kind all or any part of the portion due Lessor as royalty on minerals produced and saved hereunder, which option is hereby expressly reserved by Lessor pursuant to L.R.S. 30:127 A. and which is to be exercised by written notice by Lessor to Lessee at any time and from time to time while this lease is in effect and either prior or subsequent to acceptance by Lessor of royalties other than in kind, it being understood that nothing contained in this lease or in the rider attached hereto shall ever be interpreted as limiting or waiving said option, Lessee shall pay to Lessor as royalty:

(a) One-sixth (1/6) of the value, as hereinafter provided, of all oil, including condensate and other liquid minerals produced and saved or utilized by methods considered ordinary production methods at the time of production. The value of such oil shall not be less than the average price for oil of like grade and quality posted for the field in which this lease is situated. If there is no price posted for the field in which this lease is situated, the value of such oil shall be not less than the average of prices posted for oil of like grade and quality for the three fields nearest to the field in which this lease is situated for which such prices are posted. If Lessee enters into an oil sales contract which, at the time of execution, provides for a price equal to or in excess of the appropriate average price referred to in the two preceding sentences, the price payable under the terms of the contract at the time such oil is run shall be the value of such oil, even though the appropriate average changes during the life of the contract; however, any such contract must have been prudently negotiated under the circumstances existing at the time of execution. If Lessee is unable, after diligent effort, to sell such oil for a price equal to or in excess of the appropriate average price and Lessee consequently negotiates a contract to sell such oil to an independent party at a lesser price, the value of such oil for the duration of any such contract (but not in excess of one year) shall be the price received by Lessee under such contract.

Lessee shall not make any deduction whatsoever for the cost of any operation, process, facility, or other item considered to be a production function or facility at the time such oil is run. Without limiting the foregoing sentence and without regard to classification as production costs or otherwise, the following costs are not to be deducted from the value of production: (1) costs incurred for gathering or transporting production in the field; (2) costs incurred for handling, treating, separating, or in any way processing production to make it marketable by methods considered ordinary at the time such oil is run; and (3) the cost of storage on the lease or in the field. The performance of any producing function or any function mentioned in clauses (2) and (3) of the foregoing sentence at a commingled facility in or outside the field in which this lease is situated shall not make the cost of any such function deductible.

If Lessee delivers such oil at a point outside the field in which this lease is situated, Lessee may deduct from the value of such oil the actual costs of transportation from the field to the point of delivery by means of facilities belonging to an independent party. If such transportation is by means of facilities owned by one other than an independent party, Lessee may deduct the actual cost of such transportation, but only if such cost is no greater than the fair value of the services performed; if actual cost is greater than fair value, the fair value shall determine the amount deductible; however, if the facilities used are regulated as a common carrier by a state or federal regulatory agency, the authorized tariff chargeable for the services rendered and paid by Lessee shall be deemed the fair value of such services. If such transportation is by means of any facilities owned by Lessee, Lessee may deduct from the value of production a reasonable sum for such services, computed as follows: the amount deductible shall include only (1) the direct cost of operation and maintenance, including cost of labor, direct supervision, fuel, supplies, ordinary repairs, and ad valorem taxes; and (2) depreciation of the facility computed over the estimated life of the field.

If Lessee receives any compensation for any function or process for which Lessee is responsible to Lessor without right to deduct costs, including, but not limited to, (1) handling, gathering, or transporting such oil, or (2) treating or processing such oil by ordinary methods to make it marketable, the amount of such compensation shall be added to the value of such oil when computing royalties. If Lessee is deducting costs for any functions for which he is also receiving compensation, deductions may be made only to the extent that they are in excess of any such compensation.

(b) One-sixth (1/6) of the value as hereinafter provided, of all gas, except helium gas but including casinghead gas, produced and saved or utilized by methods considered as ordinary production methods at the time of production. When such gas is sold by Lessee to an independent party under an arms' length contract prudently negotiated under the facts and circumstances existing at the time of its execution, the value of such gas and of gas utilized by Lessee shall be the price received by Lessee for such gas under the contract. If the purchaser is not an independent party but the contract would have been considered prudently negotiated under the facts and circumstances existing at the time of its execution if made with an independent party, then the value of the gas shall be the price received by Lessee under the contract; if the contract would not have been considered prudently negotiated if made with an independent party, the value of such gas shall be its fair value at the time of production but not less than the average of the prices paid for gas of like kind and quality from the field from which such gas is being produced, or if no gas is being sold from that field, the average of prices paid for gas of like kind and quality in the three nearest fields in which gas of like kind and quality is being sold, all comparisons to be with contracts made in the same market (either interstate or intrastate) and for the sale of similar quantities of gas. In all other cases the value of such gas shall be the average stated in the last clause of the preceding sentence.

Except as expressly permitted herein, Lessee shall not make any deduction whatsoever for the cost of any operation, process, facility, or other item considered to be a producing function at the time such gas is produced. Without limiting the foregoing sentence and without regard to classification as production costs or otherwise, the following costs are not to be deducted from the value of production: (1) costs incurred for gathering or transporting production in the field; or (2) costs incurred for dehydrating, decontaminating, or in any way processing production to make it marketable by methods considered ordinary at the time such gas is produced. The performance of any producing function or any function mentioned in clause (2) of the foregoing sentence at a commingled facility in or outside the field in which this lease is situated shall not make the cost of any such function deductible. Without regard to classification as production costs or otherwise, Lessee may deduct costs incurred for compression of gas at a point in or adjacent to the field for insertion into a purchaser's line or into a line owned by Lessee or a carrier for transportation to a point of delivery outside the field.

If Lessee delivers such gas at a point outside the field in which this lease is situated, Lessee may deduct from the value of such gas a reasonable sum for transportation from the field to the point of delivery by means of facilities belonging to an independent party. not in excess of actual cost. If such transportation is by means of facilities owned by one other than an independent party, Lessee may deduct the actual cost of such transportation, but only if such cost is no greater than the fair value of the

services performed; if actual cost is greater than fair value, the fair value shall determine the amount to be deducted. If such transportation is by means of any facilities owned by Lessee, Lessee may deduct from the value of production a reasonable sum for such services, computed as follows: the amount deductible shall include only (1) the direct cost of operation and maintenance, including cost of labor, direct supervision, fuel, supplies, ordinary repairs, and ad valorem taxes; and (2) depreciation of the facility computed over the estimated life of the field.

If Lessee receives any compensation for any function or process for which Lessee is responsible to Lessor without right to deduct costs, including but not limited to, (1) gathering or transporting such gas or (2) dehydrating, decontaminating, or in any way processing production to make it marketable, the amount of such compensation shall be added to the value of such gas when computing royalties. If Lessee is deducting costs for any functions for which he is also receiving compensation, deductions may be made only to the extent they are in excess of any such compensation.

(c) In addition to the separation of condensate or other liquid hydrocarbons from gas by ordinary production methods (as to which Lessor shall receive royalties above provided and for which separation no charge may be made by Lessee), gas produced hereunder, including casinghead gas, may be processed in a gasoline or other extraction plant in or serving the field, and products may be recovered therefrom either directly by Lessee or under contracts executed by Lessee. If Lessee enters into a contract for the processing of gas with an independent party or parties under which such party or parties retain in kind a portion of the products recovered from or attributed to such gas as consideration for processing, Lessee shall pay the royalty provided for gas in paragraph 6(b) based on the value, as hereinafter determined, of Lessee's share of such products under such contract. In all other cases Lessee shall pay the royalty provided for gas in paragraph 6(b) based on the value, as hereinafter determined, of the total products recovered, after deducting therefrom the costs of processing as specified below.

The value of such products (or Lessee's share thereof) in the cases above provided shall be the price or prices received by Lessee if sold under a contract or contracts prudently negotiated under the facts and circumstances existing at the time of execution with an independent party or parties. If such products are not sold to an independent party but are sold under a contract which would have been considered prudently negotiated if executed with an independent party, the value of such products (or Lessee's share thereof) shall be the price or prices received by Lessee. If such products are not sold to an independent party under a prudently negotiated contract or are sold to one other than an independent party under a contract which would not have been considered prudently negotiated if executed with an independent party, the value of the products shall be their fair market value at the plant at the time sold. The value of any such products (or Lessee's share thereof) not sold under any contracts shall be the fair market value at the plant for such products, or if no products are being sold at the plant, the average of the market values for like products of the same grade and quality at the three nearest plants at which such products are being sold.

When the cost of processing is not met by retention by the processor of a share of the products or in any other case in which Lessee is to deduct from the value of such products the cost of processing, the charges shall be determined as follows. If the gas is processed by an independent party or parties under a contract prudently negotiated under the facts and circumstances existing at the time of execution, the charges deducted shall be those provided in such contract. In all other cases, including processing by those other than an independent party or parties and those in which Lessee itself or in conjunction with others owns the plant, the charges should be determined by contract between Lessee and Lessor. In the absence of such a contract the charges to be deducted shall include only the proportionate part of: (1) the direct cost of operating and maintaining the plant, computed annually, including cost of labor and on-site supervision, materials, supplies, and ordinary repairs; (2) plant fuel and shrinkage; (3) depreciation of the plant computed over the life or lives of the field or fields served by the plant, or by such other method as is agreed upon by Lessor and Lessee; and (4) ad valorem taxes.

In all of the cases provided for in this paragraph, Lessor shall be entitled to the royalty for gas provided in paragraph (b) of this Article based on the value of Lessee's share of the residue gas sold or otherwise disposed of after processing.

(d) If at any time or times (during or after the primary term) there is on the leased premises a well or wells capable of producing gas in paying quantities, which fact has been duly verified and confirmed in accordance with Lessor's requirements for proof thereof, but gas is not being used or marketed therefrom because of the lack of a reasonable market or marketing facilities or governmental restrictions and if this lease is not then being otherwise maintained by separate operations or production, this lease shall, nevertheless, remain in full force and effect for a period of ninety (90) days after cessation of such production or such operations or the shutting in of such well. If, on or before the expiration of the ninety (90) day period, production or operations shall not have been commenced or resumed, Lessee, in order to maintain the lease in force thereafter, shall commence semi-annual payments to the Lessor at the rate and in the manner provided hereinbelow and thereby maintain the lease in full force and effect during the periods covered by such payments; however, if the ninety (90) day period should expire during the first year of the primary term or during any year for which a rental has previously been paid, the initial payment hereunder shall not be required until the next anniversary date of the lease. The first payment, if made, shall be tendered on or before the expiration of the ninety (90) day period or the appropriate anniversary date, as the case may be, and shall maintain this lease for six (6) months, commencing from the expiration of the ninety (90) day period or the anniversary date. Subsequent payments shall be made at six (6) month intervals thereafter (herein referred to as "shut-in payment dates"). Unless additional payment periods are earned as hereinafter provided, Lessee's right to make such payments shall continue for six (6) semi-annual periods (the total of which is herein called "initial payment period"). Each semi-annual payment shall be at the rate of three dollars ($3.00) per acre for the number of acres then covered by this lease, but no payment shall be less than two hundred dollars ($200.00). Each payment shall maintain this lease in full force and effect for a period of six (6) months, and during each period for which a payment has been made, it shall be considered that gas is being produced hereunder for all purposes hereof, but especially under the provisions of Articles 2, 4, 7, and 9; however, if the provisions of this paragraph 6(d) are in conflict with those of any other articles hereof, the provisions of this paragraph shall be controlling.

If on any shut-in payment date, actual drilling or mining operations are being conducted on or actual production of oil, gas, or other mineral in paying quantities is being obtained from the leased premises, no shut-in payment shall be due until the next shut-in payment date; however, the running of the initial payment period shall not be suspended or interrupted, and the same shall be true of any extension of that period by additional shut-in periods earned as hereinafter provided.

The initial payment period may be extended in the following manner. Lessee may earn two (2) additional six (6) month shut-in payment periods beyond the initial payment period for each additional well drilled or completed after completion of the shut-in well on which the initial shut-in payment was made (whether such additional wells are dry holes, producers, or shut-in wells). To qualify as a well "completed" after the first shut-in well, the completion must be in another hole, and no more than one completion will be counted for each additional hole regardless of the number of sands in any such hole. The aggregate additional periods (hereinafter referred to as "additional periods") so earned shall not exceed a total of six (6). The first of any additional periods shall commence from the date on which the initial payment period would have expired and the initial payment period, thus extended, shall continue to run from that date, regardless whether Lessee is actually required to make any additional payments. The Board and Lessee may by mutual agreement provide for further six (6) month periods (hereinafter called "further periods") beyond the initial payment period and any extension thereof.

If the end of the initial payment period falls within the primary term of this lease and at a time when there is a remaining rental date which would permit Lessee to maintain this lease by payment of rentals, Lessee may commence or resume the payment of rentals on the next anniversary date of this lease or may maintain this lease by any other means permitted under paragraphs 4(a) and 4(c). If the end of the initial payment period or any extension thereof falls within the last year of the primary term, it shall be considered that production has ceased under the terms of paragraph 4(a), and no rental shall be due for the remainder of the primary term. If the end of the initial payment period, any extension thereof, or any further period falls on or after the expiration date of the primary term and there are no operations or actual production sufficient to maintain this lease under the provisions of paragraphs 4(b) and 4(c), this lease shall terminate.

The provisions of this paragraph shall be applicable to any well with a gas/oil ratio such that the Commissioner of Conservation will not permit its operation without use or sale of the gas.

Tender or acceptance of a shut-in payment or payments shall not free Lessee of any obligation to develop this lease as a prudent operator or to exercise diligent efforts to obtain a market for the gas so discovered.

(g) One-sixth (1/6) of any and all other liquid or gaseous minerals not specifically mentioned herein, said royalties to be delivered or paid as is the accepted custom in such matters.

(h) In all cases, Lessor's royalty shall be calculated and paid after deduction of all severance or production taxes.

(i) The first payment of royalty shall be made within 120 days following commencement of production from, or allocation of production to the leased premises, except that in the case of any production from or allocable to the leased premises, which has occurred prior to the date of but which is deemed to be covered by this lease, Lessee hereby agrees to pay Lessor's royalty on all such prior production within 120 days from the date of this lease. Thereafter, royalty on oil, including condensate or other liquid minerals produced and saved at the well by ordinary production methods shall be paid by the 25th of each month for production of the previous month; and royalty on gas, including liquids or other products extracted or processed from gas other than by ordinary production methods, and on other liquid or gaseous minerals not specifically mentioned shall be paid on or before the 25th day of the second month following that in which produced or extracted or processed. In the event any royalty payment is not correctly or timely made, the remedies provided by L.S.A.:R.S. 31:137 through 142 relative to notice, damages, interest, attorney fees, and dissolution shall be applicable.

(j) For all purposes of this Article 6 "independent party" means a company, firm, or other business unit which is not: (1) a direct part of Lessee's corporate or other business structure; (2) a wholly owned or actually controlled subsidiary corporation or other business unit of Lessee; (3) a parent corporation of Lessee; or (4) a wholly owned or actually controlled subsidiary of Lessee's parent corporation.

7. (a) Lessee may surrender all or any portion or portions of the leased premises at any time this lease is in effect and thereby be relieved of all obligations thereafter accruing under this lease as to the portions surrendered.

(b) In the event of cancellation or forfeiture of this lease Lessee may, nevertheless, retain hereunder forty (40) acres around each well capable of or producing oil and one hundred sixty (160) acres around each well producing gas and around each shut-in well capable of producing gas in paying quantities (including wells drilled under this lease by directional drilling). If any well is then being worked on or being drilled, Lessee shall have the right to complete such operations, and in the event any such operations result in completion of a well capable of producing oil or gas in paying quantities, Lessee may retain acreage around each such well as above provided. Retained acreage around any well shall form as near a square tract as is practical. If any acreage covered by this lease shall have been included in a unit established by the Commissioner of Conservation, or by conventional agreement, or if any such acreage shall have been assigned to a producing or shut-in well under statewide allowable orders of the Commissioner and such acreage is actually being drained by the well or would be drained by it if the well were produced, Lessee may retain all the acreage included in such unit or units or so assigned for allowable purposes.

8. It is further agreed and understood that the rights of Lessee may be assigned or transferred in whole or in part, but no transfer, whether in whole or in part, of the leased premises shall be valid unless such transfer or assignment be approved by the Board.

9. Lessee may, with the consent and approval of the Board, pool or combine the acreage covered by this lease (or any portion thereof) with any other property, lease, or leases (or portions thereof). Operations on or production of minerals from, or the existence of a shut-in gas well on, any portion of a unit, including units created by the Commissioner of Conservation or by conventional agreement, in which all or any part of the leased premises is embraced shall have the same effect under the terms of this lease as if it had occurred on the leased premises.

10. Should Lessee apply or give notice of intent to apply to the Commissioner of Conservation for the creation of any unit or units which would include all or any portion of the leased premises, Lessee shall furnish the Secretary of the Board with a copy of the notice or application, each accompanying unit plat, and all other attached information either at the time the application is filed with the Commissioner or at the time required by applicable orders or regulations of the Commissioner for furnishing such information to any parties entitled to receive it, whichever is earlier. If a unit or units including all or any part of the leased premises are created by order of the Commissioner, Lessee shall submit to the Board a survey plat of each unit or units so created.

11. Upon request by Lessor, Lessee shall furnish Lessor any or all of the following types of data relating to wells drilled on the leased premises or lands pooled therewith: (1) all wire line surveys in open or cased holes, including, but not limited to, all electrical and radio activity logs, porosity logs of all types, and directional surveys; (2) core descriptions of both sidewall samples and conventional cores; (3) drill stem and production test data; and (4) production data, current and cumulative, including oil, gas and water production, surface and subsurface pressures. Lessee shall also furnish Lessor with any other information and data requested by Lessor to keep Lessor fully informed that Lessee is complying with the provisions of this Lease in good faith, and developing and operating the leased premises as a reasonably prudent operator for the mutual benefit of Lessor and Lessee. Any information furnished by Lessee to Lessor or otherwise examined and studied by Lessor shall be retained in confidence. Nothing in this Article shall require that Lessee furnish or permit inspection of any interpretations of any of the types of data referred to above, and nothing herein shall be construed as requiring Lessee to secure any such data solely for the purposes of this Article. Lessor's representatives shall have access at all reasonable times to examine and inspect Lessee's records and operations pertaining to the leased premises or lands pooled therewith.

12. Lessee shall be obligated to plug and abandon all wells on the premises no longer necessary for operations or production on this lease, and to remove from the premises all structures and facilities serving said wells, all at Lessee's sole risk, cost and expense and subject to compliance with laws, rules and regulations. Lessee shall furnish bond as may be required at any time or times by Lessor, or such other security in lieu thereof as may be acceptable to Lessor, conditioned upon faithful performance of such obligations. In connection therewith, the right of Lessee to draw and remove casing from wells is recognized, provided such right is exercised by Lessee not later than one year after termination of this lease or portion thereof on which the well is located. If such right of salvage is not timely exercised, then the same shall be forfeited and said casing shall become the property of Lessor.

13. If at any time Lessee is maintaining this lease by actual drilling, reworking, or mining operations or by actual production and Lessee is prevented from continuing or resuming such operations or production by major storm, major flood, or other similar natural disaster or by a major accident such as a blowout, fire, or explosion and if Lessee cannot by reason of any such occurrence maintain this lease on any rental date by continuing any such operations or production or cannot maintain this lease beyond the primary term by continuing such operations or production, this lease shall not terminate and no rental shall be due so long as Lessee is so prevented from continuing or resuming such operations or production and is making diligent efforts to eliminate the effect of such occurrence.

14. If on the date of this lease all or any portion of the leased premises is included in a unit established by order of the Commissioner of Conservation, Lessee agrees to pay royalty on all oil, gas, and other minerals produced and saved or utilized and attributable to the leased premises from the date of such unit regardless whether all development and operating costs chargeable to the leased premises have been paid.

15. Notwithstanding any provisions to the contrary in this Lease or in the rider attached hereto, this Lease is granted and accepted without any warranty of title and without any recourse against Lessor whatsoever, either expressed or implied, it being expressly agreed that the Lessor shall not be required to return any payments received hereunder or be otherwise responsible to Lessee therefor.

THUS DONE, READ, ACCEPTED, AND SIGNED by the parties hereto in the presence of the respective undersigned witnesses, as of the __________ day of ______________________, A.D. 19____, which shall be the date of this lease for all purposes.

WITNESSES to the signature of Lessor:

______________________________ STATE MINERAL BOARD

______________________________ By: ______________________________
For the State of Louisiana, Lessor

WITNESSES to the signature of Lessee:

______________________________ ______________________________

______________________________ ______________________________

______________________________ ______________________________

______________________________ ______________________________
For Lessee

## ACKNOWLEDGMENT FOR STATE MINERAL BOARD

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

Before me, the undersigned authority, personally came and appeared ______________________________ ______________________________, who by me being first duly sworn, deposed and said:

That he is one of the witnesses to the execution of the foregoing instrument and that he saw ______________________________ sign said instrument as ______________________________ of the State Mineral Board for and on behalf of the State of Louisiana, in the presence of appearer and ______________________________, the other subscribing witness.

Sworn to and subscribed before me on this the __________ day of ____________________, 19____. ______________________________

______________________________
Notary Public

## ACKNOWLEDGMENT FOR CORPORATE LESSEE

STATE OF ______________________________
______________________ OF ______________________

Before me, the undersigned authority, personally came and appeared ______________________________ ______________________________, who by me being first duly sworn, deposed and said:

That he is one of the witnesses to the execution of the foregoing instrument and that he saw ______________________________ execute said instrument as ______________________________ of ______________________________ as the free act and deed of said corporation in the presence of appearer and ______________________________, the other subscribing witness.

______________________________

Sworn to and subscribed before me on this the __________ day of ____________________, 19____.

______________________________
Notary Public

## ACKNOWLEDGMENT FOR INDIVIDUAL LESSEE

STATE OF ______________________________
______________________ OF ______________________

Before me, the undersigned authority, personally came and appeared ______________________________ ______________________________, who by me being first duly sworn, deposed and said:

That he is one of the witnesses to the execution of the foregoing instrument and that he saw ______________________________ execute said instrument as his own free act and deed in the presence of appearer and of ______________________________ the other subscribing witness.

Sworn to and subscribed before me on this the __________ day of ____________________, 19____. ______________________________

______________________________
Notary Public

(Rev. 7/9/75)

# APPROVED RIDER FOR ATTACHMENT TO 1975 LOUISIANA STATE AND STATE AGENCY LEASE FORMS

1. **Marketing of Natural Gas**

For the purposes of this rider, the term "gas" shall include (i) gas well gas, (ii) gas cap gas produced after depletion of the oil column, and (iii) gas produced during the blow down period in a cycling or other secondary recovery project. These terms are to be construed as same are commonly understood in the oil and gas industry.

The parties hereto recognize and acknowledge that one of the essential considerations for Lessor entering into the oil, gas and mineral lease to which this rider is attached as a part thereof (herein referred to as the "Lease") is that if a well capable of producing gas in paying quantities is completed on the leased premises, or on lands pooled or unitized therewith, and is completed in a reservoir, or reservoirs, not previously committed to a gas sales contract, as permitted hereunder, such gas, insofar as attributable to the leased premises, shall be sold to an intrastate market, if such a market is available within a reasonable period of time as hereinafter provided. Therefore, in order to carry out the intentions of Lessor and Lessee in this regard, the parties hereto do hereby and by these presents agree that once a well capable of producing gas in paying quantities has been completed on the leased premises or on lands pooled or unitized therewith, the following agreements shall be thereafter effective:

(a) In the event such well is completed and qualified as a well capable of producing gas well gas, the Lease shall remain in force notwithstanding Paragraph 6(d) of the Lease without any shut-in payments being due from Lessee to Lessor for an initial period of eighteen (18) months after (a) such completion date, or (b) the effective date of pooling or unitization, as the case may be (herein called the "Initial Period"). During the Initial Period, Lessee agrees to make a diligent and good faith effort to obtain intrastate market for the gas and, if such a market can be obtained, to enter into a gas sales contract for the intrastate marketing of said gas upon the best terms that can be obtained, but on terms customary in the industry for such contracts; or in lieu of obtaining a new intrastate market, Lessee shall have the option to deliver such gas under existing intrastate contracts (including amendments thereto) or take the gas for its own intrastate use. If the gas is delivered under such an existing contract royalty shall be paid thereon as set forth in Paragraph 6(b) of the Lease except that for purposes of determining prudency of negotiations and value of such gas where applicable under Paragraph 6(b) it shall be considered that the contract was negotiated and executed on the date such delivery commenced. If the gas is taken by Lessee for its own intrastate use and royalty is due thereon, such royalty shall be based on the current market value of the gas when so used. It is further provided that if the initial intrastate contract is for a term of five (5) years or less, then if upon its termination, the well is still capable of producing gas in paying quantities, all of the provisions of this rider shall be applicable to the obtaining of a new market for the gas and the Initial Period shall be deemed to commence as of the expiration date of the first intrastate contract. In no event, however, shall Lessee be required to sell gas to an intrastate market on terms and conditions less favorable than those which could be negotiated for a sale to an interstate market. Among the conditions to be considered in making this determination are the price to be paid for the gas; the availability and the cost, direct or indirect, to Lessee of a pipeline outlet; length of contract; inclusion of any price escalation; adjustment for BTU content; renegotiation provisions; on-line processing rights and availability of facilities; and rate of take. If, however, at the end of the Initial Period Lessee shall not have commenced the delivery of the gas to an intrastate market or shall not have entered into a firm intrastate gas sales contract on the terms and conditions hereinabove set forth, but during such period has drilled, or has commenced operations for the drilling of, an additional well on the leased premises, or on lands pooled or unitized therewith, in an attempt to establish additional gas reserves, or additional producibility, then Lessee, at its option, shall be entitled to an additional six (6) months period (herein called the "Second Period"), commencing at the end of the Initial Period, within which to seek an intrastate market for such gas on the basis above set forth. In the event Lessee elects to obtain the Second Period, he shall prior to the end of the Initial Period so inform Lessor to that effect in writing and shall identify the additional well drilled or commenced during the Initial Period. During the Second Period the Lease shall remain in effect without any shut-in payment being due by Lessee to Lessor.

(b) As to gas cap gas (i. e. gas which cannot be produced until such time as the oil phase of the reservoir is depleted) and as to gas produced during the blow down period in a cycling or secondary recovery project, the provision of subparagraph (a) above shall be applicable, except (i) the Initial Period defined in subparagraph (a) above shall not commence until the date on which such gas cap gas or blow down gas is available for production and marketing, and (ii) the Second Period defined in subparagraph (a) above shall not be effective as to any gas covered by this subparagraph (b).

(c) Lessor and Lessee further agree that if within ninety (90) days after the commencement of the Initial Period, as defined in subparagraph (a) above, Lessee has not obtained an intrastate market for said gas after a diligent effort to obtain same and Lessee has the opportunity pursuant to Federal Power Commission Orders Nos. 418, 431 and 431-A, or any future similar orders, to sell gas to an interstate market under short term emergency sale contracts with pregranted abandonment, it shall, upon being granted said authorization and pregranted abandonment by the Federal Power Commission, have the right to sell said gas to said interstate market provided that the term of any such emergency sale contract shall not exceed the term of the Initial Period and the Second Period, if applicable.

(d) If at the end of the Initial Period or the Second Period, as the case may be, Lessee has provided for the intrastate marketing of said gas, but Lessee has not been able physically to commence delivery of gas to the market, then Lessee shall have an additional free period of six (6) months to permit installation of the necessary marketing equipment and facilities and to commence deliveries under that contract without any shut-in payment being due by Lessee to Lessor. If, at the end of the free period of six months provided for in the preceding sentence, deliveries have not commenced despite Lessee's good faith efforts to connect to the available market and if the Lease is not otherwise being maintained, Lessee may maintain the Lease by making shut-in gas payments as provided for in Paragraph 6(d) thereof, and it shall be considered that the well with respect to which such payments are to be made was shut in as of the end of the said additional free period.

(e) If at the end of the Initial Period or the Second Period identified above, as the case may be, Lessee has not provided for the intrastate marketing of said gas as set forth herein, and Lessor and Lessee have not mutually agreed to extend the period during which an intrastate market for said gas may be sought, Lessee shall be free to market said gas in interstate commerce. In addition, if at that time the Lease is not being otherwise maintained by separate operations or production as set forth in Paragraph 6(d) thereof, and Lessee desires to maintain the Lease by making shut-in gas well payments as provided for in said Paragraph 6(d), it shall be considered that the well with respect to which such payments are to be made was shut-in as of the end of the Initial Period or Second Period, as the case may be.

(f) Lessor shall have the right, but not the obligation, to assist Lessee in its attempts to secure an intrastate market for any gas discovered on or allocated to the leased premises, which shall include the submission through Lessor's efforts of offers from prospective purchasers; provided, however, that if Lessee shall have complied with its obligations as provided for herein to attempt to obtain an intrastate market, the decision of Lessee on the acceptance or rejection of such intrastate offers shall be final insofar as gas attributable to the interest of Lessee is concerned.

(g) Lessee shall make a full and complete disclosure to Lessor of its efforts to obtain an intrastate market, including information concerning the contacts made with prospective intrastate purchasers and the details of all interstate and intrastate offers made to Lessee as well as all contracts entered into under subparagraph 1(c) hereof. This information shall be furnished quarterly, beginning with the commencement of the Initial Period. All such information shall be kept strictly confidential by Lessor.

(h) Lessee shall not sell or commit to a contract any gas to be produced from or allocated to the leased premises unless said gas is to be produced from or allocated to a zone or zones, or their stratigraphic equivalent, which have been determined to be capable of producing gas in paying quantities on the effective date of such sale or commitment. Upon being presented reasonable justification for same, Lessor may elect to waive this restriction. It is further provided that the provisions of this rider and the time periods provided for herein shall relate separately to each such contract and to each different gas reserve as hereinafter defined. For the purposes of this rider each separate zone, or as the case may be, each separate pool or reservoir not committed under any prior gas contract shall be considered a "different gas reserve;" or if a prior contract committed all reserves to a specific depth or depths, "different gas reserves" shall be considered to be any discoveries below that specified depth or depths. In the event of the completion of a well in a different gas reserve, the Initial Period, as hereinabove defined, shall commence on the date a well is first completed in said different reserve or, as the case may be, when the gas is first ready for production and marketing.

(i) Lessor may waive any of the time periods provided for herein if it becomes satisfied that an intrastate gas market is not and will not be available, or if such waiver appears to be in the best interest of the State of Louisiana, and in connection therewith may enter into balancing agreements or similar agreements for placing other gas into an intrastate market under the terms of which Lessee may agree that the identical volume of gas produced from or allocated to the leased premises and sold by Lessee to an interstate market may subsequently be dedicated to or sold by Lessee to an intrastate market whether said gas is realized by Lessee out of subsequent production from or allocated to the leased premises or from other properties of Lessee.

