## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-90324 (cml) |
| **MLCJR LLC, et al.,**[1] | § | |
| | § | **Chapter 7** |
| Debtors. | § | **(Jointly Administered)** |

## CHAPTER 7 TRUSTEE'S STATUS REPORT

TO THE HONORABLE CHRISTOPHER M. LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

Randy W. Williams, Chapter 7 Trustee ("**Trustee**") for the bankruptcy estates of MLCJR, LLC and its subsidiaries (collectively, "**Debtors**") in the above-captioned cases files this *Status Report* ("**Status Report**") and respectfully represents as follows:

## BACKGROUND

### A. THE DEBTORS' BACKGROUND AND THE DEBTORS' OPERATIONS

1.     On May 14, 2023 ("**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases for relief under chapter 11 of the Bankruptcy Code ("**Chapter 11 Cases**"). The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Ryan Omohundro, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* ("**First Day Declaration**"),[2] which is fully incorporated into this Status Report by reference.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: MLCJR LLC (0875); Cox Oil Offshore, L.L.C. (7047); Cox Operating, L.L.C. (0939); Energy XXI GOM, LLC (0027); Energy XXI Gulf Coast, LLC (8595); EPL Oil & Gas, LLC (9562); and M21K, LLC (3978). The Debtors' address is 4514 Cole Ave, Suite 1175, Dallas, Texas 75205.

[2] ECF No. 34.

2.      On February 20, 2024, The Debtor filed its *Emergency Motion (i) to Convert Chapter 11 Cases under Chapter 7; (ii) Shorten Notice Related Thereto; and (iii) for Related Relief* ("**Conversion Motion**"), which was granted on February 28, 2024 ("**Conversion**").[3]

3.      On February 28, 2024, the Debtors filed, and the Court signed, the *Stipulation and Second Order Regarding DIP Agent's Emergency Motion for Relief from the Automatic Stay to Enforce Rights under the DIP Documents and Use of Cash Collateral* ("**DIP Stipulation**").[4] Among other things, the DIP Stipulation provides a limited carve out for Chapter 7 administration. It relates to three items: (1) a $400,000 carve out for litigation; (2) a carve out for payments from W&T and NRW to the Debtors in connection with transition services provided by the Debtors; and (3) a carve out of up to $2.865 million based on available cash in the Debtors' operating account, plus $1.45 million from the Chapter 11 professionals fee concessions under the DIP Stipulation ("**Operating Reserve**") "to fund the wind-down of the Debtors' remaining oil and gas assets, including maintenance, monitoring, and payroll expenses carve out for monitoring of leases/properties to be relinquished."

4.       In Exhibit 1 to the *Declaration of Ryan Omohundro in Support of the Conversion Motion and DIP Stipulation*,[5] which was filed in support of the conversion and consists of a demonstrative projected budget for the Trustee after conversion, the Trustee was projected to run out of cash, other than the Litigation Reserve, by March 15, 2024. However, the Trustee is currently holding $2,079,378.05.

**B.  THE CHAPTER 7 CASES**

5.      Upon the Conversion, the Chapter 11 Cases became a jointly administered Chapter

---

[3] ECF Nos. 1661 and 1720, respectively.

[4] ECF Nos. 1711 and 1714, respectively

[5] ECF No. 1681.

7 Case ("**Chapter 7 Cases**").

6.     Accordingly, the following day on February 29, 2024, the United States Trustee appointed the Trustee. The Trustee continues to serve as interim chapter 7 trustee.

### C.  POST CONVERSION ISSUES

7.     There have been three (3) main areas of focus since the conversion of the chapter 11 cases. The main issue has been following through on relinquishing the Debtors' interest in the various offshore oil and gas leases. The second major issue has been working with NRW to close the sale of certain of the Debtors' oil and gas interest. The third major area of activity has been monitoring the existing oil and gas interests during the relinquishment process and also working to have respective Debtors replaced as operator for Debtor and non-debtor oil and gas leases.

## RELINQUISHMENT

8.     Almost immediate with his appointment, the Trustee was notified by the Bureau of Ocean Energy Management ("**BOEM**") and the Bureau of Safety and Environmental Enforcement ("**BSEE**") that the Debtors had not completed the necessary paperwork to relinquish the offshore oil and gas interests (leases). The Debtors disputed this, pointing to letters that they sent. The Trustee, at the request of BOEM and BSEE executed the appropriate official forms and provided letters confirming relinquishment of the offshore interests. As the relinquishments are processed by the federal government, decommissioning orders are being transmitted to predecessors in interest. Through mid-April 2024, the Trustee had 2 vessels and a helicopter on stand by for use in monitoring. Through the end of April 2024, the Trustee had one vessel and one helicopter. The Trustee also had 7 former employees engaged on a contract basis to respond to inquiries and provide assistance with monitoring. Because of the issuance of several decommissioning orders, the Trustee requested that the former employees, who were initially retained on a weekly basis, go on an hourly basis and that use of a separate vessel or aircraft be on an as needed basis. To date,

the former employees have declined and made no counter proposal. The Trustee is looking to retain the services of a contract operator who could do routine monitoring on an as needed basis for the remaining properties.

