**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| In re: | * | **Chapter 7** |
| | * | |
| **MLCJR LLC, *et al.*,** | * | **Case No. 23-90324 (CML)** |
| Debtors, | * | |
| | * | **(Jointly Administered)** |
| | * | |
| | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |

**OBJECTION TO TRUSTEE'S EMERGENCY MOTION FOR AUTHORITY TO (A)**
**RELINQUISH CERTAIN FEDERAL LEASES; (B) ABANDON THE REMAINING**
**TITLE TO CERTAIN FEDERAL LEASES; AND (C) FOR RELATED RELIEF**

Natural Resources Worldwide LLC ("NRW") respectfully submits the following Objection to the Emergency Motion for Authority to (A) Relinquish Certain Federal Leases; (B) Abandon the Remaining Title to Certain Federal Leases (the "Leases"); and (C) For Related Relief (the "Motion"), filed by Chapter 7 trustee Michael D. Warner ("Trustee"). For the reasons detailed below, and based on the additional evidence NRW will adduce through testimony at the hearing on the Motion, the Trustee lacks any basis in fact or law for the extraordinary and drastic relief sought through the Motion.

**I. INTRODUCTION**

The relief sought by the Trustee should be denied for multiple reasons. First, the relief sought is premature, and the Trustee cannot satisfy any of the three elements required for standing. The Trustee's motion is largely premised on a purported future threat—the United States' pending motion for an administrative claim—that may never come to pass. Nor can the

Trustee satisfy the other standing requirements, that the alleged injury be attributable to NRW (as opposed to a third party), and that the alleged injury can be addressed by the Court.

In addition, the relief sought is also premature because the recent change in administrations may facilitate regulatory approval of the assignments of leases from the Debtors to NRW, and thereby render the relief sought moot.

More importantly, the relief sought would unjustifiably strip NRW of the benefit of the offshore leases it purchased from the Debtors' estates—even though NRW (i) has complied with the Court's order approving the sale, and (ii) has done (and is doing) everything reasonably within its power to obtain the necessary regulatory approval of the assignments of offshore leases the federal government.  NRW shares the Trustee's frustration with the lack of regulatory approval, but NRW should not be punished because the government has not approved the lease assignments.

NRW will discuss each issue in turn below.

## II.  ARGUMENT

### A.    The Relief Sought Is Premature, and the Trustee Lacks Standing.

Standing is a threshold issue.  Under Article III of the United States Constitution, federal courts have jurisdiction only over cases and controversies.[1]  As the Supreme Court explained in *Lujan v. Defenders of Wildlife*, constitutional standing involves three elements, ***all*** of which the claimant must establish:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or

---

[1]    *See Lujan*, 504 U.S. at 559.

imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[2]

The party seeking relief bears the burden of establishing standing.[3] Nor is standing "dispensed in gross"; a claimant such as the Trustee "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."[4]

### 1.   The Trustee Has Not Alleged a Concrete Injury.

The Trustee's Motion does not satisfy the first element of standing, a concrete and particular injury.   NRW recognizes the United States has a pending Motion for Administrative Claim (R. Doc. 2312) for allegedly unpaid royalties.   However, strong oppositions to that motion have been filed by both the Trustee (R. Doc. 2330) and NRW (R. Doc. 2331).   The United States' motion has not yet been set for hearing, and it may not be resolved for several weeks or months.   Both oppositions to the motion cite the lack of factual support for the United States' motion (*e.g.*, explaining how the amount of the claim was calculated), and the need for discovery regarding unpaid royalties.   Unless and until the United States is actually granted an administrative claim, there is no concrete injury to the Trustee.

---

[2]   *See id.* at 559-60 (internal citations and quotation marks omitted).

[3]   *Time Warner Cable, Inc. v. Hudson,* 667 F.3d 630, 635 (5th Cir. 2012).

[4]   *Reule v. Jackson*, 114 F.4th 360, 367 (5th Cir. 2024) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008); *Lewis v. Casey*, 518 U.S. 343, 358 n.6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439, 137 S.Ct. 1645, 198 L.Ed.2d 64 (2017)) (internal quotation marks omitted).

