**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **Case No. 23-90324 (CML)** |
| **MLCJR LLC, et al.,**[1] | § | |
| | § | **Chapter 11** |
| | § | |
| **DEBTORS.** | § | **Jointly Administered** |

**TGS-NOPEC GEOPHYSICAL COMPANY'S OBJECTION TO TRUSTEE'S MOTION TO DESTROY AND TRANSFER CERTAIN PROPERTY OF THE ESTATES (RELATED TO DOCKET NOS. 2420)**

TGS-NOPEC Geophysical Company ("TGS") hereby files this objection to the *Trustee's Motion to Destroy and Transfer Certain Property of the Estates* [Docket No. 2420] (the "Motion to Transfer"), as follows:

## INTRODUCTION

1. TGS and its affiliated companies are in the business of licensing geoscientific data and related products to the energy industry.[2] Such data and related products and materials are proprietary trade secrets and intellectual property that are valuable and highly confidential.

2. Certain of the Debtors and their non-debtor affiliates have been and are customers of TGS. Pursuant to the Motion to Transfer, the Trustee seeks an order authorizing transfer of the Estates' rights and interests in voluminous physical files to PXP, which has been described as "a working interest owner or predecessor-in-interest to" certain Debtors with respect to their Leases. Since the filing of the Trustee's motion, TGS entered into a non-disclosure

[1] The "Debtors" in these cases, along with the last four digits of each Debtor's federal tax identification number, are: MLCJR LLC (0875); Cox Oil Offshore, L.L.C. (7047); Cox Operating, L.L.C. (0939); Energy XXI GOM, LLC (0027); Energy XXI Gulf Coast, LLC (8595); EPL Oil & Gas, LLC (9562); and M21K, LLC (3978). The Debtors' address is 4514 Cole Ave, Suite 1175, Dallas, Texas 75205.

[2] All references to TGS herein shall include TGS-NOPEC Geophysical Company and its affiliates.

agreement and reviewed the contents of the first thirteen (13) boxes stored at VeriTrust and reflected on Exhibit 1 to the Trustee's Motion. That limited review identified eight (8) documents containing TGS's proprietary materials. PXP is not a licensee to and has no right to possession of TGS's proprietary materials. As it has previously with respect to other proposed transfers of the Debtors' assets [*see* Docket Nos. 355, 687, 1609], TGS files this Objection to ensure that its proprietary data, intellectual property, and related products and materials are not improperly disclosed, used, or transferred.

**FACTUAL BACKGROUND**

3. The Debtors engage in the development and production of oil and natural gas in the Gulf of Mexico.

4. As mentioned, TGS licenses seismic and well data and related products to third parties in the energy industry, such as the Debtors. Seismic data, well data, and related products allow oil and gas companies to evaluate prospects for drilling, make decisions about well work, identify workover and drilling opportunities, and properly map and evaluate the viability of projects. Seismic and well data are also used for valuation, evaluation, and reporting of hydrocarbon reserves.

5. A major part of TGS's business includes licensing seismic products to energy companies on a multi-client basis, meaning that the licenses are not exclusive and TGS may license the products to more than one customer. TGS also provides well data products, interpretive studies, and services to help oil and gas companies find and develop hydrocarbons. Finally, TGS offers a variety of other technical services, including processing and imaging, interpretation products, and data integration.

6. To protect its assets and as is typical in the energy data industry, TGS requires its customers to enter into master license agreements ("MLAs") and associated

supplementary agreements ("Supplements") that, together, set forth with particularity the details of the license and other rights, duties, and obligations of the parties. In its MLAs, TGS requires its customers to acknowledge, expressly, the proprietary nature of licensed products and materials derived from the products as trade secrets and intellectual property. TGS also strictly restricts allowed possession and uses related to the products. These restrictions broadly prohibit licensees from showing, allowing use of, or permitting the ability to access licensed products and related materials by third parties.

7. TGS's MLA further places specific parameters and restrictions upon use (including the ability to view or access) by a licensee's related entities, consultants, partners, and prospective partners. Finally, the MLA expressly prohibits the transfer of license rights, including the right to use licensed data, to any acquiror of the licensee unless and until the acquiring entity enters into its own license agreement and pays transfer fee compensation to TGS as outlined in the MLA.

8. TGS and the Debtors' affiliate Energy XXI Services, LLC ("Energy XXI") were parties to an MLA dated June 15, 2010 (the "Energy XXI MLA").[3] Pursuant to the Energy XXI MLA, TGS licensed seismic data and related products to Energy XXI.

9. The Energy XXI MLA (like other TGS MLAs) includes strict prohibitions on the transfer of any license rights, including upon change in ownership of Energy XXI.

10. The Debtors acquired Energy XXI in 2018. This transaction triggered the anti-assignment clauses in the Energy XXI MLA. Among other things, if Energy XXI sought to maintain possession of licensed seismic data and related materials, it (or the acquiring Debtors) was required to pay TGS a transfer fee of approximately $10 million. Ultimately, Energy XXI

[3] The Debtors, Energy XXI, and the Trustee should have possession of a copy of the Energy XXI MLA.

did not pay the transfer fee for the seismic material and TGS terminated the Energy XXI MLA and associated supplements.[4]

11. The Energy XXI MLA required Energy XXI to return or destroy all "Seismic Material" upon termination. "Seismic Material" is broadly defined in the Energy XXI MLA, purposefully, to include not only the Data, which in general means the base seismic survey, but also "the results of all processing, reprocessing, and redisplay thereof, whether produced by TGS, by Licensee or by others (regardless of their form or the medium on which they are stored, printed or displayed)." Possession by Energy XXI of any Seismic Material—in any form—related to any seismic survey after termination of the Energy XXI MLA is prohibited.

12. After termination of the Energy XXI MLA, TGS discovered that Energy XXI was still in possession of Seismic Material in various forms and was improperly sharing this information with certain of the Debtors. As a result, in March 2020 and years prior to the Debtors filing for bankruptcy, TGS sued certain of the Debtors and their non-debtor affiliates, including Energy XXI. A true and correct copy of the live pleading, Plaintiff's Fourth Amended Petition and Application for Permanent Injunction (the "Fourth Amended Petition"), filed in the 334th Judicial District, District Court of Harris County, Texas (the "State Court") is attached hereto as **Exhibit A** and incorporated by reference.[5]

13. As set forth in the Fourth Amended Petition, TGS has sued the named defendants for breach of contract, conversion, misappropriation of trade secrets, and unjust enrichment. TGS also requests a permanent injunction barring the defendants from possessing, having access to or using TGS's proprietary seismic data and related materials. As alleged and

[4] Energy XXI did elect to transfer the license rights to the well data to Cox Operating, LLC, and that data is accordingly subject to the Cox Operating MLA as defined below.

[5] Unless otherwise defined, capitalized terms shall have the meanings set forth in the Fourth Amended Petition.

confirmed by discovery—and the documents located at VeriTrust—the named defendants' possession of TGS's Seismic Material continues today.

14. The Trustee has consented to relief from the automatic stay for TGS to proceed to judgment against non-debtor parties in the litigation in the State Court. *See* Docket No. 2426.

15. TGS also has a separate MLA with debtor Cox Operating, LLC ("Cox Operating") dated December 3, 2018 (the "Cox Operating MLA"). A true and correct copy of the Cox Operating MLA is attached hereto as **Exhibit B**.

16. Pursuant to the Cox Operating MLA, which is unrelated to and independent of the 2010 Energy XXI MLA, debtor Cox Operating licensed 16.8 blocks (out of a total of 111 blocks) of the TGS Eastern Delta 3D Survey as well as certain well data. The Cox Operating MLA does not give it rights to Seismic Material related to the Energy XXI MLA, even though some of the licensed data covers the same geographic area. The Cox Operating MLA prohibits transfer of Seismic Materials thereunder to third parties.

17. Similar to the Energy XXI MLA, the Cox Operating MLA prohibits any transfer of the Cox Operating MLA and the licensed geoscientific data and related products; more specifically, the Cox Operating MLA, supplements. Likewise, Cox Operating's data licenses terminate automatically upon a direct or indirect change of Ownership or Control of Cox Operating.[6] An authorized transfer requires payment to TGS of a fee in an amount equal to 20%

[6] As defined in the Cox Operating MLA, "Ownership" means direct or indirect rights in, or legal title to, greater than fifty percent (50%) of (i) outstanding common stock or other voting securities, (ii) equity interest, (iii) economic interest, (iv) voting power, (v) management or (vi) interest in the profits. "Control" means the ability to, directly or indirectly, direct, manage or dictate the actions of, or determine the management of, the entity in question by any method, including, without limitation, by the election of members of the board of directors or other governing body of such entity, by having the ability to exercise control over a majority number of members of such governing body or through the Ownership of, or the exercise of voting or consensual right with respect to, the common stock, voting securities or other interest held in such entity.

of the undiscounted list price of the relevant data and related products and the acquirer may be required to execute a new license agreement or confirm the terms of the Cox Operating MLA.

18. TGS files this Objection out of an abundance of caution. As discussed above, the Trustee proposes to transfer certain data to PXP that includes TGS's proprietary Seismic Materials. TGS has been in regular communication with counsel for the Trustee and PXP regarding these matters but, as of the filing of this Objection, the parties have not reached a resolution that protects TGS's proprietary Seismic Materials from unauthorized disclosure to third parties including PXP.

**OBJECTIONS TO MOTION TO TRANSFER**

19. TGS objects to any transfer of its proprietary data without its express consent, a new license agreement, and/or payment of all appropriate fees.

20. Without limitation, TGS's seismic and well data and related products are intellectual property protected by trade secrets law. Seismic data is a protected trade secret under Texas law. *See, e.g., In re Bass*, 113 S.W.3d 735, 742 (Tex. 2003); *see also Musser David Land Co. v. Union Pac. Res*., 201 F.3d 561, 569 (5th Cir. 2000). Similarly, subsurface data, including both seismic and microseismic data and well logs, is entitled to trade secret protection under Texas law. *In re TXCO Res., Inc.*, 475 B.R. 781, 808-12 (Bankr. W.D. Tex. 2012).

21. Under the Uniform Trade Secrets Act, an owner of a trade secret may enjoin disclosure or use of such trade secret that may occur without the express or implied consent of the owner. Tex. Civ. Prac. & Rem. Code § 134A.002(3). Anyone who knowingly communicates or transmits a trade secret without the owner's consent is guilty of committing a felony. *See* Tex. Penal Code § 31.05. Similarly, the Defend Trade Secrets Act of 2016 creates a federal cause of action for misappropriation of trade secrets that authorizes civil remedies for any

misappropriation of trade secrets, including injunctions, compensatory damages, and even punitive damages. *See* 18 U.S.C. § 1836. These laws protect owners of proprietary data that is difficult or costly to develop and not publicly available. TGS and its proprietary data and intellectual property are entitled to these protections.

22. Furthermore, the Debtors, the Debtors' estates, and the Trustee, have no right to transfer TGS's seismic data and related materials to a third party that does not have a license with TGS to use such Seismic Materials.[7] Stated differently, TGS's Seismic Material is not property of the Estates.

23. The Debtors' estates and Trustee have no rights in TGS's proprietary trade secrets and intellectual property. *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 203 L. Ed. 2d 876, 139 S. Ct. 1652, 1663 (2019) ("The estate cannot possess anything more than the debtor itself did outside bankruptcy."); *In re Signal Hill-Liberia Ave. Ltd. P'ship*, 189 B.R. 648, 652 (Bankr. E.D. Va. 1995) (property in question was not property of the estate and therefore was not subject to sale under § 363(f)).

24. Any order approving the Transfer Motion must clarify that the Trustee, the Debtors, the Debtors' estates, and their non-debtor affiliates, including Energy XXI, are strictly prohibited from using, disclosing, or transferring TGS's Seismic Material.

25. Similarly, any order approving the Transfer Motion should reserve TGS's rights against any third parties (including any transferee of the Debtors' information) that may improperly use or possess TGS's proprietary trade secrets and intellectual property.

[7] The Trustee has not moved to assume or assign any TGS license to PXP. However, out of an abundance of caution, TGS objects to any attempt to assume or assign any license. Without limitation, the Trustee has rejected any licenses with TGS by failure to assume within the time period required under section 365(d)(1). TGS's seismic and well data and related products are intellectual property protected by copyright law and no license for such intellectual property can be assumed or assigned without TGS's consent. *E.g.*, *In re Patient Education Media, Inc.*, 210 B.R. 237, 242-43 (Bankr. S.D.N.Y. 1997) ("The federal policy designed to protect the limited monopoly of copyright owners and restrict unauthorized use constitutes applicable nonbankruptcy law. It prevents the trustee from assigning the nonexclusive license absent the owner's consent.").

**CONCLUSION AND RESERVATION OF RIGHTS**

26. TGS must diligently protect its interests in its valuable and highly confidential trade secrets and intellectual property. TGS will attempt to resolve all issues in advance of any final hearing on the Motion to Transfer. TGS has previously negotiated certain agreed language for sale orders and TGS requests that the same or substantially similar language be included in any order approving the Motion to Transfer to ensure the protection of TGS's Seismic Materials.