(j) Lessee shall have the right to process the gas and sell the liquid components thereof as permitted by the Lease; provided, however, that if the gas has not previously been committed to an interstate market, no processing or other handling shall be utilized that will destroy the intrastate status of the gas.

## 2. Marketing of Oil and Other Liquid Minerals

(a) If either oil or other liquid hydrocarbon minerals is produced, in paying quantities, from the leased premises or on lands pooled or unitized therewith, such minerals, insofar as they are attributable to the leased premises, shall be sold by Lessee to an intrastate market for refining or processing in the State of Louisiana if such market is available within a reasonable period of time, as more fully set out herein below; or in lieu of obtaining a new intrastate market, Lessee may deliver such minerals under its existing intrastate contracts to be refined or processed in the State or to take the minerals for its own intrastate refining or processing. If Lessee does not elect to deliver such minerals under existing intrastate contracts or to take such minerals for its own intrastate uses, then for a period of ninety (90) days from the date of such production Lessee agrees to make a diligent and good faith effort to obtain an intrastate market for such minerals that will cause them to be refined or processed in the State of Louisiana, and, if such a market can be obtained, to enter into a contract for the sale of such minerals to an intrastate market upon the best terms that can be negotiated, but on terms customary in the industry for such contracts. In no event, however, shall Lessee be required to sell such minerals to an intrastate market at a price less favorable than that which could be negotiated for a sale of the minerals to an interstate market and in no event shall Lessor's royalty be based on less than the current market value of the minerals. If at the end of the ninety (90) day period Lessee has not been able to sell such minerals to an intrastate market in accordance with the provisions hereof, Lessee shall be free to market such minerals to any purchaser whether intrastate or interstate in character. If the minerals are taken by Lessee for its own use or are delivered under an existing intrastate contract and royalty is due thereon, such royalty shall be based on the current market value of the minerals when so used or delivered.

(b) If the ninety (90) day period becomes operative, then it will be considered as a period during which Lessee is producing minerals from the premises in paying quantities, which production will have the same effect as actual production would have on the lease.

(c) For the purpose of assessing the performance of Lessee of the obligations imposed by this Paragraph 2, the disclosure provisions of Paragraph 1(g) of this rider shall be applicable.

(d) The waiver provisions of Paragraph 1(i) of this rider shall be applicable to the terms and conditions contained in this Paragraph 2.

3. Deferred Development

Notwithstanding anything to the contrary herein contained, it is understood and agreed that in the event during the primary term of this Lease, or within one (1) year thereafter (if the Lease is then in force and effect), a portion of the property covered hereby is integrated and included or placed with other lands in a pooled or combined unit, whether by order of a governmental agency or by conventional contract, then unit drilling operations or unit reworking operations or unit production from a well situated on lands or property embraced in such unit or units (hereinafter collectively called "unitized operations"), shall serve to maintain this Lease in force and effect as to the entirety of the leased premises, subject however to the following express requirements in lieu of reasonable development of the "outside acreage," as hereinafter defined, which is not otherwise maintained under the terms of this Lease all as set out more completely hereinbelow in this Paragraph 3. If on the anniversary date of the Lease next ensuing after the commencement of unitized operations (or if the first date of unitized operations is less than 90 days prior to the anniversary date, then on the expiration of 90 days after such first date of unitized operations) the Lease is not being maintained under its terms by means other than unitized operations, the Lease shall terminate on said anniversary date (or at the end of said 90 day period as the case may be) as to all outside acreage unless on or before said anniversary date (or the end of said 90 day period, as the case may be) Lessee pays or tenders to Lessor, as a deferred development payment, a sum of money equal to one-half of the rate per acre of the cash bonus paid for the Lease multiplied by the number of acres then comprising the oustide acreage, which tender or payment shall maintain this Lease in effect as to such outside acreage not otherwise maintained under the terms of the Lease until the next ensuing anniversary date. By similar tender or payment of a deferred development payment on or before each succeeding anniversary date this Lease may so be maintained in force during the remainder of the primary term (if any) and for two years thereafter as to such outside acreage. After the expiration of the periods during which the Lease may be maintained by deferred development payments as above provided, if this Lease at any time is not being maintained in effect by other than unitized operations, it shall terminate as to all outside acreage not otherwise so maintained under the provisions of this Lease, provided that if a unit or units are created after the expiration of said periods the effect of which is to convert non-unitized operations as hereinafter defined, into unitized operations, it shall be regarded for all purposes of this Lease as though there had been on the effective date of such unit or units a cessation of production on the outside acreage. If at any time during the primary term of the Lease or within one year thereafter there is a cessation of all non-unitized operations as hereinafter defined, whether same occurs as the result of the actual cessation of such operations or as the result of non-unitized operations being converted into unitized operations, then Lessee, in lieu of resuming non-unitized operations as provided in this Lease, may elect to maintain the Lease in effect as to the outside acreage by tendering or paying a deferred development payment, computed as hereinabove provided, on the next ensuing anniversary date of this Lease (or within 90 days from the cessation of non-unitized operations if such cessation should occur less than 90 days prior to such anniversary date). If at any time during the second year after the primary term of the Lease, there is a cessation of non-unitized operations as hereinabove defined, whether same occurs as the result of the actual cessation of such operations or as the result of non-unitized operations being converted into unitized operations, then the entire Lease shall nevertheless remain in effect until the next ensuing anniversary date.

Nothing contained in this Paragraph 3 is intended to create nor shall have the effect of creating several or separate leases, or in any manner to extend, increase or limit the obligation of Lessee to protect the leased premises from drainage as stated in the Lease, or otherwise. If at any time, either during the primary term of the Lease or the limited extension of the Lease beyond its primary term as provided above in this Paragraph 3, as to the outside acreage not otherwise held under the terms hereof, Lessee prosecutes non-unit drilling operations or non-unit reworking operations or obtains non-unit production from the leased premises (hereinafter collectively called "non-unitized operations"), then the provisions of this paragraph shall not thereafter apply so long as said non-unitized operations shall continue.

The provisions of this Paragraph 3 shall also be applicable to a unitized shut-in gas well, but in this event, the annual deferred development payment shall be reduced by deducting therefrom the amount of shut-in gas well payments due, if any, during the same period under Paragraph 6 of the Lease which is applicable to the acreage on which the deferred development payment is applicable.

For purposes of this paragraph the following definitions shall apply:

(a) The term "anniversary date" shall mean the date of this Lease and the same date of each next ensuing year or years.

(b) The term "outside acreage" shall mean all of the leased premises, except any portion(s) thereof included in a unit or units on which unitized operations are being conducted.

3. Environmental Considerations

Lessee hereby agrees, as one of the obligations of this rider, that in exercising the rights granted it under the Lease, it will comply with and be subject to all applicable environmental laws and regulations validly adopted or issued by the State of Louisiana, or its agencies, or by the United States, or its agencies. Lessee further agrees that it will comply with all minimum water quality standards validly adopted by said governmental authorities with respect to oil pollution and noxious chemicals and waste being introduced into affected water areas. Further, in conducting all operations under this Lease requiring dredging, filling, or local navigation in order to explore, develop or exploit shallow-water areas, Lessee shall comply with the applicable requirements of the appropriate Louisiana state agency charged with the environmental management of said area. Finally, it is understood and agreed that on depletion of production or completion of operations under this Lease, the Lessee shall remove all structures which would impede commercial fishing and trawling, including, without limitation, all submerged materials, equipment or debris placed on the leased premises by or for the account of Lessee; and the affected water bottoms shall, to the extent reasonably possible of accomplishment, be returned or restored to a condition as nearly equivalent to that which existed before said operations were conducted and/or structures were constructed. Lessee further agrees that in exercising the rights granted it hereunder and in discharging the obligations undertaken in Paragraph 2 of this rider, involving issuance of advance certifications, permits or approvals, it will allow sufficient lead time in the planning of its activities to permit the affected regulatory agencies to make appropriate review of the proposed operations.

4. **Notice**

Except in the situations where specific time periods are established for performance, Lessee shall not be in default under the Lease with respect to the violation of any provision of this rider until 30 days after written notice of such violation is received from Lessor, and Lessee has not corrected or commenced to correct such violation.

5. **Conflict of Terms**

Unless specifically provided otherwise, in the event of a conflict between any provision of this rider and any of the provisions of the Lease, the provisions of this rider shall control.

6. **Severability**

In the event that this rider or any provision hereof is declared to be illegal or unconstitutional, its nullity shall in no way impair the validity of the Lease to which this rider is attached or of other portions of the rider not declared illegal or unconstitutional; provided that Lessee shall not directly or indirectly institute or cause to be instituted any action seeking to declare the nullity or the unenforceability of this rider or any part thereof.

RESOLUTION

On motion of Mrs. Abell, seconded by Mr. Moran, the following resolution was offered and adopted:

WHEREAS, at a special meeting of this Board on December 21, 1981, a Validation Committee of the State Mineral Board was designated to review all requests for validation (or recognition) of acreage gained by the State of Louisiana from existing "split leases" lying landward of the three (3) mile boundary line fixed by the United States Supreme Court in its Decree of June 16, 1975 and reaffirmed in a "Stipulation" and the Court's "Final Decree" entered June 22, 1981, in the case entitled United States of America v. State of Louisiana, having Docket No. 9, Original; and

WHEREAS, the Validation Committee has considered the requests and representations made by Lessees now holding existing "split leases" issued by the United States of America (OCS Lease) covering acreage lying landward of said boundary line set forth in the "Final Decree", and the Committee has reported its determination of whether that acreage should be added to an existing State lease by amendment or granted under a new State lease;

NOW THEREFORE, BE IT RESOLVED by the State Mineral Board for the State of Louisiana, that those validation requests numbered "2" through "17, inclusive, and "19" through "27", inclusive, as shown on the attached "Exhibit A", reflecting requests for validation of OCS "split leases" lying landward of the aforesaid boundary line are approved, and said leases are hereby validated, ratified and recognized, less and except any acreage previously validated, released, lapsed, expired or as to which Lessee is in default; and

BE IT FURTHER RESOLVED that pursuant to said "Stipulation" and "Final Decree", new leases shall be issued on those validation requests shown on "Exhibit A" and attached plats as numbers "2", "3", "5", "21", "23", and "27", to Lessees holding the respective OCS Leases, containing the approximate acreage shown under the column on "Exhibit A" entitled "Total Acreage". It is further provided that on request numbers "10" and "11", two new leases shall be issued to Shell Oil Company. The first new lease shall include tracts "II" and "III" from request number "10" (as shown on the attached plat number "10 and 11"), and all acreage from request number "11" (as shown on "Exhibit A" and the attached plat number "10 and 11" as "Tract IV"), forming one contiguous tract comprising said parcels. The second lease shall include only "Tract I" from request number "10", there being no adjoining state lease for inclusion therein by amendment and said tract being adjacent to previously released acreage.

All of the above new leases shall be issued on the current state oil, gas and mineral lease form (Louisiana State Lease Form Revised, 1975, with approved Rider), excluding all minerals other than oil, gas, and other liquid or gaseous hydrocarbons except helium, providing a one (1) year period from the date of the "Stipulation" within which to further maintain the lease and using the same royalty and other appropriate terms, if any, provided in the OCS Lease covering the submerged lands now owned by the State. A more accurate written description of the acreage within each lease shall be provided by attachment of an exhibit to the new lease form.

BE IT FURTHER RESOLVED that validation of requests shown on "Exhibit A" and the attached plats as numbers "4", "6", "7", "8", "9", "12", "13", "14", "15", "16", "17", "19", "20", "22", "24", "25" and "26", be implemented by an appropriate instrument amending the corresponding state lease identified in the column on "Exhibit A" entitled "Amend Existing State Lease". It is further hereby authorized, that the amendment of State Lease No. 1012 shall provide for payment of a 1/6 royalty (as provided by OCS 0694) on that portion of State Lease No. 1012 covered by acreage validated in request number "25" of "Exhibit A".

BE IT FURTHER RESOLVED that the request of Freeport Sulphur Company for validation of OCS Lease 0880 (salt), identified as number "18" on the attached "Exhibit A" and plat, is hereby approved, and said lease is validated, ratified and recognized. This validation shall be implemented by issuance of a new lease covering salt under the terms and conditions set forth in OCS Lease 0880, and providing a one (1) year period from the date of the "Stipulation" within which to further maintain the lease.

BE IT FURTHER RESOLVED that all of the above validations and ratifications, whether done by the issuance of a new lease or the amendment of an existing state lease, are

granted under the expressed representations by Lessee that the OCS Lease is in full force and effect, and that all money due the State or the United States of America has or will be fully accounted for and paid to the State of Louisiana. The right to audit any of the above leases or to demand additional payments is fully reserved.

BE IT FURTHER RESOLVED that either the Chairman or Vice Chairman of the State Mineral Board is hereby authorized to sign any of the above instruments on behalf of the Board to implement this Resolution which is effective as of this date.

CERTIFICATE

I hereby certify that the above is a true and correct copy of a Resolution adopted at a meeting of the State Mineral Board held in the City of Baton Rouge, Louisiana, on the 21st day of December, 1981, pursuant to due notice, at which meeting a quorum was present, and that said Resolution is duly entered in the Minute Book of said Board and is now in full force and effect.

James B. Curley, Secretary
State Mineral Board

Concurring and Approving:

Governor of the State of Louisiana

December 30, 1981
Date Signed
(Effective as of December 21, 1981)

Concurring:

Attorney General
of the State of Louisiana

December 29, 1981
Date Signed
(Effective as of December 21, 1981)

VALIDATION OF SPLIT LEASES

| LESSEE | AREA | BLOCK | OCS LEASE | ADJACENT STATE LEASE | PRIOR STATE ACREAGE | ACREAGE GAINED IN 1975 | TOTAL ACREAGE | VALIDATE YES/NO | NEW LEASE | AMEND EXISTI STATE LEAS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Chevron | West Cameron | 18 | | 4418 | 3220 | None | 3200 | No | | |
| 2. Texaco | West Cameron | 18 & 47 | 1435 | | None | 11.3 | 11.3 | Yes | X | |
| 3. Gulf | West Cameron | 20 | 0680 | | None | 126.17 | 126.17 | Yes | X | |
| 4. Chevron | West Cameron | 48 | 1351 | 3840 | 483.14 | .154 | 483.29 | Yes | | 3840 |
| 5. Chevron | West Cameron | 49 | 1439 | | None | 1588.59 | 1588.59 | Yes | X | |
| 6. Union/Amoco | Vermilion | 26 | 0297 | 872 | 210.10 | 143.89 | 353.99 | Yes | | 872 |
| 7. Union/Amoco | Vermilion | 27 W½ | 1329 | 3522 | 1246.46 | 90.81 | 1337.27 | Yes | | 3522 |
| 8. Shell | Eugene Island | 18 E½ | 0356 | 1536 | 2459.27 | None | 2459.27 | Yes | | 1536 |
| 9. Shell | Eugene Island | 18 W½ | 0359 | 1667 | 2001.94 | None | 2001.94 | Yes | | 1667 |
| 10. Shell | Eugene Island | 19 | 0794 | Former 4682 | 109.89 | 798.34 | | Yes | X | |
| 11. Shell | Eugene Island | 19 E½ | 1330 | Former 4681 | 189.89 | None | | Yes | X | |
| 12. Mobil | Ship Shoal | 63 | 057 A | 763 | 1491.22 | 80.89 | 1572.11 | Yes | | 763 |
| 13. Sonat et al / Mobil et al | Ship Shoal | 64 | 058 A | 764 | 1253.44 | 220.36 | 1473.80 | Yes | | 764 |
| 14. Exxon | Grand Isle | 16 | 024 | 799 | 2833.25 | 1181.82 | 4015.07 | Yes | | 799 |
| 15. Exxon | Grand Isle | 17 | 025 | 800 | 4.85 | 3070.56 | 3075.41 | Yes | | 800 |
| 16. Exxon | Grand Isle | 18 | 032 | 801 | None | 2154.74 | 2154.74 | Yes | | 801 |
| 17. Exxon | Grand Isle | 19 | 033 | 802 | None | 1234.08 | 1234.08 | Yes | | 802 |
| 18. Freeport | Grand Isle | 9 (Salt Lease) | 880 | | | 2500.00 | 2500.00 | Yes | X | |
| 19. Gulf/Exxon | West Delta | 22 E½ | 1364 | 4242 | 647.50 | 1.16 | 648.66 | Yes | | 4242 |
| 20. Gulf/Exxon | West Delta | 23 S½ | 1331 | 3978 | 1229.41 | 4.91 | 1234.32 | Yes | | 3978 |
| 21. Gulf/Amoco | West Delta | 35 & 36 | 2165 | | None | 132.10 | 132.10 | Yes | X | |
| 22. Shell | South Pass | 23 | 0349 | 1007 | 4989.77 | 10.20 | 4999.97 | Yes | | 1007 |
| 23. Shell | South Pass | 27 S½ | 0693 | Former 4683 | 255.06 | .10 | 255.16 | Yes | X | |
| 24. Shell | South Pass | 27 N½ | 0352 | 1011 | 2264.37 | 200.41 | 2464.78 | Yes | | 1011 |
| 25. Shell | South Pass | 28 S½ | 0694 | Former 4684 | 1.05 | None | 1.05 | Yes | | 1012 |
| 26. Shell | South Pass | 28 N½ | 0353 | 1012 | 962.41 | 856.75 | 1819.16 | Yes | | 1012 |
| 27. Mobil | Main Pass | 7 | 1366 | | None | 4.97 | 4.97 | Yes | X | |

Exhibit "A" (Identified with State Mineral Board Resolution of December 21, 1981)




WEST CAMERON AREA
LOUSIANA
SCALE: 1" = 1000'

# RESOLUTION

## LOUISIANA STATE MINERAL AND ENERGY BOARD

**Resolution #16-06-021**
**(DOCKET REVIEW COMMITTEE)**

On motion of ***Mr. Segura*** seconded by ***Mr. Cordaro***, the following Resolution was offered and adopted:

BE IT RESOLVED by the State Mineral and Energy Board that Docket Item No. 1 from the June 8, 2016 Meeting be approved subject to the approval of the Governor of Louisiana, said instrument being an Assignment from Chevron U.S.A. Inc. to Cox Oil Offshore, L.L.C., of all of Assignor's right, title and interest in and to State Lease Nos. 340, 3839, 3840, 3841, 4418 and F0002, Cameron and Iberia Parishes, Louisiana, with further particulars being stipulated in the instrument.

Cox Oil Offshore, L.L.C. is designated as the joint account Lessee (contact person) pursuant to State Mineral and Energy Board Resolution dated September 10, 1975.

This approval is expressly granted and accepted subject to certain conditions in the absence of which conditions approval of said instrument would not have been given as follows:

1) That all terms and conditions of the basic lease will be fulfilled, including but not limited to the full payment of rentals and royalties, regardless of the division of leasehold interests resulting from the instrument;

2) That failure to comply with the terms and conditions of the basic lease by the original lessee, or by any assignee, sublessor or sublessee, prior or subsequent hereto, shall not be deemed waived by the approval of said instrument by the State Mineral and Energy Board for the State of Louisiana, it being distinctly understood that the State Mineral and Energy Board for the State of Louisiana does not recognize said instrument as creating a novation, as regards any right or interest of the State or Board;

3) That in the event ownership of the basic mineral lease is or becomes vested in two or more lessees responsible to the lessor for compliance with indivisible obligations to maintain the lease, then said lessees shall designate in writing to the State Mineral and Energy Board the lessee representing the joint account of all lessees, who shall be accountable to the Board for discharge of indivisible obligations under the lease for all lessees or for release in lieu of compliance therewith, provided that in the event of failure of said lessees to comply with such condition, then the Board may withhold approval of and thereby deny validity to any pending or future assignment or transfer of an interest in the lease, and, provided further, that if any lessee should agree to release the lease or any segregated portion thereof in lieu of complying with an indivisible lease obligation to maintain the lease and no other lessee desires to assume and undertake the indivisible obligation, then all lessees agree to join in a release or to otherwise execute a similar release of their rights to lessor, relegating any nonsignatory lessee to such remedy, if any, as such party may have against the lessee or lessees, who may execute a release purporting to cover the entirety of the lease or of a segregated portion thereof;

4) That this approval is given merely for the purpose of validating the assignment or transfer under the provisions of R.S. 30:128, but by giving its approval, the Board does not recognize the validity of any other instrument referred to therein that has not also been considered and approved by the Board in its entirety nor of any descriptions nor adopt any of the terms and conditions in the assignment or transfer, including but not limited to any election to convert an overriding royalty interest to a working interest, and any such election shall not be effective until written notice thereof is given to the Board and assignment or transfer of such working interest in recordable form is docketed for approval and approved by the Board, and, furthermore, that this approval may not operate as the Board's approval of any sales contract, which may have been entered into by the parties to the assignment or transfer, inasmuch as the Board specifically reserves the right to take its royalty oil, gas and other minerals in kind;

5) That for purposes of recordation and notice, certified copies of this Resolution be attached to all docketed copies of the instrument approved hereby; and

6) That nothing herein shall be construed as approval for any assignment, sublease or transfer to or from any individual, partnership, corporation or other legal entity who has filed bankruptcy proceedings unless such status is specifically recognized in this resolution.

BE IT FURTHER RESOLVED that the Executive Officer is hereby authorized to reflect the approval of the State Mineral and Energy Board by affixing his signature to the aforesaid instrument.

CERTIFICATE

I hereby certify that the above is a true and correct copy of a Resolution adopted at a meeting of the State Mineral and Energy Board held in the City of Baton Rouge, Louisiana, on the 8th day of June, 2016, pursuant to due notice, at which meeting a quorum was present, and that said Resolution is duly entered in the Minute Book of said Board and is now in full force and effect.

[signature]
Victor M. Vaughn, Executive Officer
State Mineral and Energy Board

Approved as per Executive Order BJ 2008-10
Bobby Jindal, Governor

By: [signature]
Thomas L. Arnold, Jr.
Chairman, State Mineral Board

## ASSIGNMENT AND BILL OF SALE

THIS ASSIGNMENT AND BILL OF SALE (this "**Assignment**") dated April 15, 2016, but effective from and after 7:00 a.m. Central Time Zone, on August 1, 2015 (the "**Effective Date**"), is by and between Chevron U.S.A. Inc., a Pennsylvania corporation, with a mailing address of 1400 Smith Street, Houston, Texas 77002 (collectively referred to as "**Assignor**"), and Cox Oil Offshore, L.L.C., a Louisiana limited liability company, with a mailing address of 4514 Cole Avenue, Suite 1175, Dallas, Texas 75205 ("**Assignee**"). Assignor and Assignee may sometimes be referred to in this Assignment individually as a "Party" or collectively as the "**Parties**".

WITNESSETH:

### 1. CONVEYANCE.

For and in consideration of the sum of One Hundred and No/100 dollars ($100.00), cash in hand paid, and other valuable consideration, including the assumption by Assignee of certain obligations and liabilities described in that certain Asset Sale and Purchase Agreement dated effective August 1, 2015, by and between Assignor, et al, as Seller, and Assignee, as Buyer (the "**Asset Sale and Purchase Agreement**"), the receipt and sufficiency of which are hereby acknowledged, Assignor, subject to said unrecorded Asset Sale and Purchase Agreement (which Asset Sale and Purchase Agreement is made a part of, and incorporated herein, by reference for all purposes and any capitalized terms used but not defined herein shall have the meaning given to such term in the Asset Sale and Purchase Agreement), does hereby sell, transfer, assign, convey, set over and deliver unto Assignee without warranty of any kind, express or implied, except as otherwise provided herein, and subject to the terms hereof, all of Assignor's rights, title and interests in and to the following (collectively, the "**Assets**"):

1.1 All oil and gas leases and any other rights to Hydrocarbons as set forth in Exhibit A – List of Assets, including, if applicable, all renewals and extensions of those documents and all documents issued in substitution therefor (collectively, the "**Leases**").

1.2 Any active or inactive Hydrocarbons wells, salt water disposal wells, injection wells and other wells and wellbores, together with the wellheads and well equipment located on any of the Leases, Units or within any of the Areas or covered by the Contracts, whether or not they are producing, suspended, shut-in, abandoned or plugged, to which Assignor has right, title and interest as of the Effective Date (collectively, the "**Wells**").

1.3 All physical assets located on or in the Areas, rights of way or covered by a Contract and used or previously used for production, mechanical separation, handling, gathering, processing, storage, treatment, sale, disposal or other operations relating to Hydrocarbons (collectively, the "**Facilities**"), including all of the following:

(A) All buildings, structures, facilities, and foundations.

(B) All platforms, gathering lines, gas lines, water lines, flowlines, and production and storage facilities.

(C) All equipment, machinery, fixtures, materials, and improvements.

(D) Pipeline laterals, to the extent located on any of the Leases or within any of the Areas as a lease term pipeline or serving the Assets as a gathering line under a distinct right of way.

(E) Any additional items owned or leased by Assignor, whether located within or beyond the Areas that are identified as Facilities in Exhibit A – List of Assets.

1.4 Any unitization, pooling, communitization agreements, declarations, designations or orders relating to the Leases, and all of Assignor's interest in and to the properties covered or units created thereby, to the extent attributable to the Leases (collectively, the "**Units**").

1.5 All substances (including petroleum, natural gas, and condensate) and every other mineral or substance for which the Leases grant the right to explore, develop, or produce (collectively, the "**Hydrocarbons**"), produced and severed from, or allocable, after severance, to the Areas, Leases, Units, and Wells on and after the Effective Date.

1.6 All contracts, agreements and documents pertaining to the Assets being sold under the Asset Sale and Purchase Agreement, including rights-of-way, easements, servitudes, surface leases, subsurface use agreements, JOAs, platform and pipeline connection agreements, processing agreements, division orders, farm-in and farm-out agreements, participation, exploration and development agreements, joint development agreements, area of mutual interest agreements, disposal or injection contracts, transportation agreements, platform use and platform sharing agreements, production handling agreements, gas gathering agreements, supply contracts and other agreements of any kind or nature, whether recorded or not, including those described on Exhibit A – List of Assets but excluding Leases (collectively, the "**Contracts**").

1.7 All of the following records (in written or electronic form) related to or regarding the Assets that are assembled or created in the normal course of business (collectively, the "**Records**"):

(A) Copies of files, records, documentation, and data in possession of Assignor or its Affiliates that specifically relate to Assignor's ownership or rights in or describe the Assets, including any correspondence, information, and reports (including petroleum engineering, reservoir engineering, non-proprietary geological, drilling, and other kinds of technical data and samples, uninterrupted well-logs, and analyses in whatever form), lease files, land files, well files, division order files, title opinions, and abstracts.

(B) Any non-Privileged environmental assessments or data, safety records, governmental filings, production reports, production logs, core materials, and core sample reports and maps related to the Assets.

(C) The SEMS documents listed in this subsection for each Assignor-Operated Asset covering the period prior to the Effective Date as required for retention of SEMS documents under Applicable Law through the date that Assignor and Assignee receive notice of the BOEM's approval of Assignee as the Operator of each such Assignor-Operated Asset. The SEMS documents comprise facility-level hazard analyses, job safety analyses, ordinary, routine maintenance records for critical equipment, documentation of management of change events, summary results of the latest mechanical integrity testing for and inspection of critical equipment, SEMS audit reports and any other similar documents as agreed by the Parties.

(D) The term "**Records**" does not include any of the following:

(1) Assignor's own set of any Records provided to Assignee.

(2) Any files, records, documentation or data that (a) Assignor Parties may not sell, transfer, disclose or otherwise dispose of due to Applicable Law, contractual confidentiality obligations or any other contractual obligations by which they are bound; or (b) which cannot be provided to Assignee because such transfer is prohibited by the agreement under which they were acquired.

(3) Any corporate, financial, legal, Privileged or income and franchise tax records of Assignor.

(4) Except for SCADA, operating procedures or operating manuals of Assignor and other SEMS related documents, or portions thereof, that Assignor, in its sole discretion, deems proprietary or confidential.

(5) Internal proprietary interpretative data and samples, including cores and core samples.

(6) Engineering forecasts and evaluations, including reserve estimates and production forecasts.

(7) Interpretations of Assignor's geologic or geophysical data of any kind.

(8) Any documentation relating to the sale or proposed sale of the Assets, including proposals received from Third Parties and records of negotiations with and economic analyses associated therewith.

(9) Any files, records, documentation or data that have been archived or managed pursuant to Assignor's record management policies.

1.8 Any over-production or under-production with respect to Hydrocarbons produced from or allocated to the Leases, Wells, Facilities or Units, where, as of the Effective Date, Assignor is out of balance with any of the following (collectively, the "**Production Imbalances**"):

(A) The Operator.

(B) Third Parties who own Working Interest in Leases, Wells or Units.

(C) Third Parties pursuant to a production handling agreement.

1.9 The Information Technology Equipment which is used to operate, maintain or account for the Assets, including the Information Technology Equipment set forth on Schedule 3.3 to the Asset Sale and Purchase Agreement (collectively, the "**Included Information Technology Equipment**"), save and except for the Excluded Information Technology Equipment.

1.10 All permits, authorizations, rights of way, licenses, or other rights attributed to or associated with the operation and ownership of the Assets, to the extent transferable (collectively, the "**Permits**").

## 2. EXCLUSIONS AND RESERVATIONS

2.1 Specifically excepted and reserved from this Assignment are the items listed as "**Excluded Assets**" in Exhibit B – Excluded Assets.

TO HAVE AND TO HOLD the Assets unto Assignee, its successors and assigns forever, subject to the terms, conditions and reservations set forth herein, in the Leases, the Contracts, and in the Asset Sale and Purchase Agreement. Assignor does hereby warrant title to each Asset conveyed by it hereunder unto Assignee, as to Assignor's own acts, and the acts of those lawfully claiming by, through and under Assignor, but not otherwise.

## 3. ASSET SALE AND PURCHASE AGREEMENT

3.1 The Asset Sale and Purchase Agreement is binding on and inures for the benefit of the rightful successors and permitted assigns of the Parties, as set forth in Section 4.1. The Asset Sale and Purchase Agreement contains certain representations, warranties, covenants and agreements between the Parties which shall survive the delivery of this Assignment, as provided therein.