## NRW

9.      At the time of conversion, the chapter 11 sale of certain oil and gas interests to NRW had not closed. While NRW had taken over payment of certain bills, it was not until mid to late March that NRW was able to on board certain former Debtor employees to the payroll of its contract operator, Array Petroleum. At NRW's request, the Trustee executed documents to confirm the sale to purchasers of production, and worked with those parties and NRW to allocate production and revenue. While the Trustee believes NRW's contract operator, Array, was approved, the Trustee does not believe that NRW's assignments have been approved. As a result, the sale has not closed.

## MONITORING

10.      Monitoring of the estates' oil and gas assets was originally estimated to be completed by March 15, 2024, but since the relinquishments were not properly submitted before conversion, decommissioning orders were not sent to predecessors in title. Accordingly as stated above, the Trustee continued to retain the services of two stand by vessels and a stand by helicopter. Since conversion, both the vessels and helicopter have been dispatched to address issues raised by various regulators related to condition, maintenance and spills. The Trustee also retained the services of the Debtors' former IT manager and a Houston human resources manager to assist with IT and accounting transition issues, each on an hourly basis. The Trustee requested beginning May 1, that the field personnel switch from weekly stand by to hourly as needed. As stated above, the personnel have declined, and the Trustee is waiting on a counter proposal while also accessing other options.

11.    There have been various issues with respect to the shut-in properties, either leased by one or more of the Debtors, or operated by one or more of the Debtors on behalf non-debtor third parties. The Trustee and the contract employees responded to contacts from the State of Louisiana, BOEM and BSEE and the United States Coast Guard.

12.    In addition, to the foregoing, the Trustee responded to numerous calls and emails concerning unpaid chapter 11 bills, which total approximately $60,000,000. This amount does not include the amounts owed to professionals or Amarillo National Bank ("ANB") in its capacity as the administrative agent and collateral agent, acting at the direction of the Debtor-in-Possession Lenders ("**DIP Lenders**"). The Trustee also fielded numerous inquiries relating to record retention, unpaid royalties and offers to purchase assets.

13.    With respect to the unpaid chapter 11 bills, the Trustee filed, on behalf of the Debtors, the report provided by the Debtors showing unpaid chapter 11 bills and asked for a notice procedure regarding filing chapter 11 claims and how those will be addressed.

14.    With respect to the records, the Trustee worked and continues to work with the Debtors' former IT manager to back up on to portable hard drives the Debtors' electronic files, but this is still a work in process. The Trustee is also attempting to limit the number of monthly subscriptions the Debtors must maintain for access to electronic and other records. In addition, the Trustee is attempting to move the Debtors records from leased office space to off-site storage and is still working through how to address several thousand boxes of Energy XXI-related files at Iron Mountain for which there is a significant unpaid balance.

15.    Based on calls and emails, the Debtors did not account for royalty payments from the last production of certain properties before they were shut-in. It appears there may be at least a month in some cases where the accounting related to the revenue was not completed, so third

party billing, royalties and taxes were not allocated and/or paid for those properties. It appears the DIP Lenders are holding the proceeds of production and those funds may contain moneys owed to royalty owners and/or working interest owners.

16.     The Trustee also received unsolicited offers related to various bundles of assets. Offers ranging from a few thousand to a few hundred thousand dollars were submitted in various formats, from the extremely informal to actual written offers. Since the DIP Lenders either as post-petition lenders or also as pre-petition lenders claim a lien on essentially all tangible assets, the Trustee communicated these offers to counsel for ANB. In addition, counsel for the Trustee met with counsel for ANB and said that in order for the estate to pursue the offers, the Trustee would have to have not only the consent of ANB as secured lender but also their agreement to a carve-out to pay for the administrative costs relating to the sale and an additional carve-out for the estate. The Trustee proposed a carve-out for professional fees, that appeared to be acceptable, and a split, 50/50 of net proceeds, which the DIP Lenders rejected.

17.     As the Court is aware based on the U.S. Trustee's Report on Contested Election, ANB, on the eve of the 341 meeting, contacted counsel for the U.S. Trustee to request election of a permanent trustee. Local Rule 2006-1 requires a party seeking a trustee election to give seven (7) days written notice of a proposed election to the U.S. Trustee. At the initial 341 meeting, the U.S. Trustee did not comment on the late notice and chose to go forward with an election. However, the U.S. Trustee adjourned the election to a later date. As interim Trustee, I voiced my concern as to why an election would be held without proper notice under Local Rule 2006-1 and why the election was not going forward on that date if the Local Rule was not going to be enforced. The U.S. Trustee announced the continuance was necessary to provide notice of the election to creditors. The day before the March 27th Meeting, certain creditors informed the U.S. Trustee they

were requesting a trustee election under 11 U.S.C. § 702. The U.S. Trustee adjourned the 341 meeting to April 10, 2024.[6]

18.      However, the U.S. Trustee never noticed the continued 341 meeting and trustee election to all creditors. As the Court is aware, Kroll was hired as noticing and claims agent in the chapter 11 case. Kroll was responsible for giving notice of the commencement of the chapter 11 cases.[7] In ECF No. 293, the attachment shows Kroll gave notice of the commencement of the case to over 50 pages of creditors and parties in interest (labeled Debtors' Master Service List). While the document does not appear to show or state the total the number receiving notice, there are 57 pages of parties with approximately 50 parties per page, which means that mail notice was given to more than 2500 creditors and parties in interest. Kroll was terminated[8] after conversion to chapter 7 and did not provide notice of the initial 341 meeting in the chapter 7 case.