The Trustee's speculation about potential injury likewise does not involve any concrete injury.  In an attempt to illustrate the purported risk to the Estates, the Trustee employs a colorful metaphor.   According to the Trustee, the ownership of the Leases is akin to ownership of a delivery truck, with NRW driving the truck and benefiting from its use but the Estates retaining title until licensing requirements for the truck are satisfied—and thus facing the "specter" of liability if an accident were to occur.[5]

In certain limited respects, this analogy does capture aspects of the limbo state that NRW and the Estates have found themselves in since this Court having issued its Sale Order (R. Doc. 1626) approving the Purchase and Sale Agreement ("PSA"), whereby NRW acquired offshore leases from the Estates but with the United States thus far neglecting to grant the requisite regulatory approval ("Regulatory Approval") of the leases' assignment to NRW. The Trustee's metaphor, however, does not establish any basis for the relief requested in the Motion because the Trustee has no demonstrable injury.

To establish standing under Article III of the Constitution, a claimant must establish an "injury-in-fact," *i.e.*, a "concrete and particularized invasion of a legally protected interest."[6]  Instead of a concrete or particular injury, the Trustee speculates about the "risk … of catastrophic injury," "waiting for the *sword of Damocles* to fall," and the "continuing specter of liability" purportedly confronting the Estates.[7] These hypotheticals are too

---

[5]     *See* Motion at ¶¶ 3, 49.

[6]     *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[7]     *See* Motion at ¶¶ 15, 17, 49.

speculative for standing. To borrow the Trustee's metaphor: the delivery truck has not experienced any "accident" affording the Trustee standing to bring the instant Motion.

      **2.    The Trustee Cannot Demonstrate the Necessary Connection Between the Alleged Injury and NRW.**

      The Trustee cannot satisfy the second element of standing: that the alleged injury be fairly traceable to the challenged action of NRW, rather than a third party. The Trustee devotes much of the Motion to blaming NRW for the United States government's failure, to date, to provide Regulatory Approval.[8] Using the Trustee's delivery truck analogy, the Trustee is blaming NRW for the failure to obtain the proverbial "DMV" approval.

      As the evidence will demonstrate, however, NRW has done all it reasonably can to facilitate Regulatory Approval. Through the testimony of its manager, Vincent DeVito, and others at the hearing, NRW will show it has: (1) made good faith efforts to meet all legitimate royalty obligations with respect to Leases, even in the face of unreasonable demands by the United States government; (2) worked diligently to satisfy its bonding obligations, and is close to meeting the only outstanding bonding obligation; and (3) maintained a qualified operator for the Leases. In addition to addressing these issues at trial, these issues are discussed in section II.C, below.

      Because the evidence will show NRW is not to blame for the failure to obtain Regulatory Approval, the Trustee cannot meet the standing requirement that the alleged injury be traceable to NRW.

---

[8]    *See, e.g.*, *id.* at ¶ 14.

- 5 -

3. **The Trustee Cannot Demonstrate that His Alleged Injury Will Be Redressed by Granting the Motion.**

The Trustee lacks standing for the additional reason that neither the relinquishment nor the abandonment of the Leases would actually rectify the alleged injury—or, rather, the speculative risk of injury—of which the Trustee complains.  For standing to exist, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[9]

Far from redressing the Estates' purported injury, the relinquishment/abandonment of the Leases would only create uncertainty.  The procedural and practical consequences of granting the Motion are unclear.  For instance, relinquishment of offshore leases must be sought from federal regulators.[10]  Approval of relinquishment, moreover, is "subject to the continued obligation of the record title owner and the surety to make all payments due, including any accrued rentals, royalties and deferred bonuses, and to abandon all wells and condition or remove all platforms and other facilities on the land to be relinquished to the satisfaction of the Director."[11]  This Court lacks authority to provide the necessary regulatory approval of relinquishment of the Leases, and it is unclear whether (and on what conditions) federal regulators would approve relinquishment.  As such, the relief sought by the Trustee does not provide the likelihood of redress necessary for standing.

---

[9]     *See Lujan*, 504 U.S. at 560.

[10]    *See* 30 C.F.R. 556.1101 (directing record title owners to seek relinquishment from the Bureau of Ocean Energy Management ("BOEM"))

[11]    30 CFR § 556.1101(b).

It is likewise uncertain that abandonment would provide the Trustee with relief sufficient for standing.  Abandonment results in the abandoned property reverting to the debtor[12] and is effective retroactive to the petition date.[13]  If the Court were to order the Trustee to abandon title to the Leases from the Estate, therefore, title would presumably revert to the defunct debtor entities, effective as of the bankruptcy petition date.