27. TGS files this Objection without limitation or waiver of any rights, claims, or defenses against the Trustee, the Debtors, the Debtors' estates, Energy XXI, and any other non-debtor parties.

Respectfully submitted,

BRADLEY ARANT BOULT CUMMINGS LLP

*/s/ James B. Bailey*

James B. Bailey
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: 205-521-8000
jbailey@bradley.com

Peter Scaff
JPMorgan Chase Tower
600 Travis Street
Suite 5600
Houston, TX 77002
Telephone: 713-576-0300
pscaff@bradley.com

**ATTORNEYS FOR TGS-NOPEC GEOPHYSICAL COMPANY**

**CERTIFICATE PURSUANT TO LOCAL RULE 9013-1(G)**

Pursuant to local rule 9013-1(g) I hereby certify that counsel for TGS has worked in good faith to resolve its concerns regarding the Motion to Transfer. Without limitation, counsel has communicated with counsel for the Trustee regarding access to the documents to review for any proprietary information and, upon such review, advised the Trustee's counsel what documents should not be transferred to any third parties. This Objection is filed out of an abundance of caution to preserve all rights. Counsel will continue to work to resolve these matters on a consensual basis before any hearing.

*James B. Bailey*
OF COUNSEL

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties eligible to receive service via CM/ECF.

*James B. Bailey*
OF COUNSEL

**Exhibit A**

3/3/2023 2:37 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 73328917
By: SIMONE MILLS
Filed: 3/3/2023 2:37 PM

CAUSE NO. 2020-14432

| | | |
|---|---|---|
| TGS-NOPEC GEOPHYSICAL COMPANY | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | HARRIS COUNTY, TEXAS |
| v. | § | |
| | § | |
| COX OPERATING, LLC, *et al.* | § | |
| | § | |
| Defendants. | § | 334th JUDICIAL DISTRICT |

**PLAINTIFF'S FOURTH AMENDED PETITION AND APPLICATION FOR PERMANENT INJUNCTION**

Plaintiff, TGS-NOPEC Geophysical Company ("TGS"), files its Fourth Amended Petition and Application for Permanent Injunction against Defendants Cox Operating, LLC, Energy XXI Services, LLC, Energy XXI GOM, LLC, Energy XXI Gulf Coast, Inc., LLC, MLCJR LLC, CEXXI, LLC and Cox Oil.

## I. Discovery Plan

1. In accordance with Texas Rule of Civil Procedure 190, discovery is intended to be conducted under discovery level 3.

## II. Parties

2. Plaintiff TGS-NOPEC Geophysical Company ("TGS") is a Delaware corporation with its principal place of business in Houston, Texas.

3. Defendant Cox Operating, LLC is a foreign limited liability company doing business in Texas. Cox Operating, LLC has appeared herein and may be served through its counsel of record.

4. Defendant Energy XXI Services, LLC is a foreign limited liability company doing business in Texas. Energy XXI Services, LLC has appeared herein and may be served through its counsel of record.

5. Defendant Energy XXI GOM, LLC is a foreign limited liability company doing business in Texas. Energy XXI GOM, LLC has appeared herein and may be served through its counsel of record.

6. Defendant Energy XXI Gulf Coast, Inc. is a foreign for-profit company doing business in Texas. Energy XXI Gulf Coast, Inc. has appeared herein and may be served through its counsel of record.

7. Defendant MLCJR LLC is a domestic limited liability company. MLCJR LLC has appeared herein and may be served through its counsel of record.

8. Defendant CEXXI, LLC is a foreign limited liability company. CEXXI, LLC has appeared herein and may be served through its counsel of record.

9. Defendant Cox Oil is an assumed or common name of various entities doing business in Texas. Cox Oil has appeared herein and may be served through its counsel of record.

10. To the extent applicable, Plaintiff reserves the right to substitute true or legal names pursuant to Rule 28 of the Texas Rules of Civil Procedure.

## III. Jurisdiction and Venue

11. This Court has subject matter jurisdiction over this cause and jurisdiction to grant all relief requested by TGS. The amount in controversy is within the jurisdictional limits of this Court.

12. In accordance with Texas Rule of Civil Procedure 47, TGS seeks monetary relief within the jurisdictional limits of this Court in excess of $1,000,000, *see* Tex. R. Civ. P. 47(b)(5), and non-monetary relief in the form of injunctive relief.

13. Venue is proper in Harris County, Texas pursuant to Texas Civil Practice & Remedies Code § 15.002. A substantial part of the events or omissions giving rise to the claim

occurred in Harris County, Texas. TGS and Energy XXI entered into a Master License Agreement in Harris County, performance of which created obligations in Harris County, including providing notice and paying license fees to TGS in Harris County.

## IV. Background Facts

### A. TGS develops seismic surveys and licenses them to third parties, including Defendants.

14. TGS is in the business of licensing seismic data and related products to the energy industry. Seismic data and related products allow oil and gas companies to evaluate prospects for drilling, make decisions about well work, identify workover and drilling opportunities, and properly map and evaluate the viability of projects. Seismic data is also used for valuation, evaluation, and reporting of hydrocarbon reserves.

15. A major part of TGS's business includes licensing seismic products to energy companies on a multi-client basis, meaning that the licenses are not exclusive and TGS may license the products to more than one customer. TGS also provides well data products, interpretive studies, and services to help oil and gas companies find and develop hydrocarbons. Finally, TGS offers a variety of other technical services, including processing and imaging, interpretation products, and data integration.

16. TGS has invested billions of dollars in acquiring and developing the seismic library that it licenses. For just its Eastern Delta 3D Survey, which is a focus of this case, TGS expended approximately $40 million dollars to acquire and develop it. TGS's portfolio of data and products consititute highly confidential trade secrets that are the property of TGS.

17. To protect its assets and as is typical in the seismic industry, TGS requires its customers to enter into master license agreements ("MLAs") and associated supplementary agreements ("Supplements") that, together, set forth with particularity the details of the license

and other rights, duties, and obligations of the parties. In its MLAs, TGS requires its customers to acknowledge, expressly, the proprietary nature of licensed products and materials derived from the products as trade secrets. TGS also strictly restricts allowed possession and uses related to the products. These restrictions broadly prohibit licensees from showing, allowing use of, or permitting the ability to access licensed products and related materials by third parties.

18.    TGS's MLA further places specific parameters and restrictions upon use by a licensee's related entities, consultants, partners, and prospective partners. Finally, MLA expressly prohibits the transfer of license rights, including the right to use, to any acquiror of the licensee unless and until the acquiring entity enters into its own license agreement and pays transfer fee compensation to TGS as outlined in the MLA.

**B.    Energy XXI licensed a significant amount of data from TGS.**

19.    TGS and Energy XXI entered an MLA in 2010. Thereafter, Energy XXI licensed a significant amount of data from TGS. The list of data licensed by Energy XXI is listed on the "Entitlement by Client" attached as Exhibit A. Energy XXI extensively used and worked with the licensed data for years, drilling many successful wells in some of its most productive acreage in reliance upon the licensed products.

20.    The MLA required Energy XXI to delete all "Seismic Material" upon termination of the MLA in any area on the entitlement list. "Seismic Material" is broadly defined, purposefully, to include the Data, which in general means the base seismic survey, along with "the results of all processing, reprocessing, and redisplay thereof, whether produced by TGS, by Licensee or by others (regardless of their form or the medium on which they are stored, printed or displayed)." Possession by Energy XXI of any Seismic Material—in any form—related to any survey after termination of the MLA is prohibited. Stated differently, the MLA required Energy XXI, upon

termination, to return and destroy all Seismic Material related to all items contained on the entitlement list. As the obligation covers Seismic Material in any form, the obligation includes locating and deleting categories such as all emails, PowerPoints, pictures, images, analyses, maps, evaluations, etc. that contained, displayed, or depicted in any way TGS's Seismic Material. The obligation further includes any form, whether electronic or hardcopy. With full knowledge, Defendants intentionally failed to comply with the obligation to return/destroy TGS's Seismic Material.

**C.      Cox acquires Energy XXI, Resulting in the MLA's Termination.**

21.     Cox is a privately held entity that owns and operates assets in the Gulf of Mexico and was founded by fourth generation oilman, Brad E. Cox. Cox's assets are located in both the outer continental shelf in the Gulf of Mexico and the shallow waters off the coast of Louisiana. As of mid-2020, Cox operated more than 600 producing wells from approximately 500 structures over 66 fields with daily production of approximately 85,000 barrels of oil equivalent. These operated assets stretch from offshore Florida to Texas. Cox is based in Dallas, Texas with operation staff in New Orleans, Louisiana and Houston.

22.     Founded in 2005, Energy XXI quickly became one of the largest producers of oil and gas on the outer continental shelf of the Gulf of Mexico. From August 2007 to May 2016, EXXI was publicly traded on the NASDAQ and had an approximately $2 billion market value. In April 2016, however, Energy XXI and 25 affiliates filed Chapter 11 bankruptcies to seek relief from almost $3 billion in debt. On December 13, 2016, Energy XXI's plan of reorganization was confirmed, and became effective shortly thereafter.

23.     Effective October 19, 2018, Cox acquired Energy XXI for $322,000,000, in a move by which Cox expected to increase its production to more than 61,000 barrels of oil equivalent per

day from 35,000 barrels of oil equivalent. Cox now is one of the largest outer continental shelf operators in the Gulf of Mexico. The transaction with Energy XXI caused Cox to become an "Acquiror" under the TGS/Energy XXI MLA, which specifically contemplates and delineates the parties' rights and obligations upon such an occurrence. Section 7.1 of this agreement states:

> Licensee [Energy XXI] may not transfer the right to Use Seismic Material[1] to a person that acquired, either directly or indirectly, Licensee's equity interest or assets (an "**Acquiror**"), whether such acquisition is in the form of a statutory merger, consolidation, share exchange, stock or asset sale, or otherwise, without the prior written consent of TGS. In requesting such consent, Licensee shall provide notice satisfactory to TGS of all relevant facts concerning such transfer.

24. Furthermore, Section 7 lists multiple conditions that must be satisfied for an acquiror such as Cox to use or possess TGS's Seismic Material post-merger. From a financial perspective, Section 7.2.4. states, among other things, that "Licensee or Acquiror shall . . . pay a fee in an amount equal to 20% of the undiscounted list price of the Seismic Material that is licensed from TGS by Licensee, but not by Acquiror, as of the date of the acquisition." Importantly, under Section 9.1.2, the MLA terminates "immediately if an Acquiror directly or indirectly acquired Licensee and all of the conditions set forth in Section 7.2 are not satisfied."

25. Beginning in July 2018 when the Cox/Energy XXI transaction became known, TGS began a series of customary communications and discussions with Energy XXI and Cox regarding their contemplated deal in light of the substantial quantity of TGS data licensed by Energy XXI under the MLA. TGS repeatedly advised Energy XXI and Cox of required compliance with the transfer provisions of the MLA or else the MLA would immediately terminate. As sophisticated players in the industry and because of the due diligence conducted and disclosures made when

[1] Both "Use" and "Seismic Material" are defined terms. "Use" is broadly defined in the MLA as "to have or be permitted access to Seismic Material in a manner that allows a person to alter, or generate displays, interpretations, or processings of, the Seismic Material." "Seismic Material" is broadly defined to include not only TGS's Data, but also "Derivatives," such as maps, images, displays, processings, reprocessings, and other items derived from TGS's Data.

deciding to acquire Energy XXI, Cox fully appreciated the need to comply with the confidentiality, transfer fee, and return/destruction obligations in the MLA. Cox further had access to Energy XXI's entire geoscience team, including the geophysicists that worked with TGS's Data for years, including its Chief Geophysicist, Ross Saunders, who had signed and had extensive knowledge of Energy XXI's seismic licenses including the MLA and Supplements with TGS.

26. Communications between TGS and Energy XXI/Cox continued in August and September 2018. TGS continued to advise Energy XXI/Cox of its options, requirements and obligations. On September 11, 2018, for example, TGS reminded Energy XXI/Cox that "as discussed, pursuant to Section 9.1.2 of the Master License Agreement dated June 15, 2010 between Energy XXI and TGS, the MLA and the license granted thereby terminate immediately upon the acquisition of Energy XXI by Cox if the conditions in Section 7.2 are not satisfied." Those conditions include agreement to be bound by the terms of a TGS MLA and payment of a transfer fee. If the MLA terminated, Energy XXI's licenses and right to possess any TGS Seismic Material—including any works or redisplays created or derived from any Data listed on the entitlement list—ceased immediately. And, of course, Energy XXI was prohibited from transferring possession, access, or the right to use any Seismic Material to Cox. Absent compliance or the proper agreements in place, Cox's possession of any Seismic Material related to Energy XXI licenses, in any form, would be wrongful.

27. After the Cox/Energy XXI transaction closed on October 19, 2018, TGS continued to press for resolution of the licensing issues on numerous occasions, affording extensions and grace periods while Cox supposedly contemplated its path forward.