## 4. SUCCESSORS AND ASSIGNS

4.1 It is the intent and effect of this Assignment that the conveyance, transfer or assignment of any Assets by Assignee or any future conveyances, transfers or assignments made by Assignee shall not in any way diminish, compromise, extinguish, or effect a release of Assignor's rights against, or obligations to, Assignee, or Assignee's rights against, or obligations to, Assignor in each case under the Asset Sale and Purchase Agreement. Assignee and Assignor shall remain responsible to the other Party for all obligations, indemnities and liabilities due to such Party under the Asset Sale and Purchase Agreement, unless and until expressly released by such other Party or as otherwise provided for under the Asset Sale and Purchase Agreement. The obligations and responsibilities of Assignee and Assignor shall run with the land and the Assets assigned, conveyed, transferred, or subleased, such that all subsequent assignees, grantees, transferees, and sublessees also accept and assume the same obligations to the non-assigning Party to the extent of the interest assigned, conveyed, transferred, or subleased, without the assigning Party or any subsequent assignees, grantees, transferees, or sublessee being released of any of its or their obligations to the non-assigning Party. Such obligations shall include those obligations set forth in Sections 15.2(D), 15.2(E), and 15.2(H) and their corresponding indemnification obligations in Section 15.4(A), and 15.3, 15.8, and 18 in the Asset Sale and Purchase Agreement. Assignee shall cause all its successors and assignees, and subsequent purchasers or transferees of the Assets to expressly acknowledge and solidarily assume those obligations set forth in Sections 15.2(D), 15.2(E) and 15.2(H) and their corresponding indemnification obligations in Section 15.4(A), and 15.3, 15.8, and 18 in the Asset Sale and Purchase Agreement as it relates to the Asset assigned or transferred. Any conveyance, transfer or assignment of all or a partial interest in any of the Assets by Assignee, its successors or assigns, in which the grantee, transferee or assignee fails to expressly solidarily assume the obligations set

forth in Sections 15.2(D), 15.2(E) and 15.2(H) and their corresponding indemnification obligations in Section 15.4(A), and 15.3, 15.8, and 18 in the Asset Sale and Purchase Agreement with respect to the Asset assigned or transferred, will be deemed null and void.

## 5. DISCLOSURE AND ACKNOWLEDGMENT

5.1 **Assignee acknowledges that (A) the Assets being conveyed have or may have been used in connection with oil and gas exploration, drilling and producing operations, pipeline, transportation or gathering operations, and other related oilfield operations, including, possibly the injection, storage or disposal of produced water or waste materials incidental to or occurring in connection with such operations, (B) the Assets may contain Hazardous Materials, including naturally occurring radioactive materials, asbestos and other hazardous substances arising from or relating to these operations, (C) that physical changes in the land, groundwater or subsurface may have occurred as a result of any such uses and that, subject to the provisions of the Asset Sale and Purchase Agreement, Assignee has entered into this Assignment on the basis of Assignee's own investigation of, or right to investigate, the physical condition of the Assets, including, without limitation, the Facilities, and the surface and subsurface conditions and (D) other than those representations and warranties expressly set out in the Asset Sale and Purchase Agreement and this Assignment, Assignor has not made, and Assignor hereby disclaims, any representation or warranty, whether express, statutory, implied, in fact, or by law, including with respect to the nature, quality, merchantability, fitness for any particular purpose or condition of any of the Assets. Pursuant and subject to the terms of the Asset Sale and Purchase Agreement, Assignee is acquiring the Assets precisely and only in an "AS IS, WHERE IS" condition and with all faults and assumes the risk that adverse physical conditions, including, but not limited to, the presence of unknown abandoned or unproductive oil wells, gas wells, equipment, flowlines, pipelines, water wells, injection wells and sumps which may or may not have been revealed by Assignee's investigation, are located thereon or therein, and whether discovered, discoverable, hidden, known or unknown to Assignee as of Closing and Assignee waives any right to restitution or other diminution in the purchase price on account of redhibitory defects. As more fully provided in the Asset Sale and Purchase Agreement, Assignee has assumed and Assignor has retained certain obligations attributable to the Assets and Assignor and Assignee each have agreed to indemnify, defend, release and hold the other Party harmless with respect to such obligations as provided in the Asset Sale and Purchase Agreement. The terms and provisions of the Asset Sale and Purchase Agreement which provide for the retention of obligations by Assignor and the assumption of obligations by Assignee together with the corresponding obligations of each Party to indemnify, defend, release and hold harmless the other Party are incorporated into this Assignment, as if set forth in full herein.**

## 6. ASSUMPTION OF OBLIGATIONS

6.1 Subject to the terms of the Asset Sale and Purchase Agreement, Assignee assumes all covenants, terms, and provisions, express or implied, contained in the Leases and Contracts described in Exhibit A – List of Assets, and this Assignment is made expressly subject to all easements, permits, commingling authorizations and other contracts and

agreements relating to the Assets, whether or not the same are herein specifically identified. Subject to the terms contained in the Asset Sale and Purchase Agreement, effective upon Closing, Assignee shall assume and be responsible for all obligations and liabilities of Assignor accruing under such agreements after the Effective Date and each Party agrees to execute any instrument or document reasonably required by the other Party to evidence such assumption.

**7. ENTIRE AGREEMENT**

7.1 This Assignment along with the Asset Sale and Purchase Agreement, the other agreements contemplated by the Asset Sale and Purchase Agreement and any Bureau of Ocean Management or State of Louisiana forms of assignment constitute the entire understanding between Assignor and Assignee with regard to the subject matter hereof, superseding all prior statements, representations, discussions, agreements and understandings.

**8. CONFLICTS**

8.1 In case of any conflict between the terms and provisions of the Asset Sale and Purchase Agreement and the terms and provisions of this Assignment, the terms and provisions of the Asset Sale and Purchase Agreement shall prevail. Notwithstanding the foregoing, Third Parties may rely upon this Assignment for the description of the Assets conveyed.

**9. GOVERNING LAW**

9.1 This Assignment is governed by and interpreted under the laws of the State of Texas, without regard to its choice of law rules.

[*Signature Page Follows*]

**IN WITNESS WHEREOF,** this Assignment is executed by the parties hereto before the undersigned competent witnesses, as of the dates acknowledged below, but effective the first day of August 1, 2015, subject to approval by the Bureau of Ocean Energy Management or any other Government Entity having jurisdiction.

Witnesses:

[signature]

Printed Name: Ann E. Wacker

[signature]

Printed Name: Michael A. Lemen

**ASSIGNOR:**
Chevron U.S.A. Inc.

**Signature:** [signature]

**Name:** R. J. Kolb
**Title:** Assistant Secretary

Assignor's Address:
1400 Smith Street
Houston, Texas 77002

Witnesses:

[signature]

Printed Name: Ann E. Wacker

[signature]

Printed Name: Michael A. Lemen

**ASSIGNEE:**
Cox Oil Offshore, L.L.C.

**Signature:** [signature]

**Name:** Brad Cox
**Title:** Chairman

Assignee's Address:
4514 Cole Avenue, Ste 1175,
Dallas, Texas 75205

Approved subject to attached
Resolution dated June 8, 2016
By: [signature]
STATE MINERAL AND ENERGY BOARD

STATE OF TEXAS §
§
COUNTY OF HARRIS §

On this 15th day of April, 2016, before me and the two named competent witnesses appeared R. J. Kolb, to me, Notary, personally known, who being by me duly sworn did say that he is an Assistant Secretary of Chevron U.S.A. Inc., a Pennsylvania corporation and that said instrument was signed on behalf of said corporation, by authority of its Board of Directors, and said appearer acknowledged that he executed the same as the free act and deed of said corporation.

IN WITNESS WHEREOF, I have hereunto set my official hand and seal on the date hereinabove written.

Notary Public in and for the State of Texas

CHARLES F HOLMES
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
APRIL 6, 2018

STATE OF TEXAS §
§
COUNTY OF HARRIS §

On this 15th day of April, 2016, before me and the two named competent witnesses appeared Brad Cox, to me, Notary, personally known, who being by me duly sworn did say that he is the Chairman of Cox Oil Offshore, L.L.C, a Louisiana limited liability company, and that said instrument was signed in behalf of said limited liability company, by authority of its governing authorization, and said appearer acknowledged that he executed the same as the free act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my official hand and seal on the date hereinabove written.

Notary Public in and for the State of Texas

CHARLES F HOLMES
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
APRIL 6, 2018

# EXHIBIT A – LIST OF ASSETS

## MOUND POINT FIELD

**The ASSETS:**

**The AREAS and LEASE Summary:**

| Area/ Block Field | Lease | Description\Acreage | Depths | Record Title-Operating Rights-Working Interest | Net Revenue Interest |
|---|---|---|---|---|---|
| Mound Point | SL 340 | All property included within the surface boundary created for the 1450 acre drilling & production unit established by the Operc 2 Sand, Reservoir B Order No. 822-D-1 and Gyro zone, Reservoir B, as established by Order No. 822-F-1, LESS AND EXCEPT all productive reservoirs discovered in the LA SL 340 #114 Well, which included the Operc 8 Sand, the base of which is seen at 17,610' MD in the SL 340 #114 Well. | All | 25.78551% WI | 18.09028% (1) |
| Mound Point | SL 340 | Productive reservoirs discovered by the Mound Point #114 Well (API # 1770720148) , which includes the Operc 1, 2, and 3, which are a.k.a. the Operc 3,7, & 8 | N/A | 57.30113% WI | 40.20061% (1) |

The interests are owned by Chevron U.S.A. Inc.

(1) reflects CUSA's interest, less its proportionate share of the lease burdens [20% RI and 9.8432685% ORRI (effective 3/27/05 the #114 Well paid out increasing the Burton Successor Sublease ORRI to 9.8432685%. The Working Interest DOES NOT change, only the ORRI (99.94384% * 9.8432685% = 9.835054% which is the APO ORR burden on PRA009655). The BPO ORRI was 8.804628% (99.94384% * 8.804628% = 8.799683% which is the BPO ORRI burden on PRA009655).

**The LEASES:**

**OLS No. 049505:**

**Oil and Gas Lease,** dated effective February 7, 1936, from the State of Louisiana, as Lessor, to Wm T. Burton, Lessee, Louisiana State Lease 340, Mound Point Area, containing 144,636.820 acres, more or less, an original of which is on file in the Division of State Lands, Department of Natural Resources of the State of Louisiana, having been recorded in Conveyance Book 126 at Page 185 under Entry No. 49234 of the Conveyance Records of the Parish of Iberia and in Conveyance Book 124 at Page 615 under Entry No. 57878 of the Conveyance Records of the Parish of Vermilion, State of Louisiana.

**Sublease**, dated February 15, 1936, between Wm. T. Burton, as Assignor, to The Texas Company, as Assignee, covering Louisiana State Lease 340, as located in Vermilion, Iberia, St. Mary, and Terrebonne Parishes, Louisiana, and recorded in the Conveyance Records of Vermilion Parish in Conveyance Book 126 at Page 115 under Entry No 57936 and in Conveyance Records of Iberia Parish in Conveyance Book 126 at Page 188 under Entry No. 49235.

**Supplemental and Collateral Agreement**, dated February 15, 1936, between Wm. T. Burton, as First Party, and The Texas Company, as Second Party.

**Assignment of Overriding Royalty Interest**, dated February 18, 1936, between Wm. T. Burton, Assignor, and Win or Lose Corporation, Assignee.

**1943 Compromise Agreement and Partial Release**, dated November 18, 1943, between The State Mineral Board, The Texas Company, Wm. T. Burton, and Independent Oil & Gas Company, Inc.

**Letter Agreement Commencing Drilling Operations**, dated January 25, 1947, between The Texas Company and State Mineral Board.

**Global Settlement Agreement**, dated February 22, 1994, between The State of Louisiana, Texaco Inc., and The Louisiana Land and Exploration Company.

**Agreement By and Among the State of Louisiana and William B. Lawton Company, Inc., Et Al,** dated February 22, 1994, Lease Protection Agreement.

**Global Settlement Agreement.** This Lease is subject to that certain Global Settlement Agreement effective February 1, 1994 ("**Global Settlement**") by and among Texaco Inc. (predecessor to Seller), The Louisiana Land and Exploration Company and the State of Louisiana, including Attachment "C" of the Global Settlement. (QLS 157299)

**Mound Point Field & Lighthouse Point Field Sublease of Partial Interest State Lease No. 340**, dated effective May 1, 2000, between the J. R. Imber Estate, as Sublessors, and McMoRan Oil & Gas LLC, as Sublessee.

**Mound Point Field & Lighthouse Point Field Sublease of Partial Interest State Lease No. 340**, dated effective May 1, 2000, between James A. Hall & Assoc., Inc., as Sublessors, and McMoRan Oil & Gas LLC, as Sublessee, and as may have been amended.

**Mound Point Field & Lighthouse Point Field Sublease of Partial Interest State Lease No. 340**, dated effective May 1, 2000, between Amy Scott McKenzie, as Sublessor, and McMoRan Oil & Gas LLC, as Sublessee.

**Mound Point Field & Lighthouse Point Field Sublease of Partial Interest State Lease No. 340**, dated effective May 1, 2000, between Wilcox 1992 Acquisition Fund Ltd., as Sublessors, and McMoRan Oil & Gas LLC, as Sublessee, and as may have been amended.

**Mound Point Field & Lighthouse Point Field Sublease of Partial Interest State Lease No. 340**, dated effective May 1, 2000, between Emmett A. Vaughey Estate, as Sublessors, and McMoRan Oil & Gas LLC, as Sublessee, and as may have been amended.

**Mound Point Field & Lighthouse Point Field Sublease of Partial Interest State Lease No. 340**, dated effective May 1, 2000, between REH Family Ltd. and Raymond E. Hankamer, as Sublessors, and McMoRan Oil & Gas LLC, as Sublessee, and as may have been amended.

**Mound Point Field & Lighthouse Point Field Sublease of Partial Interest State Lease No. 340**, dated effective May 1, 2000, between William F. Hartnett Jr. and Lorrayne B. Harnett, as Sublessors, and McMoRan Oil & Gas LLC, as Sublessee, and as may have been amended.

**Mound Point Field & Lighthouse Point Field Sublease of Partial Interest State Lease No. 340**, dated effective May 1, 2000, between David C. Bintliff & Co. Inc., as Sublessors, and McMoRan Oil & Gas LLC, as Sublessee, and as may have been amended.

**Mound Point Field & Lighthouse Point Field Sublease of Partial Interest State Lease No. 340**, dated effective May 1, 2000, between Jack Lawton, Inc., Vermilion Exploration Company, William B. Lawton Company, Inc., and Tower Energy Co., Inc., as Sublessors, and McMoRan Oil & Gas LLC, as Sublessee, and as may have been amended.

**Mound Point Field & Lighthouse Point Field Sublease of Partial Interest State Lease No. 340**, dated effective May 1, 2000, between Pioneer Associates Limited Partnership, as Sublessors, and McMoRan Oil & Gas LLC, as Sublessee.

**Mound Point Field & Lighthouse Point Field Sublease of Partial Interest State Lease No. 340**, dated effective May 1, 2000, between Lainelife Associates, as Sublessors, and McMoRan Oil & Gas LLC, as Sublessee.

**Mound Point Field & Lighthouse Point Field Sublease of Partial Interest State Lease No. 340**, dated effective May 1, 2000, between Noe Properties, L.L.C., as Sublessors, and McMoRan Oil & Gas LLC, as Sublessee, and as may have been amended.

**Agreement (State Acreage Agreement),** dated effective February 13, 2002, between The State of Louisiana, The Louisiana Department of Natural Resources, The Louisiana State Mineral Board, McMoRan Oil & Gas LLC, and the Burton Successors.

**Agreement Respecting Unelected Reassignment Rights under the Lease Protection Agreement for State Lease No. 340 – Mound Point Field South Marsh Island Prospect and Lighthouse Point Field Southwest Marsh Island Prospect,** dated February 13, 2002, between The State of Louisiana, The Louisiana Department of Natural Resources, The Louisiana State Mineral Board, and McMoRan Oil & Gas LLC.

**Second Amendment and Ratification of Agreement,** dated effective February 13, 2002, between The State of Louisiana, The Louisiana Department of Natural Resources, The Louisiana State Mineral Board, and McMoRan Oil & Gas LLC.

**Third Amendment and Ratification of Agreement,** dated effective February 13, 2002, between The State of Louisiana, The Louisiana Department of Natural Resources, The Louisiana State Mineral Board, and McMoRan Oil & Gas LLC.

**Assignment and Conveyance,** dated effective April 15, 2002, between McMoRan Oil & Gas LLC, as Assignor, and Chevron U.S.A. Inc., as Assignee.

**Letter Agreement**, dated April 9, 2002, between McMoRan Exploration Company and CLK Company, LLC, regarding farmout to El Paso, SL 340 and OCS-310, Mound Point, Lighthouse Point, and JB Mountain Prospect.

**Mound Point and Lighthouse Point Lease Maintenance Agreement**, dated effective November 1, 2003, between El Paso Production Company, Noble Energy, Inc., Chevron U.S.A. Inc., McMoRan Oil & Gas LLC, and Gerald J. Ford.

**Assignment and Conveyance (Mound Point Prospect – Burton Successors Subleases)**, dated March 1, 2006, between Noble Energy, Inc., as Assignor, and Chevron U.S.A. Inc. and El Paso E & P Company, L.P., as Assignees, containing approximately 1,450.00 acres.

**Assignment of Overriding Royalty Interest**, dated effective March 1, 2006, between Chevron U.S.A. Inc., as Assignor, and H. G. Kuntz et al, as Assignees, assigning .043% of 8/8th overriding royalty interest.

**Assignment of Partial Interest in State Lease 340 – Mound Point Field**, dated effective September 23, 2007, between Chevron U.S.A. Inc., as Assignor, and McMoRan Oil & Gas LLC, as Assignee, containing approximately 1450 acres.

**Resolution/Legal and Title Controversy Committee**, dated August 13, 2008, whereby the Committee grants McMoRan Oil & Gas LLC an extension under the State Acreage Agreement until February 13, 2012.

**The CONTRACTS:**

**QLS No. 157515:**
**Compromise Agreement**, dated effective October 15, 1981, as amended, between Raymond Hankamer, et al, Plaintiffs-Appellants versus Texaco Inc., Defendants-Appellees.

**QLS No. 157299:**
**Global Settlement Agreement**, dated effective February 22, 1994, as amended, between The State of Louisiana, Texaco Inc., and The Louisiana Land and Exploration Company.

**QLS No. 046160:**
**Operating Agreement, State Lease 340, Mound Point Prospect**, dated effective October 1, 2000, as amended, between Texaco Exploration and Production Inc. and McMoRan Oil & Gas LLC.
**Preferential Right to Purchase – 30 Days**. *(Section 26.2).*

**QLS No. 155353:**
**State Lease Exploration Agreement (Mound Point and Lighthouse Point Fields)**, dated effective October 12, 2000, as amended, between Texaco Exploration and Production Inc. and McMoRan Oil & Gas LLC.

**QLS No. 155511:**
**Conservation Order No. 822-E, Rob L 10 Sand, Reservoir A, Mound Point Field**, dated effective October 31, 2000, granted to McMoRan Oil & Gas LLC.

**QLS No. 157194:**
**Conservation Order No. 822-D-1, OPERC 2 RA SUA, Mound Point Field**, as amended, dated effective October 22, 2002, granted to El Paso Production Company.

**QLS No. 157195:**
**Conservation Order No. 822-F-1, GYRO RA SUA, Mound Point Field**, as amended, dated effective October 22, 2002, granted to El Paso Production Company.

**QLS No. 161069:**
**State of Louisiana Pipeline Right-of-Way No. 4371**, dated July 1, 2003, between State of Louisiana and Chevron U.S.A. Inc., 8-5/8" OD bulk gas and condensate pipeline from MP SL 340 #114 Well to SMI 217 A Structure.

<u>**QLS No. 692361**</u>**:**
**Pipeline Right-of-Way OCS-G 25262, Segment #14215**, dated effective August 14, 2003, between Minerals Management Service to Chevron U.S.A. Inc., 8" bulk gas pipeline from SMI 213 to SMI 217 A.

<u>**QLS No. 693011**</u>**:**
**Production Handling Agreement**, dated effective September 1, 2003, as amended, between Chevron U.S.A. Inc., El Paso Production Company, Noble Energy, Inc., and Robert G. Pugh, MP SL 340 production through SMI 217 Tiger Shoal Facility. *Consent to assign.*

<u>**QLS No. 822608**</u>**:**
**Amine Processing Agreement**, dated effective November 1, 2004, between Chevron U.S.A. Inc., El Paso Production Company, Noble Energy, Inc., and Robert G. Pugh, MP SL 340 through SMI 217 Tiger Shoal Facility. *Consent to assign.*

**End of Exhibit A - MOUND POINT FIELD**

## WEST CAMERON 17 FIELD

**The ASSETS:**

**The AREAS and LEASE Summary:**

| Area/Block | Lease | Description/Acreage | Depths | Record Title-Working Interest | Net Revenue Interest* |
|---|---|---|---|---|---|
| WC 17 | SL 3839 | All of Lease, 2,460.89 acres | All | 100.00% WI | 83.3333%* |
| WC 17 | SL 3840 | All of Lease, 483.44 acres | All | 100.00% WI | 83.3333%* |
| WC 18 | SL 3841 | All of Lease, 1,000.00 acres | All | 100.00% WI | 83.3333%* |
| | | #5 Wellbore | NA | NA | 3.00% ORRI |
| WC 18 | SL 4418 | All of Lease, 2,525.749 acres | All | 100.00% WI | 83.3333%* |
| WC 18 | SL F0002 | All of Lease, 11.30 acres | All | 100.00% WI | 83.3333%* |

The interests are owned by Chevron U.S.A. Inc.
* reflects Chevron's interest, less its proportionate share of lease royalty burden.

**The LEASES:**

**QLS No. 074268:**
**Oil and Gas Lease, West Cameron Block 17**, dated April 23, 1962, from the State of Louisiana, as Lessor, to The California Oil Company, as Lessee, State Lease No. 3839, originally containing 2,455.00 acres, more or less.

**Notice of Merger**, dated effective August 12, 1965, between California Oil Company and Chevron Oil Company.

**Sublease**, dated effective January 1, 1980, between Chevron U.S.A. Inc. and SHV Energy Corporation.

**Amendment to Sublease**, dated effective January 1, 1980, between Chevron U.S.A. Inc. and SHV Energy Corporation.

**Notice of Merger**, dated effective February 2, 1986, between Gulf Oil Corporation and Chevron U.S.A. Inc.

**Assignment**, dated effective July 1, 1988, between SHV Energy Corp. and Kewanee Industries, Inc.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**Assignment**, dated effective October 1, 2002, between Kewanee Industries, Inc., as Assignor, and Chevron U.S.A. Inc., as Assignee.

**Force Majeure Lease Amendment**, dated July 12, 2006, between Chevron U.S.A. Inc., as Lessee, and The Louisiana State Mineral Board, as Lessor.

**QLS No. 074269:**

**Oil and Gas Lease, West Cameron Block 48**, dated April 23, 1962, from the State of Louisiana, as Lessor, to The California Oil Company, as Lessee, State Lease No. 3840, originally containing 470.00 acres, more or less.

**Notice of Merger**, dated effective August 12, 1965, between California Oil Company and Chevron Oil Company.

**Sublease**, dated effective January 1, 1980, between Chevron U.S.A. Inc. and SHV Energy Corporation.

**Amendment to Sublease**, dated effective January 1, 1980, between Chevron U.S.A. Inc. and SHV Energy Corporation.

**Notice of Merger**, dated effective February 2, 1986, between Gulf Oil Corporation and Chevron U.S.A. Inc.

**Assignment**, dated effective July 1, 1988, between SHV Energy Corp. and Kewanee Industries, Inc.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**Assignment**, dated effective October 1, 2002, between Kewanee Industries, Inc., as Assignor, and Chevron U.S.A. Inc., as Assignee.

**Force Majeure Lease Amendment**, dated July 12, 2006, between Chevron U.S.A. Inc., as Lessee, and The Louisiana State Mineral Board, as Lessor.

**QLS No. 109807:**
**Oil and Gas Lease, West Cameron Block 18**, dated April 23, 1962, from the State of Louisiana, as Lessor, to Ocean Drilling & Exploration Company, Oil and Gas Futures, Inc., North Central Oil Corporation, South Shore Oil & Development Company, Lujon Oil Company and Murphy Corporation, as Lessees, State Lease No. 3841, originally containing 1,000.00 acres, more or less.

**Assignment**, dated effective July 9, 1969, between Ocean Drilling & Exploration Company, as Assignor, and Stan Oil Co., as Assignee.

**Assignment**, dated effective July 1, 1978, between Kewanee Industries, Inc., as Assignor, and Gulf Oil Corporation, as Assignee.

**Notice of Merger**, dated effective February 2, 1986, between Gulf Oil Corporation and Chevron U.S.A. Inc.

**Assignment**, dated effective July 1, 1990, between American Production Partnership-V, LTD et al, as Grantors, and Chevron U.S.A. Inc., as Grantee.

**Assignment, Bill of Sale and Conveyance**, dated January 1, 1991, between Paramount Petroleum Co., Inc., as Grantor, and Chevron U.S.A. Inc., as Grantee.

**Assignment, Conveyance and Bill of Sale**, dated October 1, 1998, between Forcenergy Inc, as Assignor, and Chevron U.S.A. Inc., as Assignee.

**Assignment of Interest in Oil & Gas Well (#5)**, dated effective September 1, 1999, between Chevron U.S.A. Inc. and Kewanee Industries, Inc., as Assignors, and Walter Oil & Gas Corporation, as Assignee, limited to SL 3841 #5 Well.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**Force Majeure Lease Amendment**, dated July 12, 2006, between Chevron U.S.A. Inc., as Lessee, and The Louisiana State Mineral Board, as Lessor.

**Letter Agreement**, dated November 10, 2009, from Office of Mineral Resources to Chevron U.S.A. Inc., produce #1 well on lease basis.

**QLS No. 074940:**
**Oil and Gas Lease, West Cameron Block 18**, dated November 16, 1964, from the State of Louisiana, as Lessor, to The California Oil Company, as Lessee, State Lease No. 4418, originally containing 3,220.00 acres, more or less.

**Amendment to Sublease**, dated effective January 1, 1980, between Chevron U.S.A. Inc. and SHV Energy Corporation.

**Sublease**, dated effective January 1, 1980, between Chevron U.S.A. Inc. and SHV Energy Corporation.

**Notice of Merger**, dated effective February 2, 1986, between Gulf Oil Corporation and Chevron U.S.A. Inc.

**Assignment**, dated effective July 1, 1988, between SHV Energy Corp. and Kewanee Industries, Inc.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**Assignment**, dated effective October 1, 2002, between Kewanee Industries, Inc., as Assignor, and Chevron U.S.A. Inc., as Assignee.

**Force Majeure Lease Amendment**, dated July 12, 2006, between Chevron U.S.A. Inc., as Lessee, and The Louisiana State Mineral Board, as Lessor.

**Partial Release of SL 4418 (511.913 acres)**, dated December 4, 2006, between Chevron U.S.A. Inc. and Office of Mineral Resources.

**Partial Release of SL 4418 (210.036 acres)**, dated February 28, 2008, between Chevron U.S.A. Inc. and Office of Mineral Resources.

**QLS No. 107226:**
**Oil and Gas Lease, West Cameron Blocks 18/47**, dated April 1, 1966, from the United States of America, as Lessor, to Texaco, Inc., as Lessee, bearing Serial No. OCS-G 1435, covering Tract No. La. 1688, Portion in Zone 2, Official Leasing Map, Louisiana Map No. 1, originally containing 1,525.00 acres, more or less.

**Lease Validation Agreement, West Cameron 18**, dated June 5, 1981, between State Mineral Board and Texaco Inc., State Lease F0002, containing 11.30 acres, more or less.

**Assignment**, dated effective January 1, 1987, between Texaco Inc., as Assignor, and Chevron U.S.A. Inc., as Assignee.

**Global Settlement Agreement.** This Lease (State Lease F0002), is subject to that certain Global Settlement Agreement effective February 1, 1994 ("**Global Settlement**") by and among Texaco Inc. (predecessor to Seller), The Louisiana Land and Exploration Company and the State of Louisiana, including Attachment "C" of the Global Settlement. (QLS 157299)

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 040692:**
**Commercial Water Bottom Lease No. 522**, dated May 16, 2001, between State Land Office, as Lessor, and Chevron U.S.A. Inc., as Lessee.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**Letter Agreement**, dated April 3, 2006, extending Water Bottom Lease for an additional 5 year term from May 16, 2006 until May 16, 2011.

**Letter Agreement**, dated April 4, 2011, extending Water Bottom Lease for an additional 5 year term from May 16, 2011 until May 16, 2016.

**QLS No. 936544:**
**Surface Lease**, dated effective March 1, 2015, between Crain Lands LLC and Chevron U.S.A. Inc., 36.81 acres.

**The CONTRACTS:**

**QLS No. 115094:**
**Pipeline Right-of-Way Agreement No. 590**, dated effective March 29, 1965, between Pan American Petroleum Corporation and California Oil Company.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 000588:**
**Pipeline Right-of-Way Grant No. 588**, dated effective April 20, 1965, between Charles O. Noble et al and The California Company.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 000589:**
**Pipeline Right-of-Way Grant No. 589**, dated effective April 20, 1965, between Charles O. Noble et al and The California Company.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 112047:**
**Pipeline Right-of-Way Grant No. 504**, dated effective April 21, 1965, between the State of Louisiana and California Oil Company.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 115139:**
**Pipeline Right-of-Way Grant No. 505**, dated effective April 21, 1965, between the State of Louisiana and California Oil Company.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 000584:**
**Pipeline Right-of-Way Grant No. 584**, dated effective May 7, 1965, between the Cameron Parish School Board and California Oil Company.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 112046:**
**Pipeline Right-of-Way Grant No. 585**, dated effective May 7, 1965, between the Cameron Parish School Board and California Oil Company.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 112051:**
**Pipeline Right-of-Way Grant No. 733**, dated effective November 14, 1966, between the State of Louisiana and Chevron Oil Company.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 115140:**
**Pipeline Right-of-Way Grant No. 734**, dated effective November 14, 1966, between the State of Louisiana and Chevron Oil Company.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 000597:**
**Pipeline Right-of-Way Grant No. 735**, dated effective November 14, 1966, between the State of Louisiana and Chevron Oil Company.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 000598:**
**Pipeline Right-of-Way Grant No. 736**, dated effective November 14, 1966, between the State of Louisiana and Chevron Oil Company.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 000201:**
**Unit Agreement**, dated effective June 1, 1968, between State Mineral Board, United States Department of the Interior, Chevron Oil Company, as Unit Operator, and Texaco Inc. et al as working interest owners, as amended.