19.      The BNC provided notice of the 341 meeting after conversion, which was only given to about 305 parties, again much fewer than the 2500 plus on the Debtor's master service list.[9] While the Trustee requested that notices of motions and matters that he filed be limited to fewer than all creditors, the Trustee did not ask the Court to limit notice of the creditors meeting or other deadlines related to the case(s).

20.      When the U.S. Trustee filed its notice of continuance, the U.S. Trustee only showed that parties receiving ECF notice were notified.[10] While the BNC later mailed notice of ECF No. 1801, the BNC notice reflects that only 140 notices were sent out, far fewer than the 2500 plus on

---

[6]  ECF No 1829, p. 3.

[7]  *See* ECF Nos. 125 and 293.

[8]  ECF No. 1795.

[9]  ECF No. 1728

[10] *See* ECF No. 1801.

the Debtors master service list, used by Kroll at document 293, and fewer than BNC provided, 305, of the meeting.[11] In addition, the U.S. Trustee only filed, and the BNC only served the notice of continuance in the main case, 23-90324. Neither the U.S. Trustee nor the BNC filed or served any notice of the continuance or election in any of the other cases.

21.     The same is true of the U.S. Trustee's Report after the election.[12] The U.S. Trustee only shows that ECF notice was provided; the BNC notice shows that the Report went to fewer than 150 parties.[13]

22.     In addition to the U.S. Trustee not addressing the issue of the late election notice and not giving proper notice of the continued meeting or election, the U.S. Trustee's Report does not appear to come to a conclusion regarding the total amount of unsecured debt in each case, noting the significant differences between the scheduled amount and claims filed. Here, there is another issue with respect to the prior retention of Kroll, while the claims docket maintained by the Clerk's office shows several hundred claims on file, it is many hundreds, if not thousands short of the claims that were filed during the chapter 11 case with Kroll. The Trustee contacted the Clerk's office and was told that it will take many weeks/months before the Clerk's office can update the Claim's Register with the claims filed with Kroll. In the absence of determining the amount of unsecured debt in each case, how does the U.S. Trustee or Court determine the 20% threshold for voting? Another factor complicating the issue is that ANB filed a secured claim and is scheduled as a secured creditor, so in looking at the schedules of unsecured claims, ANB's $200,000,000 if allowed as an unsecured vote would have to be added to the total of unsecured debt. In addition, ANB did not file an unsecured claim, it filed a secured claim, so if claims are

---

[11] *See* ECF No. 1812.

[12] *See* ECF Nos. 1829 and 1838.

[13] *See* ECF No. 1848.

being reviewed for total unsecured indebtedness, then again ANB's $200,000,000 vote would have to be added to the total of unsecured indebtedness.

23.     As to voting, the Court is aware that ANB is the agent for the DIP Lenders in the case as well as the agent for the pre-petition secured lending group. ANB filed and purportedly voted part of its secured claim as an unsecured deficiency claim. While the Trustee has only been involved in a few trustee elections, the U.S. Trustee in those other elections did not allow creditors with secured claims to vote. The Trustee cannot find that ANB ever filed an unsecured claim. Nor is the Trustee aware of ANB liquidating an unsecured deficiency claim, either in this Court or any other forum.

24.     Other than the issues raised regarding the lack of compliance with the Local Rules and not proceeding with the election at the initial meeting, the Trustee did not contest the purported election. The matter of permanent trustee needs to be resolved as soon as possible. There are day-to-day decisions that require prompt attention. Due to the notice and other issues regarding the purported election, the Trustee is prepared to resign so a new permanent trustee, such as Mr. Warner, can be appointed and move forward with administration of the cases.

WHEREFORE, for the reasons stated above, the Trustee files this Status Report; and for such other and further relief as the Court deems appropriate.

Dated: May 3, 2024              Respectfully submitted,

**RANDY W. WILLIAMS, CHAPTER 7 TRUSTEE**

By: */s/ Randy W. Williams, Trustee*
Randy W. Williams
7924 Broadway, Ste 104
Pearland, Texas 77581
D:.281-884-9262
E: rww@bymanlaw.com

***Chapter 7 Trustee***

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on May 3, 2024, a true and correct copy of the foregoing Status Report was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system.

*/s/ Randy W. Williams*
Randy W. Williams