And then what?  Do those debtor entities now bear responsibility for the Leases?  Is the PSA rescinded or void?  What happens to the revenue generated from the operation of the Leases since February 2024?  At best, an order granting abandonment would leave these questions pending and shift the onus to the United States to find predecessors-in-interest with the "financial ability to properly address these issues," as the Trustee suggests.[14]  That process would itself take a significant, and unpredictable length of time.  With respect to the Estates, therefore, an order granting abandonment would raise a number of vexing questions and further delays that would provide little or no actual benefit to the Estates.

B.      **The Trustee's Motion Is Premature Because It May be Mooted by the Recent Change in Administration.**

Finally, the Trustee's Motion is also premature because the federal administration changed only days ago.  This substantial development is likely to result in different decisionmakers, applying different criteria, being responsible for approving the lease

---

[12]      *In re Salazar*, 449 B.R. 890, 899 (Bankr. N.D. Tex. 2011).

[13]      *In re Buerge*, No. 11-20325, 2013 WL 5656204, at *2 (Bankr. D. Kan. Oct. 15, 2013)

[14]      *See* Motion at ¶ 50.

assignments to NRW.  Rather than grant the drastic relief sought by the Trustee, the Court should defer ruling to see whether the new regulatory landscape results in the long-awaited approval of the assignments to NRW.

In other words, the basis of the relief sought—what the Trustee calls the "purgatory" status pending approval of the assignments—may become moot.  Rather than try to short circuit the regulatory process, this Court should allow that process a reasonable time to play out.  NRW respectfully suggests that 120 days would be a reasonable amount of time.

### C. Granting the Relief Sought Would Unjustifiably Deprive NRW of the Benefit of the Court-Approved Order.

An Order permitting the Trustee to abandon or relinquish the leases acquired by NRW would unjustifiably deprive NRW of the benefit of this Court's Order approving the PSA. Such an Order could effectively result in unwinding the PSA, and call into question whether the pending lease assignments to NRW could still be approved (or would they be moot).  If the Estates are retroactively deemed (through abandonment) to have never owned the leases they purported to transfer to NRW (via this Court's approved sale order), then the pending lease assignments to NRW could be moot; if the Estates/Trustee were never the owner, it is unclear how they could be the purported transferor or assignor of the leases to NRW.  Such a result would be contrary to this Court's Sale Order (R. Doc. 1626) approving the PSA between the Estates and NRW.

Additionally, unwinding the PSA would also be unwarranted because, as explained below, NRW has done everything reasonably within its power to obtain regulatory approval.

1.      **NRW has paid the royalties it owes and provided reasonable bases for disputing other royalties requested by the United States.**

The Motion accuses NRW of failing to pay a "significant amount" of alleged post-closing royalties ("Royalties") with respect to the Leases.[15]   The Trustee cites as support for this assertion the administrative claim ("Administrative Claim") (R. Doc. 2312) filed by the United States that the Trustee himself has vehemently opposed.[16] NRW likewise disputes the government's claim for allegedly unpaid Royalties (R. Doc. 2331).

Contrary to the Trustee's allegations, NRW has paid Royalties and has made every reasonable effort to resolve its dispute over pre-and post-closing Royalties with the federal government.  NRW has been unable to finalize a settlement with the government, because the government has made unreasonable demands, and effectively and repeatedly "moved the goalposts" on NRW.

*a)*      *The Sale Order approving the PSA.*

The Trustee has not complained—and cannot complain—that this Court's Sale Order (R. Doc. 1626) approving the PSA between the Estates and NRW somehow *requires* NRW to pay all royalties, whether pre- or post-closing, that are unilaterally determined and demanded by the United States.  Instead, as the Trustee recognizes, the Sale Order contemplates that NRW and the government would negotiate and seek to resolve the dispute, with NRW having "sole discretion" in deciding whether to enter into a settlement with the government.

---

[15]      *See* Motion at ¶ 14.

[16]      *See id.*; R. Doc. 2330.

As explained in detail below, and to be further shown at the hearing, NRW has negotiated in good faith and tried to, but not yet reached, a final settlement with the government. As such, the failure to obtain regulatory approval of the lease assignments cannot be said to result from NRW's non-compliance with the PSA's provisions regarding Royalties; it has complied.