28. In November 2018, Energy XXI/Cox informed TGS that it was not going to transfer the licenses under the MLA to Cox. Thus, the MLA (and all Supplements) terminated. TGS

advised of the termination, effective November 28, 2018. Upon termination, Energy XXI had no right to Use, Show, or Deliver (as those terms are defined in the MLA) or give or permit access by others (including Cox) of any of TGS's Seismic Material, including Data, Interpretations and Derivatives, all as defined in the MLA. For clarity, TGS provided a letter to Defendants listing various categories of prohibited materials, including derivatives, reprocessed data, products or materials created, produced, generated or derived from such data (whether by Energy XXI, its respective affiliates, or a third party acting on behalf of any of the foregoing), including, but not limited to velocity data, amplitude data, and isochron data, and existing in any form or medium, including, without limitation digital form, maps, paper sections, or photocopies. Despite the clear language in the MLA and TGS's admonitions, Defendants acted contrary to the terminated MLA's prohibitions in a variety of ways, many of which are known but many others that they continue to conceal.

29.    TGS's November letter terminating the MLA is set forth below:

TGS

November 28, 2018

Mr. Ross Saunders
Chief Geophysicist
Energy XXI
1021 Main Street, Suite 2626
Houston, TX 77002

RE: Termination of Data Licenses and Affidavit of Destruction

Dear Mr. Saunders:

It is our understanding that the acquisition of Energy XXI by Cox Oil has closed effective October 19, 2018.

TGS-NOPEC Geophysical Company ("TGS") and Energy XXI Services, LLC ("Energy XXI") are parties to Master License Agreement HL0610-009 dated June 15, 2010 (the "License Agreement"), pursuant to which TGS licensed to Energy XXI that certain geoscientific data identified on Appendix I, attached hereto ("Data").

Energy XXI has indicated to TGS that it is declining to transfer the Data licenses to Cox. In accordance with the terms of the License Agreement, the License Agreement is automatically terminated.

Therefore, (1) Energy XXI and any other parties authorized to use or access the Data pursuant to the License Agreement are no longer allowed to use or access the Data, (2) other than tape copies of the Data which must be physically returned to TGS by **December 11, 2018**, all Data must be destroyed, and (3) Energy XXI must sign and return to TGS the affidavit attached hereto by **December 11, 2018** confirming destruction of the Data. Please return all tape copies and the signed affidavit to: Attn: Irene Marcha, 10451 Clay Road, Houston, Texas 77041.

For purposes of this letter, "Data" means the geoscientific data described in Appendix 1 and all derivatives, reprocessed data, products or materials created, produced, generated or derived from such data (whether by Energy XXI, its respective affiliates, or a third party acting on behalf of any of the foregoing), including, but not limited to, velocity data, amplitude data, and isochron information, and existing in any form or medium, including, without limitation, digital form, maps, paper sections, or photocopies.

To the extent Energy XXI seeks to provide any derivatives or interpretations created by or on behalf of Energy XXI to Cox, Energy XXI must first seek prior written confirmation from TGS that Cox has entitlement to the underlying data used to create the derivative.

Thank you for your cooperation. Please feel free to contact me if you have any questions.

Regards,

Linda Santiago
VP, NSA Sales
TGS-NOPEC Geophysical Company

This letter unambiguously advised Energy XXI that the broadly defined "Data" (as broadly defined in the letter) shall be returned (if tapes/storage devices) or destroyed (everything else). The last paragraph reiterates that Energy XXI shall not provide any items derived from TGS's Seismic Material to Cox without first obtaining written confirmation that Cox had an appropriate license. Neither Energy XXI nor Cox ever requested or received such confirmation.

**D. TGS learned of and inquired about one specific Derivative possessed by Energy XXI—the OBN Survey.**

30. Upon termination of the MLA, TGS turned its attention to protection of its proprietary trade secrets. On December 7, 2018, TGS followed up regarding the status of return/destruction of its Seismic Material as discussed in the November letter and the execution of an affidavit certifying same. By that time TGS had become aware of a processing undertaken by one of its licensees, Apache Corporation ("Apache"), involving TGS's Eastern Delta 3D Survey. Apache had processed its own proprietary wide azimuth ("WAZ") survey, the "OBN Survey" with the TGS Eastern Delta 3D Survey, which was a near azimuth ("NAZ") survey. By design, the OBN Survey incorporated Eastern Delta 3D, relying upon it for its velocity model, and subsequently processing the two surveys together to improve quality of the survey, for example by creating a full azimuth survey.

31. From 2014 when the velocity model was created from TGS's Eastern Delta 3D Survey, the OBN Survey was a TGS-owned Derivative and considered TGS's Seismic Material under the MLA. Thereafter, extraction of TGS's Eastern Delta 3D Survey from the OBN Survey became impossible. Even deliverables, if any, that contain pre-processing "OBN" data are still derived from TGS Eastern Delta 3D, because even before the processing, or merger, of the two surveys, the OBN Survey had already derived its velocity model from the Eastern Delta 3D Survey. Therefore, all possessors of the OBN Survey were required to pay a license fee to TGS for its Eastern Delta 3D Survey to obtain rights to possess the OBN Survey. In fact, so it is understood just how valuable this one survey is, TGS has since learned that Energy XXI alone spent approximately $30 million for its license rights for the OBN Survey, with the entire survey costing many times more. Because the OBN Survey relied upon the Eastern Delta 3D Survey, Energy

XXI also obligated itself to license, and in 2013 did license, all of the Eastern Delta 3D Survey from TGS.

32.     In 2016, four years after commencement of acquisition of the OBN Survey and two years after it used the Eastern Delta 3D for velocity modeling, the OBN Survey underwent an involved processing by another seismic company, WesternGeco, LLC. The processing lasted many months. During that time, Energy XXI attended weekly meetings with other stakeholders for updates concerning the project, receiving potentially one hundred or more presentations and PowerPoints, which invariably would have contained TGS Seismic Material. Ultimately, approximately fifty Linear Tape-Open ("LTO5") high-capacity storage tapes, holding up to three terabytes of data each, were delivered to Energy XXI containing the OBN Survey. Each of these tapes contains TGS Seismic Material.

33.     In its December letter, TGS specifically told Energy XXI its understanding that the OBN Survey must be included in the destruction obligation because the velocity model derived from the TGS Eastern Delta 3D Survey. On December 7, 2018, TGS asked for Energy XXI to confirm its understanding. Shortly thereafter Ross Saunders (now a Cox employee) confirmed that the OBN Survey "velocity model was created when Apache used Western Geco to reprocess TGS data for creating proprietary RTM volumes." Thus, by no later than December 7, 2018, Energy XXI and Cox knew that the OBN Survey contained TGS's Seismic Material and, therefore, was within the scope of the return/destroy obligation.

**E.     TGS again reminds Defendants of their obligations under the MLA.**

34.     On December 19, 2018, TGS memorialized the parties' discussions to date and the current status of winding up the MLA.  Although Energy XXI declined to transfer licensed Seismic Material to Cox, causing the license agreement to terminate, Energy XXI had also failed to return and destroy the Seismic Material and certify such destruction by signing an affidavit that it was required to provide to TGS upon request under the MLA. TGS reiterated that "any authorization of Energy XXI . . . to use or access the [Seismic Material] has ceased." TGS demanded that by 5:00 p.m. on December 28, 2018, all tapes with Seismic Material be returned to TGS, all other Seismic Material be destroyed, and that Energy XXI execute the affidavit of destruction. TGS again cautioned Energy XXI that it must obtain written permission before providing any derivatives or interpretations of TGS's Seismic Material before providing to Cox.

**F.     Cox licenses some data.**

35.     On December 19, 2018, Cox licensed 16.8 blocks of the TGS Eastern Delta 3D Survey out of a total of 111 blocks. This entitled Cox to receive new and separate tapes of the licensed data, but Cox's new license did not alter or impact in any way Energy XXI's independent return/destroy obligation with respect to all of TGS's Seismic Material in its possession.

36.     On January 3, 2019, TGS in-house counsel sent a letter to Cox and Energy XXI President and Chief Operating Officer Rodney Dykes. The letter responded to Mr. Dykes request for an extension to return/destroy TGS's Seismic Material to January 31, 2019. TGS indicated that, subject to the agreement of certain conditions, TGS would agree to the extension.  Such conditions included that by January 31, 2019, Energy XXI would 1) return of all tapes TGS, 2) destroy all other Seismic Material, 3) have an officer execute the affidavit of destruction, including a listing of the Seismic Material that had been destroyed; and 4) sign a letter confirming that no Cox

personnel had used or accessed the Data; that no Energy XXI employee or consultant had used or accessed the Data after November 28, 2018; and warranting that no Cox or Energy XXI personnel would use or access the Data until such time as it was returned and/or destroyed; provision of weekly updates on destruction efforts; and 5) confirmation that Cox/Energy XXI would allow TGS to audit Energy XXI's systems to confirm compliance with its return/destroy obligations. Cox never signed the letter, which in hindsight is unsurprising given that Cox and Energy XXI had already breached or were about to breach conditions 1-3. Cox also never gave weekly updates or confirmed its agreement to a TGS audit. As discussed below, the reason for the lack of transparency is now readily apparent—it had no intention of complying with its return/destroy obligation. In any event, because Cox/Energy XXI never signed the letter, no extension was granted to return/destroy the Seismic Material. As such, Energy XXI had been in breach of the return/destroy provision since 5:00 p.m. on December 28, 2018.

## G. Defendants falsely represent that all of TGS's Seismic Material has been returned or destroyed.

37. On January 31, 2019, Cox's Executive Vice President and General Counsel represented that all of TGS's Seismic Material had been returned/destroyed:

**From:** Vincent Devito
**Sent:** Thursday, January 31, 2019 3:26 PM CST
**To:** Gena Glover
**CC:** Jim Zotkiewicz; Linda Santiago
**Subject:** Re: Revised: Affidavit of Destruction
**Attachments:** image001.jpg

Hi - I checked in and all has been deleted and/or delivered to TGS. Thanks.

On Jan 30, 2019, at 4:28 PM, Gena Glover <Gena.Glover@tgs.com> wrote:

Dear Vincent and Jim,

Could you please advise on the status of this letter and destruction of the Seismic Material?

Thank you,
Gena

**Gena Glover**
Assistant General Counsel
**TGS**

Incontrovertibly, Mr. Devito's representation is false. Jim Zotkiewicz, Cox's Vice President of exploration is copied on this email. Zotkiewicz also knew that all of TGS's Seismic Material had not been returned or destroyed.

38. On February 12, 2019, Zotkiewicz provided an "Affidavit of Destruction" signed by Cox and Energy XXI's President and Chief Operating Officer, Rodney Dykes, copying Mr. Devito, and certifying as follows:

**Affidavit of Destruction**

TGS-NOPEC Geophysical Company ("TGS") and Energy XXI Services, LLC ("Energy XXI") are parties to Master License Agreement HL0610-009 dated June 15, 2010 (the "License Agreement"), pursuant to which TGS licensed to Energy XXI that certain geoscientific data identified on Appendix I, attached hereto (the "Data") and in accordance with the License Agreement.

Energy XXI hereby agrees and certifies that, to the best of its knowledge and belief and using best practices in accordance with industry standards to identify the location and storage of the "Seismic Material" as defined in Section 4.1 of the License Agreement, the Seismic Material has been returned to TGS or destroyed and that no copies, on whatever medium (electronic, paper, or otherwise), remain in the possession of Energy XXI or anyone acting on its behalf (subject, however, to the provision below regarding computer system backup copies).

Energy XXI further certifies that if any of the Seismic Material is found at any time in the future, Energy XXI will promptly destroy, or cause to be destroyed, the Seismic Material.

In the event that, in accordance with Energy XXI's normal and customary practices, Seismic Material resides on any electronic computer system backup file, Energy XXI may retain such Seismic Material until the destruction of the backup file occurs in the normal course. In connection with the Seismic Material, Energy XXI confirms that (i) it will not take any action to interrupt or delay the normal destruction cycle of the backup files, (ii) it will not use or access such Seismic Material at any time, and (iii) the Seismic Material shall remain subject to the confidentiality and internal use restrictions of Energy XXI.

Energy XXI agrees to provide to TGS a listing Seismic Material destroyed within 30 days of the date of this affidavit.

Agreed to and accepted this 11th day of February 2019.

**Energy XXI Services, LLC**

Rodney Dykes
Name:
Title: President & COO

Incontrovertibly, Mr. Dykes' representations are false, as was known to Devito and Zotkiewicz.

39. For example, here are photos taken in October 2022 of the approximately fifty LTO tapes containing the OBN Survey (into which TGS's Eastern Delta 3D was processed) that are currently located in Cox's offices:



40. While Defendants claim inadvertence regarding its possession of the OBN Survey, this example of Seismic Material remaining with Defendants is but one of many. Messrs. Dykes, Devito and Zotkiewicz each knew, at the time, that the representations and certifications regarding return/destruction were categorically false. On January 22, 2019, Zotkiewicz sent two PowerPoint presentations to Dykes and Devito:

| | |
|---|---|
| **From:** | Jim Zotkiewicz |
| **Sent:** | Tuesday, January 22, 2019 4:28 PM CST |
| **To:** | Vincent Devito |
| **CC:** | Rodney Dykes |
| **Subject:** | RE: TGS |
| **Attachments:** | Redacted Main Pass 61&73 Asse...erview 15August2018 z2.pdf, MP 61_73_OVERVIEW_TEAM REVISED_FINAL Show to Cox 3 Mgrs 8-15_18 z2.pdf |

REDACTED

Jim

The email (redacted by Cox) shows Cox's executive management discussing TGS during a time when the only outstanding item was destruction of TGS's Seismic Material and certification of same. The attachments, both PowerPoints, show two versions of the same presentation. One

version shows where Energy XXI has redacted amplitude maps and seismic displays, which are quintessential Derivatives. The second attachment did not redact the amplitude maps or the seismic displays. This presentation is but one of many that would have been created concerning prospects, interpretations, and other valuable materials derived from TGS's Seismic Material since 2010 when the MLA was executed. These high-ranking Cox executives should never have had possession of these items, and the mere fact that these documents existed, were circulated, and were produced in litigation (in 2022) conclusively proves that Cox failed to comply with its destruction obligation.