**QLS No. 035703:**
**Pipeline Right-of-Way Grant No. 981**, dated effective July 23, 1968, between the State of Louisiana and Michigan Wisconsin Pipe Line Company.

**Letter Agreement**, dated February 10, 1998, between Chevron U.S.A. Inc. and ANR Pipeline Company.

**Assignment of Right-of-Way**, dated effective October 14, 1998, between Michigan Wisconsin Pipeline NKA ANR Pipeline Company and Chevron U.S.A. Inc.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 607621/039153:**
**Electronic Gas Measurement Agreement**, dated October 22, 1990, between Chevron U.S.A. Inc. and ANR Pipeline Company, WC 17/48.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 157299:**
**Global Settlement Agreement**, dated effective February 22, 1994, as amended, between The State of Louisiana, Texaco Inc., and The Louisiana Land and Exploration Company.

**QLS No. 035807:**
**Purchase and Sale Agreement**, dated effective October 1, 1998, between Forcenergy Inc., as Assignor, and Halliburton Energy Services, Inc. and Chevron U.S.A. Inc., as Assignees.

**Assignment of Contracts**, dated effective October 1, 1998, between Forcenergy Inc., as Assignor, and Halliburton Energy Services, Inc. and Chevron U.S.A. Inc., as Assignees.

**Bill of Sale**, dated effective October 1, 1998, between Forcenergy Inc., as Assignor, and Halliburton Energy Services, Inc. and Chevron U.S.A. Inc., as Assignees.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 040828:**
**Pipeline Right-of-Way Grant No. 4003**, dated effective October 25, 2000, between the State of Louisiana and Chevron U.S.A. Inc.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 040101:**
**Pipeline Right-of-Way Grant No. 4060**, dated effective January 9, 2001, between the State of Louisiana and Chevron U.S.A. Inc.

**Assignment, Bill of Sale and Conveyance**, dated effective August 1, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**QLS No. 155400:**
**Production Handling Agreement**, dated effective July 30, 2002, between Chevron U.S.A. Inc. and El Paso Production GOM Inc., WC 17 Field, WC 47 G and WC 18 B.

**QLS No. 155401:**
**Production Handling Agreement**, dated effective July 30, 2002, between Chevron U.S.A. Inc. and El Paso Production GOM Inc., WC 17 Field, WC 46 #A-1 Well (WC 53A), as amended.

**QLS No. 153704:**
**Purchase and Sale Agreement**, dated effective August 1, 2002, between Halliburton Energy Services, Inc., as Seller, and Chevron U.S.A. Inc., as Buyer.

**Consulting Agreement, WC 17 & SMI 9 Fields**, dated effective August 1, 2002, between Chevron U.S.A. Inc. and Halliburton Energy Services, Inc.

**Letter Agreement**, dated August 30, 2002, between Halliburton Energy Services, Inc. and Chevron U.S.A. Inc.

**Closing Statement**, dated effective August 1, 2002, between Chevron U.S.A. Inc. and Halliburton Energy Services, Inc.

**Closing Memo**, dated August 30, 2002, between Chevron U.S.A. Inc. and Halliburton Energy Services Inc.

**Service Agreement**, dated November 25, 2002, between Chevron Texaco Exploration & Production Company and Halliburton Energy Services, Inc.

**Service Agreement**, dated November 25, 2002, between ChevronTexaco and Halliburton Energy Services, Inc.

**Consulting Agreement**, dated effective August 1, 2004, between Chevron U.S.A. Inc. and Halliburton Energy Services, Inc.

**Consulting Agreement**, dated effective August 1, 2004, between Chevron U.S.A. Inc. and Kellogg Brown & Root, Inc.

**QLS No. 153387/699367:**
**Joint Development Agreement**, dated July 30, 2002, between El Paso Production GOM Inc. and Chevron U.S.A. Inc., WC 46/47, as amended.

**QLS No. 695086:**
**Pipeline Right-of-Way No. 4437**, dated effective February 1, 2004, between the State of Louisiana and Chevron U.S.A. Inc.

**QLS No. 695113:**
**Pipeline Right-of-Way No. 4438**, dated effective February 1, 2004, between the State of Louisiana and Chevron U.S.A. Inc.

**QLS No. 826760:**
**Production Handling Agreement**, dated effective January 1, 2005, between Chevron U.S.A. Inc., Helis Oil & Gas Company, LLC, Red Willow Offshore, LLC, CL&F Resources LP, and Houston Energy, L.P., WC 21/22.

**Assignment and Bill of Sale**, dated effective April 30, 2007, between Chevron U.S.A. Inc., as Assignor, and TC Oil Louisiana LLC, as Assignee.

**QLS No. 826519:**
**Production Operations Agreement**, dated April 30, 2007, between TC Oil Louisiana LLC and Chevron U.S.A. Inc.

**QLS No. 835457:**
**Pipeline Right-of-Way No. 5240**, dated effective November 1, 2010, between State of Louisiana and Chevron U.S.A. Inc.

**End of Exhibit A – WC 17 Field and *END OF EXHIBIT A***

# EXHIBIT B – EXCLUDED ASSETS

## 1. DESCRIPTION OF ANY EXCLUDED ASSETS

1.1 All rights, titles, Claims, and interests of each Seller Entity related to the Assets for all periods prior to the Closing Date with respect to any of the following:

(A) Under any policy or agreement of insurance (including any Seller's Insurance Policies) or indemnity.

(B) Under any bond.

(C) To any insurance or condemnation proceeds or awards.

1.2 Claims of Seller for any Tax refunds, recoupment, rebates or credits.

1.3 Claims of Seller for any royalty recoupments, overpayments or prior period adjustments attributable to the period prior to the Effective Date.

1.4 All amounts due or payable to Seller under any joint interest billing or joint account reimbursement attributable to the period prior to the Effective Date, including with respect to the following matters:

(A) Chevron U.S.A. Inc. ("CUSA") filed suit in the 164th Judicial District Court, Harris County, Texas, Cause No. 2015-22827, against Black Elk Offshore Operations, LLC ("Black Elk") to recover amounts that Black Elk owed CUSA, as operator, under the JOA for HI A-563, for Black Elk's failure to pay its joint-interest billings ("JIBs"). The litigation was immediately stayed upon the filing of an involuntary bankruptcy petition by four of Black Elk's creditors on August 11, 2015. CUSA is taking Black Elk's share of production from the field to recover Black Elk's unpaid JIBs via an Assignment of Production.

(B) WesPac Energy, LLC ("WesPac") has failed to pay its HI-A-563 and HI-A-582 JIBs since October 2014 and CUSA, as operator, is currently in the process of enforcing its rights under the operating agreement to require the first purchaser of production to remit the WesPac proceeds of production to operator.

(C) Nexen Petroleum Offshore U.S.A. Inc. ("Nexen") owes the HI-A-582 joint account for Nexen's erroneous receipt of 1,604.9 bbls of oil following Nexen's non-consent of certain operation(s). CUSA has requested a reimbursement for the joint account from Nexen.

1.5 All amounts due or payable to Seller as adjustments to insurance premiums related to the Assets for all periods prior to the Closing Date.

1.6 Any existing or future refund of costs or expenses borne by Seller or Seller's predecessors in title attributable to the period prior to the Effective Date.

1.7 Any and all proceeds from production and from the settlements of contract disputes with purchasers of Hydrocarbons or byproducts from the Assets, including, without limitation, settlement of take-or-pay disputes, insofar as said proceeds are attributable to periods of time prior to the Effective Date.

1.8 All Hydrocarbons produced from the Assets with respect to all periods prior to the Effective Date and all related proceeds from such Hydrocarbons' disposition.

1.9 All of Seller's intellectual property rights, patents, trade secrets, copyrights, names, marks and logos, except as may otherwise have been expressly granted herein.

1.10 All rights, obligations, benefits, awards, judgments, settlements, if any, applicable to any Claim pending in which Seller is a named claimant or plaintiff or holds beneficial rights or interests, to the extent related to periods prior to the Effective Date, to the extent, and only to the extent, that such claims, rights and other matters do not cause a material impairment in the value of the Assets to occur after the Effective Date.

1.11 Each Seller Entity's master service agreements and charter party agreements, storage or warehouse agreements, supplier contracts, service contracts, insurance contracts, and construction agreements.

1.12 Information Technology Equipment, unless specifically identified as being included on the attached Schedule 3.3 – Information Technology Equipment.

1.13 Seller's interest, if any, in any gas processing plant, separation facility or gas treating plant serving the Assets, unless such assets are expressly identified and included on Exhibit A-List of Assets.

1.14 All vehicles, boats, tools, medical supplies (except for United States Coast Guard ("**USCG**") approved first aid kits and required litters), and identified surplus equipment, whether or not any of the foregoing are identified on any Exhibit or Schedule as being excluded, and any other assets specifically identified as retained or excluded under this Agreement.

1.15 All Third Party owned equipment and property located on or used in connection with the Assets, including contractor equipment and leased equipment.

1.16 All Third Party owned Information Technology Equipment.

1.17 Unless specifically licensed to Buyer pursuant to Exhibit H - Seismic Data and Form of Data License, any and all proprietary or licensed raw or processed or re-processed geophysical data (including magnetic tapes, field notes, seismic lines, analyses and similar data or information) and all Seller's proprietary software and any derivatives therefrom, data licensing agreements and seismic licenses between Seller and Third Parties, if any.

1.18 Equipment and other items identified as excluded or exception items in the equipment inventory lists published in the Data Room.

**END OF EXHIBIT B**

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**F0002**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| **NAME** | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | **1.0000000** |
| | OWNER'S INTEREST AFTER CONVEYANCE | **0.0000000** |
| | INTEREST CONVEYED BY OWNER | **1.0000000** |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| **NAME** | **Cox Oil Offshore, L.L.C.** | **1.0000000** |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | **1.0000000** |

| **PORTION DESCRIPTION:** |
|---|
| All of lease (portion A). |

| **COMMENTS:** |
|---|
| |

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
08/01/15

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
F0002

**LEASE ROYALTY DECIMAL**
0.1666700

**CONVEYOR'S NAME & ADDRESS**

| | | GROSS WORKING INTEREST |
|---|---|---|
| NAME | Chevron U.S.A. Inc. | |
| STREET | 1400 SMITH STREET | |
| CITY/STATE | HOUSTON, TX 77002 | |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 1.0000000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0000000 |
| | INTEREST CONVEYED BY OWNER | 1.0000000 |
| | NAME & ADDRESS OF TRANSFEREE(S) | |
| NAME | Cox Oil Offshore, L.L.C. | 1.0000000 |
| STREET | 1615 Poydras, Suite 830 | |
| CITY/STATE | New Orleans, LA 70130 | |
| | TOTAL | 1.0000000 |

**PORTION DESCRIPTION:**
All of lease (portion A).

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**F0002**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| **NAME** | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | **1.0000000** |
| | OWNER'S INTEREST AFTER CONVEYANCE | **0.0000000** |
| | INTEREST CONVEYED BY OWNER | **1.0000000** |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| **NAME** | **Cox Oil Offshore, L.L.C.** | **1.0000000** |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | **1.0000000** |

**PORTION DESCRIPTION:**

All of lease (portion A).

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**04418**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| **NAME** | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | **1.0000000** |
| | OWNER'S INTEREST AFTER CONVEYANCE | **0.0000000** |
| | INTEREST CONVEYED BY OWNER | **1.0000000** |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| **NAME** | **Cox Oil Offshore, L.L.C.** | **1.0000000** |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | **1.0000000** |

**PORTION DESCRIPTION:**

All of lease (portions A and B).

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**04418**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 1.0000000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0000000 |
| | INTEREST CONVEYED BY OWNER | 1.0000000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | **Cox Oil Offshore, L.L.C.** | 1.0000000 |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | 1.0000000 |

**PORTION DESCRIPTION:**

All of lease (portions A and B).

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**04418**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| **NAME** | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | **1.0000000** |
| | OWNER'S INTEREST AFTER CONVEYANCE | **0.0000000** |
| | INTEREST CONVEYED BY OWNER | **1.0000000** |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| **NAME** | **Cox Oil Offshore, L.L.C.** | **1.0000000** |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | **1.0000000** |

**PORTION DESCRIPTION:**

All of lease (portions A and B).

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**03840**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | **1.0000000** |
| | OWNER'S INTEREST AFTER CONVEYANCE | **0.0000000** |
| | INTEREST CONVEYED BY OWNER | **1.0000000** |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | **Cox Oil Offshore, L.L.C.** | **1.0000000** |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | **1.0000000** |

**PORTION DESCRIPTION:**

All of lease (portions A and B).

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**03840**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Chevron U.S.A. Inc. | GROSS |
| STREET | 1400 SMITH STREET | WORKING |
| CITY/STATE | HOUSTON, TX 77002 | INTEREST |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 1.0000000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0000000 |
| | INTEREST CONVEYED BY OWNER | 1.0000000 |
| | NAME & ADDRESS OF TRANSFEREE(S) | |
| NAME | Cox Oil Offshore, L.L.C. | 1.0000000 |
| STREET | 1615 Poydras, Suite 830 | |
| CITY/STATE | New Orleans, LA 70130 | |
| | TOTAL | 1.0000000 |

| PORTION DESCRIPTION: |
|---|
| All of lease (portions A and B). |

| COMMENTS: |
|---|
| |

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**03840**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Chevron U.S.A. Inc. | GROSS |
| STREET | 1400 SMITH STREET | WORKING |
| CITY/STATE | HOUSTON, TX 77002 | INTEREST |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 1.0000000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0000000 |
| | INTEREST CONVEYED BY OWNER | 1.0000000 |
| | NAME & ADDRESS OF TRANSFEREE(S) | |
| NAME | Cox Oil Offshore, L.L.C. | 1.0000000 |
| STREET | 1615 Poydras, Suite 830 | |
| CITY/STATE | New Orleans, LA 70130 | |
| | TOTAL | 1.0000000 |

**PORTION DESCRIPTION:**
All of lease (portions A and B).

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**03839**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| **NAME** | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | **1.0000000** |
| | OWNER'S INTEREST AFTER CONVEYANCE | **0.0000000** |
| | INTEREST CONVEYED BY OWNER | **1.0000000** |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| **NAME** | **Cox Oil Offshore, L.L.C.** | **1.0000000** |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | **1.0000000** |

**PORTION DESCRIPTION:**

All of lease (portions A and B).

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**03839**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| **NAME** | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | **1.0000000** |
| | OWNER'S INTEREST AFTER CONVEYANCE | **0.0000000** |
| | INTEREST CONVEYED BY OWNER | **1.0000000** |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| **NAME** | **Cox Oil Offshore, L.L.C.** | **1.0000000** |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | **1.0000000** |

**PORTION DESCRIPTION:**

All of lease (portions A and B).

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**03839**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| NAME | Chevron U.S.A. Inc. | GROSS |
| STREET | 1400 SMITH STREET | WORKING |
| CITY/STATE | HOUSTON, TX 77002 | INTEREST |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 1.0000000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0000000 |
| | INTEREST CONVEYED BY OWNER | 1.0000000 |
| | NAME & ADDRESS OF TRANSFEREE(S) | |
| NAME | Cox Oil Offshore, L.L.C. | 1.0000000 |
| STREET | 1615 Poydras, Suite 830 | |
| CITY/STATE | New Orleans, LA 70130 | |
| | TOTAL | 1.0000000 |

**PORTION DESCRIPTION:**

All of lease (portions A and B).

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**00340**

**LEASE ROYALTY DECIMAL**
**0.1250000**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| **NAME** | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | **0.2578551** |
| | OWNER'S INTEREST AFTER CONVEYANCE | **0.0000000** |
| | INTEREST CONVEYED BY OWNER | **0.2578551** |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| **NAME** | **Cox Oil Offshore, L.L.C.** | **0.2578551** |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | **0.2578551** |

**PORTION DESCRIPTION:**
All property included within the surface boundary created for the 1450 acre drilling & production unit established by the Operc 2 Sand, Reservoir B Order No. 822-D-1 and Gyro zone, Reservoir B, as established by Order No. 822-F-1.

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**00340**

**LEASE ROYALTY DECIMAL**
**0.1250000**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| **NAME** | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | **0.2578551** |
| | OWNER'S INTEREST AFTER CONVEYANCE | **0.0000000** |
| | INTEREST CONVEYED BY OWNER | **0.2578551** |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| **NAME** | **Cox Oil Offshore, L.L.C.** | **0.2578551** |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | **0.2578551** |

**PORTION DESCRIPTION:**
All property included within the surface boundary created for the 1450 acre drilling & production unit established by the Operc 2 Sand, Reservoir B Order No. 822-D-1 and Gyro zone, Reservoir B, as established by Order No. 822-F-1.

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**00340**

**LEASE ROYALTY DECIMAL**
**0.1250000**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| **NAME** | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | **0.2578551** |
| | OWNER'S INTEREST AFTER CONVEYANCE | **0.0000000** |
| | INTEREST CONVEYED BY OWNER | **0.2578551** |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| **NAME** | **Cox Oil Offshore, L.L.C.** | **0.2578551** |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | **0.2578551** |

| **PORTION DESCRIPTION:** |
|---|
| All property included within the surface boundary created for the 1450 acre drilling & production unit established by the Operc 2 Sand, Reservoir B Order No. 822-D-1 and Gyro zone, Reservoir B, as established by Order No. 822-F-1. |

| **COMMENTS:** |
|---|
| |

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**03841**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | GROSS WORKING INTEREST |
|---|---|---|
| NAME | **Chevron U.S.A. Inc.** | |
| STREET | **1400 SMITH STREET** | |
| CITY/STATE | **HOUSTON, TX 77002** | |
| | OWNER'S INTEREST BEFORE CONVEYANCE | 1.0000000 |
| | OWNER'S INTEREST AFTER CONVEYANCE | 0.0000000 |
| | INTEREST CONVEYED BY OWNER | 1.0000000 |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| NAME | **Cox Oil Offshore, L.L.C.** | 1.0000000 |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | 1.0000000 |

**PORTION DESCRIPTION:**

All of lease (portion A).

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**03841**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| **NAME** | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | **1.0000000** |
| | OWNER'S INTEREST AFTER CONVEYANCE | **0.0000000** |
| | INTEREST CONVEYED BY OWNER | **1.0000000** |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| **NAME** | **Cox Oil Offshore, L.L.C.** | **1.0000000** |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | **1.0000000** |

| **PORTION DESCRIPTION:** |
|---|
| All of lease (portion A). |

| **COMMENTS:** |
|---|
| |

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**EFFECTIVE DATE OF TRANSFER (DATE OF SALE)**
**08/01/15**

**STATEMENT OF CONVEYANCE**
***FORM B***

**STATE LEASE**
**03841**

**LEASE ROYALTY DECIMAL**
**0.1666700**

**CONVEYOR'S NAME & ADDRESS**

| | | |
|---|---|---|
| **NAME** | **Chevron U.S.A. Inc.** | **GROSS** |
| STREET | **1400 SMITH STREET** | **WORKING** |
| CITY/STATE | **HOUSTON, TX 77002** | **INTEREST** |
| | OWNER'S INTEREST BEFORE CONVEYANCE | **1.0000000** |
| | OWNER'S INTEREST AFTER CONVEYANCE | **0.0000000** |
| | INTEREST CONVEYED BY OWNER | **1.0000000** |
| | **NAME & ADDRESS OF TRANSFEREE(S)** | |
| **NAME** | **Cox Oil Offshore, L.L.C.** | **1.0000000** |
| STREET | **1615 Poydras, Suite 830** | |
| CITY/STATE | **New Orleans, LA 70130** | |
| | **TOTAL** | **1.0000000** |

**PORTION DESCRIPTION:**

All of lease (portion A).

**COMMENTS:**

| | |
|---|---|
| PREPARED BY: | Charles F. Holmes |
| DATE: | 04.11.2016 |
| Phone Number | 713.372.1217 |
| E-mail Address | chuck.holmes@chevron.com |

formb10/1/1999

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**FORM C**
**Assignments and Transfers of State Leases**
**State Lease No(s).** 3839

## Certification of Bankruptcy Status

Pursuant to State Mineral and Energy Board Resolution dated July 13, 1983, each assignor and assignee is required to inform the Board regarding its bankruptcy status.

**ASSIGNOR:**
Legal Name of Assignor: Chevron U.S.A. Inc.
Louisiana Secretary of State Name (if different): ____________________

☑ Assignor is not in Bankruptcy at this time.

☐ Assignor is in Bankruptcy at this time.
Documentation of court approval for this transfer or assignment is attached.

I certify that the above information is true and correct.

Authorized Agent of Assignor:

| | |
|---|---|
| Ann E. Wacker | Acquisition and Divestiture Office |
| Name | Title |
| | 4-15-2016 |
| Signature | Date |

**ASSIGNEE:**
Legal Name of Assignee: Cox Oil Offshore, L.L.C.
Louisiana Secretary of State Name (if different): ____________________

☑ Assignee is not in Bankruptcy at this time.

☐ Assignee is in Bankruptcy at this time.
Documentation of court approval for this transfer or assignment is attached.

I certify that the above information is true and correct.

Authorized Agent of Assignee:

| | |
|---|---|
| Rodney Dykes | President /COO |
| Name | Title |
| | 4-15-2016 |
| Signature | Date |

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**FORM C**
**Assignments and Transfers of State Leases**
**State Lease No(s).** 3840

**Certification of Bankruptcy Status**

Pursuant to State Mineral and Energy Board Resolution dated July 13, 1983, each assignor and assignee is required to inform the Board regarding its bankruptcy status.

**ASSIGNOR:**
Legal Name of Assignor: Chevron U.S.A. Inc.
Louisiana Secretary of State Name (if different): ______________________

☑ Assignor is not in Bankruptcy at this time.

☐ Assignor is in Bankruptcy at this time.
Documentation of court approval for this transfer or assignment is attached.

I certify that the above information is true and correct.

Authorized Agent of Assignor:

| | |
|---|---|
| Ann E. Wacker | Acquisition and Divestiture Officer |
| Name | Title |
| Ann E. Wacker | 4-15-2016 |
| Signature | Date |

**ASSIGNEE:**
Legal Name of Assignee: Cox Oil Offshore, L.L.C.
Louisiana Secretary of State Name (if different): ______________________

☑ Assignee is not in Bankruptcy at this time.

☐ Assignee is in Bankruptcy at this time.
Documentation of court approval for this transfer or assignment is attached.

I certify that the above information is true and correct.

Authorized Agent of Assignee:

| | |
|---|---|
| Rodney Dykes | President / COO |
| Name | Title |
| Rodney Dykes | 4-15-2016 |
| Signature | Date |

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**FORM C**
**Assignments and Transfers of State Leases**
**State Lease No(s).** 3841

**Certification of Bankruptcy Status**

Pursuant to State Mineral and Energy Board Resolution dated July 13, 1983, each assignor and assignee is required to inform the Board regarding its bankruptcy status.

**ASSIGNOR:**
Legal Name of Assignor: Chevron U.S.A. Inc.
Louisiana Secretary of State Name (if different): ____________

☑ Assignor is not in Bankruptcy at this time.

☐ Assignor is in Bankruptcy at this time.
Documentation of court approval for this transfer or assignment is attached.

I certify that the above information is true and correct.

Authorized Agent of Assignor:

| | |
|---|---|
| Ann E. Wacker | Acquisition and Divestiture Officer |
| Name | Title |
| Ann E. Wacker | 4-15-2016 |
| Signature | Date |

**ASSIGNEE:**
Legal Name of Assignee: Cox Oil Offshore, L.L.C.
Louisiana Secretary of State Name (if different): ____________

☑ Assignee is not in Bankruptcy at this time.

☐ Assignee is in Bankruptcy at this time.
Documentation of court approval for this transfer or assignment is attached.

I certify that the above information is true and correct.

Authorized Agent of Assignee:

| | |
|---|---|
| Rodney Dykes | President / COO |
| Name | Title |
| Rodney Dykes | 4-15-2016 |
| Signature | Date |

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**FORM C**
**Assignments and Transfers of State Leases**
**State Lease No(s).** 4418

**Certification of Bankruptcy Status**

Pursuant to State Mineral and Energy Board Resolution dated July 13, 1983, each assignor and assignee is required to inform the Board regarding its bankruptcy status.

**ASSIGNOR:**
Legal Name of Assignor: Chevron U.S.A. Inc.
Louisiana Secretary of State Name (if different): ____________________

☑ Assignor is not in Bankruptcy at this time.

☐ Assignor is in Bankruptcy at this time.
Documentation of court approval for this transfer or assignment is attached.

I certify that the above information is true and correct.

Authorized Agent of Assignor:

| | |
|---|---|
| Ann E. Wacker | Acquisition and Divestiture Officer |
| Name | Title |
| Ann E. Wacker | 4-15-2016 |
| Signature | Date |

**ASSIGNEE:**
Legal Name of Assignee: Cox Oil Offshore, L.L.C.
Louisiana Secretary of State Name (if different): ____________________

☒ Assignee is not in Bankruptcy at this time.

☐ Assignee is in Bankruptcy at this time.
Documentation of court approval for this transfer or assignment is attached.

I certify that the above information is true and correct.

Authorized Agent of Assignee:

| | |
|---|---|
| Rodney Dykes | President / COO |
| Name | Title |
| Rodney Dykes | 4-15-2016 |
| Signature | Date |

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**FORM C**
**Assignments and Transfers of State Leases**
**State Lease No(s).** F0002

**Certification of Bankruptcy Status**

Pursuant to State Mineral and Energy Board Resolution dated July 13, 1983, each assignor and assignee is required to inform the Board regarding its bankruptcy status.

**ASSIGNOR:**
Legal Name of Assignor: Chevron U.S.A. Inc.
Louisiana Secretary of State Name (if different): ____________________

☑ Assignor is not in Bankruptcy at this time.

☐ Assignor is in Bankruptcy at this time.
Documentation of court approval for this transfer or assignment is attached.

I certify that the above information is true and correct.

Authorized Agent of Assignor:

| | |
|---|---|
| Ann E. Wacker | Acquisition and Divestiture Officer |
| Name | Title |
| Ann E. Wacker (signature) | 4-15-2016 |
| Signature | Date |

**ASSIGNEE:**
Legal Name of Assignee: Cox Oil Offshore, L.L.C.
Louisiana Secretary of State Name (if different): ____________________

☑ Assignee is not in Bankruptcy at this time.

☐ Assignee is in Bankruptcy at this time.
Documentation of court approval for this transfer or assignment is attached.

I certify that the above information is true and correct.

Authorized Agent of Assignee:

| | |
|---|---|
| Rodney Dykes | President/COO |
| Name | Title |
| Rodney Dykes (signature) | 4-15-2016 |
| Signature | Date |

**OFFICE OF MINERAL RESOURCES**
**STATE OF LOUISIANA**
**BATON ROUGE, LA**

**FORM C**
**Assignments and Transfers of State Leases**
**State Lease No(s).** 340

**Certification of Bankruptcy Status**

Pursuant to State Mineral and Energy Board Resolution dated July 13, 1983, each assignor and assignee is required to inform the Board regarding its bankruptcy status.

**ASSIGNOR:**
Legal Name of Assignor: Chevron U.S.A. Inc.
Louisiana Secretary of State Name (if different): __________

☑ Assignor is not in Bankruptcy at this time.

☐ Assignor is in Bankruptcy at this time.
Documentation of court approval for this transfer or assignment is attached.

I certify that the above information is true and correct.

Authorized Agent of Assignor:

Ann E. Wacker
Name

Acquisition and Divestiture Officer
Title

Ann E. Wacker
Signature

4-15-2016
Date

**ASSIGNEE:**
Legal Name of Assignee: Cox Oil Offshore, L.L.C.
Louisiana Secretary of State Name (if different): __________

☒ Assignee is not in Bankruptcy at this time.

☐ Assignee is in Bankruptcy at this time.
Documentation of court approval for this transfer or assignment is attached.

I certify that the above information is true and correct.

Authorized Agent of Assignee:

Rodney Dykes
Name

President/COO
Title

Rodney Dykes
Signature

4-15-2016
Date

Louisiana State Form Feb. 1942

STATE OF LOUISIANA,
PARISH OF EAST BATON ROUGE.

STATE LEASE No. 797

WHEREAS, under the provisions of Act No. 93 of the Regular Legislative Session of 1936, as amended, application was made to the STATE MINERAL BOARD for a lease of the hereinafter-described lands, and a report thereon having been made by the Register of the State Land Office, and,

WHEREAS, in response to said advertisements, bids were received at the State Capitol on the 13th day of August 1946, at a meeting of the STATE MINERAL BOARD, and,

WHEREAS, it appears that the bid of Humble Oil & Refining Company of Houston, Texas, hereinafter styled "lessee", is the most advantageous to the State of Louisiana;

NOW, THEREFORE, BE IT KNOWN AND REMEMBERED, that the said STATE MINERAL BOARD, acting under the authority of the said Act No. 93 of the Regular Session of 1936, as amended, and in accordance with the terms thereof, and acting in behalf of the State of Louisiana as "lessor", does hereby let and lease unto the said lessee, (its) heirs and assigns, the hereinafter described property, for the purpose of exploiting the same by geophysical means in locating mineral bearing structure thereon, and for producing therefrom sulphur, potash, oil, gas and/or other liquid or gaseous hydro-carbon minerals, in and under said lands, and also the exclusive right of drilling and operating thereon for sulphur, potash, oil, gas and/or other liquid or gaseous hydro-carbon minerals, together with a right of way for, and the right to lay pipelines to convey water, oil, gas, steam and sulphur, and the right to have sufficient water from the premises to drill and operate any wells which the said lessee may bore thereon, and also such other privileges as are reasonably requisite for conducting such operations, and the right to remove from said premises at any time any and all property that may have been placed thereon by lessee, provided that the said lessee shall have fulfilled its obligations to lessor hereunder.

The said property to which this instrument applies is located in Plaquemines, Jefferson and LaFourche parish and is described as follows:

TRACT 1107 (BLOCK 9), GULF OF MEXICO, STATE OF LOUISIANA - Beginning at a point in the Gulf of Mexico off the shore of the State of Louisiana, 72,432.16 feet East of and 14,758.04 feet North of U. S. C. & G. S. triangulation station "LAKE"; Thence East 14,758.04 feet; Thence North 14,758.04 feet; Thence West 14,758.04 feet; Thence South 14,758.04 feet to the place of beginning, containing 5,000.00 acres. All bearings based on Louisiana (Lambert) Coordinate System.

TO HAVE AND TO HOLD unto the said lessee, (its) heirs and assigns, for the term and under the conditions hereinafter set forth, to-wit:

I.