### b)    Background of Negotiations with United States

On February 10, 2024, this Court approved the PSA, with NRW assuming control of the Leases.  Shortly thereafter, NRW and its consultant, Ryan, LLC ("Ryan"), began negotiating with the Office of Natural Resources Revenue ("ONRR"), a division of the United States Department of the Interior ("DOI"), regarding the amount of outstanding royalties and other payments (the "Outstanding Amounts") owed by the debtor entities with respect to the Leases.[17] On February 20, 2024, the ONRR provided a schedule of Outstanding Amounts owed with respect to the Properties reflecting a total amount due of $17,585,899.00 (the "Original Schedule").[18]

On June 10, 2024, the DOI provided a revised schedule of Outstanding Amounts reflecting total amount due of $20,703,953 (the "Revised Schedule").[19]  Shortly thereafter, NRW contacted an attorney representing the United States to express concerns regarding the Revised Schedule.[20]  Specifically, NRW pointed out that the amount had both increased materially from

---

[17]    *See* December 27, 2024 Declaration of Steven Dudgeon, R. Doc. 2331-1, at ¶¶ 3-4.

[18]    *See id.* at ¶ 5.

[19]    *See id.* at ¶ 6.

[20]    *See id.* at ¶ 7; June 14, 2024 correspondence, R. Doc. 2331-2.

the Original Schedule or altogether changed, with royalties for some periods increasing dramatically while numbers for other periods decreased or disappeared.[21]

For the next several months, NRW and Ryan continued to communicate with the United States to seek an amicable solution with respect to the Outstanding Amounts, including accrued Royalties.[22]  On October 2, 2024, Steven Dudgeon, a Severance Tax/Royalty Principal for Ryan, provided a detailed write-up reflecting NRW and Ryan's calculation of the Outstanding Amounts, which reflected a final balance of $9,167,304.70.[23]  Dudgeon explained how many of the fees and charges the ONRR was demanding, including some of the royalties assessed from February 28, 2024 onward, were excessive.[24]

The United States (through counsel) responded on October 9, 2024 by providing a spreadsheet of alleged Outstanding Amounts associated with the Properties ("October 9 Spreadsheet").[25]  This spreadsheet reflected a total amount due of $30,250,746.34, including $12,058,502.19 in royalties accrued since February 9, 2024.[26]  The October 9 Spreadsheet reflected erroneous and excessive charges to NRW in several respects.  For instance, the spreadsheet included royalties for two leases that NRW did not purchase (OCS 0384 and OCS 0385).[27]   The

---

[21]  *See id.*

[22]  *See* Declaration of Steven Dudgeon at ¶ 8.

[23]  *See id.* at ¶ 9; October 2, 2024 correspondence, R. Doc. 2331-3.

[24]  *See id.*

[25]  *See* Declaration at Steven Dudgeon at ¶ 10; October 9, 2024 correspondence and accompanying spreadsheet, R. Doc. 2331-4.

[26]  *See* Declaration at Steven Dudgeon at ¶ 11.

[27]   *See id.*

October 9 Spreadsheet also reflected rebook entries for each document and did not include reversal entries.[28]   As Dudgeon explained to counsel for the United States, in order to make an adjustment, because of filing requirements, a payor cannot simply submit one entry to make an adjustment.[29] Instead, they must first submit a reversal to remove the original entry from the account and then re-report the corrected amount.   By failing to include the reversal entries, the October 9 Spreadsheet overstated the amount owed by at least $1.4 million.[30]

On October 29, 2024, the United States provided a spreadsheet ("October 29 Spreadsheet") reflecting an Outstanding Amounts total of $28,101,048.89.[31]   This spreadsheet did not include royalties for leases for OCS 0384 and OCS 0385 but also lacked the level of detail of the October 9 Spreadsheet that would allow for a detailed reconciliation of the amounts, including which portion of the Outstanding Amounts was attributable to royalties accrued after February 9, 2024.[32]   Although NRW and Ryan immediately requested this information, the United States has thus far refused to provide any further explanation or corroboration of the amounts calculated in its October 29 Spreadsheet.[33]

---

[28]   *See id.*

[29]   *See id.*; October 10, 2024 correspondence, R. Doc. 2331-5.