41. Despite having just received, reviewed, and discussed TGS's Seismic Material (including prospect maps) on January 22, 2019, Devito represented a week later that all Seismic Material had been destroyed. Dykes did the same in his Affidavit of Destruction on February 11, 2019. Yet the document still exists today and, according to the file path, would exist at the following file path on Energy XXI's systems: P:\EnE\Op Props\Producing Fields\MP 0061\Prospects\. Defendants' corporate representative testified that the P: drive was never searched to comply with the destruction obligation.

42. Discovery also uncovered efforts by Cox to cut out and export portions of the Eastern Delta 3D Survey as a work around from the contractual obligations in an effort to keep key reprocessings from it. Cox and Jim Zotkiewicz fully appreciated that trimming down or exporting TGS's was strictly prohibited. On January 29, 2019, Cox's data manager who spearheaded deletion efforts as directed by Zotkiewicz, indicated that he was "currently exporting the cutout areas" with the goal of reloading the smaller area by the end of the week. All of this occurred during a time when all rights to access, use or possess TGS data had terminated for over a month.

Discovery has also revealed that Defendants continue to possess TGS Seismic Materials for other surveys as well. Undoubtedly, many other examples will be uncovered once Defendants comply with the Court's orders compelling production.

43. Beyond the minimal, inadequate steps undertaken to 1) return physical storage tapes containing TGS Seismic Material, and 2) ostensibly delete some of the underlying seismic Data, Defendants consciously ignored Energy XXI's obligations to return to TGS or destroy *all* Seismic Material in its possession, retaining *no* copies thereof. Characterized generously, Defendants botched the MLA's return obligation by inadvertently keeping the incredibly valuable OBN Survey tapes. Within its core Main Pass 61/73 area, Defendants also consciously breached the MLA by keeping a variety of maps, presentations, prospect work-ups, and other redisplays in various forms. Such redisplays exist in emails and in public servers and drives that were accessible to the entire geoscience team. Defendants did not bother to look (much less destroy) even the most obvious locations before making the certifications, nor did they do so when they were sued, nor when the information was requested in discovery, nor when its corporate representative admitted he still had emails containing TGS's Derivatives that he reviewed as recently as November 2022 that still have not been turned over in the litigation, nor when the Court issued multiple orders compelling discovery, or even today. Other breaches of the return/destroy obligation plainly exist but remain concealed by Defendants.

44. Upon termination of the MLA on November 28, 2018, all of Energy XXI's rights of any kind related to TGS's Seismic Material ceased. Except as extended by TGS to allow for the limited purpose of deletion, any possession, use, and/or ability to access any of TGS's Seismic

Material after termination constitutes a violation of the TGS MLA, and further constitutes conversion and misappropriation of TGS's proprietary trade secrets.

45. Moreover, Cox never acquired any rights of any kind concerning Energy XXI's licensed Seismic Material. Ignoring the MLA and TGS's repeated admonitions, Energy XXI transferred the right to Use its Seismic Material to Cox, failed to take appropriate steps to ensure that its employees and agents keep strictly confidential the Seismic Material. Cox knew of the obligations but allowed the transfer of Seismic Material anyway. Energy XXI breached its agreement not to Show, allow the Use of or Deliver the Seismic Material to any other person, violating these restrictions with respect to Cox.

46. Energy XXI further breached the MLA by failing to provide satisfactory evidence of the destruction of Seismic Material despite being requested to do so on numerous occasions. Compounding the wrongdoing, members of Defendants' executive team falsely represented, with knowledge of such falsity, that all Seismic Material had been returned or destroyed and that Energy XXI had undertaken its best efforts to locate and identify TGS's Seismic Material.

47. Throughout 2019, TGS continued its efforts to obtain compliance and information from Energy XXI and Cox. On numerous occasions, TGS requested documentation that would confirm what Energy XXI/Cox possessed. Energy XXI/Cox never provided the information requested. TGS was required to file suit to protect its property and prevent Defendants continued unlawful possession. Despite their obligations as litigants in a Texas court and orders compelling production, Energy XXI and Cox continue to obfuscate and conceal TGS's proprietary trade secrets. As a result, TGS has been forced to expend unnecessary attorneys' fees.

48. Energy XXI had no obligation to transfer its licensed Seismic Material to Cox. Energy XXI was perfectly within its contractual rights to allow the MLA to terminate. And

although TGS hoped to maintain and build upon its long-term relationship with Energy XXI, it took no offense at Cox's decision to enter a new and unrelated MLA. Sophisticated businessmen, including those whose family surname graces the Cox School of Business at Southern Methodist University, likely understand how to make such decisions better than most. The fundamental bargain TGS and Energy XXI struck, however, is that if acquired, Energy XXI must pay a transfer fee or the license immediately terminates and Energy XXI must destroy, according to an intentionally broad definition, all of TGS's Seismic Material.

49.     For a company like Energy XXI, who over the course of a decade had licensed seismic data from TGS having a list price exceeding $50 million, the exercise of identifying and destroying seismic data, interpretations and derivatives is no small task. A primary job function of geophysicists is to create maps and displays based on 3D Seismic. Displays, maps and presentations are shared by email, public drive, in hard copy, and on USB drives. Drilled wells start with ideas, and those ideas are derived from seismic data. At the time of the Cox acquisition Energy XXI had developed numerous high-quality drilling prospects in its core area of Main Pass 61/73.  Many of these prospects that existed were derived from TGS Eastern Delta 3D and the OBN Survey.  From TGS's seismic data, Energy XXI prepared literal treasure maps, showing where to drill and allowing for estimation of reservoir size and production. The prospect maps estimate reservoirs containing millions and millions of barrels of oil, and estimated drilling success rates as high as 80%. And some of the most exciting prospects at Energy XXI were derived from the cutting edge OBN Survey, which for the first time showed the deeper geology in the region.

50.     Energy XXI was free to elect not to transfer the Seismic Material or pay the transfer fee. But if it makes that decision, it must destroy TGS's proprietary Seismic Material.  All of it. On the other hand, Energy XXI was obligated to pay the transfer fee in order to allow Cox

possession/access to the OBN Survey, the treasure maps, the prospects or other Seismic Material, or even if Cox simply did not want to go through the time and expense of locating and deleting TGS's property when it has bigger fish to fry. Once the license terminates, Energy XXI is no longer allowed to possess, utilize, or benefit its economic decision-making from TGS's Seismic Material, at the time of termination or at any time in the future.

51. Assuredly, however, what Energy XXI is not allowed to do, however, is let the MLA terminate, get sticky with most valuable materials derived from TGS's Seismic Material, and fail to hold up its end of the bargain to return/destroy and protect the confidentiality of TGS's trade secrets. The OBN Survey and the prospect maps potentially hold the keys to unlocking billions of dollars of production for Cox. Energy XXI affirmatively obligated itself to keep the Seismic Material strictly confidential (i.e., in absolute secrecy) and to make sure that its personnel do the same. This part of the bargain is essential to TGS because TGS entrusted Energy XXI, as licensee, with seismic data costing hundreds of millions to develop. Energy XXI/Cox also are not allowed, on the one hand, to willfully ignore the destruction obligation on the one hand while, on the other hand, allowing its President and Chief Operating Officer to sign an affidavit that the destruction was performed in accordance with "best practices" to identify the location and storage of TGS's Seismic Material. According to Defendants' corporate representative, no custodial emails were searched for critical employees, nor were file cabinets, nor was the public drive holding presentations and prospects. He also testified that, to this day, he still has emails containing TGS's trade secrets that have neither been destroyed nor turned over to Defendants' counsel or TGS.

52. TGS has been damaged by Energy XXI allowing the MLA to terminate but maintaining and allowing Cox to possess, access and use highly valuable Seismic Material and

abdicating its contractual obligation to destroy TGS's Seismic Material. If Energy XXI desired the right to do so, for whatever reason and no matter the motive, Energy XXI was required to pay a transfer fee. TGS has been directly harmed by the loss of a transfer fee Energy XXI should have paid to keep rights to Seismic Material that Energy XXI and Cox continue to possess today. Such fee is calculated as 20% of the list price of all data licensed by Energy XXI, which equals $11,397,068.96. Such fee was not paid, thus directly damaging TGS. Additionally and alternatively, for every block of TGS data that Defendants wrongfully possess in some form or fashion, TGS's damages are in the form of a reasonable license fee. For instance, no dispute exists that Defendants continue to possess between 86.35 and 94.64 blocks of TGS's Eastern Delta 3D Survey, with a value of $140,000 per block. TGS is therefore entitled to damages equaling the number of blocks multiplied by the value. Such damages are not limited to the Eastern Delta 3D Survey alone, and TGS is entitled to a license fee for any Seismic Material that Defendants continue to wrongfully possess.

## V. Causes of Action

### Count 1: <u>Breach of Contract</u>
### (against Energy XXI Services, LLC)

53. TGS repeats, realleges, and incorporates by reference each and every allegation and averment set forth in the above paragraphs with the same force and effect as if the same were more fully set forth herein.

54. The MLA is a binding contract between TGS and Energy XXI Services, LLC. The MLA:

- Mandates strict confidentiality and requires that Energy XXI not Use, Show or Deliver TGS's Seismic Material to any other person (§ 4.2);
- Prohibits transfer of the right to Use TGS's Seismic Material to an Acquiror (§ 7.1);

- Requires that an Acquiror enter into a new license agreement (MLA and Supplement) or agree to be bound by an existing agreement (§ 7.2.3);
- Provides that either Energy XXI or Cox shall pay a transfer fee equal to 20% of the undiscounted list price of all the Seismic Material licensed by Energy XXI as of the date of the acquisition; or agree to buy additional data in an amount equal to 50% of the undiscounted list price of the Seismic Material (§ 7.2.4);
- Upon termination of the MLA, to return and/or destroy all Seismic Material in its possession, retaining no copies (§ 9.2);

Energy XXI Services, LLC has breached each of these provisions of the MLA, causing TGS to suffer damages as a result. Although TGS has presented its claim to Energy XXI, it has refused to pay.

55. TGS has been deprived of the transfer fee, which totals $11,397,068.96. Energy XXI opted not to delete all Seismic Material, and, therefore, must pay the transfer fee. Additionally and alternatively, Energy XXI is still in possession of TGS's data and must pay the market value of a license for wrongfully possessed property of TGS. For example, by virtue of Energy XXI continuing to possess the OBN Survey, Defendants wrongfully possess between 86.35 and 94.64 blocks of the Eastern Delta 3D Survey with a value of $140,000 per block. Additionally and alternatively, Energy XXI remains obligated identify, locate, and destroy all of TGS's Seismic Materials and provide evidence satisfactory to TGS of such destruction.

**<u>Count 2: Conversion</u>**
**(against all Defendants)**

56. TGS repeats, realleges, and incorporates by reference each and every allegation and averment set forth in the above paragraphs with the same force and effect as if the same were more fully set forth herein.

57. TGS owns the Seismic Material, which TGS has an immediate and superior right to possess. Energy XXI Services, LLC's right to use and possess TGS's property terminated on November 29, 2018. Since that time, after accounting for grace periods for deletion, Defendants have wrongfully exercised dominion and control over TGS Seismic Material causing injury to TGS.

58. Because Defendants acted with malice in their conversion, TGS is entitled to punitive damages.

**Count 3: Misappropriation of Trade Secrets**
**(against all Defendants)**

59. TGS repeats, realleges, and incorporates by reference each and every allegation and averment set forth in the above paragraphs with the same force and effect as if the same were more fully set forth herein.

60. As acknowledged in the MLA, TGS's Seismic Material is proprietary, confidential information. TGS undertakes the appropriate measures to ensure that Seismic Material is kept secret through limiting its dissemination through execution and enforcement of licensing agreements. TGS's data has considerable value to third parties.

61. Defendants misappropriated TGS's trade secrets by retaining possession of TGS's Seismic Materials after the right to do so terminated. They did so through acquisition, disclosure, use, and possession of TGS's Seismic Material. Defendants did so knowing or having reason to know that the trade secret was derived through improper means, acquired under circumstances giving rise to a duty to maintain secrecy of the trade secret or improperly through EXXI, which owed a duty to maintain secrecy of TGS's trade secrets. As a direct and proximate result of Defendants' possession, use, acquisition, and/or disclosure of its confidential and proprietary

information, TGS has suffered damages. TGS will continue to suffer damages and irreparable harm by Defendants continued use and possession of the data.