Lessee has this day paid to lessor the sum of Seventy-Five Thousand ($75,000.00) Dollars for the right to begin the drilling of a well on the herein leased premises at any time within one (1) year from the date hereof, said sum also being part consideration for lessee's right to delay such drilling operations under the conditions hereinafter provided.

Should lessee fail to begin the actual drilling (spudding in) of a well on these premises within the one (1) year above provided, then this lease shall terminate as to both parties, lessor and lessee, unless on or before such anniversary date lessee pays to lessor the sum of Thirty-seven Thousand Five Hundred ($37,500.00) Dollars (herein called rental), which payment shall cover the privilege of deferring commencement of drilling operations (as above defined) for a period of twelve (12) months. In like manner, and upon like payments annually, the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each, during the primary term of this lease, which primary term is hereby declared to be Five (5) years from the date hereof.

If during the primary term of this lease as above set forth, lessee shall begin actual drilling on the premises and shall thereafter cease such drilling operations for more than sixty (60) days, prior to developing and producing sulphur, potash, oil, gas and/or other liquid or gaseous hydrocarbon mineral in paying quantities, then the said lessee may continue its rights in effect for the remainder of the primary term of this lease by resuming payments as above provided, and by paying to lessor, within sixty (60) days from the cessation of drilling operations, the payment for the current period which lessee must have paid to maintain its rights had lessee begun no such operations.

II.

Upon beginning the drilling of a well within the time specified by this lease, then lessee shall have the right to make as many attempts to develop sulphur, potash, oil, gas and/or other liquid or gaseous hydro-carbon minerals as lessee pleases, even beyond said primary term as above set forth, and to continue the exercise of such rights as long as it pleases, provided, however, that except as otherwise provided herein, such attempts shall be successive in the sense that until sulphur, potash, oil, gas and/or other liquid or gaseous hydro-carbon mineral is being produced in paying quantities, not more than sixty (60) days shall lapse from the date of cessation of work on one well and the beginning of drilling operations (as above defined) on another, or of reworking operations on the same well, and provided further, that such operations shall be carried out diligently and in good faith in an effort to develop the premises as herein contemplated.

If in the exercise of the rights herein granted, minerals be developed or produced in paying quantities in or on the premises, the said lessee binds itself to thereafter proceed to further develop the said premises with reasonable diligence and to so continue until a reasonable development of the property has been accomplished.

Lessee further agrees that should a well capable of producing oil or gas or other liquid hydro-carbon mineral in paying quantities be brought in within six hundred sixty (660) feet (or within any spacing or pooling unit distance as established by the Department of Conservation) of the leased premises, it will begin the drilling of a well on said leased premises within sixty (60) days of the date on which said well so qualifies as a well capable of producing oil or gas or other liquid or gaseous hydro-carbon mineral in paying quantities, and in addition to the specific offset drilling obligation above provided, will drill any and all wells necessary on the premises to prevent drainage of oil, gas and/or other liquid or gaseous hydro-carbon mineral by a well or wells on adjacent property.

III.

Should sulphur, potash, oil, gas and/or other liquid hydro-carbon mineral be produced in paying quantities on the premises hereunder, then the said lessee shall deliver to lessor as royalty, free of expense:

One-eighth (1/8) of all oil produced and saved, including distillate or other liquid hydro-carbons, delivery of said oil to be understood as made when same has been received by the first purchaser thereof. Or lessee may, in lieu of said oil delivery, and at its option, pay to lessor sums equal to the value thereof on the premises; provided no deductions or charges shall be made for gathering or transporting said oil to the purchaser thereof, or loading terminal, nor shall any deductions whatsoever be made chargeable to lessor; provided further, that the price paid lessor for said oil shall not be less than the average posted pipe-line or loading terminal price then current for oil of like grade or quality.

One-eighth (1/8) of all gas produced and saved or utilized, delivery of said gas to be understood as made when same has been received by the first purchaser thereof. Or lessee may in lieu of said gas delivery, and at its option, pay to lessor sums equal to the value thereof at the well, provided no gathering or other charges are made chargeable to lessor; provided further that the price paid lessor for said gas shall not be less than the average price then current for gas of like character or quality delivered to the pipe line purchaser in that field. Lessee shall however when a market cannot be secured for gas and gas produced is not being utilized or sold on or off the premises, pay lessor, "lieu royalty" at the rate of Two Hundred ($200.00) Dollars per year, payable quarterly, for each well capable of producing gas only.

Two ($2.00) Dollars per long ton for all sulphur produced and saved.

Twenty (.20) Cents per ton for all potash produced and saved.

One-eighth (1/8) of any and all other liquid or gaseous hydro-carbon minerals not sepecifically mentioned, said royalties to be delivered or paid as is the accepted custom in such matters.

IV.

It is expressly understood and agreed that about, (on or before) the expiration of the primary term hereof, lessee shall declare in writing that portion or portions of the property herein leased, if any, are not at such time, in lessee's judgment developed, the lessee, in so declaring, to make known to lessor the existence of any Domes, and/or other Structure favorable

(2)

for accumulation of minerals on or under the premises of which lessee may have knowledge, and to declare whether the same be by lessee deemed capable of development as herein understood (should lessee fail to make such required declaration, then this lease shall ipso facto terminate except as to acreage lessee is specifically allowed to retain as set forth in paragraphs numbered V and VI hereof), and if there shall be any portion or portions of the premises remaining undeveloped and capable of development and this lease has been kept in force and effect by production or drilling operations, then lessee shall proceed immediately to develop the remainder of said property as contemplated herein, and lessee shall then release, by proper instrument, from the effect of this lease, any portion or portions of the premises not already under active development or included within the above described declaration as being capable of further development.

V.

Should lessee, at any time after beginning to exploit the premises as understood herein, decide that it no longer desires to carry on drilling operations, then the said lessee is granted the right to cease such operations, and lessee shall, if (he) (it) so selects, retain (his) (its) rights in and to ten (10) acres or the size acreage unit for the field as established by a spacing or pooling order of the Department of Conservation, (in the form of a square, the well being the center, as near as practicable) of the property for each and every well (other than a gas well) which lessee shall have drilled thereon and is producing sulphur, potash, oil, or other liquid hydro-carbon mineral therefrom; provided that said well or wells shall be located on that portion or portions of the property so retained by lessee; and provided further, that lessee's rights in and to that portion of the premises so retained shall endure only so long as lessee shall continue to produce sulphur, potash, oil, or other hydro-carbon mineral from said well or wells on said tract or tracts so retained in paying quantities.

Should lessee at any time elect to abandon operations as above provided, then lessee shall notify lessor in writing of its intention to so do, and shall specify what portion or portions of the said premises the said lessee is entitled by virtue hereof to retain and operate; and lessee shall, as soon as practicable thereafter, execute an instrument or all instruments necessary to effect a proper release of the undeveloped portion of the premises.

VI.

It is agreed and understood that lessee shall not be required to drill more than one (1) well for each forty (40) acres held hereunder where the premises shall prove to be productive of gas only, save and except where such well, or wells, are necessary to prevent drainage of gas from the said premises by wells on adjacent property; and it is further agreed that should lessee at any time elect to abandon drilling operations as provided in paragraph V hereof, then the said lessee shall be entitled to retain its rights in and to the gas production from forty (40) acres (in the form of a square as near as practicable) for each and every gas well from which it shall at such time be producing gas in paying quantities; provided also, that any well or wells so producing shall be located on and reasonably near the center of that portion or portions of the property retained by lessee; and provided further, that lessee's rights to so hold such portion or portions of the said premises shall endure only so long as lessee shall continue to produce therefrom, gas in paying quantities.

VII.

If at any time during the life of this lease, lessee elects to no longer maintain the rights herein granted in effect, then the said lessee shall have the right to release and surrender unto lessor any and all rights hereby held unto lessee, whereupon this contract shall wholly terminate, but without prejudice to rights of lessor to enforce any liability or cause of action which may have theretofore accrued hereunder in favor of lessor.

VIII.

It is agreed and understood that operations hereunder shall offer no impediment to navigation.

IX.

It is further agreed and understood that the rights of lessee may be assigned or transferred in whole or in part but no transfer, whether in whole or in part, of the herein leased property shall be valid unless such transfer or assignment be approved by the STATE MINERAL BOARD and that said STATE MINERAL BOARD shall have supervision of this lease for the full period of its duration.

X.

Lessee may, with the consent and approval of the STATE MINERAL BOARD, pool or combine the acreage covered by this lease, or any portion thereof, with the land, lease, or leases contiguous thereto or contained in one unit. Such pooling or combining to be in strict conformity with spacing and other rules, regulations, or orders of the Department of Conservation and the STATE MINERAL BOARD; nor shall such pooling or combining agreement in any way decrease the obligations of lessee as herein stipulated.

THUS DONE, READ, ACCEPTED AND SIGNED by the parties hereto, the lessor, The State of Louisiana, herein represented by the State Mineral Board, acting through ______ B. A. Hardey, its elected Chairman ______, duly authorized, and the lessee, ______ Humble Oil & Refining Company ______ in the presence of the respective undersigned witnesses, on this the 9th day of ______ Sept. ______, A.D. 194 3 .

WITNESSES to the signature of Lessor:

STATE MINERAL BOARD

By: ________ , Chairman
For the State of Louisiana, Lessor

WITNESSES to the signature of Lessee:

For ________ V.P. Lessee
Humble Oil & Refining Company

TRADE O. K.
MORGAN J. DAVIS
By ________

Attest:
________
Assistant Secretary

STATE OF LOUISIANA,

PARISH OF Caddo.

BE IT KNOWN that on this 9th day of Sept. 1946, before me A. R. Wherritt, Notary Public, duly commissioned and qualified, personally appeared the above named B. A. Hardey, Chairman, State Mineral Board

who signed the foregoing mineral lease before me and in the presence of the two competent witnesses whose names are thereto subscribed as such, and the said appearer thereupon declared and acknowledged unto me, in the presence of said witnesses, that he signed and executed said mineral lease for the purposes and considerations therein expressed.

IN WITNESS WHEREOF the said appearer has signed these presents before me and in the presence of said witnesses, and I have hereunto set my official hand and seal with said witnesses on the day and date above written.

WITNESSES:

________
Notary Public

STATE OF Texas,

County OF Harris.

BE IT KNOWN that on this 26th day of August, 1946, before me JOHN P. CAVANAUGH, Notary Public, duly commissioned and qualified, personally appeared the above named L. T. Barrow, Vice-President Humble Oil & Refining Company

who signed the foregoing mineral lease before me and in the presence of the two competent witnesses whose names are thereto subscribed as such, and the said appearer thereupon declared and acknowledged unto me, in the presence of said witnesses, that he signed and executed said mineral lease for the purposes and considerations therein expressed.

IN WITNESS WHEREOF the said appearer has signed these presents before me and in the presence of said witnesses, and I have hereunto set my official hand and seal with said witnesses on the day and date above written.

WITNESSES:

________ JOHN P. CAVANAUGH
Notary Public

(4)

# NOTICE OF PUBLICATION

**STATE OF LOUISIANA • STATE MINERAL BOARD**

**BATON ROUGE, LOUISIANA**




SL 795 "A" SL 798 "A" SL 801 "A"
SL 796 "A" SL 799 "A" SL 802 "A"
SL 797 "A" SL 800 "A" SL 803 "A"

By virtue of, and in conformity with, the provisions of Act 93 of the Regular Session of 1936, as amended, sealed bids will be received at the office of the State Mineral Board, State Capitol, Baton Rouge on or before the 13th day of August, 1946, at Ten (10) o'clock, A.M., for the lease of the sulphur, potash, oil, gas and/or other liquid or gaseous hydrocarbon mineral rights in and to each of the following described tracts, towit:

Tracts 1099 to 1172, inclusive, also being Blocks 1 to 74 inclusive, (numbered consecutively beginning with Tract 1099) each containing not more than five thousand (5,000) acres and together constituting all the beds and bottoms of the Gulf of Mexico and other lands belonging to the State of Louisiana and contained within the total area in Plaquemines, Jefferson and Lafourche Parishes, described as follows:

Beginning at U. S. C. & G. S. Triangulation Station "LAKE," established 1928, situated on the Southeast Shore line of Lafourche Parish, Louisiana, said Triangulation Station being located at Latitude 29° 07′ 50.532″ and Longitude 90° 07′ 36.565″ and having Lambert Coordinates of x=2,385,227.73, y=170,777.35, being also an angle point on the Northeast line of Tract No. 365, State Lease No. 362; Thence Grid S. 38° 00′ E., with the Northeast line of said State Lease No. 632, 3600 feet to the East corner of the same; Thence Southwesterly, with the Southeast line of the said State Lease No. 632 (Bay Marchand Area), to a point in said line which is Grid South of the above mentioned U. S. C. & G. S. Triangulation Station "LAKE"; Thence Grid South to a point whose Lambert Coordinates are x = 2,385,227.73, y = 6,617.35; Thence Grid N. 52° 50′ 35″ E. 109,400.46 feet to a point whose Lambert Coordinates are x = 2,472,417.93, y = 72,695.19; Thence Grid North 164,160 feet to the intersection with the Shore line; Thence Southwesterly along the said Shore line to the place of beginning;

Said tracts being also shown and located by block numbers on plat on file in the State Land Office and State Mineral Board Office at Baton Rouge, of which the following is an exact copy:

Bids for each tract shall refer to the tract and block numbers and contain detailed descriptions by calls and distances from U. S. C. & G. S. Triangulation Station "LAKE" as shown on said plat and in accordance with Louisiana Coordinate System, adopted by act 226 of 1944. Such detailed descriptions and copies of plat will be furnished to any interested party by the State Land Office or State Mineral Board Office on written or oral application therefor.

All bids to offer a cash bonus for lease with a primary term which shall not exceed five (5) years. Minimum royalties shall be one-eighth (1/8) of all oil produced and saved; one-eighth (1/8) of all gas produced and saved or utilized; seventy-five (75) cents for each long ton of sulphur produced and saved; ten (10) cents per ton for all potash produced and saved; one-eighth (1/8) of all other liquid or gaseous hydrocarbon minerals produced and saved.

Lessee must agree to drill within one (1) year, or to pay rental for the right to defer drilling for a period which CANNOT EXCEED five (5) years from date of contract, and to drill offset wells if necessary to protect the State's interests and not to sublease unless agreed to by the State Mineral Board.

The Lessee shall have the right to enter into pooling or unitization agreements with respect to development of the leased premises subject to approval of the State Mineral Board.

Certified check, payable to the Register, State Land Office, for the full amount of the cash bonus shall accompany and be deposited with each bid and no bid or deposit may be thereafter withdrawn or cancelled; and the cash bonus thus deposited shall be forfeited to the State by the successful bidder in the event said bidder does not enter into written contract within ten (10) days after the written lease is submitted to him for execution.

The State Mineral Board reserves the right to reject any and all bids and to grant a lease on any portion of the tracts advertised for a price not less than proportionate to the best bid offered for the lease on the entire tract.

STATE MINERAL BOARD,
STATE OF LOUISIANA.

State Lease No. 6706

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

Louisiana State Lease Form Revised, 1966

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas, and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received and duly opened in the City of Baton Rouge, Parish of East Baton Rouge, State of Louisiana on the 9th day of July, 1975, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of **Exxon Corporation**

whose mailing address is **P. O. Box 2180 (Room 2313), Houston, Texas 77001**,

(hereinafter referred to as "Lessee") as being the most advantageous to the State of Louisiana:

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana (hereinafter referred to as "the Board"), acting under authority of said Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, and acting for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let, and grant exclusively unto the said Lessee, and Lessee's successors and assigns, the below described property for the purpose of exploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining, and producing sulphur, potash, oil, gas, and any other liquid or gaseous hydrocarbon minerals. In connection therewith Lessee shall have the right to use so much of the property as may be reasonably necessary for such operations, including but not limited to: storing minerals and fluids in facilities or by means other than subsurface storage; laying pipelines; dredging canals; and building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines, houses for employees, and other structures and facilities. The leased property, situated in the Parish of **Plaquemines**, State of Louisiana, is more fully described as follows:

**ENTIRE TRACT NO. 13566, Said Tract No. 13566 being described as follows:**

TRACT 13566 - PORTION OF BLOCK 74, MAIN PASS AREA, REVISED, Plaquemines Parish, Louisiana

That portion of Block 74, Main Pass Area, Revised, Plaquemines Parish, Louisiana, belonging to the State of Louisiana and not under mineral lease on May 14, 1975, described as follows: Beginning at the Northwest corner of Block 74, Main Pass Area, Revised, having Lambert Plane Coordinates of X = 2,763,508.00 and Y = 214,972.00; thence East 6,876.69 feet to a point of intersection with a survey line described in a Fourth (4th) Supplemental Decree, entered on the 16th day of October, 1972, in that matter styled United States of America v. State of Louisiana et al, No. 9 Original, on the docket of the Supreme Court of the United States; thence Southeasterly, Southerly and Southwesterly along said survey line to a point of intersection with the South line of said Block 74; thence West 9,551.619 feet to the Southwest corner of said Block 74; thence North 14,758.00 feet to the point of beginning, estimated to contain approximately 3,148.10 acres, all more fully shown outlined in red on a plat on file in the State Land Office. All bearings are based on Louisiana Lambert Plane Coordinate System (South Zone). It is expressly understood that although a segment of that Fourth (4th) Supplemental Decree line is incorporated in the description of the property herein leased, that the State of Louisiana is leasing only that portion of the above described block or blocks lying more than one (1) foot landward of that line, all as provided for in said Fourth (4th) Supplemental Decree.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises ~~in good faith~~ on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of that period shall pay or tender to the Lessor the sum of **Three Million, Six Hundred Thirty-Eight Thousand, Eight Hundred Fifty and No/100ths ($3,638,850.00)** Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to the order of Register, State Land Office and delivered or mailed by registered mail to the Register on or before the rental paying date.

4. (a) If on any rental paying date actual drilling or mining operations are being conducted on or production in paying quantities is being obtained from the leased premises, no rental shall be due for the annual rental period then commencing; if actual drilling or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to commence or resume production, commence actual mining operations or actual drilling operations on the leased premises, or make the rental payment, and the commencement or resumption of production, commencement of such operations, or payment of rental within the ninety (90) day period shall have the same effect as though resumed, commenced, or paid on or before the rental paying date.

(b) If at the expiration of the primary term sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well, if a well be abandoned or production should cease

State Lease No. 6706

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

Louisiana State Lease Form Revised, 1966

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas, and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received and duly opened in the City of Baton Rouge, Parish of East Baton Rouge, State of Louisiana on the 9th day of July, 1975, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of Exxon Corporation

To the extent such permit is required there is included in the rights herein granted a permit to conduct geophysical and geological work on the leased premises, and when shot points are used, such work shall be done under all applicable rules, regulations, and statutes in force at the time such work is conducted.

1. Lessee has this day paid to Lessor the sum of Seven Million, Two Hundred Seventy-Seven Thousand, Seven Hundred and No/100ths ($7,277,700.00) Dollars as the full and adequate consideration for every right granted hereunder and not as mere rental for a period.

2. Subject to the other provisions hereof this lease shall be for a term of Five (5) years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation is conducted, payment is made, or condition exists, which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of that period shall pay or tender to the Lessor the sum of Three Million, Six Hundred Thirty-Eight Thousand, Eight Hundred Fifty and No/100ths ($3,638,850.00) Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to the order of Register, State Land Office and delivered or mailed by registered mail to the Register on or before the rental paying date.

4. (a) If on any rental paying date actual drilling or mining operations are being conducted on or production in paying quantities is being obtained from the leased premises, no rental shall be due for the annual rental period then commencing; if actual drilling or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to commence or resume production, commence actual mining operations or actual drilling operations on the leased premises, or make the rental payment, and the commencement or resumption of production, commencement of such operations, or payment of rental within the ninety (90) day period shall have the same effect as though resumed, commenced, or paid on or before the rental paying date.

(b) If at the expiration of the primary term sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well, if a well be abandoned or production should cease

within ninety (90) days prior to the expiration of the primary term) Lessee commences actual drilling, mining, or reworking operations on the leased premises in an effort to make the premises produce any such products (or production is commenced or resumed during such ninety (90) day period), then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more than ninety (90) days between cessation of operations and their recommencement whether on the same well or mine or on different wells or mines successively or so long as the production so commenced or resumed is obtained in paying quantities. If at any time or times after the expiration of the primary term production hereunder should for any reason cease or terminate, Lessee shall have the right at any time within ninety (90) days from cessation of production to resume production or actual drilling, mining, or reworking operations in an effort to make the leased premises again produce any of such products, in which event this lease shall remain in force so long as such operations are continued as above provided. If as a result of any such operations, sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral be found and produced or the production of any of them be restored, this lease shall continue in force so long as any of them is produced hereunder in paying quantities or this lease is otherwise being maintained as herein provided.

(c) This lease may be maintained in force by directional drilling operations (deviation from vertical), in which event actual drilling operations shall be considered to have commenced on the leased premises when the drill stem penetrates beneath the surface of the leased premises.

(d) Wherever used in this lease, "actual drilling operations" means actual drilling (commenced by spudding in) of a new well, including sulphur wells, or the good faith deepening, sidetracking, or the plugging back or attempted recompletion in a separate interval of an existing well (all such operations being commenced by actual downhole operations); "mining operations" means actual excavation of a mine or quarry; and "reworking operations" means reconditioning, cleaning out, or otherwise attempting in good faith to establish, increase, or restore production in an existing well by downhole operations. Once commenced, any such operations shall be deemed to continue so long as they are conducted in good faith without lapse of more than ninety (90) days. Actual drilling operations or mining operations shall be deemed to terminate on the last day actual operations of any kind, such as drilling, testing, or installation of equipment are conducted in good faith for the purpose of attempting to discover minerals or to complete a well or mine as a producer. Reworking operations shall be deemed to terminate on the last day such operations are conducted in good faith for the purpose of establishing, increasing, or restoring production.

5. The obligations set forth in this Article are applicable only to wells drilled on (1) property which is not owned by Lessor or (2) property in which Lessor has no interest, and which in either instance is not part of a pooled unit containing all or any portion of the leased property. Such property is hereinafter described in this Article as "adjoining property."

(a) If at any time during or after the primary term there is completed on adjoining property a well located within six hundred and sixty (660) feet of the leased premises (or within any spacing or pooling unit distance greater than 660 feet established by the Commissioner of Conservation) and such well produces oil, gas, or other liquid or gaseous hydrocarbons in paying quantities for twenty (20) days (which need not be consecutive) during any period of thirty (30) days, or produces its monthly allowable during such thirty (30) day period, rebuttable presumptions will arise: (1) that the leased premises are thereby being drained; (2) that the leased premises are not being reasonably protected from drainage by any well or wells on the leased premises or land pooled therewith; and (3) that an offsetting well on the leased premises would be economically feasible. If Lessee is the operator of or has a working interest in the adjoining property, Lessee will begin operations for the drilling of a well on the leased premises upon expiration of ninety (90) days after the end of the above thirty (30) day period. In all other cases Lessee shall be required to begin operations only upon expiration of ninety (90) days after receipt of written notice from the Board of the expiration of the above thirty (30) day period. No offset well shall be necessary if, on or before the maturity date of the offset obligation or any deferred maturity date as hereinafter provided, any of the stated presumptions is rebutted or a unit for the well in question embracing all or part of the leased premises is formed by agreement with the Board or by order of the Commissioner of Conservation.

In lieu of commencing operations for an offset well as above provided, Lessee may, at Lessee's option, commence compensatory payments equal to the royalties herein provided, computed on one-half (½) of the oil, gas, or other liquid or gaseous hydrocarbons produced by the well in question on and after the date operations would have otherwise been commenced, value to be determined in accordance with the provisions of Article 6 of this lease. Such payments may be commenced on or before sixty (60) days after the date operations would otherwise have been commenced, but shall include any accrued compensatory payments. Thereafter, payments shall be due monthly in accordance with Article 6(i). Lessee shall not be in default in either commencing compensatory payments or in making further payments as above provided if despite due diligence Lessee is unable timely to obtain the production information on which such payments are to be based. In any such case, however, Lessee must on or before the due date of the payments, notify the Board in writing of Lessee's inability to make such payment, the reasons therefor, and Lessee's intent to make such payment at the earliest reasonable time. Compensatory payments may be continued, at Lessee's discretion, for not more than one year from the date on which offset operations would otherwise have been commenced. At the end of that time, or within 30 days from the end of any lesser period for which payments are made, Lessee shall comply with this offset obligation if the producing well continues to produce in paying quantities or to produce its allowable and the other conditions making this obligation operative are existent. The right to make compensatory payments is intended to permit Lessee to evaluate further the producing well, and the making of such payments shall not of itself be sufficient to maintain this lease in force and effect; however, the making of any such payments shall not prejudice Lessee's right to rebut any of the above enumerated presumptions.

*(b) In addition to the specific offset drilling obligation above provided,* Lessee agrees to drill any and all wells necessary to protect the leased premises from drainage of oil, gas, or other liquid or gaseous hydrocarbons by a well or wells on adjoining property or to take any other steps reasonably necessary to protect the leased premises against such drainage, including, but not limited to, obtaining the formation of appropriate drilling or production units. If Lessee is the operator of or has a working interest in any well on adjoining property Lessee shall be obligated to

begin operations for the drilling of a well on the leased premises or to take such other steps as may be reasonably necessary to protect the leased premises upon expiration of ninety (90) days from the time Lessee knows or reasonably should know that drainage is occurring. In all other cases, Lessee shall be obligated to begin such operations or take such other steps only upon the expiration of ninety (90) days after receipt of written notice from the Board.

(c) In those instances in which notice is expressly required under paragraph (a) or (b), above, damages, if due, shall be computed only from the date on which notice is received or, if Lessee commences compensatory payments, the date on which such payments are discontinued. In those instances in which there is no requirement of notice under (a) or (b), above, damages, if due, shall be computed from the time Lessee knew or reasonably should have known drainage was occurring. Written notice containing a demand for performance shall be necessary as a prerequisite to any action for cancellation of the lease by Lessor for nonperformance of any obligations of Lessee to protect the leased premises against drainage.

6. Lessee shall pay to Lessor as royalty, **(unless Lessor elects to take in kind the portion due it as royalty, the option so to do being expressly reserved herein pursuant to Act 599 of 1970)**

(a) **One-Fifth (1/5th)** of the value, as hereinafter provided, of all oil, including condensate and other liquid hydrocarbons, produced and saved or utilized by methods considered ordinary production methods at the time of production. The value of such oil shall not be less than the average price for oil of like grade and quality posted for the field in which this lease is situated. If there is no price posted for the field in which this lease is situated, the value of such oil shall be not less than the average of prices posted for oil of like grade and quality for the three fields nearest to the field in which this lease is situated for which such prices are posted. If Lessee enters into an oil sales contract which, at the time of execution, provides for a price equal to or in excess of the appropriate average price referred to in the two preceding sentences, the price payable under the terms of the contract at the time such oil is run shall be the value of such oil, even though the appropriate average changes during the life of the contract; however, any such contract must have been prudently negotiated under the circumstances existing at the time of execution. If Lessee is unable, after diligent effort, to sell such oil for a price equal to or in excess of the appropriate average price and Lessee consequently negotiates a contract to sell such oil to an independent party at a lesser price, the value of such oil for the duration of any such contract (but not in excess of one year) shall be the price received by Lessee under such contract.

Lessee shall not make any deduction whatsoever for the cost of any operation, process, facility, or other item considered to be a production function or facility at the time such oil is run. Without limiting the foregoing sentence and without regard to classification as production costs or otherwise, the following costs are not to be deducted from the value of production: (1) costs incurred for gathering or transporting production in the field; (2) costs incurred for handling, treating, separating, or in any way processing production to make it marketable by methods considered ordinary at the time such oil is run; and (3) the cost of storage on the lease or in the field. The performance of any producing function or any function mentioned in clauses (2) and (3) of the foregoing sentence at a commingled facility in or outside the field in which this lease is situated shall not make the cost of any such function deductible.

If Lessee delivers such oil at a point outside the field in which this lease is situated, Lessee may deduct from the value of such oil the actual costs of transportation from the field to the point of delivery by means of facilities belonging to an independent party. If such transportation is by means of facilities owned by one other than an independent party, Lessee may deduct the actual cost of such transportation, but only if such cost is no greater than the fair value of the services performed; if actual cost is greater than fair value, the fair value shall determine the amount deductible; however, if the facilities used are regulated as a common carrier by a state or federal regulatory agency, the authorized tariff chargeable for the services rendered and paid by Lessee shall be deemed the fair value of such services. If such transportation is by means of any facilities owned by Lessee, Lessee may deduct from the value of production a reasonable sum for such services, computed as follows: the amount deductible shall include only (1) the direct cost of operation and maintenance, including cost of labor, direct supervision, fuel, supplies, ordinary repairs, and ad valorem taxes; and (2) depreciation of the facility computed over the estimated life of the field.

If Lessee receives any compensation for any function or process for which Lessee is responsible to Lessor without right to deduct costs, including, but not limited to, (1) handling, gathering, or transporting such oil, or (2) treating or processing such oil by ordinary methods to make it marketable, the amount of such compensation shall be added to the value of such oil when computing royalties. If Lessee is deducting costs for any functions for which he is also receiving compensation, deductions may be made only to the extent that they are in excess of any such compensation.

(b) **One-Fifth (1/5th)** of the value as hereinafter provided, of all gas, including casinghead gas, produced and saved or utilized by methods considered as ordinary production methods at the time of production. When such gas is sold by Lessee to an independent party under an arms' length contract prudently negotiated under the facts and circumstances existing at the time of its execution, the value of such gas and of gas utilized by Lessee shall be the price received by Lessee for such gas under the contract. If the purchaser is not an independent party but the contract would have been considered prudently negotiated under the facts and circumstances existing at the time of its execution if made with an independent party, then the value of the gas shall be the price received by Lessee under the contract; if the contract would not have been considered prudently negotiated if made with an independent party, the value of such gas shall be its fair value at the time of production but not less than the average of the prices paid for gas of like kind and quality from the field from which such gas is being produced, or if no gas is being sold from that field, the average of prices paid for gas of like kind and quality in the three nearest fields in which gas of like kind and quality is being sold, all comparisons to be with contracts made in the same market (either interstate or intrastate) and for the sale of similar quantities of gas. In all other cases the value of such gas shall be the average stated in the last clause of the preceding sentence.