[30]   *See id.*

[31]   *See* Declaration of Steven Dudgeon at ¶ 12; October 29, 2024 correspondence and accompanying spreadsheet, R. Doc. 2331-6..

[32]   *See id.*

[33]   *See* Declaration of Steven Dudgeon at ¶ 13; October 29, 2024 correspondence, R. Doc. 2331-7.

Subsequent efforts to seek further information regarding the United States' royalty calculations, including a request to meet with the United States, have proven futile.[34]  NRW and its consultants believe that the United States is still attempting to charge NRW for millions in Royalties that are not owed, including royalties for the Tiger Shoal property for which NRW should not be responsible, as well as inspection fees NRW never agreed to pay in the PSA.[35] However, NRW remains unable to ascertain the exact amount of royalties in dispute given the United States' refusal to provide the underlying details to their calculations.

c)      *The United States' position with respect to royalties and other outstanding amounts is unreasonable.*

NRW maintains that the United States is attempting to charge more in post-closing Royalties than NRW owes.  In support of its demand for Royalties, the United States has provided nothing other than other than a list of the Properties in question and a conclusory, self-serving assertion from an ONRR representative that $11,944,404.51 in royalties accumulated between February 28 and October 31, 2024.[36]  As explained above, upon information and belief the United States is still attempting to charge NRW for millions in royalties that are not owed, including royalties for the Tiger Shoal property for which NRW should not be responsible.[37]

Moreover, the royalty figures provided within the Administrative Claim and the exhibits thereto vary from each other without explanation.  While the declaration of ONRR

---

[34]     *See* Declaration of Steven Dudgeon at ¶¶ 14-15.

[35]     *See id.* at ¶ 16; R. Doc. 2274 at ¶ 62.

[36]     *See* R. Doc. 2312-2.

[37]     *See* Declaration of Steven Dudgeon at ¶ 16.

representative Thomas Anthony attached to the Administrative Claim identifies $11,944,404.51 in accrued royalties, the United States demands $11,943,034.41 in its motion.[38]

The errors and discrepancies in the royalty figures tabulated by the United States render NRW unable to ascertain the basis for the United States' most recent royalty demands. When the government provided the October 9 Spreadsheet, NRW and Ryan were able to assess the detail provided therein to spotlight excessive charges.  By refusing to provide the same level of detail the October 29 Spreadsheet or in the Administrative Claim, the United States is depriving NRW of the opportunity to challenge the assessed royalty amount with any precision.[39]

### d)      *NRW is continuing to work with the United States to resolve outstanding issues pertaining to Royalties.*

In spite of the United States' intransigence, NRW continues to seek a resolution to all disputes relating to Royalties as soon as possible.  NRW has kept current with payments on post-closing Royalties as of the production month of December 2024.  Negotiations with the United States remain ongoing, and NRW is willing to explore any available compromises that prove mutually beneficial, as DeVito's testimony will confirm.  Of course, it takes two to tango, and the United States must adopt a more reasonable approach to the alleged Royalties owed with respect to the Leases in order to facilitate a resolution to this issue.

What does lie beyond reasonable controversy is that granting the Motion and permitting the Trustee to seek relinquishment and abandon the Leases would exacerbate the

---

[38]   *See* October 29 Spreadsheet; R. Doc. 2312-2; R. Doc. 2312 at ¶¶ 8, 18.

[39]   For the avoidance of doubt, NRW is not conceding that it owes any of the Outstanding Amounts claimed by the United States.

situation for all parties involved.  Denial of the Motion, on the other hand, would enable NRW to continue making progress toward Regulatory Approval—the optimal outcome for not only NRW but the Trustee, the Estates, and the United States.

      **2.**      **NRW has secured or is on the verge of securing requisite bonding.**

The Motion seeks to blame the lack of regulatory approval of the lease assignments to NRW on NRW's purported failure to obtain bonding.  The evidence at the hearing will show that NRW has obtained all but one of the bonds that is required and is on the verge of resolving the lone outstanding bonding obligation.

Mr. DeVito will testify that, despite having to face numerous unexpected challenges, NRW secured all bonding obligations for Leases, save one, several months ago.[40]  As Mr. DeVito will explain, the bond market for the Gulf of Mexico has evaporated, and obtaining bonding for non-producing leases (such as WD-30) has proven especially difficult.  While NRW did acknowledge in October 2024 that it was still actively working to satisfy one remaining bonding obligation (regarding the non-producing West Delta [WD]-30 Lease), it is on the verge of resolving that issue.