62. Defendants actions in misappropriating TGS's data was "willful and malicious," allowing TGS to recover attorneys fees and exemplary damages.

**Count 4: Unjust Enrichment**
**(Cox Operating, LLC, Cox Oil, Energy XXI GOM, LLC, Energy XXI Gulf Coast, Inc., LLC, MLCJR LLC, and CEXXI, LLC)**

63. TGS repeats, realleges, and incorporates by reference each and every allegation and averment set forth in the above paragraphs with the same force and effect as if the same were more fully set forth herein.

64. Defendants Cox Operating, LLC, Cox Oil, Energy XXI GOM, LLC, Energy XXI Gulf Coast, Inc., LLC, MLCJR LLC, and CEXXI, LLC have wrongfully acquired valuable confidential and proprietary materials that Defendants were required to delete or destroy after termination of the MLA. These Defendants have not paid TGS for this information, and they would be unjustly enriched if allowed to continue to possess and have access to TGS's Seismic Materials without compensating TGS.

## VI. Conditions Precedent

65. All conditions precedent to TGS's recovery on the claims stated in this petition have occurred, been performed, been waived, or been excused.

## VII. Injunctive Relief

66. TGS repeats, realleges, and incorporates by reference each and every allegation and averment set forth in the above paragraphs with the same force and effect as if the same were more fully set forth herein.

67. Defendants continue to possess Seismic Material, constituting TGS's proprietary trade secrets.

68. Defendants should be permanently enjoined from possessing, having access to, or using TGS's Seismic Material. If the commission of Defendants' acts described herein are not restrained, but are left to occur, TGS will suffer irreparable injury. Through its license agreements, including the agreement it had with Energy XXI, TGS maintains strict control over the dissemination of its data. Defendants are currently wrongfully possessing that highly valuable Seismic Material without any agreement in place. Further access to, possession, use, dissemination or sharing of the data will cause irreparable injury to TGS. Without a permanent injunction, TGS will have no ability to maintain control or stop the further wrongful possession proprietary trade secrets.

**Request for Relief**

WHEREFORE, Plaintiff TGS-NOPEC Geophysical Company, requests that it have judgment against Defendants Cox Operating, LLC, Energy XXI Services, LLC, Energy XXI GOM, LLC, Energy XXI Gulf Coast, Inc., LLC, MLCJR LLC, CEXXI, LLC, and Cox Oil and that it be awarded the following relief:

(1) A permanent injunction prohibiting Defendants from possessing, using, displaying, showing, sharing, transferring, disseminating, or distributing TGS's Seismic Material, as well as to destroy all Seismic Material in their possession and provide evidence sufficient to confirm same;

(2) All actual damages, including but not limited to the value of the Seismic Material and/or fees lost and/or a reasonable royalty.

(3) Attorneys' fees;

(4) Exemplary damages;

(5) Pre-judgment and post-judgment interest as provided by law and the relevant MLA;

(6) Court costs and costs of suit; and

(7) All other relief, general or special, at law or in equity, to which it may be justly entitled.

Respectfully submitted,

By: _/s/ Peter Scaff_

Peter Scaff
State Bar No. 24027837
pscaff@bradley.com
Mary Frazier
State Bar No. 24054592
mfrazier@bradley.com
Philip Morgan
State Bar No. 24069008
pmorgan@bradley.com
Bradley Arant Boult Cummings, LLP
600 Travis Street, Suite 4800
Houston, Texas 77002
Telephone: (713) 576.0300
Facsimile: (713) 576.0301

**ATTORNEYS FOR PLAINTIFF,**
**TGS-NOPEC GEOPHYSICAL COMPANY**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document was delivered to all known counsel of record or parties via e-serve on the 3rd of March, 2023:

Andrew D. Mendez
amendez@stonepigman.com
Bryant S. York
byork@stonepigman.com
John M. Landis
jlandis@stonepigman.com
Stone Pigman Walther Wittmann LLC
909 Poydras Street, Suite 3150
New Orleans, Louisiana 70112
Telephone: (504) 581.3200
Facsimile: (504) 581.3361

**ATTORNEYS FOR DEFENDANTS**

_/s/ Peter Scaff_
Peter Scaff

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cindy Lopez on behalf of Peter Scaff
Bar No. 24027837
clopez@bradley.com
Envelope ID: 73328917
Status as of 3/7/2023 8:56 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Manfred Sternberg | | manfred@msternberg.com | 3/3/2023 2:37:43 PM | SENT |
| Philip Morgan | 24069008 | pmorgan@bradley.com | 3/3/2023 2:37:43 PM | SENT |
| Andrew Mendez | 797066 | amendez@stonepigman.com | 3/3/2023 2:37:43 PM | SENT |
| Bryant York | 24084866 | byork@stonepigman.com | 3/3/2023 2:37:43 PM | SENT |
| Charjean Neuer | | cneuer@bradley.com | 3/3/2023 2:37:43 PM | SENT |
| Mary ElizondoFrazier | | mfrazier@bradley.com | 3/3/2023 2:37:43 PM | SENT |
| Peter Scaff | | pscaff@bradley.com | 3/3/2023 2:37:43 PM | SENT |
| Cindy Lopez | | clopez@bradley.com | 3/3/2023 2:37:43 PM | SENT |
| Charmaine Brim | | cbrim@bradley.com | 3/3/2023 2:37:43 PM | SENT |
| John Landis | | jlandis@stonepigman.com | 3/3/2023 2:37:43 PM | SENT |

# Exhibit A

Message

**From:** Vincent Devito [vincent.devito@coxoil.com]
**Sent:** 3/6/2019 2:48:19 PM
**To:** Gena Glover [gena.glover@tgs.com]
**Subject:** TGS Seismic Material that was destroyed
**Attachments:** doc04885420190306134940.pdf

**TGS IT Notice:** This email is from an external source.

Gina,

Good afternoon: We realize that the attached list covers all TGS Seismic Material that we destroyed. Please let me know if you would like additional information. Thanks, again.

Best,
Vincent

Vincent DeVito
Executive Vice President and General Counsel
www.coxoil.com



# Entitlement By Client

ALL > All Regions > Parent Client: Energy XXI Services, LLC

| Area Survey | ID | Project Name | Available | Owned | Potential | UOM | Open Supplements |
|---|---|---|---|---|---|---|---|
| Gulf of Mexico | | | | | | | |
| Cameron SAD 3D | | | | | | | |
| | 2618 | Cameron SaD 3D (PSTM) | 1,125.661 | 92.902 | 1,032.759 | sq mi | |
| | 2426 | Cameron SaD I 3D (PSTM) | 848.849 | 92.902 | 755.947 | sq mi | |
| | 2572 | Cameron SaD II 3D (PSTM) | 276.801 | 0.000 | 276.801 | sq mi | |
| | 2619 | Cameron SaD 3D (PSDM) | 1,125.661 | 92.894 | 1,032.767 | sq mi | |
| | 2427 | Cameron SaD I 3D (PSDM) | 848.849 | 92.894 | 755.955 | sq mi | |
| | 2573 | Cameron SaD II 3D (PSDM) | 276.957 | 0.000 | 276.957 | sq mi | |
| Camerons South | | | | | | | |
| | 1283 | Camerons South 3D | 498.444 | 26.319 | 472.124 | sq mi | SA 06.11.14 |
| Crimson Tide | | | | | | | |
| | 2161 | Crimson Tide (PSTM) | 23,469.656 | 5,858.163 | 17,611.493 | mi | |
| | 2163 | Crimson Tide (PSDM) | 23,469.656 | 5,858.210 | 17,611.446 | mi | |
| | 2336 | Crimson Tide EGD (Interpretation) | 23,469.679 | 0.000 | 23,469.679 | mi | |
| | 2606 | Sake (PSTM) | 4,826.330 | 0.000 | 4,826.330 | mi | |
| | 2607 | Sake (PSDM) | 4,826.330 | 0.000 | 4,826.330 | mi | |
| | 1157 | Phase 46 | 15,827.513 | 5,701.228 | 10,126.284 | mi | |
| | 1160 | Phase 49 | 7,643.332 | 156.935 | 7,486.397 | mi | |
| | 1207 | Phase 49 (PSDM) | 3,262.339 | 79.155 | 3,183.184 | mi | |
| East Cameron | | | | | | | |
| | 1287 | East Cameron 3D | 560.691 | 30.276 | 530.416 | sq mi | SA 06.11.14 |
| | 1288 | East Cameron - Vermilion 3D | 383.082 | 15.603 | 367.480 | sq mi | SA 06.11.14 |
| | 1289 | East Cameron - Vermilion North 3D | 381.419 | 109.009 | 272.410 | sq mi | SA 06.11.14 |
| Eastern Delta 3D | | | | | | | |
| | 2092 | Eastern Delta 3D (PSTM) | 868.382 | 868.382 | 0.000 | sq mi | |
| | 2232 | Eastern Delta 3D (PSDM) | 868.983 | 868.983 | 0.000 | sq mi | |
| | 2280 | Eastern Delta Infill 3D (PSTM) | 101.095 | 0.000 | 101.095 | sq mi | |
| | 4161 | Eastern Delta TTI RTM 3D | 1,133.039 | 236.108 | 896.931 | sq mi | SA 06.11.14 |
| Eastern Gulf 1 and Viosca Knoll 2 | | | | | | | |
| | 1983 | EG1 and VK2 3D | 1,056.977 | 11.138 | 1,045.838 | sq mi | |
| | 1290 | Eastern Gulf 1 3D | 984.777 | 0.396 | 984.381 | sq mi | SA 06.11.14 |
| | 1345 | Viosca Knoll 2 3D | 694.107 | 10.758 | 683.349 | sq mi | SA 06.11.14 |
| GOM Nodal Full Azimuth | | | | | | | |
| | 4322 | Nessie FAN 3D | 314.396 | 159.759 | 154.637 | sq mi | Amnd1-4 to SupNo15,Amnd1-4 to SupNo15 |
| | 4321 | Ogo FAN 3D | 1,023.441 | 70.310 | 953.132 | sq mi | Amnd1-4 to SupNo15 |
| High Island | | | | | | | |
| | 1307 | High Island 3D | 522.512 | 158.282 | 364.230 | sq mi | SA 06.11.14 |
| Louisiana Renaissance 3D | | | | | | | |
| | 1470 | Louisiana Renaissance 3D | 5,536.416 | 704.822 | 4,831.594 | sq mi | |
| MC and eMC 3D | | | | | | | |
| | 1490 | eMC 3D (PSTM) | 2,381.171 | 0.000 | 2,381.171 | sq mi | |
| | 1916 | eMC 3D (PSDM) | 2,381.171 | 0.000 | 2,381.171 | sq mi | |
| | 2570 | eMCK 3D (PSDM) | 2,047.164 | 0.000 | 2,047.164 | sq mi | |
| | 3203 | eMC TTI High Resolution Kirchhoff 3D | 2,047.164 | 0.000 | 2,047.164 | sq mi | |
| | 2979 | eMC TTI RTM 3D | 2,047.164 | 0.000 | 2,047.164 | sq mi | |
| | 1967 | eMC 3D Rock Properties | 907.964 | 0.000 | 907.964 | sq mi | |
| | 1968 | MC Revival Rock Properties 3D | 5,613.431 | 0.000 | 5,613.431 | sq mi | |
| | 2782 | Lena RTM 3D (PSTM) | 350.769 | 0.000 | 350.769 | sq mi | |
| | 2639 | Lena RTM 3D (PSDM) | 350.769 | 0.000 | 350.769 | sq mi | |
| | 2804 | MC & eMC Shallow Hazard 3D | 7,993.928 | 0.000 | 7,993.928 | sq mi | |
| | 2326 | MC Revival Kirchhoff 3D (PSDM) | 5,948.242 | 35.477 | 5,912.765 | sq mi | |
| | 2813 | MC TTI RTM 3D | 5,948.242 | 0.000 | 5,948.242 | sq mi | |
| | 2062 | MCR plus EMC 3D (PSDM) | 7,993.928 | 483.331 | 7,510.597 | sq mi | |
| | 1315 | MC All 3D | 5,646.563 | 518.850 | 5,127.714 | sq mi | |
| | 1531 | MC Revival 3D (PSTM) | 5,646.563 | 518.861 | 5,127.702 | sq mi | |
| | 2025 | MC Revival 3D (PSDM) | 5,646.563 | 483.337 | 5,163.226 | sq mi | |
| Pangaea | | | | | | | |
| | 1165 | Pangaea 3D | 5,526.885 | 605.767 | 4,921.118 | sq mi | |