Except as expressly permitted herein, Lessee shall not make any deduction whatsoever for the cost of any operation, process, facility, or other item considered to be a producing function at the time such gas is produced. Without limiting the foregoing sentence and without regard to classification as production costs or otherwise, the

following costs are not to be deducted from the value of production: (1) costs incurred for gathering or transporting production in the field; or (2) costs incurred for dehydrating, decontaminating, or in any way processing production to make it marketable by methods considered ordinary at the time such gas is produced. The performance of any producing function or any function mentioned in clause (2) of the foregoing sentence at a commingled facility in or outside the field in which this lease is situated shall not make the cost of any such function deductible. Without regard to classification as production costs or otherwise, Lessee may deduct costs incurred for compression of gas at a point in or adjacent to the field for insertion into a purchaser's line or into a line owned by Lessee or a carrier for transportation to a point of delivery outside the field.

If Lessee delivers such gas at a point outside the field in which this lease is situated, Lessee may deduct from the value of such gas a reasonable sum for transportation from the field to the point of delivery by means of facilities belonging to an independent party, not in excess of actual cost. If such transportation is by means of facilities owned by one other than an independent party, Lessee may deduct the actual cost of such transportation, but only if such cost is no greater than the fair value of the services performed; if actual cost is greater than fair value, the fair value shall determine the amount to be deducted. If such transportation is by means of any facilities owned by Lessee, Lessee may deduct from the value of production a reasonable sum for such services, computed as follows: the amount deductible shall include only (1) the direct cost of operation and maintenance, including cost of labor, direct supervision, fuel, supplies, ordinary repairs, and ad valorem taxes; and (2) depreciation of the facility computed over the estimated life of the field.

If Lessee receives any compensation for any function or process for which Lessee is responsible to Lessor without right to deduct costs, including but not limited to, (1) gathering or transporting such gas or (2) dehydrating, decontaminating, or in any way processing production to make it marketable, the amount of such compensation shall be added to the value of such gas when computing royalties. If Lessee is deducting costs for any functions for which he is also receiving compensation, deductions may be made only to the extent they are in excess of any such compensation.

(c) In addition to the separation of condensate or other liquid hydrocarbons from gas by ordinary production methods (as to which Lessor shall receive royalties above provided and for which separation no charge may be made by Lessee), gas produced hereunder, including casinghead gas, may be processed in a gasoline or other extraction plant in or serving the field, and products may be recovered therefrom either directly by Lessee or under contracts executed by Lessee. If Lessee enters into a contract for the processing of gas with an independent party or parties under which such party or parties retain in kind a portion of the products recovered from or attributed to such gas as consideration for processing, Lessee shall pay the royalty provided for gas in paragraph 6(b) based on the value, as hereinafter determined, of Lessee's share of such products under such contract. In all other cases Lessee shall pay the royalty provided for gas in paragraph 6(b) based on the value, as hereinafter determined, of the total products recovered, after deducting therefrom the costs of processing as specified below.

The value of such products (or Lessee's share thereof) in the cases above provided shall be the price or prices received by Lessee if sold under a contract or contracts prudently negotiated under the facts and circumstances existing at the time of execution with an independent party or parties. If such products are not sold to an independent party but are sold under a contract which would have been considered prudently negotiated if executed with an independent party, the value of such products (or Lessee's share thereof) shall be the price or prices received by Lessee. If such products are not sold to an independent party under a prudently negotiated contract or are sold to one other than an independent party under a contract which would not have been considered prudently negotiated if executed with an independent party, the value of the products shall be their fair market value at the plant at the time sold. The value of any such products (or Lessee's share thereof) not sold under any contracts shall be the fair market value at the plant for such products, or if no products are being sold at the plant, the average of the market values for like products of the same grade and quality at the three nearest plants at which such products are being sold.

When the cost of processing is not met by retention by the processor of a share of the products or in any other case in which Lessee is to deduct from the value of such products the cost of processing, the charges shall be determined as follows. If the gas is processed by an independent party or parties under a contract prudently negotiated under the facts and circumstances existing at the time of execution, the charges deducted shall be those provided in such contract. In all other cases, including processing by those other than an independent party or parties and those in which Lessee itself or in conjunction with others owns the plant, the charges should be determined by contract between Lessee and Lessor. In the absence of such a contract the charges to be deducted shall include only the proportionate part of: (1) the direct cost of operating and maintaining the plant, computed annually, including cost of labor and on site supervision, materials, supplies, and ordinary repairs; (2) plant fuel and shrinkage; (3) depreciation of the plant computed over the life or lives of the field or fields served by the plant, or by such other method as is agreed upon by Lessor and Lessee; and (4) ad valorem taxes.

In all of the cases provided for in this paragraph, Lessor shall be entitled to the royalty for gas provided in paragraph (b) of this Article based on the value of Lessee's share of the residue gas sold or otherwise disposed of after processing.

(d) If at any time or times (during or after the primary term) there is on the leased premises a well or wells capable of producing gas in paying quantities, but gas is not being used or marketed therefrom because of the lack of a reasonable market or marketing facilities or governmental restrictions and if this lease is not then being otherwise maintained by separate operations or production, this lease shall, nevertheless, remain in full force and effect for a period of ninety (90) days after cessation of such production or such operations or the shutting in of such well. If, on or before the expiration of the ninety (90) day period, production or operations shall not have been commenced or resumed, Lessee, in order to maintain the lease in force thereafter, shall commence semi-annual payments to the Lessor at the rate and in the manner provided hereinbelow and thereby maintain the lease in full force and effect during the periods covered by such payments; however, if the ninety (90) day period should expire during the first year of the primary term or during any year for which a rental has previously been paid, the initial payment hereunder shall not be required until the next anniversary date of the lease. The first payment, if made, shall be tendered on or before the expiration of the ninety (90) day period or the appropriate an-

Case 23-90324 Document 712-1 Filed in TXSB on 07/25/23 Page 256 of 279

niversary date, as the case may be, and shall maintain this lease for six (6) months, commencing from the expiration of the ninety (90) day period or the anniversary date. Subsequent payments shall be made at six (6) month intervals thereafter (herein referred to as "shut-in payment dates"). Unless additional payment periods are earned as hereinafter provided, Lessee's right to make such payments shall continue for six (6) semi-annual periods (the total of which is herein called "initial payment period"). Each semi-annual payment shall be at the rate of three dollars ($3.00) per acre for the number of acres then covered by this lease, but no payment shall be less than two hundred dollars ($200.00). Each payment shall maintain this lease in full force and effect for a period of six (6) months, and during each period for which a payment has been made, it shall be considered that gas is being produced hereunder for all purposes hereof, but especially under the provisions of Articles 2, 4, 7, and 9; however, if the provisions of this paragraph 6(d) are in conflict with those of any other articles hereof, the provisions of this paragraph shall be controlling.

If on any shut-in payment date, actual drilling or mining operations are being conducted on or actual production of oil, gas, or other mineral in paying quantities is being obtained from the leased premises, no shut-in payment shall be due until the next shut-in payment date; however, the running of the initial payment period shall not be suspended or interrupted, and the same shall be true of any extension of that period by additional shut-in periods earned as hereinafter provided.

The initial payment period may be extended in the following manner. Lessee may earn two (2) additional six (6) month shut-in payment periods beyond the initial payment period for each additional well drilled or completed after completion of the shut-in well on which the initial shut-in payment was made (whether such additional wells are dry holes, producers, or shut-in wells). To qualify as a well "completed" after the first shut-in well, the completion must be in another hole, and no more than one completion will be counted for each additional hole regardless of the number of sands in any such hole. The aggregate additional periods (hereinafter referred to as "additional periods") so earned shall not exceed a total of six (6). The first of any additional periods shall commence from the date on which the initial payment period would have expired and the initial payment period, thus extended, shall continue to run from that date, regardless whether Lessee is actually required to make any additional payments. The Board and Lessee may by mutual agreement provide for further six (6) month periods (hereinafter called "further periods") beyond the initial payment period and any extension thereof.

If the end of the initial payment period falls within the primary term of this lease and at a time when there is a remaining rental date which would permit Lessee to maintain this lease by payment of rentals, Lessee may commence or resume the payment of rentals on the next anniversary date of this lease or may maintain this lease by any other means permitted under paragraphs 4(a) and 4(c). If the end of the initial payment period or any extension thereof falls within the last year of the primary term, it shall be considered that production has ceased under the terms of paragraph 4(a), and no rental shall be due for the remainder of the primary term. If the end of the initial payment period, any extension thereof, and any further periods falls on or after the expiration date of the primary term and there are no operations or actual production sufficient to maintain this lease under the provisions of paragraphs 4(b) and 4(c), this lease shall terminate.

The provisions of this paragraph shall be applicable to any well with a gas/oil ratio such that the Commissioner of Conservation will not permit its operation without use or sale of the gas.

Tender or acceptance of a shut-in payment or payments shall not free Lessee of any obligation to develop this lease as a prudent operator or to exercise diligent efforts to obtain a market for the gas so discovered.

(e) Two Dollars ($2.00) per long ton for all sulphur produced and saved.

(f) Twenty Cents (20¢) per ton for all potash produced and saved.

(g) One-Fifth (1/5th) of any and all other liquid or gaseous hydrocarbon minerals not specifically mentioned herein, said royalties to be delivered or paid as is the accepted custom in such matters.

(h) In all cases, Lessor's royalty shall be calculated and paid after deduction of all severance or production taxes.

(i) The first payment of royalty shall be made within 120 days following commencement of production from, or allocation of production to the leased premises. Thereafter, royalty on oil, including condensate and other liquid hydrocarbons, produced and saved at the well by ordinary production methods shall be paid by the 25th of each month for production of the previous month; and royalty on gas, including liquids or other products extracted or processed from gas other than by ordinary production methods, and on sulphur, potash, and other liquid or gaseous hydrocarbon minerals not specifically mentioned shall be paid on or before the 25th day of the second month following that in which produced or extracted or processed. Whenever Lessee is unable to make payments within the period so provided because of adverse claims, disputes, litigation, or other circumstance involving the title of Lessor or the extent of interest of Lessor, or whenever circumstances are such as to prevent Lessee from making payments within said periods, despite reasonable and diligent effort, Lessee shall not be required to make payments within said periods. In the event any royalty payment is not correctly or timely made, such royalty payment or unpaid portion thereof shall bear interest at the rate of six per cent per annum, beginning as of the date by which such payments should have been made and running until paid. The foregoing provisions for the payment of interest shall be in lieu of any right of Lessor to cancel the lease for nonpayment or incorrect payment of royalties, except in case of any deliberate and wrongful failure or refusal to pay such royalties after they become due as provided for above.

(j) For all purposes of this Article 6 "independent party" means a company, firm, or other business unit which is not: (1) a direct part of Lessee's corporate or other business structure; (2) a wholly owned or actually controlled subsidiary corporation or other business unit of Lessee; (3) a parent corporation of Lessee; or (4) a wholly owned or actually controlled subsidiary of Lessee's parent corporation.

7. (a) Lessee may surrender all or any portion or portions of the leased premises at any time this lease is in effect and thereby be relieved of all obligations thereafter accruing under this lease as to the portions surrendered; however, no partial release or surrender shall reduce or otherwise affect the amount of rentals provided for in Article 3 of this lease.

(b) In the event of cancellation or forfeiture of this lease Lessee may, nevertheless, retain hereunder forty (40) acres around each well capable of or producing oil and one hundred sixty (160) acres around each well producing gas and around each shut-in well capable of producing gas in paying quantities (including wells drilled under this lease by directional drilling). If any well is then being worked on or being drilled, Lessee shall have the right to complete such operations, and in the event any such operations result in completion of a well capable of producing oil or gas in paying quantities, Lessee may retain acreage around each such well as above provided. Retained acreage around any well shall form as near a square tract as is practical. If any acreage covered by this lease shall have been included in a unit established by the Commissioner of Conservation, or by conventional agreement, or if any such acreage shall have been assigned to a producing or shut-in well under statewide allowable orders of the Commissioner and such acreage is actually being drained by the well or would be drained by it if the well were produced, Lessee may retain all the acreage included in such unit or units or so assigned for allowable purposes.

8. It is further agreed and understood that the rights of Lessee may be assigned or transferred in whole or in part, but no transfer, whether in whole or in part, of the leased premises shall be valid unless such transfer or assignment be approved by the Board.

9. Lessee may, with the consent and approval of the Board, pool or combine the acreage covered by this lease (or any portion thereof) with any other property, lease, or leases (or portions thereof). Operations on or production of minerals from, or the existence of a shut-in gas well on, any portion of a unit, including units created by the Commissioner of Conservation or by conventional agreement, in which all or any part of the leased premises is embraced shall have the same effect under the terms of this lease as if it had occurred on the leased premises.

10. Should Lessee apply or give notice of intent to apply to the Commissioner of Conservation for the creation of any unit or units which would include all or any portion of the leased premises, Lessee shall furnish the Secretary of the Board with a copy of the notice or application, each accompanying unit plat, and all other attached information either at the time the application is filed with the Commissioner or at the time required by applicable orders or regulations of the Commissioner for furnishing such information to any parties entitled to receive it, whichever is earlier. If a unit or units including all or any part of the leased premises are created by order of the Commissioner, Lessee shall submit to the Board a survey plat of each unit or units so created.

11. On request by the Board or authorized members of its staff Lessee shall furnish any or all of the following types of data relating to wells drilled on the leased premises or lands pooled therewith: (1) all wire line surveys in open or cased holes, including, but not limited to, all electrical and radio activity logs, porosity logs of all types, and directional surveys; (2) core descriptions of both sidewall samples and conventional cores; (3) drill stem and production test data; and (4) production data, current and cumulative, including oil, gas, and water production. However, if furnishing any specific type of data among those described in the preceding sentence will require Lessee to release confidential trade information detrimental to its competitive position, Lessee may withhold such specific data for a reasonable time; the term "reasonable time" shall not exceed (1) a maximum period of 18 months for data on wells drilled to a depth of less than 15,000 feet measured from the surface and (2) a maximum period of 2 years (a) for wells drilled to a depth in excess of 15,000 feet measured from the surface, and (b) for Zone 1 wells located on leases bordering the Zone 2 boundary. After the lapse of said reasonable period, Lessee, at its option, shall either release such data or make it available for examination and study by members of the Board's technical staff without releasing it from Lessee's custody. Any information furnished to the Board, or furnished to or examined and studied by the Board's technical staff, shall be retained in confidence. Nothing in this Article shall require that Lessee furnish or permit inspection of any interpretations of any of the types of data referred to above, and nothing herein shall be construed as requiring Lessee to secure any such data solely for the purposes of this Article.

12. Lessee shall have the right during or within one year after the life of this lease to remove all Lessee's property and equipment, including the right to draw and remove all casing.

13. If at any time Lessee is maintaining this lease by actual drilling, reworking, or mining operations or by actual production and Lessee is prevented from continuing or resuming such operations or production by major storm, major flood, or other similar natural disaster or by a major accident such as a blowout, fire, or explosion and if Lessee cannot by reason of any such occurrence maintain this lease on any rental date by continuing any such operations or production or cannot maintain this lease beyond the primary term by continuing such operations or production, this lease shall not terminate and no rental shall be due so long as Lessee is so prevented from continuing or resuming such operations or production and is making diligent efforts to eliminate the effect of such occurrence.

14. If on the date of this lease all or any portion of the leased premises is included in a unit established by order of the Commissioner of Conservation, Lessee agrees to pay royalty on all oil, gas, and other hydrocarbons produced and saved or utilized and attributable to the leased premises from the date of this lease regardless whether all development and operating costs chargeable to the leased premises have been paid.


62
61
140
Y=240,000
233,830
9,060.98'
2,751,245.00
224,769.02
12,089.74'
2,761,780.00
221,740.20
71
72
73
147
146
Chevron 8"
Chevron 10"
Shell 12"
Shell 12"
2,751,245
2,086.66 Ac.
2,772,315
2,782,850
2,793,385
Y=214,972.00
6,876.69
7,881.31
2,773,331.50
207,593.00
TR 13566
3,148.10 AC.
JULY, 1975
X=2,763,508.00
75
74
148
149
Atlantic-Richfield
OFFICIAL COPY
STATE LAND OFFICE
DO NOT REMOVE
9,551.619
200 214
Y=200,000
29°10'00
MAIN PASS AREA, REV.
PLAQUEMINES PH.
76
77
151
150
2,886.47 A
2,773,059.619
200,214.000
2,778,266
2,793,024
8,975.315
185,456
Tot. 2,458.29 Ac.
1,440.83 Ac.
7805.22'
2,771,313.22
178,077.00
2,772,483.315
185,456.000
79
78
152
153
WEST 1/4 COR.
1017.46 AC
So. Natur
170,698
11,348.316'
3,409.68'
17.684
98.000

THUS DONE, READ, ACCEPTED, AND SIGNED by the parties hereto in the presence of the respective undersigned witnesses, as of the 14th day of July, A.D. 1975, which shall be the date of this lease for all purposes.

WITNESSES to the signature of Lessor:

Jeanette Martin Crow

Mildred B. Parker

STATE MINERAL BOARD

By: ____________, Chairman
For the State of Louisiana, Lessor
Andrew Martin

WITNESSES to the signature of Lessee:

Paul F. Nielsen

Muriel Everitt

For EXXON CORPORATION Lessee
W. M. Selvidge

**ACKNOWLEDGMENT FOR STATE MINERAL BOARD**

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

Before me, the undersigned authority, personally came and appeared Jeanette Martin Crow, who by me being first duly sworn, deposed and said; That she is one of the witnesses to the execution of the foregoing instrument and that she saw Andrew Martin sign said instrument as Chairman of the State Mineral Board for and on behalf of the State of Louisiana, in the presence of appearer and Mildred B. Parker, the other subscribing witness.

Sworn to and subscribed before me on this the 17 day of July, 19 75.

____________
Notary Public

Jeanette Martin Crow

**ACKNOWLEDGMENT FOR CORPORATE LESSEE**

STATE OF Texas
County OF Harris

Before me, the undersigned authority, personally came and appeared Paul F. Nielsen, who by me being first duly sworn, deposed and said; That he is one of the witnesses to the execution of the foregoing instrument and that he saw W. M. Selvidge execute said instrument as Attorney-in-Fact of Exxon Corporation as the free act and deed of said corporation in the presence of appearer and Muriel Everitt, the other subscribing witness.

Sworn to and subscribed before me on this the 24 day of July, 19 75.

____________
Notary Public

NaDeane Howard
Notary Public in and for Harris County, Texas
My Commission Expires June 1, 1977

Paul F. Nielsen

**ACKNOWLEDGMENT FOR INDIVIDUAL LESSEE**

STATE OF ____________
____________ OF ____________

Before me, the undersigned authority, personally came and appeared ____________, who by me being first duly sworn, deposed and said; That he is one of the witnesses to the execution of the foregoing instrument and that he saw ____________ execute said instrument as his own free act and deed in the presence of appearer and of ____________, the other subscribing witness.

Sworn to and subscribed before me on this the ____ day of ____________, 19____.

____________
Notary Public

____________

15.

3/13/73
(Rev. 7/11/73)
(Rev. 1/9/74)

APPROVED RIDER FOR ATTACHMENT TO
1966 LOUISIANA STATE LEASE FORM

---

1. Marketing of Natural Gas

For the purposes of this rider, the term "gas" shall include (i) gas well gas, (ii) gas cap gas produced after depletion of the oil column, and (iii) gas produced during the blow down period in a cycling or other secondary recovery project. These terms are to be construed as same are commonly understood in the oil and gas industry.

The parties hereto recognize and acknowledge that one of the essential considerations for Lessor entering into the oil, gas and mineral lease to which this rider is attached as a part thereof (herein referred to as the "Lease") is that if a well capable of producing gas in paying quantities is completed on the leased premises, or on lands pooled or unitized therewith, and is completed in a reservoir, or reservoirs, not previously committed to a gas sales contract, as permitted hereunder, such gas, insofar as attributable to the leased premises, shall be sold to an intrastate market, if such a market is available within a reasonable period of time as hereinafter provided. Therefore, in order to carry out the intentions of Lessor and Lessee in this regard, the parties hereto do hereby and by these presents agree that once a well capable of producing gas in paying quantities has been completed on the leased premises or on lands pooled or unitized therewith, the following agreements shall be thereafter effective:

(a) In the event such well is completed and qualified as a well capable of producing gas well gas, the Lease shall remain in force notwithstanding Paragraph 6(d) of the Lease without any shut-in payments being due from Lessee to Lessor for an initial period of eighteen (18) months after (a) such completion date, or (b) the effective date of pooling or unitization, as the case may be (herein called the "Initial Period"). During the Initial Period, Lessee agrees to make a diligent and good faith effort to obtain an intrastate market for the gas and, if such a market can be obtained, to enter into a gas sales contract for the intrastate marketing of said gas upon the best terms that can be obtained, but on terms customary in the industry for such contracts; or in lieu of obtaining a new intrastate market, Lessee shall have the option to deliver such gas under existing intrastate contracts (including amendments thereto) or take the gas for its own intrastate use. If the gas is delivered under such an existing contract royalty shall be paid thereon as set forth in Paragraph 6(b) of the Lease except that for purposes of determining prudency of negotiations and value of such gas where applicable under Paragraph 6(b) it shall be considered that the contract was negotiated and executed on the date such delivery commenced. If the gas is taken by Lessee for its own intrastate use and royalty is due thereon, such royalty shall be based on the current market value of the gas when so used. It is further provided that if the initial intrastate contract is for a term of five (5) years or less, then if upon its termination, the well is still capable of producing gas in paying quantities, all of the provisions of this rider shall be applicable to the obtaining of a new market for the gas and the Initial Period shall be deemed to commence as of the expiration date of the first intrastate contract. In no event, however, shall Lessee be required to sell gas to an intrastate market on terms and conditions less favorable than those which could be negotiated for a sale to an interstate market. Among the conditions to be considered in making this determination are the price to be paid for the gas; the availability and the cost, direct or indirect, to Lessee of a pipeline outlet; length of contract; inclusion of any price escalation; adjustment for BTU content; renegotiation provisions; on-line processing rights and availability of facilities; and rate of take. If, however, at the end of the Initial Period Lessee shall not have commenced the delivery of the gas to an intrastate market or shall not have entered into a firm intrastate gas sales contract on the terms and conditions hereinabove set forth, but during such period has drilled, or has commenced operations for the drilling of, an additional well on the leased premises, or on lands pooled or unitized therewith, in an attempt to establish additional gas reserves, or additional producibility, then Lessee, at its option, shall be entitled to an additional six (6) months period

(herein called the "Second Period"), commencing at the end of the Initial Period, within which to seek an intrastate market for such gas on the basis above set forth. In the event Lessee elects to obtain the Second Period, he shall prior to the end of the Initial Period so inform Lessor to that effect in writing and shall identify the additional well drilled or commenced during the Initial Period. During the Second Period the Lease shall remain in effect without any shut-in payment being due by Lessee to Lessor.

(b) As to gas cap gas (i. e. gas which cannot be produced until such time as the oil phase of the reservoir is depleted) and as to gas produced during the blow down period in a cycling or secondary recovery project, the provision of subparagraph (a) above shall be applicable, except (i) the Initial Period defined in subparagraph (a) above shall not commence until the date on which such gas cap gas or blow down gas is available for production and marketing, and (ii) the Second Period defined in subparagraph (a) above shall not be effective as to any gas covered by this subparagraph (b).

(c) Lessor and Lessee further agree that if within ninety (90) days after the commencement of the Initial Period, as defined in subparagraph (a) above, Lessee has not obtained an intrastate market for said gas after a diligent effort to obtain same and Lessee has the opportunity pursuant to Federal Power Commission Orders Nos. 418, 431 and 431-A, or any future similar orders, to sell gas to an interstate market under short term emergency sale contracts with pregranted abandonment, it shall, upon being granted said authorization and pregranted abandonment by the Federal Power Commission, have the right to sell said gas to said interstate market provided that the term of any such emergency sale contract shall not exceed the term of the Initial Period and the Second Period, if applicable.

(d) If at the end of the Initial Period or the Second Period, as the case may be, Lessee has provided for the intrastate marketing of said gas, but Lessee has not been able physically to commence delivery of gas to the market, then Lessee shall have an additional free period of six (6) months to permit installation of the necessary marketing equipment and facilities and to commence deliveries under that contract without any shut-in payment being due by Lessee to Lessor. If, at the end of the free period of six months provided for in the preceding sentence, deliveries have not commenced despite Lessee's good faith efforts to connect to the available market and if the Lease is not otherwise being maintained, Lessee may maintain the Lease by making shut-in gas payments as provided for in Paragraph 6(d) thereof, and it shall be considered that the well with respect to which such payments are to be made was shut in as of the end of the said additional free period.

(e) If at the end of the Initial Period or the Second Period identified above, as the case may be, Lessee has not provided for the intrastate marketing of said gas as set forth herein, and Lessor and Lessee have not mutually agreed to extend the period during which an intrastate market for said gas may be sought, Lessee shall be free to market said gas in interstate commerce. In addition, if at that time the Lease is not being otherwise maintained by separate operations or production as set forth in Paragraph 6(d) thereof, and Lessee desires to maintain the Lease by making shut-in gas well payments as provided for in said Paragraph 6(d), it shall be considered that the well with respect to which such payments are to be made was shut in as of the end of the Initial Period or Second Period, as the case may be.

(f) Lessor shall have the right, but not the obligation, to assist Lessee in its attempts to secure an intrastate market for any gas discovered on or allocated to the leased premises, which shall include the submission through Lessor's efforts of offers from prospective purchasers; provided, however, that if Lessee shall have complied with its obligations as provided for herein to attempt to obtain an intrastate market, the decision of Lessee on the acceptance or rejection of such intrastate offers shall be final insofar as gas attributable to the interest of Lessee is concerned.

(g) Lessee shall make a full and complete disclosure to Lessor of its efforts to obtain an intrastate market, including information concerning the contacts made with prospective intrastate purchasers and the details of all interstate and intrastate offers

made to Lessee as well as all contracts entered into under subparagraph 1(c) hereof. This information shall be furnished quarterly, beginning with the commencement of the Initial Period. All such information shall be kept strictly confidential by Lessor.

(h) Lessee shall not sell or commit to a contract any gas to be produced from or allocated to the leased premises unless said gas is to be produced from or allocated to a horizon or horizons, or their stratigraphic equivalent, which have been determined to be capable of producing gas in paying quantities on the effective date of such sale or commitment. Upon being presented reasonable justification for same, Lessor may elect to waive this restriction. It is further provided that the provisions of this rider and the time periods provided for herein shall relate separately to each such contract and to each different gas reserve as hereinafter defined. For the purposes of this rider each separate horizon, or as the case may be, each separate pool or reservoir, not committed under any prior gas contract shall be considered a "different gas reserve"; or if a prior contract committed all reserves to a specific depth or depths, "different gas reserves" shall be considered to be any discoveries below that specified depth or depths. In the event of the completion of a well in a different gas reserve, the Initial Period, as hereinabove defined, shall commence on the date a well is first completed in said different reserve or, as the case may be, when the gas is first ready for production and marketing.

(i) Lessor may waive any of the time periods provided for herein if it becomes satisfied that an intrastate gas market is not and will not be available, or if such waiver appears to be in the best interest of the State of Louisiana, and in connection therewith may enter into balancing agreements or similar agreements for placing other gas into an intrastate market under the terms of which Lessee may agree that the identical volume of gas produced from or allocated to the leased premises and sold by Lessee to an interstate market may subsequently be dedicated to or sold by Lessee to an intrastate market whether said gas is realized by Lessee out of subsequent production from or allocated to the leased premises or from other properties of Lessee.

(j) Lessee shall have the right to process the gas and sell the liquid components thereof as permitted by the Lease; provided, however, that if the gas has not previously been committed to an interstate market, no processing shall be utilized that will destroy the intrastate status of the gas.

2. Environmental Considerations

Lessee hereby agrees, as one of the obligations of this rider, that in exercising the rights granted it under the Lease, it will comply with and be subject to all applicable environmental laws and regulations validly adopted or issued by the State of Louisiana, or its agencies, or by the United States, or its agencies. Lessee further agrees that it will comply with all minimum water quality standards validly adopted by said governmental authorities with respect to oil pollution and noxious chemicals and waste being introduced into affected water areas. Further, in conducting all operations under this Lease requiring dredging, filling, or local navigation in order to explore, develop or exploit shallow-water areas, Lessee shall comply with the applicable requirements of the appropriate Louisiana state agency charged with the environmental management of said area. Finally, it is understood and agreed that on depletion of production or completion of operations under this Lease, the Lessee shall remove all structures which would impede commercial fishing and trawling, including, without limitation, all submerged materials, equipment or debris placed on the leased premises by or for the account of Lessee; and the affected water bottoms shall, to the extent reasonably possible of accomplishment, be returned or restored to a condition as nearly equivalent to that which existed before said operations were conducted and/or structures were constructed. Lessee further agrees that in exercising the rights granted it hereunder and in discharging the obligations undertaken in paragraph 2 of this rider, involving issuance of advance certifications, permits or approvals, it will allow

sufficient lead time in the planning of its activities to permit the affected regulatory agencies to make appropriate review of the proposed operations.

3. Deferred Development

Notwithstanding anything to the contrary herein contained, it is understood and agreed that in the event during the primary term of this Lease, or within one (1) year thereafter (if the Lease is then in force and effect), a portion of the property covered hereby is integrated and included or placed with other lands in a pooled or combined unit, whether by order of a governmental agency or by conventional contract, then unit drilling operations or unit reworking operations or unit production from a well situated on lands or property embraced in such unit or units (hereinafter collectively called "unitized operations"), shall serve to maintain this Lease in force and effect as to the entirety of the leased premises, subject however to the following express requirements in lieu of reasonable development of the "outside acreage", as hereinafter defined, which is not otherwise maintained under the terms of this Lease all as set out more completely hereinbelow in this paragraph 3. If on the anniversary date of the Lease next ensuing after the commencement of unitized operations (or if the first date of unitized operations is less than 90 days prior to the anniversary date, then on the expiration of 90 days after such first date of unitized operations) this Lease is not being maintained under its terms by means other than unitized operations, the Lease shall terminate on said anniversary date (or at the end of said 90 day period as the case may be) as to all outside acreage unless on or before said anniversary date (or the end of said 90 day period, as the case may be) Lessee pays or tenders to Lessor, as a deferred development payment, a sum of money equal to one-half of the rate per acre of the cash bonus paid for the Lease multiplied by the number of acres then comprising the outside acreage, which tender or payment shall maintain this Lease in effect as to such outside acreage not otherwise maintained under the terms of the Lease until the next ensuing anniversary date. By similar tender or payment of a deferred development payment on or before each succeeding annual anniversary date this Lease may so be maintained in force during the remainder of the primary term (if any) and for two years thereafter as to such outside acreage. After the expiration of the periods during which the Lease may be maintained by deferred development payments as above provided, if this Lease at any time is not being maintained in effect by other than unitized operations, it shall terminate as to all outside acreage not otherwise so maintained under the provisions of this Lease, provided that if a unit or units is created after the expiration of said periods the effect of which is to convert non-unitized operations, as hereinafter defined, into unitized operations, it shall be regarded for all purposes of this Lease as though there had been on the effective date of such unit or units a cessation of production on the outside acreage. If at any time during the primary term of the Lease or within one year thereafter there is a cessation of all non-unitized operations as hereinafter defined, whether same occurs as the result of the actual cessation of such operations or as the result of non-unitized operations being converted into unitized operations, then Lessee, in lieu of resuming non-unitized operations as provided in this Lease, may elect to maintain this Lease in effect as to the outside acreage by tendering or paying a deferred development payment, computed as hereinabove provided, on the next ensuing anniversary date of this Lease (or within 90 days from the cessation of non-unitized operations if such cessation should occur less than 90 days prior to such anniversary date). If at any time during the second year after the primary term of the Lease, there is a cessation of non-unitized operations as hereinabove defined, whether same occurs as the result of the actual cessation of such operations or as the result of non-unitized operations being converted into unitized operations, then the entire Lease shall nevertheless remain in effect until the next ensuing anniversary date.