As noted, the administration changed only days ago. NRW anticipates a resolution of the lone remaining bonding issue in the near future.  As with the Royalties, therefore, the best course of action for the Trustee, Estates, NRW, and the United States lies in allowing NRW to complete its efforts to secure the bonding requested by the United States.

---

[40]      *See* R. Doc. 2274 at ¶ ¶ 42-55.

3.   **The Leases are operational, and NRW has paid and will continue to pay operating expenses.**

The Trustee also claims its Motion should be granted owing to his concerns regarding the operation of the Leases.  To that point, the Trustee offers a host of factual allegations, asserting that (1) the Leases no longer have a qualified operator, (2) the Leases are shut in, and (3) the health and safety protections for the Leases are being ignored.  As will be demonstrated at the hearing, the Trustee is wrong on each of these allegations.

First, the Leases have had, and continue to have, a qualified operator: Array Operating ("Array").  NRW had a dispute with Array owing to Array overcharging NRW for its services by millions of dollars.  The parties were briefly involved in a federal lawsuit arising from the dispute.[41]  Once the court rejected Array's request for injunctive relief, the lawsuit was quickly settled and dismissed.  As Mr. DeVito will testify, NRW has now solved the Array issues through an acquisition in which an affiliate of NRW acquired Array.  Array has been, and continues to be (now under new ownership), the qualified and federally-approved operator of the Leases.

Second, the Leases were only temporarily shut in.  As part of an effort to gain leverage in its dispute with NRW, Array temporarily shut in the wells at the end of December 2024.  That dispute was quickly resolved.  With Array under new ownership, BSEE has recently approved the resumption of production on the Leases.  That work is currently underway.

---

[41]    The Trustee's support for his "operational" concerns consist of disputed allegations in Array's (since-dismissed) lawsuit and vague, hearsay-laden allegations regarding the status of the Leases and NRW's conduct.  *See* Case No. 24-2867, *Array Petroleum, LLC v. Natural Resources Worldwide LLC* (E.D. La.) ("Array Lawsuit"); Motion at ¶¶14, 26 (citing Array's Complaint). Array Lawsuit, R. Doc. 19 (order dismissing case).  *See also* Motion at ¶ 30 ("The Trustee has been informed … that NRW's non or inadequate payment of Array resulted in Array's shut-in of the Federal Leases.").

Third, the environmental, safety and health ("ESH") protections for the Leases have remained the priority for NRW.  Indeed, NRW has gone to extraordinary lengths to secure these protections even during the dispute with Array.  For instance, when NRW discovered that Array had not used funds provided by NRW to pay vendors responsible for ESH obligations, NRW then paid those vendors directly.  With Array under new ownership, NRW will continue to ensure that ESH protections are maintained.

In sum, the status of Array as Operator is not an impediment to obtaining Regulatory Approval and increasing production from the Leases in the near future.  Granting of the Trustee's Motion, on the other hand, would render NRW's efforts in the past few months futile, and indefinitely delay both Regulatory Approval and increased production from Leases.   Denial of the Motion is accordingly warranted.

III.    CONCLUSION

The facts, law, and common sense all favor denying the Motion and instead allowing the parties to keep progressing toward Regulatory Approval and the transfer of title in the Leases to NRW.  Accordingly, NRW objects to the Motion.

- 17 -

Respectfully submitted,

Dated: January 27, 2025          **STONE PIGMAN WALTHER WITTMANN LLC**

By:     */s/ Andrew D. Mendez*
_____

Andrew D. Mendez (Texas Bar No. 00797066)
Bryant S. York (Texas Bar No. 240848669)
Paul J. Masinter (*pro hac vice*)
909 Poydras Street, Suite 3150
New Orleans, Louisiana  70112
Telephone:  (504) 581-3200
Facsimile:  (504) 581-3361
Email:  amendez@stonepigman.com
       byork@stonepigman.com
       pmasinter@stonepigman.com

***Attorneys for Natural Resources Worldwide LLC***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on counsel of record via the Court's electronic filing system on this 27th day of January, 2024.

_____
          */s/ Andrew D. Mendez*