TGS

# Entitlement By Client

ALL > All Regions > Parent Client: Energy XXI Services, LLC

| Area Survey | ID | Project Name | Available | Owned | Potential | UOM | Open Supplements |
|---|---|---|---|---|---|---|---|
| Gulf of Mexico | | | | | | | |
| Phase 1 & 2 | | | | | | | |
| | 1166 | Phase 2 | 14,141.461 | 10,304.354 | 3,837.107 | mi | SA 06.11.14 |
| | 1393 | Phase 123 ( Balanced) | 20,179.464 | 15,832.647 | 4,346.818 | mi | |
| | 1398 | Phase 123R | 7,282.688 | 61.842 | 7,220.846 | mi | |
| Phase 3 | | | | | | | |
| | 1139 | Phase 3 | 6,038.004 | 5,528.293 | 509.711 | mi | SA 06.11.14 |
| Phase 4 | | | | | | | |
| | 1149 | Phase 4 | 3,493.675 | 2,255.313 | 1,238.362 | mi | SA 06.11.14 |
| Phase 5 & 17 | | | | | | | |
| | 2844 | Phase 5 & 17 (Merged) | 27,151.233 | 5,985.932 | 21,165.301 | mi | |
| | 1193 | Phase 5 & 17 | 15,751.915 | 4,497.873 | 11,254.042 | mi | SA 06.11.14 |
| | 1194 | Phase 17A | 1,789.689 | 321.125 | 1,468.564 | mi | SA 06.11.14 |
| | 1195 | Phase 17B | 3,454.311 | 642.979 | 2,811.332 | mi | SA 06.11.14 |
| | 1196 | Phase 17C | 1,352.663 | 173.347 | 1,179.316 | mi | SA 06.11.14 |
| | 1197 | Phase 17D | 4,204.694 | 347.486 | 3,857.208 | mi | SA 06.11.14 |
| | 1198 | Phase 17E | 597.045 | 3.122 | 593.922 | mi | SA 06.11.14 |
| Phase 6 | | | | | | | |
| | 1161 | Phase 6 | 9,045.471 | 9,045.471 | 0.000 | mi | |
| Phase 7 | | | | | | | |
| | 1162 | Phase 7 | 6,485.344 | 687.050 | 5,798.294 | mi | SA 06.11.14 |
| Phase 8 | | | | | | | |
| | 2891 | Phase 8 (Merged) | 7,813.137 | 7,813.137 | 0.000 | mi | |
| | 1163 | Phase 8 | 5,881.760 | 5,881.760 | 0.000 | mi | |
| | 1164 | Phase 8 Drag | 1,931.377 | 1,931.377 | 0.000 | mi | |
| Phase 11 | | | | | | | |
| | 1123 | Phase 11 | 5,096.020 | 5,096.020 | 0.000 | mi | |
| Phase 12 | | | | | | | |
| | 1124 | Phase 12 | 5,126.002 | 1,631.053 | 3,494.949 | mi | SA 06.11.14 |
| Phase 13 | | | | | | | |
| | 1189 | Phase 13 ARCO | 126.465 | 3.122 | 123.342 | mi | SA 06.11.14 |
| | 1186 | Phase 13 GBRS | 176.034 | 0.000 | 176.034 | mi | |
| | 1187 | Phase 13 MD | 1,030.435 | 4.676 | 1,025.760 | mi | SA 06.11.14 |
| | 1191 | Phase 13 STC | 811.837 | 0.000 | 811.837 | mi | |
| Phase 15 | | | | | | | |
| | 1125 | Phase 15 | 5,779.047 | 374.205 | 5,404.842 | mi | SA 06.11.14 |
| Phase 16 | | | | | | | |
| | 1391 | Phase 16 ( Balanced) | 7,362.239 | 692.005 | 6,670.233 | mi | |
| | 2850 | Phase 16 (Merged) | 7,362.239 | 692.005 | 6,670.233 | mi | |
| | 1126 | Phase 16 | 5,613.607 | 590.334 | 5,023.273 | mi | SA 06.11.14 |
| | 1127 | Phase 16B | 1,748.632 | 101.672 | 1,646.960 | mi | SA 06.11.14 |
| Phase 18 | | | | | | | |
| | 2892 | Phase 18 (Merged) | 1,017.076 | 113.711 | 903.365 | mi | |
| | 1128 | Phase 18 | 934.309 | 113.711 | 820.598 | mi | SA 06.11.14 |
| | 1129 | Phase 18 Drag | 82.767 | 0.000 | 82.767 | mi | |
| Phase 19 | | | | | | | |
| | 1130 | Phase 19 | 4,206.667 | 406.051 | 3,800.617 | mi | SA 06.11.14 |
| Phase 20 | | | | | | | |
| | 1131 | Phase 20 | 6,930.600 | 65.045 | 6,865.555 | mi | SA 06.11.14 |
| | 1390 | Phase 20 ( Balanced) | 6,930.600 | 65.045 | 6,865.555 | mi | |
| Phase 21 | | | | | | | |
| | 2893 | Phase 21 (Merged) | 8,170.223 | 1,183.867 | 6,986.356 | mi | |
| | 1132 | Phase 21 | 7,264.684 | 1,164.450 | 6,100.234 | mi | SA 06.11.14 |
| | 1133 | Phase 21B | 905.540 | 19.418 | 886.122 | mi | SA 06.11.14 |
| Phase 23 | | | | | | | |
| | 1134 | Phase 23 | 729.490 | 10.470 | 719.020 | mi | SA 06.11.14 |
| Phase 24 | | | | | | | |
| | 1135 | Phase 24 | 3,300.957 | 229.115 | 3,071.842 | mi | SA 06.11.14 |
| Phase 25 | | | | | | | |
| | 1136 | Phase 25 | 7,845.824 | 97.232 | 7,748.592 | mi | SA 06.11.14 |
| | 1399 | Phase 25R | 7,813.196 | 97.232 | 7,715.964 | mi | |



# Entitlement By Client

ALL > All Regions > Parent Client: Energy XXI Services, LLC

| Area Survey | ID | Project Name | Available | Owned | Potential | UOM | Open Supplements |
|---|---|---|---|---|---|---|---|
| Gulf of Mexico | | | | | | | |
| Phase 26 | | | | | | | |
| | 1137 | Phase 26 | 8,298.055 | 972.803 | 7,325.252 | mi | SA 06.11.14 |
| Phase 27 | | | | | | | |
| | 1138 | Phase 27 | 1,126.251 | 55.100 | 1,071.151 | mi | SA 06.11.14 |
| Phase 31 | | | | | | | |
| | 1142 | Phase 31 | 5,168.923 | 251.578 | 4,917.345 | mi | SA 06.11.14 |
| Phase 32 | | | | | | | |
| | 1143 | Phase 32 | 8,290.769 | 6.928 | 8,283.841 | mi | SA 06.11.14 |
| Phase 33 | | | | | | | |
| | 2854 | Phase 33 (Merged) | 4,176.469 | 80.918 | 4,095.551 | mi | |
| | 1144 | Phase 33 | 553.999 | 9.336 | 544.663 | mi | SA 06.11.14 |
| | 1145 | Phase 33 Infill | 3,622.470 | 71.582 | 3,550.888 | mi | SA 06.11.14 |
| Phase 38 | | | | | | | |
| | 2851 | Phase 38 (Merged) | 8,423.370 | 524.297 | 7,899.072 | mi | |
| | 1146 | Phase 38 | 2,443.247 | 194.707 | 2,248.540 | mi | SA 06.11.14 |
| | 1202 | Phase 38 Ext | 2,798.920 | 113.354 | 2,685.566 | mi | SA 06.11.14 |
| | 1201 | Phase 38D | 3,181.203 | 216.237 | 2,964.966 | mi | SA 06.11.14 |
| Phase 41 | | | | | | | |
| | 2853 | Phase 41 (Merged) | 22,393.161 | 1,969.886 | 20,423.275 | mi | |
| | 1150 | Phase 41A | 4,634.916 | 117.253 | 4,517.664 | mi | SA 06.11.14 |
| | 1203 | Phase 41BC | 12,091.697 | 1,041.868 | 11,049.828 | mi | SA 06.11.14 |
| | 1204 | Phase 41D | 5,666.548 | 810.765 | 4,855.783 | mi | SA 06.11.14 |
| Phase 43 | | | | | | | |
| | 2895 | Phase 43 (Merged) | 5,498.048 | 7.519 | 5,490.529 | mi | |
| | 1153 | Phase 43A | 4,690.141 | 7.519 | 4,682.622 | mi | SA 06.11.14 |
| | 1205 | Phase 43B | 807.907 | 0.000 | 807.907 | mi | |
| Phase 44 | | | | | | | |
| | 2896 | Phase 44 (Merged) | 10,608.321 | 100.872 | 10,507.449 | mi | |
| | 1155 | Phase 44 | 7,042.807 | 91.435 | 6,951.373 | mi | SA 06.11.14 |
| | 1156 | Phase 44B | 3,565.513 | 9.437 | 3,556.076 | mi | |
| | 1421 | Phase 44R (PSTM) | 10,605.393 | 100.872 | 10,504.521 | mi | |
| | 1439 | Phase 44R (AVO) | 10,605.393 | 19.604 | 10,585.788 | mi | |
| Phase 45 | | | | | | | |
| | 575 | Phase 45 | 61,679.627 | 34.999 | 61,644.628 | mi | |
| | 1482 | Phase 45 Again (PSTM) | 61,677.227 | 34.999 | 61,642.228 | mi | |
| | 1448 | Phase 45RDM Leviathan (PSDM) | 61,677.250 | 0.000 | 61,677.250 | mi | |
| | 1976 | Phase 45 Leviathan Too (PSDM) | 61,677.297 | 34.999 | 61,642.298 | mi | |
| | 2100 | Phase 45 DWD (Interpretation) | 61,681.025 | 0.000 | 61,681.025 | mi | |
| Phase 48 | | | | | | | |
| | 1159 | Phase 48 | 21,080.002 | 103.016 | 20,976.986 | mi | SA 06.11.14 |
| | 1473 | Phase 48R (PSTM) | 21,079.885 | 0.000 | 21,079.885 | mi | |
| | 1412 | Phase 48 (AVO) | 21,080.002 | 103.016 | 20,976.986 | mi | |
| | 2792 | Phase 48R (Interpretation) | 21,079.885 | 0.000 | 21,079.885 | mi | |
| Phase 50 | | | | | | | |
| | 1453 | Phase 50 | 28,292.584 | 10,589.563 | 17,703.021 | mi | |
| | 1886 | Phase 50 Deep (PSTM) | 28,292.584 | 10,589.563 | 17,703.021 | mi | |
| | 1887 | Phase 50 Leviathan (PSDM) | 28,292.584 | 27.985 | 28,264.599 | mi | |
| | 1472 | Phase 50 (Gravity) | 28,292.584 | 7,908.711 | 20,383.872 | mi | |
| | 2313 | Phase 50 DSD (Interpretation) | 28,292.584 | 0.000 | 28,292.584 | mi | |
| | 1885 | Phase 50 DST (Interpretation) | 38,900.951 | 0.000 | 38,900.951 | mi | |
| Ship Shoal | | | | | | | |
| | 1338 | Ship Shoal 3D | 347.099 | 104.628 | 242.471 | sq mi | SA 06.11.14 |
| | 1339 | Ship Shoal North 3D | 430.542 | 53.167 | 377.374 | sq mi | SA 06.11.14 |
| Ship Shoal / South Timbalier | | | | | | | |
| | 1340 | Ship Shoal 3D/South Timbalier 3D | 426.714 | 88.671 | 338.043 | sq mi | SA 06.11.14 |
| Sophies Resolve 3D | | | | | | | |
| | 1924 | Deep Resolve 3D (PSTM) | 3,216.581 | 397.938 | 2,818.643 | sq mi | NOSUPP-009,SA 06.11.14 |
| | 1904 | Deep Resolve 3D (PSDM) | 3,218.526 | 0.000 | 3,218.526 | sq mi | |
| | 2080 | Sophies Link 3D OBC | 720.619 | 0.000 | 720.619 | sq mi | |



# Entitlement By Client

ALL > All Regions > Parent Client: Energy XXI Services, LLC

| Area | Survey | ID | Project Name | Available | Owned | Potential | UOM | Open Supplements |
|---|---|---|---|---|---|---|---|---|
| Gulf of Mexico | | | | | | | | |
| | Sophies Resolve 3D | | | | | | | |
| | | 2093 | Sophies Link Streamer 3D | 2,010.586 | 0.000 | 2,010.586 | sq mi | |
| | | 2228 | Sophies Link 3D (PSTM) | 1,726.813 | 0.000 | 1,726.813 | sq mi | |
| | | 1989 | Sophies Link 3D (PSDM) | 1,726.813 | 0.000 | 1,726.813 | sq mi | |
| | | 2225 | Sophies Resolve 3D (PSTM) | 4,943.911 | 398.016 | 4,545.895 | sq mi | |
| | | 2235 | Sophies Resolve 3D (PSDM) | 4,943.974 | 0.000 | 4,943.974 | sq mi | |
| | | 2482 | Sophies Resolve Kirchhoff 3D (PSDM) | 4,943.911 | 398.000 | 4,545.910 | sq mi | |
| | | 3269 | Sophies Resolve TTI RTM 3D | 4,943.911 | 391.191 | 4,552.719 | sq mi | SA 06.11.14 |
| | South Timbalier | | | | | | | |
| | | 1332 | South Timbalier 3D | 709.815 | 430.991 | 278.824 | sq mi | SA 06.11.14 |
| | | 1323 | South Timbalier Block 63 Murphy 3D | 53.604 | 0.000 | 53.604 | sq mi | |
| | | 1342 | South Timbalier Extension 3D | 236.582 | 138.365 | 98.217 | sq mi | SA 06.11.14 |
| | | 1341 | South Timbalier North 3D | 361.696 | 0.022 | 361.674 | sq mi | SA 06.11.14 |
| | Texas Renaissance 3D | | | | | | | |
| | | 1530 | Texas Renaissance 3D | 520.332 | 157.720 | 362.612 | sq mi | |
| | Vermilion | | | | | | | |
| | | 1344 | Vermilion 3D | 470.364 | 56.849 | 413.515 | sq mi | SA 06.11.14 |
| | West Cameron | | | | | | | |
| | | 1346 | West Cameron 3D | 303.633 | 16.724 | 286.909 | sq mi | SA 06.11.14 |
| | | 1347 | West Cameron C 3D | 287.992 | 65.200 | 222.792 | sq mi | SA 06.11.14 |
| | | 1348 | West Cameron North 3D | 432.000 | 100.684 | 331.317 | sq mi | SA 06.11.14 |