Nothing contained in this paragraph 3 is intended to create nor shall have the effect of creating several or separate leases, or in any manner to extend, increase or limit the obligation of Lessee to protect the leased premises from drainage as stated in this Lease, or otherwise. If at any time, either during the primary term of this Lease or the limited extension of this Lease beyond its primary term as provided above in this paragraph 3, as to the outside acreage not otherwise held under the terms hereof, Lessee prosecutes non-unit drilling operations or non-unit reworking operations or

obtains non-unit production from the leased premises (hereinafter collectively called "non-unitized operations"), then the provisions of this paragraph shall not thereafter apply so long as said non-unitized operations shall continue.

The provisions of this paragraph 3 shall also be applicable to a unitized shut-in gas well, but in this event, the annual deferred development payment shall be reduced by deducting therefrom the amount of shut-in gas well payments due, if any, during the same period under paragraph 6 of the Lease which is applicable to the acreage on which the deferred development payment is applicable.

For purposes of this paragraph the following definitions shall apply:

(a) The term "anniversary date" shall mean the date of this Lease and the same date of each next ensuing year or years.

(b) The term "outside acreage" shall mean all of the leased premises, except any portion(s) thereof included in a unit or units on which unitized operations are being conducted.

4. Disclosure Obligation

Upon request of Lessor, Lessee shall furnish Lessor copies of the following on all wells drilled on the leased premises or on lands pooled or unitized therewith:

(a) all wire line surveys in open or cased holes, including, but not limited to, all electrical and radio activity logs, porosity logs of all types, and directional surveys;

(b) core descriptions of both sidewall samples and conventional cores;

(c) drill stem and production test data; and

(d) production data, current and cumulative, including oil, gas and water production and surface and subsurface pressures.

All such information shall be kept strictly confidential by Lessor.

5. Marketing of Sulphur, Potash, Oil, and Other Liquid Hydrocarbon Minerals

(a) "If either oil or other liquid hydrocarbon minerals is produced, in paying quantities, from the lease premises or on lands pooled or unitized therewith, such minerals, insofar as they are attributable to the leased premises, shall be sold by Lessee to an intrastate market for refining or processing in the State of Louisiana if such market is available within a reasonable period of time, as more fully set out herein below; or in lieu of obtaining a new intrastate market, Lessee may deliver such minerals under its existing intrastate contracts to be refined or processed in the State or to take the minerals for its own intrastate refining or processing. If Lessee does not elect to deliver such minerals under existing intrastate contracts or to take such minerals for its own intrastate uses, then for a period of ninety (90) days from the date of such production Lessee agrees to make a diligent and good faith effort to obtain an intrastate market for such minerals that will cause them to be refined or processed in the State of Louisiana, and, if such a market can be obtained, to enter into a contract for the sale of such minerals to an intrastate market upon the best terms that can be negotiated, but on terms customary in the industry for such contracts. In no event, however, shall Lessee be required to sell such minerals to an intrastate market at a price less favorable than that which could be negotiated for a sale of the minerals to an interstate market and in no event shall Lessor's royalty be based on less than the current market value of the minerals. If at the end of the ninety (90) day period Lessee has not been able to sell such minerals to an intrastate market in accordance with the provisions hereof, Lessee shall be free to market such

minerals to any purchaser whether intrastate or interstate in character. If the minerals are taken by Lessee for its own use or are delivered under an existing intrastate contract and royalty is due thereon, such royalty shall be based on the current market value of the minerals when so used or delivered."

(b) If either sulphur or potash is produced in paying quantities from the leased premises or on lands pooled or unitized therewith, the same provisions of paragraph 5(a) shall be applicable except that the royalty to be paid Lessor shall be that fixed in Paragraph 6 (e) and (f), respectively, of the lease.

(c) If the ninety (90) day period becomes operative, then it will be considered as a period during which Lessee is producing minerals from the premises in paying quantities, which production will have the same effect as actual production would have on the lease.

(d) For the purpose of assessing the performance of Lessee of the obligations imposed by this Paragraph 5, the disclosure provisions of Paragraph 1(g) of this rider shall be applicable.

(e) The waiver provisions of Paragraph 1(i) of this rider shall be applicable to the terms and conditions contained in this Paragraph 5.

6. Take in Kind

Nothing contained in this rider or the lease shall be interpreted as limiting the right of Lessor to take its royalty on any minerals "in kind" and Lessor's option to take in kind may be exercised at any time. The acceptance by Lessor of royalty other than in kind shall not be construed as a waiver of Lessor's option to take in kind at a later time or times.

7. Conflict of Terms

In the event of a conflict between any provision of this rider and any of the provisions of the lease, the provisions of this rider shall control.

8. Notice

Except in the situations where specific time periods are established for performance, Lessee shall not be in default under the Lease with respect to the violation of any provision of this rider until 30 days after written notice of such violation is received from Lessor, and Lessee has not corrected or commenced to correct such violation.

9. Severability

In the event that this rider or any provisions hereof is declared to be illegal or unconstitutional, its nullity shall in no way impair the validity of the Lease to which this rider is attached or of other portions of the rider not declared illegal or unconstitutional; provided that Lessee shall not directly or indirectly institute or cause to be instituted any action seeking to declare the nullity or the unenforceability of this rider or any part thereof.

16.

Notwithstanding any of the above provisions of this lease to the contrary, this lease is granted and accepted without any warranty or recourse against lessor whatsoever, either expressed or implied, it being expressly agreed that the Lessor shall not be required to return any payments received hereunder or be otherwise responsible to lessee.

State Lease No. **6894**
Louisiana State Lease Form Revised, 1975 with Approved Rider Attached.

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas, and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received and duly opened in the City of Baton Rouge, Parish of East Baton Rouge, State of Louisiana on the **11th** day of **February**, 19**76**, at a meeting of the State Mineral Board of the State of Louisiana; and,

WHEREAS, by resolution duly adopted, the State Mineral Board accepted the bid of **Exxon Corporation**

whose mailing address is **P. O. Box 2180, Houston, Texas 77001**,

(hereinafter referred to as "Lessee") as being the most advantageous to the State of Louisiana:

NOW, THEREFORE, be it known and remembered that the State Mineral Board of the State of Louisiana (hereinafter referred to as "the Board"), acting under authority of said Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, and acting for and in behalf of the State of Louisiana, as Lessor, does hereby lease, let, and grant exclusively unto the said Lessee, and Lessee's successors and assigns, the below described property for the purpose of exploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining, and producing sulphur, potash, oil, gas, and any other liquid or gaseous hydrocarbon minerals. In connection therewith Lessee shall have the right to use so much of the property as may be reasonably necessary for such operations, including but not limited to storing minerals and fluids in facilities or by means other than subsurface storage; laying pipelines; dredging canals, and building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines, houses for employees, and other structures and facilities. The leased property, situated in the Parish of **Plaquemines**, State of Louisiana, is more fully described as follows:

**ENTIRE TRACT NO. 13821, Said Tract No. 13821 being described as follows:**

TRACT 13821 - PORTION OF BLOCK 72, MAIN PASS AREA, REVISED, Plaquemines Parish, Louisiana

That portion of Block 72, Main Pass Area, Revised, Plaquemines Parish, Louisiana, belonging to the State of Louisiana and not under mineral lease on November 17, 1975, described as follows: Beginning at the Southwest corner of Block 72, Main Pass Area, Revised, having Lambert Plane Coordinates of X = 2,761,780.00 and Y = 214,972.00; thence North 6,768.26 feet to a point having Lambert Plane Coordinates of X = 2,761,780.00 and Y = 221,740.26; thence Southeasterly along an arc having a radius of 18,240.6 feet and a vertex of X = 2,755,325.0 and Y = 204,680.0 to a point on the South line of said Block 72 having Lambert Plane Coordinates of X = 2,770,384.69 and Y = 214,972.00; thence West 8,604.69 feet to the point of beginning, estimated to contain approximately 810.01 acres, as shown outlined in red on a plat on file in the State Land Office, LESS AND EXCEPT that portion thereof, if any, which is more than three nautical miles from the coast line as determined by the Report of the Special Master in the litigation in the Supreme Court of the United States styled United States v. State of Louisiana et al No. 9 Original, said three mile line as set out in the June, 1975, decree of the Supreme Court. All bearings are based on Louisiana Lambert Plane Coordinate System (South Zone).

one year from the date hereof, ... tender to the Lessor the sum of **Five Million, Six Hundred Two Thousand and No/100ths ($5,602,000.00)** Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to the order of Register, State Land Office and delivered or mailed by registered mail to the Register on or before the rental paying date.

4. (a) If on any rental paying date actual drilling or mining operations are being conducted on or production in paying quantities is being obtained from the leased premises, no rental shall be due for the annual rental period then commencing, if actual drilling or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to commence or resume production, commence actual mining operations or actual drilling operations on the leased premises, or make the rental payment, and the commencement or resumption of production, commencement of such operations, or payment of rental within the ninety (90) day period shall have the same effect as though resumed, commenced, or paid on or before the rental paying date.

(b) If at the expiration of the primary term sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well, if a well be abandoned or production should cease within ninety (90) days prior to the expiration of the primary term) Lessee commences actual drilling, mining, or reworking operations on the leased premises in an effort to make the premises produce any such minerals (or production is commenced or resumed during such ninety (90) day period), then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

State Lease No. **6894**
Louisiana State Lease Form Revised, 1975
with Approved Rider Attached.

WHEREAS, under the provisions of Chapter 2, Title 30 of the Louisiana Revised Statutes of 1950, as amended, and other applicable laws, the State Mineral Board of the State of Louisiana advertised for bids for an oil, gas, and mining lease on the hereinafter described property; and,

WHEREAS, in response to the necessary regular advertisements, bids were received and duly opened in the City of Baton Rouge, Parish of East Baton Rouge, State of Louisiana on the **11th** day of **February**, 19**76**, at a meeting of the State Mineral Board of the State of Louisiana, and,

[illegible] **Exxon Corporation**

To the extent such permit is required there is included in the rights herein granted a permit to conduct geophysical and geological work on the leased premises, and when shot points are used, such work shall be done under all applicable rules, regulations, and statutes in force at the time such work is conducted.

1. Lessee has this day paid to Lessor the sum of **Eleven Million, Two Hundred Four Thousand and No/100ths ($11,204,000.00)** Dollars as the full and adequate consideration for every right granted hereunder and not as mere rental for a period.

2. Subject to the other provisions hereof this lease shall be for a term of **five (5)** years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation is conducted, payment is made, or condition exists, which continues this lease in force, according to its terms.

3. If actual drilling or mining operations are not commenced hereunder on the leased premises in good faith on or before one year from the date hereof, this lease shall then terminate unless Lessee on or before the expiration of that period shall pay or tender to the Lessor the sum of **Five Million, Six Hundred Two Thousand and No/100ths ($5,602,000.00)** Dollars (hereinafter called "rental") which shall extend for twelve (12) months the time within which drilling or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders, all of Lessee's rights hereunder may be maintained without actual drilling or mining operations for successive periods of twelve (12) months each during the primary term. Payment or tender of rental may be made by check or draft of Lessee made payable to the order of Register, State Land Office and delivered or mailed by registered mail to the Register on or before the rental paying date.

4. (a) If on any rental paying date actual drilling or mining operations are being conducted on or production in paying quantities is being obtained from the leased premises, no rental shall be due for the annual rental period then commencing; if actual drilling or mining operations be abandoned at any time within a period of ninety (90) days prior to any rental paying date or if production ceases within such ninety (90) days, Lessee shall have a period of ninety (90) days after the date of such abandonment of operations or cessation of production within which to commence or resume production, commence actual mining operations or actual drilling operations on the leased premises, or make the rental payment, and the commencement or resumption of production, commencement of such operations, or payment of rental within the ninety (90) day period shall have the same effect as though resumed, commenced, or paid on or before the rental paying date.

(b) If at the expiration of the primary term sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is not being produced hereunder but on or before that date (or on or before the end of ninety (90) days following cessation of production or abandonment of a well, if a well be abandoned or production should cease within ninety (90) days prior to the expiration of the primary term) Lessee commences actual drilling, mining, or reworking operations on the leased premises in an effort to make the premises produce any such minerals (or production is commenced or resumed during such ninety (90) day period), then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more

than ninety (90) days between cessation of operations and their recommencement whether on the same well or mine or on different wells or mines successively or so long as the production so commenced or resumed is obtained in paying quantities. If at any time or times after the expiration of the primary term production hereunder should for any reason cease or terminate, Lessee shall have the right at any time within ninety (90) days from cessation of production to resume production or actual drilling, mining, or reworking operations in an effort to make the leased premises again produce any of such minerals, in which event this lease shall remain in force so long as such operations are continued as above provided. If as a result of any such operations, sulphur, potash, oil, gas, or any other liquid or gaseous hydrocarbon mineral be found and produced or the production of any of them be restored, this lease shall continue in force so long as any of them is produced hereunder in paying quantities or this lease is otherwise being maintained as herein provided.

(c) This lease may be maintained in force by directional drilling operations (deviation from vertical), in which event actual drilling operations shall be considered to have commenced on the leased premises when the drill stem penetrates beneath the surface of the leased premises.

(d) Wherever used in this lease, "actual drilling operations" means actual drilling (commenced by spudding in) of a new well, including sulphur wells, or the good faith deepening, sidetracking, or the plugging back or attempted recompletion in a separate interval of an existing well (all such operations being commenced by actual downhole operations), "mining operations" means actual excavation of a mine or quarry; and "reworking operations" means reconditioning, cleaning out, or otherwise attempting in good faith to establish, increase, or restore production in an existing well by downhole operations. Once commenced, any such operations shall be deemed to continue so long as they are conducted in good faith without lapse of more than ninety (90) days. Actual drilling operations or mining operations shall be deemed to terminate on the last day actual operations of any kind, such as drilling, testing, or installation of equipment are conducted in good faith for the purpose of attempting to discover minerals or to complete a well or mine as a producer. Reworking operations shall be deemed to terminate on the last day such operations are conducted in good faith for the purpose of establishing, increasing, or restoring production.

5. The obligations set forth in this Article are applicable only to wells drilled on property which is not part of a pooled unit containing all or any portion of the leased property. Such property is hereinafter described in this Article as "adjoining property."

(a) If at any time during or after the primary term there is completed on adjoining property a well located within six hundred and sixty (660) feet of the leased premises (or within any spacing or pooling unit distance greater than 660 feet established by the Commissioner of Conservation) and such well produces oil, gas, or other liquid or gaseous hydrocarbons in paying quantities for twenty (20) days (which need not be consecutive) during any period of thirty (30) days, or produces its monthly allowable during such thirty (30) day period, rebuttable presumptions will arise: (1) that the leased premises are thereby being drained, (2) that the leased premises are not being reasonably protected from drainage by any well or wells on the leased premises or land pooled therewith, and (3) that an offsetting well on the leased premises would be economically feasible. If Lessee is the operator of or has a working interest in the adjoining property, Lessee will begin actual drilling operations for a well on the leased premises within ninety (90) days after the end of the above thirty (30) day period. In all other cases Lessee shall be required to begin such operations only within ninety (90) days after receipt of written notice from the Board of the expiration of the above thirty (30) day period. No offset well shall be necessary if, on or before the maturity date of the offset obligation or any deferred maturity date as hereinafter provided, any of the stated presumptions is rebutted or a unit for the well in question embracing all or part of the leased premises is formed by agreement with the Board or by order of the Commissioner of Conservation.

In lieu of commencing operations for an offset well as above provided, Lessee may, at Lessee's option, commence compensatory payments equal to the royalties herein provided, computed on one-half (½) of the oil, gas, or other liquid or gaseous hydrocarbons produced by the well in question on and after the date operations would have otherwise been commenced, value to be determined in accordance with the provisions of Article 6 of this lease. Such payments may be commenced on or before sixty (60) days after the date operations would otherwise have been commenced, but shall include any accrued compensatory payments. Thereafter, payments shall be due monthly in accordance with Article 6(i). Lessee shall not be in default in either commencing compensatory payments or in making further payments as above provided if despite due diligence Lessee is unable timely to obtain the production information on which such payments are to be based. In any such case, however, Lessee must on or before the due date of the payments, notify the Board in writing of Lessee's inability to make such payment, the reasons therefor, and Lessee's intent to make such payment at the earliest reasonable time. Compensatory payments may be continued, at Lessee's discretion, for not more than one year from the date on which offset operations would otherwise have been commenced. At the end of that time, or within 30 days from the end of any lesser period for which payments are made, Lessee shall comply with this offset obligation if the producing well continues to produce in paying quantities or to produce its allowable and the other conditions making this obligation operative are existent. The right to make compensatory payments is intended to permit Lessee to evaluate further the producing well, and the making of such payments shall not of itself be sufficient to maintain this lease in force and effect; however, the making of any such payments shall not prejudice Lessee's right to rebut any of the above enumerated presumptions.

(b) In addition to the specific offset drilling obligation above provided, Lessee agrees to drill any and all wells necessary to protect the leased premises from drainage of oil, gas, or other liquid or gaseous hydrocarbons by a well or wells on adjoining property or to take any other steps reasonably necessary to protect the leased premises against such drainage, including, but not limited to, obtaining the formation of appropriate drilling or production units. If Lessee is the operator of or has a working interest in any well on adjoining property Lessee shall be obligated to begin actual drilling operations for a well on the leased premises or to take such other steps as may be reasonably necessary to protect the leased premises within ninety (90) days from the time Lessee knows or reasonably should know that drainage is occurring. In all other cases Lessee shall be obligated to begin such operations or take such other steps only within ninety (90) days after receipt of written notice from the Board.

(c) In those instances in which notice is expressly required under paragraph (a) or (b), above, damages, if due, shall be computed only from the date on which notice is received or, if Lessee commences compensatory payments, the date on which such payments are discontinued. In those instances in which there is no requirement of notice under (a) or (b), above, damages, if due, shall be computed from the time Lessee knew or reasonably should have known drainage was occurring. Written notice containing a demand for performance shall be necessary as a prerequisite to any action for cancellation of the lease by Lessor for nonperformance of any obligations of Lessee to protect the leased premises against drainage.

6. Unless Lessor elects to take in kind all or any part of the portion due Lessor as royalty on minerals produced and saved hereunder, which option is hereby expressly reserved by Lessor pursuant to L.R.S. 30:127 A.4., and which is to be exercised by written notice by Lessor to Lessee at any time and from time to time while this lease is in effect and either prior or subsequent to acceptance by Lessor of royalties other than in kind, it being understood that nothing contained in this lease or in the rider attached hereto shall ever be interpreted as limiting or waiving said option, Lessee shall pay to Lessor as royalty:

(a) **One-Fifth (1/5th)** ____________ of the value, as hereinafter provided, of all oil, including condensate and other liquid hydrocarbons, produced and saved or utilized by methods considered ordinary production methods at the time of production. The value of such oil shall not be less than the average price for oil of like grade and quality posted for the field in which this lease is situated. If there is no price posted for the field in which this lease is situated, the value of such oil shall be not less than the average of prices posted for oil of like grade and quality for the three fields nearest to the field in which this lease is situated for which such prices are posted. If Lessee enters into an oil sales contract which, at the time of execution, provides for a price equal to or in excess of the appropriate average price referred to in the two preceding sentences, the price payable under the terms of the contract at the time such oil is run shall be the value of such oil, even though the appropriate average changes during the life of the contract; however, any such contract must have been prudently negotiated under the circumstances existing at the time of execution. If Lessee is unable, after diligent effort, to sell such oil for a price equal to or in excess of the appropriate average price and Lessee consequently negotiates a contract to sell such oil to an independent party at a lesser price, the value of such oil for the duration of any such contract (but not in excess of one year) shall be the price received by Lessee under such contract.

Lessee shall not make any deduction whatsoever for the cost of any operation, process, facility, or other item considered to be a production function or facility at the time such oil is run. Without limiting the foregoing sentence and without regard to classification as production costs or otherwise, the following costs are not to be deducted from the value of production: (1) costs incurred for gathering or transporting production in the field; (2) costs incurred for handling, treating, separating, or in any way processing production to make it marketable by methods considered ordinary at the time such oil is run; and (3) the cost of storage on the lease or in the field. The performance of any producing function or any function mentioned in clauses (2) and (3) of the foregoing sentence at a commingled facility in or outside the field in which this lease is situated shall not make the cost of any such function deductible.

If Lessee delivers such oil at a point outside the field in which this lease is situated, Lessee may deduct from the value of such oil the actual costs of transportation from the field to the point of delivery by means of facilities belonging to an independent party. If such transportation is by means of facilities owned by one other than an independent party, Lessee may deduct the actual cost of such transportation, but only if such cost is no greater than the fair value of the services performed; if actual cost is greater than fair value, the fair value shall determine the amount deductible; however, if the facilities used are regulated as a common carrier by a state or federal regulatory agency, the authorized tariff chargeable for the services rendered and paid by Lessee shall be deemed the fair value of such services. If such transportation is by means of any facilities owned by Lessee, Lessee may deduct from the value of production a reasonable sum for such services, computed as follows: the amount deductible shall include only (1) the direct cost of operation and maintenance, including cost of labor, direct supervision, fuel, supplies, ordinary repairs, and ad valorem taxes; and (2) depreciation of the facility computed over the estimated life of the field.

If Lessee receives any compensation for any function or process for which Lessee is responsible to Lessor without right to deduct costs, including, but not limited to, (1) handling, gathering, or transporting such oil, or (2) treating or processing such oil by ordinary methods to make it marketable, the amount of such compensation shall be added to the value of such oil when computing royalties. If Lessee is deducting costs for any functions for which he is also receiving compensation, deductions may be made only to the extent that they are in excess of any such compensation.

(b) **One-Fifth (1/5th)** ____________ of the value as hereinafter provided, of all gas, including casinghead gas, produced and saved or utilized by methods considered as ordinary production methods at the time of production. When such gas is sold by Lessee to an independent party under an arms' length contract prudently negotiated under the facts and circumstances existing at the time of its execution, the value of such gas and of gas utilized by Lessee shall be the price received by Lessee for such gas under the contract. If the purchaser is not an independent party but the contract would have been considered prudently negotiated under the facts and circumstances existing at the time of its execution if made with an independent party, then the value of the gas shall be the price received by Lessee under the contract; if the contract would not have been considered prudently negotiated if made with an independent party, the value of such gas shall be its fair value at the time of production but not less than the average of the prices paid for gas of like kind and quality from the field from which such gas is being produced, or if no gas is being sold from that field, the average of prices paid for gas of like kind and quality in the three nearest fields in which gas of like kind and quality is being sold, all comparisons to be with contracts made in the same market (either interstate or intrastate) and for the sale of similar quantities of gas. In all other cases the value of such gas shall be the average stated in the last clause of the preceding sentence.

Except as expressly permitted herein, Lessee shall not make any deduction whatsoever for the cost of any operation, process, facility, or other item considered to be a producing function at the time such gas is produced. Without limiting the foregoing sentence and without regard to classification as production costs or otherwise, the following costs are not to be deducted from the value of production: (1) costs incurred for gathering or transporting production in the field; or (2) costs incurred for dehydrating, decontaminating, or in any way processing production to make it marketable by methods considered ordinary at the time such gas is produced. The performance of any producing function or any function mentioned in clause (2) of the foregoing sentence at a commingled facility in or outside the field in which this lease is situated shall not make the cost of any such function deductible. Without regard to classification as production costs or otherwise, Lessee may deduct costs incurred for compression of gas at a point in or adjacent to the field for insertion into a purchaser's line or into a line owned by Lessee or a carrier for transportation to a point of delivery outside the field.

If Lessee delivers such gas at a point outside the field in which this lease is situated, Lessee may deduct from the value of such gas a reasonable sum for transportation from the field to the point of delivery by means of facilities belonging to an independent party, not in excess of actual cost. If such transportation is by means of facilities owned by one other than an independent party, Lessee may deduct the actual cost of such transportation, but only if such cost is no greater than the fair value of the

services performed; if actual cost is greater than fair value, the fair value shall determine the amount to be deducted. If such transportation is by means of any facilities owned by Lessee, Lessee may deduct from the value of production a reasonable sum for such services, computed as follows: the amount deductible shall include only (1) the direct cost of operation and maintenance, including cost of labor, direct supervision, fuel, supplies, ordinary repairs, and ad valorem taxes; and (2) depreciation of the facility computed over the estimated life of the field.

If Lessee receives any compensation for any function or process for which Lessee is responsible to Lessor without right to deduct costs, including but not limited to, (1) gathering or transporting such gas or (2) dehydrating, decontaminating, or in any way processing production to make it marketable, the amount of such compensation shall be added to the value of such gas when computing royalties. If Lessee is deducting costs for any functions for which he is also receiving compensation, deductions may be made only to the extent they are in excess of any such compensation.

(c) In addition to the separation of condensate or other liquid hydrocarbons from gas by ordinary production methods (as to which Lessor shall receive royalties above provided and for which separation no charge may be made by Lessee), gas produced hereunder, including casinghead gas, may be processed in a gasoline or other extraction plant in or serving the field, and products may be recovered therefrom either directly by Lessee or under contracts executed by Lessee. If Lessee enters into a contract for the processing of gas with an independent party or parties under which such party or parties retain in kind a portion of the products recovered from or attributed to such gas as consideration for processing, Lessee shall pay the royalty provided for gas in paragraph 6(b) based on the value, as hereinafter determined, of Lessee's share of such products under such contract. In all other cases Lessee shall pay the royalty provided for gas in paragraph 6(b) based on the value, as hereinafter determined, of the total products recovered, after deducting therefrom the costs of processing as specified below.

The value of such products (or Lessee's share thereof) in the cases above provided shall be the price or prices received by Lessee if sold under a contract or contracts prudently negotiated under the facts and circumstances existing at the time of execution with an independent party or parties. If such products are not sold to an independent party but are sold under a contract which would have been considered prudently negotiated if executed with an independent party, the value of such products (or Lessee's share thereof) shall be the price or prices received by Lessee. If such products are not sold to an independent party under a prudently negotiated contract or are sold to one other than an independent party under a contract which would not have been considered prudently negotiated if executed with an independent party, the value of the products shall be their fair market value at the plant at the time sold. The value of any such products (or Lessee's share thereof) not sold under any contracts shall be the fair market value at the plant for such products, or if no products are being sold at the plant, the average of the market values for like products of the same grade and quality at the three nearest plants at which such products are being sold.

When the cost of processing is not met by retention by the processor of a share of the products or in any other case in which Lessee is to deduct from the value of such products the cost of processing, the charges shall be determined as follows. If the gas is processed by an independent party or parties under a contract prudently negotiated under the facts and circumstances existing at the time of execution, the charges deducted shall be those provided in such contract. In all other cases, including processing by those other than an independent party or parties and those in which Lessee itself or in conjunction with others owns the plant, the charges should be determined by contract between Lessee and Lessor. In the absence of such a contract the charges to be deducted shall include only the proportionate part of: (1) the direct cost of operating and maintaining the plant, computed annually, including cost of labor and on-site supervision, materials, supplies, and ordinary repairs; (2) plant fuel and shrinkage; (3) depreciation of the plant computed over the life or lives of the field or fields served by the plant, or by such other method as is agreed upon by Lessor and Lessee; and (4) ad valorem taxes.

In all of the cases provided for in this paragraph, Lessor shall be entitled to the royalty for gas provided in paragraph (b) of this Article based on the value of Lessee's share of the residue gas sold or otherwise disposed of after processing.

(d) If at any time or times (during or after the primary term) there is on the leased premises a well or wells capable of producing gas in paying quantities, which fact has been duly verified and confirmed in accordance with Lessee's requirements for proof thereof, but gas is not being used or marketed therefrom because of the lack of a reasonable market or marketing facilities or governmental restrictions and if this lease is not then being otherwise maintained by separate operations or production, this lease shall, nevertheless, remain in full force and effect for a period of ninety (90) days after cessation of such production or such operations or the shutting in of such well. If, on or before the expiration of the ninety (90) day period, production or operations shall not have been commenced or resumed, Lessee, in order to maintain the lease in force thereafter, shall commence semi-annual payments to the Lessor at the rate and in the manner provided hereinbelow and thereby maintain the lease in full force and effect during the periods covered by such payments; however, if the ninety (90) day period should expire during the first year of the primary term or during any year for which a rental has previously been paid, the initial payment hereunder shall not be required until the next anniversary date of the lease. The first payment, if made, shall be tendered on or before the expiration of the ninety (90) day period or the appropriate anniversary date, as the case may be, and shall maintain this lease for six (6) months, commencing from the expiration of the ninety (90) day period or the anniversary date. Subsequent payments shall be made at six (6) month intervals thereafter (herein referred to as "shut-in payment dates"). Unless additional payment periods are earned as hereinafter provided, Lessee's right to make such payments shall continue for six (6) semi-annual periods (the total of which is herein called "initial payment period"). Each semi-annual payment shall be at the rate of three dollars ($3.00) per acre for the number of acres then covered by this lease, but no payment shall be less than two hundred dollars ($200.00). Each payment shall maintain this lease in full force and effect for a period of six (6) months, and during each period for which a payment has been made, it shall be considered that gas is being produced hereunder for all purposes hereof, but especially under the provisions of Articles 2, 4, 7, and 9; however, if the provisions of this paragraph 6(d) are in conflict with those of any other articles hereof, the provisions of this paragraph shall be controlling.