CONFIDENTIAL



# Entitlement By Client

ALL > All Regions > Parent Client: Energy XXI Services, LLC

## Clients Under This Parent

| | |
|---|---|
| EPL O&G, Inc. was Energy Partners Limited | 19752 |
| Energy XXI Services, LLC | 28494 |
| Energy XXI (Bermuda) Limited | 29485 |

CONFIDENTIAL

# Exhibit B

**MASTER LICENSE AGREEMENT**
**FOR**
**GEOPHYSICAL AND GEOLOGICAL DATA**
No. HL0818-513

THIS MASTER LICENSE AGREEMENT FOR GEOPHYSICAL AND GEOLOGICAL DATA (this "**Agreement**") is entered into this 3rd day of December, 2018 (the "**Effective Date**"), by and between TGS-NOPEC Geophysical Company ASA, a Norwegian company, with its principal office at Lensmannslia 4 N-1386 Asker, Norway ("**TGS**"), and COX OPERATING, LLC a Texas Limited Liability Company, with its principal offices at: 1615 Poydras, Suite 830, New Orleans, LA. 70112 (the "**Licensee**").

WHEREAS, TGS is the owner, or is the duly authorized agent of the owner (in either case the "**Owner**"), of certain proprietary geophysical, geological, and well log data, and associated Presentation Software (regardless of their form or the medium on which they are stored, printed or displayed, the "**Data**") resulting from seismic surveys and from well log services;

WHEREAS, Licensee desires to obtain a non-exclusive license to Use (as defined in Section 6.6) specified portions of the Data and certain interpretations generated by TGS thereof (regardless of their form or the medium on which they are stored, printed or displayed, the "**Interpretations**") on the terms and conditions hereinafter set forth; and

WHEREAS, TGS desires to grant to Licensee a non-exclusive license to Use the Data and Interpretations on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and the respective agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## 1. Grant of License; Supplemental Agreements

1.1 TGS hereby agrees to grant to Licensee, and Licensee hereby agrees to accept, a non-exclusive license to use the Data and Interpretations provided to Licensee in accordance with Section 1.2, on the terms and conditions set forth in this Agreement and the Supplements hereunder.

1.2 Each license to specific Data and Interpretations shall be set forth in a supplemental agreement (a "**Supplement**"), which shall identify in detail the content and form of the Data and Interpretations, the consideration payable by Licensee for such Data and Interpretations and any other matters concerning the license transactions as mutually determined by the parties. Upon execution by TGS and Licensee, the Supplement shall become part of this Agreement. Except as specifically set forth in a Supplement with respect to the Data and Interpretations licensed pursuant to that Supplement only, all licenses for Data and Interpretations granted hereunder shall be governed by the terms and conditions of this Agreement.

1.3    TGS acknowledges and agrees that affiliated entities of Licensee may enter into Supplements under this Agreement; provided that any such affiliated entity meets the definition of Related Entity.  As provided in Section 1.2, all Supplements, whether in the name of Licensee or such affiliated entity, shall be considered a part of, and subject to the terms of, this Agreement. "Licensee" as used herein shall mean the Licensee defined in the introductory paragraph of this Agreement and any such affiliated entity that enters into a Supplement under this Agreement.

## 2.    Payment Terms

2.1    The amount of the license fee to be paid by Licensee for the Data and Interpretations requested shall be calculated in accordance with the then current price and discount schedule established by TGS, or as set forth in the applicable Supplement.  Licensee shall also pay TGS all reproduction, copying, handling, freight, and insurance charges in connection with the license of the Data and Interpretations pursuant to this Agreement and any Supplement hereunder.  Except where Licensee is determined to be exempt from payment of Taxes by the proper taxing authority, Licensee agrees to promptly pay all such Taxes .  The term "**Taxes**" as used herein shall mean all sales, withholding, value-added tax, goods and services tax, use, excise, personal property, ad valorem, stamp, documentary and other taxes, and all other governmental fees, charges and assessments (general or special) due, assessed or levied by any foreign, federal, state, county or local government or taxing authority, and any penalties, fines or interest thereon, which are imposed against, upon or relating to the Material (as defined in Section 4.1) or the use, registration, rental, shipment, transportation, delivery, ownership or operation thereof, and on or relating to the license fee hereunder, but shall not include any taxes solely based upon or measured by the income of TGS.

2.2    Upon delivery to Licensee of requested Data and Interpretations or as otherwise set forth in the Supplement, TGS shall invoice Licensee for the license fee, any services performed in connection therewith and the costs and taxes as described in Section 2.1.  Licensee shall remit payment in of all undisputed amounts to TGS within thirty (30) days after receipt of each invoice.

## 3.    Retention of Originals; Right to Destroy

3.1    To the extent applicable to the specific type of Data licensed, the original field tapes relating to the Data and the original work maps, seismic sections and subsurface correlations relating to the Interpretations will be retained by TGS for as long as it shall deem appropriate and, after TGS has made reasonable efforts to give prior notice to Licensee, may be erased or otherwise destroyed by TGS at any time.

3.2    TGS plans to maintain duplicate sets of unstacked Data at separate locations. Licensee may purchase a copy of such Data on magnetic tape at prevailing prices.  TGS does not guarantee the future availability of such copies.

## 4.    Ownership and Confidential Treatment

4.1    TGS represents, and Licensee acknowledges, that the Data and Interpretations, together with the results of all processing, reprocessing, and redisplay thereof, whether produced

by TGS, by Licensee or by others (regardless of their form or the medium on which they are stored, printed or displayed, the "**Derivatives**"), constitute valuable and highly confidential trade secrets and intellectual property that are not generally available and are the sole property and proprietary information of TGS or the other Owner for whom TGS acts as agent. Title to the Data, Interpretations and Derivatives (collectively, the "**Material**") shall remain in TGS or the other Owner, as the case may be, and Licensee's rights thereto shall be limited to those granted hereby. TGS shall have the right at any time to license any part of the Material to persons or entities other than the Licensee at such prices and on such terms as are determined from time to time by TGS.

4.2 Except as expressly permitted by this Agreement, Licensee agrees (a) to keep strictly confidential, and to take appropriate steps to insure that its employees and agents keep strictly confidential, the Material and (b) not to Show, allow the Use of or Deliver (as such terms are defined, respectively, in Sections 6.5, 6.6 and 6.7 below) the Material to any other person.

4.3 Each copy of Material delivered to Licensee or subsequently made by or on behalf of Licensee shall have the following notice printed thereon or attached to it or its container:

> These data are owned by and are trade secrets and intellectual property of TGS or its principal (in either case the "**Data Owner**"). The use of these data is restricted to companies holding a valid use license from Data Owner and is subject to the strict confidentiality requirements of that license. The data may not be disclosed or transferred to, or reviewed or used by, any other party except as expressly authorized by the license. Unauthorized disclosure, use, review, reproduction, reprocessing or transfer of this data to or by a third party is strictly prohibited.

4.4 Notwithstanding the foregoing, the Material may be disclosed to the extent such disclosure is specifically required by law, governmental or court decree, order, rule or regulation, or by any similar legal process. In the event Licensee is required by law, governmental or court decree, order, rule or regulation, or by any similar legal process, to disclose any Material, Licensee shall give TGS prompt notice of such process so that TGS may seek an appropriate protective order. If, in the absence of a protective order, Licensee is nevertheless compelled to disclose Material, Licensee may disclose only that portion of Material that Licensee is advised by written opinion of counsel is legally required to be disclosed in compliance with the relevant process. In the event of such disclosure, Licensee shall give TGS written notice of the Material to be disclosed as far in advance of its disclosure as practicable, and upon TGS's request, Licensee shall use reasonable efforts to obtain assurances that the disclosed Material will be accorded confidential treatment.

## 5. Right of Use by Related Entities

5.1 A "**Related Entity**" of a Licensee means any entity, as of the Effective Date, (a) that owns or controls, directly or indirectly, 100% of the stock, equity interest or economic interest (collectively, the "**Equity**") of the Licensee, (b) 100% of the Equity of which is directly or indirectly owned or controlled by the Licensee, or (c) 100% of the Equity of which is directly or indirectly owned or controlled by an entity that owns or controls, directly or indirectly, 100% of

the Equity of the Licensee. Licensee shall promptly notify TGS in writing of all Related Entities under Sections 5.1 and 5.2.

5.2 An entity formed after the Effective Date as a result of an internal reorganization or restructuring and otherwise meets the definition of Related Entity in Section 5.1 above shall be deemed a Related Entity; provided that any entity formed to accomplish a statutory merger, consolidation, asset sale or purchase, stock sale or purchase or any other transaction with an entity that is not a Related Entity as of the Effective Date shall not be considered a Related Entity.

5.3 Notwithstanding the provisions of Section 4, a Related Entity shall have the same right to Use the Material as Licensee without payment to TGS of an additional license fee and shall be fully bound by the terms of this Agreement and any Supplement hereunder, together with the Licensee, who shall not be released from any of its obligations hereunder but shall remain fully responsible for all Use made of Material by any Related Entity.

5.4 Unless otherwise agreed by TGS, if at any time a third party acquires any interest in a Related Entity, (i) such entity shall no longer be a Related Entity, (ii) any right of such entity to Use Material licensed hereunder shall immediately terminate without any action by TGS, and (iii) such entity shall immediately deliver (and Licensee shall cause the delivery) to Licensee all Material, if any, in its possession.

**6. Disclosure to Consultants, Prospective Partners and Partners**

6.1 Licensee may allow Use of the Material by an independent consultant (a "**Consultant**") hired solely for the purpose of analyzing and interpreting the Material for the exclusive Use of Licensee (but not for the Use or benefit of the Consultant or any other client of the Consultant), provided that such Consultant (a) is advised in writing of the restrictions contained in this Section 6.1, (b) agrees in writing to deliver all copies of such analyses and interpretations to Licensee at the completion of the work for which such Consultant has been retained and (c) agrees in writing to be bound by the confidentiality provisions set forth in Section 4. A Consultant retained by Licensee may summarize, transcribe reproduce or photocopy such Material as is reasonably incidental to the performance of such Consultant's contractual responsibilities.

6.2 Licensee may Show, but shall not allow Use of or Deliver, the Material to a prospective partner in, investor in, lender to, or participant in (each, a "**Prospective Partner**") a partnership, farmout, operating group, joint bidding agreement or similar third party business transaction for the joint exploration and/or development of a particular geographical area or areas covered by the Data or Interpretations (a "**Shared Risk Transaction**") solely for the purpose of allowing such Prospective Partner to evaluate its proposed participation in the Shared Risk Transaction. Notwithstanding anything in this Section 6.2 to the contrary, Licensee shall not Show Material to any Prospective Partner unless such Prospective Partner has agreed in writing to keep the Material confidential.

6.3 If Licensee elects to Participate (as defined in Section 6.8 below) in a Shared Risk Transaction, Licensee shall promptly notify TGS of the identity of each third party, partner or group member with whom Licensee has entered into such Shared Risk Transaction (each, a

"**Partner**"). Licensee shall not Show or allow any Partner to Use, take Delivery of, or, otherwise have possession of Material unless and until such Partner has acquired a license from TGS as described in Section 6.4.

6.4 TGS agrees to grant to each Partner that elects to license the Material a license to Use and take Delivery of Material to the same extent as granted to the Licensee hereunder, subject to the following conditions:

6.4.1 Each such Partner, on its own behalf, must enter into with TGS a Master License Agreement and a Supplement hereunder, or if such Partner has in place with TGS an existing, valid Master License Agreement , a Supplement under such existing Master License Agreement, in either case with respect to the Material.

6.4.2 Each such Partner must pay (or the Licensee must pay with respect to each such Partner) to TGS a license fee in accordance with TGS's current price and discount schedule at the time such license is sought to be obtained. Notwithstanding the foregoing, if such Partner has previously licensed the Material from TGS pursuant to a separate license agreement with TGS, no license fee shall be payable by that Partner to TGS under this section.