If on any shut-in payment date, actual drilling or mining operations are being conducted on or actual production of oil, gas, or other mineral in paying quantities is being obtained from the leased premises, no shut-in payment shall be due until the next shut-in payment date; however, the running of the initial payment period shall not be suspended or interrupted, and the same shall be true of any extension of that period by additional shut-in periods earned as hereinafter provided.

The initial payment period may be extended in the following manner. Lessee may earn two (2) additional six (6) month shut-in payment periods beyond the initial payment period for each additional well drilled or completed after completion of the shut-in well on which the initial shut-in payment was made (whether such additional wells are dry holes, producers, or shut-in wells). To qualify as a well "completed" after the first shut-in well, the completion must be in another hole, and no more than one completion will be counted for each additional hole regardless of the number of sands in any such hole. The aggregate additional periods (hereinafter referred to as "additional periods") so earned shall not exceed a total of six (6). The first of any additional periods shall commence from the date on which the initial payment period would have expired and the initial payment period, thus extended, shall continue to run from that date, regardless whether Lessee is actually required to make any additional payments. The Board and Lessee may by mutual agreement provide for further six (6) month periods (hereinafter called "further periods") beyond the initial payment period and any extension thereof.

If the end of the initial payment period falls within the primary term of this lease and at a time when there is a remaining rental date which would permit Lessee to maintain this lease by payment of rentals, Lessee may commence or resume the payment of rentals on the next anniversary date of this lease or may maintain this lease by any other means permitted under paragraphs 4(a) and 4(c). If the end of the initial payment period or any extension thereof falls within the last year of the primary term, it shall be considered that production has ceased under the terms of paragraph 4(a), and no rental shall be due for the remainder of the primary term. If the end of the initial payment period, any extension thereof, or any further period falls on or after the expiration date of the primary term and there are no operations or actual production sufficient to maintain this lease under the provisions of paragraphs 4(b) and 4(c), this lease shall terminate.

The provisions of this paragraph shall be applicable to any well with a gas/oil ratio such that the Commissioner of Conservation will not permit its operation without use or sale of the gas.

Tender or acceptance of a shut-in payment or payments shall not free Lessee of any obligation to develop this lease as a prudent operator or to exercise diligent efforts to obtain a market for the gas so discovered.

(e) **Three and One-Half Percent (3 1/2%)** of the value per long ton when marketed for all sulphur produced and saved, but not less than $2.00 per long ton.

(f) **One Percent (1%)** of the value per ton when marketed for all potash produced and saved, but not less than 10c per ton.

(g) **One-Fifth (1/5th)** of any and all other liquid or gaseous hydrocarbon minerals not specifically mentioned herein, said royalties to be delivered or paid as is the accepted custom in such matters.

(h) In all cases, Lessor's royalty shall be calculated and paid after deduction of all severance or production taxes.

(i) The first payment of royalty shall be made within 120 days following commencement of production from, or allocation of production to the leased premises, except that in the case of any production from or allocable to the leased premises, which has occurred prior to the date of but which is deemed to be covered by this lease, Lessee hereby agrees to pay Lessor's royalty on all such prior production within 120 days from the date of this lease. Thereafter, royalty on oil, including condensate and other liquid hydrocarbons, produced and saved at the well by ordinary production methods shall be paid by the 25th of each month for production of the previous month; and royalty on gas, including liquids or other products extracted or processed from gas other than by ordinary production methods, and on sulphur, potash, and other liquid or gaseous hydrocarbon minerals not specifically mentioned shall be paid on or before the 25th day of the second month following that in which produced or extracted or processed. In the event any royalty payment is not correctly or timely made, the remedies provided by L.S.A.:R.S. 31:137 through 142 relative to notice, damages, interest, attorney fees, and dissolution shall be applicable.

(j) For all purposes of this Article 6 "independent party" means a company, firm, or other business unit which is not: (1) a direct part of Lessee's corporate or other business structure; (2) a wholly owned or actually controlled subsidiary corporation or other business unit of Lessee; (3) a parent corporation of Lessee; or (4) a wholly owned or actually controlled subsidiary of Lessee's parent corporation.

7. (a) Lessee may surrender all or any portion or portions of the leased premises at any time this lease is in effect and thereby be relieved of all obligations thereafter accruing under this lease as to the portions surrendered, however, no partial release or surrender shall reduce or otherwise affect the amount of rentals provided for in Article 3 of this lease.

(b) In the event of cancellation or forfeiture of this lease Lessee may, nevertheless, retain hereunder forty (40) acres around each well capable of or producing oil and one hundred sixty (160) acres around each well producing gas and around each shut-in well capable of producing gas in paying quantities (including wells drilled under this lease by directional drilling). If any well is then being worked on or being drilled, Lessee shall have the right to complete such operations, and in the event any such operations result in completion of a well capable of producing oil or gas in paying quantities, Lessee may retain acreage around each such well as above provided. Retained acreage around any well shall form as near a square tract as is practical. If any acreage covered by this lease shall have been included in a unit established by the Commissioner of Conservation, or by conventional agreement, or if any such acreage shall have been assigned to a producing or shut-in well under statewide allowable orders of the Commissioner and such acreage is actually being drained by the well or would be drained by it if the well were produced, Lessee may retain all the acreage included in such unit or units or so assigned for allowable purposes.

8. It is further agreed and understood that the rights of Lessee may be assigned or transferred in whole or in part, but no transfer, whether in whole or in part, of the leased premises shall be valid unless such transfer or assignment be approved by the Board.

9. Lessee may, with the consent and approval of the Board, pool or combine the acreage covered by this lease (or any portion thereof) with any other property, lease, or leases (or portions thereof). Operations on or production of minerals from, or the existence of a shut-in gas well on, any portion of a unit, including units created by the Commissioner of Conservation or by conventional agreement, in which all or any part of the leased premises is embraced shall have the same effect under the terms of this lease as if it had occurred on the leased premises.

10. Should Lessee apply or give notice of intent to apply to the Commissioner of Conservation for the creation of any unit or units which would include all or any portion of the leased premises, Lessee shall furnish the Secretary of the Board with a copy of the notice or application, each accompanying unit plat, and all other attached information either at the time the application is filed with the Commissioner or at the time required by applicable orders or regulations of the Commissioner for furnishing such information to any parties entitled to receive it, whichever is earlier. If a unit or units including all or any part of the leased premises are created by order of the Commissioner, Lessee shall submit to the Board a survey plat of each unit or units so created.

11. Upon request by Lessor, Lessee shall furnish Lessor any or all of the following types of data relating to wells drilled on the leased premises or lands pooled therewith. (1) all wire line surveys in open or cased holes, including, but not limited to, all electrical and radio activity logs, porosity logs of all types, and directional surveys; (2) core descriptions of both sidewall samples and conventional cores; (3) drill stem and production test data, and (4) production data, current and cumulative, including oil, gas and water production, surface and subsurface pressures. Lessee shall also furnish Lessor with any other information and data requested by Lessor to keep Lessor fully informed that Lessee is complying with the provisions of this Lease in good faith, and developing and operating the leased premises as a reasonably prudent operator for the mutual benefit of Lessor and Lessee. Any information furnished by Lessee to Lessor or otherwise examined and studied by Lessor shall be retained in confidence. Nothing in this Article shall require that Lessee furnish or permit inspection of any interpretations of any of the types of data referred to above, and nothing herein shall be construed as requiring Lessee to secure any such data solely for the purposes of this Article. Lessor's representatives shall have access at all reasonable times to examine and inspect Lessee's records and operations pertaining to the leased premises or lands pooled therewith.

12. Lessee shall be obligated to plug and abandon all wells on the premises no longer necessary for operations or production on this lease, and to remove from the premises all structures and facilities serving said wells, all at Lessee's sole risk, cost and expense and subject to compliance with laws, rules and regulations. Lessee shall furnish bond as may be required at any time or times by Lessor, or such other security in lieu thereof as may be acceptable to Lessor, conditioned upon faithful performance of such obligations. In connection therewith, the right of Lessee to draw and remove casing from wells is recognized, provided such right is exercised by Lessee not later than one year after termination of this lease or portion thereof on which the well is located. If such right of salvage is not timely exercised, then the same shall be forfeited and said casing shall become the property of Lessor.

13. If at any time Lessee is maintaining this lease by actual drilling, reworking, or mining operations or by actual production and Lessee is prevented from continuing or resuming such operations or production by major storm, major flood, or other similar natural disaster or by a major accident such as a blowout, fire, or explosion and if Lessee cannot by reason of any such occurrence maintain this lease on any rental date by continuing any such operations or production or cannot maintain this lease beyond the primary term by continuing such operations or production, this lease shall not terminate and no rental shall be due so long as Lessee is so prevented from continuing or resuming such operations or production and is making diligent efforts to eliminate the effect of such occurrence.

14. If on the date of this lease all or any portion of the leased premises is included in a unit established by order of the Commissioner of Conservation, Lessee agrees to pay royalty on all oil, gas, and other hydrocarbons produced and saved or utilized and attributable to the leased premises from the date of such unit regardless whether all development and operating costs chargeable to the leased premises have been paid.

15. Notwithstanding any provisions to the contrary in this Lease or in the rider attached hereto, this Lease is granted and accepted without any warranty of title and without any recourse against Lessor whatsoever, either expressed or implied, it being expressly agreed that the Lessor shall not be required to return any payments received hereunder or be otherwise responsible to Lessee therefor.




OFFICIAL COPY
STATE LAND OFFICE
DO NOT REMOVE

SCALE: 1"=4000'

MAIN PASS AREA
(REVISED)

PLAQUEMINES PH., LOUISIANA

State Lease No. 6894

THUS DONE, READ, ACCEPTED, AND SIGNED by the parties hereto in the presence of the respective undersigned witnesses, as of the 16th day of February, A.D. 1976, which shall be the date of this lease for all purposes.

WITNESSES to the signature of Lessor:

Frances H. Dupuy
Frances H. Dupuy

Mildred B. Parker
Mildred B. Parker

STATE MINERAL BOARD

By: William C. Huls, Vice-Chairman
For the State of Louisiana, Lessor
William C. Huls

WITNESSES to the signature of Lessee:

Palmera C. Jimenez
Palmera C. Jimenez

Paul F. Nielsen
Paul F. Nielsen

W. M. Selvidge
For EXXON CORPORATION Lessee
W. M. Selvidge

## ACKNOWLEDGMENT FOR STATE MINERAL BOARD

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

Before me, the undersigned authority, personally came and appeared Frances H. Dupuy, who by me being first duly sworn, deposed and said: That she is one of the witnesses to the execution of the foregoing instrument and that she saw William C. Huls sign said instrument as Vice-Chairman of the State Mineral Board for and on behalf of the State of Louisiana, in the presence of appearer and Mildred B. Parker, the other subscribing witness.

Sworn to and subscribed before me on this the 16th day of February, 1976.

Frances H. Dupuy
Frances H. Dupuy

James ? Curley
Notary Public

## ACKNOWLEDGMENT FOR CORPORATE LESSEE

STATE OF TEXAS
COUNTY OF HARRIS

Before me, the undersigned authority, personally came and appeared Paul F. Nielsen, who by me being first duly sworn, deposed and said: That he is one of the witnesses to the execution of the foregoing instrument and that he saw W. M. Selvidge execute said instrument as Attorney-in-Fact of Exxon Corporation as the free act and deed of said corporation in the presence of appearer and Palmera C. Jimenez, the other subscribing witness.

Paul F. Nielsen
Paul F. Nielsen

Sworn to and subscribed before me on this the 19th day of February, 1976.

NaDeane Howard
Notary Public

NaDeane Howard
Notary Public in and for Harris County, Texas
My Commission Expires June 1, 1977

## ACKNOWLEDGMENT FOR INDIVIDUAL LESSEE

STATE OF ______
______ OF ______

Before me, the undersigned authority, personally came and appeared ______, who by me being first duly sworn, deposed and said: That he is one of the witnesses to the execution of the foregoing instrument and that he saw ______ execute said instrument as his own free act and deed in the presence of appearer and of ______ the other subscribing witness.

Sworn to and subscribed before me on this the ______ day of ______, 19___.

______
Notary Public

(Rev 7/9/75)

## APPROVED RIDER FOR ATTACHMENT TO 1975 LOUISIANA STATE AND STATE AGENCY LEASE FORMS

1 Marketing of Natural Gas

For the purposes of this rider, the term "gas" shall include (i) gas well gas, (ii) gas cap gas produced after depletion of the oil column, and (iii) gas produced during the blow down period in a cycling or other secondary recovery project. These terms are to be construed as same are commonly understood in the oil and gas industry.

The parties hereto recognize and acknowledge that one of the essential considerations for Lessor entering into the oil, gas and mineral lease to which this rider is attached as a part thereof (herein referred to as the "Lease") is that if a well capable of producing gas in paying quantities is completed on the leased premises, or on lands pooled or unitized therewith, and is completed in a reservoir, or reservoirs, not previously committed to a gas sales contract, as permitted hereunder, such gas, insofar as attributable to the leased premises, shall be sold to an intrastate market, if such a market is available within a reasonable period of time as hereinafter provided. Therefore, in order to carry out the intentions of Lessor and Lessee in this regard, the parties hereto do hereby and by these presents agree that once a well capable of producing gas in paying quantities has been completed on the leased premises or on lands pooled or unitized therewith, the following agreements shall be thereafter effective·

(a) In the event such well is completed and qualified as a well capable of producing gas well gas, the Lease shall remain in force notwithstanding Paragraph 6(d) of the Lease without any shut-in payments being due from Lessee to Lessor for an initial period of eighteen (18) months after (a) such completion date, or (b) the effective date of pooling or unitization, as the case may be (herein called the "Initial Period"). During the Initial Period, Lessee agrees to make a diligent and good faith effort to obtain intrastate market for the gas and, if such a market can be obtained, to enter into a gas sales contract for the intrastate marketing of said gas upon the best terms that can be obtained, but on terms customary in the industry for such contracts, or in lieu of obtaining a new intrastate market, Lessee shall have the option to deliver such gas under existing intrastate contracts (including amendments thereto) or take the gas for its own intrastate use. If the gas is delivered under such an existing contract royalty shall be paid thereon as set forth in Paragraph 6(b) of the Lease except that for purposes of determining prudency of negotiations and value of such gas where applicable under Paragraph 6(b) it shall be considered that the contract was negotiated and executed on the date such delivery commenced If the gas is taken by Lessee for its own intrastate use and royalty is due thereon, such royalty shall be based on the current market value of the gas when so used. It is further provided that if the initial intrastate contract is for a term of five (5) years or less, then if upon its termination, the well is still capable of producing gas in paying quantities, all of the provisions of this rider shall be applicable to the obtaining of a new market for the gas and the Initial Period shall be deemed to commence as of the expiration date of the first intrastate contract. In no event, however, shall Lessee be required to sell gas to an intrastate market on terms and conditions less favorable than those which could be negotiated for a sale to an interstate market. Among the conditions to be considered in making this determination are the price to be paid for the gas; the availability and the cost, direct or indirect, to Lessee of a pipeline outlet; length of contract; inclusion of any price escalation; adjustment for BTU content; renegotiation provisions; on-line processing rights and availability of facilities; and rate of take. If, however, at the end of the Initial Period Lessee shall not have commenced the delivery of the gas to an intrastate market or shall not have entered into a firm intrastate gas sales contract on the terms and conditions hereinabove set forth, but during such period has drilled, or has commenced operations for the drilling of, an additional well on the leased premises, or on lands pooled or unitized therewith, in an attempt to establish additional gas reserves, or additional producibility, then Lessee, at its option, shall be entitled to an additional six (6) months period (herein called the "Second Period"), commencing at the end of the Initial Period, within which to seek an intrastate market for such gas on the basis above set forth. In the event Lessee elects to obtain the Second Period, he shall prior to the end of the Initial Period so inform Lessor to that effect in writing and shall identify the additional well drilled or commenced during the Initial Period. During the Second Period the Lease shall remain in effect without any shut-in payment being due by Lessee to Lessor.

(b) As to gas cap gas (i. e. gas which cannot be produced until such time as the oil phase of the reservoir is depleted) and as to gas produced during the blow down period in a cycling or secondary recovery project, the provision of subparagraph (a) above shall be applicable, except (i) the Initial Period defined in subparagraph (a) above shall not commence until the date on which such gas cap gas or blow down gas is available for production and marketing, and (ii) the Second Period defined in subparagraph (a) above shall not be effective as to any gas covered by this subparagraph (b).

(c) Lessor and Lessee further agree that if within ninety (90) days after the commencement of the Initial Period, as defined in subparagraph (a) above, Lessee has not obtained an intrastate market for said gas after a diligent effort to obtain same and Lessee has the opportunity pursuant to Federal Power Commission Orders Nos. 418, 431 and 431-A, or any future similar orders, to sell gas to an interstate market under short term emergency sale contracts with pregranted abandonment, it shall, upon being granted said authorization and pregranted abandonment by the Federal Power Commission, have the right to sell said gas to said interstate market provided that the term of any such emergency sale contract shall not exceed the term of the Initial Period and the Second Period, if applicable.

(d) If at the end of the Initial Period or the Second Period, as the case may be, Lessee has provided for the intrastate marketing of said gas, but Lessee has not been able physically to commence delivery of gas to the market, then Lessee shall have an additional free period of six (6) months to permit installation of the necessary marketing equipment and facilities and to commence deliveries under that contract without any shut-in payment being due by Lessee to Lessor. If, at the end of the free period of six months provided for in the preceding sentence, deliveries have not commenced despite Lessee's good faith efforts to connect to the available market and if the Lease is not otherwise being maintained, Lessee may maintain the Lease by making shut-in gas payments as provided for in Paragraph 6(d) thereof, and it shall be considered that the well with respect to which such payments are to be made was shut in as of the end of the said additional free period.

(e) If at the end of the Initial Period or the Second Period identified above, as the case may be, Lessee has not provided for the intrastate marketing of said gas as set forth herein, and Lessor and Lessee have not mutually agreed to extend the period during which an intrastate market for said gas may be sought, Lessee shall be free to market said gas in interstate commerce. In addition, if at that time the Lease is not being otherwise maintained by separate operations or production as set forth in Paragraph 6(d) thereof, and Lessee desires to maintain the Lease by making shut-in gas well payments as provided for in said Paragraph 6(d), it shall be considered that the well with respect to which such payments are to be made was shut-in as of the end of the Initial Period or Second Period, as the case may be.

(f) Lessor shall have the right, but not the obligation, to assist Lessee in its attempts to secure an intrastate market for any gas discovered on or allocated to the leased premises, which shall include the submission through Lessor's efforts of offers from prospective purchasers; provided, however, that if Lessee shall have complied with its obligations as provided for herein to attempt to obtain an intrastate market, the decision of Lessee on the acceptance or rejection of such intrastate offers shall be final insofar as gas attributable to the interest of Lessee is concerned.

(g) Lessee shall make a full and complete disclosure to Lessor of its efforts to obtain an intrastate market, including information concerning the contacts made with prospective intrastate purchasers and the details of all interstate and intrastate offers made to Lessee as well as all contracts entered into under subparagraph 1(c) hereof. This information shall be furnished quarterly, beginning with the commencement of the Initial Period. All such information shall be kept strictly confidential by Lessor.

(h) Lessee shall not sell or commit to a contract any gas to be produced from or allocated to the leased premises unless said gas is to be produced from or allocated to a zone or zones, or their stratigraphic equivalent, which have been determined to be capable of producing gas in paying quantities on the effective date of such sale or commitment. Upon being presented reasonable justification for same, Lessor may elect to waive this restriction. It is further provided that the provisions of this rider and the time periods provided for herein shall relate separately to each such contract and to each different gas reserve as hereinafter defined. For the purposes of this rider each separate zone, or as the case may be, each separate pool or reservoir not committed under any prior gas contract shall be considered a "different gas reserve;" or if a prior contract committed all reserves to a specific depth or depths, "different gas reserves" shall be considered to be any discoveries below that specified depth or depths. In the event of the completion of a well in a different gas reserve, the Initial Period, as hereinabove defined, shall commence on the date a well is first completed in said different reserve or, as the case may be, when the gas is first ready for production and marketing.

(i) Lessor may waive any of the time periods provided for herein if it becomes satisfied that an intrastate gas market is not and will not be available, or if such waiver appears to be in the best interest of the State of Louisiana, and in connection therewith may enter into balancing agreements or similar agreements for placing other gas into an intrastate market under the terms of which Lessee may agree that the identical volume of gas produced from or allocated to the leased premises and sold by Lessee to an interstate market may subsequently be dedicated to or sold by Lessee to an intrastate market whether said gas is realized by Lessee out of subsequent production from or allocated to the leased premises or from other properties of Lessee.

(j) Lessee shall have the right to process the gas and sell the liquid components thereof as permitted by the Lease; provided, however, that if the gas has not previously been committed to an interstate market, no processing or other handling shall be utilized that will destroy the intrastate status of the gas.

2. Marketing of Sulphur, Potash, Oil, and Other Liquid Hydrocarbon Minerals

(a) If either oil or other liquid hydrocarbon minerals is produced, in paying quantities, from the leased premises or on lands pooled or unitized therewith, such minerals, insofar as they are attributable to the leased premises, shall be sold by Lessee to an intrastate market for refining or processing in the State of Louisiana if such market is available within a reasonable period of time, as more fully set out herein below; or in lieu of obtaining a new intrastate market, Lessee may deliver such minerals under its existing intrastate contracts to be refined or processed in the State or to take the minerals for its own intrastate refining or processing. If Lessee does not elect to deliver such minerals under existing intrastate contracts or to take such minerals for its own intrastate uses, then for a period of ninety (90) days from the date of such production Lessee agrees to make a diligent and good faith effort to obtain an intrastate market for such minerals that will cause them to be refined or processed in the State of Louisiana, and, if such a market can be obtained, to enter into a contract for the sale of such minerals to an intrastate market upon the best terms that can be negotiated, but on terms customary in the industry for such contracts. In no event, however, shall Lessee be required to sell such minerals to an intrastate market at a price less favorable than that which could be negotiated for a sale of the minerals to an interstate market and in no event shall Lessor's royalty be based on less than the current market value of the minerals. If at the end of the ninety (90) day period Lessee has not been able to sell such minerals to an intrastate market in accordance with the provisions hereof, Lessee shall be free to market such minerals to any purchaser whether intrastate or interstate in character. If the minerals are taken by Lessee for its own use or are delivered under an existing intrastate contract and royalty is due thereon, such royalty shall be based on the current market value of the minerals when so used or delivered.

(b) If either sulphur or potash is produced in paying quantities from the leased premises or on lands pooled or unitized therewith, the same provisions of paragraph 2(a) shall be applicable except that the royalty to be paid Lessor shall be that fixed in Paragraph 6(e) and (f), respectively, of the lease.

(c) If the ninety (90) day period becomes operative, then it will be considered as a period during which Lessee is producing minerals from the premises in paying quantities, which production will have the same effect as actual production would have on the lease.

(d) For the purpose of assessing the performance of Lessee of the obligations imposed by this Paragraph 2, the disclosure provisions of Paragraph 1(g) of this rider shall be applicable.

(e) The waiver provisions of Paragraph 1(i) of this rider shall be applicable to the terms and conditions contained in this Paragraph 2.

3. Deferred Development

Notwithstanding anything to the contrary herein contained, it is understood and agreed that in the event during the primary term of this Lease, or within one (1) year thereafter (if the Lease is then in force and effect), a portion of the property covered hereby is integrated and included or placed with other lands in a pooled or combined unit, whether by order of a governmental agency or by conventional contract, then unit drilling operations or unit reworking operations or unit production from a well situated on lands or property embraced in such unit or units (hereinafter collectively called "unitized operations"), shall serve to maintain this Lease in force and effect as to the entirety of the leased premises, subject however to the following express requirements in lieu of reasonable development of the "outside acreage," as hereinafter defined, which is not otherwise maintained under the terms of this Lease all as set out more completely hereinbelow in this Paragraph 3. If on the anniversary date of the Lease next ensuing after the commencement of unitized operations (or if the first date of unitized operations is less than 90 days prior to the anniversary date, then on the expiration of 90 days after such first date of unitized operations) the Lease is not being maintained under its terms by means other than unitized operations, the Lease shall terminate on said anniversary date (or at the end of said 90 day period as the case may be) as to all outside acreage unless on or before said anniversary date (or the end of said 90 day period, as the case may be) Lessee pays or tenders to Lessor, as a deferred development payment, a sum of money equal to one-half of the rate per acre of the cash bonus paid for the Lease multiplied by the number of acres then comprising the outside acreage, which tender or payment shall maintain this Lease in effect as to such outside acreage not otherwise maintained under the terms of the Lease until the next ensuing anniversary date. By similar tender or payment of a deferred development payment on or before each succeeding anniversary date this Lease may so be maintained in force during the remainder of the primary term (if any) and for two years thereafter as to such outside acreage. After the expiration of the periods during which the Lease may be maintained by deferred development payments as above provided, if this Lease at any time is not being maintained in effect by other than unitized operations, it shall terminate as to all outside acreage not otherwise so maintained under the provisions of this Lease, provided that if a unit or units are created after the expiration of said periods the effect of which is to convert non-unitized operations as hereinafter defined, into unitized operations, it shall be regarded for all purposes of this Lease as though there had been on the effective date of such unit or units a cessation of production on the outside acreage If at any time during the primary term of the Lease or within one year thereafter there is a cessation of all non-unitized operations as hereinafter defined, whether same occurs as the result of the actual cessation of such operations or as the result of non-unitized operations being converted into unitized operations, then Lessee, in lieu of resuming non-unitized operations as provided in this Lease, may elect to maintain the Lease in effect as to the outside acreage by tendering or paying a deferred development payment, computed as hereinabove provided, on the next ensuing anniversary date of this Lease (or within 90 days from the cessation of non-unitized operations if such cessation should occur less than 90 days prior to such anniversary date). If at any time during the second year after the primary term of the Lease, there is a cessation of non-unitized operations as hereinabove defined, whether same occurs as the result of the actual cessation of such operations or as the result of non-unitized operations being converted into unitized operations, then the entire Lease shall nevertheless remain in effect until the next ensuing anniversary date

Nothing contained in this Paragraph 3 is intended to create nor shall have the effect of creating several or separate leases, or in any manner to extend, increase or limit the obligation of Lessee to protect the leased premises from drainage as stated in the Lease, or otherwise. If at any time, either during the primary term of the Lease or the limited extension of the Lease beyond its primary term as provided above in this Paragraph 3, as to the outside acreage not otherwise held under the terms hereof, Lessee prosecutes non-unit drilling operations or non-unit reworking operations or obtains non-unit production from the leased premises (hereinafter collectively called "non-unitized operations"), then the provisions of this paragraph shall not thereafter apply so long as said non-unitized operations shall continue.

The provisions of this Paragraph 3 shall also be applicable to a unitized shut-in gas well, but in this event, the annual deferred development payment shall be reduced by deducting therefrom the amount of shut-in gas well payments due, if any, during the same period under Paragraph 6 of the Lease which is applicable to the acreage on which the deferred development payment is applicable.

For purposes of this paragraph the following definitions shall apply.

(a) The term "anniversary date" shall mean the date of this Lease and the same date of each next ensuing year or years

(b) The term "outside acreage" shall mean all of the leased premises, except any portion(s) thereof included in a unit or units on which unitized operations are being conducted.

4. Environmental Considerations

Lessee hereby agrees, as one of the obligations of this rider, that in exercising the rights granted it under the Lease, it will comply with and be subject to all applicable environmental laws and regulations validly adopted or issued by the State of Louisiana, or its agencies, or by the United States, or its agencies. Lessee further agrees that it will comply with all minimum water quality standards validly adopted by said governmental authorities with respect to oil pollution and noxious chemicals and waste being introduced into affected water areas Further, in conducting all operations under this Lease requiring dredging, filling, or local navigation in order to explore, develop or exploit shallow-water areas, Lessee shall comply with the applicable requirements of the appropriate Louisiana state agency charged with the environmental management of said area Finally, it is understood and agreed that on depletion of production or completion of operations under this Lease, the Lessee shall remove all structures which would impede commercial fishing and trawling, including, without limitation, all submerged materials, equipment or debris placed on the leased premises by or for the account of Lessee; and the affected water bottoms shall, to the extent reasonably possible of accomplishment, be returned or restored to a condition as nearly equivalent to that which existed before said operations were conducted and/or structures were constructed Lessee further agrees that in exercising the rights granted it hereunder and in discharging the obligations undertaken in Paragraph 2 of this rider, involving issuance of advance certifications, permits or approvals, it will allow sufficient lead time in the planning of its activities to permit the affected regulatory agencies to make appropriate review of the proposed operations.

5. Notice

Except in the situations where specific time periods are established for performance, Lessee shall not be in default under the Lease with respect to the violation of any provision of this rider until 30 days after written notice of such violation is received from Lessor, and Lessee has not corrected or commenced to correct such violation

6. Conflict of Terms

Unless specifically provided otherwise, in the event of a conflict between any provision of this rider and any of the provisions of the Lease, the provisions of this rider shall control

7. Severability

In the event that this rider or any provision hereof is declared to be illegal or unconstitutional, its nullity shall in no way impair the validity of the Lease to which this rider is attached or of other portions of the rider not declared illegal or unconstitutional, provided that Lessee shall not directly or indirectly institute or cause to be instituted any action seeking to declare the nullity or the unenforceability of this rider or any part thereof

8. Shut-In Oil Well Payments

If at any time during the primary term there is on the leased premises a well or wells capable of producing oil in paying quantities, which fact has been duly verified and confirmed in accordance with Lessor's requirements for proof thereof, but oil is not being used or marketed because of the lack of structures and facilities necessary for delivery of said oil pending determination of the proper scope and location of such structures and facilities, this lease shall, nevertheless, remain in full force and effect for a period of ninety (90) days after the shutting in of such well. If, on or before the expiration of the ninety (90) day period, production or operations shall not have been commenced or resumed, Lessee, in order to maintain the lease in force thereafter, shall commence semi-annual payments to the Lessor at the rate and in the manner, and with all of the rights, obligations and consequences provided in Paragraph 6 (d) for payments on a shut-in gas well, except that the lease may not be maintained by such shut-in oil well payments for any period (1) extending beyond ninety (90) days after the date that structures and facilities necessary for delivery of oil from the lease are available, or (2) after the primary term of the lease, or (3) after the six (6) semi-annual periods called "initial payment period", whichever expiration date occurs first, on or before which expiration date Lessee may maintain this lease thereafter in any other manner provided in this lease.