6.5 "**Show**" means to give passive access to, or permit to be viewed by, a person, for limited periods of time not to exceed eight (8) hours in the aggregate, those portions of the Material that are related to the specific geographical areas that are the subject of the consultation or the Shared Risk Transaction; provided, however, that a Licensee who Shows Material shall:

(a) prevent (i) any summarizing, transcribing, reproducing or photocopying of such Material by the person to whom the Material is Shown and (ii) the person's departing from Licensee's premises with any Material or any summary or description thereof, or any other knowledge thereof that is comparable to having a copy of such Material;

(b) prevent the operation of any computer workstation on which Material is displayed by the person to whom the Material is Shown; and

(c) prevent any alteration or generation of displays, interpretations or processings of Material by the person to whom the Material is Shown.

6.6 "**Use**" means to have or be permitted access to Material in a manner that allows a person to alter, or generate displays, interpretations or processings of, the Material.

6.7 "**Deliver**" means to give or permit access, or actual or constructive possession of Material to any extent equal to or greater than that contemplated by the definitions of Show and Use in Sections 6.5 and 6.6, respectively, including any physical transfer or electronic or other transmission of Material on or through any media or by any means whatsoever.

6.8 "**Participate**" means to agree contractually to jointly explore, lease and/or develop areas of interest, but does not include any agreement to join together primarily to license seismic, petrophysical, geological, or well log data for individual use.

**7. Transfers; Acquisitions**

7.1 Except as otherwise expressly provided by this Agreement or any Supplement, Licensee shall not transfer this Agreement, any Supplement hereunder, or any of its rights and obligations under this Agreement or any Supplement, including, without limitation, the license granted to Licensee or the rights of Use of the Material or any part thereof, whether by sale, assignment, sublicense, trade, lien, pledge, hypothecation or any other disposition or transfer, whether voluntary, by operation of law or by any other method.

7.2 Unless Licensee has obtained the prior written consent of TGS, this Agreement, the Supplements hereunder and any rights to Use the Materials shall automatically terminate at the time that a person (or a group of persons acting in concert) (an "**Acquiror**") acquires, directly or indirectly, (i) all or substantially all of the assets of Licensee or (ii) Ownership or Control of Licensee, whether accomplished voluntarily or by operation of law, by statutory merger, consolidation or share exchange, by stock or asset sale or purchase, or by any other transaction method (the events in clause (i) or (ii), an "**Acquisition**"). "**Ownership**" means direct or indirect rights in, or legal title to, greater than fifty percent (50%) of (i) outstanding common stock or other voting securities, (ii) equity interest, (iii) economic interest, (iv) voting power, (v) management or (vi) interest in the profits. "**Control**" means the ability to, directly or indirectly, direct, manage or dictate the actions of, or determine the management of, the entity in question by any method, including, without limitation, by the election of members of the board of directors or other governing body of such entity, by having the ability to exercise control over a majority number of members of such governing body or through the Ownership of, or the exercise of voting or consensual right with respect to, the common stock, voting securities or other interest held in such entity. In requesting such consent, Licensee shall provide notice satisfactory to TGS of all relevant facts concerning such transaction. The above provisions shall not apply to ordinary public trading of the voting securities of Licensee in which the ownership of such securities changes over time in the normal course of business, unless one unrelated party (or group of unrelated parties) acquires Ownership or Control of Licensee, in which event, the provisions of Section 7.2 will apply.

7.3 TGS shall not withhold its consent unreasonably in the case of an Acquisition if the Licensee and/or Acquiror pay to TGS a fee in an amount equal to 20% of the undiscounted list price of the Material that is licensed from TGS by Licensee as of the date of the Acquisition. In addition, at the option of TGS, Acquiror may be required to execute a new license agreement or a confirmation of this Agreement.

**8. Temporary Possession by Reprocessors**

0.1 Licensee may temporarily transfer possession of Data to a data processor for the purpose of reformatting or reprocessing such Data for the exclusive Use and benefit of Licensee; provided that such data processor agrees in writing to maintain the Data in strict confidence and,

upon completion of the work for which it has been engaged, to return to Licensee the Data, all copies thereof and all reprocessed Data.

0.2 All reprocessed Data shall be marked with the notice set forth in Section 4.3 hereof.

**9. Termination of License**

9.1 This Agreement and the Supplements hereunder, including the rights and benefits hereunder and thereunder, shall terminate:

9.1.1 immediately if Licensee breaches any provision of this Agreement or any Supplement relating to the ownership, Use, disclosure or transfer of Material;

9.1.2 immediately as set forth in Section 7.2;

9.1.3 upon 10 days' written notice if Licensee breaches any provision of this Agreement or any Supplement not relating to the ownership, Use, disclosure or transfer of Material and fails to remedy such breach within the 10 days following receipt of notice;

9.1.4 upon 10 days' written notice of termination by either party to the other; provided that any payment obligations for Data and Interpretations previously ordered shall have been satisfied, in which case the Data and Interpretations so paid for may be retained until expiration of the period set forth in Section 9.1.7 below; or

9.1.5 immediately if Licensee (a) is dissolved, adjudicated as bankrupt, or becomes subject to an order for relief under any bankruptcy law, (b) admits in writing its inability to pay its debts generally as they become due, (c) applies for, seeks, consents to, or acquiesces in the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for itself or any substantial part of its property; (d) institutes any proceedings seeking an order for relief or to adjudicate it as bankrupt or insolvent, or seeks dissolution, winding up, liquidation, or reorganization of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors; or (e) takes any action to authorize or effect any of the foregoing actions;

9.1.6 immediately if, without the application, approval or consent of Licensee, a receiver, trustee, examiner, liquidator or similar official shall be appointed for Licensee, or any part of its property, or a proceeding described in subsection 9.1.5(d) is instituted against Licensee and such appointment shall continue with discharge or such proceeding shall continue without dismissal or stay for a period of ninety (90) consecutive days or Licensee shall fail to file in a timely manner, an answer or other pleading denying the material allegations filed against it in any such proceeding;

9.1.7 with respect to each item of Data and Interpretations delivered to Licensee pursuant to this Agreement and any Supplement, upon the later to occur of 25 years after such delivery or Licensee's receipt of written notice of termination from TGS; or

9.1.8    immediately as set forth in sections 11.2 and 13.6.

9.2    Except as provided in Section 9.1.4 hereof, upon termination of this Agreement, at TGS's option, Licensee shall either (a) return to TGS, or (b) destroy, all Material in its possession. Licensee shall (and shall ensure that all of its Related Entities) retain no copies thereof (in whatever form or medium stored, printed or displayed, including electronic and physical copies), and, if TGS opts to have the Material destroyed, shall provide evidence satisfactory to TGS of such destruction.

9.3    All provisions of this Agreement relating to the confidentiality of or restrictions on the Use, transfer and disclosure of Material shall survive any termination of the Agreement. Termination shall not affect the right of TGS to collect any outstanding payment obligations owed by Licensee.

## 10.    Limited Warranties

10.1    As of the date of the each Supplement, TGS warrants that it has full power and authority to grant the license granted to Licensee under such Supplement.

10.2    TGS agrees to hold Licensee harmless from any claims, actions or damages that may be asserted against Licensee by any unrelated parties and arise out of the acquisition and processing of the Data by TGS.

10.3    The Material licensed to Licensee under each Supplement is, to the best knowledge, information and belief of TGS, accurately prepared in accordance with accepted practices of the geophysical profession.    EXCEPT AS STATED HEREIN, TGS MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR DESCRIPTION WITH RESPECT TO THE MATERIAL, INCLUDING ANY WARRANTY REGARDING THE MERCHANTABILITY, QUALITY OR RELIABILITY OF THE MATERIAL OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. TGS assumes no liability for reliance by Licensee or others on the Material, nor for failure of Licensee, any Partner or any other person or entity to locate or extract any oil, gas, or other hydrocarbons or materials based in whole or part upon reliance on the Material. Any action Licensee may take based on the Material shall be taken at its own risk and expense, and Licensee shall have no claim against TGS as a consequence thereof. Licensee agrees to hold TGS harmless from any claims, actions or damages that may be asserted against TGS arising out of any action taken, or decision or expenditure made, resulting from the Use of the Material.

10.4    Licensee's sole and exclusive remedy for any claim under this Agreement and any Supplement hereunder shall be limited to repayment of the license fee by TGS in exchange for return of the Material by Licensee. No special, consequential or other damages shall be available to Licensee or TGS. Notwithstanding the foregoing, TGS and Licensee agree that any damages related to TGS's lost revenues from Licensee's breach of the use or disclosure provisions of this Agreement shall be considered direct damages.

## 11.    Export/Import Compliance

11.1 Licensee represents and warrants that it will comply with all applicable laws and regulations pertaining to export/import controls and economic sanctions. Without limiting the foregoing, Licensee shall not (a) in contravention of export/import controls and economic sanctions, directly or indirectly export, re-export, transship, or otherwise deliver any goods, services, or technology to a country, entity or person against whom economic sanctions or trade embargoes have been imposed; or (b) broker, finance, or otherwise facilitate any transaction in violation of any applicable economic sanctions law.

11.2 Licensee represents and warrants that neither Licensee, nor any of its Related Entities, Consultants, Partners, or Prospective Partners, do not intend to, and will not, share the Data with any entity or individual that is the target of, owned or subject to control by any country, institution, organization, entity or person that is the target of, economic sanctions or trade restrictions imposed by the United States, Norway, or European Union. Licensee agrees to provide Licensor with immediate notice of the names and addresses of any member of the foregoing that is the target of, or owned or subject to control by any country, institution, organization, entity or person that is the target of, economic sanctions and trade restrictions imposed by the United States, Norway, or European Union.

11.2 If Licensee breaches any of the covenants set forth in this Section 11, then this Agreement shall become void, Licensor may in its sole discretion rescind this Agreement and all related Supplements, all obligations by Licensor shall immediately cease, and Licensee shall immediately return to Licensor all licensed Data. Furthermore, Licensee agrees to indemnify and hold Licensor harmless with respect to any and all claims, demands, causes of action, judgments, damages, losses, fines, penalties and liabilities of every kind and character (including costs, fees, and reasonable attorneys' fees incurred by Licensor) arising or resulting from breach of these representations and warranties by Licensee.

**12. Notices**

All notices hereunder must be in writing and will be deemed to have been duly given upon receipt of hand delivery; certified or registered mail, return receipt requested; recognized courier service or telecopy transmission with confirmation of receipt:

(a) If to TGS:

TGS-NOPEC Geophysical Company ASA
c/o TGS-NOPEC Geophysical Company
10451 Clay Road
Houston, Texas 77041
Attn: Linda Santiago
Telecopy No: (713) 334-3308

With a copy to:

Attention: General Counsel
10451 Clay Road
Houston, Texas 77041

(b) If to Licensee:

COX Operating, LLC
Address: 1615 Poydras, Suite 830

City/State/Zip: New Orleans, LA. 70112

Attn: Jeff Wallace (Procurement Director)

Telecopy No: (504) 267-9139

Such names and addresses may be changed by written notice to each person listed above.

**13. Miscellaneous**

13.1 If TGS shall consent to the disclosure or transfer of Material or any part thereof pursuant to this Agreement or any Supplement hereunder, such consent shall not be deemed a waiver by TGS with respect to its right to object to any other disclosure or transfer of Material or any part thereof.

13.2 Except as specifically permitted herein, this Agreement and any Supplement hereunder shall not be assignable or transferable by Licensee or TGS, whether by contract, operation of law or otherwise, without TGS's or Licensee's prior written consent (one to the other respectively). Notwithstanding the foregoing, either party may assign or transfer this Agreement to a wholly-owned affiliate without prior written consent of the other party.

13.3 The failure of either party to enforce or insist upon compliance with any of the terms or conditions of this Agreement or any Supplement hereunder, the waiver of any term or condition of this Agreement or any Supplement hereunder, or the granting of an extension of time for performance, shall not constitute the permanent waiver of any term or condition of this Agreement or any Supplement hereunder, and this Agreement and the Supplements and each of its and their provisions shall remain at all times in full force and effect until modified by the Parties in writing.

13.4 In the event any one or more of the provisions of this Agreement or any Supplement hereunder shall for any reason be held to be invalid or unenforceable, the remaining provisions of this Agreement and the Supplements hereunder shall be unimpaired, and shall remain in effect and be binding upon the parties.

13.5 This Agreement together with the Supplements issued hereunder represent the entire agreement between the parties in relation to the subject matter hereof. No modification or

amendment of this Agreement or any Supplement shall be valid and binding on the parties hereto unless set forth in writing and signed by the parties.

13.6    In the event laws enacted after execution of this Agreement make performance of this Agreement in whole or in part illegal, the parties shall at that time make good faith efforts to amend the Agreement so as to conform to the then-current laws.  In the event that the parties, despite their good faith efforts, are unable to amend the Agreement, this Agreement shall be terminated, Licensee shall return the Material to TGS and TGS shall refund to Licensee all monies paid to date for the returned Material.

13.7    This Agreement and the Supplements hereunder shall be governed by the laws of the State of Texas.

**[SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement the day and year first above written.

**TGS-NOPEC GEOPHYSICAL COMPANY ASA**

By: DocuSigned by: 5EE809F9D924405...

Name: Fredrik Amundsen

Title: Sr. VP, Europe and Asia Pacific

**LICENSEE: COX OPERATING, LLC**

By:____________________

Name: Craig L. Sanders

Title: CEO